REDACTED

Dale M. Cendali
Johanna Schmitt
Joshua L. Simmons
Brian Leary
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
joshua.simmons@kirkland.com
brian.leary@kirkland.com

*Attorneys for Plaintiff Fox News Network, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FOX NEWS NETWORK, LLC, | Case No.  1:13-cv-05315-AKH |
| Plaintiff, | ECF Case |
| - against - | |
| TVEYES INC., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**<u>FOX NEWS NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND .....................................................................................5

    I.     FOX NEWS .............................................................................................5

          A.    Fox News' Channels ...........................................................5

          B.    Fox News' Significant Investment in Newsgathering and Reporting..........................................................................10

          C.    Fox News' Digital Businesses ..............................................13

          D.    Fox News' Exclusive Licensing Agent....................................15

          E.    Fox News' Monetization of its Video Content and News Reports............16

          F.    Fox News' Copyrights in Its Programs....................................17

    II.    TVEYES ...............................................................................................17

          A.    TVEyes' Media Clipping Service...........................................17

          B.    TVEyes' For-Profit Business Model ......................................22

          C.    TVEyes' Licenses with Content Owners Other Than Fox News .............23

          D.    TVEyes' Refusal to Stop Using Fox News' Content without a License ...............................................................................23

ARGUMENT ...........................................................................................................24

    I.     LEGAL STANDARD..............................................................................24

    II.    TVEYES IS LIABLE FOR COPYRIGHT INFRINGEMENT............................25

          A.    TVEyes Wilfully Has Infringed the Registered Works .............................25

          B.    TVEyes' Cannot Meet its Burden of Establishing that its Copying of Fox News' Content is Fair Use...............................................26

    III.   TVEYES IS LIABLE FOR HOT NEWS MISAPPROPRIATION .....................44

          A.    Fox News Generates Information at Significant Cost and Expense ..........45

          B.    The Value of Fox News' Information is Time Sensitive When Copied by TVEyes.....................................................46

          C.    TVEyes Free-Rides on Fox News' Information Gathering Efforts...........46

          D.    TVEyes' Services Directly Compete with Fox News' Services...............48

          E.    TVEyes' Free-Riding Reduces Fox News' Incentives to Produce News ...............................................................................49

IV.    TVEYES IS LIABLE FOR MISAPPROPRIATION ............................................51

    A.    TVEyes Has Misappropriated the Results of Fox News' Labor, Skill and Expenditures in Competition with Fox News and Has Deceived Consumers ...................................................................51

    B.    TVEyes' Preemption Defense Fails.........................................................55

**CONCLUSION** .............................................................................................................**56**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Broadcasting Cos. v. Aereo, Inc.*,
  No. 13-461, 2014 WL 2864485 (U.S. June 25, 2014) ............................................. 26

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ..................................................................................... 32

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
  931 F. Supp. 2d 537 (S.D.N.Y. 2013) ............................................................... passim

*Authors Guild, Inc. v. Google Inc*,
  954 F. Supp. 2d 282 (S.D.N.Y. 2013) ..................................................................... 31

*Authors Guild, Inc. v. HathiTrust*,
  No. 12-4547, 2014 WL 2576342 (2d Cir. June 10, 2014) ...................................... 32

*BanxCorp v. Costco Wholesale Corp.*,
  723 F. Supp. 2d 596 (S.D.N.Y. 2010) ................................................ 46, 47, 48, 49

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011) ............................................................................. 45, 47

*Board of Trade v. Christie Grain & Stock Co.*,
  198 U.S. 236 (1905) ................................................................................................ 47

*Bond Buyer v. Dealers Digest Publ'g Co.*,
  267 N.Y.S.2d 944 (N.Y. App. Div. 1966).............................................................. 48

*Cablevision Sys. Dev. Co. v. MPAA*,
  836 F.2d 599 (D.C. Cir. 1988) ............................................................................... 37

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ......................................................................................... passim

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 25

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  973 N.E.2d 390 (Ill. App. Ct. 2012)....................................................................... 50

*Davis v. Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) ............................................................................. passim

*Demetriades v. Kaufmann*,
  698 F. Supp. 521 (S.D.N.Y. 1988) ......................................................................... 55

*Dior v. Milton*,
  155 N.Y.S.2d 443 (N.Y. Sup. 1956) ...................................................................... 54

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ................................................................................................ 43

*Electrolux Corp. v. Val-Worth, Inc.*,
  6 N.Y.2d 556 (1959) ............................................................................................... 52

*Eyal R.D. Corp. v. Jewelex New York Ltd.,*
  784 F. Supp. 2d 441 (S.D.N.Y. 2011) ........................................................... 53

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.,*
  751 F.2d 501 (2d Cir. 1984) ........................................................................ 28

*Forest Park Pictures v. Universal Television Network, Inc.,*
  683 F.3d 424 (2d Cir. 2012) ........................................................................ 55

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
  No. 96 Civ. 1103, 1996 WL 724734 (S.D.N.Y. Dec. 17, 1996) ............................ 56

*Georgia Malone & Co. v. Rieder,*
  19 N.Y.3d 511 (2012) ................................................................................ 51

*Golan v. Holder,*
  132 S. Ct. 872 (2012) ................................................................................ 43

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.,*
  879 F.2d 1005 (2d Cir. 1989) ...................................................................... 51

*Hall v. Bed Bath & Beyond, Inc.,*
  705 F.3d 1357 (Fed. Cir. 2013) ......................................................... 51, 52, 53

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) ........................................................................... passim

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998) ................................................................. passim

*Int'l News Serv. v. Associated Press,*
  248 U.S. 215 (1918) .................................................................. 44, 45, 46, 47

*Int'l Sec. Exch., LLC v. S & P Dow Jones Indices, LLC,*
  No. 06 Civ. 12878, 2013 WL 6653687 (S.D.N.Y. Dec. 17, 2013) ......................... 50

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.,*
  621 F.2d 57 (2d Cir. 1980) ......................................................................... 34

*LinkCo, Inc. v. Fujitsu Ltd.,*
  230 F. Supp. 2d 492 (S.D.N.Y. 2002) ............................................................. 52

*Los Angeles News Service v. Reuters Television Int'l, Ltd.,*
  149 F.3d 987 (9th Cir. 1998) .............................................................. 27, 31, 33

*Los Angeles News Service v. Tullo,*
  973 F.2d 791 (9th Cir. 1992) .................................................................. 27, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) .................................................................................. 25

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005) .................................................................................. 43

*Microban Prods. Co. v. API Indus., Inc.,*
  No. 14 Civ. 41, 2014 WL 1856471 (S.D.N.Y. May 8, 2014) ............................... 55

*Miller v. Schloss,*
218 N.Y. 400 (1916) ............................................................................................. 51

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
105 F.3d 841 (2d Cir. 1997) ................................................................. 44, 47, 48, 50

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,*
166 F.3d 65 (2d Cir. 1999) ........................................................................... 27, 32

*Pacific and Southern Co. v. Duncan,*
744 F.2d 1490 (11th Cir. 1984) .................................................................... 27, 31

*Pollstar v. Gigmania Ltd.,*
No. 00 Civ. 5671, 2000 WL 34016436 (E.D. Cal. Sep. 1, 2000) ...................... 47, 50

*Ringgold v. Black Entm't Television, Inc.,*
126 F.3d 70 (2d Cir. 1997) ................................................................... 31, 33, 42

*Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler, M.D., LLC,*
905 N.Y.S.2d 232 (N.Y. App. 2010) ..................................................................... 53

*Rogers v. Koons,*
960 F.2d 301 (2d Cir. 1992) ................................................................................ 29

*Roy Exp. Co. v. Columbia Broad. Sys. Inc.,*
503 F. Supp. 1137 (S.D.N.Y. 1980) ................................................................ 30, 54

*Roy Exp. Co. v. Columbia Broad. Sys. Inc.,*
672 F.2d 1095 (2d Cir. 1982) ...................................................................... 30, 51, 52

*Salinger v. Colting,*
641 F. Supp. 2d 250 (S.D.N.Y. 2009) ................................................................... 42

*Samara Bros. Inc. v. Wal-Mart Stores,*
165 F.3d 120 (2d Cir. 1998) ................................................................................ 56

*Scholz Design, Inc. v. Sard Custom Homes, LLC,*
691 F.3d 182 (2d Cir. 2012) ................................................................................ 26

*Sokol Holdings, Inc. v. BMB Munai, Inc.,*
726 F. Supp. 2d 291 (S.D.N.Y. 2010) ................................................................... 52

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
464 U.S. 417 (1984) ........................................................................................... 28

*Standard & Poor's Corp. v. Commodity Exchange, Inc.,*
683 F.2d 704 (2d Cir. 1982) ..................................................................... 49, 52, 53, 56

*Triboro Quilt Mfg. Corp. v. Luve LLC,*
No. 10 Civ. 3604, 2014 WL 1508606 (S.D.N.Y. Mar. 18, 2014) .......................... 55

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.,*
338 F.3d 127 (2d Cir. 2003) ................................................................................ 25

*Twentieth Century Sporting Club, Inc. v. Transradio Press Service, Inc.,*
300 N.Y.S. 159 (N.Y. Sup. 1937) ................................................................... 48, 49

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ............................................................... 37

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................... 26, 29, 32, 44

*United States v. ASCAP*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) ........................................ passim

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003) ............................................................... 27

*Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*,
   No. 04 Civ. 5332, 2005 WL 2875327 (S.D.N.Y. Nov. 2, 2005) .............................. 40

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*,
   558 F.2d 91 (2d Cir. 1977) .......................................................... 28, 36

*Warner Bros. Entm't Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................. 42

*Weissmann v. Freeman*,
   868 F.2d 1313 (2d Cir. 1989) .................................................. 29, 34, 35

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) ........................................................ passim

**Statutes**

17 U.S.C. § 102(b) ........................................................................... 55

17 U.S.C. § 107 ......................................................................... passim

17 U.S.C. § 410(c) ........................................................................... 25

**Other Authorities**

NIMMER ON COPYRIGHT § 1.01 ................................................. 55, 56

NIMMER ON COPYRIGHT § 13.05[A][4] ............................................ 40

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................ 24

## PRELIMINARY STATEMENT

Through this lawsuit, Fox News Network, LLC ("Fox News") seeks to stop the significant, irreparable harm caused by TVEyes, Inc.'s ("TVEyes") parasitic practice of copying all of Fox News' propriety content as it airs, 24 hours a day, seven days a week, and redistributing that content for a fee to TVEyes' subscribers in "real-time" to watch, download, and edit video clips as they wish.

Fox News owns and operates two premier news channels: Fox News Channel ("FNC") and Fox Business Network ("FBN").  Unlike traditional broadcast television networks that make their content available for free over-the-air and are supported primarily by advertising revenue, Fox News distributes its two channels to viewers who pay for television subscriptions.  Fox News has premised its whole business on earning revenue from cable, satellite and other multichannel video programming distributors (Fox News' "affiliates") who offer Fox News' channels to subscribers.  This revenue is key to the financial resources Fox News needs to provide continuously updated news reports and programming, 24 hours a day, seven days a week.

Fox News has invested considerable skill, labor and money in both of its channels in order to provide high-quality, award-winning news and information programming to its viewers.  These investments include ██████████████████████ to hire and train journalists and other professionals, operate television studios and news bureaus around the world, and acquire and maintain high-tech newsgathering and reporting equipment.  As a result, Fox News is able to create highly rated television programs that reflect numerous expressive choices (such as the selection of talent, camera angles, scripts, set dressings, music, and graphics), efficiently disseminate the latest news as events unfold around the world, and carefully construct a distribution system that enables Fox News to disseminate the news to viewers quickly.

Without making any similar investments, TVEyes pilfers the results of Fox News' efforts for its own pecuniary benefit without any authorization from or compensation to Fox News. TVEyes refers to itself as a "TV news clipping service," which copies all of Fox News' content and offers it to its customers in exchange for subscription fees.  Almost ███████ video clips of Fox News' content have been played and over █████ Fox News clips have been downloaded using TVEyes.  As emphasized in its marketing materials, TVEyes enables its subscribers to "watch live TV, 24/7" and "monitor Breaking News" without any blackouts.  Further, TVEyes markets its service as a way for subscribers to "download unlimited clips" of Fox News' content in "high-definition," which can then be edited, archived, and shared with others.  Video clips of consecutive segments even can be downloaded and combined to comprise an entire television show.

TVEyes' entire business is based on a callous disregard for the rights of others.  TVEyes has access to and records content from FNC, FBN, and other channels through subscriptions with cable providers, in the same way that other consumers subscribe to cable television.  These cable providers expressly prohibit "copying, redistribution, reselling, bundling or publication" of television content.  TVEyes, however, wholly ignores these provisions by recording all of Fox News' television content and that of other content owners anyway, and by redistributing it to TVEyes' thousands of subscribers for a fee.

In tacit admission that it needs permission from content owners to operate its service lawfully, TVEyes has entered into licenses with certain content owners pursuant to which it pays for the right to copy and use their content.  TVEyes even stopped using content from ████████ TV when ██████████████████ so demanded, and did not start using it again until the parties nearly had finalized a license.

- 2 -

In contrast to ███████ when Fox News rejected TVEyes' request for a license and demanded that TVEyes stop using its television content, TVEyes misled Fox News by repeatedly representing that it would stop, but in fact it never did.  This bad faith, differential treatment of Fox News is explained by the commercial importance of Fox News' television content to TVEyes' business.  TVEyes knows that its subscribers specifically pay for its service in part to access Fox News' content.   In fact, Fox News' channels are among TVEyes' most viewed and downloaded, and TVEyes' salespeople have dubbed them "high priority" or "must have" channels.

TVEyes' service interferes with Fox News' own distribution and monetization of its television content.   By enabling its subscribers to watch FNC and FBN, TVEyes diverts viewers away from Fox News' channels, relieving them of the need to pay for a separate cable or satellite subscription.  Also, when viewers watch through TVEyes, they are not counted in Fox News' ratings, which are a key factor in determining the amount of revenue Fox News earns from its affiliate agreements and advertising.

In addition to its channels, Fox News operates websites on which it continuously posts video clips from its television programs throughout the day.  Fox News earns revenue from companies that pay to have online advertising included on Fox News' websites, including pre-roll ads shown before the video clips and banner ads displayed next to them.  By making clips of Fox News' programs available on its own website in real time, TVEyes diverts viewers away from Fox News' websites.  This diversion diminishes Fox News' online advertising revenues and undermines Fox News' use of its websites to promote and increase viewership for its television programs.  Also, by allowing its subscribers to download and use unlimited, high-definition clips without any restrictions, TVEyes directly competes with Fox News' own clip licensing business.

Given that TVEyes copies and redistributes all of Fox News' television content to TVEyes' subscribers in real time, permits unlimited video clip downloads, and refused to stop using Fox News' content even after representing that it would do so, Fox News had no choice but to file this lawsuit asserting claims against TVEyes for (1) copyright infringement, (2) hot news misappropriation, and (3) common law misappropriation.  As discussed below, Fox News has established each claim.

First, TVEyes is liable for copyright infringement.  As TVEyes admits, Fox News owns copyright registrations covering nineteen television programs.  TVEyes has copied each program in its entirety without any blackouts.  Further, TVEyes' wholesale reproduction does not constitute fair use.  It is well-established in the Second Circuit (as well as other Circuits) that fair use does not immunize media clipping services like TVEyes, because their commercial and verbatim copying and distribution of copyrighted content is not transformative and harms the actual and potential markets for such material.  Moreover, while TVEyes itself already causes significant harm, Fox News' business would be decimated if this type of unlicensed use was deemed permissible and became widespread.

Second, TVEyes is liable for hot news misappropriation under New York law.  Fox News invests considerable resources to gather and report news around the world.  TVEyes is the quintessential "free rider."  Without making the same investments or compensating Fox News at all, TVEyes copies this breaking news wholesale and redistributes it to paying subscribers in "real time," as emphasized in its marketing materials.  TVEyes even describes its service as a way to "monitor[] Breaking News," and highlights the fact that it includes Fox News' channels.  TVEyes also supplants Fox News as the provider of video clips of its own content, by making clips available on its service before Fox News has posted them to its own website.  Thus,

TVEyes directly competes with Fox News' breaking news distribution, and serves as a substitute for Fox News' cable channels and website.  As a result, it reduces Fox News' incentives to produce the news.

Third, Fox News has established its claim for common law misappropriation.  TVEyes directly competes with Fox News by misappropriating the results of Fox News' labor, skill and expenditures—namely, the distribution system Fox News carefully has negotiated with its affiliates.  In addition, TVEyes has misled the public to believe that its service is authorized by Fox News and other copyright owners.  Moreover, TVEyes has been enriched by its bad faith conduct at Fox News' expense.  This claim is not preempted by the Copyright Act because it involves a system that is not protected by copyright law and the extra element of deception.

Accordingly, as discussed in detail below, given the well-settled law of this Circuit and the undisputed facts in this case, summary judgment for Fox News on each claim is appropriate and the most expeditious and cost-effective means of resolving this case.  Thus, Fox News respectfully requests that the Court grant summary judgment for Fox News on all three of its claims and dismiss TVEyes' remaining affirmative defenses.[1]

## FACTUAL BACKGROUND

### I.    FOX NEWS

#### A.    Fox News' Channels

Fox News is an international television news organization headquartered in New York City.  Fox News' Rule 56.1 Statement of Undisputed Facts ("FX SUF") ¶ 1.  It produces up-to-the-minute news reports, with extensive commentary and analysis, and creative prime-time

---

[1]    TVEyes only has three remaining affirmative defenses: (1) fair use, (2) preemption, and (3) failure to state a claim.  On April 7, 2014, the Court struck all of its other defenses from TVEyes' Answer.  Simmons Decl. Ex. 71 (Discovery Hr'g Tr. 22:10–12, Apr. 4, 2014 ("So what we have [left] here is: First defense, failure to state a claim; the third defense, fair use; and the eighteenth defense, preemption of the state claims.")).

programming.  *Id.* ¶¶ 2–3.  It owns and operates two television news channels, on which its news

and information programming are aired: FNC and FBN.  *Id.* ¶¶ 4, 12, 55.

       1.    <u>Fox News Channel</u>

FNC is an all-encompassing news channel that is dedicated to delivering breaking news,

as well as political and business news and information.  *Id.* ¶ 12.  As explained by Timothy

Carry, Fox News' Executive Vice President of Affiliate Sales, the decision to launch FNC was

considered very risky.  *Id.* ¶ 14.  There was significant speculation as to whether the market

could support another news channel, and numerous commentators suggested FNC would fail.  *Id.*

¶¶ 15–16.  Since its launch in 1996, however, FNC has become the most watched news channel

in the United States for more than eleven years.  *Id.* ¶¶ 13, 17.  It is available in more than 90

million homes.  *Id.* ¶ 18.

FNC airs news and information programming 24 hours a day, seven days a week.  *Id.* ¶

19.  As described by Jay Wallace, Fox News' Senior Vice President and Senior Executive

Producer of News and Politics, this 24-hour news cycle requires extensive planning, investment,

and creativity.  *Id.* ¶ 21.  Newsworthy stories continuously break around the clock, and each

potential story requires immediate evaluation to determine whether, how, and when to cover it.

*Id.* ¶¶ 22, 23.  Even a relatively simple story that might be covered in a two-minute segment[2]

requires decisions about, among other things, the point of view to take; whether to interview

witnesses, consultants, or experts; and what on-screen graphics to include to ensure that FNC

viewers receive timely, thorough and accurate coverage.  *Id.* ¶¶ 6, 11, 24–27.  Examples of the

creative graphic choices incorporated into just one of Fox News' television programs include the

---

[2]    While the length of an average news segment is two minutes, a story can be much shorter or sometimes longer (e.g., three to five minutes for an interview segment).  FX SUF ¶¶ 6–8.

following:

  

**Screenshots from July 3, 2013 episode of *The O'Reilly Factor***
Declaration of Jay Wallace, dated June 26, 2014, ("Wallace Decl.") Ex. 38.

Further, news that is covered repeatedly throughout the day requires the production of multiple two-minute segments, each offering a fresh take on the latest developments.  FX SUF ¶¶ 10, 28. These decisions continue throughout the news day as new stories break and as additional developments occur relating to earlier stories.  *Id.* ¶ 29.

Whereas traditional over-the-air broadcast networks, which are supported primarily by ad revenue, only air news at limited times during the day, Fox News gathers and reports the latest news every hour of every day of the year.  *Id.* ¶¶ 2, 20; Wallace Decl. ¶ 12.  To facilitate this constant news reporting, Fox News created the first text news ticker, which appears along the lower edge of the screen and delivers the latest updates.  FX SUF ¶ 30.

In addition, to meet viewers' expectations of continuous updates on the day's news, FNC has developed a full schedule of original daytime, prime-time, overnight, and weekend programming.  *Id.* ¶ 31.  FNC begins its news day at 5:00 a.m. by offering an analysis of the previous day's top stories and continues to update and report the news throughout the day.  *Id.* ¶ 32.  FNC's current daytime programs include *Fox and Friends*, *America's Newsroom*, *Happening Now*, *Outnumbered*, *The Real Story with Gretchen Carlson,* and *Your World with*

*Neil Cavuto*, and *The Five*.[3]  *Id.* ¶ 33.  It also includes the program *Shepard Smith Reporting,*
which airs daily at 3:00 p.m. and throughout the day when major news stories occur.  As
depicted below, Mr. Smith delivers fast-paced reporting on the day's top stories from FNC's
specially designed "Fox News Deck" studio, from which Mr. Smith can pull the latest updates to
provide viewers with the most up-to-date reporting on the most important stories.

  

**Images of Shepard Smith in the Fox News Deck**
Declaration of Sharri Berg, dated June 26, 2014, Ex. 14

In the evening, FNC produces prime-time programs that offer analysis of the day's news
by top commentators as well as continued news reporting and interviews to provide viewers a
full and up-to-date understanding of the most important stories.  FNC's prime-time programs
include the following:

- *The O'Reilly Factor*, a news and talk show hosted by Bill O'Reilly, has been the
  highest rated cable news show for more than ten consecutive years.  FX SUF ¶¶ 40–
  41.  It has won two BMI Cable Awards and has been nominated for the Television
  Critics Association Award for Outstanding Achievement in News and Information.
  *Id.* ¶ 42.

- *Hannity* is hosted by Sean Hannity, who is considered one of the most prominent and
  influential conservative voices in the country.  *Id.* ¶ 43.  This program offers a mix of
  news, commentary, interviews and branded segments, such as the "Great American
  Panel," which is made up of three nightly in-studio guests from across the political
  spectrum who discuss various issues.  *Id.* ¶ 44.

---

[3]   *The Five* is a talk show featuring various personalities and guests who discuss current political issues and pop
culture.  FX SUF ¶ 34.  It features a rotating panel of hosts, including Andrea Tantaros, Bob Beckel, Dana
Perino, Eric Bolling, Greg Gutfield, Juan Williams and Kimberly Guilfoyle.  *Id.*

- *On the Record with Greta Van Susteren* is a news and interview program hosted by Greta Van Susteren. *Id.* ¶ 45. Ms. Susteren has conducted numerous high-profile interviews on this program, including interviews of former Presidents George H. W. Bush, Bill Clinton and George W. Bush. *Id.* ¶ 46. This program has been the highest rated cable news program in its timeslot. *Id.* ¶ 47.

- *Special Report with Bret Baier* is anchored by Washington news veteran Bret Baier. This program provides in-depth analysis of news and political issues. *Id.* ¶ 48. It has been the number one news program on cable in its time slot. *Id.* ¶ 49.

FNC continues to report on major ongoing stories throughout the night, and airs *Red Eye with Greg Gutfeld* at 3:00 a.m. *Id.* ¶ 50.

On the weekends, FNC has a full schedule of news and information programming, including *Fox and Friends Weekend, America's News Headquarters, The Journal Editorial Report, Fox Report, Huckabee, Fox News Sunday with Chris Wallace*, and *Media Buzz. Id.* ¶ 51.

Each episode of the foregoing programs is separately written, produced, and directed by Fox News. *Id.* ¶ 52. These programs are very valuable to Fox News and are watched weekly by millions of viewers. *Id.* ¶¶ 53–54.

2.     Fox Business Network

FBN is a financial news channel that provides real-time information and reports on financial and business news that impacts both Main Street and Wall Street. *Id.* ¶ 55. Although a relatively new network, FBN's viewership has increased significantly over the past few years and is expected to continue growing. *Id.* ¶¶ 56–57. FBN is distributed to more than 70 million cables subscribers across the United States. *Id.* ¶ 58.

FBN also delivers a full schedule of original programming, which offers the latest insights, interviews, and breaking business and financial news. *Id.* ¶¶ 60–62. FBN's weekday programming includes *Imus in the Morning, The Opening Bell with Maria Bartiromo, Varney & Co., Risk & Reward with Deirdre Bolton, MONEY with Melissa Francis, Countdown to the*

*Closing Bell*, *After the Bell*, and *The Willis Report*.  *Id.* ¶ 61.  Its prime-time programming

includes *Making Money with Charles Payne, Lou Dobbs Tonight, Cavuto, The Independents*, and

*Stossel*.  *Id.* ¶ 62. When major stories develop overnight, FBN continues to provide the latest

updates.  *Id.* ¶ 63.  FBN also provides additional information through its news ticker.  *Id.* ¶ 30.

> **B.      Fox News' Significant Investment in Newsgathering and Reporting.**

Fox News must make significant investments to produce up-to-the-minute news reports

and to develop and maintain its overall newsgathering business.  *Id.* ¶ 64.   As explained by

Sharri Berg, Fox News' Senior Vice President, News Operations and Services, Fox News

Channel and Fox Television Stations, ███████████████████████████████████ *Id.* ¶

65.

News Bureaus and Equipment:  In order to cover news all over the world, Fox News ███

███████████████████ to open and maintain bureaus in all major U.S. cities and several

foreign locations.  *Id.* ¶ 67.  Fox News also ████████████████████████████████████

███████████ to acquire high-tech equipment necessary to collect, produce and telecast

news, including, but not limited to:

- Satellite trucks and quick response vehicles, which include mobile transmission facilities that are custom built and specialized for Fox News' particular needs;

- Professional cameras—both studio cameras and shoulder-mounted cameras for electronic newsgathering—and associated gear, such as tripods, recording media, batteries, and chargers;

- Production and wireless equipment, including editing equipment and control rooms;

- Lighting, both portable and fixed;

- Sophisticated computer information systems; and

- Fixed transmission facilities.

*Id.* ¶ 68–74.

Fox News ███████████████████████████ to create its high-tech Fox News Deck studio to serve as a centralized hub for breaking news.  *Id.* ¶ 75.  The Fox News Deck is uniquely suited for breaking news as its producers are situated on camera, rather than behind the scenes. *Id.* ¶ 76.   As noted above, the Fox News Deck enables producers and reporters to have instant access to developments that they can incorporate into the program and illustrate onscreen for viewers immediately, thereby speeding the dissemination of information to the audience.  *Id.* ¶ 77.

<u>Journalists and Other Staff</u>:   Fox News ██████████████ highly-skilled journalists and staff members.  *Id.* ¶ 78.  Fox News makes significant investments of time and money to identify and hire these professionals, which include (1) on-air journalists; (2) newsgathering personnel, such as producers, camera operators, photographers, truck operators, and field technicians; (3) support personnel, such as editors, graphic artists, scenic artists, hair and makeup artists; (4) administrative personnel; and (5) specialized personnel, such as broadcast engineers.  *Id.* ¶ 79. The payroll costs associated with Fox News' newsgathering operations ████████████████ ███████.  *Id.* ¶ 80.

Further, Fox News has invested in developing these individuals' job-specific skills, which are required for Fox News to gather and report information quickly and accurately.  *Id.* ¶ 81.  Such skills take years of experience to develop.  *Id.*  Further, these journalists must develop contacts who will supply information in breaking news situations and with whom they have developed bonds of trust over many years of work.  *Id.* ¶ 82.

<u>News Agencies</u>:  Fox News also ████████████████████████████ ███████████████████  *Id.* ¶ 83.  These news agencies provide Fox News with raw, unvoiced

video from all over the world to supplement Fox News' own newsgathering efforts.  *Id.* ¶ 84.

Fox News also is a member of Network News Service, LLC ("NNS"), which is a vehicle for ABC News, CBS News, and Fox News to pool resources and share video among them.  *Id.* ¶ 85.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  *Id.* ¶ 86.

<u>Additional Costs of Reporting Major News Stories</u>:   When major unanticipated news occurs, Fox News will send journalists and staff to cover the story where it is unfolding, such as to Boston, Massachusetts in April 2013 to cover the Boston Marathon bombing and manhunt and to Moore, Oklahoma in May 2013 to cover the devastating tornado.  *Id.* ¶¶ 87–89.

These major breaking news stories ████████████████████████████████████

████████████████████  as Fox News' crews rush to the scene (sometimes in remote locations) and deliver their reports around-the-clock.  *Id.* ¶ 90.  These extra costs include travel costs for personnel (including housing, overtime and per diems); shipping costs for broadcast equipment; additional personnel hired specifically to report a breaking news event; rental and purchase of special equipment (e.g., quick response vehicles, professional cameras, wireless equipment); replacing equipment that is damaged or stolen; additional operating costs for satellite trucks and work space in remote locations; satellite, cellular, and Internet charges when working in remote locations; security costs for dangerous assignments; and medical care for injured staff and freelancers.  *Id.* ¶ 91.

Furthermore, as with other television news organizations, Fox News often cancels its advertising during major breaking news events to provide crucial information in an accurate and timely manner, ████████████████████████████████████████.  *Id.* ¶ 92.

### C.      Fox News' Digital Businesses

In addition to its cable channels, Fox News also has invested heavily in building and growing its online and digital presence. *Id.* ¶ 93.  As described by Jeff Misenti, Fox News' Chief Digital Officer, Fox News' goal is to provide its audience with a richer news experience and to increase the overall viewership of Fox News' content by making it accessible on platforms other than its cable channels. *Id.* ¶ 94.  Clearly an important resource, even TVEyes' CEO admitted that he "go[es] to [the FoxNews.com website] every day," because "[t]here is news there." *Id.* ¶ 95.  While Fox News' digital unit leverages the labor, skills, and resources that already are invested in Fox News' television channels, it adds its own specialized expertise and ████████ ██████████████████████ to operate. *Id.* ¶ 96.

As depicted below, Fox News makes live-streams of FNC and FBN available on the Internet through its "TVEverywhere" service.  *Id.* ¶ 97.



**Screenshot of TVEverywhere Service**
Declaration of Jeff Misenti, dated June 26, 2014, ("Misenti Decl.") ¶ 9.

To access this service, viewers must have a cable or satellite subscription.  FX SUF ¶ 98. Viewers obtain credentials from their cable or satellite providers, which they can use to watch FNC or FBN "everywhere" on their laptops and mobile devices. *Id.* ¶¶ 98–99.  When viewers watch these live-streams on TVEverywhere, they see advertising and will soon be counted in the ratings.  *Id.* ¶ 100.

In addition, Fox News makes video clips of content originally telecast on its channels

available to the public on its websites, FoxNews.com and FoxBusiness.com.  *Id.* ¶ 101.   As Fox

News' coverage unfolds, Fox News' team of video editors edit its content specifically for digital

and online distribution in the format shown below.  *Id.* ¶ 102.



**Screenshot of Fox News Video Clip Available on Fox News' Website**
Misenti Decl. ¶ 14.

These clips generally are available on Fox News' websites within an hour of airing, and Fox

News continuously updates its website with new clips.  FX SUF ¶¶ 103–04.  The availability of

Fox News' video clips encourages viewers to visit its websites, which, as discussed below,

provide Fox News with additional income from banner and pre-roll advertising and expose

visitors to promotions for Fox News' programming.  *Id.* ¶¶ 105, 109, 129.   Fox News also

permits video clips of its content to be distributed through third-party websites, including

Yahoo!, Hulu, and YouTube, which it refers to as its "syndication partners."  *Id.* ¶ 106.

In addition, people can disseminate Fox News' clips further by posting links to the clips

on websites and social media platforms (such as Facebook, Twitter, and LinkedIn).  *Id.* ¶ 107.

When others click on these links, they will be taken back to Fox News' websites to watch the

clips.  *Id.*  Fox News' video clips even can be displayed using Fox News' proprietary video

player on any third-party website using website "embed codes" supplied by Fox News.  *Id.* ¶

108.  While they are on Fox News' websites or using Fox News' video player, users are exposed

to ads and other promotional content and are counted among Fox News' websites' visitors.  *Id.* ¶

109.  This benefits Fox News by increasing the viewership and profitability of its websites.  *Id.* ¶¶ 129–34.

Fox News also helps users find its video clips by providing a robust search engine on its websites, which use computer-created transcripts of Fox News' video clips to allow users to search for any keywords referenced in the video clips.  *Id.* ¶ 110.  Fox News also allows its video clips to be listed on Internet search engines, such as Google.com.  *Id.* ¶ 111.

### D.      Fox News' Exclusive Licensing Agent

Fox News further distributes video clips of its content through its exclusive clip licensing agent, ITN Source, Ltd. ("ITN Source").  *Id.* ¶ 112.   As explained by Andrew Williams, ITN Source's Managing Director, ITN Source has a dedicated staff whose job is to distribute and license video clips of Fox News' content to companies and governmental organizations for use in a variety of ways, including to post on an Intranet site or social media platform or to create a digital archive.  *Id.* ¶ 113.   ITN Source maintains a library of over 80,000 Fox News video clips, which its customers can search using keywords.  *Id.* ¶ 114.  In addition, if a video clip is not included in the library, ITN Source can work with Fox News to license it.  *Id.* ¶ 115.

ITN Source's partner, Executive Interviews Ltd. ("Executive Interviews"), also distributes Fox News' content by marketing copies of video clips to guests who have appeared on Fox News' channels.  *Id.* ¶ 116.  As described by Elizabeth Ashton, Executive Interviews' Global Head of Sales and Marketing, Executive Interviews' large client base includes multinational corporations, small boutique and regional companies, nonprofit organizations, and government entities.  *Id.* ¶ 117.  It leverages that client base on behalf of Fox News when it markets the availability of fully licensed video clips that can be used by its clients in a number of different ways, including posting on social media platforms.  *Id.* ¶¶ 117–18.

### E.      Fox News' Monetization of its Video Content and News Reports

Payments from Cable, Satellite and Other Multichannel Video Programming Distributors
and Advertising Fees:  As noted above, Fox News' channels are not over-the-air broadcast

television networks that are available to viewers for free.  *Id.* ¶ 119.  They are only available on

cable, satellite, or other multichannel video programming platforms (Fox News' "affiliates").  *Id.*

¶ 120.  Fox News has invested tremendous skill, labor and effort to construct these affiliate

relationships carefully and to negotiate their terms.  *Id.* ¶ 121.   In exchange for the right to

include FNC and FBN in their subscription packages, the affiliates pay per-subscriber carriage

fees.  *Id.* ¶ 126.   Traditional over-the-air broadcast networks do not receive these fees, thereby

making it more difficult for them to be able to afford to produce news reports around the clock as

Fox News does.  *Id.* ¶¶ 2, 20; Declaration of Timothy Carry, dated June 23, 2014, ¶ 3; Wallace

Decl. ¶ 12.   In addition, companies pay Fox News to telecast advertisements during commercial

breaks on FNC and FBN.  FX SUF ¶ 127.  These fees are determined, in part, based on the

viewership of Fox News' channels.  *Id.* ¶ 128.  In other words, Fox News earns more revenue if

more people watch FNC and FBN.

Revenues from Online Advertising:  Fox News also receives payments for online

advertising.  *Id.* ¶¶ 129–30, 132–33.  Companies pay Fox News to have their pre-roll

commercials displayed before a viewer is able to watch a video clip of Fox News content.  *Id.* ¶

129.  They also pay to place banner advertisements on Fox News' websites, which are displayed

to viewers who visit them.  *Id.* ¶ 130.  The higher the websites' viewership and the longer

viewers stay on the websites, the more revenue Fox News will earn.  *Id.* ¶ 131.  Fox News

drives traffic to its websites and entices viewers to remain on them for longer periods of time by

constantly updating its online content and posting new clips of Fox News' television content.  *Id.*

¶¶ 94, 103–04.  This benefits Fox News by increasing online advertising revenue and also by

increasing the number of people who will see Fox News' online promotions for its upcoming

programs. *Id.* ¶ 131. 

*Id.* ¶ 132.

*Id.* ¶ 133.

<u>Income from Video Clip Licensing</u>:  Fox News also licenses its video clips to third-party

websites, such as Yahoo!, Hulu and YouTube. *Id.* ¶ 106.

*Id.* ¶ 134.

*Id.* ¶¶ 112, 135.

**F.     Fox News' Copyrights in Its Programs**

Fox News owns the copyrights to all of its programs that are aired on FNC and FBN.

*Id.* ¶ 136.  Numerous creative choices are required to create these programs, including unique

commentary and reporting, and selection of talent, graphics, images, music, and camera angles.

*Id.* ¶¶ 139, 141–42.  They also represent Fox News' creative expression of news events and are

the product of editorial discretion and substantial journalistic skills, resources, and creative

energies.  *Id.* ¶¶ 139–40.

Fox News owns U.S. copyright registrations for a representative sample of nineteen

television programs that aired on FNC (the "Registered Works").  *Id.* ¶ 137.  Each of these

copyright registrations was obtained within five years of publication.  *Id.* ¶ 138.

**II.     TVEYES**

**A.     TVEyes' Media Clipping Service**

TVEyes owns and operates a for-profit, subscription-only online media clipping service,

which is available at TVEyes.com.  *Id.* ¶¶ 143, 161–65.  According to its website, TVEyes

delivers "real-time TV and radio content on an international platform for a flat fee," which

generally is $500 a month.  *Id.* ¶¶ 144, 145.  Content from over 1,600 television channels is available on TVEyes' service, including FNC and FBN.  *Id.* ¶¶ 146, 148, 149.

TVEyes has access to Fox News' television content through standard subscription agreements with the cable providers ███████████████████████████████

████████████████████████████

█  ██████████████████████████████████████

█  ████████████████████████████████████████████
████████████████████
██████████████████████████████████████████████████
████████████

█  ████████████████████████████████████████████
██████████████████████████

████████████

In violation of these subscription agreements, TVEyes copies all of Fox News' content on FNC and FBN, as well as content from other channels, 24 hours a day, seven days a week, and stores it on TVEyes' servers.  *Id.* ¶¶ 147, 149, 151.  As TVEyes' CEO explained, recording content "24/7" is "an important part of our service."  *Id.* ¶ 147.  TVEyes then almost instantaneously redistributes that television content, without any commentary or analysis, to its subscribers for a fee.  *Id.* ¶¶ 143–49, 162, 170, 179, 214.  Its CEO admits that TVEyes "doesn't

---

4     ██████████████████████████████████████████████████████████
████████████████████████████████  FX SUF ¶¶ 152–53.  Fox News repeatedly pressed TVEyes to produce copies of its agreements with these cable providers.  *Id.* ¶ 157. TVEyes refused to produce them even after Fox News cited those companies' standard terms and conditions, which prohibit retransmssion and reproduction of content.  *Id.* ¶ 154–56, 158.  TVEyes has never denied that its agreements with these cable providers include these same prohibitions—even when Fox News' counsel discussed this issue with the Court at a hearing on April 7, 2014.  *Id.* ¶ 159.

blacklist portions of" any of the video content that it records to prevent it from being viewed or downloaded.  *Id.* ¶ 180.  It also places no limitations on its users, and specifically enables them to do the following:

- Watch Live Television and Breaking News.  TVEyes enables its subscribers to watch live streams of television channels, including FNC and FBN.  *Id.* ¶¶ 168, 169–71.  TVEyes does not require its subscribers to have a cable or satellite subscription before watching FNC or FBN.  *Id.* ¶ 172.  As TVEyes emphasizes in its marketing materials, its subscribers can "watch live TV, 24/7, on any station [it is] recording" and "monitor[] Breaking News."  *Id.* ¶ 168.

- View Past Television Programs.  TVEyes touts its service as "similar to a DVR" or TiVo because it allows its users to access video content that aired in the past.  *Id.* ¶ 173.  Unlike a DVR that only records content at the direction of an authorized cable or satellite subscriber for home use, TVEyes itself records all of Fox News' telecasts and it profits from those recordings by making them available to its thousands of subscribers.  *Id.* ¶¶ 143, 145, 149, 172, 229.  As stated in TVEyes' marketing materials, subscribers can "play unlimited clips" of this recorded content in 10-minute segments, which can be viewed sequentially in order to watch an entire program.  *Id.* ¶¶ 174–75.  Subscribers can also pause, rewind and fast-forward the content.  *Id.* ¶ 176.

- Download Unlimited High-Definition Video Clips and Share Them with Others.  TVEyes markets itself as enabling its subscribers to "download unlimited clips" of video content for a flat fee.  *Id.* ¶ 177.  In fact, TVEyes' CEO thinks "[d]ownloading clips is an important feature" of TVEyes' service.  *Id.* ¶ 178.  Further, TVEyes emphasizes the availability of these "unlimited clips in real time."  *Id.* ¶ 179.   None of the content from FNC, FBN or other channels

is blacklisted.  *Id.* ¶ 180.  In addition, one of the aspects that TVEyes promotes is the "high-definition" quality of these clips.  *Id.* ¶ 181.

 The downloaded video clips can be as long as ten minutes.  *Id.* ¶ 182.   In the news business, however, entire stories usually are much shorter than ten minutes.  *Id.* ¶¶ 6–9.  Thus, as TVEyes' CEO admitted, subscribers are able to download an entire news story on TVEyes' service.  *Id.* ¶ 184.  In fact, one TVEyes clip could include numerous stories.  *Id.* ¶¶ 9, 182.  Moreover, TVEyes allows its subscribers to download unlimited numbers of ten-minute clips *seriatim*, thereby permitting entire television programs to be downloaded.  *Id.* ¶ 183.  TVEyes repeatedly characterizes itself in marketing materials as a "clipping service," and also emphasizes "we do not charge per clip like a traditional clipping service."  *Id.* ¶¶ 161–64.  With these statements, TVEyes hopes to get a competitive edge over Fox News' licensee, ITN Source, and other clipping services that charge by the clip.  *Id.* ¶¶ 112–13, 116, 165.

 Compounding the problem, TVEyes does not put a copyright notice on the downloaded video clips to indicate that they came from Fox News.  *Id.* ¶¶ 186–87.  ██████████████

████████████████████████████████████████████████

████████████████        *Id.* ¶ 247.

 Similarly, TVEyes places neither technological restrictions on what its subscribers can do with video clips once they are downloaded nor adds watermarks or copyright notices to its video clips.  *Id.* ¶ 188.  TVEyes also promotes the fact that its subscribers can use its service to "[e]mail unlimited clips to unlimited recipients" and "[p]ost an unlimited number of clips" to social media.  *Id.* ¶ 189.  As TVEyes' CEO admitted, subscribers can "forward the video to other people," "upload the video to YouTube," "tweet the video," or "put the video in a PowerPoint presentation."  *Id.* ¶ 190.

- <u>Create Archives of High-Definition Video Clips.</u>  According to its fact sheet, TVEyes provides its subscribers with "unlimited storage [of clips] on TVEyes servers."  *Id.* ¶ 191.   Such clips are permanently stored and never deleted, even if a subscriber terminates his or her account.  *Id.* ¶ 192.  The TVEyes User Manual tells TVEyes' subscribers to "[a]lways save" their clips in this manner, because "[t]his will ensure your clip is saved FOREVER!!" *Id.* ¶ 193 (emphasis in original).  TVEyes also promotes the fact that subscribers can "save hard copies to [their] own server" and "burn it onto a disc."  *Id.* ¶ 194.  TVEyes even copies, creates, and sends its subscribers DVDs with copies of video clips for their files.  *Id.* ¶ 197.

- <u>Share Hyperlinks to High-Definition Video Clips</u>.  TVEyes also enables its subscribers to share hyperlinks to high-definition video clips with any person (even non-TVEyes subscribers) and to post these hyperlinks on social media platforms (such as Facebook).  *Id.* ¶¶ 196, 198.   When a viewer clicks on such hyperlinks, they are directed to TVEyes' website (not the content owners' website) to watch the video content.  *Id.* ¶ 199.   For example, even though this Court may not be a TVEyes subscriber, if it were to enter the following hyperlink into any web browser, it would be able to view and download a high-definition video clip of Fox News' content from TVEyes' servers:

> http://mediacenter.tveyes.com/downloadgateway.aspx?UserID=27
> 5209&MDID=2909241&MDSeed=7195&Type=Media

- <u>Edit Video Clips</u>.  As stated in its marketing materials, one of the "most useful features" of TVEyes for subscribers is a tool to "edit unlimited TV and Radio clips."  *Id.* ¶ 200.  In other words, this tool enables subscribers to extract a clip from TVEyes' system and to edit it in any way that they want.  Once a clip is edited, TVEyes' tool allows its subscribers to save or download the clip.  *Id.* ¶ 201.  In addition, subscribers can create a hyperlink that, according to

TVEyes' marketing materials, "becomes available immediately!" to post online or send to anyone, including non-TVEyes users, for promotional purposes.  *Id.* ¶¶ 196, 202.

- <u>Supplies Content to Other Media Clipping Services</u>.  In addition to providing content (including Fox News' content) to its subscribers, TVEyes also contracts with "Sales Partners," to provide them with content that they, in turn, further re-distribute to their customers. *Id.* ¶¶ 203–07.  TVEyes gives direct access to its database of copied content to these "Sales Partners," which include ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████  *Id.* ¶¶ 204–06.  Thus, in addition to copying content for its own for-profit subscription service, TVEyes supplies the content to other companies involved in the same or similar businesses.   This facilitates even more viewers watching FNC, FBN and other cable channels without getting a cable or satellite subscription or visiting Fox News' website, thereby negatively affecting Fox News' viewership statistics.  *Id.* ¶ 209.

### B.     TVEyes' For-Profit Business Model

TVEyes is a for-profit, commercial enterprise.  *Id.* ¶¶ 227–28.   Most of TVEyes' revenue is generated from annual and monthly subscription fees paid by its subscribers.  *Id.* ¶ 230. TVEyes has thousands of subscribers.  *Id.* ¶ 229.  In 2013, these subscription fees totaled almost ███████  *Id.* ¶ 231.  In addition, TVEyes' Sales Partners pay it a portion of the fees collected from their customers, which totaled ██████ in 2013.  *Id.* ¶¶ 208, 232.   TVEyes also receives ████████████████████ each year from the sale of ten-day or ten-clip passes, which it offers

to potential customers who are "not ready to commit to a full subscription." *Id.* ¶¶ 233–34.

Overall, TVEyes has earned ███████████ in profits. In 2013 alone, TVEyes'
revenues exceeded ████████ and its net profit was approximately ████████. *Id.* ¶¶ 235–36.
TVEyes expects those numbers to continue to rise. *Id.* ¶ 237.

### C.   TVEyes' Licenses with Content Owners Other Than Fox News

TVEyes has entered into license agreements pursuant to which it pays content owners in
exchange for a license to copy, reproduce, distribute, and display their televised content on
TVEyes' service. *Id.* ¶¶ 238–41. Such content owners include ██████████████
████████████████████████████████████████
█████████████ *Id.*

In addition, TVEyes negotiated a license with ███████ *Id.* ¶ 245. ████████
█████████████████████████████████████
██████████████████████████████
██████████████████████████████
███████████████████████████ *Id.* ¶¶
244, 246–47.

### D.   TVEyes' Refusal to Stop Using Fox News' Content without a License

TVEyes does not have a license to use Fox News' content. *Id.* ¶ 251. In contrast to how
it dealt with ████████ however, TVEyes did not comply with Fox News' repeated demands to
take down its content.

In 2012, TVEyes contacted Fox News to negotiate a license. *Id.* ¶ 252. Fox News,
through its then-Vice President of Digital Sales and Business Development, Jeremy Steinberg,
declined TVEyes' request and demanded multiple times that TVEyes stop using Fox News'
content. *Id.* ¶ 253. TVEyes repeatedly represented to Fox News that it would remove the

content, but never followed through—even after Fox News informed TVEyes of its exclusive

licensing arrangement with another party.  *Id.* ¶ 254.

TVEyes' refusal is motivated by the fact that Fox News' content admittedly is

commercially important to its business.  FNC and FBN are among the most important stations to

TVEyes business.  *Id.* ¶¶ 210–12.   In fact, TVEyes' sales team has repeatedly referred to FNC

and FBN as "high priority" or "must have" channels.  *Id.* ¶¶ 211–12.  TVEyes also admits that it

has referenced FNC and FBN in its promotional materials for the TVEyes service, including

stating in one such document that it "has High Quality Resolution video for ALL cable news

24/7 in real time, such as . . . FNC," touting the availability of FNC and FBN on the service in

others, and offering sample clips of Fox News' content to market its service to potential

subscribers.  *Id.* ¶¶ 213–15.  TVEyes even has taken special technical steps, such as system alerts

and duplicate recordings, to ensure that these two channels remains available to its subscribers

and are not disrupted by content outages.  *Id.* ¶¶ 216–20.  Out of the over 1,600 channels that are

available on TVEyes, FNC is among the top three most viewed and downloaded channels, and

FBN is in the top ten.  *Id.* ¶¶ 221–22.  Fox News' content represents ███████ of the total

content viewed on TVEyes' system.  *Id.* ¶ 223.   Almost ████████ video clips of Fox News'

content have been viewed using TVEyes' service and ████ clips have been downloaded.  *Id.* ¶¶

224–25.  Video clips from the nineteen Registered Works alone were viewed over 500 times on

TVEyes' service.  *Id.* ¶ 226.

## ARGUMENT

### I.    LEGAL STANDARD

Courts grant summary judgment if there is "no genuine dispute as to any material fact"

and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant

has the burden of "informing the district court of the basis for its motion" and the matter "it

believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to come forward with competent evidence establishing a disputed issue as to those material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Mere conclusory allegations or unsupported speculations are insufficient.  *See id.*

## II.   TVEYES IS LIABLE FOR COPYRIGHT INFRINGEMENT

In light of TVEyes' admission that it copied the Registered Works without a license and provided those recordings to its subscribers for a subscription fee that allows them to view and download an unlimited number of video clips in real time, Fox News manifestly has established its claim of copyright infringement.  *See infra* Part II.A.  Thus, TVEyes' liability hinges on its fair use defense.  Unfortunately for TVEyes, this Circuit (and others) already has rejected such a defense under similar circumstances.  *See infra* Part II.B.

### A.   TVEyes Wilfully Has Infringed the Registered Works

Fox News can succeed on its copyright claim by showing (1) ownership of a valid copyright; and (2) unauthorized copying.  *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

As to the first prong, Fox News owns the copyrights to the creative expression in its programs that air on FNC and FBN.  FX SUF ¶¶ 3, 11, 23–28, 136.  TVEyes admits that Fox News owns U.S. copyright registrations for the Registered Works.  *Id.* ¶ 137.  As each of these registrations issued within five years of the work's publication, *id.* ¶ 138, they are "*prima facie* evidence of both valid ownership of copyright and originality," raising a presumption of validity. *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013); *see also* 17 U.S.C. § 410(c); *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012).  In any case, there is ample evidence of the Registered Works' originality and

creativity.  FX SUF ¶¶ 38–52, 139–42.

As to the second prong of the test for copyright infringement, TVEyes has admitted to verbatim copying of each of the Registered Works.  *Id.* ¶ 151; *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000) (finding prong satisfied by evidence that the defendant verbatim copied the plaintiff's works).  Thus, summary judgment in Fox News' favor on its affirmative copyright claim is warranted, whether or not TVEyes can meet its burden of establishing its fair use defense (and, as discussed below, it cannot).  *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998); *see also Am. Broadcasting Cos. v. Aereo, Inc.*, No. 13-461, 2014 WL 2864485, at *17–18 (U.S. June 25, 2014) (finding streaming television broadcasts over the Internet infringed copyrights); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 288 (2d Cir. 2012) (affirming injunction of service that made real-time retransmissions of plaintiffs' copyrighted programming over the Internet to its users for profit and without plaintiffs' consent).

### B.     TVEyes' Cannot Meet its Burden of Establishing that its Copying of Fox News' Content is Fair Use

TVEyes cannot meet its burden of establishing its fair use defense, which permits "reproduction . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107; *Infinity Broad.*, 150 F.3d at 107 (finding that, as an affirmative defense, the burden of proving fair use is on the proponent).

This failure is not surprising as the Second Circuit and other courts consistently have held that for-profit media clipping services (like TVEyes), which copy and distribute clips from news programs or articles, do not qualify for the fair use defense.  *See Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (holding gathering news articles and

providing "rough translations" to customers is not fair use); *Infinity Broad.*, 150 F.3d at 112

(holding radio monitoring service was not a fair use); *Meltwater*, 931 F. Supp. 2d at 553, 556

(holding that media monitoring service, which was "the online equivalent of the traditional news

clipping service," was not fair use); *see also Video Pipeline, Inc. v. Buena Vista Home Entm't,*

*Inc.*, 342 F.3d 191, 199, 203 (3d Cir. 2003) (holding supplying video clip previews of movies on

the Internet was not fair use); *Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149

F.3d 987, 990, 994–95 (9th Cir. 1998) (holding news clipping service that copied and distributed

television programs to its subscribers for an annual fee was not a fair use); *Los Angeles News*

*Service v. Tullo*, 973 F.2d 791, 792, 797, 799 (9th Cir. 1992) (holding company that "monitors

television news programs, records them on videotape and sells copies of all or segments of the

tapes to interested individuals and businesses" not entitled to fair use defense); *Pacific and*

*Southern Co. v. Duncan*, 744 F.2d 1490, 1493, 1498 (11th Cir. 1984) (holding "commercial

enterprise" that "videotapes television news programs, identifies the persons and organizations

covered by the news reports, and tries to sell them copies of the relevant portion of the newscast"

was not a fair use).

Given these consistent rulings about clipping services, predictably, the four statutory fair

use factors weigh in Fox News' favor.  These factors are:

(1)  the purpose and character of the use, including whether such use is of a
commercial nature or is for nonprofit educational purposes;

(2)  the nature of the copyrighted work;

(3)  the amount and substantiality of the portion used in relation to the copyrighted
work as a whole; and

(4)  the effect of the use upon the potential market for or value of the copyrighted
work.

17 U.S.C. § 107.  All of the factors "are to be explored, and the results weighed together, in light

of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

Those purposes being "to motivate the creative activity of authors . . . by [providing] a special

reward," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984), and to

ensure that copyright owners receive "a fair return for their labors." *Harper & Row Publishers,*

*Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985).

      As noted by the Second Circuit, "fair use is not a license for corporate theft, empowering

a court to ignore a copyright whenever it determines the underlying work contains material of

possible public importance." *Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 751 F.2d 501, 508

(2d Cir. 1984) (internal quotation marks omitted).  "Put more graphically, the doctrine

distinguishes between a true scholar and a chiseler who infringes a work for personal profit."

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) (internal

quotation marks omitted).

      1.    <u>Factor One: TVEyes' Use Is Commercial, in Bad Faith, and Not</u>
           <u>Transformative</u>

      The first fair use factor is "the purpose and character of the use, including whether such

use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  As

discussed below, this factor weighs in Fox News' favor because (a) TVEyes uses the Registered

Works and other content commercially, which has resulted in ▮▮▮▮▮▮▮ of profits in

2013 alone; (b) TVEyes has acted in bad faith; and (c) TVEyes' use merely supersedes Fox

News' use of the Registered Works.  *Campbell*, 510 U.S. at 579.

      a.    <u>TVEyes' Use of the Registered Works Is Highly Commercial</u>

      TVEyes is a for-profit, commercial enterprise, which made over ▮▮▮▮▮ in 2013 alone

from user subscriptions and fees paid by its Sale Partners.  FX SUF ¶¶ 227–28, 230–32, 235.

Further, FNC and FBN are among the most important channels that are included on TVEyes

service, which indicates that most of TVEyes' revenue is directly attributable to its use of Fox

News' content (including the Registered Works).  *Id.* ¶¶ 210–26.

Given TVEyes' undisputed direct commercial exploitation of the Registered Works, this

factor weighs heavily against fair use.  *See Harper & Row*, 471 U.S. at 562 (commercial use of

copyrighted material is presumptively unfair); *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir.

1992) (finding that the "substantial profit from [the defendant's] intentionally exploitive use of

[the plaintiff's] work" weighed against a finding of fair use); *United States v. ASCAP*, 599 F.

Supp. 2d 415, 425–26 (S.D.N.Y. 2009) (finding use of audio clips to facilitate sales for

commercial gain weighed against finding of fair use); *UMG*, 92 F. Supp. 2d at 351 (finding that

use of copyrighted content to make a profit constitutes commercial use and weighs against

finding of fair use).

b.    <u>TVEyes Used the Registered Works In Bad Faith</u>

As fair use is an equitable doctrine and "presupposes good faith and fair dealing," "the

propriety of [TVEyes'] conduct" and whether it acted in bad faith also are relevant.  *Harper &*

*Row*, 471 U.S. at 562 (internal quotation marks omitted); *Weissmann v. Freeman*, 868 F.2d 1313,

1323 (2d Cir. 1989); *Meltwater*, 931 F. Supp. 2d at 552.

In *Harper & Row*, the Supreme Court held that it is bad faith (and thus not fair use) for a

defendant to obtain a copyrighted work illicitly, which is the situation here.  471 U.S. at 563

(finding bad faith where defendant "knowingly exploited a purloined manuscript").  As noted

above, TVEyes acquires Fox News' content (including the Registered Works) through ordinary

cable subscriptions.  *See supra* 18.  TVEyes' acquisition and use of this content (i.e., copying the

Registered Works, as well as distributing and displaying them outside of TVEyes' premises)

- 29 -

violates its cable agreements.[5]    FX SUF ¶¶ 152–56, 159.

Further, bad faith is found where, as here, the defendant uses the works over plaintiff's

repeated objections, and such use violates the defendant's own guidelines or accepted practices

in its industry.  *Roy Exp. Co. v. Columbia Broad. Sys. Inc.*, 503 F. Supp. 1137, 1146–47

(S.D.N.Y. 1980),  *aff'd*, 672 F.2d 1095, 1105 (2d Cir. 1982).  As TVEyes admits, Fox News

repeatedly refused to grant it a license, and demanded that TVEyes stop offering Fox News'

content as part of its service.  FX SUF ¶ 253.  TVEyes even repeatedly represented that it would

take down Fox News' content, but never followed through.  *Id.* ¶ 254.

Moreover, TVEyes' use of  the Registered Works without a license contradicts its own

stated procedures and practice of obtaining licenses from other content owners ███████

████████  in order to use their television content on its system.  *Id.* ¶¶ 238–41, 248, 245.   As

TVEyes has represented to content holders, "It is certainly not the practice of TVEyes to operate

without any necessary agreement being in place."  *Id.* ¶ 248.  Further, TVEyes actively misleads

or knowingly permits its subscribers to believe that video clips downloaded from the TVEyes

service are licensed for use on internal and external websites.  *Id.* ¶¶ 255–59.  TVEyes' practice

of licensing the right to include content on its service is consistent with the practices of other

media clipping services.  *Id.* ¶¶ 249–50.

TVEyes' bad faith use of the Registered Works further militates against fair use.

c.    TVEyes' Use of the Registered Works Is Not Transformative and
Merely Supersedes Fox News' Use

TVEyes' use does not transform the Registered Works by adding something new, "with a

---

[5]    In similar disregard for contractual provisions, TVEyes also obtained content from Fox News' websites in direct
violation of Fox News' Terms of Use, which expressly state that users "may not copy, download, stream
capture, reproduce, duplicate, archive, upload, modify, translate, publish, broadcast, transmit, retransmit,
distribute, perform, display, sell or otherwise use" Fox News' content.  FX SUF ¶¶ 150, 160.

further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579.  Rather, it is a direct, slavish substitute for Fox News' own use. *Harper & Row*, 471 U.S. at 550 (fair use is precluded by superseding use of the original work).

TVEyes markets itself as a media "clipping service," and one of its own former customers testified in this case that she had "used TVEyes as a clipping service."  FX SUF ¶¶ 161–65, 167.  As discussed above, courts consistently hold that the reproduction and distribution of video clips by media clipping services (like TVEyes) is not fair use.  *See supra* 26.  That is because there simply "is nothing transformative about that function," *Meltwater*, 931 F. Supp. 2d at 556, as it "leave[s] the character of the original broadcasts unchanged" with "neither new expression, new meaning nor new message." *Infinity Broad.*, 150 F.3d at 108; *see also Reuters*, 149 F.3d at 994; *Pacific*, 744 F.2d at 1496.  Here, TVEyes reproduces the Registered Works in unedited form and enables its paying subscribers to view, download, and share unlimited high-definition clips.  FX SUF ¶¶ 151, 168, 170–71, 177–81, 188–90, 198–99.  This is "not remotely similar to any of the listed categories" in the statutory preamble.  *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 78 (2d Cir. 1997) (finding use outside of categories not to be transformative).  Thus, TVEyes is no different than the long line of for-profit media clipping services that have been held not to be transformative.[6]

---

[6]    Nor does the decision in *Authors Guild, Inc. v. Google Inc.*—in which the Google Books search engine was found to be fair use—help TVEyes.  954 F. Supp. 2d 282 (S.D.N.Y. 2013).  In contrast to TVEyes, Google provided only "snippets" of books (one-eighth of a page in length) to users in response to search queries. *Id.* at 284.  Google also "black-listed" (i.e., did not show) one of the snippets on each page and also black-listed at least one out of ten pages in each book. *Id.* at 287.  As the court found, the snippets of text only "act as pointers directing users to a broad selection of books," and did not "supersede or supplant books because it is not a tool to be used to read books." *Id.* at 291.  Moreover, Google instituted "security measures to prevent users from viewing a complete copy" of a book. *Id.* at 287.  In addition, unlike TVEyes, Google offered its service to the public for free and, thus, did not "engage in the direct commercialization of copyrighted works." *Id.* at 292.  As "Google does not sell its scans, and the scans do not replace the books," the court found that Google's service did not serve as a "market replacement." *Id.* at 292–93; *see also Authors Guild, Inc. v. HathiTrust*, No. 12-

TVEyes' uses of the Registered Works and other copyrighted content is a substitute for

Fox News' own use, including:

- TVEyes enables its subscribers to "watch live TV, 24/7, on any station [TVEyes is] recording" and to watch older programming with its DVR feature.[7]  FX SUF ¶¶ 168, 173.   TVEyes' subscribers, thus, have no need to get a cable or satellite subscription in order to watch Fox News' channels and record on their personal DVRs.   This use is a substitute for Fox News telecasts through authorized providers, as well as for Fox News' TVEverywhere service, which allows cable and satellite subscribers to watch FNC and FBN on Fox News' websites and on mobile devices.  *Id.* ¶¶ 97, 99. It similarly substitutes for the authorized video clips that Fox News makes available on its websites.  *Id.* ¶¶ 101–05.

- TVEyes enables its subscribers to download and edit unlimited and unrestricted high quality video clips, which is a substitute for for the video clips Fox News makes available through ITN Source and Executive Interviews.[8]  *Id.* ¶¶ 112–18, 177–81, 186–88, 200–02.

- TVEyes enables subscribers to e-mail video clips to others and to share video clips via social media, which substitutes for the authorized video clips that Fox News makes available on its website and the websites of its licensees for users to view and share.  *Id.* ¶¶ 101–08, 189–90, 196, 198–99.

As TVEyes adds nothing of its own to the Registered Works—not commentary,

expression, meaning, message, or anything else that possibly could be considered

transformative—but rather is a direct substitute for Fox News' use, TVEyes' service supersedes

---

4547, 2014 WL 2576342, at *7–8 (2d Cir. June 10, 2014) (finding search service that indicated the location of keywords in a book by page number, but returned no copyrighted content (snippet or otherwise) to be a fair use).

[7]  As recognized by the Second Circuit, merely altering the format of the Registered Works from telecasts on cable television to video clips available through the Internet does not make TVEyes' use transformative.  *Nihon*, 166 F.3d at 72 (service that merely retransmits copyrighted work to paying subscribers is "not in the least 'transformative'"); *Infinity Broad.*, 150 F.3d at 108 n.2 (finding a "change of format" not transformative); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994) (cautioning that "untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use"); *see also UMG*, 92 F. Supp. 2d at 351 (retransmission in another medium is not transformation).

[8]  As noted above, TVEyes enables subscribers to create permanent digital libraries of video clips, but this does not make its use transformative.  *Texaco*, 60 F.3d at 919–20 (holding that copying "for the primary purpose of providing numerous [individuals] each with his or her own personal copy of [a work] without . . . having to purchase" access to the work "merely supersedes the objects of the original creation").

the use of the Registered Works and lacks transformativeness.  *See Davis v. Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001) (finding use of work "in the manner it was made to be worn" constituted superseding use); *Ringgold*, 126 F.3d at 79 (finding lack of transformativeness where defendant used work "for precisely a central purpose for which it was created").  Thus, its wholly commercial and bad faith exploitation of Fox News' content "takes on a heightened importance." *ASCAP*, 599 F. Supp. 2d at 428 (citing *Davis*, 246 F.3d at 175).  Accordingly, the first fair use factor heavily weighs against fair use.[9]

> 2.     Factor Two: The Registered  Works Are Creative and Expressive.

The second factor in a fair use inquiry is the nature of the copyrighted work, and whether the work is expressive or creative. 17 U.S.C. § 107(2); *Meltwater*, 931 F. Supp. 2d at 557.  In this case, the Registered Works include many creative and expressive choices, including selecting the stories to cover, how to write and arrange them, and which points to emphasize or discuss.  FX SUF ¶ 139.  As elucidated in Mr. Wallace's declaration, they contain the commentary and analysis of Fox News' professional staff.  *Id.* ¶ 140.   Each work also includes numerous artistic elements, including textual and pictorial graphics, music and sound effects, set dressing, and audiovisual content.  *Id.* ¶ 141.  They further embody the choices of various camera operators, who decide which lens to use, the depth of field, and the positioning of different elements in frame.  *Id.* ¶ 142.  Taken together, these elements create a compilation of elements that are both "unique and creative."  *See Infinity Broad.*, 150 F.3d at 109 (finding such

---

[9]     Uses of the Registered Works by TVEyes' subscribers are not relevant to whether TVEyes' use is fair.  As this Court recognized, it is well-established that a defendant cannot rely on the activities of its users to support a fair use defense.  Simmons Decl. Ex. 7 (Discovery Hr'g Tr. 27:2–16); *see also Infinity Broad.*, 150 F.3d at 108 ("[I]t is [the defendant's] own retransmission of the broadcasts, not the acts of his end-users, that is at issue here and all [he] does is sell access to unaltered radio broadcasts."); *Reuters*, 149 F.3d at 994 (holding that media clipping service could not rely on its subscribers' use to support a fair use finding); *Tullo*, 973 F.2d at 797 (holding that "the ultimate use to which the customer puts the tape is irrelevant, as is the use [its] customers make of the tapes [it] sells").

compilation in radio programs to be creative and, therefore, holding that the second factor favored the plaintiff).

The fact that the Registered Works are news programs that contain factual information does not change this analysis. *See Harper & Row*, 471 U.S. at 556–57 ("[C]opyright assures those who write and publish factual narratives . . . that they may at least enjoy the right to market the original expression contained therein as just compensation for their investment."); *Weissmann*, 868 F.2d at 1325 (holding that scientific nature of original work did not weigh in favor of fair use finding). Thus, this factor weighs in Fox News' favor.

3.    Factor Three: TVEyes Copied the Registered Works in Their Entirety.

The third factor in a fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor has both quantitative and qualitative dimensions. *Meltwater*, 931 F. Supp. 2d at 557. The quantitative assessment considers the portion of the copyright work that was taken in relation to the whole, and the Second Circuit has found that copying as little of eight percent of the original may weigh against a finding of air use. *Id. (citing Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 61–62 (2d Cir. 1980)). The qualitative assessment considers the importance of the portion copied and whether that portion is "essentially the heart" of the copyrighted expression. *Id.* at 558 (finding that copying the short lede from every AP story, which is meant to "convey the heart of the story," tipped this factor away from fair use).

Here, TVEyes admits that it has copied <u>all</u> of the Registered Works verbatim and in their entirety, including the "heart" of the works. FX SUF ¶¶ 149, 151. Thus, this factor favors Fox News. *See Harper & Row*, 471 U.S. at 565 (verbatim copying evidences qualitative value of copied material); *Davis*, 246 F.3d at 175 (stating that when copying is "wholesale," a defendant "cannot benefit from the third factor"); *Infinity Broad.*, 150 F.3d at 110 (finding that third factor

favored plaintiff as defendant provided his subscribers with access to every radio station . . . 24

hours a day, seven days a week"); *Weissmann*, 868 F.2d at 1325 (finding that copying of work

word-for-word, even with "slight additions," weighed against a finding of fair use); *ASCAP*, 599

F. Supp. 2d at 431 (finding substantial taking given verbatim copying).

        4.    <u>Factor Four: TVEyes' Use Harms the Market for and the Value of the Registered Works.</u>

       The fourth factor in a fair use inquiry is "the effect of the use upon the potential market

for or value of the copyrighted work," including harm to the market for the original work and

derivative works, as well as whether unrestricted and widespread conduct like the defendant's

would cause additional harm.  *Campbell*, 510 U.S. at 590; *Harper & Row*, 571 U.S. at 568; 17

U.S.C. § 107(4).  The Supreme Court has recognized a near-presumption of market harm in the

"context of verbatim copying of the original in its entirety for commercial purposes."  *Campbell*,

510 U.S. at 591 ("[W]hen a commercial use amounts to mere duplication of the entirety of an

original, it clearly supersedes the objects . . . of the original and serves as a market replacement

for it, making it likely that cognizable market harm to the original will occur." (internal quotation

marks, citations and alterations omitted)).  As TVEyes copied the Registered Works verbatim, in

their entirety, as part of its for-profit business, this presumption heavily weighs this factor against

a fair use finding.

        a.    <u>TVEyes' Use Harms the Original Market for the Registered Works</u>

       TVEyes' marketing materials tout that its system offers live streams of FNC and FBN to

"watch live TV, 24/7," and its subscribers use TVEyes to watch television.  FX SUF ¶¶ 168,

170–71, 213–15.   In other words, TVEyes replaces Fox News as the supplier of its own telecasts

on television and and through its TVEverywhere online service, which "is precisely the kind of

harm the fourth factor aims to prevent."  *Infinity Broad.*, 150 F.3d at 111 (finding that, because

the defendant's revenues come from a market occupied by the plaintiff, the fourth fair use factor weighed against fair use).  As TVEyes "offers itself as a market substitute" for Fox News' channels, this weighs strongly against a finding of fair use.  *Davis*, 246 F.3d at 175–76; *Wainwright*, 558 F.2d at 96 (finding no fair use where use of plaintiff's reports "was blatantly self-serving, with the obvious intent, if not the effect, of fulfilling the demand for the original work"); *see also WPIX*, 691 F.3d at 285 (holding that "live retransmissions of [television broadcasters'] copyrighted programming over the Internet" constitutes not just market harm, but irreparable harm).

TVEyes threatens the fees that cable and satellite providers pay to Fox News, which are determined, in part, by ratings.  *WPIX*, 691 F.3d at 285; FX SUF ¶ 260.  TVEyes' subscribers who watch FNC and FBN on TVEyes (not on television) are not included in Fox News' ratings. FX SUF ¶¶ 261–62.  Therefore, TVEyes' service devalues Fox News' content to Fox News' affiliates, who will seek lower carriage fees as a result.  *Id.* ¶ 263.  If this use becomes widespread, the effect would decimate Fox News.  Thus, TVEyes' service substantially diminishes the value of Fox News' copyrighted programming.  *WPIX*, 691 F.3d at 285.

In addition, TVEyes' use threatens Fox News' advertising revenues.  *Id.* at 286. Advertising fees "are often determined by the number of viewers and their demographic profiles."  *Id.*  Here, as discussed above, subscribers who watch FNC and FBN on TVEyes' system are not counted in the ratings.  FX SUF ¶¶ 261–62.  As a result, TVEyes' use of the Registered Works weakens Fox News' negotiating position for advertising fees and reduces the value of advertisements aired on its channels.  *Id.* ¶ 264; *see WPIX*, 691 F.3d at 286 (citing *Cablevision Sys. Dev. Co. v. MPAA*, 836 F.2d 599, 603 (D.C. Cir. 1988) ("Local advertisers will not pay extra to reach viewers who cannot reasonably be expected to patronize their businesses,

so the revenue base from which to compensate the owners understates the value of the use of the

materials, and the copyright holders would be under compensated." (alterations omitted)).

    b.  TVEyes' Use Harms the Derivative Market for the Registered

      Works.

   TVEyes' use also impairs the derivative market for video clips of the Registered Works.

*Campbell*, 510 U.S. at 593 (recognizing that "the licensing of derivatives is an important

economic incentive to the creation of originals"); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,

996 F.2d 1366, 1377 (2d Cir. 1993) ("[I]t is a safe generalization that copyright holders, as a

class, wish to continue to sell the copyrighted work and may also wish to prepare or license such

derivative works as book versions or films."); *Meltwater*, 931 F. Supp. 2d at 559 ("Where there

is a fully functioning market for the infringer's use of the copyrighted material, it will be difficult

for the infringing party to show that it made fair use without paying a licensing fee."); *ASCAP*,

599 F. Supp. 2d at 432 ("By using ASCAP music without compensating ASCAP, applicant

avoids paying the 'customary price' ASCAP is entitled to charge for the use of its songs." (citing

*Davis*, 246 F.3d at 176)).

   First, Fox News' exclusive licensee, ITN Source, along with ITN Source's partner,

Executive Interviews, distributes and licenses video clips of Fox News' content to third-parties.

FX SUF ¶¶ 112–18. ████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 265. By offering its subscribers the ability to

watch and download Fox News' content without limits, TVEyes significantly curtails ITN

Source's ability to compete in the market for video clips of Fox News' content as TVEyes' users

can get such clips as part of their subscription. *Id.* ¶¶ 168, 170–71, 177–80, 186–89. In fact,

over   video clips of Fox News' content have been created using TVEyes' service without

any license fees paid to ITN Source, ████████████████████████████████. *Id.*

¶¶ 225, 268.  Further, as TVEyes emphasizes in sales pitches, subscribers can get unlimited video clips in "high definition" (not low resolution) and without any blackouts.  *Id.* ¶¶ 177–81.  TVEyes even markets itself as "more effective and far less expensive than using old-fashioned press clipping services."  *Id.* ¶ 165.

  As Ms. Ashton's attests in her declaration, Executive Interviews ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████   *Id.* ¶¶ 177–79, 269–71, 255–59.  Executive Interviews █

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

Declaration of Elizabeth Ashton, dated June 26, 2014, ¶¶ 23–35.  In addition, by offering unrestricted access and unlimited clips, TVEyes has interfered with Executive Interviews' ██████

██████████████████████████████████████████████████

████████   *Id.* ¶ 24.  This makes it very difficult for Executive Interviews to compete with TVEyes.  FX SUF ¶ 271.

  Second, as explained by Mr. Misenti, Fox News edits and posts video clips of its content on its websites generally within an hour after they appear on Fox News' channels.  *Id.* ¶ 103.  Fox News posts a substantial number of video clips online, including 70 separate video clips from the Registered Works alone.  *Id.* ¶¶ 104, 272–73.  Fox News, however, does not post video clips of all of its content so that it can ensure an audience for its channels through traditional television distribution.  *Id.* ¶¶ 280–81.  All of Fox News' authorized video clips can be distributed using social media platforms, shared using a link, or displayed on a third-party

website using Fox News' proprietary video player, which includes links back to Fox News' websites. *Id.* ¶¶ 107–08, 274.  Each of these features directs users back to Fox News' website, thereby increasing their audience and, in turn, Fox News' revenues from pre-roll and banner advertising. *Id.* ¶¶ 274–75.  As TVEyes' CEO acknowledged, high-traffic websites receive more online advertising revenue. *Id.* ¶ 275.  TVEyes, however, robs Fox News of these revenues by giving its users access to an unlimited number of video clips and doing so before Fox News' digital unit is able to post authorized clips on Fox News' websites, as TVEyes' users have no reason to visit Fox News' websites to view authorized video clips. *Id.* ¶¶ 103, 168–69, 174, 177–80.

Third, Fox News obtains revenue from other businesses—including Yahoo!, YouTube, and Hulu—in exchange for licensing them to use its video clips on their websites. *Id.* ¶¶ 106, 134.  TVEyes directly competes with these businesses for video clip viewership by posting the same clips without paying Fox News <u>any</u> licensing fees. *Id.* ¶ 279.

Fourth, the evidence in this case shows that Fox News has a potential market in licensing to clipping services.  This is evidenced by the fact that TVEyes itself licenses the right to reproduce, distribute, and display audiovisual content from other copyright holders,

*Id.* ¶ 245.  In addition, other copyright holders have indicated that, to access their content, media clipping services typically pay for a license. *Id.* ¶ 250.  Thus, by not paying Fox News <u>anything</u> for the use of its content, TVEyes causes Fox News to lose the benefit of <u>any</u> royalty revenue. *Id.* ¶ 279; *see Davis*, 246 F.3d at 175–76 (finding that taking a copyrighted work for free allowed the defendant to avoid "paying the customary price," that the plaintiff "was entitled to charge for the use of his" work, and that, as a result, the plaintiff "suffered market harm through his loss of the royalty revenue to which he was reasonably entitled in the

circumstances, as well as through the diminution of his opportunity to license to others");
*Meltwater*, 931 F. Supp. 2d at 553 ("Moreover, permitting Meltwater to avoid paying licensing fees gives it an unwarranted advantage over its competitors who do pay licensing fees.").

The facts set forth above clearly show that there is a market for and value in video clips of the Registered Works and other content that is adversely impacted by TVEyes' free use, which serves as independent basis to weigh the fourth fair use factor heavily against a finding of fair use. *ASCAP*, 599 F. Supp. 2d at 432 (finding fourth factor favored copyright holder where it "established the existence of markets for licenses of preview performances and other short segments of its music"); *Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*, No. 04 Civ. 5332, 2005 WL 2875327, at *8 (S.D.N.Y. Nov. 2, 2005) (holding that erosion of commercial market for video clips of performance excerpts was sufficient to support finding of no fair use, despite educational and non-commercial purpose of use).

### c.   Similar Widespread Use Would Harm Fox News

In addition to the particular harm associated with TVEyes' actions, courts consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting NIMMER ON COPYRIGHT § 13.05[A][4]).

As noted above, the decision to launch FNC was considered very risky as many questioned whether the market could support another news channel.  FX SUF ¶¶ 14–16.  As TVEyes' CEO admits, the newsgathering business is expensive and the costs are considerable. *Id.* ¶ 66.  News organizations, like Fox News, need significant financial and other resources in order to fund their efforts.  If their revenues shrink, they will go out of business.  As Mr. Wallace explained, real life examples of this phenomenon have been illustrated in recent years by the many newspapers that have gone out of business and television news organizations that radically

have cut back on their news coverage. *Id.* ¶ 284.  For example, the audience for the three

network evening news broadcasts on a typical day has shrunk from 52 million in 1980 to just 22

million in 2013. *Id.* ¶ 285.  As a result, the networks have had to close bureaus, lay off staff, and

cover less news. *Id.* ¶ 286.  Similarly, in the cable news industry, MSNBC and CNN have

moved away from covering breaking news. *Id.* ¶ 287.  If free-riders like TVEyes, who do not

have to shoulder these costs and give nothing back to those that do, are allowed to copy creative

works, like those at issue here, the news industry will be dealt yet another serious blow.

  As Mr. Carry explains in his declaration, if TVEyes' use became widespread with all of

Fox News' content available on the Internet through TVEyes and similar services, Fox News'

authorized affiliates ████████████████████████████████████████████

███████████. *Id.* ¶ 289.  Similarly, Fox News' online advertising partners will not pay to

advertise on Fox News' websites if its online viewership declines, and companies will not buy

video clips that they can download directly from TVEyes. *Id.* ¶¶ 289–91.  The   video

clips of Fox News' content, noted above, ██████████████████████████████ but,

if TVEyes' use became widespread, Fox News would lose considerably greater income. *Id.* ¶¶

225, 268.  Services like TVEyes are particularly insidious because they do not employ copy

protection measures, such as digital rights management technology, watermarking, or adding

copyright notices. *Id.* ¶¶ 186–88.  As a result, the video clips they supply are susceptible to

additional copying and further unlimited, viral distribution. *Id.* ¶¶ 189–90, 277.

  By robbing Fox News of these revenue streams, TVEyes threatens Fox News' incentive

to make the significant and sustained financial investments described above, which it currently

can justify because it receives sufficient revenue to offset the costs of its newsgathering and

reporting. *Id.* ¶ 292. As explained by Mr. Williams of third-party ITN Source at his deposition:



*Id.* ¶ 293 (emphasis added). In other words, the result of permitting TVEyes (and other companies like it) to copy Fox News' content and redistribute in this manner without authorization would be a decline in the breadth and variety of Fox News' newsgathering and reporting.

As TVEyes' use of Fox News' content—particularly if it became widespread—threatens numerous original and derivative markets for the Registered Works and clearly devalues them by diverting viewership from Fox News' channels and websites, the fourth factor heavily weighs against fair use. *See Ringgold*, 126 F.3d at 81 (finding that defendant's conduct in using plaintiff's work for its intended purpose without compensation, if widespread, would adversely impact the market for licensing plaintiff's work and, thus, weighed against fair use).[10]

5.      Considerations of the Public Interest Favor Fox News

The Supreme Court has noted that the fair use factors "are not meant to be exclusive," but rather that they must be considered in light of the policies and incentives on which copyright law is based, all of which weigh against a finding of fair use. *Harper & Row*, 471 U.S. at 545–46, 560 (admonishing courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the original works that provide the seed and substance of this harvest").

---

[10]  Even in cases, unlike this one, where transformativeness is found, market harm similar to that at issue here supported a finding of no fair use. *See Salinger v. Colting*, 641 F. Supp. 2d 250, 268 (S.D.N.Y. 2009) (transformative nature outweighed by other factors); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008) (same).

As noted by the Supreme Court, "the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Thus, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming." *WPIX*, 691 F.3d at 287 (citing *Golan v. Holder*, 132 S. Ct. 872, 890 (2012); *Eldred*, 537 U.S. at 219; and *Harper & Row*, 471 U.S. at 558). "Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 961 (2005)). In the case of news organizations:

> Paraphrasing James Madison, the world is indebted to the press for triumphs which have been gained by reason and humanity over error and oppression. Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits [news organizations] to earn the revenue that underwrites that work. Permitting [media clipping services] to take the fruit of [that] labor for [their] own profit, without compensating [the news agencies], injures [the agencies'] ability to perform this essential function of democracy.

*Meltwater*, 931 F. Supp. 2d at 553.

Therefore, while TVEyes' service may provide access to Fox News' content, the Second Circuit has found that, where "the public will still be able to access [television] programs through means other than [such] Internet service[s], including cable television," there is no reason to distort the principles on which copyright is based. *WPIX*, 691 F.3d at 288. Copyright simply "is not designed to afford consumer protection or convenience but, rather, to protect the copyrightholders' property interests." *UMG*, 92 F. Supp. 2d at 352; *Meltwater*, 931 F. Supp. 2d

at 549 ("The principle purpose of the Copyright Act is to encourage the origination of creative works by attaching enforceable property rights to them.").

As "[c]ontinued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry," *WPIX*, 691 F.3d at 286, Fox News respectfully requests that this Court enter summary judgment in its favor on TVEyes' fair use defense.

## III.    TVEYES IS LIABLE FOR HOT NEWS MISAPPROPRIATION

The hot news misappropriation doctrine exists to protect the investment by news organizations, like Fox News, which perform a public service by gathering and disseminating news, from predatory and pernicious businesses designed merely to copy and re-disseminate their efforts, like TVEyes.[11]  *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918). The elements of a hot news misappropriation claim under New York law are: "(i) the plaintiff generates or collects information at some cost or expense, . . . (ii) the value of the information is highly time-sensitive, . . . (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it, . . . (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff, . . . [and] (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997) (citations omitted); *see also Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876,

---

[11]   This claim is not preempted by copyright law.  As the Court has explained, the hot news doctrine protects "the substance of the information" while copyright law protects "the particular form or collection of words in which the writer has communicated it."  *INS*, 248 U.S. at 234.

900 (2d Cir. 2011).  Here, Fox News can establish each of these elements and, thus, is entitled to summary judgment on this claim.

### A.        Fox News Generates Information at Significant Cost and Expense

It cannot be disputed that Fox News has invested vast resources in its newsgathering and reporting services.  As discussed above and illuminated by Ms. Berg's declaration, this investment includes acquiring high-tech equipment and operating news bureaus in all major U.S. cities and several foreign locations.  FX SUF ¶¶ 67–77.  Fox News also makes significant investments to identify, hire, and train numerous journalists and other personnel to gather and report news in a speedy and accurate manner.  *Id.* ¶¶ 78–82.  Further, Fox News pays the Associated Press and Reuters to obtain raw, unvoiced video from all over the world to supplement its own newsgathering efforts, and it makes considerable annual payments to NNS. *Id.* ¶¶ 83–86.

In addition, Fox News makes considerable supplementary investments when it covers breaking news events as Fox News' crews rush to the scene (sometimes in remote locations) and deliver their reports around-the-clock.  *Id.* ¶¶ 87–91.  Moreover, as with other television news organizations, Fox News often cancels advertising during breaking news events to provide crucial information and commentary in a timely manner, thereby foregoing significant advertising revenues.  *Id.* ¶ 92.

Fox News' annual newsgathering ███████████████████████████████ ████████████████ such as capital investments in studio and field equipment.  *Id.* ¶ 65. Accordingly, there can be little question that Fox News has established the first hot news element.  *See INS*, 248 U.S. at 229 (finding first element established by the AP's $3.5 million investment in newsgathering).

**B.     The Value of Fox News' Information is Time Sensitive When Copied by TVEyes**

TVEyes copies Fox News' up-to-the-minute, time-sensitive news programming as soon as it is aired on FNC and FBN.  FX SUF ¶¶ 146–49, 162, 170, 179, 214.  It markets itself as making that programming available to its subscribers in "Real-time," thereby allowing them to "watch live TV, 24/7" and "monitor[] Breaking News."  *Id.* ¶¶ 162, 168–69.  TVEyes re-transmits Fox News' information before Fox News is able to take full competitive advantage, as Fox News' video clips do not appear on the Fox News website and the websites of its licensees in real-time.  *Id.* ¶ 103.

Accordingly, Fox News has established the second hot news element.  *See BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 612–13 (S.D.N.Y. 2010) (finding time sensitiveness exists where information is collected in "real-time" and updated "24x7" and as the defendants engaged in "constant and continuous unauthorized <u>daily</u> reproduction and multimedia redistribution" (emphasis in original)); *see also INS*, 248 U.S. at 238 (finding time sensitiveness where information from newspapers was copied on the East Coast, reviewed and retransmitted to the West Coast, and incorporated into newspapers printed there).

**C.     TVEyes Free-Rides on Fox News' Information Gathering Efforts**

As discussed above, Fox News gathers and reports time sensitive news continuously every day and night at great effort and expense.  FX SUF ¶¶ 64–92.  Moreover, its news ticker updates Fox News' reporting moment to moment.  *Id.* ¶ 30.  By contrast, TVEyes freely admits that it is neither a newsgathering organization nor in the business of gathering news.  *Id.* ¶ 288.  As such, it makes no investment in newsgathering or reporting, and bears none of the substantial operating costs needed to cover the news on a day-to-day basis across the globe, which solely are shouldered by Fox News.  *Id.* ¶¶ 64–92.   Nevertheless, TVEyes takes Fox News' news reports

and redistributes them on its subscription-based service in competition with and before Fox

News' authorized video clips appear on its websites and the websites of its syndication partners,

thereby supplanting Fox News and its licensees. *Id.* ¶¶ 103, 162, 279, 290.  It even publicizes

the fact that FNC and FBN are available on its system. *Id.* ¶¶ 213–15.

        This is the epitome of free-riding, which entails "enabling [TVEyes] to produce a directly

competitive product for less money because it has lower costs." *Barclays*, 650 F.3d at 901

(quoting *NBA*, 105 F.3d at 854); *BanxCorp*, 723 F. Supp. 2d at 613 (finding unauthorized use of

the plaintiff's information to constitute free riding); *Pollstar v. Gigmania Ltd.*, No. 00 Civ. 5671,

2000 WL 34016436, at *6 (E.D. Cal. Sep. 1, 2000) (finding that free riding exists where the

defendant copies information from the plaintiff and profits from its use).  In other words, by

"appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by

disposing of it to" its subscribers, TVEyes "is appropriating to itself the harvest of those who

have sown." *INS*, 248 U.S. at 239–40.

        TVEyes' free-riding is underscored by its bad faith conduct discussed above, including

its copying and redistribution of Fox News' telecasts in violation of its agreements with cable

providers. *See supra* 29; *Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 245–46

(1905) (emphasizing that the defendant must have obtained the plaintiff's information "through a

known breach of the confidential terms on which the plaintiff communicates them").

        In sum, TVEyes' verbatim reproduction of Fox News' information in a deliberate attempt

to reap millions of dollars in profit from Fox News' newsgathering efforts is the quintessence of

parasitic behavior that the hot news doctrine was intended to prohibit. *INS*, 248 U.S. at 231

(holding that a hot news claim exists for "copying news from bulletin boards and from early

editions of complainant's newspapers and selling this, either bodily or after rewriting it, to

defendant's customers"); *Bond Buyer v. Dealers Digest Publ'g Co.*, 267 N.Y.S.2d 944, 945 (N.Y. App. Div. 1966) (enjoining defendant that "appropriated information gained from plaintiff's wire service" and that published "items in its news sheet contemporaneously with plaintiff's publication in its news sheet, thereby reaping the benefit of plaintiff's newsgathering staff without either incurring the expense or expending the effort"). Accordingly, Fox News has established the third hot news element.

### D.    TVEyes' Services Directly Compete with Fox News' Services

TVEyes' use of Fox News' information—which it describes as a better alternative to "old-fashioned press clipping services"— competes with multiple Fox News services. As discussed above, TVEyes copies and retransmits Fox News' news reports, which are available on television and on Fox News' TVEverywhere service, in "real-time" to its subscribers, thereby relieving them of the need to purchase a cable subscription to watch Fox News' channels. FX SUF ¶¶ 97–99, 120, 162, 170, 172, 179. Similarly, TVEyes competes with Fox News by making the primary selling feature of its service "the ability to download and edit an unlimited number of" high definition video clips of Fox News "content recorded by TVEyes" before Fox News and its licensees make them available. *Id.* ¶ 279. TVEyes' system even competes with Fox News' identification of video clips through the Fox News search engine. *Id.* ¶ 278. As a result of TVEyes' efforts, its subscribers, which overlap with Fox News' viewers, have made Fox News' content among the most downloaded on TVEyes' service. *Id.* ¶¶ 221, 225, 229.

Consequently, there can be little question that TVEyes' use is in direct competition with Fox News' services. *NBA*, 105 F.3d at 852; *see BanxCorp*, 723 F. Supp. 2d at 613–14 (finding sufficient direct competition where parties' services compete); *Twentieth Century Sporting Club, Inc. v. Transradio Press Service, Inc.*, 300 N.Y.S. 159, 161 (N.Y. Sup. 1937) ("[T]here can be no doubt that the service of the defendant in supplying news to broadcasting stations would

constitute them competitors of the plaintiffs to the extent and for the purpose of broadcasting the exhibition.").

Furthermore, TVEyes competes with the services of Fox News' licensee, ITN Source, and its partner, Executive Interviews, in the identification and distribution of video clips.  FX SUF ¶ 291.  In fact, as described by Ms. Ashton, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 161–67, 269.  TVEyes' CEO even admitted that a consumer, happy with the high quality/high definition video clips provided by TVEyes, would have no need for an authorized video clip.  *Id.* ¶ 271.  This independently establishes direct competition between the parties.  *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 710 (2d Cir. 1982) (finding competition sufficiently shown for general misappropriation where the plaintiff licenses a product that competes with the defendant's use of the plaintiff's property).

Accordingly, there can be no question that the parties' services directly compete and that Fox News has established the fourth hot news element.  *See BanxCorp*, 723 F. Supp. 2d at 614 (finding direct competition would exist between Plaintiff's market HYSAs and CDs, on the one hand, and Defendants' co-branded savings accounts, on the other hand); *Twentieth Century*, 300 N.Y.S. at 161 (finding direct competition between parties that transmitted same sporting); *cf. Meltwater*, 931 F. Supp. 2d at 561 (finding that parties directly compete where clipping service and content owner both made content available on the Internet).

### E.    TVEyes' Free-Riding Reduces Fox News' Incentives to Produce News

It is unsurprising that TVEyes' freeriding reduces Fox News' incentives to gather and report the news.  By copying all of Fox News' news reports and disseminating them to its subscribers in real-time, TVEyes directs viewers away from Fox News' channels and discharges

their need to purchase a subscription from one of Fox News' distribution affiliates.  FX SUF

¶¶ 120, 146–49, 162, 170, 179.  As a result of TVEyes' viewer diversion, Fox News will earn

less revenue from affiliate and advertising fees.  *Id.* ¶¶ 126, 131.  Similarly, TVEyes' system

replaces the need for authorized video clips through Fox News' websites by making all of Fox

News' content almost instantaneously available as video clips.  *Id.* ¶¶ 162, 290.  ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████  *Id.* ¶¶ 103, 122.  Thus, TVEyes reduces Fox News' website

traffic, resulting in reduced online advertising revenue and fewer users seeing Fox news'

promotional offerings.  *Id.* ¶¶ 131, 290.  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████  *Id.* ¶¶ 225, 268–70.  If TVEyes' actions are deemed lawful and this

conduct became widespread, Fox News' business of providing news 24 hours a day, which is

premised on earning these revenues, would be stymied.  *Id.* ¶¶ 284–92.

        As TVEyes' use (or similar use by other parties) of Fox News' information causes Fox

News' services to be less profitable and, as a result, reduces Fox News' incentive to gather and

report the news, Fox News has established the final hot news element.  *NBA*, 105 F.3d at 852,

854 (undermined incentive to create television program would be shown by a service that acts

"as a substitute for . . . watching [NBA games] on television"); *Int'l Sec. Exch., LLC v. S & P*

*Dow Jones Indices, LLC*, No. 06 Civ. 12878, 2013 WL 6653687, at *9 (S.D.N.Y. Dec. 17, 2013)

(Hellerstein, J.) (giving effect to *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 973

N.E.2d 390, 406 (Ill. App. Ct. 2012) (finding that demonstrated ability to monetize information

makes protection more likely)); *see also Pollstar*, 2000 WL 34016436, at *6 (finding this

element sufficiently pleaded by allegation that the defendant profits from its use of information copied from the plaintiff); *cf. WPIX*, 691 F.3d at 288 (noting that "desire to create original television programming surely would be dampened if their creative works could be copied and streamed over the Internet in derogation of their exclusive property rights").

* * *

For the reasons above, Fox News respectfully requests that the Court grant its motion for summary judgment on hot news misappropriation.

## IV.   TVEYES IS LIABLE FOR MISAPPROPRIATION

TVEyes has misappropriated the results of Fox News' labor, skill and expenditures in bad faith, and has used them to profit at Fox News' expense.  It also has deceived customers into thinking that Fox News has authorized its use of content from FNC and FBN.   As discussed below, both forms of unfair competition are prohibited under New York law, and TVEyes cannot meet its burden to show that Fox News' claim is preempted by copyright law.

### A.   TVEyes Has Misappropriated the Results of Fox News' Labor, Skill and Expenditures in Competition with Fox News and Has Deceived Consumers

The foundation of New York's common law of unfair competition is "the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia Malone & Co. v. Rieder,* 19 N.Y.3d 511, 516 (2012) (quoting *Miller v. Schloss*, 218 N.Y. 400, 407 (1916)).  Such a claim "must be grounded in either deception or appropriation of the exclusive property of the plaintiff."  *H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1025 (2d Cir. 1989).  New York law recognizes claims based on the misappropriation of the results of another's labor, skills and expenditures in bad faith and using them in direct competition.  *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1371 (Fed. Cir. 2013); *Roy Exp.,* 672 F. 2d at 1105.  As the New York Court of Appeals has acknowledged, these claims are

- 51 -

designed to protect against "parasitism" and the increasing opportunities for "chicanery" in the constantly evolving business world.  *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 568 (1959).

TVEyes' conduct is just the type of "parasitic" behavior that the law seeks to prevent.  As discussed above, Fox News has devoted a tremendous amount of labor, skill and expenditures producing and distributing its news programming.  This includes crafting a complex system with its affiliates to disseminate news and information quickly to the public.  FX SUF ¶¶ 83–86, 119–28; *S&P*, 683 F.2d at 710 (finding protectable property right in index due to the expertise by 25–30 employees and significant financial expenditures that were invested to create it); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 303 (S.D.N.Y. 2010) (finding property right due to exercise of due diligence, planning, and development in creating business plans); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 502 (S.D.N.Y. 2002) (finding sufficient investment to create property right given that the plaintiff "had more than twenty professionals working for over two years on its computer system, at a cost of over two million dollars").

TVEyes' unfair competition with Fox News is established in two independent ways.  First, TVEyes has utilized Fox News' distribution system for its own commercial benefit and in direct competition with Fox News's use.  *Hall*, 705 F.3d at 1369; *Roy Exp.,* 672 F. 2d at 1105 (holding that an "unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property").  As detailed above, TVEyes provides the news reports disseminated on Fox News' distribution system to its own subscribers for a fee.  FX SUF ¶¶ 143–49, 169.  This is a commercially important feature of TVEyes' service.  *Id.* ¶¶ 147, 210–26.  TVEyes hypes the availability of FNC and FBN in its marketing materials, and these channels are among the most

watched and downloaded by TVEyes' subscribers.  *Id.* ¶¶ 213–15, 221–26.  By diverting viewers

to its service, TVEyes directly competes with and harms Fox News' and its licensees'

distribution of this content.  As a result, TVEyes has been enriched in the amount of

in 2013 alone.  *Id.* ¶ 236.  Thus, TVEyes is liable for misappropriation.  *See S&P*, 683 F.2d at

710 (finding competition where the plaintiff licenses a product that competes with the

defendant's use of the plaintiff's property); *Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler,*

*M.D., LLC*, 905 N.Y.S.2d 232, 1166 (N.Y. App. 2010) (finding plaintiffs to have demonstrated

*prima facie* case "by submitting evidence establishing that the defendants wrongfully diverted

the plaintiffs' business to themselves"); *see also Hall*, 705 F.3d at 1371.

Second, TVEyes has deceived consumers by crafting the overall appearance of its

website and service in a way that gives the misimpression to consumers that it has permission or

a license from Fox News and other content owners when it does not.  FX SUF ¶¶ 255–56.

TVEyes' representatives have made statements to customers and potential customers that also

create the misimpression that video clips downloaded from the TVEyes service are licensed for

use on internal and external websites.  *Id.* ¶¶ 257–59.  As a result of this deception, consumers

have turned to TVEyes for Fox News' content, rather than to Fox News or its licensees.  *Id.* ¶¶

171, 257–59, 269; *Eyal R.D. Corp. v. Jewelex New York Ltd.,* 784 F. Supp. 2d 441, 447

(S.D.N.Y. 2011) (Hellerstein, J.) (stating claim can be established by showing "efforts of a

salesman or a company, by words or deeds, to deceive consumers into believing that accused

merchandise is something else").

Moreover, TVEyes has acted in bad faith, which supports a finding of summary judgment

for Fox News.  By commandeering Fox News' distribution system, ███████████████████

████████████████████████████████████████████████████



██████████████████████████████████████████

██████████████████████████ FX SUF ¶ 122. ██████████████

██████████████████████████████ *Id.* ¶ 121. ████████████

████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 123.

TVEyes, however, makes all of Fox News' content available online in a manner that ██████████

██████████████████████████████████████████████

██████████████ *Id.* ¶¶ 146–49, 289.  Thus, TVEyes has acted in bad faith by misappropriating

the product of Fox News' labors for itself.  *Dior v. Milton*, 155 N.Y.S.2d 443, 457 (N.Y. Sup.

1956) (finding defendant acted in bad faith by interfering with plaintiff's contractual relationship

with its licensees).

        Similarly, ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████ FX SUF ¶ 124.  As a result, Fox News' affiliates' subscriber contracts have

specific terms that prohibit, among other things, "redistributing or retransmitting the Service."

*Id.* ¶ 125.  As discussed above, however, TVEyes uses Fox News' distribution system and

content in violation of its agreements with these providers, *id.* ¶¶ 152–59, which further

evidences its bad faith.  *Roy Exp.*, 503 F. Supp. at 1146–47, 1152 (finding bad faith where

defendant acquired product through illicit means).

        Further, TVEyes' conduct contradicts its own stated policy and the practices of other

clipping services that permission is needed from content owners to run this type of business.  FX

SUF ¶¶ 238–50.  TVEyes also refused to comply with Fox News' demands to cease and desist

(even though it represented it would), and highlighted the availability of FNC and FBN in order

to induce more subscribers to sign up.  *Id.* ¶¶ 213–15, 251–54; *see Microban Prods. Co. v. API*

*Indus., Inc.*, No. 14 Civ. 41, 2014 WL 1856471, at *15 (S.D.N.Y. May 8, 2014) (granting

summary judgment on misappropriation as bad faith existed due to defendant's failure to comply

with cease and desist letters and attempt to capitalize on the benefits of the plaintiff's intellectual

property rights); *Triboro Quilt Mfg. Corp. v. Luve LLC*, No. 10 Civ. 3604, 2014 WL 1508606, at

*9 (S.D.N.Y. Mar. 18, 2014) (finding inference of bad faith in the misappropriation context

where defendant used plaintiff's designs "to generate interest" in competing product).

Thus, Fox News respectfully requests that summary judgment be entered on this claim.

### B.      TVEyes' Preemption Defense Fails

In order for TVEyes to prevail on its preemption defense, TVEyes has the burden of

establishing that <u>both</u> "(i) the work at issue come[s] within the subject matter of copyright <u>and</u>

(ii) the right being asserted is equivalent to any of the exclusive rights within the general scope

of copyright." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429

(2d Cir. 2012).  TVEyes cannot meet this burden.

 First, Fox News' misappropriation claim is based on TVEyes' use of its distribution

system that it painstakingly negotiated and constructed in order to disseminate news and

information to the public quickly.  It is well-established that distribution "systems" like this are

not protected under copyright law.  17 U.S.C. § 102(b); NIMMER ON COPYRIGHT § 1.01

(explaining that works not within the meaning of § 102 are not preempted, even if the state-

created rights therein are equivalent to copyright); *see Demetriades v. Kaufmann*, 698 F. Supp.

521, 528 (S.D.N.Y. 1988) (finding no preemption of misappropriation claim based on moldings

not protected by copyright); *see also S&P*, 683 F.2d at 710 (affirming preliminary injunction

based on misappropriation of index).

Second, as one of Fox News' theories of unfair competition is based on deception, it is an

extra element that makes Fox News' claim qualitatively different from a copyright claim.

*Samara Bros. Inc. v. Wal-Mart Stores,* 165 F.3d 120 (2d Cir. 1998) (finding "actual confusion" to constitute extra element); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, No. 96 Civ. 1103, 1996 WL 724734, at *2–3 (S.D.N.Y. Dec. 17, 1996) (finding plaintiff's unfair competition claim based on "passing off" not to be preempted, and noting that "[t]he Second Circuit has held that passing off claims are not preempted by the Copyright Act because they involve an element of misrepresentation or deception which is not an element of copyright claims"); NIMMER ON COPYRIGHT § 1.01[B][1][e] ("Similarly, crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement.  Thus, there is no pre-emption of . . . the state law of unfair competition of the 'passing off' variety.").  Accordingly, TVEyes' preemption defense fails.

## CONCLUSION

For the foregoing reasons, Fox News respectfully requests that its motion for summary judgment be granted in its entirety.

Dated:  New York, New York
       June 26, 2014

*/s/ Dale M. Cendali*

Dale M. Cendali
Johanna Schmitt
Joshua L. Simmons
Brian Leary
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
joshua.simmons@kirkland.com
brian.leary@kirkland.com

Attorneys for Plaintiff
Fox News Network, LLC

- 56 -