**<u>HIGHLY CONFIDENTIAL</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOX NEWS NETWORK, LLC,

            Plaintiff,

    - against -

TVEYES, INC.,

            Defendant.

Case No.  13-CV-5315 (AKH)

**DEFENDANT TVEYES' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................... 1

FACTUAL BACKGROUND ...................................................................... 3

 A. Overview of TVEyes' Service ................................................ 3

 B. TVEyes' Clients ..................................................................... 4

 C. TVEyes' Features .................................................................. 6

 D. How TVEyes' Customers Use TVEyes ................................. 16

  1. Subjects of Customers' Searches ................................ 16

  2. Ways That Customers Search TVEyes ........................ 17

  3. Length of Clips That Users View ................................ 17

 E. The Benefits of TVEyes ....................................................... 18

 F. The Business of Fox News ................................................... 20

  1. Fox's Websites ............................................................ 20

  2. Fox's Clip-Licensing Activities .................................. 22

  3. Fox Does Not Offer Media-Monitoring Services .......... 22

 G. The Works-in-Suit ............................................................... 23

ARGUMENT ......................................................................................... 24

I. LEGAL STANDARD ................................................................... 24

II. TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107 ............ 26

 A. The Nature and Character of TVEyes' Service Is Consistent
  With the Principles Underlying Fair Use ............................... 28

  1. TVEyes' Creation of a Comprehensive Searchable
   Database of Broadcast Content Is Highly Transformative ........ 29

  2. TVEyes' Use Of The Works-in-Suit Serves Important
   Public Interests ........................................................... 35

  3. TVEyes' For-Profit Status Does Not Weigh Against Fair
   Use .............................................................................. 36

 B. The Works-in-Suit Are Factual in Nature and Were Previously
  Published .............................................................................. 39

 C. Copying the Entirety of the Works Was Necessary to Create a
  Comprehensive, Text-Searchable Index and to Provide Targeted
  Snippets to TVEyes' Clients .................................................. 40

D.      TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit............................................................................ 43

      1.      TVEyes Does Not Act as a Substitute for the Works-in-Suit ..................................................................................... 45

           a.      TVEyes Does Not Affect Fox's Revenues from Cable Company Licenses or Advertising Partners .................... 45

           b.      TVEyes Does Not Affect the Secondary Market for Public Performances Licenses for the Works-in-Suit...... 46

           c.      TVEyes Does Not Deprive Fox of Revenue From Use of the Works-in-Suit Online ...................................... 47

      2.      TVEyes Provides a Tremendous Benefit to the Public ............. 51

E.      Weighing the Fair Use Factors, Along with Other Relevant Considerations, TVEyes' Use Is Fair..................................... 55

III.    FOX'S "HOT NEWS" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS........................................................ 56

A.      Fox's "Hot News" Misappropriation Claim Is Preempted by the Copyright Act............................................................................. 56

      1.      Fox Has Not Identified Any Particular Piece of Exclusive, Time-Sensitive "Hot News" That Was Misappropriated .......... 57

      2.      TVEyes Does Not "Free Ride" on Fox's Efforts ......................... 60

      3.      TVEyes Is Not a Threat to the Very Existence of Fox's Newsgathering Activities ............................................................. 62

      4.      TVEyes and Fox Are Not "Direct Competitors" ........................ 62

B.      Fox Cannot Prove "Hot News" Misappropriation On The Merits........ 64

IV.     FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS ...................................... 64

A.      Fox's "Direct Competition" Misappropriation Claim Is Preempted by the Copyright Act ........................................................... 64

B.      Fox's "Direct Competition" Misappropriation Claim Is Duplicative of Its "Hot News" Misappropriation Claim ...................... 67

C.      Fox Cannot Prove "Direct Competition" Misappropriation on the Merits................................................................................... 67

CONCLUSION............................................................................... 69

## TABLE OF AUTHORITIES

**Page**

### Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
 562 F.3d 630 (4th Cir. 2009) .................................................................. 29, 30, 41

*Am.  Geophysical Union v. Texaco Inc.,*
 60 F.3d 913 (2d Cir. 1994).............................................................................. 37, 38

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) .............................................................................................. 25

*Authors Guild, Inc. v. Google Inc.,*
 954 F. Supp. 2d 282 (S.D.N.Y. 2013) ...........................................................*passim*

*Authors Guild, Inc. v. HathiTrust*
 --- F.3d ---, 2014 WL 2576342 (2d Cir. June 10, 2014)................................*passim*

*BanxCorp v. Costco Wholesale Corp.,*
 723 F. Supp. 2d 596 (S.D.N.Y. 2010) ................................................................. 59

*Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.,*
 650 F.3d 876 (2d Cir. 2011)........................................................ 56, 67, 60, 61, 65

*Bell v. Metro. Transp. Auth.,*
 No. 12 Civ. 1235(AKH), 2013 WL 8112461 (S.D.N.Y. Nov. 1, 2013)................... 24

*Bill Graham Archives v.  Dorling Kindersley Ltd.,*
 448 F.3d 605 (2d Cir. 2006)...........................................................................*passim*

*Blanch v. Koons,*
 467 F.3d 244 (2d Cir. 2006)............................................................. 25, 27, 31, 38

*Campbell v. Acuff-Rose Music, Inc.,*
 510 U.S. 569 (1994) .......................................................................................*passim*

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
 262 F. Supp. 2d 204 (S.D.N.Y. 2003) ................................................................. 60

*Cariou v. Prince,*
 714 F.3d 694 (2d Cir. 2013)............................................................. 25, 31, 36, 38

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
 150 F.3d 132 (2d Cir. 1998)........................................................................ 27, 28

*Computer Assoc. Int'l v. Altai, Inc.,*
 982 F.2d 693 (2d Cir. 1992)........................................................................ 57, 66

*Consumers Union of United States, Inc. v. Gen. Signal Corp.,*
 724 F.2d 1044, 1049 (2d Cir. 1983)..................................................................... 36

*Durham Indus., Inc. v. Tomy Corp.,*
 630 F.2d 905 (2d Cir. 1980).................................................................................. 66

*Eldred v. Ashcroft,*
 537 U.S. 186 (2003) ................................................ 39

*Eyal R.D. Corp. v. Jewelex New York Ltd.,*
 784 F. Supp. 2d 441 (S.D.N.Y. 2011) ...................... 66, 67

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
 499 U.S. 340 (1991) ............................................ 39, ,53

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.,*
 808 F.2d 204 (2d Cir. 1986)................................... 60, 65

*Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.,*
 73 F. Supp. 2d 1044 (E.D. Mo. 1999) ...................... 26

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
 111 F.3d 993 (2d Cir. 1997)................................... 68

*Harlen Assocs. v. Vill. of Mineola,*
 273 F.3d 494 (2d Cir. 2001)................................... 24

*Harper & Row Publishers, Inc. v. Nation Enters.,*
 471 U.S. 539 (1985) ............................................ 5, 28

*Hollander v. Steinberg,*
 419 F. App'x. 44 (2d Cir. 2011) ............................. 25

*International News Service v. Associated Press,*
 248 U.S. 215 (1918) ............................................ 50, 60

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth Inc.,*
 58 F.3d 27, 34-35 (2d Cir. 1995)............................ 67

*Kelly v. Arriba Soft Corp.,*
 336 F.3d 811 (9th Cir. 2002) ................................ 30

*Leibovitz v. Paramount Pictures Corp.,*
 137 F.3d 109 (2d Cir. 1998).................................. 31

*Maxtone-Graham v. Burtchaell,*
 803 F.2d 1253 (2d Cir. 1986)................................. 37

*Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder  Corp.,*
 101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950) .................... 65

*NXIVM Corp. v. Ross Inst.,*
 364 F.3d 471 (2d Cir. 2004)................................... 28, 29

*N.Y. Times Co. v. Sullivan,*
 376 U.S. 254 (1964) ........................................... 55

*Nash v. CBS, Inc.,*
 704 F. Supp. 823 (N.D. Ill. 1989) ........................... 66

*Nat'l Basketball Ass'n v. Motorola, Inc. ("NBA")*,
  105 F.3d 841 (2d Cir. 1997).............................................................. 57, 61, 62, 63

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
  904 F.2d 152, 157 (2d Cir. 1990)............................................................... 39

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .................................... 30,  31, 34,  35, 36, 41

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
  894 F. Supp. 2d 288 (S.D.N.Y. 2012) ....................................................... 68

*Roe v. City of Waterbury*,
  542 F.3d 31 (2d Cir. 2008).......................................................................... 24

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) .................................................................... 35

*Silver v. Lavandeira*,
  2009 WL 513031 (S.D.N.Y. Feb. 26, 2009) ............................................. 59

*Sony Corp.  of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ....................................................... 35, 39, 41,  48

*Scotto v. Almenas*,
  143 F.3d 105, 114 (2d Cir. 1998).............................................................. 25

*Sparaco v. Lawler, Matusky, Skelly Eng'rs*,
  303 F.3d 460 (2d Cir. 2002)....................................................................... 39

*Stadt v. Fox News Network LLC*,
  719 F. Supp. 2d 312 ................................................................................... 66

*Stewart v. Abend*,
  495 U.S. 207 (1990) .................................................................................... 39

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  --- F.3d ---, 2014 WL 2219162 (2d Cir. May 30, 2014)..................................*passim*

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  861 F. Supp. 2d 336 (S.D.N.Y. 2012) ..................................................... 42

*Taggart v. WMAQ Channel 5 Chicago*,
  2000 WL 1923322 (S.D. Ill. Oct. 30, 2000) ............................................. 39

*U.S. ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*,
  104 F.3d 1453 (4th Cir. 1997) ................................................................... 26

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986).......................................................................... 64

*Wright v. Warner Books, Inc.*,
  953 F.2d 731 (2d Cir. 1991)....................................................................... 25

## <u>Statutes</u>

26 U.S.C. § 9003(e) ............................................................................. 7

47 C.F.R. § 79.1 .................................................................................. 7

17 U.S.C. § 107 ...........................................................................*passim*

17 U.S.C. § 301 ........................................................................... 57, 65

47 U.S.C. § 611 ................................................................................... 7

Fed. R. Civ. P. 56(a) ......................................................................... 24

## <u>Miscellanesous</u>

Pierre N. Leval, *Toward a Fair Use Standard,*
   103 Harv. L. Rev. 1105, 1107 (1990) ........................................... 26, 28

## PRELIMINARY STATEMENT

TVEyes is a research tool that allows users to learn when and how a particular word—any word—was used on television.   Using state-of-the-art technology, TVEyes captures the broadcasts of over 1,400 television and radio stations, indexes every word spoken into a massive database, and enables users to run searches on that database to discover: (1) the *fact* that a particular word was mentioned; (2) the **context** of the mention; and (3) advanced **metrics** associated with the mention.   In delivering search results, TVEyes displays the text of the broadcast transcript surrounding the user's keyword and allows the user to view a short excerpt of the corresponding video.

TVEyes' service provides an enormous public benefit: there is simply no other way to effectively monitor what is said on more than 27,000 hours of television broadcasts every day without a tool like TVEyes.   Clients use TVEyes to, among other things: confirm the accuracy of the information reported on the air; ensure the safety of American troops abroad; and criticize broadcast news itself.   To serve the diverse monitoring objectives of its clients, TVEyes must capture everything that has aired, exactly as it aired, to create a complete and accurate searchable database.

Through this action, Fox seeks to establish its exclusive control over the news content it broadcasts.  In Fox's view, TVEyes' service is unlawful because it interferes with Fox's exclusive right to determine when, how and on what terms it makes previously broadcast news content available to the public.  ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████   And Fox carefully curates what content it makes available to the public on its website, choosing to include some—but not all—

of what it previously broadcast.  Such restrictions frustrate the purposes of those who monitor the media.

The doctrine of fair use guarantees that use of copyrighted content—particularly highly factual content, such as the programs that air on Fox News Channel—is not an infringement when the use is for a different purpose than the original and when the use benefits the public interest.  Here, TVEyes' media-monitoring service fulfills a fundamentally different purpose than Fox's broadcasts—it is a research and reference tool that provides the important benefit of allowing media, politicians, and the public to function as a watchdog over channels such as Fox, and to conduct research on those channels' accuracy, biases, and trends.  Such use is quintessentially fair.  *See*, *e.g.*, *Authors Guild, Inc. v. HathiTrust*, --- F.3d ---, 2014 WL 2576342 (2d Cir. June 10, 2014) (copying of 10 million books in their entirety to create a text-searchable database is fair use); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, --- F.3d ---, 2014 WL 2219162 (2d Cir. May 30, 2014) (copying entirety of sound recording in furtherance of factual accuracy, not piracy, is fair use); *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013) (Chin, J.) (copying books and providing users with snippets of text in results is fair use).

Fox's remaining state-law claims are meritless.  For example, when asked to identify Fox's "hot news" that TVEyes allegedly misappropriated, Fox merely points to its entire "coverage" of world events—*e.g.*, two full months of reporting on the "Arab spring uprisings," and six weeks of reporting on "the papal resignation and election."  Fox, however, does not own all news regarding the Arab uprisings or the papal election—two of the most widely covered stories of the year.  Covering an important story, alongside thousands of others, does not render every second of coverage "hot news," owned by Fox.  While Fox's state-law claims are toothless

because they are preempted by the Copyright Act, they demonstrate the excessive level of control Fox seeks to exert over basic facts, which cannot be owned.

The Court should: (1) recognize that TVEyes' use is a fair, non-infringing use under the § 107 of the Copyright Act; and (2) reject Fox's claims of state-law misappropriation as preempted and meritless. TVEyes' motion for summary judgment should be granted.

## FACTUAL BACKGROUND[1]

### A.    Overview of TVEyes' Service

TVEyes is a media-monitoring service that enables its clients to discover and locate mentions of particular words on almost every major television and radio broadcast in the United States.  (SUF ¶¶ 2-3.)  Launched in 1999, TVEyes uses proprietary technology to: (1) capture television and radio content from more than 1,400 channels, 24 hours a day, 7 days a week; (2) make that content text-searchable by keyword; and (3) allow customers to view snippets of the content in response to their queries.  (*Id.* ¶ 3, 13.)  Fundamentally, TVEyes is a tool, akin to a search engine, that makes it possible for users to sift through vast amounts of broadcast television content to locate particular information. (*Id.* ¶ 2-4.)  Unlike a traditional search engine, however, which queries only content that already exists on the Internet, TVEyes captures and aggregates more than ***27,000 hours*** of content every day, broadcast on over 1,400 television and radio stations, and quickly transforms it into a comprehensive, searchable database, to facilitate research.  (*Id.* ¶ 13-15.)  Without TVEyes (or a service like it), it would not be possible to efficiently

---

[1]  The material undisputed facts are set forth more fully in the accompanying Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated June 26, 2014 ("SUF"), and the Declarations of David Ives, David Seltzer, Jessica Rose, and Todd Anten, dated June 26, 2014.

search through and review the staggering amount of information broadcast every day on television.  (*Id.* ¶ 14.)

## B.  TVEyes' Clients

TVEyes is a subscription-based service that is offered exclusively to businesses, organizations, and government bodies—*e.g.*, elected officials, non-profits, the media and political campaigns—to facilitate their internal research and analysis of television content.  (SUF ¶¶ 4-5.)  Most TVEyes subscribers pay a fee of $500 per month for access to TVEyes' service, although select subscribers, such as non-profits or journalists, may receive reduced rates.  (*Id.* ¶ 6.)  TVEyes does not offer subscriptions to individuals (except in connection with the operation of a business or political office), and the service is not intended for personal use.  (*Id.* ¶ 5.)  Further, it is TVEyes' policy that subscribers are required to limit their use of video content obtained from TVEyes solely to internal research and analysis—a requirement that is stated in TVEyes' contract, on its website, and in its communications with subscribers.  (*Id.* ¶¶ 7-9.)

As of October 2013, TVEyes had over 2,200 subscribers.  (*Id.* ¶ 10.)  TVEyes' customers include:

- ***Governmental bodies***, ███████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████

- ***Congressional committees***, ████████████████████████
████████████████████████████████████████████████████████
████████████████

- ***Journalism organizations***, ███████████████████████
████████████████████████████████████████████████████████
██████████████

- ***Armed Services***, ████████████████████████████████████████

- ***Political candidates*** at the local, state, and national levels, as well as ***political organizations***, ████████████████████████

- ***Non-profit organizations***, ████████████████████████████████

- ***For-profit corporations***, ██████████████████████████████████

- ***Media organizations***, ████████████████████████████████

- ***Law enforcement offices***, ███████████████████████████████

- ***Public and private schools*** ███████████████████████

- ***Legal organizations***, ███████████████████████████

- ***Press relations organizations***, ██████████████████████

- ***Sports organizations***, ████████████████████████

(*Id.* ¶¶ 10-11.)

TVEyes' clients use the service in various ways to facilitate their research objectives.   For example, journalists use TVEyes to comment on and criticize broadcast news channels (including Fox), often by comparing and contrasting how the major news networks cover particular news events.   (*Id.* ¶¶10-11, 53, 59-60.) Government officials and corporations use TVEyes to monitor the accuracy of facts

reported by the media so they can make timely corrections when necessary  (*Id.* ¶¶10, 54, 57.)  Political campaigns use TVEyes to monitor political advertising and appearances of candidates in election years.  (*Id.* ¶¶ 10-11, 51.)  Financial firms use TVEyes to track and archive public statements made about securities by their employees for regulatory compliance. (*Id.* ¶¶ 10-11, 48.) The White House uses TVEyes to evaluate news stories and give feedback to the press corps, including Fox News.  (*Id.* ¶¶ 10-11, 56.)  Without TVEyes or a service akin to it, there would be no way to effectively accomplish these objectives.

## C.      **TVEyes' Features**[2]

TVEyes functions much like a search engine for television content.  (SUF ¶¶ 3, 13-17.)  Unlike a conventional search engine, however, TVEyes does not "crawl" the Internet.  This is because the vast majority of television content is not posted to the Internet.  Rather, TVEyes captures and indexes the actual broadcasts of more than 1,400 television and radio stations, 24 hours a day, 365 days a year, as they are aired, and creates a comprehensive database of everything that was broadcast, exactly as it was broadcast.  (*Id.* ¶¶ 3, 13-16.)  In so doing, TVEyes offers a unique and important service by creating from scratch a text-searchable library of broadcast content ***that would otherwise not exist***, and making it searchable to subscribers for research and analysis.  (*Id.* ¶¶ 14-15.)

Using closed-captioned data and speech-to-text technology, TVEyes creates transcript "indexes" for every word spoken on a particular television station.[3]  (*Id.*

---

[2]   Pursuant to a request by Fox, TVEyes provided Fox's counsel with confidential TVEyes credentials so that it could access and use the TVEyes service.  Under separate cover, TVEyes is providing the Court with confidential credentials so that it may access and use the TVEyes service.

[3]   Since at least 2011, Fox has provided closed captioning for both daytime and primetime shows.   *See*  http://help.foxnews.com/entries/505254-Does-Fox-News-Channel-and-Fox-Business-Network-provide-closed-captioning-; *see also*  47 C.F.R. § 79.1 (FCC rules for closed captioning).  While standard commercials shorter than

(*footnote continued*)

¶ 16.)   When a user searches for a particular keyword, she will receive a list of results that include: (1) a snippet of the transcript in which the keyword was used; and (2) the ability to watch a short clip of the television broadcast in which the word was used, beginning 14 seconds before the keyword was said.  (*Id.* ¶¶ 17-18.)  This is accomplished by a mathematical algorithm. (*Id.* ¶ 18.)   Beginning the clip only a few seconds before the keyword is uttered helps to ensure that TVEyes provides a targeted result that is closely tailored to the user's research needs. (*Id.*)

Content captured by TVEyes is searchable for up to 32 days from the date it was first broadcast.  (*Id.* ¶ 19.)  All videos, other than those specifically archived by users,[4] are deleted from TVEyes servers 32 days after the broadcast was captured. (*Id.*)  As a result, TVEyes cannot be used to search or access content that is more than a month old.

TVEyes' clients can perform an unlimited number of search queries on its system.   (*Id.* ¶ 20.)   Upon logging into the TVEyes website, hosted at http://www.tveyes.com, clients are first brought to the "Watchlist" page ("Watchlist Page") of TVEyes' Media Monitoring Suite ("MMS").  (*Id.* ¶ 21.)  From the Watchlist Page, clients can select the words or phrases that they wish to monitor on an ongoing basis ("Watch Terms"), without ever having to conduct another manual search for that word.  (*Id.*)  There is no limit to the number of Watch Terms that can be monitored; indeed, some clients monitor hundreds of keywords and phrases simultaneously.  (*Id.* ¶ 22.)

---

5 minutes are not required to have closed captioning, 47 C.F.R. § 79.1(a)(1), candidates for President and Vice President who receive money from the Presidential Election Campaign Fund must closed-caption their advertisements, 26 U.S.C. § 9003(e).  In addition, public service announcements are required to be closed captioned.  47 U.S.C. § 611.

[4]  If a user saves a particular clip to her Media Center, then that clip may be downloaded at any time that the account is active.  However, the clip must still be initially found and saved within 32 days of the original broadcast.



**Figure 1: Watchlist Page**

*Figure 1* is an example of the MMS page displayed upon logging onto TVEyes. This page gives the user an easy-to-understand metric of the overall frequency of the appearance of a particular Watch Term by date. (*Id.* ¶ 24.) In this example, "Starbucks" was mentioned in 264 unique instances across all media (television and radio) on June 19, 2014. TVEyes also offers more advanced search functionality (under "Add Advanced Terms"), which allows the user to add more complex Watch Terms. (*Id.* ¶ 25.) MMS also allows users to: (1) run an instant "Google News" search for the Watch Term, allowing users to compare mentions of the Watch Term on the Internet with mentions of the Watch Term on television; (2) edit the Watch Term; (3) view Media Stats for the Watch Term; (4) set up an Email Alert for the Watch Term; or (5) delete the Watch Term. (*Id.* ¶ 26.)

The "Media Stats" function organizes data associated with each Watch Term. (*Id.* ¶ 27.)    For example, at a user's request, TVEyes generates a graphic representation of the number of  times a Watch Term has been mentioned over a given time period—month, day, week, or custom range.  (*Id.*)  In addition, users can compare the relative frequency of mentions of multiple Watch Terms.   Rolling over any point in the graph provides the precise number of mentions.  ***Figure 2*** below provides an example of the frequency of mentions of the two Watch Terms "Starbucks" and "climate change" between May 21, 2014 and June 20, 2014— allowing the user to compare and contrast coverage of these two Watch Terms:



**Figure 2: Watchlist Mentions Over Time**

When the user clicks "Marketshare," TVEyes generates a "heatmap" of the market share for the Watch Term, visually communicating the geographic location and frequency of mentions, as in *Figure 3* below:



**Figure 3: Heatmap for Marketshare of Watch Term**

(*Id.*)

When the user clicks "Broadcast Network," TVEyes generates a pie chart depicting the breakdown of broadcast stations on which the Watch Term was used, as in *Figure 4* below:

10



**Figure 4: Watchlist Data Mentions By Source**

(*Id.*)

The "Email Alert" function sends an email to the user from the email address Results@TVEyes-Alerts.com whenever a Watch Term is mentioned.  (*Id.* ¶ 28.)  The Email Alert received by the user contains a thumbnail image from the relevant portion of the broadcast and a link to a short video clip of the use on TVEyes.  (*Id.*)  Generally, a user will receive an Email Alert between ███████████ after the Watch Term was mentioned.  The Email Alert feature is the fastest way to learn that a Watch Term has been mentioned on the air.  (*Id.* ¶ 29.)

The Watchlist Page (see ***Figure 1***), includes hyperlinked numbers under the "Mentions for Date" banner.  (*Id.* ¶ 30.)  When a user clicks a number, she is brought to a results page (the "Results List Page"), where each mention of the Watch Term on that date is organized in reverse chronological order, with the Watch Term highlighted in a snippet of transcript text.  (*Id.*)  For example, if a user clicks "264" for the Watch Term "Starbucks" on June 19, 2014, she encounters a page listing the search results, as displayed in ***Figure 5*** below:

11



**Figure 5: Results List of Watch Term Hits**

If the user clicks "Show Map" in the upper right on the Results List Page, a map is displayed presenting where the mention occurred and the relative number of mentions (by the size of the circle). (*Id.* ¶ 31.) **_Figure 6_** below, for example, shows that on June 19, 2014, the greatest number of mentions for "Starbucks" occurred in Seattle-area media, while there were no mentions by Utah media:



**Figure 6: Map of Watch Term Hits**

When the user clicks a thumbnail image on the Results List Page, a video clip begins to play automatically, accompanied by snippet of the transcript (with the Watch Term highlighted).  (*Id.* ¶ 32.)  The clip begins 14 seconds before the Watch Term mention to provide the user with sufficient context while still closely tailoring the result to the user's research needs.  (*Id.*)  ***Figure 7*** below provides an example:



**Figure 7: Transcript Page**

As depicted in ***Figure 7***, in addition to watching the relevant clip, the user can also access a wealth of information about the video excerpt, including: (1) the title of the program; (2) the precise date and time of the clip; (3) the transcript of the video, drawn from the closed caption feed for the content; (4) the name and location of the channel; (5) market viewership for the clip ████████████████████ and (6) the publicity value for the clip ██████████████ (*Id.*)  In addition, the user can save the clip; edit and download a shorter version of the clip and email the clip or its transcript to others.   (*Id.*)   All of this is subject to the contractual limitation that the video snippet is to be used for the client's internal purposes only. (*Id.* ¶¶ 7-9.)

On the Results List Page (*see* Figure 5), there is a small icon of a television above each entry—this is a feature called "Media View" (the "Media View Page"). (*Id.* ¶ 32.)  When the user clicks the television icon instead of the thumbnail, the user is presented with a more advanced presentation.  (*Id.*)  Upon clicking the icon, the user is presented with a screen similar to the one in ***Figure 8*** below:



**Figure 8: Media View Page**

The Media View Page not only presents the user with the clip (again, beginning 14 seconds before the keyword is mentioned), but also highlights the transcript as the text is spoken (in the example above, the words "for in libya" are being spoken at that moment).  (*Id.* ¶ 35.)  The screen also displays: (1) the title of the program, (2) the category of program (*e.g.*, news); (3) the year the program premiered; (4) the URL for that program's website, if one exists; and (5) credits for the program.  (*Id.*)   In the example above, because this excerpt comes from the Fox News program *America's Newsroom*, the user is provided with the URL to Fox's website for that program: http://www.foxnews.com/americas newsroom/index.html.[5]  This data is automatically provided by the Rovi Corporation and is not collected or maintained by TVEyes.  (*Id.*)  Clicking the "Viewership" tab presents the total viewership and ad value for the clip.  (*Id.* ¶ 36.)  Clicking the "Editor" tab allows the user to edit and save a short clip.  (*Id.*)

In addition to Watch Terms, TVEyes allows users to run ad hoc keyword search queries through its "Power Search" tool.  (*Id.* ¶ 37.)  The results of a user's Power Search are displayed in a result list—with a thumbnail image and transcript excerpt—in reverse-chronological order (similar to the Results List for Watch Term Hits shown in Figure 5).  (*Id.*)  And, similar to the Results List for Watch Term hits, when the user clicks a thumbnail image, the user is brought to the clip's corresponding Transcript Page, exemplified in Figure 7 above.

TVEyes also has a "Date and Time Search" feature, which allows users to play a video clip starting at a specific time on a specific television station, rather than entering a search term.  (*Id.* ¶ 39.)  This tool is useful because sometimes

---

[5]   The Media View Page may provide the URL for the homepage for that program, but it does not include a link to a particular clip on the Internet.  It is not possible to direct the user to a particular clip on the Internet because: (1) each user's clip is unique, starting about 14 seconds before the selected keyword; and (2) the vast majority of broadcast content is not available on the Internet.

closed-caption text contains spelling errors, or is otherwise entirely absent (as is sometimes the case with commercials, or where there is an error with the closed-caption capture).  (*Id.*)  In such circumstances, Date and Time Search provides an alternate way to research precisely what was said on a particular  channel, at a particular moment.

Clips offered by TVEyes in response to users' queries are generated by a mathematical algorithm.  Each clip automatically begins 14 seconds before the keyword is mentioned, to provide the user with sufficient context.  (*Id.* ¶ 18.)  In this way, TVEyes precisely tailors the clip to the user's research objective and thus maximizes research efficiency.  (*Id.*)  Moreover, the clips generated by TVEyes are responsive solely to the user's queries, and do not correlate to the beginning, end, or "heart" of any particular television program or segment, or to the headline or lede of any particular broadcast.  (*Id.* ¶ 40.)  TVEyes does not identity the "top" stories of the day, nor does it distinguish between important versus unimportant news, as what is "unimportant" to one client may be "important" to another. (*Id.*)  In other words, TVEyes' text-based search system is 100% content-neutral, correlating results solely to the chosen search term and nothing more.

## D.  **How TVEyes' Customers Use TVEyes**

### 1.  **Subjects of Customers' Searches**

The subjects of searches on TVEyes vary widely.  The average TVEyes user monitors ▆ Watch Terms simultaneously, although some monitor hundreds of Watch Terms.  (*Id.* ¶ 62.)  For example, on January 13, 2014, among the ten most popular Watch Terms were: "state police," "Obama," "Health Department," "national guard," "Department of Health," and "Special Olympics," and each was being monitored by more than 100 individual users.  (*Id.*¶ 63 )

16

In a typical month, less than ██ of users' Watch Term hits result in a user playing the corresponding video clip.  (*Id.* ¶ 65.)  In other words, the overwhelming majority of TVEyes' service is used to discover the mere fact that a particular Watch Term was mentioned on the air, rather than to view a clip associated with that Watch Term.  (*Id.* ¶ 64.)

### 2. Ways That Customers Search TVEyes

Keyword search functionality is the heart of TVEyes' service.  Most clips on TVEyes are discovered via the "Watch Terms" or "Power Search" functions.  (*Id.* ¶ 66.)  Less than ██ of the plays originate with the "Date and Time Search" feature.  (*Id.* ¶ 67.)

### 3. Length of Clips That Users View

TVEyes' users play the video clips they access for an average of ████ while the median play duration is ████  (*Id.* ¶ 68.)  In addition, ██ of all video clips played on TVEyes are three minutes or shorter in length; ██ are two minutes or shorter; and ██ are one minute or shorter.  (*Id.* ¶ 69.)  While the maximum length that any particular clip can be played is ten minutes, less than ██ of clips are ever played to the maximum.  (*Id.* ¶ 70.)

User play statistics for Fox News Channel ("FNC") and Fox Business Network ("FBN") are similar to the aggregate:  Users play FNC clips for an average of ██ seconds and FBN clips for an average of ██ seconds.  (*Id.* ¶ 71.)  For FNC, ██ of video clips are played for three minutes or less; ██ are played for two minutes less; and ██ are played for one minute or less.  (*Id.*)  For FBN, ██ of clips are played for three minutes or less; ██ are played for two minutes or less; and ██ are played for one minute or less.  (*Id.*)

**E.      The Benefits of TVEyes**

The benefits of TVEyes' service are immense.   TVEyes assembles from scratch a library of television broadcast content that does not otherwise exist, and renders it easily and efficiently text-searchable.   (*Id.* ¶¶ 15, 45.)   In so doing, TVEyes enables clients to discover, track and utilize what was said on television for multiple purposes having nothing to do with the mere watching of television. Without TVEyes (or a service like it), there is no other way to sift through more than 27,000 hours of programming broadcast on television every day—most of which is not available online or anywhere else—to track and discover information. (*Id.* ¶ 46.)

The various ways that TVEyes' clients use the system to conduct research and analysis demonstrate TVEyes' enormous public benefits, ranging from improving public safety to aiding legal enforcement to enabling media oversight. For example:

- *Financial firms* use TVEyes to track and archive public statements made by their analysts and commentators, to comply with legal requirements;

- ████████████████████████████████████

- *Advertising tracking firms* use TVEyes to confirm that television commercials ran at the proper times and around the correct programming;

- *Political campaigns* use TVEyes to evaluate candidates' public appearances, tweak their messages, and improve candidates' communication skills;

- *Police departments*, *public health campaigns*, and other use TVEyes to track television coverage of public safety messages across different stations and locations, and to and adjust outreach efforts accordingly;

- *Journalists* use TVEyes to research, report on, compare and contrast, and criticize broadcast news coverage—*e.g.*, TVEyes is an invaluable tool for journalists to research the frequency of mentions of certain words across stations, to critique one station

18

for giving a particular story more or less coverage than its competitors;

- **Elected officials** use TVEyes to confirm the accuracy of information reported on the news and seek timely corrections of misinformation; and

- **Television networks** use TVEyes to track their own programming and to research the programming of their competitors.

(*Id.* ¶¶ 10-11, 48-58, 60.)   TVEyes and its users access broadcast content for purposes entirely different from those served by the underlying broadcasts themselves.   Clients use TVEyes to monitor the news, not to watch it.



## F.      The Business of Fox News[7]

Fox owns and operates FNC and FBN, which are national cable channels. (*Id.* ¶¶ 1, 91.)  Fox content is broadcast on FNC and FBN, each of which telecasts content 24 hours a day, every day.  (*Id.* ¶ 91.) ███████████████████████████ ███████████████ (*Id.* ¶ 92.) ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████ (*Id.* ¶ 94.)[8]

### 1.      Fox's Websites

Fox operates the websites associated with FNC and FBN, located at http://www.foxnews.com and http://www.foxbusiness.com, respectively (collectively, the "Fox Website"). (*Id.* ¶ 98).   Fox makes some, but not all, of the content previously broadcast on FNC and FBN available for viewing on the Fox Website. (*Id.* ¶ 101).  Fox alone controls what content previously broadcast on FNC and FBN, if any, will be made available to the public via the Fox Website, and when, if ever, to make such content available.  (*Id.* ¶¶ 99, 101).   Further, Fox can—and does—

---

[7]   At a Court conference on April 7, 2014, TVEyes noted it did not yet have the opportunity to take a 30(b)(6) deposition of Fox.  Thus, TVEyes has not had the opportunity to ask Fox about its documents, licensing activities, revenues, websites, purported markets, or any other topic; in contrast, Fox took a 30(b)(6) deposition of TVEyes.  The Court ruled that, at that time, a 30(b)(6) deposition of Fox was not necessary; however, the Court noted that if a party believed that discovery was cut off too soon, it could bring that to the Court's attention.   TVEyes respectfully reserves that right, to the extent that Fox relies upon any evidence in its opposition to this motion about which TVEyes did not have an opportunity to depose Fox.

[8]   In discovery, Fox refused to produce certain documents relating to Fox's revenues.  For example, Fox refused to produce: (1) total annual revenues for Fox, FNC, and FBN; (2) information demonstrating the methods by which revenues were generated for its websites or any other authorized websites; and (3) actual or potential revenues purportedly lost by Fox as a result of TVEyes' service.  (SUF ¶ 95.)   To the extent such information could have any bearing on the Court's analysis, TVEyes respectfully seeks the opportunity to review the documents requested and to depose Fox about their contents.

restrict or disable access to content on the Fox Website, and may do so at any time, for any reason. (*Id.* ¶ 99.) In addition, the video content that Fox chooses to make available on the Fox Website is materially different from what is broadcast on FNC and FBN. (*Id.* ¶¶ 111-113). For example, video clips accessible on the Fox Website do not contain a ticker graphic. (*Id.* ¶¶ 111-112.) However, on the original FBN broadcast there is a graphic that displays: (1) the time of the broadcast; (2) the station logo; (3) information about financial markets, including the Dow Jones Industrial Average and stock prices; and (4) a running ticker of financial news. (*Id.* ¶ 112.) On the original FNC broadcast, there is a graphic that displays: (1) the station logo; and (2) a running ticker of the latest news. (*Id.* ¶ 112.) In addition, Fox broadcast content is sometimes "corrected" on the Fox Website, and the original "as aired" version is not available on the Fox Website. (*Id.* ¶ 106.)

In addition, Fox restricts how the public may use the content available on the Fox Website through its Terms of Use. (*Id.* ¶ 114). Pursuant to these Terms, visitors to the Fox Website may access video content for "***personal*** use only and [the content] may not be used for ***commercial*** purposes." (*Id.* (emphasis added)) The Terms of Use for the Fox Website also prohibit users from downloading content from the Fox Website. (*Id.*)

Fox claims to generate revenue on the Fox Website through advertisements placed before video clips and from the placement of Fox-owned content on the Yahoo!, Hulu.com and YouTube websites. There is no evidence, however, that any revenue earned by Fox from advertising on the Fox Website or the placement of content on the Yahoo!, Hulu, and/or YouTube websites, is directly attributable to the display of the 19 Works-in-Suit on these sites, or that anyone who ever viewed such content on TVEyes would otherwise go to the Fox Website, Yahoo!, Hulu, or YouTube for the same information. (*Id.* ¶ 116).

## 2.   Fox's Clip-Licensing Activities

Both directly and through its exclusive licensee ITN Source, Inc., Fox licenses content previously aired on FNC and FBN to third parties for use in connection with the production of television shows, movies, advertisements, video games, film festivals, e-books and other projects through which the Fox-owned work will be publicly performed and/or displayed.  (*Id.* ¶ 115.)  There is no evidence that any of this revenue is attributable to licenses issued for use of (1) the Works-in-Suit; or (2) any Fox-owned content solely for internal research.  (*Id.* ¶ 116.)



## 3.   Fox Does Not Offer Media-Monitoring Services

Fox does not offer media-monitoring services.  (*Id.* ¶¶ 93, 125).   It does not capture and index the complete broadcasts of over 1,400 television and radio channels worldwide, exactly as they aired, to create complete and accurate database of content that is text-searchable by keyword.  (*Id.*)  Fox does not provide a web-

based software platform for monitoring and accessing snippets of previously aired content for internal use.  (*Id.*)  Fox does not provide data about the frequency of the keyword, the geographic location of where it was mentioned, or other data analytics tools.  Fox does not offer an e-mail alert-service that sends notification moments after a keyword of interest is mentioned on the air.  (*Id.* ¶¶ 93, 102, 125.)  Fox does not even provide access on the Fox Website to all the content aired on FBN or FNC, nor does it permit the public to use the content it does post for commercial business purposes.  (*Id.* ¶ 101.)

## G.   <u>The Works-in-Suit</u>

Fox claims that TVEyes has infringed its rights under federal copyright law in 19 individual hour-long programs, referred to herein as the "Works-in-Suit."  (*Id.* ¶ 72.)[9]  All of the Works-in Suit, which were initially broadcast on FNC between October 16, 2012 and July 3, 2013, are highly factual news programs, many containing live interviews and video footage owned by other networks.  (*Id.* ¶¶ 72-73.)

Because TVEyes allows users to search for and view content only within 32 days of the initial broadcast, none of the Works-in-Suit are now available on TVEyes, and they have not been for many months.  (*Id.* ¶ 76).  Over the entirety of the 32 days that each Work-in-Suit was available for searching, there were a total of 560 plays for clips sourcing from the Works-in-Suit.  (*Id.* ¶ 77.)  As a basis for comparison, in an average month, there are about ███ plays for video clips on TVEyes.  (*Id.* ¶ 78).  The video plays resulting from users accessing the Works-in-

---

[9]   The 19 Works-in-Suit consist of: two episodes of *On the Record with Greta Van Sustren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*;  two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in Benghazi*.  (SUF ¶ 72.)

Suit thus accounted for approximately ███████████████ of all the video plays in the month the Works-in-Suit were available on TVEyes.  (*Id.* ¶ 79).

The average length of the clips played from the Works-In-Suit by TVEyes users was 53.4 seconds, with the full range spanning from 11.5 seconds to 362 seconds.  (*Id.* ¶ 80).  As each Work-in-Suit constituted a one-hour broadcast, this represents approximately 0.32% to 10% of the total length of each broadcast. Further, 85.5% of all of the clips viewed from the Works-in-Suit were less than one minute long, and 76% were less than 30 seconds long; and 51% were less than 10 seconds long.  (*Id.* ¶ 81).  One of the Works-in-Suit was never played by any TVEyes user.  (*Id.* ¶ 77).

It is not disputed that Fox received fees from cable companies to air FNC programming, which includes the Works-in-Suit, or that Fox received revenue from advertisers to air commercials before, during, or after breaks in the Works-in-Suit. However, there is no evidence that Fox has ever earned any revenue from directly licensing any of the 19 Works-in-Suit to any party for any purpose after the Works-in-Suit aired on FNC.  For example, there is no evidence that anyone has ever asked ITN Source for a license of any sort—let alone one for internal review and analysis—for any of the Works-In-Suit.

## ARGUMENT

## I.  LEGAL STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted).

However, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Thus, "the non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion," *Bell v. Metro. Transp. Auth.*, No. 12 Civ. 1235(AKH), 2013 WL 8112461, at *1 (S.D.N.Y. Nov. 1, 2013) (Hellerstein, J.) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Further, even where admissible evidence is presented by the non-movant, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

TVEyes' copyright fair use defense "is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). However, "the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (citing *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991)). Thus, courts in this district have "on numerous occasions resolved fair use determinations at the summary judgment stage." *Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013) (quoting *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006)). *See, e.g.*, *Authors Guild, Inc. v. HathiTrust* ("*HathiTrust*"), --- F.3d ---, 2014 WL 2576342 (2d Cir. June 10, 2014) (affirming district court's grant of summary judgment to defendant on fair use grounds); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch*"), --- F.3d ---, 2014 WL 2219162 (2d Cir. May 30, 2014) (same); *Cariou*, 714 F.3d 694 (same); *Hollander v. Steinberg*, 419 F. App'x. 44 (2d Cir. 2011) (summary order) (same); *Blanch*, 467 F.3d 244 (same); *Bill Graham*, 448 F.3d 605 (same); *Authors Guild, Inc. v. Google Inc.* ("*Google Books*"), 954 F. Supp. 2d 282 (S.D.N.Y. 2013) (Chin, J.) (same).

As to Fox's remaining state-law misappropriation claims, "[w]hether federal copyright law preempts a state law claim is a question of law." *U.S. ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). Fox bears the burden of directing the Court to evidence establishing that these claims are not preempted. *See, e.g., Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc.*, 73 F. Supp. 2d 1044, 1050 (E.D. Mo. 1999) (granting defendant's motion for summary judgment on "hot news" claim because "plaintiff here has failed to establish the last element of the 'hot news' exception to preemption").

As explained below, the material facts here are not in dispute, and a finding of summary judgment for TVEyes as to all three of Fox's claims is warranted.

## II.   <u>TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107</u>

The overriding purpose of copyright is "[t]o promote the Progress of Science and useful Arts." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 574 (1994) (quoting U.S. Const. art. I, § 8, cl. 8). Accordingly, "our law recognizes that copyright is 'not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations. It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public.'" *HathiTrust*, 2014 WL 2576342, at *4 (quoting Pierre N. Leval, *Toward a Fair Use Standard,* 103 HARV. L. REV. 1105, 1107 (1990)).

One "important limit[] to an author's rights to control original and derivative works … is the doctrine of 'fair use.'" *Id.* at *5. Indeed, "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose." *Campbell*, 510 U.S. at 575. Though of common-law origin, the fair use doctrine was codified into the Copyright Act in 1976 at § 107. "Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way and

intended that courts continue the common-law tradition of fair use adjudication." *Id.* at 577 (quotations omitted).  Thus, § 107 "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 577).

Title 17, United States Code, Section 107 states in relevant part:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching … scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Determining whether a particular use is fair "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."  *Campbell*, 510 U.S. at 577.  Thus, a court is to "engage in 'an open-ended and context-sensitive inquiry.'"  *Swatch*, 2014 WL 2219162, at *5 (quoting *Blanch*, 467 F.3d at 251).  The examples of fair use provided in the preamble of § 107 "are 'illustrative and not limitative' and 'provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses.'"  *Castle Rock Entm't*, 150 F.3d at 141 (quoting *Campbell*, 510 U.S. at 577-78).

To this end, the four fair-use factors "are non-exclusive." *Swatch*, 2014 WL 2219162, at *5. In addition, a defendant "need not establish that each of the factors set forth in § 107 weighs in [its] favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir. 2004) (internal citation omitted). This is because "[t]he factors do not represent a score card that promises victory to the winner of the majority. Rather, they direct courts to examine the issue from every pertinent corner and to ask in each case whether, and how powerfully, a finding of fair use would serve or disserve the objectives of copyright." Leval, *supra*, at 1110-11. Thus, the statutory factors "guide but do not control" fair use analysis, *Castle Rock Entm't*, 150 F.3d at 141, and "are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578. "The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Bill Graham*, 448 F.3d 605 at 608 (quotations omitted).

Finally, because fair use requires a "case-by-case determination," the Court is tasked with determining "whether a ***particular*** use is fair." *Harper & Row*, 471 U.S. at 549 (emphasis added); *see also Swatch*, 2014 WL 2219162, at *5 (same). Thus, in assessing whether TVEyes engaged in fair use, the Court is required to limit its assessment to the 19 Works-in-Suit.

Applying these principles to Fox's claim, TVEyes' use of the 19 Works-in-Suit as part of a research tool for discovering and analyzing excerpts of television broadcasts is fair.

### A.   The Nature and Character of TVEyes' Service Is Consistent With the Principles Underlying Fair Use

The first fair-use factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "[T]here is a strong presumption that factor one

favors the defendant if the allegedly infringing work fits the description of uses described in [the preamble] of] § 107," such as research, criticism, comment, and news reporting. *NXIVM*, 364 F.3d at 477 (quotations omitted). TVEyes is designed to assist users in discovering not only the fact that a particular keyword was used on a broadcast, but also *how* it was used, and how that use compares with uses of other words. (SUF ¶¶ 4, 26-27, 32, 64); *see Google Books*, 954 F. Supp. 2d at 287 (describing similar system as "an essential research tool" that, in particular, allows users "to analyze massive amounts of data"). Further, TVEyes informs its uses that it is to be used for research and analysis only. (*Id.* ¶¶ 7-9). Because TVEyes fits comfortably within the illustrative guide of fair uses, factor one presumptively favors TVEyes.

Even apart from this "strong presumption," the first factor strongly favors TVEyes because: (1) the use is highly transformative; (2) TVEyes' use serves important public interests; (3) any commerciality is of minimal relevance; and (4) there is no evidence of bad faith.

### 1.  TVEyes' Creation of a Comprehensive Searchable Database of Broadcast Content Is Highly Transformative

"An important focus of the first factor is whether the use is 'transformative.'" *HathiTrust*, 2014 WL 2576342, at *6. This inquiry evaluates whether the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. Further, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

Crucially, "[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009). Rather, a use "can be transformative in *function or purpose* without altering or actually adding to the original work." *Swatch*, 2014

29

WL 2219162, at *8 (quoting *Vanderhye*, 562 F.3d at 639) (emphasis added). The Second Circuit has held, for example, that "[i]n the context of news reporting and analogous activities, … the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Id.* at *8. Indeed, the Second Circuit recently found the copying of entire copyrighted books without alteration or augmentation, for the purpose of creating a text-searchable database, to be "a quintessentially transformative use." *HathiTrust*, 2014 WL 2576342, at *7; *see also Vanderhye*, 562 F.3d at 639 (copying entire essays, without alteration, into database for plagiarism detection transformative); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (copying of entire images into database for Internet search engine results transformative); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2002) (similar).

Because TVEyes' service employs the Works-in-Suit for a different "function or purpose" than Fox's original transmission, its use is highly transformative on multiple levels.

*First*, TVEyes captures and indexes broadcast feeds from hundreds of television channels, including FNC and FBN, and transforms those feeds into a comprehensive, text-searchable, word index that enables its users to discover when, where, and how a particular word was mentioned on television or radio. (SUF ¶¶ 3, 13-17.) This service is functionally indistinguishable from the digitizing and indexing of books to create a text-searchable database that the Second Circuit has found to be "quintessentially transformative." *HathiTrust*, 2014 WL 2576342, at *7. In that case, a group of authors claimed that HathiTrust's copying and digitizing of more than ten million books to create a full-text searchable database of their contents (the "HDL") infringed their copyrights. *Id.* *1. The Second Circuit found this use to be transformative:

> [T]he result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn.  Indeed, we can discern little or no resemblance between the original text and the results of the HDL full-text search.  There is no evidence that the Authors write with the purpose of enabling text searches of their books.  Consequently, the full-text search function does not "supersede[] the objects [or purposes] of the original creation."  The HDL does not "merely repackage[] or republish[] the original[s]," or merely recast "an original work into a new mode of presentation.  ***Instead, by enabling full-text search, the HDL adds to the original something new with a different purpose and a different character.***

*Id.* at *7 (emphasis added, citation omitted).

TVEyes is no different.  It captures broadcast content to make it searchable by keyword, and thus is different in purpose, character, expression, meaning, and message than the original broadcast.  There is no evidence that Fox creates broadcast content for the purpose of enabling text-based searches.  Moreover, TVEyes' "overriding purpose here was not to 'scoop[]' [Fox] or 'supplant the copyright holder's commercially valuable right of first publication,' … but rather simply to deliver newsworthy … information" to its customers.  *Swatch*, 2014 WL 2219162, at *7 (quoting *Harper & Row*, 471 U.S. at 562).  At base, TVEyes provides a powerful research tool that enables users to efficiently navigate an otherwise unmanageable quantity of data and discover, with appropriate context, how certain words were mentioned on television.

TVEyes' creation of a text-searchable database "adds a great deal more to the copyrighted works at issue than did the transformative uses [the Second Circuit] approved in several other cases."  *HathiTrust*, 2014 WL 2576342, at *7 (citing *Cariou*, 714 F.3d at 706; (finding transformation); *Bill Graham*, 448 F.3d at 609-11 (same); *Blanch*, 467 F.3d at 252-53 (same); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998) (same); *see also id.* at *8 (citing cases from other circuits that support this conclusion, including *Perfect 10*, *Arriba*, and *Vanderhye*).  Indeed, TVEyes presents an even more compelling case—TVEyes captures and

indexes **broadcasts**, which are ephemeral and largely unavailable once they have aired. (SUF ¶ 15). By contrast, words on a page are already in a form that lends itself to searching. TVEyes thus not only collects the information (akin to *HathiTrust*), but adds another level of transformation by making video broadcasts text-searchable.

*Second*, TVEyes' service further transforms the Works-in-Suit by incorporating them into a comprehensive database of all content broadcast over 1,400 of television and radio stations, creating a "one-stop shop" for researching broadcast content. (SUF ¶¶ 3-4,13-15, 44-45.) A user selects a keyword or phrase to monitor, and TVEyes automatically searches for it across all of these stations, every day, seven days a week, without the user ever having to conduct a manual search again. (*Id.* ¶¶ 21, 23.) In response to this query, TVEyes returns the keyword "hit" results from all stations in reverse chronological order, enabling users to conduct substantive research, such as the analysis of overall frequency of particular word mentions across television channels, comparisons between word frequency on television channels, and differences in word frequency on broadcasts in different areas of the country. (*Id.* ¶¶ 17-27). If the user so chooses, TVEyes will also send an email alerting the user that her Watch Term has been spoken on television, providing a link to transcript and video excerpts surrounding the Watch Term. (*Id.* ¶¶ 28-29.) Such data could not be available absent a research tool such as TVEyes, which undertakes the task of capturing all major broadcasts, digitizing them, and making them text-searchable. (*Id.* ¶¶ 13-14, 46.)

This use is highly transformative in its own right, as such tools "add[s] something new" to the original broadcast. *Campbell*, 510 U.S. at 579. Judge Chin came to a similar conclusion in *Google Books*, finding the Google Books service, which "digitizes books and transforms expressive text into a comprehensive word

index that helps readers, scholars researchers, and others find books," to be "highly transformative." 954 F. Supp. 2d at 291. Judge Chin explained:

> Google Books is also transformative in the sense that it has transformed book text into data for purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research. Words in books are being used in a way they have not been used before. Google Books has created something new in the use of book text—the frequency of words and trends in their usage provide substantive information.

*Id.* The same is true for TVEyes—it transforms broadcasts into data for purposes of substantive research, opening up new fields of research. By contrast, Fox does not provide a comprehensive, digitized database of over 1,400 television and radio broadcasts, 24 hours a day, seven days a week, searchable by keyword, that alerts users by email within moments that the keyword is mentioned. Fox offers no service that could allow users to conduct research on a complete data set of broadcast text, exactly as that text was stated on the air. (SUF ¶¶ 93, 100-110.)

*Third*, as to the ability to play snippets of video responsive to a search request, TVEyes' service is also highly transformative, as these clips are accessed for a different purpose than the original broadcasts. As discussed above, TVEyes' clients use the service for diverse purposes—*e.g.*, to evaluate and criticize broadcast journalism, to misinformation, to evaluate commercial advertising, to evaluate national security risks for U.S. troops, to track compliance with financial market regulations—none of which implicates the original purpose of the broadcast, and thus are transformative uses. Monitoring television simply is not the same as watching it. Snippets generated by TVEyes are designed to serve the former purpose, not the latter—they are closely tailored to meet the user's research needs; each clip begins just 14 seconds before the keyword is mentioned. (*Id.* ¶ 18.) The fact that the average length that TVEyes' users play video excerpts is just ▮ ▮ and that ▮ of all plays are shorter than 12 seconds, further

demonstrates that TVEyes' purpose is different than Fox's and does not supersede the original.  (*Id.* ¶ 68.)  TVEyes' subscribers do not pay $500 per month so that they can watch Fox programming.  Finally, the clips generated by TVEyes are content–neutral, corresponding to the search term only, regardless of where and when it appears in a broadcast.  (*Id.* ¶ 40.)  These snippets, much like the concert posters in *Bill Graham*, are small, tailored references to past events, *i.e.*, past broadcasts.  *See*, *e.g.*, *Google Books*, 954 F. Supp. 2d at 291 ("[t]he display of snippets of text for search is similar to the display of … small images of concert posters for reference to past events").

TVEyes' use is even more limited than uses in other search-engine cases where transformation was recognized.  In *Perfect 10*, for example, where the defendant displayed the ***entirety*** of the copyrighted work, the court found the display to be transformative because "a search engine puts images in a different context so that they are transformed into a new creation."  508 F.3d at 1165 (quotations omitted).  Here, any particular search result returns only a short portion of the original broadcast.  *See* William F. Patry, Patry on Fair Use ("Patry") § 3.9 ("Providing access to portions of a work for research purposes will be fair use, even if to do so a copy must be made, as by a library or a search engine.").  Further, a fully accurate visual recreation in the form of a video snippet is necessary to accomplish TVEyes' fair-use goals.  As courts recognize, particularly "[i]n the context of news reporting and analogous activities … the need to faithfully convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to reproduce an original work without alteration."  *Swatch*, 2014 WL 2219162, at *8.  In *Swatch*, for example, the Court recognized that by disseminating an actual sound recording, unaltered, "Bloomberg was able to convey with precision not only the raw data of … words, but also the more subtle indications of meaning inferable from their hesitation, emphasis, tone

of voice, and aspects of their delivery." *Id.* Likewise, the video excerpts provided by TVEyes convey important information that cannot be obtained from a mere transcript, such as the tone of voice, gestures and body language of the speaker, and graphics and visual images on the screen at the time the keyword was mentioned.

### 2. TVEyes' Use Of The Works-In-Suit Serves Important Public Interests

Apart from transformation, the first factor weighs in favor of fair use where the use serves important public interests. Courts consistently consider the social benefit that a secondary use provides, apart from whether the use is transformative or commercial. *See, e.g., Perfect 10*, 508 F.3d at 1166 (in addition to transformation and commerciality, court must weigh "the extent to which [defendant's] search engine promotes the purposes of copyright and serves the interests of the public"); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) (court "free to consider the public benefit resulting from a particular use"); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984) ("to the extent time-shifting expands public access to freely broadcast television, it yields societal benefits"); *HathiTrust*, 2014 WL 2576342, at *12 (first factor favored fair use, even absent transformation, because providing the copyrighted material is in the public interest to make appropriate accommodations for the blind and print disabled). This is because "[t]he key issue in every case is whether the use is beneficial to society." Patry § 3:9.

Courts have found the first factor to favor fair use—even absent transformation—where the use benefits society. In *Swatch*, for example, by disseminating "a full, unadulterated recording" of an earnings call, "Bloomberg was able to convey valuable factual information that would have been impaired" had it not been permitted to disseminate the call. 2014 WL 2219162, at *9. The Second Circuit concluded that the first factor favored fair use "regardless of how

transformative the use is" because "Bloomberg's faithful reproduction … served 'the interest of accuracy, not piracy.'" *Id.* at *9 (quoting *Consumers Union of United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)).

TVEyes' service overwhelmingly furthers important public interests in connection with research, education, and faithful reproduction with accuracy. Searchable databases such as TVEyes' are consistently found to promote the purposes of copyright and the public interest. *See, e.g.*, *Perfect 10*, 508 F.3d at 1165 ("[A] search engine provides a social benefit by incorporating an original work into a new work, namely, an electronic reference tool"); *Google Books*, 954 F. Supp. 2d at 292 ("Google Books serves several important educational purposes"). By capturing, digitizing, and making searchable television content in the manner described above, TVEyes has created an original, electronic reference tool that furthers the research and educational purposes copyright law was designed to protect. Without TVEyes— or a service like it—it would not be possible to search all television broadcasts by keyword. (SUF ¶¶ 14, 46).

In addition, as discussed *infra* at Part IV.D.2, TVEyes' service also serves the public interest because it facilitates: (1) criticism of Fox and other news broadcasters; and (2) access to facts when Fox is itself the subject of news.

### 3.   TVEyes' For-Profit Status Does Not Weigh Against Fair Use

While a court will consider whether the use "is of a commercial nature" as part of its first-factor analysis, such considerations carry minimal weight in the circumstances presented here. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. Thus, courts routinely afford the most minimal weight to commerciality where a use is transformative. *See, e.g.*, *Cariou*, 714 F.3d at 708 ("Although there is no question that Prince's artworks are

36

commercial, we do not place much significance on that fact due to the transformative nature of the work."); *NXIVM*, 364 F.3d at 478 ("Finding the work substantially transformative, the district court properly discounted the secondary commercial nature of the use."). Because TVEyes' service is highly transformative, the commerciality of the service has minimal relevance here.

Even if the Court disregarded the transformative nature of the uses, any commerciality of TVEyes' service does not weigh against fair use. The proper inquiry is not merely whether TVEyes operates for profit, as "nearly all of the illustrative uses listed in the preamble paragraph of § 107 … are generally conducted for profit." *Campbell*, 510 U.S. at 584 (quotations omitted). Rather, "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a ***direct consequence*** of copying the original work." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (emphasis added). Further, commerciality is not "a clear-cut choice between two polar characterizations, 'commercial' and 'non-profit.' … The commercial nature of a use is a matter of degree, not an absolute." *Maxtone-Graham v. Burtchaell*, 803 F. 2d 1253, 1262 (2d Cir. 1986).

Here, there is no evidence that TVEyes directly sold any of the Works-in-Suit for profit. *See Google Books*, 954 F. Supp. 2d at 292 (Google Books "does not engage in the direct commercialization of copyrighted works"). Rather, TVEyes charges a flat fee of $500 a month to conduct unlimited research on ***all*** television and radio broadcasts. Whether a user ever searches or plays for FNC or FBN content does not affect that price. (SUF ¶ 6, 12). Because "the link between [TVEyes'] commercial gain and its copying is … attenuated," *Am Geophysical Union*, 60 F.3d at 922, such use should not weigh against fair use. In *Swatch*, for example, the Second Circuit assigned the commerciality of Bloomberg Professional "relatively little weight," even

though it—like TVEyes—was "a subscription service available to paying users," because "it would strain credulity to suggest that providing access to Swatch Group's earnings call more than trivially affected the value of that service."  2014 WL 2219162, at *7.  So too in this case: users' access to snippets of the 19 particular Works-in-Suit (compared to Bloomberg, which provided the entire work at issue) for 32 days could not have more than trivially affected the value of TVEyes' service. (SUF ¶ 79 (plays of snippets from the Works-in-Suit accounted for about ███████████████████████ of all the video plays in the month they were available).)

Finally, any economic gain by TVEyes from any use of the 19 Works-in-Suit was not "to the exclusion of broader public benefits."  *Am. Geophysical Union*, 60 F.3d at 921-22.  Just as the exhibition of art has "value that benefits the broader public interest" even though "artists are sometimes paid and museums sometimes earn money," *Blanch*, 467 F.3d at 254 (quotations omitted), TVEyes provides a research tool for discovering, locating, and learning about broadcast content for a new and different purpose.  Where a defendant's use serves the broader public interest—particularly an educational interest, as a research tool does—commerciality takes on a reduced role.  *See Google Books*, 954 F. Supp. 2d at 292 ("[E]ven assuming Google's principal motivation is profit, the fact is that Google Books serves several important educational purposes."). [10]

---

[10] While authorities have questioned the relevance of good or bad faith to the first factor, *see, e.g.*, *Swatch*, 2014 WL 2219162, at *7 (questioning the "role good or bad faith plays in fair use analysis"), there is no evidence TVEyes acted in bad faith. For example, TVEyes' awareness that Fox did not wish for its content to be captured is not evidence of bad faith.  *See Campbell*, 510 U.S. at 585 n.18 ("being denied permission to use a work does not weigh against a finding of fair use"); *Swatch*, 2014 WL 2219162, at *7 (similar).

**B.   The Works-in-Suit Are Factual in Nature and Were Previously Published**

The second fair-use factor assesses "the nature of the copyrighted work." § 107(2).  This factor recognizes "that some works are closer to the core of intended copyright protection than others," *Campbell*, 510 U.S. at 586.  In considering this factor, courts consider "(1) whether the work is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709-10 (quotations omitted).  Both strongly favor TVEyes.

*First*, "[i]t is well established that 'the scope of fair use is greater with respect to factual than non-factual works.'" *Swatch*, 2014 WL 2219162, at *13 (quoting *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 157 (2d Cir. 1990)); *see also*, *e.g.*, *Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works."); *Harper & Row*, 471 U.S. at 563 (noting "a greater need to disseminate factual works than works of fiction or fantasy"); *Sony Corp.*, 464 U.S. at 455 n.40 ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture.").  The Works-in-Suit are all highly factual television news programs.  (SUF ¶¶ 72-73).  Almost every element of these works—*e.g.*, facts and information conveyed, unscripted interviews, and the like—are protectable only to the extent of their placement in the work's overall arrangement; otherwise, Fox would benefit from an impermissible copyright over facts and news of the day.  *See*, *e.g.*, *Eldred v. Ashcroft,* 537 U.S. 186, 219 (2003) ("Every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication"); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991) ("[A]ll facts—scientific, historical, biographical, and news of the day … may not be copyrighted and are part of the

39

public domain available to every person."); *Sparaco v. Lawler, Matusky, Skelly Eng'rs*, 303 F.3d 460, 466-67 (2d Cir. 2002) ("[H]istorical, scientific, or factual information belongs in the public domain, and … allowing the first publisher to prevent others from copying such information would defeat the objectives of copyright by impeding rather than advancing the progress of knowledge."); *see also Taggart v. WMAQ Channel 5 Chicago*, 2000 WL 1923322, at *4-5 (S.D. Ill. Oct. 30, 2000) (unscripted interview answers not protectable under copyright law).  Indeed, the Works-in-Suit themselves contain snippets from broadcasts of competing news channels, such as CNN and MSNBC, which FNC presumably used for their factual content, pursuant to the doctrine of fair use.  (*Id.* ¶ 70). (listing third-party video excerpts contained in the Works-in-Suit)).  The inherently factual nature of the Works-in-Suit favors dissemination.

*Second*, courts also consider whether the plaintiff's works were published at the time of the use.  Here, there is no dispute that, at the time of TVEyes' capture and indexing of Fox's broadcasts, the Works-in-Suit were already published— TVEyes captures only what has already been disseminated, and thus necessarily captures only already-published broadcasts.  (*Id.* ¶ 85).

Because the Works-in-Suit (1) are highly factual and (2) were published prior to TVEyes' use, this factor strongly favors fair use.

### C. Copying the Entirety of the Works Was Necessary to Create a Comprehensive, Text-Searchable Index and to Provide Targeted Snippets to TVEyes' Clients

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  § 107(3).  In conducting this analysis, the Court is to assess "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor."  *HathiTrust*, 2014

WL 2576342, at *6. "For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use." *Id.* at *8; *see, e.g., Sony Corp.*, 464 U.S. at 449-50 (entire work copied); *Bill Graham*, 448 F.3d at 613 (entire image copied). Here, this factor does not weigh against fair use.

Courts routinely recognize that it is reasonably necessary for a secondary user to utilize the entirety of copyrighted works in order to create a full-text searchable database. In *HathiTrust*, for example, the Second Circuit held that the copying of the entirety of millions books for the purpose of creating a text-searchable database did not weigh against a finding of fair use:

> In order to enable the full-text search function, the Libraries, as we have seen, created digital copies of all the books in their collections. Because it was reasonably necessary for the HDL to make use of the entirety of the works in order to enable the full-text search function, we do not believe the copying was excessive.

2014 WL 2576342, at *8 (footnotes omitted). Other courts have come to the same conclusion. *See, e.g., Google Books*, 954 F. Supp. 2d at 292 (copying and digitizing entirety of books to facilitate full-text search function "critical to the functioning of Google Books"); *Vanderhye*, 562 F. 3d at 642 (copying of entire essays to create digitized database to detect plagiarism did not weigh against fair use); *Perfect 10*, 508 F. 3d at 1165 ("The fact that Google incorporates the entire Perfect 10 image into the search engine results does not diminish the transformative nature of Google's use."); *Kelly*, 336 F.3d at 821 ("It was necessary for Arriba to copy the entire image" because copying only part of the image would "reduc[e] the usefulness of the visual search engine").

TVEyes' capture and index of the entirety of each of the 19 Works-in-Suit was reasonably necessary—indeed, unavoidable—to accomplish its fair use purposes as described *supra*, Section II. TVEyes captured each of the 19 Works-in-Suit in its

entirety to: (1) create a comprehensive, electronic database of broadcast content; (2) render that content full-text searchable; and (3) allow users to conduct research regarding particular search terms, ranging from the frequency of mentions to where they occurred to how they occurred. (SUF ¶¶ 74-75.) To provide its full-text search function, it was necessary to copy the entirety of the Works-in-Suit; otherwise, the database would be incomplete and have reduced utility. (*Id.* ¶ 75). Additionally, TVEyes serves an important public interest in making important factual information available to users. *See Swatch*, 2014 WL 2219162, at *14 ("the use of the entire recording was reasonable in light of its purpose of disseminating important financial information"); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 342 (S.D.N.Y. 2012) (Hellerstein, J.) (public interest "better served by the dissemination of that information in its entirety").

That TVEyes allows users to access snippets of video does not weigh against a finding of fair use, for multiple reasons. *First*, as noted above, access to the actual video is necessary to provide to convey the full meaning and context surrounding the keyword mention. *See Swatch*, 2014 WL 2219162, at *10 ("[T]he sound recording conveys information that a transcript or article cannot.").

*Second*, any snippets played were not substantial portions of the Works-in-Suit. The average play length of the snippets associated with the Works-in-Suit was 53.4 seconds. (SUF ¶ 80). More than 85% of the plays were shorter than 60 seconds, 76% were less than 30 seconds, and 51% were less than 10 seconds. (*Id.* ¶ 81). By any measure, the snippets constitute a fractional amount of the overall Works-in-Suit. TVEyes' provision of these snippets was thus not excessive in light of the need to provide sufficient context about the keyword mention to serve the user's particular purpose. *See Swatch*, 2014 WL 2219162, at *13 (recognizing need for sufficient context when facts are disseminated).

*Third*, snippets of the Works-in-Suit accessed by TVEyes' users were generated automatically by TVEyes' standard mathematical algorithm, which selects the start point of the snippet 14 seconds before the term queried by the user. (SUF ¶ 18, 82.)   As a result, any snippets of the Works-in-Suit are closely and reasonably tailored to the user's research objectives.   Further, TVEyes did not make the entirety of any of the Works-in-Suit available to users; rather, the maximum that could ever be played is ten minutes, and none were played for even close to that long.  (*Id.* ¶ 70); *see Google Books*, 954 F. Supp. 2d at 292 ("Significantly, Google limits the amount of text it displays in response to a search.").

*Fourth*, all clips generated by TVEyes' primary search functions, "Watch Terms" and "Power Search," are entirely content-neutral—they do not correlate to the structural elements of the broadcasts, such as segments based on a topic, or to the most "important" portions of the broadcasts, such as the lead stories or headlines.[11]  (SUF ¶ 40).   TVEyes does not create headlines for snippets, favor a "lede," or undertake any other activity to favor certain content over other content; thus, TVEyes cannot be considered to have taken the "heart" of any of the Works-in-Suit—something that Fox refused to even identify.  (*Id.*).

### D.   TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit

Finally, the fourth fair-use factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  § 107(4).   This factor "requires a balancing of [1] the benefit the public will derive if the use is permitted

---

[11]   In contrast, the starting point of all video clips on the Fox Website are predetermined, beginning at the opening of a particular "story" and ending at the close of that "story."   If, for example, a Fox Website visitor was interested only in a word that appeared at the 8-minute mark, she would still be taken to the beginning of that segment.   To this end, the Fox Website is not reasonably tailored to providing visitors with the ability to conduct keyword research. (SUF ¶ 103.)

43

and [2] the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448 F.3d at 613 (quotations omitted).

Crucially, this factor "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 2014 WL 2576342, at *9 (citing *Campbell*, 510 U.S. 591). Thus, "any economic 'harm' caused by transformative uses ***does not count*** because such uses, by definition, do not serve as substitutes for the original work." *Id.* (citation omitted); *see also Bill Graham*, 448 F.3d at 615 ("Since [defendant's] use of [copyrighted] images falls within a transformative market, [plaintiff] does not suffer market harm due to the loss of license fees."); *Castle Rock Entm't*, 150 F.3d at 145 ("The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original.").

Fox cannot manufacture an injury by claiming that it has in the past, or will in the future, seek licensing fees from media-monitoring services to use Fox content. "[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work. [C]opyright owners may not preempt exploitation of transformative markets ...." *Bill Graham*, 448 F.3d at 614-15 (citation and quotations omitted, alteration in original).

Finally, it bears repeating that the Court's analysis must be limited to the effect of TVEyes' use upon the potential market for or value of "the copyrighted work," § 107(4), *i.e.*, the 19 Works-in-Suit. While the Court may consider whether "unrestricted and widespread conduct of the sort engaged in by [TVEyes] would result in a substantially adverse impact on the potential market for the original work," that inquiry still focuses upon "the original work," *i.e.*, the Works-in-Suit. *Swatch*, 2014 WL 2219162, at *14 (quoting *Campbell*, 510 U.S. at 590).

1. **TVEyes Does Not Act as a Substitute for the Works-in-Suit**

TVEyes captured each of the 19 Works-in-Suit after they were broadcast on FNC to create a comprehensive keyword-searchable database, that allowed users to play, edit or download snippets of the Works-in-Suit.  (SUF ¶¶ 74-75.)  The record contains no evidence that any of these features are, either actually or potentially, a substitute for the Works-in-Suit.  And because TVEyes' use of the Works-in-Suit is highly transformative, by definition there is no market substitution.  *See HathiTrust*, 2014 WL 2576342, at *9.

Fox cannot argue that TVEyes' text-searchable database has any effect on the market for or value of the Works-in-Suit, as Fox does not offer, and has no plans to offer, a media-monitoring service such as TVEyes.  (SUF ¶¶ 93, 125.)  And, in any case, "the full-text search function does not serve as a substitute for the [works] that are being searched."  *HathiTrust*, 2014 WL 2576342, at *10.  The remainder of this section of the brief therefore addresses whether TVEyes users' ability to play and save snippets of video from search-results affects the market for the Works-in-Suit. It does not.

a. **TVEyes Does Not Affect Fox's Revenues from Cable Company Licenses or Advertising Partners**

The primary market for the Works-in-Suit is cable companies and advertisers, who pay Fox a royalty for access to Fox-produced content or to advertise during commercial breaks in Fox programming, including the Works-in-Suit.  This market is unaffected by TVEyes' service, which records and indexes content only **after** it is licensed to and broadcast by cable companies.  There is no evidence that Fox lost any revenue from any actual or potential cable company licensees or advertisers from TVEyes' capture and provision of snippets of the 19 Works-in-Suit (nor could there conceivably be any such effect).

45

### b.   TVEyes Does Not Affect the Secondary Market for Public Performances Licenses for the Works-in-Suit

Both directly and through its exclusive licensee ITN Source, Fox licenses footage from its programming to incorporate into new works, such as television shows, films, advertisements, video games, electronic-books, and similar projects, that are then shown to the public. (SUF ¶¶ 115, 117.)   Fox also issues licenses to third parties to publicly perform clips of Fox-owned footage on their websites.  (*Id.*) To date, however, neither Fox nor ITN Source has earned any revenue from directly licensing any of the 19 Works-in-Suit to third parties for use in connection with new works or for display on their websites.  (*Id.* ¶ 116).  Thus, there has been no market substitution.   While Fox may choose to license the Works-in-Suit, or portions thereof, to third parties for public performance in the future, TVEyes does not substitute for that potential market for several reasons.

*First*, the Works-in-Suit were accessible on TVEyes only for 32 days after the initial broadcast—none of the Works have been available outside that window.  (*Id.* ¶ 76).  Thus, no future use by TVEyes could interfere with any future licensing by Fox.   The limited availability of the Works-in-Suit on TVEyes after broadcast undermines any argument that TVEyes' service is a substitute for Fox's public-performance licensing business.

*Second*, TVEyes' contract with its subscribers prohibits the use of clips for any purpose other than internal use, including public performance, and clients are repeatedly reminded of this restriction, including every time they download a snippet of video.  (*Id.* ¶¶ 7-9.)  Thus, while there are seven clips that remain on TVEyes' servers, any public performance of these seven clips would  necessarily breach their contract with TVEyes.  Because any licensing activity by Fox is for the purpose of public performance, and because TVEyes does not permit public performance of any clips gathered, TVEyes does not usurp Fox's potential licensing

market.  In any event, there is no evidence that any of the Works-in-Suit, or portions thereof, were publicly performed by a TVEyes user in violation of her contract.

*Third*, Fox's licensees seek to use Fox content for entirely different purposes than TVEyes' clients.  As noted above, TVEyes' contract and policies limit any use of clips to internal research and analysis.  (*Id.*) ██████████████████████

████████████████████████████████████  ██████  ████████

████████████████████████████████████

(*Id.* ¶ 116).  This is not surprising, given that use of a clip for internal research and analysis is fair use and does not require a license in the first place.  *Cf. Bill Graham*, 448 F.3d at 614 ("A copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for … transformative uses of its own creative work.").

### c.   TVEyes Does Not Deprive Fox of Revenue From Use of the Works-in-Suit Online

Finally, Fox alleges that TVEyes substitutes for users watching Fox programming on the Fox Websites or the websites of its licensees.  The record, however, supports the opposite conclusion, as Fox introduced no evidence that users who played portions of the Works-in-Suit on TVEyes otherwise would have visited the Fox Website, or any other Fox-authorized website, to independently search for and view any clips from the Works-in-Suit.  Indeed, there are multiple, material differences between the two that establish that market substitution is absent as a matter of law.

*First*, the crux of TVEyes' service is that it is automated, enabling users to monitor unlimited Watch Terms on an unlimited number of stations, 24 hours a day, seven days a week.  Once a user selects a Watch Term, TVEyes periodically searches for this word automatically, ***without the user ever having to manually***

47

***conduct another search***.  (SUF ¶¶  21, 23).  TVEyes can email the user whenever any Watch Term is mentioned, alerting the user to the existence of a clip containing the Watch Term.   In contrast,  neither Fox nor its licensees offer continuous, automated searches of pre-selected terms, nor do they email the user whenever that term is mentioned.  (*Id.* ¶¶ 28, 100-109).   This difference is critical, as there is no evidence that, if TVEyes did not exist, its users would endeavor to undertake repeated manual searches of the Fox Website and its partners, one by one, for the dozens (or hundreds) of keywords they desire to track, multiple times every day.  Fox's assumption that TVEyes' users would have searched for the same keywords on its or another's website is thus rank speculation.  *See Sony*, 464 U.S. at 453-54 (time shifting was fair use because the copyright owners' "prediction that live television or movie audiences will decrease" was "speculative") (quotations omitted).

*Second*, visitors to the Fox Website are bound by the site's Terms of Use, which restrict the use of the site's content to "personal use only and may not be used for commercial purposes unless you receive prior written authorization from Fox News."  (SUF ¶ 114).  While the Fox Website prohibits commercial use, TVEyes permits ***only*** commercial use—it does not provide subscriptions for personal use.  Thus, the markets are mutually exclusive.

*Third*, to enable its clients to efficiently and effectively monitor broadcast media, TVEyes must record ***everything that is broadcast, exactly as it was broadcast***, and create a comprehensive database that is searchable by keyword.  (*Id.* ¶¶ 3, 13, 18, 44.)  By contrast, as Fox concedes, it does not make every portion of every broadcast on the FNC or FBN available on the Internet.  (*Id.* ¶ 101.)  Accordingly, any search results obtained by running keyword searches on the Fox Website or its partners are necessarily incomplete.  It is thus not possible to use the Fox Website to be assured of how many times a particular keyword was mentioned on FNC, or to obtain a complete understanding of how a particular subject was

covered on the air in a given period of time, which is why clients use TVEyes. *See,* Rose Decl. ¶ 27, Ex. WW (*e.g.,* "Fox News has spent just over 10 minutes covering the 13 court decisions in favor of marriage equality since *Windsor*"). Even if Fox decided to make available every single second of its television shows on its website, Fox does not include the commercials that aired on FNC or FBN—thus, it is not possible to use the Fox Website to track or evaluate the political advertising or study the relationship between Fox programming and the commercial advertising that supports it. *See id* ¶ 18, Ex. NN (the Romney ads "are still airing in multiple markets, according to TVEyes, a media monitoring service"). The ***only*** way to be assured of complete accuracy of what was aired on FNC, FBN, or any other major network, is to use a service that captures, indexes and provides search capability for everything spoken or shown.

*Fourth*, in addition to being incomplete, the video segments that are available on the Fox Website and its partners are materially different from what is broadcast on FNC and FBN. Video segments from FBN on the Fox Website, for example, do not contain the news ticker graphic that was included in the actual telecast, which displays (1) the time of the broadcast, (2) the station logo, and (3) information about financial markets (including the Dow Jones Industrial Average), stock prices, and a running ticker of financial news. (SUF ¶ 111). Likewise, video segments from FNC on the Fox Website do not include the news ticker graphic that was included in the actual telecast, which displays the station logo and a ticker reporting the news. (*Id.* ¶ 112.) Thus, if a user is interested in researching the relationship between the contents of the news ticker and what was said on FNC or FBN, such information could not be gathered from Fox. In addition, Fox sometimes purposely changes the video segments made available on its website from what had been aired. For example, Fox recently came under fire for using an incorrect graphic during a story about the ferry disaster in Korea; Fox removed the video from its website and

assured viewers that the graphic would be "corrected" on its website. (*Id.* ¶¶ 113.) The Fox Website cannot guarantee the accuracy of what was actually broadcast. TVEyes can.

*Fifth,* because the Fox Website is designed for entertainment, not research (Rose Decl. ¶ 12, Ex. HH (Fox Website is for "personal enjoyment and entertainment" and "solely for [] personal, non-commercial use"), the video segments available on the Fox Website lack basic contextual information about the footage, such as the air time and show title. (SUF ¶ 105). Such information is essential to TVEyes' users, who can access snippets to research the context in which their keyword was mentioned. In addition, the Fox Website offers limited search functionality—for example, users cannot set a date range when conducting a search on the Fox Website, nor use advanced Boolean connections such as "&" in conducting a search. (*Id.* ¶ 109). Further, a search query returns a maximum of only 510 results. (*Id.* ¶ 110). Finally, the Fox Website does not offer any of the analytics that TVEyes makes available, such as demographics, market share, heat maps, term frequency, or broadcast range. (*Id.* ¶¶ 106-107).

*Sixth*, while TVEyes' clips always begin 14 seconds prior to the user's query term, each video segment on the Fox Website has a predetermined beginning and ending, based on a particular topic or story, and is pre-edited to a length that corresponds to the start and end point around the particular discussion. (*Id.* ¶ 103.) As a result, if a user tries to search the Fox Website for a particular word, she must watch the entire segment or try to scroll through irrelevant portions to somehow find her keyword. Because TVEyes' clips always begin within the first 14 seconds of the mention, it is a much more efficient research tool. (*Id.* ¶ 18.)

*Seventh*, the Fox Website cannot be used to monitor Fox News, **because it is controlled by Fox News**. (*Id.* ¶ 99.) There is an inherent conflict of interest between Fox and those who monitor it. This conflict is most obvious when

journalists use TVEyes to publicly criticize Fox News.  *See*, *e.g.*, Rose Decl. ¶ 27, Ex. WW (*e.g.*, HUFFINGTON POST, Jan 9, 2014: "Fox News Downplayed Chris Christie Scandal All Day"; BUSINESS INSIDER, July 11, 2011" "Fox News Has Only Reported On The Murdoch Phone-Hacking Scandal 14 x In 5 Days"; MEDIA MATTERS, June 4, 2014: "On Fox, The Gay Marriage Revolution Has Not Been Televised").  A conflict of interest also exists when organizations use TVEyes to give feedback to the press.  For example, the White House has used TVEyes to criticize Fox's reporting, *see* Anten Decl. ¶ 23, Ex. EEE (White House to Fox: "This is not even close to a balanced piece"), and Governor Scwarzenegger has used TVEyes to obtain an official correction, *see id.* ¶ 22, Ex. DDD ("We had expected a clarification somewhere on the network but never saw  one").  Because Fox has complete control over the contents of its website, and can alter or remove the content posted at any time, for any reason, without explanation or notice, it cannot be relied upon as a neutral, complete and accurate source for monitoring.  Only a third party that agnostically records everything that is broadcast, exactly as it was broadcast, can serve this purpose.  TVEyes does so.

*     *     *

For these reasons and more, TVEyes cannot be said to affect the market for Fox's own purported provision of segments.[12]  Because TVEyes is not a market "substitute" for the Works-in-Suit, the fourth factor heavily favors TVEyes.

## 2.  TVEyes Provides a Tremendous Benefit to the Public

Even if TVEyes did affect the market for the Works-in-Suit (which it did not), TVEyes nonetheless provides significant benefits to the public that far

---

[12]  This outcome is also supported by logic—if TVEyes truly was a substitute for the Fox Website, a user interested in watching a clip from FNC would do so for free rather than pay $500 a month to TVEyes to watch it.

outweigh the gain, if any, that Fox "will receive if the use is denied." *Bill Graham*, 448 F.3d at 613.  The benefits are manifold.

*First*, TVEyes has created a repository of information that can be accessed for research on a previously impossible scale.  Using TVEyes, clients can efficiently sift through the daily deluge of television content from numerous, disparate sources to instantly discover information relevant to them.  TVEyes allows users to monitor 1,400 channels, which continuously capture more than 27,000 broadcast hours every single day, instead of conducting endless, constant searches on thousands of websites, where the content may not even be available.  (SUF ¶¶ 15, 44-46.)  And even then, TVEyes provides significant educational, research benefits through its comparative analyses of keyword frequencies, distribution, and trends.  Without TVEyes, or a service like it, there would be no other way for users to discover, gain access to, and efficiently review this information. (Id. ¶ 46.)

*Second*, TVEyes serves the public interest by facilitating access to news **made** by Fox.  Today, the manner in which news organizations like Fox report news is often news in its own right, separate and distinct from the underlying news being reported.  (SUF ¶¶ 120-122.)  In other words, Fox does not merely report the news, often it **is** the news.  *See*, *e.g.*, (Rose Decl ¶26-27, Exs., VV-WW; (*e.g.* HUFFPOST MEDIA, June 4, 2014: "Fox Makes Disgusting Comment About Bowe Bergdahl's Father"; RAW STORY, May 25, 2014: "Fox News Expert Suggests Homosexual Impulses Triggered Calif. Mass Shooting"; WASHINGTON POST, Oct. 7, 2013: "Fox & Friends Fails On Obama-Muslim Museum Connection: No Surprise Here")).  Further, many national media outlets have journalists dedicated to "meta-news"— that is, covering how the media covers the news.  *See*, *e.g.*, Erik Wemple, WASHINGTON POST, http://www.washingtonpost.com/blogs/erik-wemple/ ("A reported opinion blog on news media.").  Major television networks—including FNC—also have programs dedicated to media analysis.  *See*, *e.g.*, #*mediabuzz* (FNC broadcast),

*available at* http://www.foxnews.com/on-air/media-buzz/index.html ("Our new media program analyzes the coverage of a wide range of topics …."); *Reliable Sources* (CNN broadcast), *available at* http://reliablesources.blogs.cnn.com/ ("Now more than ever, the press is a part of every story it covers").

Indeed, several of the statements made in the Works-in-Suit at issue here were themselves newsworthy, independent of the underlying story being covered— and these FNC broadcasts were then covered by other news stations. (Rose Decl. ¶ 14, Ex. JJ (*e.g.*, MEDIAITE, Nov. 1, 2012: "Fox's *The Five* Hosts: Post-Hurricane Sandy Gas Lines Are 'Carter-Esque,' Bad For Obama"; WASHINGTON POST, Dec. 10, 2012: "Will George Zimmerman Regret Hannity Interview?"). TVEyes' service thus greatly facilitates the public's access to the news made *by* Fox on its broadcasts every day, functioning as the source for creating a *new* news story. Just as the Second Circuit recognized that "Bloomberg was simply revealing the newsworthy information of what Swatch Group executives had said," *Swatch*, 2014 WL 2219162, at *8, TVEyes functions to "reveal the newsworthy information of what [FNC and FBN] had said," *id.*; *see also Feist*, 499 U.S. at 348 ("facts … [such as] news of the day … may not be copyrighted and are part of the public domain available to every person.") (quotations omitted).

*Third*, TVEyes furthers the public interest by facilitating criticism of Fox—a fundamental First Amendment value. Without TVEyes (or services like it), the public could not efficiently review content broadcast on FNC, exactly as it was broadcast on FNC, for the purpose of commenting on or criticizing Fox. ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████  ██████  ████████████████

██  (SUF ¶¶ 117-118.)  Further, would-be critics and commentators cannot use content from the Fox Website to criticize Fox because, as noted above, that content: (1) is exclusively controlled by Fox; (2) is incomplete; (3) does not accurately reflect

exactly what was broadcast; and (4) has limited search functionality that interferes with the ability to search for and find content.  (*Id.* ¶¶ 100-114.)  In contrast, there is tremendous value in having a disinterested third party capture and index all content as it aired, make it searchable, provide analytic tools, and provide snippets for purposes consistent with fair use.

For example, Media Matters—a TVEyes client—is a highly trafficked website that systematically monitors a cross section of print, broadcast, cable, radio, and internet media outlets for conservative misinformation, which directs a substantial portion of its monitoring and criticism  towards Fox.  (*Id.* ¶ 61.)  Media Matters can best serve its role to the public as a media watchdog, and lay the groundwork for substantive political debate, ***because*** it can efficiently and affordably research and compare broadcast content via TVEyes.  For example, Media Matters reported that "Fox News Underreported Sexual Assault In The Military," as compared to MSNBC and CNN, using TVEyes to conduct the analysis.  (Rose Decl. ¶ 15, Ex. JJ).  This undeniably benefits the public interest and the core principles underlying the First Amendment.

Cable news shows about the news media's coverage of the news, and media watchdogs that criticize and expose what they deem bias and misinformation, demonstrate the extent to which news reporting is the subject of legitimate and widespread political debate.  Denying TVEyes the ability to make excerpts of Fox broadcasts available to subscribers for research—especially for research that results in criticism of Fox—elevates Fox's rights to exclusive ownership and control over the public's right to continue to access information and effectively engage in political discourse.  There is a public benefit to—and a First Amendment interest in—giving the public the means to carry on this conversation on its own terms. Since TVEyes is essential to this end, this Court should hold that its use is fair.

### E.   Weighing the Fair Use Factors, Along with Other Relevant Considerations, TVEyes' Use Is Fair

Ultimately, "the various non-exclusive statutory factors are to be weighed together, along with any other relevant considerations, in light of the purposes of the copyright laws." *Google Books*, 954 F. Supp. 2d at 293.   Here, the relevant considerations weigh heavily in favor of fair use: (1) TVEyes' use of the Works-in-Suit is transformative in that they are used for a different function and purpose than the original work; (2) TVEyes offers the important public benefit of conveying factual information, promoting the goal of accuracy, not piracy; (3) the Works-in-Suit are highly factual and already published; (4) TVEyes uses no more of the Works-in-Suit than necessary to accomplish its fair-use goals: TVEyes must use the entirety of the works to create a functional search database and TVEyes provided clients with access to small portions of the Works-in-Suit that were narrowly targeted to the user's search; and (5) TVEyes does not act as a substitute for the Works-in-Suit and, in any event, the public benefit of the use far outweighs any gain to Fox.

The ultimate question before the Court is "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it," *Bill Graham*, 448 F.3d 605 at 608.   TVEyes furthers fundamental First Amendment protections by allowing users to research what was said on television, without the danger that the source will withhold, delete or alter that information.   While Fox seeks to control what parts of its broadcast may and may not be accessible to the public, such control frustrates TVEyes' purpose of allowing people to monitor the media.   *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 305 (1964) (Goldberg, J., concurring) ("sunlight is the most powerful of all disinfectants") (quotations and citation omitted).

Weighing all of these considerations together, the Court should find that TVEyes' particular use of Fox broadcasts—both in their entirety for the purpose of creating a comprehensive, searchable database, and in providing targeted snippets in response to specific queries—is fair.

## III. FOX'S "HOT NEWS" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS

Fox's New York state-law claim for "hot news" misappropriation[13]—a tort that is rarely recognized, and only in circumstances that are essentially identical to those of *International News Service v. Associated Press* ("*INS*"), 248 U.S. 215 (1918), should be rejected, both because it is preempted by the Copyright Act and, in any event, Fox has failed to introduce  evidence sufficient to support such a claim.

### A. Fox's "Hot News" Misappropriation Claim Is Preempted by the Copyright Act

To determine whether a state-law "hot news" misappropriation claim is preempted by the Copyright Act, courts in this Circuit apply a two-pronged test. *See Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.* ("*Fly*"), 650 F.3d 876, 892 (2d Cir. 2011).  A claim is preempted if: (1) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by the Copyright Act; and (2) the work in question is of the type of works protected by the Copyright Act.  *Id.*  Where both prongs of the preemption test are satisfied, courts will then apply the "extra element test" to determine whether the claim should nonetheless survive preemption.  This test asks whether "an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of

---

[13]  In a letter to TVEyes' counsel dated August 26, 2013, counsel for Fox stated that Counts II and III of the Complaint are brought under New York state common law. (Rose Decl. ¶ 31, Ex. AAA).

action,'" to ascertain whether the claim is qualitatively different from a copyright claim. *Nat'l Basketball Ass'n v. Motorola, Inc.* ("*NBA*"), 105 F.3d 841, 850 (2d Cir. 1997) (quoting *Computer Assoc. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). If so, "then the right does not lie within the general scope of copyright, and there is no preemption." *Id.*

The two seminal cases of this Circuit addressing "hot news" misappropriation are *Fly* and *NBA*. In both *Fly* and *NBA*, the Second Circuit recognized an extremely narrow "hot news" exception to the rule that claims of misappropriation under New York common law arising from the copying of the plaintiff's materials are preempted by federal copyright law. *See Fly*, 650 F.3d at 896 ("The *NBA* panel repeatedly emphasized the 'narrowness' of the 'hot news' tort."); *NBA*, 105 F.3d at 852 ("[O]nly a narrow 'hot news' misappropriation claim survives preemption."). This exception applies only to allegations of misappropriation that mirror the facts of *INS*. *See NBA*, 105 F.3d at 845 ("a 'hot-news' *INS*-like claim survives preemption," but noting that prior panels have come to this conclusion "only begrudgingly") (citations omitted).

Here, Fox cannot prove **any** of the elements of an "*INS*-type non-preempted claim," let alone all of them. Accordingly, its "hot news" claim is preempted by § 301 of the Copyright Act. *Fly*, 650 F.3d at 902 ("hot news" claim was preempted by Copyright Act because defendant did not free-ride); *NBA*, 105 F.3d at 854 (same).

1.    <u>**Fox Has Not Identified Any Particular Piece of Exclusive, Time-Sensitive "Hot News" That Was Misappropriated**</u>

As a threshold matter, Fox has not identified **any** specific piece of time-sensitive "hot news" that TVEyes allegedly misappropriated; rather, Fox identified entire **topics**, without identifying a specific time or date that a particular piece of "hot news" was exclusively disseminated by Fox. Because TVEyes has not been

placed on notice of the particular "hot news" that it allegedly misappropriated, Fox's claim must be dismissed.

In discovery, TVEyes issued an interrogatory to Fox requesting that it "[i]dentify each piece of 'hot news' that TVEyes allegedly misappropriated and, for each piece of 'hot news' identified, describe the efforts Fox News undertook to gather it." (Anten Decl. ¶ 33, Ex. OOO.)  The entirety of Fox's substantive response is as follows:

> … Fox News identifies, as the "hot news" that TVEyes misappropriated, all of the breaking news aired on Fox News Channel or Fox Business Network between July 31, 2010 and July 30, 2013, including, but not limited to: Fox News' May 19–25, 2013 coverage of the Moore, Oklahoma tornado; Fox News' April 15–22, 2013 coverage of the Boston marathon bombing and subsequent manhunt; Fox News' April 4–13, 2013 coverage of North Korea tensions; Fox News' February 11, 2013 to March 20, 2013 coverage of the papal resignation and election; Fox News' December 14–18, 2012 coverage of the Newtown, Connecticut school shooting; Fox News' November 15–30, 2012 coverage of the Israel-Hamas conflict; Fox News' October 25 to November 5, 2012 coverage of Hurricane Sandy; Fox News' August 26–31, 2012 coverage of Hurricane Isaac; Fox News' September 12–20, 2012 coverage of political unrest in the Mideast; Fox News' August 24–31, 2011 coverage of Hurricane Irene; and Fox News' July 4, 2011 to September 4, 2011 coverage of the Arab Spring uprisings in Libya.

*Id.*  Fox's identification of the "hot news" that TVEyes allegedly misappropriated is so specious as to be frivolous, warranting outright dismissal of this claim.

*First*, Fox merely identifies the subject of its "hot news" claim as "all of the breaking news" that aired on FNC or FBN—a clear tautology—without placing TVEyes on fair notice of what such "breaking news" would be.

*Second*, Fox identifies as the substance of its claim entire weeks of its "coverage" of world events as constituting its protectable "hot news."  For example, without identifying any particular story or segment that was broadcast, Fox claims the entirety of its coverage of the Arab Spring uprisings for ***63 days*** is "hot."

Likewise, without identifying any particular story or segment that was broadcast, Fox claims the entirety of its "coverage" of the papal resignation and election for **43 days** is "hot." Fox even identifies the entirety of nine days of "coverage of political unrest in the Mideast" as protectable "hot news"—a frustratingly vague claim considering that, unfortunately, there is almost always political unrest in the Mideast. At base, Fox seeks to claim that **all** of its coverage is "hot news." But Fox does not, and never has, owned the topics of Hurricane Sandy, the Newtown shootings, or Israel-Hamas conflict. The Court should reject Fox's argument that it can simply name a world event and own every fact reported on it. There is a difference between "news" and legally protectable "hot news," but Fox makes no distinction.

*Third*, Fox produced no evidence that any of the facts contained in its "coverage" of these events was first published exclusively by Fox, nor that any such "facts" were not already available from another source when TVEyes allegedly misappropriated them. To establish a claim for "hot news," Fox must identify specific, time-sensitive facts, that were acquired exclusively by Fox, and were subsequently published by Fox before any other competing news source. *See BanxCorp v. Costco Wholesale Corp.,* 723 F. Supp. 2d 596, 612 (S.D.N.Y. 2010) ("Plaintiffs must allege not only that the news was time-sensitive when it was gathered, but that it was time-sensitive when it was misappropriated"); *Silver v. Lavandeira*, 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26, 2009) (rejecting "hot news" claim where "[t]he same information that was allegedly gathered by Plaintiff through costly efforts was widely available and published by numerous other sources on the Internet, generally before it was published by Plaintiff"). Fox, however, offers no evidence that any of its "coverage" of particular topics was time-

sensitive, nor that the facts uncovered were published exclusively by Fox and no other outlet.[14]

Even if Fox could establish that it was the first news outfit to report a particular piece of news, that information would lose its time-sensitive value as soon as other news networks independently acquired and disseminated it.  *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 209 (S.D.N.Y. 2003) ("This doctrine creates a narrow quasi property right in news, which as facts 'may not be copyrighted,' only as against business competitors and only until its commercial value as 'hot news' has passed.") (citing *Fin. Info., Inc. v. Moody's Investors Serv. Inc.*, 808 F.2d 204, 207 (2d Cir. 1986)).  In the age of the 24-hour news cycle, the time-sensitive value of news is increasingly fleeting.  Fox bears the burden of proving that any of the facts it claims to have exclusively acquired and reported to the world first were not reported by other news sources before Fox's broadcast was captured, indexed, and rendered searchable on TVEyes.

### 2.  TVEyes Does Not "Free Ride" on Fox's Efforts

Fox cannot establish that TVEyes "free-rides" on Fox's effort as this element has been interpreted by this Circuit in *Fly* and *NBA*.  "Free-riding" was defined in *INS* as "'taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and … appropriating it and selling it as [the defendant's] own ….'" *Fly*, 650 F.3d at 903 (quoting *INS*, 248 U.S. at 239).  However, where a

defendant provides "attribution" of the factual information, there can be no free-riding because the defendant has not sold it "as its own." *Id.*

Here, far from passing off Fox's content as its own, TVEyes ***specifically attributes*** all broadcast content made accessible to subscribers to its source, including FNC an FBN content.  (SUF ¶ 126).  That is in many respects the whole point of the service.  For example, to the extent that the FNC and FBN logos are displayed on the screen when broadcast, those logos also appear, in the same manner, on TVEyes.  For TVEyes to pass these clips on as its own "would be of little value to either [TVEyes] or its customers," *Fly*, 650 F.3d at 903, who are interested in the fact that their keyword was mentioned on a particular news channel, not on TVEyes.  Under *INS*, *Fly* and *NBA,* TVEyes does not "free-ride" because it does not take the information broadcast by Fox and redistribute "that news as though it were 'breaking' news of its own." *Fly*, 650 F.3d at 903 n.36.

Moreover, TVEyes expends its own resources to capture the content of over 1,400 television and radio broadcasts and, using its own skill and technology, indexes the content into text databases and delivers relevant search results and excerpts to its customers in response to user-selected keywords (SUF ¶¶ 3, 13-15.) All of these unique contributions—capturing, indexing, organizing, and delivering— occur solely at TVEyes' expense.  *See NBA*, 105 F.3d 854 ("free riding" not met where the parties each bore their own costs in collecting and disseminating the factual information in question).

Finally, by delivering keyword results to customers, TVEyes reports the ***fact*** that a particular keyword was mentioned in a particular Fox broadcast.  This, by definition, is not the same underlying news reported by Fox; it is a new fact, and therefore cannot constitute free-riding.  *See Fly*, 650 F.3d at 902 ("[Fly] is collecting, collating and disseminating factual information—the ***facts*** that Firms and others in the securities business have made recommendations with respect to the value of

and the wisdom of purchasing or selling securities—and attributing the information to its source.  The Firms are making news; Fly, despite the Firms' understandable desire to protect their business model, is breaking it.") (emphasis in original).

### 3.    TVEyes Is Not a Threat to the Very Existence of Fox's Newsgathering Activities

Fox cannot begin to prove that TVEyes represents a "threat to the very existence" of Fox's newsgathering activities.  *NBA*, 105 F.3d at 853.  As *NBA* noted, the "hot news" doctrine remedies the threat to newsgathering posed by misappropriation that "would destroy the incentive to collect news in the first place."  *Id*.  The fate of Fox and its news programming, however, is not affected by the existence of TVEyes' service, because TVEyes has no plausible impact on Fox's two primary sources of revenue: (1) licensing fees collected from cable companies and (2) revenue generated from adverting broadcast during program breaks. (Compl. ¶ 20).  To the extent Fox argues that TVEyes may threaten Fox's incentive to license video clips or host them on the Fox Website, such a position is flawed— the question is not whether TVEyes may have any conceivable financial effect on a portion of Fox's business model; rather, the question is whether the existence of TVEyes would "destroy" Fox's "incentive to collect news in the first place."  *NBA*, 105 F.3d at 853.  Because Fox introduced no such evidence, this claim must fail.

### 4.    TVEyes and Fox Are Not "Direct Competitors"

Finally, the "hot news" tort requires that the parties be *bona fide* direct competitors, in the way that INS and AP were directly competitive wire services chasing after identical stories.  As *Fly* noted, "in talking about a "hot-news" *INS*-like claim, as we did in [*NBA*], … we are mindful that the *INS* Court's concern was tightly focused on the practices of the parties to the suit before it: news, data, and the like, gathered and disseminated by one organization as a significant part of its

business, taken by another entity and published as the latter's own in competition with the former."  650 F.3d at 905 (quotations omitted).

Here, TVEyes and Fox do not "directly" compete—Fox is not a media-monitoring service, and TVEyes does not (and does not purport to) engage in its own newsgathering efforts.  (SUF ¶¶ 93, 125.)  There is no evidence that Fox is now, or plans to be, in the business of capturing, indexing and making searchable by keyword the content broadcast on over 1,100 television stations, nor that TVEyes is in the business of providing original programming for consumption on television.  *See Fly*, 650 F.3d at 914-15 (Raggi, J., concurring) ("The Firms do not aggregate or distribute other Firms' Recommendations … [and] Fly does not produce any of its own recommendations or seek trading commissions"). ███████████████ ████████████████████████████████████████ (Anten Decl. ¶ 21, Ex. CCC.)

Nor has Fox introduced any evidence of an actual or potential cable subscriber no longer subscribing to or watching FNC or FBN because of the existence of TVEyes.  *See NBA*, 105 F.3d at 853-54 ("With regard to NBA's primary products—producing basketball games with live attendance and licensing copyrighted broadcasts of those games—there is no evidence that anyone regards SportsTrax or the AOL site as a substitute for attending NBA games or watching them on television.").  While Fox may claim that Fox and TVEyes "directly compete" in connection with Fox's ancillary business of licensing clips, the issue is not whether there is ***any*** competition, but whether there is "direct" competition akin to two directly competing newswire services, where one party "scoops" the other.  This case does not present such (necessary) facts.

**B.**    **Fox Cannot Prove "Hot News" Misappropriation On The Merits**

Even if Fox's "hot news" claim was not preempted by the Copyright Act, it should be rejected on the merits for the same reasons discussed above. The "extra elements" for a claim of "hot news" misappropriation are also the elements of the underlying "*INS*-like" tort, *Fly* 650 F.3d at 898, and accordingly Fox's "hot news" claim fails for lack of proof.

**IV.**    **FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS**

While Fox's third count alleges a claim of "State Law Misappropriation (Direct Competition)" (Compl. ¶¶ 71-77), it is not clear such a claim even exists. TVEyes has uncovered no authority recognizing a claim for "direct competition" misappropriation under New York law. To the extent that Fox has included such a claim as a backup catch-all, the claim fails.

**A.**    **Fox's "Direct Competition" Misappropriation Claim Is Preempted by the Copyright Act**

Fox alleges that TVEyes is liable for "direct competition" misappropriation under New York law because "TVEyes uses Fox News's work in competition with it" and is thus "intentionally misappropriating Fox News content and palming it off to consumers … intentionally misleading the public to believe that there is a connection between Fox News and TVEyes where there is none." (Compl. ¶¶ 73-74.)

This claim should be dismissed as a matter of law because binding Second Circuit precedent directs that state-law unfair competition/misappropriation claims premised on the copying of a plaintiff's copyrighted works are preempted by the Copyright Act. *See NBA*, 105 F.3d at 852 (New York's broad misappropriation doctrine preempted by federal copyright law); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) ("Walker's cause of action for unfair competition is preempted by the federal copyright laws to the extent it seeks protection against

copying of Walker's book."); *see also* 17 U.S.C. § 301(a) ("all legal or equitable rights that are equivalent to any of the exclusive rights" of the Copyright Act "are governed exclusively by" the Copyright Act).

In this case, there can be no dispute that the first two elements of the preemption test are met: the essence of Count III is that TVEyes' alleged copying, distributing and performing of Fox's copyrightable content amounts to misappropriation, all of which are governed by the Copyright Act. (*See* Compl. ¶¶ 72, 74.) As to the "extra element test," the Second Circuit has consistently held that non-"hot news" misappropriation claims grounded in acts of copying are preempted by the Copyright Act. *See, e.g., NBA*, 105 F.3d at 852 ("only a narrow 'hot-news' misappropriation claim survives preemption for actions concerning material within the realm of copyright"); *Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 208 (2d Cir. 1986) ("We are not persuaded by FII's argument that misappropriation is not 'equivalent' to the exclusive rights provided by the Copyright Act."). In *Fly*, the Second Circuit reiterated that the broad doctrine of unfair competition described in *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950) is preempted by the Copyright Act. 650 F.3d at 896-97. The Court explained:

> No matter how "unfair" Motorola's use of NBA facts and statistics may have been to the NBA—or Fly's use of the fact of the Firms' Recommendations may be to the Firms—then, such unfairness alone is immaterial to a determination whether a cause of action for misappropriation has been preempted by the Copyright Act. The adoption of new technology that injures or destroys present business models is commonplace. ***Whether fair or not, that cannot, without more, be prevented by application of the misappropriation tort.*** Indeed, because the Copyright Act itself provides a remedy for wrongful copying, such unfairness may be seen as supporting a finding that the Act preempts the tort.

*Fly*, 650 F.3d at 896 (emphasis added, footnotes omitted).

Fox's "direct competition" misappropriation claim undeniably is based upon acts of alleged copying, and therefore is preempted by the Copyright Act—Fox alleges that TVEyes misappropriated Fox's "premium programming and content," "uses" and "distributes" Fox's work, and "palm[s] it off" to consumers.  (Compl. ¶¶ 72-74.)   This is qualitatively equivalent to Fox's claim for copyright infringement.  *See*, *e.g.*, *Computer Assocs. Int'l*, 982 F.2d at 717 ("unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by Section 301"); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 919 (2d Cir. 1980) ("[t]o the extent that Tomy's unfair competition claim seeks protection against Durham's copying," it is preempted).  For similar reasons, this Court has dismissed such a claim as preempted because the plaintiff "simply attempted to dress up its claim that [the defendant] had copied [plaintiff's work]." *Eyal R.D. Corp. v. Jewelex New York Ltd.*, 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) (Hellerstein, J.).

Finally, to the extent that Fox claims its allegation regarding TVEyes' purported "palming off" (Compl. ¶ 74) of Fox content constitutes an extra element, this does not save the claim.   "Palming off," or any other "evidence of misrepresentation only 'accentuates' a misappropriation claim and is not the 'essence' of such an action."   *Nash v. CBS, Inc.*, 704 F. Supp. 823, 834 (N.D. Ill. 1989) (quoting *INS*, 248 U.S. at 242).   Thus, in *Nash*, the court found a misappropriation claim premised on allegations of misrepresentation of source or deception to the public to be preempted by the Copyright Act.   *Id.* at 834-35. Indeed, in a recent case where Fox was the defendant, Fox argued—and the court found—that a claim for "reverse passing off," the allegation Fox (at most) makes here, "does not constitute an extra element for preemption purposes because it is essentially a claim for unauthorized use of copyrighted material."  *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 322 & nn.67-68 (S.D.N.Y. 2010) (citing

cases); *see also id.*, No. 09-cv-7910, Doc No. 18, at 7 (March 5, 2010) (Fox arguing that plaintiff's claims of "misappropriation" and "passing off" are "preempted by the Copyright Act").

### B.   Fox's "Direct Competition" Misappropriation Claim Is Duplicative of Its "Hot News" Misappropriation Claim

Fox alleges that: (1) Fox "expends considerable time and expense in producing and distributing" its content (Compl. ¶ 72); and (2) "TVEyes uses Fox News's work in competition with it" by "providing an archival clip service in competition with … ITN Source" and "allow[ing] customers to watch Fox programming online" (*id.* ¶ 73). These allegations are indistinguishable from Fox's allegations in support of its "hot news" claim. (*Compare id.* ¶¶ 72, 73 *with id.* ¶¶ 64, 67.) Fox's "direct competition" claim is nothing more than a watered-down version of its "hot news" claim. Because Fox's "hot news" claim is preempted, so is its "direct competition" claim.

### C.   Fox Cannot Prove "Direct Competition" Misappropriation on the Merits

Even if Fox's "direct competition" misappropriation claim were not pre-empted by the Copyright Act, Fox cannot succeed on the merits of its claim.

The "essence" of an unfair competition claim premised upon misappropriation "is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Eyal R.D.*, 784 F. Supp. 2d at 447 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995)). Thus, Fox's misappropriation claim is, at base, an unfair competition claim. "To recover for unfair competition, a plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief, and must show that there was bad faith." *Id.* at 447 (quotations omitted). Both elements are required, yet neither is satisfied here.

67

*First*, there is no evidence in the record of consumer confusion. Fox has not introduced a consumer survey demonstrating that TVEyes' customers are likely to believe that TVEyes' service emanates from or is approved by Fox, nor is there any other evidence demonstrating that consumers are deceived or confused about the origin of TVEyes' service. TVEyes does not claim to have a business relationship with Fox, and nothing in the manner in which TVEyes markets and promotes itself suggests that such a relationship exists. (SUF ¶ 127.)

*Second*, TVEyes has not acted in bad faith. In determining whether there is bad faith for purposes of a misappropriation claim, the "only relevant intent is intent to confuse." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 329 (S.D.N.Y. 2012) (quotations omitted). Fox has not introduced any evidence that TVEyes intended to confuse the public as to the existence of a "connection or association" between Fox and TVEyes. TVEyes' purpose in capturing and indexing Fox's content is to create a comprehensive text-searchable database of all broadcast content—that TVEyes captured this content does not support an inference of bad faith. *Cf. Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005 (2d Cir. 1997) ("bad faith should not be inferred simply from the fact of copying"). Indeed, TVEyes attributes the source of any broadcast content by identifying the channel from which all content originates. (SUF ¶ 126).

## **CONCLUSION**

For the foregoing reasons, TVEyes respectfully requests that the Court grant its motion for summary judgment in its entirety.

Dated:       June 26, 2014

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By ___/s/  Andrew H. Schapiro_____
    Andrew H. Schapiro
    andrewschapiro@quinnemanuel.com
    Todd Anten
    toddanten@quinnemanuel.com
    Jessica A. Rose
    jessicarose@quinnemanuel.com

    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    (212) 849-7000

    *Attorneys for Defendant TVEyes, Inc.*