REDACTED

Dale M. Cendali
Johanna Schmitt
Joshua L. Simmons
Felicity Kohn
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
joshua.simmons@kirkland.com
felicity.kohn@kirkland.com

*Attorneys for Plaintiff Fox News Network, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FOX NEWS NETWORK, LLC, | Case No.  1:13-cv-05315-AKH |
| Plaintiff, | ECF Case |
| - against - | |
| TVEYES INC., | |
| Defendant. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**<u>FOX NEWS NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................4

    I.      TVEYES IS LIABLE FOR COPYRIGHT INFRINGEMENT.............................5

            A.      TVEyes Does Not Dispute Fox News' *Prima Facie* Case of
                    Copyright Infringement ................................................................5

            B.      TVEyes Cannot Meet its Burden of Establishing that its Copying
                    of Fox News' Content is Fair Use...............................................7

                  1.      Factor One: TVEyes' Use Is Commercial, in Bad Faith, and
                            Not Transformative........................................................12

                  2.      Factor Two: The Registered Works Are Creative and
                            Expressive ......................................................................22

                  3.      Factor Three: TVEyes Copied the Registered Works in
                            Their Entirety ...............................................................24

                  4.      Factor Four: TVEyes' Use Harms the Market for and the
                            Value of the Registered Works ......................................27

                  5.      Considerations of the Public Interest Favor Fox News .................39

    II.     TVEYES IS LIABLE FOR HOT NEWS MISAPPROPRIATION AND
           ITS PREEMPTION DEFENSE FAILS.......................................................42

            A.      TVEyes Has Misappropriated Fox News' Time-Sensitive "Hot
                    News," Which Fox News Has Generated at Significant Cost and
                    Expense. ...................................................................................43

            B.      TVEyes Free Rides on Fox News' Newsgathering Efforts .......................50

             C.      If TVEyes' Appropriation of Fox News' News Became
                    Widespread, It Would Threaten the Existence of Fox News'
                    Newsgathering Activities............................................................54

             D.      TVEyes and Fox News Directly Compete....................................56

             E.      Fox News' Hot News Misappropriation Claim Is Not Preempted ...........59

    III.    FOX NEWS HAS ESTABLISHED ITS MISAPPROPRIATION CLAIM
           AND TVEYES' PREEMPTION DEFENSE FAILS .............................................60

            A.      Fox News Has Established Its Misappropriation Claim Under Two
                    Independent Theories..................................................................60

             B.      TVEyes' Preemption Defense Fails..............................................69

CONCLUSION ......................................................................................................72

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex. rel. Vanderhye v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009)................................................................. 11, 14, 25, 26

*Am. Broadcasting Cos. v. Aereo, Inc.,*
  No. 13-461, 2014 WL 2864485 (U.S. June 25, 2014) ............................................ 6

*Am. Geophysical Union v. Texaco Inc.,*
  60 F.3d 913 (2d Cir. 1995) ................................................................................. passim

*Associated Press v. All Headline News Corp.,*
  608 F. Supp. 2d 454 (S.D.N.Y. 2009)................................................................... 59

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
  931 F. Supp. 2d 537 (S.D.N.Y. 2013)............................................................ passim

*Authors Guild, Inc. v. Google Inc.,*
  954 F. Supp. 2d 282 (S.D.N.Y. 2013)............................................... 11, 12, 21, 22

*Authors Guild, Inc. v. HathiTrust,*
  No. 12-4547, 2014 WL 2576342 (2d Cir. June 10, 2014) ............................ passim

*Barclays Capital, Inc. v. Theflyonthewall.com, Inc.,*
  650 F.3d 876 (2d Cir. 2011)............................................................................. passim

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006) ................................................................................ 15

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006) ................................................................................ 18

*Bouchat v. Baltimore Ravens Ltd.,*
  737 F.3d 932 (4th Cir. 2013)................................................................................ 14

*Boykin v. KeyCorp.,*
  521 F.3d 202 (2d Cir. 2008) ................................................................................ 64

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ...................................................................................... passim

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  262 F. Supp. 2d 204 (S.D.N.Y. 2003).................................................................. 48

*Castle Rock Entm't, Inc. v. Carol Publish'g Grp., Inc.,*
  150 F.3d 132 (2d Cir. 1998)...................................................................... 25, 34, 39

*Celotex Corp. v. Catrett,*
  447 U.S. 317 (1986) ...................................................................................... passim

*Computer Assocs. Int'l v. Altai, Inc.,*
  982 F.2d 693 (2d Cir. 1992)................................................................................. 71

*Davis v. Gap, Inc.,*
  246 F.3d 152 (2d Cir. 2001).......................................................................... passim

*Demetriades v. Kaufmann,*
  698 F. Supp. 521 (S.D.N.Y. 1988) .................................................................. 70

*Dior v. Milton,*
  155 N.Y.S.2d 443 (N.Y. Sup. 1956) ............................................................... 64

*Durham Indus., Inc. v. Tomy Corp.,*
  630 F.2d 905 (2d Cir. 1980) ........................................................................... 71

*Eldred v. Ashcroft,*
  537 U.S. 186 (2003) ........................................................................................ 39

*Eyal R.D. Corp. v. Jewelex New York Ltd.,*
  784 F. Supp. 2d 441 (S.D.N.Y. 2011) ...................................................... 67, 71

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ........................................................................................ 24

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.,*
  751 F.2d 501 (2d Cir. 1984) ........................................................................... 42

*Fitzgerald v. CBS Broad., Inc.,*
  491 F. Supp. 2d 177 (D. Mass. 2007) ............................................................. 37

*Forest Park Pictures v. Universal Television Network, Inc.,*
  683 F.3d 424 (2d Cir. 2012) ........................................................................... 70

*Friends of Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................................ 38

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
  No. 96 Civ. 1103, 1996 WL 724734 (S.D.N.Y. Dec. 17, 1996) ..................... 71

*Georgia Malone & Co. v. Rieder,*
  19 N.Y.3d 511 (2012) ..................................................................................... 60

*Getty Petroleum Corp. v. Island Transp. Corp.,*
  878 F.2d 650 (2d Cir. 1989) .............................................................. 64, 65, 68

*Gross v. Bare Escentuals Beauty, Inc.,*
  641 F. Supp. 2d 175 (S.D.N.Y. 2008) ............................................................. 65

*Gucci Am., Inc. v. Action Activewear, Inc.,*
  759 F. Supp. 1060 (S.D.N.Y. 1991) ................................................................ 66

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.,*
  879 F.2d 1005 (2d Cir. 1989) ......................................................................... 60

*Hall v. Bed Bath & Beyond, Inc.,*
  705 F.3d 1357 (Fed. Cir. 2013) ........................................................... 60, 62, 63

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) ................................................................................. passim

*Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharm., Inc.,*
  No. 05 Civ. 2674 WL 1988737 (E.D.N.Y. July 5, 2007) ................................ 67

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) .................................................................... passim

*Int'l News Service v. Associated Press*,
  248 U.S. 215 (1918) ............................................................................... passim

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2002)........................................................... 12, 20, 23

*Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*,
  411 F.2d 1097 (2d Cir. 1969)..................................................................... 69

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................... 6, 14, 18, 24

*LinkCo, Inc. v. Fujitsu Ltd.*,
  230 F. Supp. 2d 492 (S.D.N.Y. 2002) ....................................................... 61

*Lone Wolf McQuade Assocs. v. CBS Inc.*,
  961 F. Supp. 587 (S.D.N.Y. 1997) ...................................................... 69, 71

*Los Angeles News Service v. Reuters Television Int'l, Ltd.*,
  149 F.3d 987 (9th Cir. 1998)................................................................. 7, 19

*Los Angeles News Service v. Tullo*,
  973 F.2d 791 (9th Cir. 1992)................................................................... 7, 8

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001)..................................................................... 65

*Maryland. v. Wilson*,
  519 U.S. 408 (1997) ................................................................................... 58

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................... 61

*Maxtone-Graham v. Burtchaell*,
  803 F.2d 1253 (2d Cir. 1986)..................................................................... 33

*Microban Prods. Co. v. API Indus., Inc.*,
  No. 14 Civ. 41, 2014 WL 1856471 (S.D.N.Y. May 8, 2014) ............ 67, 69

*Miller v. Schloss*,
  218 N.Y. 400 (1916) ................................................................................... 60

*Morris v. Guetta*,
  No. 12 Civ. 684, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013) ........ 6, 17, 30

*Nash v. CBS, Inc.*,
  704 F. Supp. 823 (N.D. Ill. 1989) ....................................................... 59, 71

*Nash v. CBS, Inc.*,
  899 F.2d 1537 (7th Cir. 1990).................................................................... 59

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir. 1997)................................................................. passim

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
    904 F.2d 152 (2d Cir. 1990) ........................................................................... 17

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) ........................................................................... 8, 9

*NXIVM Corp. v. Ross Institute*,
    364 F.3d 471 (2d Cir. 2004) ...................................................................... 16, 17

*Oracle Am., Inc. v. Google Inc.*,
    750 F.3d 1339 (Fed. Cir. 2014) ........................................................... 14, 20, 25

*Pac. & S. Co. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) ..................................................................... 9, 19

*Pebble Beach Co. v. Tour 18 I, Ltd.*,
    155 F.3d 526 (5th Cir. 1998) ........................................................................... 69

*Pebble Beach Co. v. Tour 18 I, Ltd.*,
    942 F. Supp. 1513 (S.D. Tex. 1996) .............................................................. 69

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ........................................................................ 12

*Pollstar v. Gigmania Ltd.*,
    No. 00 Civ. 5671, 2000 WL 34016436 (E.D. Cal. Sep. 1, 2000) .............. 51, 56

*Ringgold v. Black Entm't Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997) ................................................................... 13, 20, 39

*Ritani, LLC v. Aghjayan*,
    880 F. Supp. 2d 425 (S.D.N.Y. 2012) ............................................................ 45

*Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler, M.D., LLC*,
    905 N.Y.S.2d 232 (N.Y. App. 2010) .............................................................. 62

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*,
    894 F. Supp. 2d 288 (S.D.N.Y. 2012) ............................................................ 61

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992) ............................................................................ 13

*Roy Exp. Co. v. Columbia Broad. Sys., Inc.*,
    503 F. Supp. 1137 (S.D.N.Y. 1980) ............................................................... 63

*Roy Exp. Co. v. Columbia Broad. Sys., Inc.*,
    672 F.2d 1095 (2d Cir. 1982) ..................................................................... 60, 62

*Russian Media Grp., LLC v. v. Echostar Commc'ns Corp.*,
    No. 3:03 Civ. 1263, 2009 WL 275833 (D. Conn. Feb. 4, 2009) ..................... 61

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) .............................................................................. 28

*Salinger v. Colting*,
    641 F. Supp. 2d 250 (S.D.N.Y. 2009) .................................................. 28, 36, 39

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ........................................................................................ 39

*Samara Bros. Inc. v. Wal-Mart Stores*,
   165 F.3d 120 (2d Cir. 1998) ...................................................................................... 71

*SEC v. Research Automation Corp.*,
   585 F.2d 31 (2d Cir. 1978) ........................................................................... 61, 62, 65

*Short v. Connecticut Cmty. Bank, N.A.*,
   No. 3:09 Civ. 1955, 2012 WL 1057302 (D. Conn. Mar. 28, 2012) ......................... 17

*Silver v. Lavendeira*,
   No. 08 Civ. 6522, 2009 WL 513031 (S.D.N.Y. Feb. 26, 2009) ............................... 48

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   726 F. Supp. 2d 291 (S.D.N.Y. 2010) ....................................................................... 61

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ..................................................................................... 14, 27, 40

*Sparaco v. Lawler, Matusky, Skelly, Engineers LLP*,
   303 F.3d 460 (2d Cir. 2002) ...................................................................................... 24

*Speedry Prods., Inc. v. Dri Mark Prods., Inc.*,
   271 F.2d 646 (2d Cir. 1959) ...................................................................................... 63

*Standard & Poor's Corp. v. Commodity Exch., Inc.*,
   683 F.2d 704 (2d Cir. 1982) ........................................................................... 61, 62, 70

*Stewart v. Abend*,
   495 U.S. 207 (1990) ............................................................................................ 14, 23

*Swatch Grp. Mngm't Servs. Ltd. v. Bloomberg L.P.*,
   861 F. Supp. 2d 336 (S.D.N.Y. 2012) ................................................................ passim

*Swatch Grp. Mngm't Servs. Ltd. v. Bloomberg L.P.*,
   No. 12-2412, WL 2219162 (2d Cir May 30, 2014) ........................................... passim

*Taggart v. WMAQ Channel 5 Chi.*,
   No. 00 Civ. 4205, 2000 WL 1923322 (S.D. Ill. Oct. 30, 2000) ............................... 24

*Triboro Quilt Mfg. Corp. v. Luve LLC*,
   No. 10 Civ. 3604, 2014 WL 1508606 (S.D.N.Y. Mar. 18, 2014) ....................... 67, 69

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
   338 F.3d 127 (2d Cir. 2003) ........................................................................................ 5

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) .............................................................. 5, 14, 39

*United States v. ASCAP*,
   599 F. Supp. 2d 415 (S.D.N.Y. 2009) ............................................................ 14, 25, 35

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   342 F.3d 191 (3d Cir. 2003) ........................................................................................ 8

*Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*,
  No. 04 Civ. 5332 WL 2875327 (S.D.N.Y. Nov. 2, 2005) ................................................... 5, 36

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*,
  558 F.2d 91 (2d Cir. 1977) ................................................................................................. 29, 42

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986) ........................................................................................................ 71

*Warner Bros. Entm't Inc. v. RDR Books*,
  575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................................. 26, 36

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir. 1989) ..................................................................................... 16, 23, 25

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) .............................................................................................. passim

*X17 v. Lavendeira*,
  563 F. Supp. 2d 1102 (C.D. Cal. 2007) ...................................................................................... 59

**Statutes**

17 U.S.C. § 102 ................................................................................................................... 9, 70

17 U.S.C. § 107 ................................................................................................................... passim

17 U.S.C. § 504 ......................................................................................................................... 6

**Other Authorities**

Nimmer on Copyright § 1.01 ............................................................................................. 70, 72

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................................... 5

Fed. R. Evid. 801 ..................................................................................................................... 65

Fed. R. Evid. 802 ..................................................................................................................... 65

## PRELIMINARY STATEMENT

TVEyes did its best in its lengthy opposition brief to confuse the issues by asserting a series of convoluted legal arguments that are not supported by or contradict well-established case law. It also tried to create the appearance of disputed issues of material fact by throwing out a series of unsubstantiated factual statements, but such unsupported statements are not sufficient to defeat summary judgment under *Celotex*. After cutting through TVEyes' tactics, it is clear that this is a straightforward case that is ripe for summary judgment determination in favor of Fox News without, as previously recognized by this Court, the need for further expensive discovery.

Indeed, the nature of TVEyes' service and how it operates is not in dispute. TVEyes copies all of Fox News' copyrighted content and news reports as they air, 24 hours a day, seven days a week, and redistributes them in "real time" as part of a highly profitable subscription service that provides unlimited, unchanged, and unrestricted "high definition" video clips that can be watched, downloaded, edited, and shared with anyone. Moreover, TVEyes' own marketing materials state that its service is intended to allow users to "watch live TV, 24/7" and "monitor Breaking News" without any blackouts, to use the service as a "DVR" or "TiVo" to watch past programming, and to "download unlimited clips." TVEyes even markets itself as a better alternative to "old-fashioned press clipping services." As a result, ███████ video clips of Fox News' content have been played and over ██████ Fox News clips have been downloaded using TVEyes' service. In fact, hundreds of video clips were created from the representative nineteen Registered Works alone.

The resulting harm to Fox News is equally clear. TVEyes interferes with Fox News' distribution and monetization of its television content by diverting viewers away from Fox News' channels to TVEyes' service, relieving them of the need to pay for a separate cable or satellite subscription and preventing them from being counted in Fox News' ratings, which are a

key factor in determining the amount of revenue Fox News earns from its affiliate agreements and advertising.  TVEyes also harms Fox News' website revenues by making Fox News' content available more quickly and in greater amounts than Fox News itself, thereby diverting viewership from Fox News' websites where they would see banner and pre-roll advertising. Further, TVEyes harms Fox News' clip licensing business as no customer would need a clip from ITN Source or Executive Interviews once they were provided a high quality clip by TVEyes.  These examples of harm to Fox News are not speculative musings about future operations, but rather they directly interfere and compete with Fox News' current businesses. Moreover, while harmful in and of themselves, if TVEyes' conduct becomes widespread with anyone permitted to resell Fox News' content to his or her subscribers, it would undermine the very foundation on which the cable news industry was built to the detriment of Fox News and other owners of 24-hour cable news channels.

Given these straightforward facts and TVEyes' inability to dispute them, Fox News has established each of its three claims.  Fox News' *prima facie* copyright claim is straightforward and not disputed by TVEyes: Fox News holds copyright registrations for the nineteen Registered Works, and TVEyes admittedly copied those works verbatim in their entirety.  Thus, TVEyes must resort to arguing fair use.  The burden of proving fair use, however, is on TVEyes, and it cannot meet that burden as there is nothing remotely fair about its conduct.

Fair use is an equitable doctrine and, thus, the propriety of TVEyes' conduct must be considered.  On that score, TVEyes' bad faith is crystal clear.  In its opening brief, Fox News established that TVEyes records Fox News' content wholesale under standard subscription agreements with various cable operators, which prohibit precisely the conduct at issue here: copying and commercial redistribution.  <u>Nowhere in its opposition brief does TVEyes deny this</u> and, thus, it has not rebutted Fox News' showing that TVEyes acquires Fox News' content

illicitly.  This is the quintessence of unfairness and dooms TVEyes' defense.

Consideration of the other fair use factors is equally clear.  ***First***, TVEyes' commercial media clipping service is not transformative as it leaves Fox News' telecasts unchanged and substitutes for Fox News' own use.  ***Second***, the Registered Works are creative and expressive.  ***Third***, TVEyes copied verbatim the entirety of the Registered Works, including the qualitatively most important parts (*i.e.*, the "heart" of the works).  ***Fourth***, as noted above, TVEyes' continued, unfettered use of Fox News' content without authorization from or compensation to Fox News—particularly if such use becomes widespread—will ruin the revenue streams on which Fox News relies to offset the considerable costs of its newsgathering and reporting efforts.

No court in the United States has found fair use in a case with facts remotely similar to these.  While TVEyes tries to obfuscate the issues by desperately mischaracterizing its service as a mere search engine, it is obvious that TVEyes is, as this Court put it, "more than Google."  Indeed, unlike the search engines in *Google* and *HathiTrust*—which simply directed their users to authorized copies of the works at issue (and the latter of which provided <u>no</u> copyrighted content at all)—or the clipping service in *Meltwater*—which at least made a pretense of doing so—TVEyes provides its subscribers with high quality versions of Fox News' content, thereby obviating its subscribers' need to get that content from Fox News and, thus, does nothing to improve access to authorized copies of Fox News' telecasts or video clips.  Moreover, TVEyes' service is wholly unlike the search engines in the non-binding Ninth Circuit cases it cites, in which only small, low resolution thumbnails that linked back to the original works were provided.

Fox News also has established its claim for hot news misappropriation under New York law.  Truly, it is difficult to envision a case more like *INS* that this one: Fox News expends considerable costs to gather and report time-sensitive news and TVEyes free rides on those

efforts by providing Fox News' news reports to its subscribers in "real time" as touted by its marketing materials.  If TVEyes' use became widespread, the clear result would be that Fox News' entire business model would be upended, destroying any incentive to continue its newsgathering efforts.

Similarly, Fox News has proved its common law misappropriation claim as TVEyes enriches itself in bad faith by misappropriating the results of Fox News' labor, skill, and expenditures—namely, the distribution system Fox News carefully has negotiated with its affiliates—and by misleading the public to believe that its service is authorized by Fox News and other copyright owners.

This case has gone on long enough.  As Fox News has established each of its claims and TVEyes has failed to come forward with sufficient admissible evidence to the contrary as required by *Celotex*, Fox News respectfully requests that its motion for summary judgment be granted in its entirety.

## ARGUMENT[1]

Consistent with its entire approach to this lawsuit, TVEyes asserts that this Court's analysis of the parties' cross-motions for summary judgment should be wholly one-sided in its favor.  TVEyes Opp. Br. 21–22 ("[A]ny representation by TVEyes that a genuine dispute of material fact exists in response to Fox [News'] motion cannot be used as a concession in [sic] TVEyes' in deciding its motion.").  While it is true that both parties' motions must be considered on their own merits, courts regularly find copyright infringement and no fair use on summary judgment when the parties have cross-moved on the same issues.  *See, e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013) (considering parties'

---

[1]    Fox News incorporates by reference the declarations that it submitted in opposition to TVEyes' motion for summary judgment.  In addition, capitalized terms not defined here are defined in Fox News' opening brief or its memorandum of law in opposition in opposition to TVEyes' motion for summary judgment ("Fox News' opposition brief" or "Fox News Opp. Br.").

cross-motions for summary judgment in the same decision); *Video-Cinema Films, Inc. v. Lloyd E. Rigler-Lawrence E. Deutsch Found.*, No. 04 Civ. 5332, 2005 WL 2875327, at *3 (S.D.N.Y. Nov. 2, 2005) (same).

## I.    TVEYES IS LIABLE FOR COPYRIGHT INFRINGEMENT

As discussed below, TVEyes has failed to offer any evidence opposing Fox News' motion for summary adjudication of its *prima facie* claim of copyright infringement and, thus, Fox News is entitled to summary judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 447 U.S. 317, 323 (1986) (holding that "moving party is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing"); Fed. R. Civ. P. 56(a); *see infra* Part I.A.  Moreover, as application of this Circuit's well-established precedents to the undisputed facts of this case clearly shows that TVEyes does not make fair use of the Registered Works, summary judgment for Fox News on TVEyes' fair use defense also is warranted.  *See infra* Part I.B.

### A.    TVEyes Does Not Dispute Fox News' *Prima Facie* Case of Copyright Infringement

In its opening brief, Fox News established both prongs of its *prima facie* copyright infringement claim.  Fox News Br. 25–26; *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (prima facie claim established by showing (1) ownership of a valid copyright and (2) unauthorized copying).  First, Fox News owns U.S. copyright registrations for the Registered Works, which are "*prima facie* evidence of both valid ownership of copyright and originality."  *Meltwater*, 931 F. Supp. 2d at 549; FX SUF ¶¶ 137–38. Second, TVEyes admittedly verbatim copied each of the Registered Works, which proves its unauthorized copying.  *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000) (finding evidence of verbatim copying satisfied this prong of the copyright

infringement test).[2]

 <u>TVEyes does not dispute that Fox News has established both prongs of its copyright</u> <u>claim</u>.  TVEyes Opp. Br. 61–62.  Thus, consistent with TVEyes' own cited cases, Fox News has established its *prima facie* case of copyright infringement and it is entitled to summary adjudication of that issue.  *See Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 321 (S.D.N.Y. 2008) (holding that, as defendant failed to come forward with contrary evidence (as is its burden), "plaintiffs have established a *prima facie* case of copyright infringement"); *see also Morris v. Guetta*, No. 12 Civ. 684, 2013 WL 440127, at *4 (C.D. Cal. Feb. 4, 2013) (finding admitted copying left no genuine issue of material fact as to the plaintiffs' affirmative copyright claim).

 Instead, TVEyes makes the confusing argument that somehow Fox News has requested that this Court grant it summary judgment on its copyright claim even if TVEyes were able to establish its fair use defense.  TVEyes Opp. Br. 61–62.  Fox News, however, never made such a request.  Rather, Fox News has proved its *prima facie* case of copyright infringement and seeks summary adjudication of that issue.  Fox News Br. 26 (citing *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998); *Am. Broadcasting Cos. v. Aereo, Inc.*, No. 13-461, 2014 WL 2864485, at *17–18 (U.S. June 25, 2014); and *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 288 (2d Cir. 2012)).  As with any other affirmative defense, after a court finds a *prima facie* case of copyright infringement has been established, it separately considers whether the defendant can meet its

---

[2] TVEyes nonsensically asserts that, because a section heading of Fox News' brief referenced TVEyes' "willful" infringement but Fox News has not moved for summary judgment on TVEyes' willfulness, Fox News somehow "has waived any argument that the Court should find any infringement to be 'willful.'"  TVEyes Opp. Br. 61 n.31.  This argument makes no sense.  Merely mentioning TVEyes' willfulness in a header has nothing to do with waiver, and TVEyes cites no legal support for its assertion.  More to the point, in a copyright case, willfulness is not a liability issue, 17 U.S.C. § 504, and the parties have deferred the issue of damages until after the Court decides their summary judgment motions.  Simmons Decl. Ex. 71 (Discovery Hr'g Tr. 23:12–15, Apr. 4, 2014 ("THE COURT: Both sides want to postpone discovery on damages; is that agreeable?  MR. SCHAPIRO: Yes.  MS. CENDALI: Yes, Your Honor.")).  In any case, Fox News has placed ample evidence before this Court revealing TVEyes' willful bad faith conduct.  *See infra* 15.

burden of proving fair use, which TVEyes cannot do in this case.  *See infra* 7.  Despite TVEyes'

attempt to obfuscate these issues, summary adjudication of Fox News' copyright claim plainly is

warranted.[3]

> **B.**   **TVEyes Cannot Meet its Burden of Establishing that its Copying of Fox News' Content is Fair Use**

As detailed in Fox News' opening brief, TVEyes' fair use defense easily can be decided

by looking to the thirty years of precedent from the Second Circuit and other courts holding that

for-profit media clipping services that copy and distribute clips from news programs and other

content (as TVEyes does) do not qualify for the fair use defense.  Fox News Br. 26–27 (citing

cases); *see also* Fox News Opp. Br. 4–5. Hoping to avoid this well-settled, binding precedent,

TVEyes makes three desperate and inapposite arguments.

*First*, TVEyes attempts to distinguish factually its wholesale copying of Fox News'

content and redistribution of that content as video clips that its subscribers can watch, download,

edit, and share without limitation from the similar uses at issue in the media clipping service

cases cited by Fox News.  TVEyes Opp. Br. 24–27.  Its attempt fails.  As a preliminary matter,

TVEyes conspicuously fails to address *Tullo* or *Reuters*, which is a tacit admission of their

applicability to this case.  *See Los Angeles News Service v. Reuters Television Int'l, Ltd.*, 149

F.3d 987, 990, 994–95 (9th Cir. 1998) (holding news clipping service that copied and distributed

---

[3]   In one sentence of a footnote, TVEyes requests leave from this Court to reassert its inequitable estoppel and unclean hands defenses.  TVEyes Opp. Br. 62 n.32.  TVEyes' request is a belated maneuver to try to drag out this case and delay the inevitable finding that it is liable for copyright infringement.  During discovery, TVEyes refused to answer Fox News' interrogatories seeking the factual basis for each of TVEyes' litany of affirmative defenses.  When Fox News sought to compel such answers at the parties' April 7, 2014 court conference, the Court asked TVEyes' counsel for the bases of these defenses.  Counsel could not articulate the bases.  Thus, the Court struck the defenses.  Simmons Decl. Ex. 71 (Discovery Hr'g Tr. 22:10–12, Apr. 4, 2014).  The Court stated that, if TVEyes wanted the Court to reconsider that decision, TVEyes was required to do so by motion.  *Id.* (Discovery Hr'g Tr. 22:20–22 ("I am not making a ruling on the merits, Mr. Schapiro, but you will have to make a motion to add the defense.")).  TVEyes, however, made no such motion, and Fox News proceeded in good faith with summary judgment briefing, which was designed to decide this case as a whole.  At this late stage, TVEyes should not be permitted to delay a finding of liability in this action by attempting to resurrect its meritless defenses.

television programs to its subscribers for an annual fee was not a fair use); *Los Angeles News Service v. Tullo*, 973 F.2d 791, 792, 797, 799 (9th Cir. 1992) (holding company that "monitors television news programs, records them on videotape and sells copies of all or segments of the tapes to interested individuals and businesses" not entitled to fair use defense).

Similarly, while TVEyes claims that "[n]one of the circuit-level 'clipping service' cases cited by Fox [News] involved a service even remotely like TVEyes, which uses the copyrighted content as part of a comprehensive database and search engine," TVEyes Opp. Br. 25, it attempts to downplay *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.* by burying it in a footnote.  *Id.* at 25 n.10 (discussing 342 F.3d 191 (3d Cir. 2003)).  The facts and analysis in *Video Pipeline*, however, are directly on point.  The service at issue, like TVEyes, provided video clips for a fee as part of an Internet-based, searchable database.  342 F.3d at 195–96.  The Third Circuit found the case straightforward and held that such clips substituted for the authorized (but different) clips of the same content provided by the plaintiffs and caused market harm.  *Id.* at 199, 203.  Moreover, the court distinguished such use from the search engine cases TVEyes now attempts to rely upon (discussed below) because it did not "improve access to authorized" video clips, but rather "indexes and displays unauthorized copies of copyrighted works."  *Id.* at 199; *see infra* 11.  In other words, the Third Circuit considered the exact same arguments that TVEyes makes here and found them lacking.

TVEyes also argues that *Infinity Broadcast*, *Nihon*, and *Duncan* are distinguishable because they "involved the pure sale of entire copyrighted radio broadcasts and news abstracts, and nothing more."  TVEyes Opp. Br. 24–25.  TVEyes, however, fails to reconcile the fact that it too provides unadulterated video clips of Fox News' content that substitute for Fox News' own use and harm its actual and potential markets for the Registered Works.  *See infra* 18, 27.  Thus, under binding Second Circuit law, TVEyes makes a classic unfair use of the Registered Works.

- 8 -

*See Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (holding gathering news articles and providing "rough translations" to customers is not fair use); *Infinity Broad.*, 150 F.3d at 112 (holding radio monitoring service was not a fair use); *see also Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1493, 1498 (11th Cir. 1984) (holding "commercial enterprise" that "videotapes television news programs, identifies the persons and organizations covered by the news reports, and tries to sell them copies of the relevant portion of the newscast" was not a fair use).[4]

Further, TVEyes makes a last-ditch effort at convincing this Court not to reach the same well-reasoned conclusion that Judge Cote reached in *Meltwater* when considering a similar "media monitoring service" (a/k/a a "clipping service"). 931 F. Supp. 2d at 553, 556 (holding that media monitoring service, which was "the online equivalent of the traditional news clipping service," was not fair use). As discussed below, however, TVEyes' effort to distance itself from *Meltwater* fails:

- TVEyes asserts that *Meltwater* "arguably has been abrogated by *HathiTrust*." TVEyes Opp. Br. 25. TVEyes, however, provides no basis for this absurd claim. Nor can it as the two cases are consistent: <u>no</u> copyrighted content was provided by the word index at issue in *HathiTrust* (and, thus, that search engine was found to be fair use), whereas Meltwater offered a subscription-based news monitoring service that provided clips of the AP's content (and, thus, it was found not to be fair use). Fox News Opp. Br. 13–14; *Meltwater*, 931 F. Supp. 2d at 543.

- TVEyes oddly argues that the *Meltwater* "court repeatedly relied upon its view that it could not permit the [sic] Meltwater 'to 'take the fruit of AP's labor'" and that the "Supreme Court has rejected this precise theory of copyright protection." TVEyes Opp. Br. 26. The copyrightability of the AP's news stories, however, was not at issue in *Meltwater* as such stories clearly qualify as original literary works under the Copyright Act. 17 U.S.C. § 102(a). In any case, Judge Cote did not rely on any form of "sweat of the brow" argument in reaching her conclusion, but rather, applying the binding Second Circuit precedent discussed above, correctly focused on the fact that Meltwater's pervasive copying of the AP's

---

[4]    Moreover, to the extent that TVEyes asserts that its service provides a separate "media monitoring" feature, the service at issue in *Infinity Broadcast* also was marketed as providing a media monitoring feature and, yet, the Second Circuit held that it served as a substitute for listening to the radio programs that it claimed to "monitor." 150 F.3d at 112.

creative reporting of newsworthy events was a superseding use.  *Meltwater*, 931
F. Supp. 2d at 553.

- TVEyes finally asserts that its service is factually distinguishable from
  Meltwater's service.  TVEyes Opp. Br. 26.  Its assertion is flawed, however, as
  Meltwater "use[d] its computer programs to automatically capture and republish
  designated segments of text from news articles, without adding any commentary
  or insight . . . . to make money directly from the undiluted use of the copyrighted
  material," *Meltwater*, 931 F. Supp. 2d at 552, just as TVEyes did with the
  Registered Works.  FX SUF ¶¶ 151, 168, 170–71, 177–81, 188–90, 198–99.
  Moreover, contrary to TVEyes' attempt at revisionist history, it clearly has
  marketed its service as a substitute for the services provided by Fox News.  FX
  SUF ¶¶ 168, 173–75, 177, 189, 191, 193–94, 200.

- In fact, TVEyes' service is a more flagrant infringement than Meltwater's service.
  Meltwater only copied a portion of the AP's articles, and it provided its users with
  a link to the original articles.  *Meltwater*, 931 F. Supp. 2d at 558.  By contrast,
  TVEyes copies all of Fox News' content in its entirety and provides it as high
  quality video clips that can be watched, downloaded, edited, and shared without
  limitation, and it does not link to Fox News' websites or authorized video clips.
  FX SUF ¶¶ 147, 149, 151, 177, 181, 198, 267; FX CSUF ¶¶ 6–9.

*Second*, TVEyes improperly asserts that Fox News is putting form over substance in

trying to claim that any service that calls itself a clipping service, as TVEyes does, is "*per se*

ineligible for fair use."  TVEyes Opp. Br. 24.  In doing so, TVEyes is distorting Fox News'

argument.  Fox News relies on the foregoing thirty years of binding precedent holding that

companies that provide the same services that TVEyes admittedly provides cannot establish a

viable fair use defense.  Fox News Br. 26–27.  This is not because the services were called

"clipping services," but rather because the nature of the services do not constitute fair use as (1)

they are for-profit services that provide unaltered clips to their customers that supersede the

copyrighted content they copy, (2) the content copied generally is creative in nature, (3) they

copy substantial amounts of the content verbatim, and (4) such use, particularly if it were to

become widespread, substantially harms the market for and value of the content.  *See id.*

Nevertheless, it should not be forgotten that TVEyes repeatedly refers to itself as a "clipping

service."  FX SUF ¶¶ 161–64.

**Third**, TVEyes attempts to analogize its unbridled copying and redistribution of the Registered Works to the search engines in *HathiTrust* and *Google* and, thus, heavily relies on those cases.  TVEyes Opp. Br. 26–27.  As noted in Fox News' opposition brief, this strategy is puzzling as both cases clearly favor Fox News.  *Authors Guild, Inc. v. HathiTrust* involved a word index that delivered <u>no</u> copyrighted content to its users and, thus, did "not add into circulation any new, human-readable copies of any books" (or even snippets of books).  No. 12-4547, 2014 WL 2576342, at *1, *7 (2d Cir. June 10, 2014); *see also* Fox News Opp. Br. 13–14. TVEyes, by contrast, makes unlimited video content available to its subscribers in "high definition" without any blackouts and touts the ability to watch, download, edit, share them with others.  FX SUF ¶¶ 177–81.  Similarly, *Authors Guild, Inc. v. Google Inc.* involved a free search engine for books that only provided "snippets" of text (constituting one-eighth of a page in length) to "act as pointers directing users to a broad selection of books" and "black-listed" (i.e., did not show) one of the possible snippets on each page of the books it copied and similarly did not show at least one out of ten pages in each book.  954 F. Supp. 2d 282, 287, 291–92 (S.D.N.Y. 2013).[5]  The unlimited and unrestricted high definition video clips provided by TVEyes simply are not analogous to the limited use at issue in *Google*.  FX SUF ¶¶ 147, 149, 151, 168, 170–71, 177–81, 188–90, 198–99.[6]  It would be a perversion of the careful balancing

---

[5]    In attempting to defend against its system's clear lack of transformativeness, TVEyes strains to argue that *Google's* discussion of black-listing and other  "security measures to prevent users 'other than the instructor to whom plaintiffs submitted their own papers.'" 562 F.3d 630, 641 (4th Cir. 2009).  Moreover, the Ninth Circuit image search engine cases involved services that (1) provided much "smaller, lower-resolution thumbnails of the images" that could not be increased in resolution as "any enlargement would result in a loss of clarity of the

[6]    TVEyes' service also is distinguishable from the non-binding, out of circuit cases that TVEyes cites.  TVEyes Br. 23.  The *A.V. ex. rel. Vanderhye v. iParadigms, LLC* service (unlike TVEyes' service) "did not publicly disseminate or display plaintiffs' works and did not send them to any third party 'other than the instructor to whom plaintiffs submitted their own papers.'" 562 F.3d 630, 641 (4th Cir. 2009).  Moreover, the Ninth Circuit image search engine cases involved services that (1) provided much "smaller, lower-resolution thumbnails of the images" that could not be increased in resolution as "any enlargement would result in a loss of clarity of the

reflected in the *HathiTrust* and *Google* opinions to hold that fair use extends to TVEyes' for-profit, wholesale copying and redistribution. As this Court noted at the parties' initial court conference when TVEyes' counsel first referenced the *Google* decision, TVEyes is "more than Google."

For these reasons and the additional reasons detailed below, TVEyes cannot meet its burden of establishing the affirmative defense of fair use and, thus, Fox News respectfully requests that the Court grant its motion for summary judgment. *See Swatch Grp. Mngm't Servs. Ltd. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 339 (S.D.N.Y. 2012) (Hellerstein, J.) (finding that defendant "has the burden of proving that its use was fair"), *aff'd*, No. 12-2412, 2014 WL 2219162 (2d Cir. May 30, 2014).

1.     <u>Factor One: TVEyes' Use Is Commercial, in Bad Faith, and Not Transformative</u>

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). As discussed in Fox News' opening brief, this factor weighs in Fox News' favor because (a) TVEyes uses the Registered Works and other content commercially, which has resulted in ▮▮▮▮▮▮▮▮ of profits in 2013 alone; (b) TVEyes has acted in bad faith; and (c) TVEyes' use merely supersedes Fox News' use of the Registered Works. Fox News Br. 28.

Attempting to distract the Court from this straightforward application of traditional fair use principles, TVEyes awkwardly reasserts the argument from its opening brief that its unadulterated and unchanged use of Fox News' content somehow is entitled to a presumption on

---

image," making them "inappropriate" substitutes for the plaintiffs' original images, and that (2) "guide[d] users to [the plaintiffs'] web site," where the original images were displayed. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 815, 818, 821 (9th Cir. 2002); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155, 1165 (9th Cir. 2007) (same). By contrast, TVEyes takes all of Fox News' content and makes it available to subscribers as high quality video clips, which can be maximized, without improving access to authorized copies of Fox News' content. FX SUF ¶¶ 177–81; FX CSUF ¶¶ 6–9, 15–17.

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

the first fair use factor because it "fits comfortably within the illustrative guide of fair uses" articulated in the fair use statute's preamble.  TVEyes Opp. Br. 27.  As discussed in Fox News' opposition brief, however, TVEyes' use is "not remotely similar to any of the listed categories" as it does not criticize or comment on the Registered Works, it does not gather or report the news, and its service does not constitute scholarship, research, or a teaching method.  Fox News Br. 6–7 (quoting *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 78 (2d Cir. 1997)). Moreover, neither case to which TVEyes cites found such a presumption when presented with such a service.  *Id.*

Furthermore, while TVEyes now conclusorily claims that "questions of material fact exist on factor one," TVEyes Br. 28, it never identifies such supposed questions of fact as is required by *Celotex*, and does not explain how its own motion for summary judgment based on this factor survives these questions of fact.  As the parties do not dispute the nature of TVEyes' use as a factual matter, but rather only its legal significance, a finding of summary judgment for Fox News is appropriate.

a.    TVEyes Admits that Its Use of the Registered Works is Highly Commercial

As TVEyes admits, "[t]here is no dispute that TVEyes is a for-profit corporation," TVEyes Opp. Br. 32, that "charges a flat fee of $500 a month" for access to the content on its system.  TVEyes Br. 37.  Indeed, TVEyes admits that its revenues in 2013 alone exceeded █████  █████ TVEyes' Response to Fox News' Statement of Undisputed Facts ("TV RSUF") ¶¶ 227–31, 234–37.  As made clear by the cases cited in Fox News' opening brief, these facts heavily weigh against fair use.  Fox News Br. 29 (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985); *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992); *United*

*States v. ASCAP*, 599 F. Supp. 2d 415, 425–26 (S.D.N.Y. 2009); and *UMG*, 92 F. Supp. at 351).[7]

While TVEyes attempts to minimize the fact that its commercial use militates against a fair use finding, TVEyes Opp. Br. 32–33, the caselaw is clear that where, as here, the use is not transformative, *see infra* 18, commercial use, as well as bad faith, "takes on a heightened importance." *ASCAP*, 599 F. Supp. 2d at 428 (citing *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001)); *see also Bouchat v. Baltimore Ravens Ltd.*, 737 F.3d 932, 941 (4th Cir. 2013) (a case cited by TVEyes finding "the commerciality inquiry is most significant when the allegedly infringing use acts as a direct substitute for the copyrighted work"). Moreover, as illustrated by cases cited by TVEyes, even where a use is transformative and provides a public benefit (which is not the case here) this subfactor still weighs against fair use. *See Swatch*, 2014 WL 2219162, at *7 (commercial nature of Bloomberg's use weighed against fair use); *Lennon*, 556 F. Supp. 2d at 322 (finding commercial purpose weighed against fair use despite highly transformative use and public benefits of defendants' use and only finding fair use due to minimal use of song for the purpose of criticism and commentary).

Hoping to avoid the implication of its clear commercial purpose, TVEyes argues that its "commercial gain" is not linked to its copying of the Registered Works. TVEyes Opp. Br. 33– 34. This is absurd. TVEyes' revenues clearly are a result of its copying of Fox News' content, including the Registered Works, 24 hours a day, seven days a week and its redistribution of that content to its subscribers in real time. FX SUF ¶¶ 151, 227–28, 230–32, 235; TV SUF ¶ 13.

---

[7]    Many of TVEyes' own cases support this proposition. *Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("Every unauthorized commercial use of copyright material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." (alterations omitted)); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984) (finding use of "copies for a commercial or profit-making purpose . . . would presumptively be unfair."); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1995) (stating that "courts will not sustain a claimed defense of fair use when the secondary use can fairly be characterized as a form of 'commercial exploitation'"); *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1375 (Fed. Cir. 2014) ("Use of the copyrighted work that is commercial tends to weigh against a finding of fair use." (internal quotation marks omitted)); *Vanderhye*, 562 F.3d at 638 ("A use of the copyrighted material that has a commercial purpose tends to weigh against a finding of fair use." (internal quotation marks omitted)).

TVEyes' entire business is focused on promoting the availability of this copied content, which it has admitted is important to its service and among the most viewed and downloaded by its customers.  FX SUF ¶¶ 168, 173–75, 177, 189, 191, 193–94, 200, 210–12, 221–22.  In fact, almost ███████ video clips of Fox News' content have been viewed on TVEyes' service, representing over ████ of the total content viewed on TVEyes' system.  FX SUF ¶¶ 223–24.  Furthermore, ████ clips of Fox News content have been downloaded through TVEyes' service, including 560 clips from the nineteen Registered Works alone.  FX SUF ¶¶ 225–26.[8]

Similarly, despite its conclusory and unsupported protestation that it "has not used the 19 Works in commercial advertising or to promote [sic] sale of its service," TVEyes Opp. Br. 34, TVEyes admits that it uses the availability of high definition clips and of Fox News' content (of which the Registered Works are a part) to promote its service.  TV RSUF ¶¶ 181, 213.  Thus, this is a far cry from the advertising in *Bill Graham Archives v. Dorling Kindersley Ltd.*, to which TVEyes cites, which did not use or mention the copied movie posters in promoting the defendants' new biography.  448 F.3d 605, 612 (2d Cir. 2006).[9]

      b.    <u>TVEyes Used the Registered Works In Bad Faith</u>

Fox News' opening brief detailed the myriad evidence showing that TVEyes has acted in bad faith.  Fox News Br. 29–30.  As recognized by the Supreme Court, because fair use is an equitable doctrine and "presupposed good faith and fair dealing," TVEyes' bad faith weighs against fair use.  *See Harper & Row*, 471 U.S. at 562 (internal quotation marks omitted);

---

[8]    TVEyes also attempts to minimize the commercial nature of its service by focusing on how often its subscribers view the nineteen representative Registered Works as compared to all of the other copyrighted content on TVEyes' service.  TVEyes Opp. Br. 34–35.  Yet, TVEyes does not deny that it copies and makes available all of Fox News' content or that its CEO regards Fox News' content as "an important part of our service," and these nineteen works alone were downloaded hundreds of times.  FX SUF ¶¶ 225–26; TV RSUF ¶¶ 147, 149.  It is ridiculous to think that TVEyes can excuse its copying of the Registered Works by stating that they are just a small part of all of the other copyrighted content that TVEyes infringes.

[9]    While TVEyes argues in a footnote that the Court should consider the commercial nature of only its use of the Registered Works, TVEyes Opp. Br. 34 n.16, the very case it cites, which found no fair use, clearly states that the commercial use subfactor should consider the commercial nature of the <u>user</u>, as well as the use.  *Texaco*, 60 F.3d at 921–22, 922 n.8.

- 15 -

*Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir. 1989); *Meltwater*, 931 F. Supp. 2d at 552.

In its opposition brief, TVEyes does not deny that the Supreme Court and TVEyes' own cited cases have held that it is bad faith to gain illicit access to a copyrighted work. *Harper & Row*, 471 U.S. at 563 (finding bad faith where defendant "knowingly exploited a purloined manuscript"); *see NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 478 (2d Cir. 2004) (holding that it is bad faith to use a work knowing access was unauthorized or was "derived from a violation of law or breach of duty" and only finding fair use due to defendant's critical analysis of quoted material). In light of these precedents, TVEyes' use of Registered Works could not be more damning, both legally and factually. <u>TVEyes does not even attempt to deny that it acquires Fox News' content (including the Registered Works) through standard cable subscriptions with Comcast, Cablevision, and ImOn, and that its use of the Registered Works violates the terms of those companies' agreements</u>, which prohibit copying and redistributing cable content. Fox News Br. 18, 29–30. Thus, it is clear that TVEyes has set up a comprehensive system to pilfer content for its own profit, in brazen violation of the contractual terms under which it obtains access to Fox News' content. This hardly is "fair."

In response, TVEyes has not produced a copy of its agreements with the cable providers or disputed that they do not contain these prohibitions against copying and redistribution. Instead, TVEyes merely argues that its "agreements with cable companies are irrelevant" because the "cable companies are [not] plaintiffs in this case" and have not claimed "that TVEyes breached a contract." TVEyes Opp. Br. 37.[10] It is hard to imagine, however, what could be more relevant to showing TVEyes' illicit access to the Registered Works than its agreements with these companies. Indeed, TVEyes cites no authority or factual support for its

---

[10]   Notably, this assertion is just argument without the support of a declaration and, thus, is not evidence under *Celotex*. TVEyes also has put nothing in the record establishing that it put the cable companies on notice that it was breaching its agreements with them, making it difficult for them to complain.

bald assertions.  Nor can it do so as the Supreme Court's clear precedent holds that where, as

here, the defendant has acquired the plaintiff's content illicitly, its claim of fair use is

unquestionably suspect.[11]  Moreover, as TVEyes has not presented any evidence to dispute that

its actions violate its cable agreements, it has not made a "sufficient showing" under *Celotex*.

447 U.S. at 323.

　　　TVEyes also attempts to downplay the relevance of the bad faith subfactor set forth by

the Supreme Court, TVEyes Opp. Br. 35, but its own cited cases consider a defendant's bad faith

and find "the propriety of a defendant's conduct . . . is an integral part of the analysis under the

first factor."  *NXIVM*, 364 F.3d at 478 (finding district court erred by failing to consider bad faith

subfactor); *see New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 160 (2d Cir.

1990) (finding that "bad faith by the user of copyrighted material . . . suggests unfairness");

*Swatch*, 861 F. Supp. 2d at 340 (crediting "Plaintiff's allegations that Defendant was not

authorized to access the Earnings Call and that Defendant's publication of the Infringing Work

violated the directive regarding publication of a recording of the Earnings Call"), *aff'd*, 2014 WL

2219162, at *7 (considering defendant's bad faith); *see also Morris*, 2013 WL 440127, at *4

(finding bad faith to be relevant to fair use inquiry).

　　　Further, TVEyes attempts to excuse the other examples of bad faith described in Fox

News' opening brief: (1) TVEyes' copying and use of Fox News' content despite Fox News'

repeated demands that TVEyes stop doing so; (2) TVEyes' failure to follow through on its

repeated representations that it would take down Fox News' content; and (3) TVEyes' use of the

---

[11]　　In a footnote, TVEyes asserts that certain documents are "inadmissible hearsay."  This is a red herring.  Fox
News did not cite to the documents TVEyes identifies to show TVEyes' bad faith.  *Compare* TVEyes Opp. Br.
37 n.20 (citing FX SUF ¶¶ 124–25) *with* Fox News Br. 30 (citing FX SUF ¶¶ 152–56, 159).  In any case, the
standard terms of TVEyes' cable agreements to which Fox News did cite (and which TVEyes repeatedly
refused to produce in this lawsuit) are not hearsay.  *See Short v. Connecticut Cmty. Bank, N.A.*, No. 3:09 Civ.
1955, 2012 WL 1057302, at *7 n.8 (D. Conn. Mar. 28, 2012) (finding statements in contracts have
"independent legal significance" and, thus, are not hearsay).

Registered Works without a license despite its own stated practice of obtaining licenses from other content owners to make this same use, which is consistent with the practices of other media clipping services.  Fox News Br. 30.  TVEyes' opposition brief, however, does not dispute that TVEyes acted in this manner.  TVEyes Opp. Br. 36.[12]  Instead, it cites to inapposite caselaw that does not address continued use in the face of repeated demands that the defendant cease its willful infringement, let alone TVEyes' (unfulfilled) promise to cease and desist or its failure to abide by its own practices.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (addressing only whether a "request for permission to use the original" was bad faith); *Swatch*, 2014 WL 2219162, at *7 (addressing whether unauthorized disclosure is permissible for members of the news media for purposes of news reporting); *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (addressing whether failure to ask permission was bad faith).[13]

> c.    TVEyes' Use of the Registered Works Is Not Transformative and Merely Supersedes Fox News' Use

Fox News' opening brief explained that, because TVEyes' use of Fox News' content is a direct, slavish substitute for Fox News' own use, it does not transform the Registered Works by adding something new, "with a further purpose or different character, altering the first with new

---

[12]   TVEyes also oddly claims that its representation to content holders that "[i]t is certainly not the practice of TVEyes to operate without any necessary agreement being in place," FX SUF ¶ 248, somehow shows that no agreement was necessary.  TVEyes Br. 37 n.19.  As the undisputed evidence demonstrates that TVEyes has entered into numerous licensing agreements with copyright holders to use their content, TVEyes' attempt to recast this statement fails.  FX SUF ¶¶ 238–41, 245.  Similarly, TVEyes failed to rebut Fox News' evidence that TVEyes' customers have been led by TVEyes to believe that video clips downloaded from the TVEyes service are licensed for use on internal and external websites.  TVEyes Br. 37 n.19.  Instead, TVEyes conclusorily attacks the statement of one such customer, who gave consistent testimony when she was deposed by TVEyes.  FX SUF ¶¶ 255–59.  TVEyes likewise argues that certain statements in the declaration of Elizabeth Ashton, Executive Interviews' Global Head of Sales and Marketing, are hearsay, but it fails to offer any evidence showing that the customers Ms. Ashton identified did not decline Executive Interviews' services because they had TVEyes subscriptions.  TVEyes Opp. Br. 37 n.19.

[13]   Contrary to TVEyes' assertion, TVEyes Opp. Br. 36 n.18, the cases it cites do not stand for the proposition that TVEyes' inconsistent approach to licensing is not evidence of bad faith.  *See Campbell*, 510 U.S. at 585 n.18 (addressing only a request for permission from the plaintiff, not a history of licensing); *Lennon*, 556 F. Supp. 2d at 325 (addressing only that, where the defendant used a piece of music for criticism and commentary, it did not seek a license as it had with other music that was not used for those purposes; not inconsistent approach to the same use of similar content).  Similarly, TVEyes' attempt to rely on claimed journalistic purposes of its users is irrelevant to the question of TVEyes' bad faith.  *See infra* 20.

expression, meaning or message."  Fox News Br. 30–31 (quoting *Campbell*, 510 U.S. at 579).

Indeed, like the media clipping service cases discussed in detail above, *see supra* 7, TVEyes'

service is a direct substitute that supersedes Fox News' use of the Registered Works in numerous

ways, including:

- The ability to "watch live TV, 24/7 on any station [TVEyes is] recording" substitutes for watching Fox News' content through a cable, satellite, or other multichannel video programming distributor subscription, including on Fox News' TVEverywhere service.

- The ability to view older programming with TVEyes' "DVR" or "TiVo" feature substitutes for using an authorized and traditional DVR and for watching authorized video clips on Fox News' website (on which users see pre-roll and banner advertising).

- The ability to download and edit unlimited and unrestricted high quality video clips substitutes for licensing clips through ITN Source or Executive Interviews.

- The ability to e-mail and share those video clips via e-mail and social media substitutes for sharing Fox News' authorized video clips through similar means.

Fox News Br. 32.[14]  Thus, as TVEyes admittedly "leave[s] the character of the original

broadcasts unchanged" with "neither new expression, new meaning nor new message," *Infinity

Broad.*, 150 F.3d at 108; TVEyes Opp. Br. 40, its use is not transformative just like those that

courts have held  not to be fair use over the past three decades.  *Meltwater*, 931 F. Supp. 2d at

556 (finding there "is nothing transformative about that function"); *see also Reuters*, 149 F.3d at

993; *Duncan*, 744 F.2d at 1496.  Rather, TVEyes' service is a typical example of a superseding

use.  *See Davis*, 246 F.3d at 174 (finding use of work "in the manner it was made to be worn"

---

[14]    In a footnote, TVEyes mentions that a few of its employees include a small, easily missed footer below the signature line of some of their e-mails and asserts that it shows the "purpose of [TVEyes'] service is internal research and analysis."  TVEyes Opp. Br. 31.  The text of those footers, however, do not speak to the purpose of TVEyes' system, which instead is made crystal clear in TVEyes' marketing materials, which tout the availability of unlimited video clips to watch, download, edit, and share without restriction.  *See* Fox News Br. 18–22.  Moreover, by TVEyes' own admission, its employees are not required to include such a footer in their e-mail signatures, and only some choose to do so.  Ives Decl. ¶ 8, Ex. C.  Notably, David Ives, TVEyes' CEO, does not include such a statement in his e-mails with potential customers.  *See, e.g.,* Simmons 2d Decl. Ex. 129 (e-mail from David Ives to potential customer requesting a video clip stating, "We record everything, so we'll have it!" but not including any disclaimer on subsequent use of the clip).  In any case, TVEyes places no restrictions (either technological or contractual) on the use of its service by its subscribers.  FX RSUF ¶¶ 7–8.

constituted superseding use); *Ringgold*, 126 F.3d at 79 (finding lack of transformativeness where defendant used work "for precisely a central purpose for which it was created"); FX SUF ¶¶ 151, 168, 170–71, 177–81, 188–90, 198–99.[15]

Tellingly, TVEyes fails to address a number of Fox News' arguments. ***First***, in a dramatic shift from its opening brief, TVEyes no longer argues that the uses that its subscribers make of Fox News' content can serve as a basis for finding TVEyes' wholesale, verbatim copying transformative. *Compare* TVEyes Br. 32–34 *with* TVEyes Opp. Br. 28–31. This striking change in approach was, of course, necessitated by the binding caselaw in the Second Circuit, discussed by this Court at the April court conference and Fox News in its opening brief, which holds that a fair use defendant cannot rely on the activities of its users to support a fair use defense. *See* Simmons Decl. Ex. 71 (Discovery Hr'g Tr. 27:2–16); Fox News Br. 33 n.9 (citing cases).

***Second***, TVEyes does not address the similarly binding Second Circuit caselaw cited in Fox News' opening brief, which holds that merely altering the format of the Registered Works from telecasts on cable television to video clips available through the Internet does not make TVEyes' use transformative. Fox News Br. 32 n.7 (citing cases). Similarly, it does not address the Second Circuit's holding in *Texaco* that enabling individuals to create permanent libraries of copyrighted content, as TVEyes does, is not transformative, but rather "merely supersedes the objects of the original creation." 60 F.3d at 919–20. TVEyes' silence is a tacit admission that its wholesale copying is not transformative.

---

[15] TVEyes' own cited cases find such use not to be transformative. *See Harper & Row*, 471 U.S. at 550 (fair use is precluded by superseding use of the original work); *HathiTrust*, 2014 WL 2576342, at *11–12 (providing content in a different format is not transformative, but rather is the "paradigmatic" example of a derivative work); *Texaco*, 60 F.3d at 923 (cautioning that "untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use"); *see also Oracle*, 750 F.3d at 1374 ("A work is not transformative where the user makes no alteration to the expressive content or message of the original work." (internal quotation marks and emphasis omitted)); *Kelly*, 336 F.3d at 819 ("[R]eproducing news footage into a different format does not change the ultimate purpose of informing the public about current affairs . . . .").

*Third*, TVEyes fails to address Fox News' evidence of TVEyes' superseding use.  This is a critical issue as a superseding use, by definition, is not transformative.  *See Campbell*, 510 U.S. at 579.  <u>TVEyes utterly has failed to rebut the multiple examples of superseding uses discussed above</u>.  *See supra* 19.  Instead, it refers the Court to its market harm section, TVEyes Opp. Br. 30–31, but that is an entirely different part of the fair use analysis (and, as discussed below, TVEyes has not met its burden of showing a lack of usurpation, *see infra* 27).

Further, TVEyes repetitively argues that its service is "functionally identical" to the search engine cases discussed above.  TVEyes Opp. Br 28–30.  As already addressed in this brief, TVEyes' arguments are unavailing as its service is materially different from those at issue in the cases it cites.  *See supra* 11.  In fact, TVEyes goes well beyond the function of a search engine that directs its users to authorized content to, instead, actually provide its customers with a smorgasbord of "all you can eat" infringing content.

TVEyes also makes a transparent, eleventh-hour attempt to shoehorn itself within *Google's* reasoning by asserting that it "has implemented safeguards to ensure that its service does not act as a replacement for watching television on the couch."  TVEyes Opp. Br. 30.  TVEyes, however, provides no facts to support such a conclusion, as required by *Celotex*, and its own marketing materials trumpet the ability to "watch live TV, 24/7, on any station [TVEyes is] recording."  FX SUF ¶ 168.[16]  In any case, TVEyes' supposed "safeguards" actually highlight the superseding nature of its use:

- While TVEyes asserts that its video clips of Fox News' content "can only be searched for 32 days from the date of broadcast," TVEyes Opp. Br. 30, that is precisely the time during which Fox News' up-to-the-minute news programming is most valuable and there is no limit on TVEyes' subscribers' access to the Registered Works during that time period.  *See* Fox News Opp. Br. 28. Moreover, TVEyes encourages its users to save video clips permanently.  *See id.*

---

[16]  It also should be noted that Fox News' television programs are not just "watched on the couch," but rather at work, on Fox News' websites, and using mobile devices.  *See* Fox News Br. 5–17.

(discussing the fact that TVEyes' User Manual encourages its subscribers to "[a]lways save" their clips to TVEyes' servers, because "[t]his will ensure your clip is saved FOREVER!!").

- While TVEyes asserts that the video clips it provides are correlated to its users' search terms, TVEyes Opp. Br. 30, TVEyes cannot deny that it makes all of Fox News' content available to its users or that it provides its users with the content that they want most (i.e., the "heart" of the works).  *See* Fox News Opp. Br. 23 n.16.  Moreover, not all of TVEyes' features rely on search terms.  *See* Fox News Br. 19–22.  In any case, TVEyes cannot defend its unbridled and unauthorized taking and redistribution of Fox News' content by pointing to the actions of its users.  *See supra* 20.

- While TVEyes asserts that the video clips it provides "may be played up to a maximum of only ten minutes," TVEyes Opp. Br. 30, the length of an average news segment is two minutes, and often times much shorter.  FX SUF ¶¶ 6–8.  Thus, it is no surprise that TVEyes' CEO admitted that TVEyes' subscribers "absolutely" can "download an entire news story" using its system or that the average length of the clips TVEyes' users played from the Registered Works was approximately one minute, with some clips over six minutes.  FX SUF ¶ 184; *see id.* ¶ 9; TV SUF ¶ 80.[17]

- While TVEyes asserts that "access is restricted to business [sic] and professionals, and is not for personal use," TVEyes Opp. Br. 30, it cites to no support for that proposition and it is not the type of technological safeguard at issue in *Google*.  Moreover, the evidence shows that the parties' customer base overlaps.  FX RSUF ¶ 92.

Accordingly, the first fair use factor heavily weighs against fair use.[18]

### 2.    Factor Two: The Registered Works Are Creative and Expressive

The second factor in a fair use inquiry is the nature of the copyrighted work, including whether the work is expressive or creative.  17 U.S.C. § 107(2); *Meltwater*, 931 F. Supp. 2d at

---

[17]    In obvious recognition that TVEyes' system is dissimilar from the system considered in *Google*, TVEyes also asserts in a footnote that it recently added a feature to "block a user from trying to play or download 25 or more minutes of sequential content from a single station."  TVEyes Opp. Br. 30 n.13.  This changes nothing.  ***First***, TVEyes still permits users to download 25 minutes of consecutive content, which in the the context of news reporting could contain multiple news reports, making this feature unlike the security measures in *Google* that prevented "users from viewing a complete copy of a snippet-preview book."  954 F. Supp. 2d at 291.  ***Second***, TVEyes' design of this feature is a tacit admission that its system permits its users to download consecutive video clips, and TVEyes has admitted that its users have done so with Fox News' content.  TV CSUF ¶ 140.  ***Third***, it should be noted that this feature admittedly only was added to TVEyes' system on July 25, 2014, which was after the parties' opposition briefs were exchanged, and long after the close of fact discovery.

[18]    Although TVEyes repetitively addresses the public interest with regard to factor one and factor four, TVEyes Opp. Br. 31, 58, Fox News addresses the public interest in one section below.  *See infra* 39.

557.  Ignoring the actual content of the Registered Works, TVEyes conclusorily asserts that they merely are factual "news programs" that are entitled to less protection from TVEyes' wholesale copying.  TVEyes Opp. Br. 38–39.  As detailed in Fox News' brief and not disputed by TVEyes, however, the Registered Works include many creative and expressive elements, Fox News Br. 6–9, 33–34 (detailing creative choices), the compilation of which is both "unique and creative," weighing this factor in Fox News' favor.  *See Infinity Broad.*, 150 F.3d at 109 (finding such compilation in radio programs to be creative and, therefore, holding that the second factor favored the plaintiff); *see also Harper & Row*, 471 U.S. at 556–57 ("[C]opyright assures those who write and publish factual narratives . . . that they may at least enjoy the right to market the original expression contained therein as just compensation for their investment."); *Weissmann*, 868 F.2d at 1325 (holding that scientific nature of original work did not weigh in favor of fair use finding).[19]

Indeed, cases TVEyes itself cites show that fair use is less likely when works that serve an informational purpose are creative.  *See Swatch*, 861 F. Supp. 2d at 341 (this Court recognizing that "[e]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy"); *Kelly*, 336 F.3d at 820 ("Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature." (emphasis added)); *see also Stewart*, 495 U.S. at 237 (finding "a use is less likely to be deemed

---

[19]  TVEyes' attempt to distinguish *Infinity Broadcast* and *Weissmann* fails.  In *Infinity Broadcast*, the defendant argued that the plaintiff's radio broadcasts were entitled to less protection because they included music and advertisements to which the plaintiff did not own the copyright—as TVEyes asserts here, TVEyes Opp. Br. 38—but the Second Circuit found that the second fair use factor favored the plaintiff because "the compilation of these and other elements to make the allegedly infringed works is both unique and creative."  150 F.3d at 109.  Similarly, the works at issue in *Weissmann* were scholarly scientific articles evidencing far less creativity than the Registered Works and, yet, the Second Circuit held that the second fair use factor did not support a fair use finding.  868 F.2d at 1325.

fair when the copyrighted work is a creative product" (alteration omitted)).[20]

TVEyes also argues that this factor favors a finding of fair use because the Registered Works were "published at the time of use." TVEyes Opp. Br 39. Fox News certainly agrees that anyone with a cable, satellite, or other multichannel video distribution subscription would have had access to the Registered Works when TVEyes copied them. This fact merely underscores the weakness of TVEyes' assertion that the public would not have access to Fox News' content if not for TVEyes. In any case, TVEyes' own cited case shows that this fact does not weigh this factor in TVEyes' favor given the creativity of the Registered Works. *See Lennon*, 556 F. Supp. 2d at 325 (finding factor weighed against fair use despite the fact that song had been published and only finding fair use due to minimal use of song in for the purpose of criticism and commentary).

Accordingly, the second fair use factor weighs against fair use.

### 3.     Factor Three: TVEyes Copied the Registered Works in Their Entirety

The third factor in a fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor has both quantitative and qualitative dimensions, which consider the portion of the copyrighted work taken in relation to the whole and the importance of that portion to the work. *Meltwater*, 931 F. Supp. 2d at 557. TVEyes admits that it verbatim copied "each [Registered Work] in its entirety."

---

[20]   It also is black-letter law that compilations of facts and the manner in which those facts are expressed are protectable and can be extremely creative, as illustrated by the cases cited by TVEyes *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348–49 (1991) (finding that in compilations of facts the "author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers" and holding such collections of words and subjective descriptions of facts to be copyrightable); *Sparaco v. Lawler, Matusky, Skelly, Engineers LLP*, 303 F.3d 460, 467 (2d Cir. 2002) (finding "manner of expression employed in communicating the factual information" protectable as "considerable skill and originality can be exercised . . . in the setting forth of unprotected information—in the selection or elimination of detail, the size, shape, and density of informative legends, the establishment of conventions relating to color or design to represent . . . features, and many other details of presentation"); *see also Taggart v. WMAQ Channel 5 Chi.*, No. 00 Civ. 4205, 2000 WL 1923322, at *4–5 (S.D. Ill. Oct. 30, 2000) (distinguishing interviewee's responses in Q&A from the interviewers prepared questions and the resulting videotaped interview).

TVEyes Opp. Br. 40; FX SUF ¶¶ 149, 151.  Accordingly, this factor favors Fox News.  *See*

*Harper & Row*, 471 U.S. at 565 (verbatim copying evidences qualitative value of copied

material); *Davis*, 246 F.3d at 175 (stating that when copying is "wholesale," a defendant "cannot

benefit from the third factor"); *Infinity Broad.*, 150 F.3d at 110 (finding that third factor favored

plaintiff as defendant provided "his subscribers with access to every radio station . . . 24 hours a

day, seven days a week"); *Weissmann*, 868 F.2d at 1325 (finding that copying of work word-for-

word, even with "slight additions," weighed against a finding of fair use); *ASCAP*, 599 F. Supp.

2d at 431 (finding substantial taking given verbatim copying).[21]

In a desperate attempt to rebut Fox News' straightforward application of these well-

established legal principles, TVEyes asserts that its verbatim copying of all of Fox News'

content is permissible because it was "reasonably necessary" to create a text searchable database.

TVEyes Opp. Br. 40–41.  As discussed in Fox News' opposition brief, however, TVEyes is a

classic example of a defendant that has taken <u>too much</u> of the copyrighted work for its stated

purpose.  Fox News Opp. Br. 23.  To create a word index, TVEyes does not need to provide

unlimited high definition video clips to its users that they can watch, download, and edit without

restriction.  Further, TVEyes' assertion that it needs to provide all of Fox News' content to

provide "context" is inconsistent with the limited reproduction permitted by the fair use doctrine,

which does not allow a defendant to excuse unbridled copying whenever he claims that such

copying provides useful context.  *See Castle Rock Entm't, Inc. v. Carol Publish'g Grp., Inc.*, 150

F.3d 132, 144 (2d Cir. 1998) (finding Seinfeld trivia book took too much content to make its

---

[21]   TVEyes' cited cases are in agreement with these principles. *See Swatch*, 861 F. Supp. 2d at 342 (finding that
use of an entire work "generally weighs against fair use"); *Oracle*, 750 F.3d at 1375 (finding "copying an entire
work militates against a finding of fair use" as "the fact that a substantial portion of the infringing work was
copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the
plagiarist who seeks to profit from marketing someone else's copyrighted expression" (internal quotation marks
omitted)); *Vanderhye*, 562 F.3d at 642 ("Generally speaking, as the amount of the copyrighted material that is
used increases, the likelihood that the use will constitute a fair use decreases." (internal quotation marks
omitted)).

"rather straightforward point"); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 548 (S.D.N.Y. 2008) (finding that "extensive borrowing that might be expected of a copyright owner, not a third party author," was not "reasonably necessary" to purpose).[22]

TVEyes also attempts to avoid the logical conclusion that, if TVEyes verbatim copied the entirety of the Registered Works, it by necessity copied the "heart" of the Registered Works. TVEyes Opp. Br. 41. To do so, TVEyes oddly argues that, because it provides video clips to its subscribers "in response to user-generated search queries" and its system does not distinguish between the lede of a story or breaking news, it must not be providing them the "heart" of the works. *Id.* This makes no sense. By letting users search for and identify the content that they want most, TVEyes, by definition, provides the "heart" of the Registered Works for those users. *Meltwater*, 931 F. Supp. 2d at 554–55 (holding service that "systematically provides its subscribers with what in most instances will be the essence of the [copyrighted works] relevant to" them was a clipping service and did not constitute fair use).[23]

Finally, TVEyes' discussion of this factor is telling as TVEyes has now dropped its argument that its use is fair based on the uses that its subscribers make of Fox News' content. *Compare* TVEyes Br. 42 *with* TVEyes Opp. Br. 40–41. As discussed above, this abrupt change reflects TVEyes' realization that its argument flies in the face of Second Circuit precedent, which holds that a defendant's use must constitute fair use on its own. *See supra* 20.

---

[22]    As discussed above, TVEyes' reliance on the search engine cases is misplaced as its use goes well beyond the limited uses permitted in those cases. *See supra* 11. Indeed, no content was made available to the public in *HathiTrust* or *Vanderhye* and only content that would not supersede the copyright holders' original works was made available in TVEyes' other cited cases. *Id.*

[23]    TVEyes conclusorily argues that "Fox [News] has waived this argument by refusing to identify the 'heart' of the [Registered] Works in discovery, or in its brief." TVEyes Opp. Br. 41. No such identification was necessary, however, as TVEyes admittedly copied the entirety of the Registered Works, including their heart. FX SUF ¶¶ 149, 151; FX RSUF ¶ 18. Moreover, it was TVEyes that strenuously argued in favor of an order "that the parties need not respond to contention interrogatories" (including TVEyes' interrogatory which asked Fox News to "Identify the 'heart' of each of the Works-in-Suit."). *See* Letter from Andrew Schapiro to Hon. Alvin K. Hellerstein (Apr. 1, 2014) (Dkt. No 18), at 3. As a result of TVEyes' own arguments, discovery ended before TVEyes obtained the information it now claims it needs.

For the foregoing reasons, the third fair use factor weighs against fair use.

        4.     <u>Factor Four: TVEyes' Use Harms the Market for and the Value of the Registered Works</u>

The fourth factor in a fair use inquiry is "the effect of the use upon the potential market for or value of the copyrighted work," including harm to the market for the original work and derivative works. *Campbell*, 510 U.S. at 590; 17 U.S.C. § 107(4).  This factor is not restricted to TVEyes' own use, but rather considers whether unrestricted and widespread conduct like TVEyes' would cause additional harm to Fox News.  *Harper & Row*, 571 U.S. at 568.  In *Campbell*, a case cited by TVEyes, the Supreme Court found a near-presumption of market harm exists in the "context of verbatim copying of the original in its entirety for commercial purposes." 510 U.S. at 591 (discussing *Sony*, 464 U.S. at 451).  As TVEyes copied the Registered Works verbatim, in their entirety, as part of its for-profit business, this presumption heavily weighs this factor against fair use.

TVEyes argues that the presumption recognized by the Supreme Court "is not the law," TVEyes Opp. Br. 42, but it cannot deny that the Supreme Court's opinion is binding precedent.  Moreover, the Supreme Court noted that the presumption "simply makes common sense: when a commercial use amounts to mere duplication of the entirety of the original, it clearly . . . serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591.  The cases to which TVEyes cites are inapposite as those courts found the use at issue to be transformative, thus requiring a closer consideration of market harm.  TVEyes Opp. Br. 43 (citing cases).  As discussed above, TVEyes' use is not transformative, but rather is a typical for-profit superseding use and, thus, those cases do not apply.  *See supra* 18.

a.    TVEyes' Use Harms the Original Market for the Registered Works

In its opening brief, Fox News explained in detail that TVEyes harms both the market for

and the value of the Registered Works in their original market by, as touted in its marketing

materials, offering its subscribers the ability to "watch live TV, 24/7."[24]  Fox News Br. 35–37.

As recognized by the Second Circuit, this use harms both carriage fees (paid by Fox News'

distribution affiliates) and advertising revenues (paid by companies to place advertisements on

Fox News' channels) by devaluing the Registered Works.  *See WPIX*, 691 F.3d at 285; FX SUF

¶¶ 260–64.  In fact, in *WPIX*, the Second Circuit held that such use not only harms these markets,

but that it <u>irreparably</u> harms them.  691 F.3d at 285.  In other words, by replacing Fox News as

the supplier of its own telecasts on television and through its TVEverywhere online service,

TVEyes "offers itself as a market substitute" for Fox News, *Davis*, 246 F.3d at 175–76, which

---

[24]  Without addressing them, TVEyes contradicts its own marketing materials by now arguing that its "service cannot be used to watch live television."  TVEyes Opp. Br. 44.  This, of course, is an obvious and failed attempt at revisionist history.  **First**, TVEyes' marketing materials clearly state that its subscribers can use its service to "watch live TV, 24/7, on any station [it is] recording" and watch "digital video segments in real-time."  FX SUF ¶ 168.  TVEyes' attempt at recharacterizing its service is contrary to the law.  *See Salinger v. Colting*, 641 F. Supp. 2d 250, 258, 260 n.3, 262 (S.D.N.Y. 2009) (rejecting defendant's attempt at post-hoc re-characterization of his book as commentary or criticism in light of pre-litigation documentary evidence that showed that defendant promoted his book as a sequel), *vac. and rem. on other grounds*, 607 F.3d 68 (2d Cir. 2010).  **Second**, TVEyes' User Manual states that its Media Snapshot feature "allows you to watch live-streams of everything we are recording.  This is great for Crisis Communications, monitoring Breaking News, as well as for Press Conferences."  Simmons Decl. Ex. 83, at TVEYES-010933.

***Third***, even though TVEyes now admits that the content on its system is available within ███████████ *id.*, and TVEyes is working to reduce any latency, FX RSUF ¶ 38, which alone would be consistent with watching live television, TVEyes' CEO, sitting as a 30(b)(6) witness, testified that video that was on television can be available in less than two minutes.  Kohn Decl. Ex. 132 (Ives Dep. 49:8–15 ("Q.  Now, isn't it true that it frequently takes less than two minutes?  A.  What takes less than two minutes?  Q.  From video that was on television to be available on TVEyes' service.  A.  Some of the faster processing servers can process that two-minute file in less than two minutes, yes.").  **Fourth**, that users can watch up to ten minutes of video before refreshing their screens to watch the next ten minutes only highlights the gross amount of infringing content that TVEyes' system provides, particularly when ten minutes will include multiple news segments.  FX SUF ¶¶ 6–8.

TVEyes also artificially attempts to restrict the concept of watching live television to circumstances in which a user accesses half-an-hour of consecutive content.  TVEyes Opp. Br. 44.  This argument makes no sense as anyone who has watched television knows that news programs are not continuous, but rather broken up into smaller segments interspersed with advertisements.  Moreover, TVEyes actually admits that, as Fox News had asserted, TVEyes users have accessed half-an-hour or more of sequential Fox News content.  *Id.*  No doubt its users have done the same for other copyright holders' content, as well as done so in smaller or non-sequential segments (for example, using TVEyes' system to remove any advertising).  In any case, as discussed above, TVEyes cannot rely on the actions of its users to support its fair use analysis.  *See supra* 20.

"is precisely the kind of harm the fourth factor aims to prevent." *Infinity Broad.*, 150 F.3d at 111;

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977) (finding no

fair use where use of plaintiff's reports "was blatantly self-serving, with the obvious intent, if not

the effect, of fulfilling the demand for the original work").

      In an effort to mislead this Court, TVEyes conclusorily asserts that these "markets were

unaffected by TVEyes' use of the [Registered] Works" because it copies and redistributes Fox

News' content "only after they were licensed to and broadcast by cable companies."  TVEyes

Opp. Br. 43 (emphasis omitted).  This claim, however, is completely inconsistent with the law of

this Circuit and the facts of this case.

      Legally, TVEyes' claim is in hopeless conflict with the fair use statute's text, which

directs courts to consider the effect of the use on the actual and potential markets for the works

as well as their <u>value</u>, 17 U.S.C. § 107(4), and the Second Circuit's holding that television

programming is irreparably devalued by services like TVEyes.  *WPIX*, 691 F.3d at 285.

Tellingly, <u>TVEyes does not address the harm to the value of the Registered Works caused by its

system or the Second Circuit's holding in *WPIX*</u>.

      TVEyes' claim also is wrong factually.  ***First***, Fox News submitted evidence in its

opening brief that, ███████████████████████████████████████

██████████████████████████████ Fox News Br. 36–37. ██████████████████

████████████████████████████████████████████████████████

████████████████████ *See generally* Carry Decl. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ FX SUF ¶¶ 280–81. ████████████████████████████

████████████████████████████████████████████ While Fox News has offered

- 29 -

evidence showing that TVEyes' service is a market substitute, however, <u>it ultimately is TVEyes</u> <u>that "bears the burden of showing an absence of 'usurpation' harm</u>." *Infinity Broad.*, 150 F.3d at 111.  Instead of doing so, TVEyes conclusorily asserts that the relationship between the value of Fox News' content and the fees that it is paid is "attenuated."  TVEyes Opp. Br. 42.  Without coming forward with evidence to support these bald assertions, however, TVEyes cannot satisfy its burden under *Celotex*.[25]

      *Second*, TVEyes asserts that there is no evidence of a "TVEyes client forgo[ing] a subscription to cable or satellite television in favor of TVEyes' service" and that "there is no reason to believe that TVEyes' clients . . . do not have both cable and TVEyes subscriptions." TVEyes Opp. 44–45.  TVEyes, however, cites to no evidence supporting these bald assertions, which again is required under *Celotex*.  To the contrary, it actually admits that it "does not require subscribers to have a separate cable or satellite subscription."  TV RSUF ¶ 172.  In any case, even if TVEyes were correct, that would not change Fox News' argument that TVEyes provides a service that substitutes for watching Fox News' content.

      *Third*, in support of its argument that its service does not depress Fox News' ratings, TVEyes asserts that "Nielsen ratings do not measure television viewership in the workplace." TVEyes Opp. Br. 46.  That is wrong.  As indicated by TVEyes' own exhibit, Nielsen measures television viewing across "all screens."  Fox News' Response to TVEyes' Counterstatement of Additional Facts ("FX R-CSUF") ¶ 139.  This only makes sense as Nielsen's ratings would lack meaning if they did not accurately reflect actual viewership.  In fact, Nielsen soon will be

---

[25]   TVEyes also attempts to downplay the evidence put before this Court in the sworn declarations of Fox News' employees.  TVEyes Opp. Br. 44.  As TVEyes' own cited case makes clear, however, declarations are the typical way that evidence is put before a court on summary judgment.  *See Morris*, 2013 WL 440127, at *4 (finding fact sworn to in declaration was undisputed and established due to the lack of contrary evidence in the record).  Moreover, TVEyes presents no evidence that is contrary to Fox News' declarations.  Indeed, in its discussion of Caley Cronin's declaration, ████████████████████████████████████████████

TVEyes Opp. Br. 45 n.23.  In any event, TVEyes too has submitted numerous declarations of its employees concerning the use of TVEyes' system.

including in its ratings anyone watching Fox News' channels using Fox News' TVEverywhere service to further supplement its data. Villar Decl. ¶ 29. In any case, TVEyes has put forward no evidence that its service is used exclusively in the workplace. Indeed, it cannot as TVEyes places no technological restrictions on the use of Fox News' content and allows its users to access content on their mobile devices wherever they are using the TVEyes iPhone app—even from home. FX SUF ¶ 188; *see* Seltzer Decl. Ex. G, at 15.

> b.   TVEyes' Use Harms the Derivative Market for the Registered Works

As discussed in Fox News' opening brief, TVEyes' use also impairs numerous derivative markets for video clips of the Registered Works, all of which are relevant when assessing fair use. Fox News Br. 37. ***First***, TVEyes significantly curtails the ability of Fox News' exclusive licensee, ITN Source, and its partner, Executive Interviews, to distribute and license video clips of Fox News' content to third-parties. Fox News Br. 37–38. Each of TVEyes' arguments that its service does not harm this market fails.

- TVEyes asserts that no market harm has occurred because ITN Source has not identified sales of video clips of the particular nineteen representative Registered Works. TVEyes Opp. Br. 46–47. That is not surprising, however, because by offering its subscribers the ability to watch and download Fox News' content and use it for unlimited purposes, the evidence shows that TVEyes significantly has curtailed ITN Source's ability to compete in the market for video clips of Fox News' content. FX SUF ¶¶ 168, 170–71, 177–80, 186–89, 265–67. In fact, Executive Interviews, ITN Source's partner, ███████████████ ████████████████████████████████████████████████████████████ ███████████   Fox News Br. 38; FX SUF ¶¶ 177–79, 269–71, 255–59. TVEyes even markets itself as "more effective and far less expensive than using old-fashioned press clipping services." FX SUF ¶ 165.

- TVEyes also asserts that its service "cannot possibly substitute for that potential market because the [Registered] Works are no longer accessible on TVEyes, and have not been since 32 days after each was broadcast." TVEyes Opp. Br. 47. That, however, is precisely the time during which Fox News' up-to-the-minute news programing is most valuable and there was no limit on TVEyes' subscribers' access to the Registered Works during that time period. Further,

TVEyes' subscribers can save and access the Registered Works well beyond 32 days as TVEyes' User Manual encourages its subscribers to "[a]lways save" their clips to TVEyes' servers, because "[t]his will ensure your clip is saved FOREVER!!" FX SUF ¶ 193 (emphasis in original); *see also id.* ¶¶ 146–49, 162, 170, 179, 191–92, 214.

- TVEyes absurdly argues that its provision of unlimited high definition video clips that can be used for any purpose is in a different market from Fox News and its licensees, because Fox News and its licensees "provide clips (and the appropriate licenses) for use when a license is legally required . . . while TVEyes supplies clips to third parties for use when a license is not necessary." TVEyes Opp. Br. 47. As discussed throughout this briefing, however, it is TVEyes' own use—providing all of Fox News' content to paying subscribers in real time so that they can watch, download, and edit an unlimited and unrestricted number of video clips, FX SUF ¶¶ 147, 149, 151, 168, 170–71, 177–81, 188–90, 198–99—that is relevant, not the downstream use to which its subscribers may put the unlimited high quality clips that TVEyes provides to them.[26] *See supra* 20. Moreover, TVEyes has provided no factual support for the idea that it only supplies clips for use when a license is not necessary. To the contrary, its CEO acknowledged that TVEyes encourages its users "create an archive of their clips," Simmons Decl. Ex. 66 (Ives Dep. 58:9–12); FX SUF ¶¶ 191–97, which, as indicated above, the Second Circuit has held is not fair use. *See supra* 20.

- Hopelessly trying to create a conflict where none exists, TVEyes further argues that the declaration of ITN Source's Managing Director, Andrew Williams, is somehow inconsistent with the licensing documents produced by ITN Source. TVEyes Opp. Br. 48. Mr. Williams' declaration ███████████████████████ ██████████████████████████████████████ Williams Decl. ¶ 26. ████████ ████████████████████████████████████████████████ *See* Rose Decl. Ex. M. TVEyes' assertions simply are not grounded in the facts of this case.

- Similarly, TVEyes hopes to avoid the declaration of Executive Interviews' Global Head of Sales and Marketing, Elizabeth Ashton, ████████████████████ ████████████████████████ FX SUF ¶¶ 177–79, 269– 71, 255–59, 271; Ashton Decl. ¶¶ 23–25. This testimony is highly relevant as it shows that TVEyes' service is a market substitute for the services of Fox News' licensees.[27] TVEyes desperately argues that ██████████████████████

---

[26] Moreover, contrary to TVEyes' argument that internal use by its users somehow automatically would constitute fair use, TVEyes Opp. Br. 48, the Second Circuit has held that use within a company, particularly to create a library of copyrighted content, is not a fair use. *Texaco*, 60 F.3d at 919–20. Furthermore, the evidence establishes that TVEyes' users do not restrict themselves to internal use. Misenti Decl. Ex. 63.

[27] ████████████████████████████████████████████████████ Moreover, the evidence submitted by Ms. Ashton clearly is properly before this Court. *See infra* 65 n.47.

████████████████████████████████████████ TVEyes Opp. Br. 49, but it cites to no evidence that supports that proposition, which is required under *Celotex*. And, even if it did, the Second Circuit has made clear that such use does require a license. *Texaco*, 60 F.3d at 919–20 (holding internal distribution of photocopies not a fair use).

- TVEyes' final argument is patently absurd. It argues that, having provided its users with unlimited and unrestricted video clips, "it certainly is not 'beyond the realm of possibility that [TVEyes' service] might stimulate further interest in access to Fox [News]-owned content for public performance.'" TVEyes Opp. Br. 49 (quoting *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1264 (2d Cir. 1986)). The absurdity of this claim is revealed by the fact that *Maxtone* involved the use of quotations from a book with a "series of sympathetic interviews on abortion and adoption" in an "essay sharply critical of abortion." *Maxtone*, 803 F.2d at 1264. Understandably, the court found that the critical essay was an unlikely substitute for the book. Providing unadulterated video clips that can be used for any purpose is extremely different from using quotations from a book in a critical essay taking the contrary position. Moreover, that TVEyes, when cornered, may sometimes admit that further permission is required for further use by its subscribers does not change whether TVEyes' service is a market substitute for Fox News' own use. *See* Ives Decl. Ex. TTT, at 6 (after providing content "to download, play and email edited video unlimited times," TVEyes' Senior Vice President is forced to admit that further permission may be necessary).

**Second**, by giving its users access to an unlimited number of video clips, TVEyes robs

Fox News of viewership for Fox News' authorized video clips on its website. Fox News Br. 38–

39. TVEyes' use is particularly harmful to Fox News because Fox News receives revenues from

pre-roll and banner advertising whenever a user watches an authorized video clip on Fox News'

websites or using Fox News' proprietary video player, which includes links back to Fox News'

websites. FX SUF ¶¶ 107–08, 274–75. Moreover, TVEyes posts its video clips in "real time,"

which is before Fox News' digital unit is able to post authorized clips on Fox News' websites,

thereby leaving little reason for TVEyes' users to visit Fox News' websites to view authorized

video clips. FX SUF ¶¶ 103, 168–69, 174, 177–80, 271.

As it did in its opening brief, TVEyes asserts that its use does not harm this derivative

market because certain features of its service are not available on Fox News' websites. TVEyes

- 33 -

Opp. Br. 49–55.  This line of argument, however, continues to be misplaced as TVEyes "bears the burden of showing an absence of 'usurpation' harm," *Infinity Broad.*, 150 F.3d at 111, which cannot be met by arguing that its service offers features that Fox News' websites do not.  Rather, TVEyes must show the opposite: that providing unlimited high definition video clips to its subscribers does not usurp Fox News' actual or potential derivative market.  *See id.* (finding differences in the parties' services did not change the fact that defendant's service affected plaintiff's potential derivative market); *Castle Rock*, 150 F.3d at 145–46 (finding that plaintiff's decision not to enter derivative market occupied by defendant did not change fair use analysis); *Meltwater*, 931 F. Supp. 2d at 557 (finding display of analytics and analysis—"whether it be a graphic display of geographic distribution of coverage or tone or any other variable included by [the defendant]—is an entirely separate service . . . from the publishing of excerpts from copyrighted articles" and, thus, irrelevant to fair use analysis).[28]

As discussed in Fox News' opening brief and its opposition brief, however, the evidence is clear that TVEyes usurps this derivative market.  Fox News Br. 38–39; Fox News Opp. Br. 30. As TVEyes repeats, in some cases verbatim, the same failed arguments that it made in its opening brief, Fox News respectfully refers the Court to its responses to those arguments in Fox News' opposition brief.  Fox News Opp. Br. 30–32.[29]

---

[28]   Fox News also notes the backwardness of TVEyes' argument that Fox News would need to show that the video clips accessed by TVEyes' users were available on Fox News' websites.  TVEyes Opp. Br. 50.  ***First***, as it is TVEyes' usurpation that is at issue, all that matters is that TVEyes admittedly copies and redistributes all of Fox News' content, including the content that Fox News chooses to make available on its website.  FX SUF ¶¶ 103, 168–69, 174, 177–80, 279.  There is no requirement that Fox News make all of the content accessed by TVEyes' users available.  Indeed, the Second Circuit has held that this factor weighs against fair use even if none of the Registered Works has been made available.  *See infra* 39.  ***Second***, in light of TVEyes' pervasive copying and redistribution, the specific content accessed by its users is irrelevant.  *See supra* 20.

[29]   TVEyes again asserts that the sworn declarations of Fox News' employees are just "conclusory statements." TVEyes Opp. Br. 51.  As discussed above, however, TVEyes' assertion is contradicted by its own cited caselaw and inclusion of declarations from its employees.  *See supra* 30 n.25.  Moreover, the factual declarations submitted by Fox News in support of its summary judgment brief are more than mere speculation, but rather based on information gleaned from the declarants' years of experience in this industry and supported by

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

*Third*, TVEyes directly competes with Fox News' syndication partners, including

Yahoo!, YouTube, and Hulu, for video clip viewership by posting the same clips without paying

Fox News any licensing fees. Fox News Br. 39. In its opposition brief, TVEyes does not

address this separate source of revenue other than in connection with its arguments about Fox

News' own websites. TVEyes Opp. Br. 49–55. The issues, however, clearly are distinct as

TVEyes' use of the Registered Works devalues them for Fox News' syndication partners,

thereby reducing Fox News' potential revenues. FX SUF ¶¶ 106, 134, 279. TVEyes' failure to

address this issue is a tacit admission of market harm.

*Fourth*, TVEyes' use harms Fox News' potential market for licensing to media

monitoring or clip licensing services like TVEyes. Fox News Br. 39. In its opening brief, Fox

News put forward evidence that TVEyes licenses the right to reproduce, distribute, and display

audiovisual content from other copyright holders, including ████████, and that other copyright

holders have indicated that, to access their content, media clipping services typically pay for a

license. *Id.* As TVEyes does not pay Fox News to use Fox News' content, it causes Fox News

to lose the benefit of <u>any</u> royalty revenue, which is a classic example of market harm. *See Davis*,

246 F.3d at 175–76 (finding that taking a copyrighted work for free allowed the defendant to

avoid "paying the customary price," that the plaintiff "was entitled to charge for the use of his"

work, and that, as a result, the plaintiff "suffered market harm through his loss of the royalty

revenue to which he was reasonably entitled in the circumstances, as well as through the

diminution of his opportunity to license to others"); *Meltwater*, 931 F. Supp. 2d at 553

("Moreover, permitting Meltwater to avoid paying licensing fees gives it an unwarranted

advantage over its competitors who do pay licensing fees."); *ASCAP*, 599 F. Supp. 2d at 432

---

documentary evidence, including Fox News' agreements with its licensees. Furthermore, TVEyes cannot satisfy its obligations under *Celotex* in this manner, and it has offered no contrary evidence.

(finding fourth factor favored copyright holder where it "established the existence of markets for licenses of preview performances and other short segments of its music"); *Video-Cinema*, 2005 WL 2875327, at *8 (holding that erosion of commercial market for video clips of performance excerpts was sufficient to support finding of no fair use, despite educational and non-commercial purpose of use).

Tellingly, TVEyes' opposition brief does not address either Fox News' evidence that media monitoring/clipping services are a typical market for a copyright holder or its caselaw establishing that, by failing to pay Fox News a royalty, TVEyes causes Fox News market harm. Instead, TVEyes solely relies on its argument that its services are transformative. TVEyes Opp. Br. 55–56. As discussed above, however, TVEyes' service is not transformative. *See supra* 18. Even if it were, however, the market harm detailed above clearly shows that TVEyes' service is not a fair use. *See Salinger*, 641 F. Supp. 2d at 268 (transformative nature outweighed by other factors); *Warner Bros.*, 575 F. Supp. 2d at 551 (same).

c.   <u>Similar Widespread Use Would Harm Fox News</u>

In its opposition brief, TVEyes acknowledges that an additional consideration in deciding the fourth fair use factor is "whether 'unrestricted and widespread conduct of the sort engaged in by [TVEyes] would result in a substantially adverse impact on the potential market for the original work." TVEyes Opp. Br. 56 (quoting *Swatch*, 2014 WL 2219162, at *14). Fox News' opening brief explained that, because newsgathering and reporting is a costly enterprise, Fox News must receive considerable revenues to offset its expenses. Fox News Br. 40–42. Indeed, numerous other news organizations, faced with lost revenues, have seen significant contractions, resulting in numerous shuttered newspapers and television news bureaus, shrunken network news audiences, and a moving away from breaking news by Fox News' cable news competitors. *Id.* at 40–41. If TVEyes' use became widespread with all of Fox News' content available on the

Internet through TVEyes and similar services, Fox News' authorized affiliates, advertising partners, syndication partners, and licensing agents would no longer be willing to remunerate Fox News at the rates Fox News currently can seek for its content. *Id.* at 41. As a result, Fox News' incentive to make the significant and sustained financial investments that are necessary to maintain its news organization unquestionably is threated by such use. *Id.* at 41–42.

Both of TVEyes' opposing arguments are unavailing. ***First***, TVEyes argues that the Court's consideration of widespread use should be limited only to Fox News' representative sample of nineteen Registered Works. TVEyes Opp. Br. 56. This approach, however, is entirely hypocritical and in direct conflict with the caselaw concerning widespread use. TVEyes consistently argues that its service is beneficial because it copies all of Fox News' content and enables its subscribers to search all of that content—an argument that obviously goes beyond the nineteen Registered Works. Now, when the issue of "unrestricted and widespread conduct of the sort engaged in by" TVEyes is to be considered, *Campbell*, 510 U.S. at 590, TVEyes attempts to restrict the Court's vision solely to the Registered Works. This is the epitome of chutzpah. Moreover, courts regularly look beyond the particular copyrighted works at issue and consider the result of determining that the defendant's <u>type of use</u> was a fair use. *See Harper & Row*, 471 U.S. at 569 (considering "broader perspective" of whether finding type of conduct to be fair use would damage the marketability of the type of work at issue and finding that "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented"); *HathiTrust*, 2014 WL 2576342, at *13 (considering market harm of similar use on the book industry in general); *see also Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 189 (D. Mass. 2007) ("It is hard to imagine that freelance photojournalists would continue to seek out and capture difficult to achieve pictures if they could not expect to collect any licensing fees. This is exactly the kind of situation that copyright is

- 37 -

meant to impact — where unrestricted use would likely dry up the source.").[30]

TVEyes' improperly narrow approach also is unworkable.  In TVEyes' view, Fox News would need to register each piece of its content as soon as it was telecast and sue TVEyes immediately in the hope of receiving some kind of relief during the 32 days that each telecast is available on TVEyes' system.  There is no reason for this Court to adopt such a contorted, inefficient and, frankly, ridiculous approach to considering market harm.  Rather, as the nineteen Registered Works merely are a representative sample of the works copied by TVEyes 24 hours a day, 365 days a year, the adverse impact on their market necessarily includes TVEyes' pervasive copying of all of Fox News' content.  The fact that TVEyes needs to strain to make this kind of argument only highlights the emptiness of its position.

*Second*, focusing solely on its own use, TVEyes argues that Fox News' original and derivative markets will not be harmed by conduct of the type engaged in by TVEyes because, to date, Fox News successfully has balanced its high costs with necessary income.  TVEyes Opp. Br. 42.  Yet, TVEyes' own opposition brief admits that the question of widespread use is directed to "unrestricted and widespread conduct of the sort engaged in by [TVEyes]," including copying and redistribution by other companies.  TVEyes Opp. Br. 56 (quoting *Swatch*, 2014 WL 2219162, at *14).  As discussed in Fox News' opening brief, such use clearly would devalue Fox News' content and divert viewership from Fox News' channels and website, making them unprofitable.  Fox News Br. 42.

Moreover, the fair use statute explicitly instructs courts to consider "potential" markets for the works.  17 U.S.C. § 107(4).  Thus, even if TVEyes' assertion that Fox News' revenues would be unaffected by TVEyes' use were correct, Fox News is not required "to show a decline

---

[30]  TVEyes' approach also is inconsistent with the legal principle that actions capable of repetition, yet evading review are within the purview of the courts.  *See Friends of Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 213 (2000) (finding cases not moot when challenged conduct is "capable of repetition, yet evading review").

in the number of licensing requests" as a result of TVEyes' use.  *Ringgold*, 126 F.3d at 81.

Indeed, the Second Circuit has found market harm in cases in which the plaintiffs had not

exercised their rights in the defendants' markets—in fact, in *Salinger v. Random House, Inc.*

market harm existed despite the plaintiff's "disavowe[l] of any intention to publish [copyrighted

letters] in his lifetime."  811 F.2d 90, 99 (2d Cir. 1987); *Salinger*, 641 F. Supp. 2d at 268 (same);

*see Castle Rock*, 150 F.3d at 145–46 ("Although Castle Rock has evidenced little if any interest

in exploiting the market for derivative works based on *Seinfeld*, such as by creating and

publishing Seinfeld trivia books [as the defendant had done], the copyright law must respect that

creative and economic choice."); *UMG*, 92 F. Supp. 2d at 352 (finding that copyright holder

need not have yet entered market in issue to find market harm).

In the end, these cases only serve to highlight how even more compelling the harm to Fox

News' markets is in this case as compared to the type of harms in previous cases that,

nevertheless, found market harm and no fair use.  Fox News need not rely on *Salinger* or

*Seinfeld* (though it could) because the harm that it has articulated goes well beyond a potential

market as these cases focused on, to instead impact Fox News' actual, current markets.  As

discussed above, it simply is common sense that TVEyes harms Fox News' television, Internet,

and clip licensing markets.  Indeed, this Court has recognized, because Fox News "provides clips

to people that want clips . . . that makes them competitive" with TVEyes.  Simmons Decl. Ex. 71

(Discovery Hr'g Tr. 16:5–6).

Accordingly, the fourth fair use factor heavily weighs against fair use.

5.     Considerations of the Public Interest Favor Fox News

In its opening brief, Fox News put forward two independent bases for finding that the

public interest favors Fox News in this case.  ***First***, because "copyright itself [is intended] to be

the engine of free expression," *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003), "the public has a

- 39 -

compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming." *WPIX*, 691 F.3d at 287. TVEyes admits that "there is a public interest in enforcing the copyright regime," but it argues that such interests should be ignored by this Court and that, instead, this Court should focus solely on whether TVEyes' use serves a public interest. TVEyes Opp. Br. 58. The Supreme Court, however, has made clear that a fair use analysis must consider the policies, incentives, and purposes on which copyright law is based. *See Campbell*, 510 U.S. at 578 (finding that all of the factors "are to be explored, and the results weight together, in light of the purposes of copyright"); *Harper & Row*, 471 U.S. at 545–46, 560 (admonishing courts that "gave insufficient deference to the scheme established by the Copyright Act for fostering the original works that provide the seed and substance of this harvest"). Those purposes being "to motivate the creative activity of authors . . . by [providing] a special reward," *Sony*, 464 U.S. at 429, and to ensure that copyright owners receive "a fair return for their labors." *Harper & Row*, 471 U.S. at 546. As "[i]nadequate protections for copyright owners can threaten the very store of knowledge to be accessed," it is appropriate and required for this Court to consider the public interest in enforcing Fox News' copyrights in this case. *WPIX*, 691 F.3d at 287.

**Second**, the public has an interest in protecting news organizations, like Fox News, from media clipping services, like TVEyes:

> Paraphrasing James Madison, the world is indebted to the press for triumphs which have been gained by reason and humanity over error and oppression. Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits [news organizations] to earn the revenue that underwrites that work. Permitting [media clipping services] to take the fruit of [that] labor for [their] own profit, without compensating [the news agencies], injures [the agencies'] ability to perform this essential function of democracy.

*Meltwater*, 931 F. Supp. 2d at 553; *see also Swatch*, 861 F. Supp. 2d at 340 (this Court finding

"work as a prominent gatherer and publisher of business and financial information serves an important public interest, for the public is served by the full, timely and accurate dissemination of business and financial news"). Again, "TVEyes does not dispute that Fox [News'] news programming serves an important public interest." TVEyes Opp. Br. 58. Instead, it argues that its unrestricted copying and redistribution of Fox News' content also serves a public interest. *Id.* TVEyes, however, merely repeats the same failed arguments that it made in its opening brief, which Fox News' opposition brief showed to be without merit. Fox News Opp. Br. 17–20, 33–35.

TVEyes' arguments just do not make common sense. Individuals and companies can get Fox News' content in any number of ways—whether traditional television distribution, recording for later viewing using a DVR, watching video clips on Fox News' websites or the websites of its syndication partners, or getting a clip from ITN Source and Executive Interviews—all of which support the incredible expense of Fox News' two 24-hour cable news channels. Indeed, before cable news channels like Fox News, CNN, or MSNBC existed, free over-the-air broadcast channels could not support the robust 24-hour programming that is now available to consumers. If everyone could copy and sell this content to be watched, downloaded, edited, and shared, it is obvious that it would undermine the foundation that makes these channels possible and that the cable news industry would collapse in the same manner that other parts of the news industry have done. The time to stop TVEyes' conduct is now before its use becomes more pervasive.

Accordingly, the public interest weighs against fair use.

* * *

Contrary to TVEyes' convoluted and unsuccessful arguments, the Second Circuit has made clear that "fair use is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public

importance." *Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 751 F.2d 501, 508 (2d Cir. 1984)

(internal quotation marks omitted).  "Put more graphically, the doctrine distinguishes between a

true scholar and a chiseler who infringes a work for personal profit."  *Wainwright*, 558 F.2d at 94

(internal quotation marks omitted).  The foregoing analysis shows that each fair use factor and

the public interest weigh against finding that TVEyes' uninhibited copying and redistribution of

the Registered Works was fair use.  Accordingly, Fox News respectfully requests that this Court

enter summary judgment in its favor on TVEyes' fair use defense.

## II.    TVEYES IS LIABLE FOR HOT NEWS MISAPPROPRIATION AND ITS PREEMPTION DEFENSE FAILS

Despite TVEyes' best attempts to distinguish this case from *International News Service

v. Associated Press*, it is hard to imagine a hot news misappropriation claim that is more "*INS*-

like" than this one.  *See* 248 U.S. 215 (1918).  Like the AP (the plaintiff in *INS*), at great

expense, Fox News gathers news about current events and distributes it daily to its viewers.  It

then recoups its costs through revenues derived from its affiliates and other distribution outlets.

Similarly, like INS (the defendant in *INS*), TVEyes copies Fox News' news reports verbatim as

they are aired on Fox News' news channels and sells them to its own subscribers in "real-time,"

before Fox News is able to post them on its own websites.  Moreover, TVEyes is a for-profit

company and markets its service to subscribers as a place to "monitor Breaking news," including

from Fox News' channels, in direct competition with Fox News' own news distribution outlets.

TVEyes cannot dispute these facts.  Thus, in a desperate attempt to defeat Fox News'

motion, it makes confusing and scatter-shot arguments, none of which, as discussed below, have

any legal basis or factual support.  TVEyes also tries to dispute certain facts with conclusory

statements that are not supported by admissible evidence, but such unsupported statements

cannot defeat a motion for summary judgment.  *See Celotex*, 447 U.S. at 323.  Moreover,

because it knows that Fox News has established its hot news misappropriation claim, TVEyes desperately attempts to argue that Fox News' claim is preempted, but TVEyes has not met its burden, which is not surprising as it is well-settled that hot news misappropriation under New York law is not preempted by copyright law.  Accordingly, Fox News has established its claim for hot news misappropriation.

**A.    TVEyes Has Misappropriated Fox News' Time-Sensitive "Hot News," Which Fox News Has Generated at Significant Cost and Expense.**

TVEyes argues that Fox News' claim fails because it (1) has not identified any particular piece of "hot news" that TVEyes has misappropriated, (2) failed to establish that any such news was exclusive to Fox News and not already simultaneously being reported by its competitors, and (3) failed to establish the cost it incurred in gathering the news.  TVEyes Opp. Br. 69.  As discussed below, each of these arguments are nonsensical as TVEyes copies <u>all</u> of Fox News' news reports as they air (which include breaking "hot" news), there is no requirement that Fox News be the first or only news outlet to have reported on a particular breaking story, and Fox News has established that it █████████████████████████ on newsgathering and TVEyes has put forth no evidence to dispute that figure.

1.    <u>TVEyes Appropriates *All* of Fox News' "Hot News," Including the Specific Examples Identified by Fox News in Discovery.</u>

TVEyes' opposition brief is notable for the numerous issues that it concedes.  TVEyes does not dispute that Fox News is a news organization that gathers and reports breaking news on television every hour of the day, seven days a week.  It does not dispute that Fox News' channels display a news ticker that continuously provides updates in text along the bottom of the screen.  Nor does TVEyes dispute that it copies all of Fox News content (news reports and otherwise) as

it airs and makes it available to its paying subscribers in "real-time."[31]  TVEyes also admits that

Fox News has "identified entire <u>topics</u>" of breaking news.  TVEyes Opp. Br. 65 (emphasis in

original).

Instead, TVEyes makes the ridiculous argument that Fox News' claim fails because it has

not identified the specific piece of breaking news that it appropriated.  ***First***, there is no

requirement that Fox News identify each and every specific piece of "hot news" that TVEyes has

appropriated—especially as Fox News' entire business is news reporting and TVEyes copies

<u>everything</u> Fox News airs and makes it available to TVEyes' subscribers in "real time."  FX SUF

¶¶ 151, 227–28, 230–32, 235; TV SUF ¶ 13.  Indeed, in *INS*, the Court did not list the specific

news bulletins that INS copied (nor did it require that the AP identify them), rather it determined

that INS was liable because it copied all of the AP's news bulletins on a daily basis.  *See INS,*

248 U.S. at 231–232 (claim based on "pirating of complainant's news by defendant" and

"appropriating news taken from bulletins issued by complainant or any of its members"); *see*

*also Barclays Capital, Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 881 (2d Cir. 2011) (claim

based on taking all "trading 'Recommendations'" regularly put out by financial institutions);

*Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 843 (2d Cir. 1997) (claim based on

taking and displaying "updated information of professional basketball games in progress").

<u>TVEyes cites no case that supports its argument that this level of detail is required for a hot news</u>

---

[31]  TVEyes does not dispute that its marketing materials claim that it makes Fox News' content available in "real-time," which is defined as "the actual time during which something takes place."  MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/real%20time.  TVEyes now argues that it has a <u>different</u> definition of "real time," which means ▮▮▮▮▮▮▮▮▮▮▮▮ after the event takes place.  Seltzer 2d Decl. ¶ 10.  As discussed above, however, TVEyes' newly formed, post-litigation position is wholly inconsistent with its marketing materials, User Guide, and the testimony of its CEO and Rule 30(b)(6) witness, David Ives.  *See* *supra* 28 n.24.  Leaving that aside, this delay of a few minutes in retransmitting Fox News' live news reports to its subscribers does not negate Fox News' evidence that TVEyes' misappropriation is time sensitive.  *See NBA,* 105 F.3d at 853 (finding time sensitive element met even though the information transmitted by defendant "is not precisely contemporaneous").

misappropriation claim under New York law.[32]

Moreover, TVEyes' assertion that it was not put on notice of Fox News' claim and that Fox News did not identify specific examples of "hot news" is completely insincere. TVEyes Opp. Br. 66. In its Complaint, Fox News alleged facts supporting its hot news misappropriation claim, and this Court denied TVEyes' motion to dismiss that claim. Compl. (Dkt. No. 1); Order (Dkt. No. 7). Further, throughout the many months of discovery in this case, TVEyes had ample opportunity to discover the factual basis of Fox News' claim. For example, in an interrogatory response, Fox News identified numerous specific representative examples of its breaking news reports and the corresponding dates, and Fox News produced copies of all of this coverage. Anten Decl. Ex. MMM; Cendali Decl. ¶ 30. These examples included breaking news reports about Hurricane Irene from August 24–31, 2011, the Arab Spring uprisings in Libya from July 4 – September 4, 2011, the Newtown school shooting from December 14–18, 2012, North Korea tensions from April 4–13, 2013, and the Moore, Oklahoma tornado and aftermath from May 19– 25, 2013. *Id.* TVEyes did not object to Fox News' interrogatory response, or seek a more detailed response from Fox News, which it could have done if it needed more specificity. Cendali Decl. ¶ 30. Similarly, in its initial disclosures, Fox News identified Sharri Berg and Jay Wallace as individuals on whom Fox News may rely for the topics of the creation and ownership of Fox News' content and Fox News' practices and policies regarding news gathering. Cendali Decl. ¶ 6. Yet, TVEyes chose not to notice their depositions. *Id*. TVEyes also served a Rule 30(b)(6) deposition notice on Fox News, which included a topic on "[e]ach specific portion or

---

[32] TVEyes' reliance on *Ritani, LLC v. Aghjayan,* 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012), is misplaced. As a threshold matter, in *Ritani,* the court considered a trade secrets claim, not a hot news misappropriation claim. Moreover, contrary to TVEyes' misleading description of the case in its parenthetical, the court did not dismiss the trade secret claim because plaintiff "failed to identify the trade secret used." TVEyes Opp. Br. 66. Rather, the court sustained the trade secret claim against two of the defendants, and dismissed against the other defendants because there were no allegations "as to the use of the alleged trade secrets" by those defendants. *Ritani,* 880 F. Supp. 2d at 451 (emphasis added).

segment of Fox News Content … that Fox News claims to constitute breaking news or 'hot' news that TVEyes allegedly misappropriated," but TVEyes voluntarily opted to forego this deposition even though it was aware that Fox News planned to move for summary judgment on this claim.  Cendali Decl. ¶¶ 19-22.

The absurdity of TVEyes' assertion that it has no idea what "hot news" is at issue in this case is further underscored by a review of the actual coverage that was produced to TVEyes in discovery.   Many of the stories are prominently labeled "BREAKING NEWS" or "ALERT." Wallace Decl. ¶ 37, Ex. 57.  Further, the footage depicts the text news ticker, which provides additional, immediate updates of news on the bottom of the screen throughout the telecast.  *Id.* Illustrative excerpts from the coverage Fox News produced to TVEyes in discovery are provided below:

- Fox News' initial breaking coverage of the shooting at Sandy Hook Elementary School on the morning of December 14, 2012, which repeatedly interrupted the regular telecast of *America's Newsroom*.



- Fox News' breaking coverage of Pope Benedict XVI's resignation on February 11, 2013, as well as Fox News' coverage of the first signs of white smoke at the Vatican and the announcement of the election of Pope Francis on March 13, 2013.[33]

---

[33]   TVEyes argues that this coverage about Pope Benedict's resignation is not "hot news" because it contains commentary and opinions by Fox News correspondents.  TVEyes Opp. Br. at 68 n.35.   A review of the coverage, however, belies this argument.   The report is labeled "ALERT," and gives information about the substance of the "stunning" announcement (i.e., the Pope will resign on February 28th), where the statement was made (i.e., made in Latin during a meeting with Vatican cardinals), and when (i.e., that morning).  Further, it reports on statements by the Vatican about the time period between the resignation and election of a successor.  The fact that Fox News' correspondent in Rome gives further context and background about the announcement does not make it any less "hot news."  Moreover, TVEyes wholly ignores the text news ticker at the bottom of the screen, which reports updates about statements made by the Chairman of the House



- Fox News' breaking updates throughout the week of the Boston marathon bombing and manhunt, including breaking coverage of the bombing on April 15, 2013, with live footage and assessment of the immediate aftermath; Fox News' interruption of reporting on the FBI's release of suspect photos to provide breaking updates about the shootout between police and the bombing suspects on April 19, 2013; Shepard Smith's reports on the imminent capture of the second suspect later that day; and initial reports of the second suspect's surrender into custody shortly thereafter.




- Fox News' initial coverage of the Moore, Oklahoma tornado on May 20, 2013, with live footage of the tornado and repeated warnings to the public to seek safety underground, as well as Shepard Smith's interruption of *The O'Reilly Factor* later in the day to report breaking updates on the death toll and devastation at the scene.




International Committee about the U.S.'s vulnerability to cyber-attacks.   All of this coverage was copied by TVEyes and retransmitted to its paying subscribers.

Wallace Decl. ¶ 37, Ex. 57.[34]   Thus, Fox News has identified many examples of "hot news" that TVEyes appropriated.

> 2.    Fox News Is Not Required to Establish That It Was the First or Only News Provider to Report on the "Hot News" that TVEyes' Misappropriated.

TVEyes also asserts that Fox News has the burden of proving that it was the first and only news source to report the breaking news that TVEyes appropriated, TVEyes Opp. Br. 67–68, 68 n.36), but TVEyes cites no cases that support this assertion.[35]   In *INS,* the Court did not state that the AP must establish that it was the only or very first news agency to report on a particular story among all the newspapers in the world.   Indeed, given that the AP's member newspapers were in the United States, it seems highly unlikely that the AP and its members would be the only sources to report on, for example, a news story that happened in England, when there are local papers in England, or that they would be the first to report on such incident when newspapers in England were published hours earlier than the newspapers in the United States given the time differences.   Indeed, such a requirement would render this tort meaningless as virtually no newsworthy event happens in the world without more than one reporter covering

---

[34]   TVEyes' argument that it had no notice of the examples provided in Jay Wallace's declaration is disingenuous. TVE Opp. Br. 68 n.35.  All of the coverage attached as an exhibit to Mr. Wallace's declaration was identified in Fox News' interrogatory response on April 3, 2014, and copies of it were produced during discovery on March 21, 2014.  Anten Decl., Ex. NNN; Cendali Decl. ¶ 7.  Moreover, Mr. Wallace was disclosed in Fox News' initial disclosures, but TVEyes chose not to depose him.  Cendali Decl. ¶ 6.

[35]   Neither of the two cases cited by TVEyes supports this argument.  TVEyes Opp. Br. 67–68, 68 n.36.  In *Silver v. Lavendeira,* the court denied a motion for a preliminary injunction because there was no evidence that the plaintiff, an Internet blogger who simply reported on stories she saw on the Internet, had incurred substantial costs in obtaining the information at issue—not because she could not establish that she was the only or first source to report on a story.  No. 08 Civ. 6522, 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26, 2009) ("The fact of such widespread availability calls into question Plaintiff's conclusory assertion that she incurred substantial costs in obtaining the information at issue.").  Here, as discussed below, unlike the plaintiff in *Silver,* Fox News ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in its newsgathering and reporting services.  Further, the other case TVEyes cites merely stands for the proposition that the news must be time sensitive when it is gathered and misappropriated, which Fox News has established as detailed in its opening and opposition briefs.  *See Capitol Records, Inc. v. Naxos of Am., Inc.,* 262 F. Supp. 2d 204, 206, 209 (S.D.N.Y. 2003) (finding hot news misappropriation did not apply to sound recordings of historic musical performances from the 1930s because they continue to be salable when old, as opposed to news which is valuable while it is fresh); Fox News Br. 46; Fox News Opp. Br. 41.

it.  It would be nonsensical to excuse TVEyes' verbatim misappropriation of Fox News'

breaking news reports simply because, for example, CNN or the New York Times may also have

sent a reporter to the scene to gather similar information and to report on the same story.[36]

      Further, contrary to TVEyes' hyperbole, Fox News does not seek to "own every fact"

about a world event on which it reports.[37]  TVEyes Opp. Br. 67.  As the Court in *INS* recognized,

it is common for news agencies to report on the same story, and it is even permissible for a

"rival" news agency to use another's news report "as a 'tip' to be investigated" and then report

that news itself once it has "verified [it] by independent investigation."  248 U.S. at 243.  Fox

News would have no issue with TVEyes if it merely watched Fox News' news reports for "tips"

and then sent its own journalists to verify those facts independently or report about the same

breaking news event.  But that is not what TVEyes does.  TVEyes "bodily appropriat[es]" all of

Fox News' news reports in their entirety and then resells them "without independent

investigation or expense" <u>as soon as they are aired on FNC and FBN</u> (which is when the news

still has time-sensitive value), which is not permissible under *INS*.  *Id.* at 243–45.

      **3.**    <u>Fox News Has Established That It Incurs Substantial Costs in Gathering and Reporting "Hot News"</u>

      Fox News has established that it does not gather its news by copying what other news

channels are reporting (like TVEyes does), but rather it ███████████████████████████

████████████████ on news and information gathering efforts.  This investment—which

---

[36]  TVEyes mischaracterizes the content of a document produced by Fox News.  TVEyes Opp. Br. 67 (citing Anten Decl. Ex. CCC).  ██████████████████████████████████████ ████████████████████████████████████████  In any event, Fox News does break news stories before other news organizations.  For example, Fox News was the first news organization to interview George Zimmerman and report those statements from the interview.  Wallace Decl. ¶ 27, Ex. 37 (describing exclusive interview on *Hannity* and attaching exhibit containing entire *Hannity* program).

[37]  Moreover, while it may not own a "fact" about a breaking news event (*e.g.*, the fact that a tornado hit Moore, OK on May 20, 2013), Fox News does own its particular report of a breaking news event that it has generated and gathered at a cost, and which may include, among other things, interviews with particular sources or eyewitnesses that do not appear in other reports on the same breaking news event.

includes, among other things, the expense of hiring and training journalists to report 24-hours-a-day and sending crews to the scenes of major events all around the world—was detailed at length in the Declaration of Sharri Berg, Fox News' SVP of News Operations and Services.  Berg Decl. ¶¶ 5–31; FX SUF ¶ 64-92.

Because it does not (and cannot) dispute any of this evidence, TVEyes resorts to the nonsensical argument that Fox News' claim fails because it did not detail its costs for any particular piece of "hot news."  TVEyes Opp. Br. 69.  Again, TVEyes cites no legal support for its argument.  Moreover, in *INS,* the Court did not require the AP to calculate the cost of each and every separate news bulletin that INS misappropriated, but simply noted that the cost of the AP's newsgathering and distribution service was approximately $3.5 million per year.  248 U.S. at 229; *see also NBA,* 105 F.3d at 852 (stating that one of the "elements central to an INS claim" is that "the plaintiff generates or collects information at some cost or expense").  Arguments like this, which are peppered throughout TVEyes' brief, seem designed to make it impossible for news organizations to protect their rights.  Thus, Fox News has established this element of its claim.

### B.    TVEyes Free Rides on Fox News' Newsgathering Efforts

TVEyes does not dispute that its marketing materials describe its service as allowing its subscribers to "monitor Breaking news," and even admits that it "does not…engage in its own newsgathering efforts."  TVEyes Opp. Br. 74.  Further, as discussed above, TVEyes offers no evidence to refute that Fox News is a news organization that gathers and reports breaking news on television every hour of the day, seven days a week and ███████████████████ on these newsgathering efforts.  FX SUF ¶¶ 1, 20, 65, 75; TV RSUF ¶¶ 1, 20, 65, 75.  Nor does TVEyes dispute that it copies all of Fox News news reports in their entirety as they air and makes them available to TVEyes' own paying subscribers in "real-time" without compensating

Fox News.  TV RSUF ¶ 149.  Clearly, this conduct constitutes "free riding," which entails

"enabling [TVEyes] to produce a directly competitive product for less money because it has

lower costs."  *Barclays*, 650 F.3d at 901 (quoting *NBA*, 105 F.3d at 854); *Pollstar v. Gigmania*

*Ltd.*, No. 00 Civ. 5671, 2000 WL 34016436, at *6 (E.D. Cal. Sept. 1, 2000) (free riding exists

where defendant copies information from plaintiff and profits from its use).

 Faced with its undisputed freeriding, TVEyes makes three tortured arguments, hoping to

avoid liability.  ***First***, TVEyes asserts that it is not liable for hot news misappropriation because

it "attributes" Fox News' news reports to Fox News.  TVEyes Opp. Br. 70–71.  Under TVEyes'

theory, it (and countless others) can freely copy and resell Fox News' news reports verbatim as

long as its subscribers understand that the reports originated from Fox News, and Fox News has

absolutely no recourse unless TVEyes' tries to pass off the news reports as its own.  Lack of

attribution or passing off, however, is not required to establish a hot news misappropriation

claim.  In *INS*, when discussing INS' practice of rewriting the AP's articles and giving the

misimpression to its readers that the reported news was the result of INS' own investigation in

the field, the Court stated that these elements:

> …although accentuating the wrong, <u>are not the essence of it</u>.  It is something more
> than the advantage of celebrity of which complainant is being deprived.

*INS,* 248 U.S. at 242 (emphasis added).  In other words, while the fact that INS passed off the

AP's stories as its own exacerbated the wrong, it was not required to find INS liable for hot news

misappropriation.[38]  In *INS*, the central question was whether INS' conduct in "appropriating for

commercial use matter taken from bulletins or early editions of Associated Press publications

constitutes unfair competition."  *Id.* at 233.  The Court affirmed that it was unfair competition—

and this is exactly the type of conduct that TVEyes engages in here.

---

[38] The Court also made clear that an "attempt by defendant to palm off its goods as those of the complainant" is
not necessary for a hot news claim.  *INS*, 248 U.S. at 242

TVEyes' repeated reliance on the Second Circuit's statements in the *Barclays* case (which TVEyes refers to as *Fly*) to support its argument that "no attribution" is required for hot news misappropriation is misplaced.  In *Barclays,* the Second Circuit found that there was no hot news misappropriation because the defendant was not misappropriating news gathered by the plaintiff financial institutions, but rather was <u>reporting</u> on what the plaintiff financial institutions were doing (*i.e.,* what stocks they were recommending to buy and sell).  650 F.3d at 903.  As part of its analysis, the Second Circuit pointed out that the defendant attributed the recommendations to the particular financial institutions that made them.  *Id.*  This type of attribution supported the court's finding that the defendant was reporting on the financial institutions' recommendations and made sense because the value of these recommendations derived from the fact that these well-established financial institutions (not the defendant) made them.  The Second Circuit did not hold that there could never be a hot news misappropriation claim where attribution was made.  *See also NBA*, 105 F.3d at 853–54 (the fact that defendant attributed the information as coming from plaintiff's basketball games was not cited as reason that claim failed).

**Second**, TVEyes makes the disingenuous argument that it "reports" on Fox News.  As discussed in Fox News' opposition brief, however, TVEyes does not employ journalists who gather facts and write independent reports about Fox News and others in the television news industry.   Fox News Opp. Br. 74.  Thus, TVEyes is not like the electronic news service in *Barclays* that the court found was reporting on financial institutions and not misappropriating hot news—that service employed about fourteen people who were "devoted to content production" and reporting on financial news, including reporting on the "<u>facts</u> that [Plaintiff] Firms and others in the securities business have made recommendations with respect to the value and the wisdom of purchasing or selling securities."  650 F. 3d at 882 (emphasis in original); *see also id.*

- 52 -

at 903 ("The [Plaintiff] Firms are making the news; Fly . . . is breaking it."). Nor is TVEyes like

the pager company in *NBA* that the court found was not liable for hot news misappropriation.

That pager company employed people to watch games on television or listen to them on the radio

and key information about the game into a personal computer, which information was then

relayed to a central computer to compile statistics and other information from the games for

retransmission.[39] 105 F.3d at 844.

*Third*, TVEyes claims that it does not free ride because it incurs some costs to operate its

business. TVEyes Opp. Br. 71. This argument, however, is meritless as hot news

misappropriation can exist even where the defendant spends money in the operation of its

business. Indeed, in *INS,* the Court found that the defendant was liable even though it spent $2

million a year on its own newsgathering operations (which was a lot of money in 1918). 248

U.S. at 230. Rather, the key is that TVEyes (like INS) takes Fox News' news reports without

paying Fox News or investing in the same type of resources to acquire that news and, thus, it

unfairly "appropriat[es] to itself the harvest of those who have sown." *Id.* at 239–40.

Accordingly, TVEyes is like the freeriding defendant in *INS,* which "lift[ed] factual

stories from AP bulletins and sen[t] them by wire to INS papers." *NBA*, 105 F.3d at 845 (citing

*INS,* 248 U.S. at 231).[40] It also is like the hypothetical examples of free riding articulated by the

Second Circuit. *See Barclays,* 650 F.3d at 905–06 (stating that if a plaintiff Firm were to "collect

and disseminate . . . facts about securities recommendations in the brokerage industry . . . and

---

[39]   As TVEyes notes, Fox News occasionally cites to what other news media have reported. TVEyes Opp. Br. 70
(citing Second Rose Decl. Exs. NNNN–VVVV). The Second Circuit, however, has noted that this type of
reporting is permissible. *See Barclays,* 650 F.3d at 903 n.36 (citing the following *PBS Newshour* report as an
example of permissible reporting: "The Associated Press and major news networks reported late Sunday that
President Obama plans to nominate Solicitor General Elena Kagan to replace retiring Supreme Court Justice
John Paul Stevens"). But, as explained above, this is not the type of reporting that is the subject of this lawsuit.
TVEyes does not simply report what Fox News has reported, it copies Fox News news reports verbatim and
resells them.

[40]   TVEyes' conduct is more egregious than INS's conduct as INS rewrote some of the stories it lifted from AP
bulletins, while TVEyes simply copies and redistributes everything verbatim. *INS*, 248 U.S. at 231.

were [defendant] to copy the facts contained in the Firm's hypothetical service . . . that would

appear to be an *INS*-type claim and might survive preemption."); *NBA,* 105 F.3d at 854 (stating

that if the defendants "were to collect facts from [the plaintiff's] Gamestats pager to retransmit

them to [their] SportsTrax pagers, that would constitute free-riding and might well cause

Gamestats to be unprofitable because it had to bear costs to collect facts that SportsTrax did

not."). Thus, Fox News has established this element of its claim.

### C. If TVEyes' Appropriation of Fox News' News Became Widespread, It Would Threaten the Existence of Fox News' Newsgathering Activities

While TVEyes cannot escape the fact that it copies all of Fox News' news and resells it,

it tries to evade liability for hot news misappropriation by arguing that it is just a small company

that will not cause Fox News to go out of business.  TVEyes Opp. Br. 73.  TVEyes, however,

ignores the fact that, as with fair use discussed above, the relevant inquiry is not just what threat

is posed by TVEyes on its own, but what would happen if  TVEyes' use became widespread and

countless others were allowed to copy and disseminate Fox News' news reports freely in the

same way.  In other words, while one parasite may not kill an animal, hundreds may.  *See INS,*

248 U.S. at 241 (rejecting defendant's theory because "by permitting indiscriminate publication

by anybody and everybody for purposes of profit in competition with the news-gatherer, it would

render publication profitless, or so little profitable as in effect to cut off the service by rendering

the cost prohibitive in comparison with the return" (emphasis added)); *NBA*, 105 F.3d at 852

(finding consideration of "the ability of other parties to free-ride on the efforts of the plaintiff"

relevant to this element) (emphasis added); *cf. WPIX,* 691 F.3d at 286 (affirming lower court's

finding of irreparable harm in copyright case because absence of preliminary injunction would

encourage others "to follow [defendant's] lead in retransmitting plaintiffs' copyrighted

programming without their consent").

Fox News has offered sworn testimony by experienced executives who have worked in this industry for years and who put forth reasoned, commonsense explanations supported by the documentary evidence as to the numerous ways TVEyes harms Fox News and threatens its primary and derivative markets.  *See generally* Ashton Decl.; Berg Decl.; Carry Decl.; Misenti Decl.; Wallace Decl.; Williams Decl.  **First**, by copying all of Fox News' news reports and disseminating them to its subscribers in real time, TVEyes directs viewers away from Fox News' channels and eliminates their need to purchase a subscription from one of Fox News' affiliates. FX SUF ¶¶ 120, 146–49, 162, 170, 179.  TVEyes' siphoning off of Fox News' viewers causes Fox News to earn less revenue from affiliate and advertising fees.  *Id.* ¶¶ 126, 130-31, 260–64. **Second**, TVEyes replaces the need for Fox News' authorized video clips by making all of Fox News' content almost instantaneously available as video clips.  *Id.* ¶¶ 162, 168, 173–75, 177, 267, 269–271, 290. ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶¶ 103, 122–23.  Thus, TVEyes reduces Fox News' website traffic, resulting in reduced online advertising revenue and fewer users seeing Fox News' promotional offerings.  *Id.* ¶¶ 131, 290.  **Third**, TVEyes cuts into Fox News' increasingly important clip licensing business, ██████████████████████████

████████████████████████████. *Id.* ¶¶ 225, 265–71.

TVEyes has offered no evidence to dispute these facts.  It merely argues that Fox News' business has improved over the past several years, TVEyes Opp. Br. 73, but this says nothing about whether Fox News has been harmed by TVEyes' conduct or will be harmed if its use became widespread.  Clearly it must—TVEyes provides access to Fox News' content regardless of whether its subscribers pay for cable subscriptions, see advertising on Fox News' website, or license clips through ITN Source or Executive Interviews.  TVEyes' argument essentially is that

a successful company never can establish a hot news claim, which clearly is false as the AP was and is a very successful news agency.

Accordingly, the record is clear that, if TVEyes' actions are deemed lawful and its conduct becomes widespread with anyone able to take Fox News reports and to post them for others online, Fox News would have little or no incentive to collect news 24-hours a day as its whole business would be threatened.  FX SUF ¶¶ 284–93; *see NBA*, 105 F.3d at 852, 854 (undermined incentive to create television program would be shown by a service that acts "as a substitute for . . . watching [NBA games] on television"); *Pollstar*, 2000 WL 34016436, at *6 (this element sufficiently pleaded by allegation that defendant profits from its use of information copied from plaintiff); *cf. WPIX*, 691 F.3d at 288 (noting that "desire to create original television programming surely would be dampened if their creative works could be copied and streamed over the Internet in derogation of their exclusive property rights").

**D.      TVEyes and Fox News Directly Compete**

TVEyes' claim that it does not directly compete with Fox News defies credulity. TVEyes Opp. Br. 74.  Clearly, TVEyes competes with Fox News' primary business of distributing its news live on its cable channels and online through its TVEverywhere service. TVEyes does not dispute that it copies and retransmits all of Fox News' news reports to its subscribers in real time.  TV RSUF ¶¶ 144, 149, 168.  Nor does TVEyes dispute that its subscribers can watch Fox News' news reports without purchasing a cable or satellite subscription.  *Id.* ¶¶ 97–99, 120, 162, 170, 172, 179.  Similarly, TVEyes cannot dispute that its marketing materials tout TVEyes' service as a way to "watch live TV, 24/7" and "monitor Breaking News" without any blackouts.  FX SUF ¶¶ 168–69.  TVEyes even promotes the fact that Fox News' channels are available on its service.  *Id.* ¶¶ 213–215.  Indeed, TVEyes' subscribers actually use the service to watch television.  *Id.* ¶ 171.

Moreover, TVEyes competes with Fox News' distribution and identification of clips of its breaking news reports by marketing itself as a better alternative to "old-fashioned press clipping services." *Id.* ¶ 165.  As discussed in its opening brief, Fox News posts video clips of its news reports on its own websites and sells them through ITN Source and Executive Interviews.  *Id.* ¶ 101–04, 112–118, 291.  TVEyes directly competes with this aspect of Fox News' business by making a primary selling feature of its service "the ability to download and edit an unlimited number of" "high definition" clips of Fox News "content recorded by TVEyes," which can then be edited, archived, and shared with others.  *Id.* ¶¶ 177, 181, 198, 267.  To make matters worse, TVEyes makes these clips available to its subscribers <u>before</u> Fox News and its licensee can make them available and, thus, "scoops" Fox News.  *Id.* ¶ 103, 144, 168, 279.  TVEyes' system even competes with Fox News' identification of video clips through the Fox News search engine.  *Id.* ¶ 278.

As a result of TVEyes' efforts, its subscribers, which overlap with Fox News' viewers, have made Fox News' content among the most downloaded on TVEyes' service.  *Id.* ¶¶ 221–26, 229; FX RSUF ¶ 92.  TVEyes' subscribers have viewed almost ██████████ video clips of Fox News' content and have downloaded over ██████ clips of Fox News' content using TVEyes' service.  FX SUF ¶¶ 224–25.  Again, TVEyes' subscribers were able to do this without purchasing a cable subscription to access Fox News' channels, visiting Fox News' websites, or doing business with Fox News' clip licensee.  ████████████████████████████████ ██████████████████████████████████████████████ ████████████████████  *Id.* ¶¶ 161–67, 269.  Further, TVEyes' CEO even admitted that a consumer would have no need for an authorized video clip if they obtained a clip from TVEyes.  *Id.* ¶ 271.

As articulated by the Second Circuit, this element of Fox News' hot news claim only requires "free riding by [TVEyes] on [Fox News'] product, which enables [TVEyes] to produce

a <u>directly competitive product</u> for less money because it has lower costs." *NBA*, 105 F.3d at 854

(emphasis added).   As discussed above and in Fox News' opening brief, it has established this

element.  <u>There is no requirement that the parties themselves be direct competitors in every</u>

<u>single aspect of their businesses.</u>[41]  <u>Nor is there a requirement that TVEyes be Fox News' only or</u>

<u>even primary competitor</u>.  Thus, TVEyes' claims that (1) Fox News is not a media-monitoring

service and TVEyes does not engage in its own newsgathering efforts and (2) MSNBC and CNN

are Fox News' competitors is meaningless.  TVEyes Opp. Br. 74.

Further, TVEyes tries to argue that Fox News has not shown that it has been harmed by

TVEyes (*i.e.*, that it has lost cable subscribers or TVEyes has affected Fox News' revenues).

TVEyes Opp. Br. 75.  As discussed above, this argument is unavailing because Fox News has

established that TVEyes' use—especially if it became widespread—would cause harm to Fox

News.  Indeed, it defies commonsense that TVEyes (which copies and resells Fox News' news

reports in "real time" and promotes the availability of Fox News on its systems) does not harm

Fox News.  As Elizabeth Ashton from Executive Interviews stated in her declaration, ███████

████████████████████████████████████████████████████  Ashton Decl. ¶¶ 23–35.

Moreover, this competition element does not require a showing of actual harm by the defendant.

Lastly, TVEyes' attempt to recast itself as merely a "research tool" that is different from

the products that Fox News offers is not persuasive.  Again, the fact that TVEyes may offer some

services that differ from Fox News is not relevant.  Under TVEyes' nonsensical argument, INS

would not have been liable if, in addition to running newspapers, it also had a separate book

publishing business that did not compete with the AP.  What is relevant is that TVEyes enables

its customers to watch Fox News' breaking news without having to go through Fox News'

---

[41]   TVEyes repeatedly relies on Judge Raggi's concurrence, but a concurrence is not binding authority.  *See*
      *Maryland. v. Wilson*, 519 U.S. 408, 412–13 (1997) (observing that a concurrence is not "binding precedent").

distribution channels and, thus, TVEyes' service competes with Fox News.

Accordingly, TVEyes has not disputed the evidence that overwhelmingly shows that TVEyes uses Fox News' news reports in direct competition with Fox News' services.

### E.     Fox News' Hot News Misappropriation Claim Is Not Preempted

In tacit recognition that this is a textbook "*INS*-like" case of hot news misappropriation, TVEyes, in desperation, asserts that the claim is preempted even though it is well-settled that a claim for hot news misappropriation is recognized under New York law and not preempted by copyright law.  *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461 (S.D.N.Y. 2009) ("A cause of action for misappropriation of hot news remains viable under New York law, and the Second Circuit has unambiguously held that it is not preempted by federal law.").  Indeed, the Second Circuit and other courts have concluded that, "[b]ased on legislative history of the 1976 [Copyright Act amendments], it is generally agreed that a 'hot-news' *INS*-like claim survives preemption." *Barclays*, 650 F.3d at 894 (quoting *NBA,* 105 F.3d at 845); *see also Nash v. CBS, Inc.*, 704 F. Supp. 823, 834–35 (N.D. Ill. 1989)  (noting, in a case cited by TVEyes, that the Supreme Court of Illinois adopted the tort of misappropriation first recognized in *INS* and concluding that "hot news" misappropriation claims escape § 301 preemption), *aff'd*, 899 F.2d 1537 (7th Cir. 1990); *X17 v. Lavendeira,* 563 F. Supp. 2d 1102, 1107 (C.D. Cal. 2007) (concluding that California recognizes the "hot news" species of misappropriation and that it avoids preemption).  As the Second Circuit explained, this is because the claim of hot news misappropriation contains "extra elements" that are not essential to a copyright infringement claim, including (i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff." *NBA*, 105 F.3d at 853.  Fox News has established each of these "extra elements." Accordingly, TVEyes cannot meet its burden of establishing its preemption defense.

III.    **FOX NEWS HAS ESTABLISHED ITS MISAPPROPRIATION CLAIM AND TVEYES' PREEMPTION DEFENSE FAILS**

Just like its clear cut liability for copyright infringement and hot news misappropriation,

TVEyes is liable for unfair competition under New York law.  *See infra* Part III.A.  Moreover,

TVEyes cannot meet its burden to show that Fox News' claim is preempted.  *See infra* Part III.B.

A.    **Fox News Has Established Its Misappropriation Claim Under Two Independent Theories**

New York's common law of unfair competition is based on "the equitable principle that a

person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia*

*Malone & Co. v. Rieder,* 19 N.Y.3d 511, 516 (2012) (quoting *Miller v. Schloss*, 218 N.Y. 400,

407 (1916)).  Fox News' claim is grounded in two independent theories of liability, either of

which would be sufficient to support Fox News' motion for summary judgment:

(1) "appropriation of the exclusive property of the plaintiff" and (2) "deception."  *H.L. Hayden*

*Co. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1025 (2d Cir. 1989).   As discussed below and in

its opening brief, Fox News has established both grounds.  Fox News Br. 51–55.

1.    <u>TVEyes Has Misappropriated the Results of Fox News' Labor, Skill and Expenditures in Competition with Fox News</u>

The first basis of Fox News' claim is that TVEyes misuses Fox News' carefully-

constructed distribution system for its own profit, in direct competition with Fox News, and in

bad faith.  *See Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1371 (Fed. Cir. 2013) (holding

that New York law recognizes claims based on the misappropriation of the results of another's

labor, skills and expenditures in bad faith and using them in direct competition); *Roy Exp. Co. v.*

*Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982).

TVEyes does not dispute the essential facts of Fox News' claim. ***First***, it is clear that Fox

News devoted tremendous labor, skill, and expenditures to craft a complex system with its

affiliates to disseminate news and information quickly to the public.  FX SUF ¶¶ 119–28.  As

TVEyes admits, Fox News' channels only are available from cable, satellite, or other

multichannel video programming distributors—they are not available for free as over-the-air

broadcasts, like NBC or ABC—and ██████████████████████████████████████████

████████████████████████.  TV RSUF ¶ 119.  Indeed, TVEyes offers no facts refuting that

Fox News invested significant time, effort, and skill to create a distribution system with its

affiliates based on hotly negotiated contractual terms.  FX SUF ¶ 120; *see* TV RSUF ¶ 120.[42]

       As a result of these efforts and consistent with other systems that have formed the basis

of similar claims, Fox News clearly has established a protectable property right in its distribution

system.  *See LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 502 (S.D.N.Y. 2002) (finding

sufficient investment to create property right in computer system given that the plaintiff "had

more than twenty professionals working for over two years on its computer system, at a cost of

over two million dollars"); *see also Russian Media Grp., LLC v. v. Echostar Commc'ns Corp*.,

No. 3:03 Civ. 1263, 2009 WL 275833, at *2 (D. Conn. Feb. 4, 2009) (recognizing that unfair

competition claim under Connecticut law may be based on misappropriation of television signal

distribution system); *cf. Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 710

(2d Cir. 1982) (finding protectable property right in stock index due to the expertise by 25–30

employees and significant financial expenditures that were invested to create it); *Sokol Holdings,*

*Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 303 (S.D.N.Y. 2010) (finding property right in

business plans based on the due diligence, planning, and development that were invested to

create them).

---

[42]  TVEyes only makes the conclusory assertion that Fox News has not proven that it owns a property right in the
distribution system.  TVEyes' Opp. Br. 81.  TVEyes, however, "must do more than simply show that there is
some metaphysical doubt as to the material facts."  *Rockland Exposition, Inc. v. Alliance of Auto. Serv.*
*Providers of New Jersey*, 894 F. Supp. 2d 288, 303 (S.D.N.Y. 2012) (citing *Matsushita Elec. Indus. Co. v.*
*Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  TVEyes "may not rest upon mere conclusory allegations or
denials" to oppose Fox News' motion.  *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

*Second*, TVEyes admits that it uses Fox News' distribution system to gain access to Fox News' content and to copy and redistribute it in "real time" to thousands of TVEyes' own subscribers for a fee. TV RSUF ¶¶ 143–49, 152–53; TV SUF ¶¶ 12–13, 15, 17. Indeed, TVEyes admits that this feature of its service is commercially important, TV RSUF ¶¶ 147, 210–22, 224, 226, and that, in marketing the feature, it touts the availability of FNC and FBN, which are among the most watched and downloaded by TVEyes' subscribers. *Id.* ¶¶ 213–15, 221–22, 224, 226. It is common sense that, as a result, TVEyes directly competes with and has diverted its subscribers away from use of Fox News' distribution system, resulting in ████████████ for TVEyes in 2013 alone. *Id.* ¶ 236.[43]

Thus, TVEyes has appropriated Fox News' distribution system for TVEyes' own commercial benefit and in direct competition with Fox News' use. *See Hall*, 705 F.3d at 1369, 1371; *S&P*, 683 F.2d at 710 (finding competition where the plaintiff licenses a product that competes with the defendant's use of the plaintiff's property); *Roy Exp.*, 672 F. 2d at 1105 (an "unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property"); *Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler, M.D., LLC*, 905 N.Y.S.2d 232, 1166 (N.Y. App. 2010) (finding plaintiffs to have demonstrated *prima facie* case "by submitting evidence establishing that the defendants wrongfully diverted the plaintiffs' business to themselves").

---

[43]    TVEyes makes the conclusory assertion that "[t]here is no evidence that TVEyes has somehow stolen Fox's proprietary . . . 'system' for distributing its copyrightable works." TVEyes' Opp. Br. 81. In doing so, TVEyes ignores its own numerous admissions, all of which show that TVEyes hijacks Fox News' proprietary distribution system by recording all of Fox News' television content and redistributing it to TVEyes' thousands of subscribers for a fee. TV RSUF ¶¶ 143–49, 210–22, 224, 226, 236. As described above, TVEyes "may not rest upon mere conclusory . . . denials" and, thus, has failed to meet its burden. *See supra* 61 n.42 (quoting *SEC*, 585 F.2d at 33). This is just the kind of conclusory non-rebuttal that the *Celotex* decision and its progeny prohibits.

*Third*, TVEyes has acted in bad faith.[44]  Indeed, TVEyes admits that it accesses Fox News' channels under cable agreements that restrict its ability to copy and redistribute Fox News' content.  FX SUF ¶ 124–25, 152–59; *see id.* ¶ 154 (Comcast's Business Service terms and conditions prohibit "copying, redistribution, reselling, bundling, or publication" of content); *id.* ¶¶ 155–56 (quoting similar provisions in Cablevision and ImOn's terms of service).  ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *Id.* ¶

124–25.  As TVEyes has not come forward with any evidence to dispute that its activities breach its cable agreements, it cannot rebut Fox News' showing of bad faith.[45]  *See Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 503 F. Supp. 1137, 1146–47, 1152 (S.D.N.Y. 1980) (finding bad faith where defendant acquired product through illicit means).

TVEyes also has interfered with the carefully constructed contractual relationships that are integral part to its distribution system.  ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ TV

RSUF ¶ 122.  By making all of Fox News' content available online in a manner that ███████

---

[44]  TVEyes states that "[i]n determining whether there is bad faith for purposes of a misappropriation claim, the only relevant intent is intent to confuse."  TVEyes Opp. Br. 82 (internal quotation marks and citation omitted).  Quite to the contrary, <u>unfair competition claims based on the misappropriation of another's labor, skill and expenditures do not require a showing of consumer confusion</u>.  *See Hall,* 705 F.3d at 1370 (finding viable claim for misappropriation based on defendant's alleged misappropriation of plaintiff's labor, skill, and expenditures, with no discussion of confusion*); Speedy Prods., Inc. v. Dri Mark Prods., Inc.*, 271 F.2d 646, 650 (2d Cir. 1959) (noting that in the misappropriation cases, unlike in palming off cases, "recovery seems not to depend upon the confusion or deceit of the public").  In any event, TVEyes' bad faith in misleading consumers to believe that its use of Fox News' content is licensed or otherwise authorized (which supports Fox News' separate theory of unfair competition) is discussed below.  *See infra* 64.

[45]  Indeed, TVEyes admits that, despite repeated requests from Fox News, it refused to produce copies of its agreements with its cable providers during discovery, TV RSUF ¶ 157, and did not disclose them in opposition to this motion.

████████████████████████████████████████████████████

██████████████████████████████   *Id.* ¶¶ 146–49; FX SUF ¶ 289.  This serves as an

independent basis of bad faith.  *See Dior v. Milton*, 155 N.Y.S.2d 443, 457 (N.Y. Sup. 1956)

(finding defendant acted in bad faith by interfering with plaintiff's contractual relationship with

its licensees).

Accordingly, TVEyes has misappropriated the results of Fox News' labor, skill and

expenditures—namely its distribution system—in competition with Fox News and in bad faith.[46]

### 2.    TVEyes Has Deceived Consumers

Independent of the foregoing, Fox News also has established its claim based on the fact

that TVEyes has misled consumers into believing that its use of Fox News' content is licensed or

otherwise authorized.  **First**, TVEyes has designed its overall system (which is before the Court)

in a way that misleads consumers into thinking that TVEyes has a license or other permission

from content owners.  Indeed, as TVEyes admits, its system contains no disclaimer or other

indication that it does not have permission or a license from Fox News.  TV RSUF ¶ 256; *see*

*Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656 (2d Cir. 1989) (upholding

judgment for plaintiff in state-law unfair competition claim based in part upon the fact that

consumers would "have no way of knowing the truth" about the product at issue).

**Second**, Fox News ███████████████████████████████████████████

---

[46]    TVEyes tries to evade liability by asserting that it did not have adequate notice of Fox News' claim.  TVEyes Opp. Br. 78.  Its argument fails for two reasons.  **First**, Fox News' complaint contains numerous allegations addressing the misuse of its distribution system by TVEyes, Compl. ¶¶ 20–23, 73, which clearly satisfy "the liberal pleading standards of Rule 8(a)."  *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) (internal quotation marks omitted).  **Second**, TVEyes had ample opportunity to discover the bases of Fox News' misappropriation claim during discovery.  It served a Rule 30(b)(6) deposition notice on Fox News and a contention interrogatory, both of which included topics seeking the factual bases for Fox News' claim.  As discussed above, however, before Fox News' interrogatory response was due, TVEyes requested—over Fox News' objections—that this Court rule that the parties not answer contention interrogatories, resulting in a court conference during with the parties and the Court agreed that this case should proceed to summary judgment.  *See supra* 26 n.23.  Even though it was aware that Fox News would move for summary judgment on this claim, TVEyes did not ask for additional discovery on the claim.  Thus, it would be patently unfair to permit TVEyes now to object to Fox News' claim on the basis that it had no notice of Fox News' claim.

████████████████████████████████████████████████████████████████

████████. *See* Cronin Decl. ¶ 8.  ***Third***, Fox News submitted a declaration from Elizabeth

Ashton, Executive Interviews' Global Head of Sales and Marketing, ████████████████

████████████████████████████████████████████.[47]  *See* Ashton Decl. ¶¶ 24–35;

FX SUF ¶ 259 (BGC Partners "ha[d] been told by TVEyes (and [are] still being told)" that

TVEyes "ha[s] (and ha[s] had) all the necessary agreements in place with the broadcasters to

legitimate this practice").  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  FX SUF ¶ 248 (citing Ashton Decl. ¶

27, Ex. 31; emphasis added).  In other words, Mr. Mellor gave the misimpression that TVEyes

has "agreements" with content owners to use their content on TVEyes' system—not that TVEyes

believes its use is fair use or otherwise permissible under the law, as TVEyes now argues.  It is

---

[47]  In the face of this straightforward evidence of consumer confusion, TVEyes makes the conclusory statement that the declarations of Ms. Cronin and Ms. Ashton are self-serving and insufficient to establish confusion. TVEyes Opp. Br. 81.  Tellingly, TVEyes cites to nothing in its brief to refute the facts put forth in these declarations.  Further, as described above, TVEyes "may not rest upon mere conclusory . . . denials" in its opposition to Fox News' motion for summary judgment and, thus, TVEyes has failed to meet its burden.  *See supra* 61 n.42 (quoting *SEC*, 585 F.2d at 33).  This is just the kind of conclusory non-rebuttal that the *Celotex* decision and its progeny prohibits.

TVEyes' argument that Ms. Ashton's statements in her declaration about ████████████████
████████ are hearsay fails because they fall within well-established hearsay exceptions and thus are admissible.  TVEyes' statements are admissible as party admissions, Fed. R. Evid. 802(d), and ████████ ████████ are not being offered for the truth of the matter asserted—indeed, they could not be, as TVEyes does not have the necessary agreements in place—but rather to evidence TVEyes' bad faith in the representations it made to consumers.  Fed. R. Evid. 801(c)(2); *see Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (finding evidence of confusion in trademark infringement action not to be hearsay as it was not offered for the truth of the matter asserted; similarly, here, statements that TVEyes' use of Fox News' content is licensed clearly are not being offered for the truth of the matter asserted, but rather to show consumer confusion); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 188 (S.D.N.Y. 2008) (finding that "most of the instances of consumer confusion . . . presented are either not being offered for the truth of the matter asserted or fit within a hearsay exception, and thus are admissible hearsay").

Furthermore, Fox News' evidence of consumer confusion is not *de minimis*.  In addition to the declarations of Ms. Cronin and Ms. Ashton, Fox News has shown that TVEyes' entire system is deceptive.  Not only does TVEyes license some of the content on its cite, FX SUF ¶¶ 238-45, but also it places no disclaimer or other indication on the cite alerting consumers to material that is not licensed or otherwise authorized.  *Id.* ¶ 256.  As in *Getty*, consumers "have no way of knowing the truth," 878 F.2d at 656, and almost certainly assume the existence of a license, sponsorship, or other affiliation between Fox News and TVEyes.

illogical to expect TVEyes' subscribers to understand TVEyes' use of the word "necessary" to mean that TVEyes does not have such agreements. If TVEyes wanted to be straightforward with its customers, it simply should have said that it does not have agreements for all of the content on its system and that it is relying on fair use. TVEyes clearly is being evasive.

*Fourth*, the fact that TVEyes has licenses with some content owners █████████████ ██████████████████████████████████████████████████████████████████████ █████████████████████ to use their content on its system, FX SUF ¶¶ 238–45, bolsters Fox News' argument that subscribers mistakenly believe that TVEyes has a license for all of the content on its system (including Fox News' content). Indeed, it is industry practice to license services like TVEyes, *id*. ¶¶ 249–50, and Mr. Mellor's statement that "[i]t is certainly not the practice of TVEyes to operate without any necessary agreement being in place" unquestionably gives the misimpression that TVEyes indeed ██ licenses for all of the content on its system (including Fox News' content). *Id*. ¶ 248.

*Fifth*, "the Second Circuit has repeatedly recognized that evidence that a defendant deliberately engaged in a deceptive commercial practice raises a presumption of consumer confusion." *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) (internal quotation marks omitted). As discussed above, TVEyes engages in deceptive practices by crafting its website and service in a way that suggests they have a license, FX SUF ¶ 255–56, and by making misleading statements to consumers that suggest they have licenses to use the content on their site, and that such content is licensed for intranet and other commercial uses. *Id*. ¶¶ 248, 257–59 As it has failed to submit anything evidencing an absence of consumer confusion (save the self-serving declaration of its CEO discussed below), TVEyes has failed to rebut this presumption.

As a result of TVEyes' deception, companies that perhaps would not wish to use

TVEyes' service if they knew it were not licensed, have nevertheless turned to TVEyes for Fox

News' content, rather than to Fox News or its licensees.  *Id.* ¶¶ 171, 257–59, 269; *Eyal R.D.*

*Corp. v. Jewelex N.Y. Ltd.,* 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) (Hellerstein, J.) (stating

claim can be established by showing "efforts of a salesman or a company, by words or deeds, to

deceive consumers into believing that accused merchandise is something else").  Thus, as a result

of TVEyes' misrepresentations, it has been able to compete unfairly with Fox News and siphon

off potential customers.

Finally, there is evidence that TVEyes has acted in bad faith, which satisfies the final

element of Fox News' unfair competition claim.  TVEyes' conduct contradicts its own stated

policy and the practices of other clipping services that permission is needed from content owners

to run this type of business.  *Id*. ¶¶ 238–50.  TVEyes also refused to comply with Fox News'

demands to cease and desist (even though it represented that it would),[48] and highlighted the

availability of FNC and FBN in order to induce more subscribers to sign up.  *Id.* ¶¶ 213–15, 251–

54.  The foregoing is ample evidence of TVEyes' bad faith conduct and supports Fox News'

claim for unfair competition.  *See Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41, 2014

WL 1856471, at *15 (S.D.N.Y. May 8, 2014) (granting summary judgment on misappropriation

as bad faith existed due to defendant's failure to comply with cease and desist letters and attempt

to capitalize on the benefits of the plaintiff's intellectual property rights); *Triboro Quilt Mfg.*

*Corp. v. Luve LLC*, No. 10 Civ. 3604, 2014 WL 1508606, at *9 (S.D.N.Y. Mar. 18, 2014)

(finding inference of bad faith in the misappropriation context where defendant used plaintiff's

---

[48]   TVEyes argues that its decision not to comply with Fox News' demand letter does not evidence bad faith, as it
had a reasonable belief that it was not infringing under the principles of fair use.  TVEyes Opp. Br. 82.  Its cited
case, however, merely stands for the proposition that failure to comply with a cease and desist letter <u>alone</u> does
not constitute bad faith.  *Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharm., Inc.*, No. 05 Civ. 2674, 2007 WL
1988737, at *11 (E.D.N.Y. July 5, 2007).  Here, in stark contrast to the factual situation in *Hi-Tech*, the
evidence shows that TVEyes intentionally encouraged consumer misperception that its content was licensed by
content owners.  Furthermore, unlike in *Hi-Tech*, here TVEyes represented to Fox News that it would cease
using its content but did not follow through.  FX SUF ¶ 254.  Thus, *Hi-Tech* is inapposite.

designs "to generate interest" in competing product).

* * *

In a last-ditch effort to deny the obvious, TVEyes states that "[t]here is nothing about the presentation of [its] service that suggests a business affiliation with Fox."  TVEyes' Opp. Br. 81. The only evidence that it cites, however, is the URL of TVEyes' website and two conclusory, unsupported statements from its CEO's declarations.[49]  Regarding TVEyes' website, as stated above, TVEyes' service and website are before this Court, and their confusing nature speaks for itself.  Regarding Mr. Ives' assertions in his declarations, such entirely self-serving statements should not be credited on summary judgment.  *See supra* 61 n.42.

In addition, TVEyes argues that Fox News' claim fails because it did not introduce survey evidence.   TVEyes Opp. Br. 81.  However, <u>survey evidence is not required to establish a claim for unfair competition</u>.  *See Getty*, 878 F.2d at 656 (upholding judgment for plaintiff in state-law unfair competition claim, and finding that no survey evidence was necessary because "[t]he jury was entitled to use its common sense to reason that purchasers . . ., who would have no way of knowing the truth, were certainly deceived by and unaware of the substitution"; here, consumers viewing TVEyes' service would no more be able to see the existence of a license to use Fox News' (or other content owners) content than they would be able to see the origin of gasoline).[50]  Moreover, <u>actual confusion is not required where there is a high likelihood of</u>

---

[49]   For instance, Mr. Ives states that he "instructed [his] staff to explain, <u>if they were ever asked</u>, that TVEyes operates without the express permission of <u>many of the broadcasters</u>."  Ives 2d Decl. ¶ 22 (emphasis added). Notably, TVEyes cited no documentary evidence to support Mr. Ives' claim that he instructed his staff to do this.  Moreover, even accepting Mr. Ives unlikely statement as true, TVEyes' employees only were instructed to tell customers that the content was not licensed <u>when they were expressly asked</u>, which does not account for those that did not ask but simply assumed that TVEyes was licensed (as Ms. Cronin did).  Given the deceptive nature of TVEyes' service, without any sort of disclaimer, customers would have had little reason to make such a pointed inquiry.

[50]   TVEyes' reference to Fox News' lack of survey evidence is disingenuous as it previously represented to this Court that expert reports (such as experts conducting consumer confusion surveys) were unnecessary.  *See* Simmons Decl. Ex. 71 (Discovery Hr'g Tr. 32:12–15).  It cannot now object that Fox News has not provided a sufficient sampling of confusion.

confusion.  *See, e.g.*, *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1100-

01 (2d Cir. 1969) (finding "little or no evidence of actual confusion" to be "of no significance"

where, as here, there is great likelihood of confusion).

      Finally, TVEyes makes the baseless argument that Fox News has failed to prove that it

acted in bad faith because "the only relevant intent is the intent to confuse," and it has not

introduced evidence that TVEyes intended to confuse the public.  TVEyes Opp. Br. 82.  First, as

shown by the foregoing, bad faith may be shown by more than just an intent to confuse.  *See*

*Microban*, 2014 WL 1856471, at \*15; *Triboro*, 2014 WL 1508606, at \*9 (finding inference of

bad faith in the misappropriation context where defendant used plaintiff's designs "to generate

interest" in competing product).  Moreover, even if intent to deceive were the only relevant

intent with respect to bad faith, as described above, Fox News has introduced ample evidence of

TVEyes' intent to deceive.  FX SUF ¶¶ 255–59; *see supra* 64.  The fact that TVEyes attributes

the source of any content it redistributes, TVEyes Opp. Br. 82, is irrelevant, as Fox News' claim

is that TVEyes has deceived customers into thinking its content is licensed or otherwise

authorized, not that it was created by TVEyes.  Compl. ¶ 74; *Lone Wolf McQuade Assocs. v.*

*CBS Inc.*, 961 F. Supp. 587, 599 (S.D.N.Y. 1997) (allegation that defendants conduct was "likely

to cause confusion or mistake, or to deceive consumers into thinking that [defendants' works] are

sponsored, licensed or otherwise authorized by, or affiliated, connected other otherwise

associated with the plaintiff. . ." stated unfair competition claim); *Pebble Beach Co. v. Tour 18 I,*

*Ltd.*, 942 F. Supp. 1513, 1547, 1554 (S.D. Tex. 1996) *aff'd as modified*,  155 F.3d 526 (5th Cir.

1998) (finding evidence that defendants had "sought and received permission to copy plaintiff's

[product] and use plaintiff's name on the copies" established unfair competition claim).

### B.    TVEyes' Preemption Defense Fails

      TVEyes' claim that Fox News' misappropriation defense is preempted by the Copyright

Act fails.  In order for TVEyes to prevail on its preemption defense, TVEyes has the burden of

establishing that <u>both</u> "(i) the work at issue come[s] within the subject matter of copyright <u>and</u>

(ii) the right being asserted is equivalent to any of the exclusive rights within the general scope

of copyright."  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429

(2d Cir. 2012) (emphasis added).  TVEyes cannot meet this burden.

1. <u>Misappropriation of the Results of Fox News' Labor, Skill and
   Expenditures Is Not Preempted by the Copyright Act</u>

TVEyes' argument that Fox News' claim based on the misappropriation of its labor, skill

and expenditures is predicated on its stubborn insistence that Fox News' claim is based on

misappropriation of copyrighted content or "hot news" (despite its acknowledgement that Fox

News has said that is not the basis of its claim), and thus falls within the general scope of

copyright.[51]  TVEyes Opp. Br. 78–80.  As discussed above, however, Fox News' claim is based

not on TVEyes' copying of its content, but rather on its misappropriation of the distribution

system that Fox News painstakingly negotiated and constructed in order to disseminate news and

information to the public quickly, which is not protected by copyright law but can be the subject

of a misappropriation claim.  17 U.S.C. § 102(b); Nimmer on Copyright § 1.01 (explaining that

works not within the meaning of § 102 are not preempted, even if the state-created rights therein

are equivalent to copyright); *see supra 61*; *Demetriades v. Kaufmann*, 698 F. Supp. 521, 528

(S.D.N.Y. 1988) (finding no preemption of misappropriation claim based on moldings not

protected by copyright); *see also S&P*, 683 F.2d at 710 (affirming preliminary injunction based

on misappropriation of index).

Tellingly, TVEyes does not (and cannot) dispute this well-established principle.  Indeed,

<u>none</u> of the cases it cites to support its defense involve distribution systems like the one at issue

---

[51]   To justify its straw man argument, TVEyes relies on its absurd argument that Fox News had not pleaded
adequately that its distribution system formed the basis of its misappropriation, which Fox News addressed
above.  *See supra* 64 n.46.

here or other types of materials outside the realm of copyright. Rather, they all deal with claims based on copying content. *See, e.g.*, *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) (computer software); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (books); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 919 (2d Cir. 1980) (cartoon characters); *Eyal*, 784 F. Supp. 2d at 447 (jewelry designs).

### 2. Unfair Competition Based on TVEyes' Consumer Deception Is Not Preempted by the Copyright Act

Regarding Fox News' claim for unfair competition based on TVEyes' consumer deception, TVEyes argues that it is preempted because consumer deception or confusion does not constitute an extra element. This argument contradicts established law in this circuit.[52] *See Samara Bros. Inc. v. Wal-Mart Stores,* 165 F.3d 120 (2d Cir. 1998) (finding "actual confusion" to constitute extra element); *Lone Wolf*, 961 F. Supp. at 599 (finding unfair competition claim alleging defendants' conduct was "likely to cause confusion or mistake, or to deceive consumers into thinking that [defendants' works] are sponsored, licensed or otherwise authorized by, or affiliated, connected other otherwise associated with the plaintiff. . ." not to be preempted by the Copyright Act); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, No. 96 Civ. 1103, 1996 WL 724734, at *2–3 (S.D.N.Y. Dec. 17, 1996) (finding plaintiff's unfair competition claim based on "passing off" not to be preempted, and noting that "[t]he Second Circuit has held that passing off

---

[52]     None of TVEyes' cited cases support its claim that Fox News' unfair competition claim based on consumer deception is preempted because the consumer deception arises out of the defendant's unauthorized copying.  In *Walker v. Time Life Films, Inc.*, the court found an unfair competition claim based on mere copying to be preempted, but it did not consider a claim based on consumer deception.  784 F.2d 44, 53 (2d Cir. 1986).  TVEyes' reliance on *Eyal* is even more misplaced.  In *Eyal*, this Court dismissed the "conclusory" unfair competition claim based on the copying of jewelry designs as preempted, but made clear that a claim based on "the efforts of a salesman or a company, by words or deeds, to deceive consumers into believing that accused merchandise is something else . . . might not be preempted because it would involve allegations beyond the scope of the Copyright Act."  784 F. Supp. 2d at 447.  Such clear deception is precisely what is at issue in this case; thus, Fox News' claim is not preempted.  TVEyes' reliance on *Nash* also is misplaced as that court was discussing a "hot news" misappropriation claim under Illinois (not New York) law and simply held that such a claim did not require a showing of consumer deception.  704 F. Supp. at 834–35.  Finally, TVEyes' remaining cases deal with reverse passing off, which is not at issue here as Fox News is not asserting that TVEyes misrepresented Fox News' works as its own.  *See* Fox News Opp. Br. 56–57, 57 n.30.

claims are not preempted by the Copyright Act because they involve an element of misrepresentation or deception which is not an element of copyright claims"); NIMMER ON COPYRIGHT § 1.01 [B][1][e] ("Similarly, crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement.  Thus, there is no pre-emption of . . . the state law of unfair competition of the 'passing off' variety.").

Accordingly, TVEyes' preemption defense fails.

## CONCLUSION

For the foregoing reasons, Fox News respectfully requests that its motion for summary judgment be granted in its entirety.

Dated:  New York, New York
      August 7, 2014

/s/ Dale M. Cendali
Dale M. Cendali
Johanna Schmitt
Joshua L. Simmons
Felicity Kohn
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
joshua.simmons@kirkland.com
felicity.kohn@kirkland.com

Attorneys for Plaintiff
Fox News Network, LLC