**HIGHLY CONFIDENTIAL**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOX NEWS NETWORK, LLC,

              Plaintiff,

      - against -

TVEYES, INC.,

              Defendant.

Case No.  13-CV-5315 (AKH)

 

**DEFENDANT TVEYES' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND .......................................................................... 1

I.    ABOUT TVEYES ............................................................................... 2

    A.    Overview of TVEyes' Service .............................................. 2

    B.    TVEyes' Clients ................................................................... 3

    C.    TVEyes' Features ................................................................. 4

        1.    Searching for Word Mentions .................................. 5

        2.    Viewing Snippets in Response to Searches ............... 6

        3.    Other Methods of Searching ..................................... 8

        4.    How Search Results Are Generated ........................... 8

    D.    How TVEyes' Customers Use TVEyes ............................... 9

        1.    Subjects of Searches ................................................. 9

        2.    Methods of Searches ............................................... 10

        3.    Length of Snippets Viewed ..................................... 10

    E.    The Benefits of TVEyes ................................................... 10

    F.    Fox's Inaccurate Claims About TVEyes' Service .............. 12

        1.    TVEyes Cannot Be Used to Watch "Live" TV ......... 12

        2.    TVEyes Is Not Marketed as a Substitute for Watching TV ...... 13

        3.    TVEyes Places Multiple Restrictions on Clients' Use of Snippets ...... 14

II.    ABOUT FOX ................................................................................... 15

    A.    The Business of Fox News ................................................ 15

        1.    Fox's Websites ....................................................... 15

        2.    Fox's Clip-Licensing Activities .............................. 17

        3.    Fox Does Not Offer Media-Monitoring Services ...... 18

III.    THE WORKS-IN-SUIT ................................................................... 19

ARGUMENT .............................................................................................. 21

I.    LEGAL STANDARD ....................................................................... 21

II.    TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107 ...... 22

    A.    The Nature and Character of TVEyes' Use of the Works-in-Suit Is Consistent With Fair Use ...... 27

        1.    TVEyes' Creation of a Comprehensive, Searchable Database of TV Content Is Highly Transformative ... 28

        2.    TVEyes' Use of the Works-in-Suit Serve a Greater Public Interest ...... 31

        3.    TVEyes' For-Profit Status Does Not Weigh Against Fair Use ...... 32

|  | 4. | Fox Offers No Evidence of Bad Faith | 35 |

| B. | The Works-in-Suit Are Factual in Nature and Were Previously Published | 37 |
| C. | Copying the Entirety of the Works Was Necessary to Create a Comprehensive, Text-Searchable Index | 39 |
| D. | TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit | 42 |

|  | 1. | TVEyes Does Not Harm the Original Market for the Works-in-Suit | 42 |
|  | 2. | TVEyes Does Not Harm the Derivative Market for the Works-in-Suit | 46 |

|  |  | a. | TVEyes Does Not Affect the Market for Public Performances Licenses for the Works-in-Suit | 46 |
|  |  | b. | TVEyes Does Not Deprive Fox of Revenue From Use of the Works-in-Suit Online | 49 |
|  |  | c. | Lost Licenses to Media Monitoring Services Are Not Legally Cognizable Bases of Market Harm | 55 |

|  | 3. | There Is No Possibility of "Similar Widespread Use," But Even If There Were, It Would Not Harm Fox | 56 |
|  | 4. | Consideration of Public Interests Greatly Favors TVEyes | 58 |

| III. | FOX HAS NOT ESTABLISHED THAT TVEYES IS LIABLE FOR WILLFUL COPYRIGHT INFRINGEMENT | 61 |
| IV. | FOX'S "HOT NEWS" CLAIM IS BOTH PREEMPTED AND MERITLESS | 63 |
| A. | Fox's "Hot News" Claim Is Preempted by the Copyright Act | 63 |

|  | 1. | Fox Has Not Identified Any Particular Piece of Exclusive, Time-Sensitive "Hot News" Misappropriated by TVEyes That It Generated at Significant Cost and Expense | 65 |
|  | 2. | TVEyes Does Not "Free-Ride" on Fox's Efforts Because It Attributes All Fox Content to Fox | 70 |
|  | 3. | TVEyes Is Not a Threat to the Very Existence of Fox | 73 |
|  | 4. | TVEyes and Fox Do Not "Directly" Compete | 74 |
| B. | Fox's "Hot News" Claim Is Preempted by the Copyright Act | 76 |

| V. | FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS | 76 |
| A. | Fox's "Direct Competition" Misappropriation Claim Is Preempted by the Copyright Act | 77 |
| B. | Fox Has Failed To Prove "Direct Competition" Misappropriation on the Merits | 80 |

| CONCLUSION | | 83 |

HIGHLY CONFIDENTIAL

## TABLE OF AUTHORITIES

**Page**

### Cases

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
447 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................................... 82

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009) ..............................................................*passim*

*Am Broadcasting Cos. v. Aereo, Inc.,*
134 S. Ct. 2498 (2014) ......................................................................... 62

*Am. Geophysical Union v. Texaco Inc.,*
60 F.3d 913 (2d Cir. 1994) .................................................................... 34

*Am. Int'l Group, Inc. v. London Am. Int'l Corp.,*
664 F.2d 348 (2d Cir. 1981) .................................................................. 21

*Ambac Assur. Corp. v. Adelanto Pub. Utility Auth.,*
2014 WL 2893306 (S.D.N.Y. June 26, 2014) ........................................ 48

*Arica Inst., Inc. v. Palmer,*
970 F.2d 1067 (2d Cir. 1992) ................................................................ 39

*Associated Press v. Meltwater U.S. Holdings, Inc.,*
931 F. Supp. 2d 537 (S.D.N.Y. 2013) ....................................... 14, 25, 26

*Authors Guild, Inc. v. Google Inc.,*
954 F. Supp. 2d 282 (S.D.N.Y. 2013) ...............................................*passim*

*Authors Guild, Inc. v. HathiTrust,*
--- F.3d ---, 2014 WL 2576342 (2d Cir. June 10, 2014)...................*passim*

*BanxCorp v. Costco Wholesale Corp.,*
723 F. Supp. 2d 596 (S.D.N.Y. 2010) ................................................... 71

*Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.,*
650 F.3d 876 (2d Cir. 2011)............................................................*passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006)............................................................*passim*

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006)................................................... 23, 35, 36

*Bouchat v. Baltimore Ravens Ltd. P'ship,*
737 F.3d 932 (4th Cir. 2013) .......................................................... 35, 36

*Buttner v. R.D. Palmer Enterprises, Inc.,*
2013 WL 6196560 (N.D.N.Y. Nov. 27, 2013) ....................................... 80

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,*
  753 F.2d 14 (2d  Cir. 1985) ............................................................................. 81

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) .................................................................................*passim*

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  262 F. Supp. 2d 204 (S.D.N.Y. 2003) ............................................................ 68

*Cariou v. Prince,*
  714 F.3d 694 (2d Cir. 2013) ...................................................................... 33, 37

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,*
  150 F.3d 132 (2d Cir. 1998) .............................................................. 22, 42, 58

*Computer Assocs. Int'l v. Altai, Inc.,*
  982 F.2d 693 (2d Cir. 1992) .......................................................................... 78

*Consumers Union of United States, Inc. v. Gen. Signal Corp.,*
  724 F.2d 1044 (2d Cir. 1983) ........................................................................ 32

*In re Dana Corp.,*
  574 F.3d 129 (2d Cir. 2009) .......................................................................... 21

*Donnelly v. Greenburgh Cent. School. Dist. No. 7,*
  691 F.3d 134 (2d Cir. 2012) .......................................................................... 21

*Durham Indus., Inc. v. Tomy Corp.,*
  630  F.2d 905 (2d Cir. 1980) .................................................................... 78, 79

*Eldred v. Ashcroft,*
  537 U.S. 186 (2003) ...................................................................................... 38

*Eyal R.D. Corp. v. Jewelex New York Ltd.,*
  784 F. Supp. 2d 441 (S.D.N.Y. 2011) ........................................................ 79, 80

*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.,*
  499 U.S. 340 ................................................................................ 26, 38, 39, 60

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.,*
  808 F.2d 204 (2d Cir. 1986) ...................................................................... 68, 77

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
  111 F.3d 993 (2d Cir. 1997) .......................................................................... 82

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.,*
  716 F.3d 302 (2d Cir. 2013) .......................................................................... 22

*Harper & Row Pubs. Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) .................................................................................. 38, 39

*Hi-Tech Pharm. Co. v. Hi-Tech Pharm., Inc.,*
  2007 WL 1988737 (E.D.N.Y. July 5, 2007) ............................................... 82, 83

**HIGHLY CONFIDENTIAL**

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ................................................................. 24, 39, 62

*International News Service v. Associated Press*,
    248 U.S. 215 (1918) ..............................................................................*passim*

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth Inc.*,
    58 F.3d 27 (2d Cir. 1995) ...................................................................... 80

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2002) ........................................................ 23, 29, 40, 62

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) .................................................... 36

*Levine v. Landy*,
    832 F. Supp. 2d 176 (N.D.N.Y. 2011)..................................................... 79

*Los Angeles News Serv. v. Reuters Tele. Int'l, Ltd.*,
    149 F.3d 987 (9th Cir. 1998) ................................................................ 24

*Los Angeles News Serv. v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) ................................................................ 24

*Maxtone-Graham v. Burtchaell*,
    803 F.2d 1253 (2d Cir. 1986) ............................................................. 39, 49

*Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*,
    101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950) ............................................... 78, 80

*Morris v. Guetta*,
    2013 WL 440127 (C.D. Cal. Feb. 4, 2013)............................................ 35

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir.)....................................................................... 27, 33, 36

*Nash v. CBS, Inc.*,
    704 F. Supp. 823 (N.D. Ill. 1989) ......................................................... 80

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) ...............................................................*passim*

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
    904 F.2d 152 (2d Cir. 1990) ................................................................ 37

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) .................................................................. 24

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001)................................................................. 81

*Oracle Am., Inc. v. Google Inc.*,
    750 F.3d 1339 (Fed. Cir. 2014)............................................................ 21

*Overton v. N.Y. State Div. of Military & Naval Affairs,*
  373 F.3d 83 (2d Cir. 2004) ....................................................................... 21

*Pac. & S. Co. v. Duncan,*
  744 F.2d 1490 (11th Cir. 1984) ......................................................... 24, 25

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ..................................................... *passim*

*Pollstar v. Gigmania Ltd.,*
  2000 WL 34016436 (E.D. Cal. Sep. 1, 2000) ........................................ 71

*Reeves v. Sanderson Plumbing Prods., Inc.,*
  530 U.S. 133 (2000) .................................................................................. 21

*Ritani, LLC v. Aghjayan,*
  880 F. Supp. 2d 425 (S.D.N.Y. 2012) ..................................................... 66

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.,*
  894 F. Supp. 2d 288 (S.D.N.Y. 2012) ..................................................... 82

*Sega Enters. Ltd. v. Accolade, Inc.,*
  977 F.2d 1510 (9th Cir. 1992) ................................................................. 31

*In re Sept. 11 Litig.,*
  908 F. Supp. 2d 442 (S.D.N.Y. 2012) ..................................................... 21

*Silver v. Lavandeira,*
  2009 WL 513031 (S.D.N.Y. Feb. 26, 2009) ........................................... 67

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ............................................................. 38, 45, 51, 58

*Sparaco v. Lawler, Matusky, Skelly Eng'rs,*
  303 F.3d 460 (2d Cir. 2002) ................................................................... 38

*Stewart v. Abend,*
  495 U.S. 207 (1990) ................................................................................ 37

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,*
  861 F. Supp. 2d 336 (S.D.N.Y. 2012) ............................................... 35, 41

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,*
  2014 WL 2219162 (2d Cir. May 30, 2014) ................................... *passim*

*Taggart v. WMAQ Channel 5 Chicago,*
  2000 WL 1923322 (S.D. Ill. Oct. 30, 2000) ........................................... 38

*Terry v. Ashcroft,*
  336 F.3d 128 (2d Cir. 2003) ................................................................... 21

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,*
  342 F.3d 191 (3d Cir. 2003) ................................................................... 25

**HIGHLY CONFIDENTIAL**

*Walker v. Time Life Films, Inc.,*
   784 F.2d 44 (2d Cir. 1986) ............................................................... 77, 79

*Warren Publ'g Co. v. Spurlock,*
   645 F. Supp. 2d 402 (E.D. Pa. 2009) ...................................................... 36

*Weissman v. Freeman,*
   868 F.2d 1313 (2d Cir. 1989) ................................................................. 39

## **Statutes and Rules**

17 U.S.C. § 102 .................................................................................... 63

17 U.S.C. § 106(3) ............................................................................... 79

17 U.S.C. § 107 ................................................... 22, 23, 27, 33, 61, 62

17 U.S.C. § 107(3) ............................................................................... 39

17 U.S.C. § 107(4) ......................................................................... 42, 56

17 U.S.C. § 301(a) ............................................................................... 77

Fed. R. Civ. P. 56(d) ............................................................................. 2

Fed. R. Civ. P. 56.1 ........................................................................... 1, 2

U.S. Const. art. I, § 8, cl. 8 ........................................................... 22, 26

## **Other Authorities**

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ....... 22

**HIGHLY CONFIDENTIAL**

**PRELIMINARY STATEMENT**

In this action, Fox contends that TVEyes has infringed its copyrights in 19 news programs (the "Works-in-Suit" or "Works") by including them in a text-searchable database that TVEyes' clients use to conduct internal research. TVEyes' use of the Works is quintessentially fair. By capturing these otherwise ephemeral television programs (along with the other 27,000 hours of television broadcasts TVEyes captures every day) and making them text-searchable, TVEyes enables users to discover facts that would otherwise be impossible to know, such as how many times a particular word was mentioned across multiple television stations in a given week. This is exactly the type of innovation that copyright law aims to promote and the fair-use doctrine is designed to protect. And while TVEyes' technology may be groundbreaking, holding that TVEyes' use of the Works is fair would not be. *See*, *e.g.*, *Authors Guild, Inc. v. HathiTrust*, 2014 WL 2576342 (2d Cir. June 10, 2014) (copying of books to create text-searchable database was fair); *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013) (copying and providing snippets of books for text-searchable database was fair).

For the reasons set forth below, TVEyes respectfully requests that the Court deny Fox's motion for summary judgment in its entirety.

**FACTUAL BACKGROUND**

In its moving brief, TVEyes presented the Court with a detailed description of TVEyes' service, including: (1) TVEyes' clients; (2) TVEyes' research-oriented features; (3) the ways in which customers use TVEyes, including the topics, methods, and results of various searches; (4) the benefits TVEyes provides; and (5) metrics regarding the Works. (*See* TVEyes Br. at 3-19.)[1]  In addition, TVEyes'

---

[1]   The facts relied upon by TVEyes in its moving brief are set forth more fully in TVEyes' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated June

(*footnote continued*)

**HIGHLY CONFIDENTIAL**

moving brief includes a detailed walk-through of TVEyes' service, complete with screenshots.  (*Id.* at 7-16.)  The declarations of David Ives and David Seltzer (accompanied by a 21-page technical report), submitted with TVEyes' brief, provided further detail about TVEyes.

For the convenience of the Court, and for the sake of brevity, below TVEyes provides a summary of those materials, and corrects several of the factual misstatements presented in Fox's moving brief ("Fox Br.").[2]  TVEyes otherwise respectfully incorporates herein the facts presented in its earlier submissions.

## I.   ABOUT TVEYES

### A.   Overview of TVEyes' Service

TVEyes is a media-monitoring service that enables its clients to discover and locate mentions of particular words on almost every major television and radio broadcast in the United States.  (SUF ¶¶ 2-3.)  TVEyes uses proprietary technology to: (1) capture television and radio content from more than 1,400 channels, 24 hours a day, 7 days a week; (2) make that content text-searchable by keyword; and (3) allow customers to view snippets of the content in response to their queries.  (*Id.* ¶¶ 3, 13.)  Fundamentally, TVEyes is a tool, akin to a search engine, that makes it possible for users to sift through vast amounts of broadcast television content to locate particular information. (*Id.*  ¶¶ 2-4.)   Unlike a traditional search engine, however, which queries only content that already exists on the Internet, TVEyes captures and aggregates more than ***27,000 hours*** of content every day, broadcast

---

26, 2014 ("SUF"), and the Declarations of David Ives, David Seltzer, Jessica Rose, and Todd Anten, dated June 26, 2014.

[2]   All additional material facts not already referenced in TVEyes' motion are set forth in TVEyes' Response to Fox's Rule 56.1 Statement of Undisputed Facts and Counterstatement of Additional Facts, dated July 24, 2014 ("CSUF"), and the Second Declarations of David Ives (dated July 23, 2014), David Seltzer  (dated July 23, 2014), Jessica Rose (dated July 24, 2014), and Todd Anten (dated July 24, 2014).

HIGHLY CONFIDENTIAL

on over 1,400 television and radio stations, and quickly transforms it into a comprehensive, searchable database, to facilitate research. (*Id.* ¶¶ 13-15.) Without TVEyes (or a service like it), it would not be possible to efficiently search through and review the staggering amount of information broadcast every day on television. (*Id.* ¶ 14.)

### B.   TVEyes' Clients

TVEyes is a subscription-based service that is offered exclusively to businesses, organizations, and government bodies to facilitate their internal research and analysis of television content.  (SUF ¶¶ 4-5.)  Its clients include governmental bodies, Congressional committees, journalism organizations, armed services, political candidates, political organizations, non-profit corporations, for-profit corporations, media organizations, law enforcement offices, public and private schools, legal organizations, press relations organizations, and sports organizations. (*Id.* ¶¶ 10-11.)[3]  Most TVEyes subscribers pay a fee of $500 per month for access to TVEyes' service, although select subscribers, such as non-profits or journalists, may receive reduced rates.  (*Id.* ¶ 6.)  TVEyes does not offer subscriptions to individuals (except in connection with the operation of a business or political office), and the service is not intended for personal use.  (*Id.* ¶ 5.)  Subscribers are required to limit their use of video content obtained from TVEyes solely to internal research and analysis—a requirement that is stated in TVEyes' contract, on its website, and in its communications with subscribers.  (*Id.* ¶¶ 7-9.)

TVEyes' clients use the service in various ways to facilitate their research objectives.   For example, journalists use TVEyes to comment on and criticize broadcast news channels (including Fox), often by comparing and contrasting how

---

[3]   Lists of TVEyes' current and former clients are attached to the June 26, 2014 declaration of David Ives ("Ives Decl.") as Exhibits D & E.

HIGHLY CONFIDENTIAL

the major news networks cover particular news events.  (*Id.* ¶¶10-11, 53, 59-60.) Government officials and corporations use TVEyes to monitor the accuracy of facts reported by the media so they can make timely corrections when necessary  (*Id.* ¶¶10, 54, 57.)  Political campaigns use TVEyes to monitor political advertising and appearances of candidates in election years.  (*Id.* ¶¶ 10-11, 51.)  Financial firms use TVEyes to track and archive public statements made about securities by their employees for regulatory compliance.  (*Id.* ¶¶ 10-11, 48.)  The White House uses TVEyes to evaluate news stories and give feedback to the press corps, including Fox News.  (*Id.* ¶¶ 10-11, 56.)  Without TVEyes or a service akin to it, there would be no way to effectively accomplish these objectives.

### C.   TVEyes' Features

TVEyes functions much like a search engine for television content.  (SUF ¶¶ 3, 13-17.)   Unlike a conventional search engine, however, TVEyes does not "crawl" the Internet.  This is because the vast majority of television content is not posted to the Internet.  Rather, TVEyes captures and indexes the actual broadcasts of more than 1,400 television and radio stations, 24 hours a day, 365 days a year, as they are aired, and creates a comprehensive database of everything that was broadcast, exactly as it was broadcast.  (*Id.* ¶¶ 3, 13-16.)  In so doing, TVEyes offers a unique and important service by creating from scratch a text-searchable library of broadcast content ***that would otherwise not exist***, and making it searchable to subscribers for research and analysis.  (*Id.* ¶¶ 14-15.)

Using closed-captioned data and speech-to-text technology, TVEyes creates transcript "indexes" for every word spoken on a particular television station.  (*Id.* ¶ 16.)  When a user searches for a particular keyword, she will receive a list of results that includes: (1) a snippet of the transcript in which the keyword was used;

HIGHLY CONFIDENTIAL

and (2) the ability to watch a short clip of the television broadcast in which the word was used, beginning 14 seconds before the keyword was said.  (*Id.* ¶¶ 17-18.)

All videos, other than those specifically archived by users, are deleted from TVEyes servers 32 days after the broadcast was captured.  (*Id.* ¶ 19.)  As a result, TVEyes cannot be used to search or access content that is more than a month old.

### 1.  Searching for Word Mentions

TVEyes' clients can perform an unlimited number of search queries on its system.  (*Id.*  ¶ 20.)   Upon logging into the TVEyes website, hosted at http://www.tveyes.com, clients are first brought to the "Watchlist" page ("Watchlist Page") of TVEyes' Media Monitoring Suite ("MMS").  (*Id.* ¶ 21.):



**Watchlist Page**

From the Watchlist Page, clients can select the words or phrases that they wish to monitor on an ongoing basis ("Watch Terms"), without ever having to conduct

HIGHLY CONFIDENTIAL

another manual search for that word.  (*Id.* ¶¶ 21, 23)  There is no limit to the number of Watch Terms that can be monitored; indeed, some clients monitor hundreds of keywords and phrases simultaneously.  (*Id.* ¶ 22.)  The Watchlist Page provides the overall frequency of each Watch Term by Date.  (*Id.* ¶ 24.)  A user can also click "Add Advanced Terms" to create more complex Watch Terms.  (*Id.* ¶ 25.)  The Watchlist Page also allows users to:

- ***Run an instant "Google News" search*** for the Watch Term, allowing users to compare mentions of the Watch Term on the Internet with mentions of the Watch Term on television.  (*Id.* ¶ 26)

- ***Edit*** the Watch Term. (*Id.*)

- ***View various "Media Stats"*** for the Watch Term.  For example, at a user's request: (1) TVEyes generates a graphic representation of the number of times a Watch Term has been mentioned over a given time period—month, day, week, or custom range—as well as a comparison of the relative frequency of mentions of multiple Watch Terms; (2) TVEyes generates a "heatmap" of the geographic market share for each Watch Term over time, visually communicating the geographic location and frequency of mentions; and (3) generates a pie chart depicting the breakdown of broadcast stations on which the Watch Term was used over time.[4]  (*Id.* ¶¶ 26-27.)

- ***Set up an Email Alert*** for the Watch Term, which sends an email to the user whenever a Watch Term is mentioned.  The Email Alert received by the user contains a thumbnail image from the relevant portion of the broadcast and a link to a short video clip of the use on TVEyes.  Generally, a user will receive an Email Alert between ███████ ██████████████ after the Watch Term was mentioned. The Email Alert feature is the fastest way to learn that a Watch Term has been mentioned on the air. (*Id.* ¶¶ 26, 28-39.)

- ***Delete*** the Watch Term.  (*Id.* ¶ 26.)

### 2.    Viewing Snippets in Response to Searches

The Watchlist Page includes hyperlinked numbers under the "Mentions for Date" banner.  (*Id.* ¶ 30.)  When a user clicks a number, she is brought to a results

---

[4]    Screenshots and descriptions of the various "Media Stats" functions can be found in TVEyes' moving brief.  See Br. at 9-11 & Figures 2-4; *see also* Declaration of David Seltzer, dated June 26, 2014 ("Seltzer Decl.") at ¶¶ 10-15 & Figures 2-4.

HIGHLY CONFIDENTIAL

page (the "Results List Page"), where each mention of the Watch Term on that date is organized in reverse chronological order, with the Watch Term highlighted in a snippet of transcript text.  (*Id.*)  If the user clicks "Show Map" in the upper right on the Results List Page, a map is displayed presenting where the mention occurred and the relative number of mentions (by the size of the circle). (*Id.* ¶ 31.)

When the user clicks a thumbnail image on the Results List Page, she is brought to a "Transcript Page," where a video clip associated with that thumbnail begins to play automatically, accompanied by snippet of the transcript (with the Watch Term highlighted).  (*Id.* ¶ 32.)  The clip begins 14 seconds before the Watch Term mention, to provide the user with sufficient context while still closely tailoring the result to the user's research needs.  (*Id.*)



**Transcript Page**

In addition to watching the relevant clip, the user can access a wealth of information about the video excerpt, including: (1) the title of the program; (2) the precise date and time of the clip; (3) a transcript of the video, drawn from the closed caption feed for the content; (4) the name and location of the channel; (5) market viewership for the clip ███████████████████; and (6) the publicity value for the clip ███████████████. (*Id.*)  In addition, the user can save the clip; edit and download a shorter version of the clip; and email the clip or its transcript to others. (*Id.* ¶¶ 32-33.)  All of this is subject to the contractual limitation that the video snippet is to be used for the client's internal purposes only. (*Id.* ¶¶ 7-9.)

### 3.   <u>Other Methods of Searching</u>

In addition to Watch Terms, TVEyes allows users to run ad-hoc keyword search queries through its "Power Search" tool. (*Id.* ¶ 37.)  The results of a user's Power Search are displayed in a result list—with a thumbnail image and transcript excerpt—in reverse-chronological order. (*Id.*)  When the user clicks a thumbnail image, the user is brought to the clip's corresponding Transcript Page.

TVEyes also has a "Date and Time Search" feature, which allows users to play a video clip starting at a specific time on a specific television station, rather than entering a search term. (*Id.* ¶ 39.)  This tool is useful because sometimes closed-caption text contains spelling errors, or is otherwise entirely absent (as is sometimes the case with commercials, or where there is an error with the closed-caption capture). (*Id.*)  In such circumstances, Date and Time Search provides an alternate way to research precisely what was said on a particular channel, at a particular moment.

### 4.   <u>How Search Results Are Generated</u>

Clips offered by TVEyes in response to users' queries are generated by a mathematical algorithm.  Each clip automatically begins 14 seconds before the

**HIGHLY CONFIDENTIAL**

keyword is mentioned, to provide the user with sufficient context.   (*Id.* ¶ 18.) Beginning the clip only a few seconds before the keyword is uttered helps to ensure that TVEyes provides a targeted result that is closely tailored to the user's research needs and thus maximizes research efficiency.   (*Id.*)

The clips generated by TVEyes are responsive solely to the user's queries, and do not correlate to the beginning, end, or "heart" of any particular television program or segment, or to the headline or lede of any particular broadcast.   (*Id.* ¶ 40.)   TVEyes does not identity the "top" stories of the day, nor does it distinguish between important versus unimportant news, as what is "unimportant" to one client may be "important" to another. (*Id.*)   In other words, TVEyes' text-based search system is 100% content-neutral, correlating results solely to the chosen search term and nothing more.

### D.   How TVEyes' Customers Use TVEyes

#### 1.   Subjects of Searches

The subjects of searches on TVEyes vary widely, and are entirely selected by the user and her interest, without any prompting or suggestions by TVEyes.   The average TVEyes user monitors ▮ Watch Terms simultaneously, although some monitor hundreds of Watch Terms.   (*Id.* ¶ 62.)   For example, on January 13, 2014, among the most popular Watch Terms were: "state police," "Health Department," and "Special Olympics."   (*Id.* ¶ 63 )

In a typical month, less than ▮ of users' Watch Term hits result in a user playing the corresponding video clip.   (*Id.* ¶ 65.)   In other words, the overwhelming majority of TVEyes' service is used to discover the fact that a particular Watch Term was mentioned on the air, rather than to view a clip associated with that Watch Term.   (*Id.* ¶ 64.)

HIGHLY CONFIDENTIAL

### 2.    Methods of Searches

Keyword search functionality is the heart of TVEyes' service.  Most clips on TVEyes are discovered via the "Watch Terms" or "Power Search" functions.  (*Id.* ¶ 66.)  Less than ██ of the plays originate with the "Date and Time Search" feature.  (*Id.* ¶ 67.)

### 3.    Length of Snippets Viewed

TVEyes' users play the video clips they access for an average of ██ seconds, while the median play duration is 12 seconds.  (*Id.* ¶ 68.)  In addition, ██ of all video clips played on TVEyes are three minutes or shorter in length; ██ are two minutes or shorter; and ██ are one minute or shorter.  (*Id.* ¶ 69.)  While the maximum length that any particular clip can be played is ten minutes, less than ██ of clips are ever played to the maximum.  (*Id.* ¶ 70.)

User play statistics for FNC and FBN are similar:  Users play FNC clips for an average of ██ seconds and FBN clips for an average of ██ seconds.  (*Id.* ¶ 71.)  For FNC, ██ of video clips are played for three minutes or less; ██ are played for two minutes less; and ██ are played for one minute or less.  (*Id.*)  For FBN, ██ of clips are played for three minutes or less; ██ are played for two minutes or less; and ██ are played for one minute or less.  (*Id.*)

### E.    The Benefits of TVEyes

The benefits of TVEyes' service are immense.  TVEyes assembles from scratch a library of television-broadcast content that does not otherwise exist, and renders it text-searchable.  (*Id.* ¶¶ 15, 45.)  In so doing, TVEyes enables clients to discover, track and utilize what was said on television for multiple purposes having nothing to do with watching television.  Without TVEyes (or a service like it), there is no other way to sift through more than 27,000 hours of programming broadcast

HIGHLY CONFIDENTIAL

on television every day—most of which is not available online or anywhere else—to track and discover information.  (*Id.* ¶ 46.)

The various ways that TVEyes' clients use the system to conduct research and analysis demonstrate TVEyes' enormous public benefits, ranging from improving public safety to aiding law enforcement to enabling media oversight.  For example: (1) financial firms use TVEyes to track and archive public statements made by their analysts and commentators, to comply with legal requirements; (2)

(3) police departments use TVEyes to track television coverage of public safety messages across different stations and locations, and to and adjust outreach efforts accordingly; and (4) journalists use TVEyes to research, report on, compare and contrast, and criticize broadcast news coverage—*e.g.*, to research the frequency of mentions of certain words across stations, to critique one station for giving a particular story more or less coverage than its competitors.  (*Id.* ¶¶ 10-11, 48-58, 60.)  TVEyes and its users access broadcast content for purposes entirely different from those served by the underlying broadcasts themselves.  Clients use TVEyes to *monitor* the news, not to *watch* it.

11

HIGHLY CONFIDENTIAL



### F.    Fox's Inaccurate Claims About TVEyes' Service

Fox's brief contains a number of inaccurate statements about TVEyes' service. While TVEyes' responses to these inaccuracies are presented in its Response to Fox's Statement of Undisputed Facts, TVEyes addresses certain inaccuracies below that Fox appears to rely upon most.

### 1.    TVEyes Cannot Be Used to Watch "Live" TV

TVEyes service can be used to monitor, or keep watch over, live television broadcasts, 24/7 through the use of Watch Terms.  But TVEyes' service cannot be used to "watch live television," as Fox misleadingly uses the phrase.  (Fox Br. at 19.) This is because TVEyes only permits users to access snippets of video in response to search queries, which can be a maximum of 10 minutes in length (the average length of snippets accessed on TVEyes is ███ seconds) (Second Seltzer Decl. ¶¶ 3-11; Second Ives Decl. ¶¶ 3-9.)  In addition, there is a ████████████ delay before video content is even available on TVEyes' system for viewing.  To try to simulate the experience of watching television on TVEyes, a client would have to watch a snippet of video to its completion, and then run to locate the next portion of video

**HIGHLY CONFIDENTIAL**

content, and so on.  This would be a tedious, cumbersome process.  (Second Ives Decl. ¶ 3.)  Moreover, this process would only allow a user to cobble together snippets that were at least ███████████ old—a far cry from watching live television.

In any event, Fox's hypothesizing about what might, in theory, be done with TVEyes' service is irrelevant—***none*** of the Works were accessed in this manner (*see* Second Seltzer Decl. ¶ 5), nor has the service been used this way in the past to access Fox content.  (Second Seltzer Decl. ¶ 5.)

Fox also claims that clients can use TVEyes' "snapshot" feature to watch "live" TV.  This is wrong.  The "snapshot" displays on a single screen an array of ***still thumbnail images*** for each station that TVEyes is capturing, and each of these frozen images is ████████████ old.  (Second Seltzer Decl. ¶ 11.)  Thus, the snapshot feature cannot be used to "watch" any videos at all, let alone "live" television.  However, the snapshot feature is an excellent way to visually compare and contrast what is being broadcast across a number of television stations at once, something that cannot be accomplished by watching live television.  (*Id.*)

### 2.   TVEyes Is Not Marketed as a Substitute for Watching TV

TVEyes' service is not, and has never been, marketed as a replacement or substitute for watching television.  To the contrary, TVEyes is marketed as a media-monitoring service that allows users to monitor over 1,400 television and radio stations for word mentions, for the purpose of their business-related research and analysis.  *See*, *e.g.*, www.tveyes.com; (Simmons Decl. ¶ 50, Ex. 111 (TVEyes' two-page glossy handout).)  TVEyes has never promoted its service by stating that users will no longer need their own cable subscriptions, or that TVEyes eliminates the

need to visit content providers' own websites.[6]  (Second Ives Decl. ¶ 4.)  Further, almost all TVEyes clients are given a free 30-day trial account before they pay to subscribe to TVEyes' service, during which they have access to all features of the service.  TVEyes' clients are therefore able to determine exactly what the service does (and does not) do before they pay for a subscription.  (*Id.* ¶ 5.)

Fox seizes on the use of certain words and phrases in some of TVEyes' marketing documents, such "real-time" and "breaking news," and claims that TVEyes permits its clients to watch television in "real-time" or "live"  (*See*, *e.g.*, Fox Br. at 1, 3, 4, 25, 46, 48-50).  But none of these terms, when read in context, suggests that TVEyes can be used as a replacement for television.

### 3.   TVEyes Places Multiple Restrictions on Clients' Use of Snippets

Fox repeatedly asserts that TVEyes places "no restrictions" on client's use of video snippets obtained through the service.  (*See*, *e.g.*, Fox Br. at 3, 38.)  This is false.  TVEyes' contract with subscribers restricts their use of the video excerpts accessed through TVEyes to the client's internal use only, and clients are reminded of this restriction in their communications with TVEyes' staff, as well as on the TVEyes website every time they download a video snippet from the service. (SUF ¶¶ 7-9; Second Ives Decl. ¶ 17).  In addition, TVEyes has implemented technical safeguards which disable access to snippets hosted by TVEyes if they pass certain usage thresholds, preventing them from "going viral."  (Second Seltzer Decl. ¶¶ 14-17; Second Ives Decl. ¶ 19).

---

[6]   This is in stark contrast to cases where a defendant marketed its service as a direct replacement.  *See*, *e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 543 (S.D.N.Y. 2013) (defendant marketed service by telling customers its service "saves you time so you don't have to read the full article").

HIGHLY CONFIDENTIAL

## II.   ABOUT FOX

### A.   The Business of Fox News[7]

Fox owns and operates FNC and FBN, which are national cable channels. (SUF ¶¶ 1, 91.)  Fox content is broadcast on FNC and FBN, each of which telecasts content 24 hours a day, every day.  (*Id.* ¶ 91.) ███████████████████████



████████ (*Id.* ¶ 92; *see also* Wallace Decl. ¶ 45 (describing CNN and MSNBC as Fox's "primary" competitors); Villar Decl. ¶ 13 & Ex. 4.) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (SUF ¶ 94.; Carry Decl. ¶ 14 ████████████████████████████████████

#### 1.   Fox's Websites

Fox operates the websites associated with FNC and FBN, located at http://www.foxnews.com and http://www.foxbusiness.com, respectively (collectively, the "Fox Website"). (SUF ¶ 98.   Fox makes some, but not all, of the content previously broadcast on FNC and FBN available for viewing on the Fox Website. (SUF ¶ 101; Carry Decl. ¶¶ 10-11.) ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ (Carry ¶¶ 10-11; Misenti Decl. ¶ 13.)   In other words, the vast

---

[7]   As noted in the accompanying Rule 56(d) Declaration of Andrew H. Schapiro, TVEyes has not yet had the opportunity to take a 30(b)(6) deposition of Fox to ask it about, *inter alia*, its documents, licensing activities, revenues, websites, purported markets, or any other topic.  Thus, to the extent that the Court determines that these and other topics raised by Fox are relevant, TVEyes respectfully requests that the Court grant TVEyes additional discovery on these topics pursuant to Fed. R. Civ. P. 56(d).

**HIGHLY CONFIDENTIAL**

majority of Fox broadcasts are not made available on the Fox Website (or the websites of Fox's partners).

Moreover, Fox alone controls what content previously broadcast on FNC and FBN, if any, will be made available to the public via the Fox Website, and when, if ever, to make such content available. (SUF ¶¶ 99, 101). Fox admits that it employs a team of editors who carefully curate and excerpt Fox broadcasts before they are made available online (Misenti Decl. ¶ 7), and that the selection of clips to post is "a matter of editorial discretion." (Misenti Decl. ¶ 12; *see also* Second Rose Decl. ¶¶7-8, Exs. HHHH-KKKK) (newsworthy events that occurred on Fox broadcasts not posted to Fox Website). Further, Fox can—and does—restrict or disable access to content on the Fox Website, and may do so at any time, for any reason. (SUF ¶ 99.)

In addition, the video content that Fox chooses to make available on the Fox Website is materially different from what is broadcast on FNC and FBN. (*Id.* ¶¶ 111-113). For example, video clips accessible on the Fox Website do not contain a ticker graphic. (*Id.* ¶¶ 111-112.) On the original FBN broadcast there is a graphic that displays: (1) the time of the broadcast; (2) the station logo; (3) information about financial markets, including the Dow Jones Industrial Average and stock prices; and (4) a running ticker of financial news. (*Id.* ¶ 112.) On the original FNC broadcast, there is a graphic that displays: (1) the station logo; and (2) a running ticker of the latest news. (*Id.* ¶ 112.) In addition, Fox broadcast content is sometimes "corrected" on the Fox Website, and the original "as aired" version is not available on the Fox Website. (*Id.* ¶ 106).

Fox also restricts how the public may use the content available on the Fox Website through its Terms of Use. (*Id.* ¶ 114; Simmons Decl. ¶12, Ex. 73 (Terms of Use).). Pursuant to these Terms, visitors to the Fox Website may access video content for "**personal** use only and [the content] may not be used for **commercial** purposes." (*Id.* (emphasis added)) The Fox Website's Terms of Use also prohibit

**HIGHLY CONFIDENTIAL**

users from downloading content from the site.  (*Id.*)  That the Fox Website is intended for personal entertainment (and not targeted business research) is reflected in how visitors use the site:



.  (Villar Decl. ¶¶ 23-24 & Exs. 8-9).

By contrast, clients use TVEyes to conduct targeted research for business purposes:  TVEyes is overwhelmingly used to discover the fact that a particular Watch Term was mentioned on the air (only ▮ of users' Watch Term hits result in video plays) and when video snippets are accessed, they are viewed briefly, for a mean of ▮ seconds and a median of ▮ seconds.  (Seltzer Decl. ¶¶ 35, 38).

Fox claims to generate revenue from the Fox Website through advertisements placed before or near video clips and from the placement of Fox-owned content on the Yahoo!, Hulu.com and YouTube websites.  There is no evidence, however, that: (1) any revenue earned by Fox from advertising on the Fox Website or the placement of content on the Yahoo!, Hulu, and/or YouTube websites, is directly attributable to the display of the 19 Works on these sites; or (2) any TVEyes client would otherwise have gone to the Fox Website, Yahoo!, Hulu, or YouTube to search for the same snippets they viewed on TVEyes if the service did not exist..  (SUF ¶ 116; Second Ives Decl.¶¶ 14-16).

### 2.    Fox's Clip-Licensing Activities

Both directly and through its exclusive licensee ITN Source, Inc., Fox licenses content previously aired on FNC and FBN to third parties for use in connection with the production of television shows, movies, advertisements, video games, film festivals, e-books and other projects through which the Fox-owned work will be publicly performed and/or displayed.  (*Id.* ¶ 115.)  By contrast, video snippets

**HIGHLY CONFIDENTIAL**

accessed by clients through TVEyes service cannot be used for any of these purposes. (SUF ¶¶ 7-9; Second Ives. Decl. ¶¶ 17-19).  In other words, these markets for clips are mutually exclusive:  Fox provides clips, and the appropriate licenses, **when a license from Fox is legally required**, such as for use in a television show, in contrast, TVEyes supplies clips to third parties for use **when a license from Fox is not required,** such as for a client's internal use, or when a client wants access to Fox content to criticize Fox.



### 3.     <u>Fox Does Not Offer Media-Monitoring Services</u>

Fox does not offer media-monitoring services.  (*Id.* ¶¶ 93, 125).  It does not capture and index the complete broadcasts of over 1,400 television and radio channels worldwide, exactly as they aired, to create complete and accurate database

of content that is text-searchable by keyword.  (*Id.*)   Fox does not provide a web-based software platform for monitoring and accessing snippets of previously aired content for internal use.  (*Id.*)   Fox does not provide data about the frequency of the keyword, the geographic location of where it was mentioned, or other data analytics tools.   Fox does not offer an e-mail alert-service that sends notification moments after a keyword of interest is mentioned on the air.  (*Id.* ¶¶ 93, 102, 125.)  Fox does not even provide access on the Fox Website, or through its online content partners to all the content aired on FBN or FNC— ███████  ██████  █████████████
███████████████████████████████████████  ██████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████  Fox does not permit the public to use the content it does post for commercial, business or non-personal purposes.  (SUF ¶ 114.)  ███████████████
███████████████████████████████████████████████████████████████████

(*Id.* ¶ 117).

## III.   <u>THE WORKS-IN-SUIT</u>

Fox claims that TVEyes has infringed its rights under federal copyright law in 19 individual hour-long programs.  (*Id.* ¶ 72.)[8]  All of the Works-in Suit, which were initially broadcast on FNC between October 16, 2012 and July 3, 2013, are highly factual news programs, many containing live interviews and video footage owned by other networks.  (*Id.* ¶¶ 72-73.)

---

[8]   The 19 Works consist of: two episodes of *On the Record with Greta Van Sustren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*; two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in Benghazi*.  (SUF ¶ 72.)

HIGHLY CONFIDENTIAL

Because TVEyes allows users to search for and view content only within 32 days of the initial broadcast, none of the Works are now available on TVEyes, nor have they been for many months.  (*Id.* ¶ 76.)  Over the entirety of the 32 days that each Work-in-Suit was available for searching, there were a total of 560 plays for clips sourcing from the Works.  (*Id.* ¶ 77.)  As a basis for comparison, in an average month, there are about ███████ plays for video clips on TVEyes.  (*Id.* ¶ 78).  The video plays resulting from users accessing the Works thus accounted for approximately ████████████████████ of all the video plays in the month the Works were available on TVEyes.  (*Id.* ¶ 79.)

The average length of the clips played from the Works by TVEyes users was 53.4 seconds, with the full range spanning from 11.5 seconds to 362 seconds.  (*Id.* ¶ 80).  As each Work-in-Suit is a one-hour broadcast, this represents approximately 0.32% to 10% of the total length of each broadcast.  Further, 85.5% of all of the clips viewed from the Works were less than one minute long, and 76% were less than 30 seconds long; and 51% were less than 10 seconds long.  (*Id.* ¶ 81).  One of the Works was never played by any TVEyes user.  (*Id.* ¶ 77.)

There is no evidence that Fox has ever earned any revenue from directly licensing any of the 19 Works to any party for any purpose after the Works aired on FNC.  For example, there is no evidence that anyone has ever asked Fox, ITN Source or its sub-agent Executive Interviews, for a license of any sort—let alone one for internal review and analysis within 32 days of broadcast—for any of the Works.

## ARGUMENT

### I.   LEGAL STANDARD

In ruling on a motion for summary judgment, this Court must view all evidence in the light most favorable to the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Donnelly v. Greenburgh Cent. School. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). *See also In re Sept. 11 Litig.*, 908 F. Supp. 2d 442, 446 (S.D.N.Y. 2012) (Hellerstein, J.) (articulating standards).

Not only must the Court consider all evidence in TVEyes' favor, but it also "must disregard all evidence favorable to [Fox] that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). Ultimately, "if the party opposing summary judgment generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quotations omitted).[9]

Finally, TVEyes' positions as to Fox's motion are not to be conflated with TVEyes' positions in support of its own motion for summary judgment—that is, any representation by TVEyes that a genuine dispute of material fact exists in response to Fox's motion cannot be used as a concession in TVEyes' in deciding its cross-

---

[9]   This holds true in evaluating fair use—where a defendant raises an issue of material fact relating to any component of any fair-use factor, summary judgment cannot be granted to the plaintiff on fair use.  *See, e.g., Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1372-77 (Fed. Cir. 2014) (rejecting Oracle's position that Google's use was not fair "as a matter of law" because "we cannot say that there are no material facts in dispute" as to whether Google's use was transformative and whether it substantially harmed Oracle's actual or potential licensing markets).

HIGHLY CONFIDENTIAL

motion.  Each motion before the Court is to be evaluated independently, and the Court is to recognize that each party bears a separate burden in connection with its own motion.  *See Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 308, 320 (2d Cir. 2013) (in reviewing cross-motions for summary judgment in copyright case, construing facts in one party's favor, and then construing "alternative version" of facts in other party's favor).

## II.    TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107

Copyright protection serves the specific purpose of "promot[ing] the Progress of Science and useful Arts."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994) (quoting U.S. Const. art. I, § 8, cl. 8).   Indeed, the first copyright statute of Anglo-American history—the Statute of Anne of 1709—"declared itself to be '[a]n Act for the Encouragement of Learning.'"  *Authors Guild, Inc. v. HathiTrust*, --- F.3d ---, 2014 WL 2576342, at *4 (2d Cir. June 10, 2014) (citation omitted).  "In short, our law recognizes that copyright is 'not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public.'"  *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990) ("Leval")).

Thus, while the Copyright Act  grants authors "a limited monopoly" over the dissemination of their original or derivative works, "[a]t the same time, ***there are important limits*** to an author's right to control original and derivative works."  *Id.* at *5.  One such "important limit[]" is the doctrine of fair use.  *Id.*  Codified at 17 U.S.C. § 107, fair use "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 577).

HIGHLY CONFIDENTIAL

Finally, and crucially, "the determination of fair use is an open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). Fair use "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell,* 510 U.S. at 577. To this end, § 107 "employs the terms 'including' and 'such as' in the preamble paragraph to indicate the illustrative and not limitative function of the examples given, which thus provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." *Id.* at 577-78.

<p style="text-align:center">*       *       *</p>

Application of these principles strongly favors a finding of fair use here. Courts that have considered whether defendants' copying of content to create text-searchable databases routinely have found such uses to be fair. *See*, *e.g.*, *HathiTrust*, 2014 WL 2576342 (2d Cir. June 10, 2014) (copying 10 million books in their entirety to create text-searchable database is fair use); *Authors Guild, Inc. v. Google Inc.* ("*Google Books*"), 954 F. Supp. 2d 282 (S.D.N.Y. 2013) (Chin, J.) (copying over 20 million books to create database—and providing users with snippets of text—is fair use); *see also A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) (copying and digitizing essays in their entirety for plagiarism database is fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (copying and displaying of entire images for database for search engine is fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2002) (similar). As described in detail above, TVEyes not only operates a text-searchable database of words spoken on television—something that would not exist at all but for TVEyes' efforts—it does so for the purpose of enabling its clients to conduct research and analysis, including by allowing clients to see appropriately tailored snippets to provide complete context of any usage. This is fair.

**HIGHLY CONFIDENTIAL**

Largely ignoring this law, Fox labels TVEyes a "for-profit media clipping service" and argues, in effect, that **all** such services are automatically and *per se* ineligible for fair use. (Fox Br. at 26.) There is nothing in the case law to support this argument, nor is there anything magical about phrase "clipping service" that would render TVEyes' service *ispo facto* infringing. The Court should thus reject Fox's invitation to employ such "bright-line rules," *Campbell*, 510 U.S. at 577. Fox's "clipping service" argument, if credited, would have required a different outcome in all of the above-cited cases, as each involved the copying of a work in its entirety in connection with the provision of an electronic database. For example, in *Google Books*, Google copied more than 20 million books, used them in an electronic, text-searchable database, and allowed users to view snippets from those books as part of their search results—effectively, it created a "book clipping service." Judge Chin correctly found the use to be fair. 954 F. Supp. 2d at 284. The same is true of the other cases: when engaging in a properly nuanced, context-sensitive inquiry, courts recognize that the use of content for the purpose of creating a searchable database to aid in research, analysis and education is consistent with fair use.

Fox directs the Court to purported "news clipping" cases, ranging from 15 to 30 years old, for the proposition that the copying and distributing of television or radio news programs is not fair. (*See* Fox Br. at 26-27 (citing *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998); 150 F.3d at 112, *Los Angeles News Serv. v. Reuters Tele. Int'l, Ltd.*, 149 F.3d 987 (9th Cir. 1998); *Los Angeles News Serv. v. Tullo*, 973 F.2d 791 (9th Cir. 1992); *Pac. & S. Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984).) Each of these cases, however, involved services that had no purpose other than to simply copy and sell the plaintiffs' news programs. *Nihon* and *Infinity*, for example, involved the pure sale of entire copyrighted radio broadcasts and news abstracts, and nothing more. Likewise, *Duncan* found there to

**HIGHLY CONFIDENTIAL**

be no fair use because the defendant "***only*** copies and sells," and did not "analyze …

or improve," the original news broadcasts.  744 F.2d at 1496 (emphasis added).[10]

None of the circuit-level "clipping service" cases cited by Fox involved a service even remotely like TVEyes, which uses the copyrighted content as part of a comprehensive database and search engine, inventing an entirely new way to conduct research.  TVEyes captures over 1,400 television and radio broadcasts— including news broadcasts in the current 24-hour news cycle—digitizes them, and indexes every word spoken into a comprehensive, text-searchable database that enables users to navigate an otherwise unmanageable quantity of data and conduct research and analysis on that data.  In connection with offering these services, and to provide sufficient context, TVEyes allows users to view targeted snippets of where the word is mentioned, beginning 14 seconds before the mention.  In so doing, TVEyes creates an invaluable research tool that otherwise would not exist and that could not be provided by Fox.  (*See* Carry Decl. ¶¶ 10-11 (Fox precluded by contract from offering posting online more than 4 of its 24 hours of content).)

Fox also cites to *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013)—a decision that arguably has been abrogated by *HathiTrust*—for the proposition that a "media monitoring service which was 'the online equivalent of the traditional news clipping service' was not fair use."  (Fox Br. at 27.)  Notwithstanding its status as a non-binding district court decision whose fair-use analysis has never been followed, *Meltwater* has no bearing on this case.  *First*, *Meltwater* is a deeply flawed decision on the law.  For example, in

---

10   Fox also cites to *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191 (3d Cir. 2003) for the proposition that the defendant's video-clip previews distributed over the Internet were not fair.  (Fox Br. at 27.)  That case is even further afield—it is not a monitoring case and did not involve copying of news broadcasts.  In any event, the defendant there did not offer a text-searchable word database that allowed users to conduct research on when and how particular words were used in the films at issue.

**HIGHLY CONFIDENTIAL**

determining whether the defendant engaged in fair use, the court repeatedly relied upon its view that it could not permit the Meltwater "to "take the fruit of AP's labor." *See* 931 F. Supp. 2d at 553.  The Supreme Court has rejected this precise theory of copyright protection, recognizing that "[t]he primary objective of copyright is ***not*** to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 349 (quoting U.S. Const. art. I, § 8, cl. 8) (emphasis added).  This erroneous reliance on a "hot news" principle infected the court's entire analysis.

*Second*, in any event, the facts in *Meltwater* are distinguishable on multiple, material grounds.  For example, Meltwater merely scraped the web for already-existing electronic AP articles, and then promoted its news alerts—which uniformly used the lede, or "heart," of each story—as direct substitutes for reading the original.  TVEyes, on the other hand, captures and renders searchable television content that has been broadcast on TV but is otherwise largely unavailable for subsequent research, because content providers like Fox do not make most of what is broadcast on television available to the public, much less in searchable form.  Further, TVEyes' search results are entirely content-neutral, not providing a title, lede, or any other information that would necessarily convey a story's "heart." (SUF ¶ 40; Second Ives Decl. ¶ 7).  And, most obviously, unlike the defendant in *Meltwater*, TVEyes has never promoted its service as a direct substitute for watching television.  (Second Ives Decl. ¶ 4).  It would be utterly impractical to try to use TVEyes as substitute for watching Fox broadcasts—a user would have to run repeated and continuous searches, already aware of keywords that appear in the program, to try to cobble together an entire program.  (*Id*. ¶ 3; Second Seltzer Decl. ¶¶ 4-5).

TVEyes' service is much more akin to the services at issue in *Google Books* and *HathiTrust* than in *Meltwater*—TVEyes captures non-digitized content,

HIGHLY CONFIDENTIAL

digitizes it, renders it text-searchable, and allows users to view limited snippets of video for internal research and analysis. This is functionally indistinguishable from *HathiTrust* and *Google Books*, except that TVEyes is an even clearer case of fair use: instead of capturing fictional work and maintaining it forever to be searched by anyone for any reason, TVEyes (1) captures **factual** news content; (2) that is otherwise ephemeral and inaccessible to the public after it is broadcast; (3) allows it to be searched for **only 32 days** after broadcast, and (4) even then restricts the tool to use **by professionals**; and (5) further restricts the use to **internal research and analysis** purposes. In this context, TVEyes' use of the Works is fair.

We now turn to the four fair-use factors: (1) the nature and character of TVEyes' use of the Works; (2) the nature of the Works; (3) the amount and substantially of the Works that were used; and (4) the effect of the use upon the market for or value of the Works.

### A.   The Nature and Character of TVEyes' Use of the Works-in-Suit Is Consistent With Fair Use

"[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in [the preamble] of] § 107," such as research, criticism, comment, and news reporting. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir.) (quotations omitted). TVEyes is designed to assist users in discovering not only the fact that a particular keyword was used on a broadcast, but also **how** it was used, and how that use compares with uses of other words. (SUF ¶¶ 4, 26-27, 32, 64); *see Google Books*, 954 F. Supp. 2d at 287 (describing similar system as "an essential research tool" that, in particular, allows users "to analyze massive amounts of data"). Further, TVEyes informs its users that it is to be used for research and analysis only. (*Id.* ¶¶ 7-9). Because TVEyes fits comfortably within the illustrative guide of fair uses, factor one presumptively favors TVEyes.

**HIGHLY CONFIDENTIAL**

Even apart from this "strong presumption," the first factor strongly favors TVEyes because: (1) the use is highly transformative; (2) TVEyes' use serves important public interests; (3) any commerciality is of minimal relevance; and (4) there is no evidence of bad faith.  At a minimum, disputed questions of material fact exist on factor one, rendering summary judgment unavailable to Fox.

### 1.   TVEyes' Creation of a Comprehensive, Searchable Database of TV Content Is Highly Transformative

The central inquiry under the first fair-use factor "is whether the use is 'transformative.'"  *HathiTrust*, 2014 WL 2576342, at *6.  This inquiry evaluates whether the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579.

"The use of a copyrighted work need not alter or augment the work to be transformative in nature."  *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009). Rather, a use "can be transformative in ***function or purpose*** without altering or actually adding to the original work." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch*"), 2014 WL 2219162, at *8 (2d Cir. May 30, 2014) (quoting *Vanderhye*, 562 F.3d at 639) (emphasis added).  This is particularly true in the context of creating text-searchable electronic databases, where the value of the database depends on 100% accuracy of the underlying contents.   For example, the Second Circuit found the copying of 10 million copyrighted books without alteration or augmentation, for the purpose of creating a text-searchable database, to be "a quintessentially transformative use." *HathiTrust*, 2014 WL 2576342, at *7.  And recently, Judge Chin found that the copying of ***20 million*** books in their entirety for the purpose of creating a text-searchable database, and allowing users to see three snippets of text correlated with each search query, is "highly transformative." *Google Books*, 954 F. Supp. 2d at

**HIGHLY CONFIDENTIAL**

286, 291. *See also Vanderhye*, 562 F.3d at 639 (copying entire essays, without alteration, into database for plagiarism detection transformative); *Perfect 10*, 508 F.3d at 1165 (copying of entire images into database for Internet search engine results transformative); *Kelly*, 336 F.3d at 819 (similar).[11]

In a footnote, Fox tries distinguish *Google Books* by pointing to certain factual distinctions between the two services. (*See* Fox Br. at 31 n.6.) None of these distinctions, however, was ever referenced, or had anything to do with, the court's evaluation of whether Google's use was ***transformative***.[12] To the contrary, the Court found the use to be transformative because:

> Google Books digitizes books and transforms expressive text into a comprehensive word index that helps readers, scholars, researchers, and others find books. … The use of book text to facilitate search through the display of snippets is transformative. …
>
> Google Books is also transformative in the sense that it has transformed book text into data for purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research. Words in books are being used in a way they have not been used before. Google Books has created something new in the use of book text—the frequency of words and trends in their usage provide substantive information.

*Google Books*, 954 F. Supp. 2d at 291. The court concluded that Google "'adds value to the original' and allows for 'the creation of new information, new aesthetics, new insights and understandings.' Hence, the use is transformative." *Id.* (quoting Leval, *supra*, at 1111).

TVEyes offers a functionally identical service—it "digitizes [broadcasts] and transforms expressive text into a comprehensive word index." Providing snippets

---

[11] Fox concedes that TVEyes' capture of Fox content for the purpose of creating a text-searchable database is fair. *See* Fox Br. at 31-32 n.6 (citing *HathiTrust*).

[12] For example, that Google offered its service to the public for free was part of the court's commerciality discussion (although the court did recognize the commercial benefit to Google). *Google Books*, 954 F. Supp. 2d at 291-92. The "black-listing" of pages was mentioned in the fourth factor, *id.* at 293. The remaining attempted distinctions cited by Fox were not even mentioned in the Court's legal analysis.

**HIGHLY CONFIDENTIAL**

for context, to help facilitate client's research is likewise transformative.  Finally, TVEyes uses broadcast content "in a way that has not been used before" by permitting users to analyze "the frequency of word and trends in their usage," which is new information.  *Id.*  There can be no doubt that this adds value to the original, and allows for the creation of new information, insights, and understandings.  *See also* William F. Patry, Patry on Fair Use ("Patry") § 3.9 ("providing access to portions of a work for research purposes will be fair use, even if to do so a copy must be made, as by a library or search engine").

Further, TVEyes has implemented safeguards to ensure that its service does not act as a replacement for watching television on the couch, but rather for conducting narrow research and analysis.  For example: (1) access is restricted to business and professionals, and is not for personal use; (2) content can only be searched for 32 days from the date of broadcast, after which it is unavailable; (3) snippets automatically begin 14 seconds before the word is spoken, and thus are not correlated with the "beginning" or "end" of any particular news story; and (4) snippets may be played up to a maximum of only ten minutes (which occurs in less than ▮▮▮ of all video plays (SUF ¶ 70), akin to the snippets provided by Google.[13]

Finally, seeking to create liability where none exists, Fox proclaims that TVEyes' use of the Works[14] "is a substitute for Fox News's own use."  (Fox Br. at 32.)  However, for the reasons set forth in detail *infra* at Part II.D., TVEyes is not used as a substitute for any of Fox's service—be it cable subscriptions, website visits, or licenses—and Fox directs the Court to no evidence (other than

---

[13]  In addition, after the issuance of *Google Books*, out of an abundance of caution, TVEyes began designing a back-end feature that will block a user from trying to play or download 25 or more minutes of sequential content from a single station. This feature will be implemented on July 25, 2014.  (Second. Seltzer Decl, ¶ 7.)

[14]  Fox also refers to "other copyrighted content" (Fox Br at 32) but of course the Works are the only copyrighted materials Fox alleges TVEyes infringed.

**HIGHLY CONFIDENTIAL**

unsupported speculation) to the contrary. Rather, as described above, TVEyes is designed to be, and is used as, a tool for conducting research and analysis on television content—a transformative, non-substitutive use, and thus a fair use.[15]

### 2.    TVEyes' Use of the Works-in-Suit Serve a Greater Public Interest

Independent of transformation, the first factor weighs in favor of fair use where the use serves important public interests. *See*, *e.g.*, *Perfect 10*, 508 F.3d at 1166 (in addition to transformation and commerciality, court must weigh "the extent to which [defendant's] search engine promotes the purposes of copyright and serves the interests of the public"); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) (court "free to consider the public benefit resulting from a particular use"); *see also HathiTrust*, 2014 WL 2576342, at *12 (first factor favored fair use, even absent transformation, because providing copyrighted material to visually impaired is in public interest). This is because "[t]he key issue in every case is whether the use is beneficial to society." Patry § 3:9. Fox does not even mention this crucial component of the fair-use analysis.

In *Swatch*, for example, the Second Circuit found that the first factor favored fair use—""regardless of how transformative the use is"— where the use benefitted society. *Swatch*, 2014 WL 2219162, at *9. In disseminating "a full, unadulterated recording" of an earnings call, "Bloomberg was able to convey valuable factual

---

[15]  Fox's own exhibits confirm that TVEyes consistently reminds its clients that the purpose of its service is internal research and analysis. *See*, *e.g.*, Simmons Decl. Ex. 87 at TVEYES-0044106 (TVEyes employee Alan Willig: "TVEyes clips are for internal review, analysis and research only. Any placement on any public website may violate copyright law."); *id.* Ex. 108 at TVEYES-001991, 94, 99 (TVEyes employee Larry Gallo: "TVEyes clips are for Internal review, Analysis and Research Only. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden and may violate copyright laws."), Simmons Decl. Ex. 110 at TVEYES-038910 (same from TVEyes employee Michael Schmitt); Simmons Decl. Ex. 116 at TVEYES-037689 (same from TVEyes employee Chris Catropa).

HIGHLY CONFIDENTIAL

information that would have been impaired" had it not been permitted to disseminate the call. *Id.* The first factor thus favored Bloomberg because its "faithful reproduction … served 'the interest of accuracy, not piracy.'" *Id.* (quoting *Consumers Union of United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)).

Searchable databases such as TVEyes' are consistently found to promote the public interest. *See*, *e.g.*, *Perfect 10*, 508 F.3d at 1165 ("[A] search engine provides a social benefit by incorporating an original work into a new work, namely, an electronic reference tool"); *Google Books*, 954 F. Supp. 2d at 292 ("Google Books serves several important educational purposes"). By capturing, digitizing, and making television content searchable in the manner described above TVEyes has created an original, electronic reference tool that furthers the research and educational purposes copyright law was designed to protect. Without TVEyes—or a service like it—it would not be possible to search all television broadcasts by keyword. (SUF ¶¶ 14, 46).

Further, as discussed in more detail *infra* at Part II.D.4, TVEyes serves the public interest by facilitating (1) criticism of Fox and other news broadcasters; and (2) access to facts when Fox is itself the subject of news. Fox makes little of its content available for public viewing; TVEyes allows users to conduct research and analysis on Fox content—even when Fox does not wish to be the subject of such research—which necessarily requires both ***accurate*** and ***complete*** capture of Fox broadcasts. TVEyes promotes "the interest of accuracy, not piracy." *Swatch*, 2014 WL 2219162, at *9.

### 3. TVEyes' For-Profit Status Does Not Weigh Against Fair Use

There is no dispute that TVEyes is a for-profit corporation. However, "the more transformative the new work, the less will be the significance of other factors,

HIGHLY CONFIDENTIAL

*like commercialism*, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (emphasis added). Thus, courts routinely disregard a defendant's commerciality where a use is transformative.  *See, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013) ("Although there is no question that Prince's artworks are commercial, we do not place much significance on that fact due to the transformative nature of the work."); *NXIVM*, 364 F.3d at 478 ("Finding the work substantially transformative, the district court properly discounted the secondary commercial nature of the use."). Because TVEyes' service is highly transformative, the commerciality of the service has minimal relevance.  *See supra* Part II.A.1.

While Fox apparently believes that TVEyes' mere status as a for-profit enterprise dictates that fair use be unavailable, that is not the law.  *See Campbell*, 510 U.S. at 584 ("nearly all of the illustrative uses listed in the preamble paragraph of § 107 … are generally conducted for profit") (quotations omitted); *see also id.* ("[i]f … commerciality carried presumptive force against a finding of fairness, the presumption wound swallow nearly all of the illustrative uses listed in the preamble of § 107"). The Second Circuit recently addressed an identical argument in *Swatch*. Bloomberg Plus, a research service, was (like TVEyes) a for-profit, "subscription service available to paying users."  2014 WL 2219162, at *7.  The Court held that this did not weigh against fair use, because "we have recognized that almost all newspapers, books and magazines are published by commercial enterprises that seek a profit."  *Id.* (citation omitted).  Rather, the Second Circuit looked to the "link" between Bloomberg's commercial gain and its copying, concluding that "it would strain credulity to suggest that providing access to Swatch Group's earnings call more than trivially affected the value of that service."  *Id.*

**HIGHLY CONFIDENTIAL**

The same holds true here: TVEyes is a "multifaceted research service," of which the 19 Works "is but one small part."[16]  Further, in contrast to Bloomberg (where the entire earnings call was made available), TVEyes allows only snippets to be viewed.  Finally, plays of the Works could not have more than trivially affected the value of TVEyes' service.  *See* SUF ¶ 79 (plays of snippets from the Works accounted for about ███████████████ of all the video plays in the month they were available).)  The trivial value of the Works is confirmed by the fact that 85.5% of the plays of clips from the Works were less than 1 minute long—indeed, half were less than *10 seconds* long.  SUF ¶ 81.  This is consistent with the length of clips for all Fox content.  *See* SUF ¶ 71 ████ of Fox clips played for 1 minute or less).  In short, because any "commercial gain [by TVEyes] and its copying is … attenuated," it would be misleading to characterize TVEyes' use as "commercial exploitation."  *Am. Geophysical Union¸* 60 F.3d at 922.

Fox argues that FNC and FBN are "important" channels and therefore TVEyes use of the Works directly contributed to TVEyes' revenue.  (Fox Br. at 29.)  TVEyes, however, has never exploited the 19 Works in any commercial way other than through their incidental inclusion in TVEyes' massive database—for example, TVEyes has not used the 19 Works in commercial advertising or to promote sale of its service.  *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (use of plaintiff's images in book sold for profit to not be for "commercial gain" because defendant "has not used any of BGA's images in its commercial advertising or in any other way to promote the sale of the book.").

---

[16]  To be clear, the inquiry is not whether TVEyes' use of *all* Fox content, as a general matter, is "commercial," but only the 19 Works.  *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) ("[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying *the original work*") (emphasis added).  Here, "the original work[s]" are the 19 Works.

**HIGHLY CONFIDENTIAL**

Moreover, the evidence demonstrates that the Works were only played a total of 560 times in the entire 32 days they were available on TVEyes, representing approximately ███████████████ of all video plays on TVEyes during that time.  SUF ¶ 79.  To treat these plays as having anything more than a trivial commercial effect on TVEyes' business would "strain[s] credulity."  *Swatch*, 2014 WL 2219162, at *7.

### 4.  Fox Offers No Evidence of Bad Faith

Finally, Fox argues that TVEyes acted in bad faith because it: (1) used the Works over Fox's objections; (2) purportedly violated cable agreements in acquiring and using Fox content; and (3) has obtained licenses from other content owners.  Fox Br. at 29-30.  None of these arguments has merit.

As a initial matter, recent authorities have questioned whether good or bad faith has ***any*** continuing relevance to the first fair-use factor.  *See, e.g., Swatch*, 861 F. Supp. 2d 336, 340 (S.D.N.Y. 2012) (Hellerstein, J.) ("fair use does not depend on a finding of good faith"); *aff'd*, 2014 WL 2219162, at *7 (questioning the "role good or bad faith plays in fair use analysis"); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 942 (4th Cir. 2013) ("'good faith' is not listed as a fair use factor in § 107 of the Copyright Act and it is questionable whether allegations of subjective 'bad faith' could undercut a use that was objectively fair").  This is because *Campbell* questioned whether any weight should be placed "on the alleged infringer's state of mind."  510 U.S. at 585 n.18.  *See, e.g., Blanch*, 467 F.3d at 256 ("Much has been written about whether good faith was de-emphasized by the advent of *Campbell* or essentially written out of the fair-use test"); *Morris v. Guetta*, 2013 WL 440127, at *6 (C.D. Cal. Feb. 4, 2013) (*Campbell* has "cast doubt on the relevance of good faith in a fair use analysis").  Even where a party's good or bad faith is considered, "it

generally contributes little to the fair use analysis." *NXIVM*, 364 F.3d at 479 n.2 (citing *Campbell*, 510 U.S. at 585 n.18).[17]

Even if TVEyes' good or bad faith has any meaningful role in the fair-use analysis, Fox has introduced no evidence of bad faith. *First*, Fox claims that "bad faith is found where … the defendant uses the works over plaintiff's repeated objections." (Fox Br. at 30.) The Supreme Court soundly rejected this exact argument, stating that "being denied permission to use a work does not weigh against a finding of fair use." *Campbell*, 510 at 585 n.18; *see also Swatch*, 2014 WL 2219162, at *7 (similar); *Blanch*, 467 F.3d at 256 (similar). That is because "[i]f the use is otherwise fair, then no permission need be sought or granted." *Blanch*, 467 F.3d at 256 (quoting *Campbell*, 510 U.S. at 585 n.18). This makes sense—**every** disputed fair use involves use of a work without the plaintiff's permission. Further, because journalists use TVEyes to analyze and criticize Fox, and because Fox concedes that it curates the content it posts on line pursuant to its own "discretion" (Misenti Decl. ¶12), journalists' watchdog activities, "whose protection lies at the core of the First Amendment, would be crippled if the news media and similar organizations were limited to sources of information that authorize disclosure." *Swatch*, 2014 WL 2219162, at *7.[18, 19]

---

[17]  This is particularly true where the use at issue is transformative, as is the case here. *See*, *e.g.*, *Bouchat*, 737 F.3d at 942 ("The transformative nature of the defendants' uses … provided them with every reason to believe that their use was fair."); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 422 (E.D. Pa. 2009) ("even if bad faith has some role in the first factor analysis, [defendant] has shown that his use of the copyrighted works is sufficiently transformative").

[18]  Nor does the fact that TVEyes entered into agreements with other content providers amount to admission that a license is necessary for Fox content or constitute evidence of bad faith. *Campbell*, 510 U.S. at 585 n.18. (noting agreements with others "may simply have been made in a good-faith effort to avoid … litigation."); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 325 (S.D.N.Y. 2008) (rejecting argument that defendant's obtaining "permission for all the other music in the movie" but not for plaintiff's evinces bad faith).

HIGHLY CONFIDENTIAL

*Second*, Fox alleges that TVEyes violated cable agreements in using Fox content, and that this somehow evinces bad faith here. (Fox Br. at 29-30.) TVEyes' agreements with cable companies are irrelevant to whether TVEyes' use of ***Fox's*** content is fair or not. No cable companies are plaintiffs in this case, and no cable company has made any claim that TVEyes breached a contract.[20]

## B.  The Works-in-Suit Are Factual in Nature and Were Previously Published

The second fair-use factor assesses "the nature of the copyrighted work." § 107(2). This factor recognizes "that some works are closer to the core of intended copyright protection than others," *Campbell*, 510 U.S. at 586. In considering this factor, courts assess "(1) whether the work is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou*, 714 F.3d at 709-10 (quotations omitted). Both strongly favor TVEyes.

*First*, "[i]t is well established that 'the scope of fair use is greater with respect to factual than non-factual works.'" *Swatch*, 2014 WL 2219162, at *13 (quoting *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 157 (2d Cir. 1990)); *see also, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 237 (1990) ("In general, fair use is more

---

[19]  Fox's invocation of TVEyes' position that "[i]t is certainly not the practice of TVEyes to operate without any necessary agreement being in place" (Fox Br. at 30) only proves this point—no agreement with Fox was "necessary" here because it is a fair use. And Fox's assertion that "TVEyes actively misleads or knowingly permits its subscribers to believe that video clips downloaded from the TVEyes service are licensed for use on internal and external websites" (*id.*) is supported by nothing other than a single, self-serving statement of a Fox employee's purported (false) belief or on hearsay from unidentified "clients." (*See* TVEyes' Response to Fox's SUF ¶¶ 255, 257-259.) Further, Fox concedes that TVEyes never represented that it was licensed by Fox. (*See id.* ¶ 256.)

[20]  Further, the document Fox cites in support of its argument are inadmissible hearsay. (*See* TVEyes' Response to Fox's SUF ¶¶ 124-25.)

**HIGHLY CONFIDENTIAL**

likely to be found in factual works than in fictional works."); *Harper & Row Pubs. Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985) (noting "a greater need to disseminate factual works than works of fiction or fantasy"); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984) ("Copying a news broadcast may have a stronger claim to fair use than copying a motion picture.").

The Works are all highly factual television news programs.  (SUF ¶¶ 72-73).  Almost every element of the Works—*e.g.*, facts and information conveyed, unscripted interviews, and the like—are protectable only to the extent of their placement in the work's overall arrangement; otherwise, Fox would benefit from an impermissible copyright over facts and news of the day.  *See*, *e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) ("Every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication"); *Feist*, 499 U.S. at 348 ("[A]ll facts—scientific, historical, biographical, and news of the day … may not be copyrighted and are part of the public domain available to every person."); *Sparaco v. Lawler, Matusky, Skelly Eng'rs*, 303 F.3d 460, 466-67 (2d Cir. 2002) ("[H]istorical, scientific, or factual information belongs in the public domain, and … allowing the first publisher to prevent others from copying such information would defeat the objectives of copyright by impeding rather than advancing the progress of knowledge."); *see also Taggart v. WMAQ Channel 5 Chicago*, 2000 WL 1923322, at *4-5 (S.D. Ill. Oct. 30, 2000) (unscripted interview answers not protectable under copyright law).  Indeed, the Works themselves contain snippets from broadcasts of competing news channels, such as CNN and MSNBC, which FNC presumably used for their factual content, pursuant to the doctrine of fair use.  (*Id.* ¶ 73). (listing third-party video excerpts contained in the Works)).  The inherently factual nature of the Works favors dissemination.

Fox argues that because the Works contain "expressive choices" their otherwise factual nature should be ignored.  (Fox Br. at 33-34).  That the Works are

HIGHLY CONFIDENTIAL

not pure compilations of facts, however, means only that they qualify for copyright protection in the first instance, *see Feist*, 499 U.S. at 348, not that they are any less amenable to fair use.  Indeed, it is hard to conceive of a work that is more factual in nature than a news program.  *See Maxtone-Graham v. Burtchaell*, 803 F. 2d 1253, 1262-63 (2d Cir. 1986).[21]  Because Fox does not dispute that the contents of the Works are factual in nature, this factor tilts strongly in TVEyes' favor.

*Second*, courts consider whether the plaintiff's works were published at the time of the use.  *See Harper & Row*, 471 U.S. at 564.  Fox cannot dispute that the Works were broadcast on cable to millions of viewers before they were captured and indexed by TVEyes (SUF ¶ 85), which favors a finding of fair use.  *See e.g. Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (second factor favored fair use where work was previously published and accessible to the public).

Because the Works (1) are highly factual in nature and (2) were published prior to TVEyes' use, this factor strongly favors fair use.

## C. Copying the Entirety of the Works Was Necessary to Create a Comprehensive, Text-Searchable Index

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  In conducting this analysis, the Court is to assess "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor."  *HathiTrust*, 2014

---

[21]  Fox's citations to *Infinity Broad.* and *Weissman* v. *Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989), are inapposite. (Fox. Br. at 33-34).  In *Infinity*,  neither the district court nor the Second Circuit considered or addressed the factual nature or newsworthiness of the copyrighted works as part of the second-factor analysis.  *See* 150 F.3d at 109; 965 F. Supp. 553, 557 (S.D.N.Y. 1997).  In *Weissman*, the Court held that "the scientific nature of [the Work] tilts this factor ***toward*** [fair use]," though it ultimately held the factor was neutral because "incentive interests" favored the plaintiff.  868 F.2d at 1325 (emphasis added).

**HIGHLY CONFIDENTIAL**

WL 2576342, at *6. "For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use." *Id.* at *8.

Fox argues that because TVEyes captured each Work-in-Suit in its entirety, this factor necessarily weighs against fair use. (Fox. Br. at 34-35). Fox ignores, however, that Courts routinely recognize that it is necessary for a secondary user to utilize the entirety of copyrighted works in order to create full-text searchable database. In *HathiTrust*, for example, the Second Circuit held that the copying of the entirety of millions books for the purpose of creating a text-searchable database did not weigh against a finding of fair use:

> In order to enable the full-text search function, the Libraries, as we have seen, created digital copies of all the books in their collections. Because it was reasonably necessary for the HDL to make use of the entirety of the works in order to enable the full-text search function, we do not believe the copying was excessive.

2014 WL 2576342, at *8 (footnotes omitted). Other courts have come to the same conclusion. *See*, *e.g.*, *Google Books*, 954 F. Supp. 2d at 292 (copying and digitizing entirety of books to facilitate full-text search function "critical to the functioning of Google Books"); *Vanderhye*, 562 F. 3d at 642 (copying of entire essays to create digitized database to detect plagiarism did not weigh against fair use); *Perfect 10*, 508 F. 3d at 1165 ("The fact that Google incorporates the entire Perfect 10 image into the search engine results does not diminish the transformative nature of Google's use."); *Kelly*, 336 F.3d at 821 ("It was necessary for Arriba to copy the entire image" because copying only part of the image would "reduc[e] the usefulness of the visual search engine").

TVEyes' use of each of the 19 Works was reasonably necessary—indeed, unavoidable—to (1) create a comprehensive, electronic database of broadcast content; (2) render that content full-text searchable; and (3) allow users to conduct

**HIGHLY CONFIDENTIAL**

research regarding particular search terms, ranging from the frequency of mentions to where they occurred to how they occurred.  (SUF ¶¶ 74-75.)  In so doing, TVEyes makes important factual information available to users and provides them with an appropriate amount of context.  *See Swatch*, 2014 WL 2219162, at *14 ("the use of the entire recording was reasonable in light of its purpose of disseminating important financial information"); *id.*, 861 F. Supp. 2d at 342 (Hellerstein, J.) (public interest "better served by the dissemination of that information in its entirety").

To the extent Fox is claiming that TVEyes made the "heart" of the Works accessible to its clients (Fox Br. at 34), Fox has waived this argument by refusing to identify the "heart" of the Works in discovery, or in its brief.  (Supp. Anten Decl. ¶ 8, Ex. AAAA ("Identify the 'heart' of each of the Works-in-Suit" (Rog. 21).)  Fox simply presumes that if the entirety of the Work was captured by TVEyes, a "heart" must be in there somewhere.  But Fox offers no evidence that any user searched for, let alone saw, the "heart" of any Work.

Further, even if Fox had identified the "heart" of the Works, it is beyond dispute that TVEyes' service does not recognize the "heart" or "lede" of a broadcast, nor can it distinguish between "breaking" and "regular" news.  (SUF ¶ 40; Second Ives Decl. ¶ 7).  In this respect, TVEyes' service is content-agnostic and does not favor one portion of a broadcast over another.  Rather, to the extent TVEyes  makes video snippets accessible, it does so only in response to user-generated search queries, and the snippets, which are generated by mathematical algorithm, always begin 14 seconds before the search term, without regard for the nature or relative import of the content excerpted.  (SUF ¶ 82).  Thus, the third factor does not weigh against a finding of fair use.

HIGHLY CONFIDENTIAL

**D.    TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit**

The fourth fair-use factor considers "the effect of the use upon the potential market for or value of the copyrighted work."   17 U.S.C. § 107(4).   This factor "requires a balancing of [1] the benefit the public will derive if the use is permitted and [2] the personal gain the copyright owner will receive if the use is denied."   *Bill Graham*, 448 F.3d at 613 (quotations omitted).   Crucially, this factor "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work."   *HathiTrust*, 2014 WL 2576342, at *9 (citing *Campbell*, 510 U.S. 591).   Thus, "any economic 'harm' caused by transformative uses ***does not count*** because such uses, by definition, do not serve as substitutes for the original work."   *Id.* (citation omitted); *see also Bill Graham*, 448 F.3d at 615 ("Since [defendant's] use of [copyrighted] images falls within a transformative market, [plaintiff] does not suffer market harm due to the loss of license fees."); *Castle Rock Entm't*, 150 F.3d at 145 ("The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original.").

Fox contends that TVEyes' media-monitoring service has harmed just about every facet of its business.   The evidence, however, does not support Fox's outsized claims.   To the contrary, the record demonstrates that TVEyes' service has no effect on any legally cognizable market for either the Works or derivatives thereof.

**1.    TVEyes Does Not Harm the Original Market for the Works-in-Suit**

As an initial matter, Fox argues that there is "a near presumption of market harm in the context of verbatim copying of the original in its entirety for commercial purposes."   (Fox SJ Br. at 35).   That is not the law.   As Courts in this Circuit have

**HIGHLY CONFIDENTIAL**

recognized, market harm does not necessarily flow from verbatim copying of the entire original copyrighted work, particularly where, as here, the defendant's use is transformative and/or furthers the goals of copyright law. *See*, *e.g.*, *Swatch*, 2014 WL 2219162, at *15-16 (no market harm from defendant's verbatim copying of the entire original work for commercial purposes); *Bill Graham*, 448 F.3d at 614-15 (same) *Google Books*, 954 F. Supp. 2d at 292-93 (same); *see also Campbell*, 501 U.S. at 591 (when a work is transformative "market substitution is at least less certain, and market harm may not be so readily inferred"). In this case, TVEyes' use of the Works is transformative, there is no evidence of cognizable market harm to Fox, and none should be "presumed" merely because TVEyes captured the entire Works to include in its index.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ (Carry Decl. ¶¶ 4, 14; Second Rose Decl. ¶ 5, Ex. GGGG.) These markets were unaffected by TVEyes' use of the Works, which were captured and indexed by TVEyes only ***after*** they were licensed to and broadcast by cable companies. In other words, TVEyes' *post facto* use of the Works had no bearing whatsoever on the fees commanded by Fox in connection with airing the Works. Not one of Fox's nine fact witnesses makes any claim to the contrary. And since the Works are no longer available on TVEyes service, and have not been since 32 days after each was broadcast, the inquiry should end here.

Instead, Fox argues that TVEyes service ***in general*** could reduce cable subscriptions in the future, which in turn, could result in lost revenue to Fox. In addition to being irrelevant (because it has no relationship to the Works), this attenuated argument fails for lack of proof. There is no evidence that even a single

**HIGHLY CONFIDENTIAL**

TVEyes client has ever opted to forgo a subscription to cable or satellite television in favor of TVEyes' service—whether in connection with the Works or otherwise.  The only "proof" Fox offers in support of this alleged potential market substitution is the self-serving and conclusory testimony of its senior executives—and even this evidence does not support the proposition that TVEyes' clients will forgo cable service in favor of TVEyes.

Contrary to Fox's repeated and erroneous assertions, TVEyes' service cannot be used to watch live television and therefore does not serve as substitute for cable or satellite subscriptions.  (Second Seltzer Decl. ¶¶ 3-11; Second Ives Decl. ¶¶ 3-9).  TVEyes only permits users to access video snippets in response to their queries up to a maximum of 10 minutes (which is less than ▮▮▮▮ of the time (SUF ¶ 70)), and these snippets are at minimum ▮▮▮▮▮▮.  (SUF. ¶¶ 29, 70).  The closest a user can come to "watching" live television on TVEyes is to run multiple queries and then cobble together a set of ▮▮▮▮▮ clips to view in sequence—a process that would be extraordinarily cumbersome and tedious.[22]  (Second Seltzer Decl. ¶¶ 3-11; Second Ives Decl. ¶¶ 3-9).  Notably, **none** of the Works was ever accessed in this manner, nor does Fox even contend that they were.  (Second Seltzer Decl. ¶ 5.)

TVEyes' service enables clients to **monitor** television—not to watch it—and that is how it is used.  TVEyes' clients accessed FNC content for an average of ▮▮ seconds and ▮▮ of all plays of FNC are 2 minutes in length or shorter. (Seltzer Decl. ¶ 36).  Client's use of TVEyes to access longer excerpts of content has been exceedingly rare.  For example, between March 31, 2003 and December 31, 2013 there were only three instances of users **ever** accessing 30 minutes or more of

---

[22] *See also*, *e.g.*, *Google Books*, 954 F. Supp. 2d at 292-93 (users unlikely to spend energy to run multiple searches to recreate entire book).

sequential content on FNC and **zero** instances on FBN. [23]   (Second Seltzer Decl. ¶ 5).   To put these numbers in perspective, these uses represent approximately ▇ of all user plays of FNC content in the same period of time.   In fact, during these same 10-plus years, approximately ▇ of TVEyes' users had never accessed **any** FNC content on TVEyes at all.   (*Id.*)   The evidence is overwhelming that TVEyes is not now, nor has it ever been, a substitute for watching FNC, or live television in general.

Fox's suggestion that TVEyes' clients—who are all business or government entities—would forgo purchasing subscriptions to cable television in favor of TVEyes' service, which does not offer even remotely comparable functionality, is absurd.   (SUF ¶¶ 5, 11; Second Ives Decl. ¶ 9).   No business that needs access to live television would pay TVEyes $500 a month for a service that does not even provide that functionality, when it could subscribe to cable for a fraction of that that price.   And there is no reason to believe that TVEyes' clients—such as the White House, Members of Congress, ▇, television stations, media companies, and a variety of corporations—do not have **both** cable and TVEyes subscriptions, because they serve entirely different purposes.   Fox offers no evidence to the contrary.   *See Sony*, 464 U.S. at 453-54 (rejecting plaintiffs "prediction that live television or movie audiences will decrease" as "speculative") (quotations omitted).



**HIGHLY CONFIDENTIAL**

Fox also argues that TVEyes' service reduces television viewership ratings for FNC and FBN, which in turn, impacts the fees paid by cable providers and advertisers to Fox. (Fox. Br. at 36).  In addition to being irrelevant (having no connection to the market for or value of the Works, which were captured by TVEyes only *after* they were broadcast) and speculative, the premise of this argument, and the testimony given in support of it, is highly misleading.  As Fox and its testifying senior executives are no doubt aware, Nielsen ratings do not measure television viewership in the workplace, which is where TVEyes is used.  (Villar Decl. ¶ 7 (Nielsen ratings based on meters placed "in the home"); Second. Rose Decl. ¶ 10, Ex. MMMM (same); SUF ¶¶ 5,11 (TVEyes is only sold to businesses for business purposes)).  Nor do Nielsen's ratings account for viewership on Fox's TVEverywhere service accessed via the Internet.  (Villar Decl. ¶ 29).  It is thus virtually impossible for TVEyes' service to have depressed Fox's ratings.

## 2.    TVEyes Does Not Harm the Derivative Market for the Works-in-Suit

Fox also claims that TVEyes supplants the market for excerpts of the Works supplied by Fox and/or its exclusive licensees.  Specifically, Fox argues that TVEyes (1) interferes with Fox's ability to issue public performance licenses for portions of the Works to third parties and (2) reduces traffic to Fox Website, and the sites of its partners, where portions of the Works are posted.  The undisputed evidence proves that TVEyes does not serve as a substitute for either of these markets.

### a.    TVEyes Does Not Affect the Market for Public Performances Licenses for the Works-in-Suit

Fox claims that TVEyes directly competed with its exclusive licensees ITN Source and Executive Interviews because TVEyes provided its clients with access to excerpts of the Works for 32 days after they were broadcast.  (Fox Br. at 37-38).  Notably, however, Fox has earned ***no revenue*** directly from licensing any of the

Works to third parties for any purpose—either in the 32 day period after the Works were broadcast, or at any time since then.  (SUF. ¶ 116).  Thus, there is no evidence that a secondary market for public performance licenses for these particular Works even exists, much less that it was usurped by TVEyes.  And while it is possible that third parties might be interested in licensing these Works, or portions thereof, in the future (for example, to be incorporated in a television show or advertisement), TVEyes' service cannot possibly substitute for that potential market because the Works are no longer accessible on TVEyes, and have not been since 32 days after each was broadcast.  (*Id.* ¶ 76)  Thus, TVEyes' service has had no effect on the market for licenses to publicly perform the Works (if one exists), nor will it have any effect in the future.

(SUF ¶ 116).

The fact is, TVEyes and ITN Source serve different markets that do not overlap. Fox, ITN Source and Executive Interviews provide clips (and the appropriate licenses) for use ***when a license is legally required***, such as for use in a television show, while TVEyes supplies clips to third parties for use ***when a license is not necessary*** such as for a client's internal use, or to criticize Fox. [24, 25]



(*footnote continued*)

**HIGHLY CONFIDENTIAL**

[REDACTED]

Fox is prohibited from excluding TVEyes from a fair-use market under the guise of copyright law. *Bill Graham*, 448 F.3d at 614-15 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work. [C]opyright owners may not preempt exploitation of transformative markets ....").[27]

[REDACTED]

---

[26] Courts reject conclusory, self-serving declarations that speak in generalities but are otherwise unsupported by the evidence. *See*, *e.g.*, *Ambac Assur. Corp. v. Adelanto Pub. Utility Auth.*, 2014 WL 2893306, at *3 (S.D.N.Y. June 26, 2014) (giving no weight to "conclusory statement" in declaration that alleged that payment would "severely impact" its finances and "potentially put at risk" its ability to continue because the court was not provided with "context for how exactly the … finances would be affected").

[27] Indeed, it borders on the absurd to think that the White House would have to pay Fox a hefty licensing fee every time it viewed an excerpt of Fox-owned footage and circulated it for internal comment and/or criticism.  (*See* SUF ¶ 56 (emails showing White House uses TVEyes service to comment on Fox news coverage)).

**HIGHLY CONFIDENTIAL**

███████████████████████████████████

██████████████████████████████████[28]

Finally, it certainly is not "beyond the realm of possibility that [TVEyes' service] might stimulate further interest in [access to Fox-owned content for public performance]" *Maxtone-Graham*, 803 F.2d at 1264.  When asked by clients about how to obtain the public performance rights to video excerpts, TVEyes refers these clients the appropriate broadcaster.  (Second Ives. Decl. ¶ 12, Ex. TTT (emails in which TVEyes has referred clients to broadcasters to obtain licenses for clips). Further, all video content available on TVEyes is clearly sourced to the broadcaster, and in some instances, even points clients to the broadcaster's website.  (*See* Seltzer Decl.  ¶¶ 16, 18, 23 & Figures 5, 7, 8 (screen shots from TVEyes showing content is clearly sourced to the broadcaster and example referring to the Fox Website).)  This evidence proves that clients can discover content using TVEyes they subsequently might want to license from Fox.

TVEyes enables its clients to access relevant excerpts of Fox content in connection with their media monitoring activities.  In so doing, it does not conflict with Fox's business of offering legitimate public performance licenses to third parties.

### b.   TVEyes Does Not Deprive Fox of Revenue From Use of the Works-in-Suit Online

Fox contends that TVEyes has replaced the market for the excerpts of the Works made available on the Internet by Fox.  (Fox Br. at 38).  Fox's argument rests entirely on the assumption that clients who accessed snippets of the Works on

---

[28] For the reasons set forth in TVEyes' Response to Fox's Rule 56.1 Statement of Facts, Ms. Ashton's testimony on this point, as well as the documents she introduces, should be excluded as inadmissible hearsay and because the documents were not produced during discovery.  *See* TVEyes Response to Fox's SUF, at 2-4, 36-37, 84.

**HIGHLY CONFIDENTIAL**

TVEyes would otherwise have visited the Fox Website, or the sites of its content partners, to search for and view those same snippets.  The record does not support this assumption.

As an initial matter, Fox points to no evidence that any of the snippets of Works accessed by TVEyes' clients were ever even available on Fox's Website, or the sites of its content partners.  Fox concedes that the vast majority of the content it broadcasts is not posted online, and that it posted only 70 clips **total** from the Works—an average of between only 3 and 4 clips per program—out of 19 hours of programming.  (Misenti Decl. ¶ 14).  It would be pure speculation to **assume** that any of the snippets accessed by TVEyes' clients overlapped with these 70 clips, especially given that 51% of the snippets of the Works accessed by TVEyes clients were **less than 10 seconds long**.  (SUF ¶ 81).  In short, there is no evidence whatsoever that TVEyes' use of the Works deprived Fox of any actual or potential online revenues.

Further, Fox speculates—without any factual basis whatsoever—that users who accessed portions of the Works on TVEyes would otherwise have visited the Fox Website, or the sites of its content partners, to manually conduct keyword searches for the same content.  That assumption is unreasonable.  TVEyes **automatically** monitors multiple keywords simultaneously on thousands of channels across a **comprehensive and accurate** database of content.  (Seltzer Decl.¶¶ 37-39).  Logistically speaking, it would not be possible for TVEyes' clients to conduct these individual searches manually, nor can it be assumed that any client would attempt to do so.  Indeed, it is beyond implausible that TVEyes' clients—who are professionals using TVEyes at work—would spend countless hours conducting multiple keyword searches across potentially hundreds of websites, including the

**HIGHLY CONFIDENTIAL**

Fox Website, searching for content.[29]  This is especially true for searches on the Fox Website because, as Fox concedes, just a small fraction of the content broadcast on FNC and FBN is available on the site (and the sites of its partners)—making a manual keyword search on the Fox Website a particularly fruitless exercise.  Other than the conclusory statements of Fox executives who simply declare—without any factual basis—that TVEyes' service diverts traffic from the Fox Website, there is no proof that any this has ever occurred, in connection with the Works or otherwise.  *See Sony*, 464 U.S. at 453-54 (time shifting was fair use because the copyright owners' "prediction that live television or movie audiences will decrease" was "speculative") (quotations omitted).

Fox's claim of market substitution is undermined by the Terms of Service of its Website, which expressly restrict the use of the site's content to "personal use only" which "may not be used for commercial purposes" unless the user "receives prior written authorization from Fox News."  (SUF ¶ 114; *see also* Rose Decl. ¶ 11, Ex. GG (Hulu.com Terms of Service).  By contrast, TVEyes' services are offered solely to businesses for their commercial use.  (SUF ¶ 5, 11).  Under the Fox Website's Terms of Service, users are ***prohibited*** from using the Fox Website for non-personal, business purposes, without prior written consent.  Fox cannot claim that TVEyes usurps a market that it expressly disclaims in its Terms of Service.

Fox's claim of market substitution is further undermined by the fact that TVEyes' clients cannot possibly accomplish their media-monitoring objectives on the

---

[29]  An analogy to Google's popular "Alert" function is useful to illustrate this point. When an individual sets up an "Alert" using Google, the search engine automatically delivers hit results for the chosen keyword to that person via email and with a frequency selected by the user.  But just because a person sets  up and receives Google Alerts does not at all mean that without these alerts the user would conduct hundreds or thousands of manual searches on various websites for the same term.  In fact, it is very likely that the user would not ever have become aware that the term was mentioned on the web at all.

Fox Website.  Clients subscribe to TVEyes so they can automatically monitor everything that has been broadcast on television, exactly as it was broadcast, across multiple channels simultaneously.  (*Id.* ¶¶ 3, 13, 18, 44.); *see also Campbell*, 501 U.S. at 591 (when a work is transformative "market substitution is at least less certain, and market harm may not be so readily inferred").  This  cannot be accomplished on the Fox Website (or the sites of its content partners such as Hulu and Yahoo!) for at least the following reasons:

*First*, and most obviously, the Fox Website does not aggregate, index and make keyword searchable content from broadcasters other than Fox.  It thus does not serve as a one-stop-shop for monitoring keywords on broadcast television and radio.  (*See* Seltzer Decl. ¶ 47).

*Second*, as Fox concedes, only a fraction of the content broadcast on FNC is made available by Fox online.  (Carry Decl. ¶ 10).  And the video content that does appear on the site is subject to Fox's "editorial discretion." (Misenti Decl. ¶ 12.) Accordingly, any search results obtained by running keyword searches on the Fox Website or its partner sites, are necessarily incomplete, and it is thus not possible to use the Fox Website to monitor Fox broadcasts the way this can be done using TVEyes.  For example, it is impossible to use the Fox Website to track how many times a particular keyword was said by Fox anchors or to obtain a complete understanding of how a particular subject was covered on the air in a given period of time, which are objectives that can be achieved on TVEyes.  (*See* Rose Decl. ¶ 27 & Ex. WW (*e.g.,* "Fox News has spent just over 10 minutes covering the 13 court decisions in favor of marriage equality since *Windsor*")).  Nor does the Fox Website, or those of its content partners, include the commercials that aired on FNC or FBN—thus, it is not possible to use the Fox Website to track or evaluate the political advertising or study the relationship between Fox programming and the commercial advertising that supports it.  (*See id* ¶ 18, Ex. NN (the Romney ads

**HIGHLY CONFIDENTIAL**

"are still airing in multiple markets, according to TVEyes, a media monitoring service").)  The ***only*** way to access a complete and accurate record of what aired on FNC, FBN, or any other major network, is to use a service that captures, indexes and provides search capability for everything spoken or shown on the air.

*Third,* in addition to being incomplete, the few video segments that are available on the Fox Website and its partners are materially different from what is broadcast on FNC and FBN.  (Misenti Decl. ¶ 7).  Video segments from FNC and FBN on the Fox Website, for example, do not contain the news ticker graphic that appears in the actual telecast.  Thus, if a user is interested in researching the relationship between the contents of the news ticker and what was said on FNC or FBN, such information could not be gathered from the Fox Website.  In addition, Fox sometimes changes the video segments made available on its website from what had been aired.  For example, Fox recently came under fire for using an incorrect graphic during a story about the ferry disaster in Korea; Fox removed the video from its website and assured viewers that the graphic would be "corrected" on its website.  (SUF ¶ 113; Rose Decl. ¶ 9 & Exs. DD-EE.)  The Fox Website does not necessarily reflect what was actually broadcast.  TVEyes does.

*Fourth*, because the Fox Website is designed for entertainment, not research (Rose Decl. ¶ 12, Ex. HH (Fox Website is for "personal enjoyment and entertainment" and "solely for [] personal, non-commercial use")), the video segments available on the Fox Website lack basic contextual information about the footage, such as the air-time and show title.  (SUF ¶ 105).  Such information is essential to TVEyes' users, who can access snippets to research the context in which their keyword was mentioned.  In addition, the Fox Website offers limited search functionality—for example, users cannot set a date range when conducting a search on the Fox Website, nor use advanced Boolean connections such as "&" in conducting a search.  (*Id.* ¶ 109).  Further, a search query returns a maximum of

**HIGHLY CONFIDENTIAL**

only 510 results.  (*Id.* ¶ 110).  Finally, the Fox Website does not offer any of the analytics that TVEyes makes available, such as demographics, market share, heat maps, term frequency, or broadcast range.  (*Id.* ¶¶ 106-107).

*Fifth*, while TVEyes' clips always begin 14 seconds prior to the user's query term, each video segment on the Fox Website has a predetermined beginning and ending, based on a particular topic or story, and is pre-edited to a length that corresponds to the start and end point around the particular discussion.  (*Id.* ¶ 103; Misenti Decl. ¶ 7.)  As a result, if a user tries to search the Fox Website for a particular word, she must watch the entire segment or try to scroll through irrelevant portions to somehow find her keyword.  TVEyes is a much more efficient research tool.  (*Id.* ¶ 18.)

*Sixth*, the Fox Website cannot be used to monitor Fox News, ***because it is controlled by Fox News***.  (*Id.* ¶ 99.)  There is an inherent conflict of interest between Fox and those who monitor it.  This conflict is most obvious when journalists use TVEyes to publicly criticize Fox.  (*See*, *e.g.*, Rose Decl. ¶ 27, Ex. WW (*e.g.*, HUFFINGTON POST, Jan 9, 2014: "Fox News Downplayed Chris Christie Scandal All Day"; BUSINESS INSIDER, July 11, 2011" "Fox News Has Only Reported On The Murdoch Phone-Hacking Scandal 14 x In 5 Days"; MEDIA MATTERS, June 4, 2014: "On Fox, The Gay Marriage Revolution Has Not Been Televised").  A conflict of interest also exists when organizations use TVEyes to give feedback to the press.  For example, the White House has used TVEyes to criticize Fox's reporting (*see* Anten Decl. ¶ 23, Ex. EEE (White House to Fox: "This is not even close to a balanced piece")), and former Governor Scwarzenegger used TVEyes to obtain an official correction (*see id*. ¶ 22, Ex. DDD ("We had expected a clarification somewhere on the network but never saw one")).  Because Fox has "editorial discretion" over the clips it makes available on its website, and can also alter or remove the content posted at any time, for any reason, without explanation or

**HIGHLY CONFIDENTIAL**

notice, it cannot be relied upon as a neutral, complete and accurate source for monitoring.   Only a third party that agnostically records everything that is broadcast, exactly as it was broadcast, can serve this purpose.

Two recent examples illustrate why third-party media monitoring companies like TVEyes serve an important function that can never be filled by Fox.   On July 8, 2014, Fox contributor and USA Today columnist Kristen Powers made news on the Bill O'Reilly show when she engaged in an angry exchange with Mr. O'Reilly during which she accused him of mocking liberals.   (Second Rose Decl. ¶ 7, Ex. HHHH.) The incident was subsequently reported by the press and bloggers, including the Huffington Post and Mediate (both TVEyes clients).   (*Id.* Ex. IIII.)   However, no clip of the incident was made available by Fox on its website.   It was available, however, unedited and exactly as it was broadcast, on TVEyes.   (*Id.* ¶ 7.)   Similarly, on July 10, 2014, Ben Shapiro, a guest on Fox's *The Kelly File* made news by referring to the Obama White House as a "borderline Jew-Hating Administration."   (*Id.* Ex. JJJJ.) Again, the incident was reported by the press and bloggers, but the clip was not made available on Fox's website. (*Id.* ¶ 8 & Ex. KKKK.)   It was available on TVEyes.   (*Id.* ¶ 8 & JJJJ.)   These examples illustrate that those who monitor Fox cannot rely on Fox to accomplish their monitoring objectives, because Fox always maintains exclusive and ultimate control over whether and what previously broadcast content is made available to the public.

### c.   Lost Licenses to Media Monitoring Services Are Not Legally Cognizable Bases of Market Harm

Fox argues that TVEyes' use of the Works affects the potential market for licenses it might issue to other media-monitoring services.   (Fox Br. at 39.) However Fox cannot claim harm from loss of a transformative or fair use market as a matter of law. *See HathiTrust*, 2014 WL 2576342, at *10 ("It is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this

**HIGHLY CONFIDENTIAL**

transformative use (if the use were deemed unfair).  Lost licensing revenue counts under Factor Four only when the use serves as a substitute for the original and the full-text use does not."); *Bill Graham*, 448 F.3d at 614-15 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work. [C]opyright owners may not preempt exploitation of transformative markets ....") (citation and quotations omitted, alteration in original).  Fox's claim that one day it might partner with a media-monitoring company does not constitute legally cognizable market harm under this factor.

### 3.    There Is No Possibility of "Similar Widespread Use," But Even If There Were, It Would Not Harm Fox

Fox argues that TVEyes' business should be shuttered because it "threatens Fox's incentive" to report the news.  (Fox Br. at 41).  As an initial matter, Fox's argument is legally irrelevant.   Although the Court may consider whether "unrestricted and widespread conduct of the sort engaged in by [TVEyes] would result in a substantially adverse impact on the potential market for the original work," that inquiry focuses upon "the original work," *i.e.*, the 19 Works.  *Swatch*, 2014 WL 2219162, at *14 (quoting *Campbell*, 510 U.S. at 590).  In other words, the Court's analysis must be limited to the effect of TVEyes' use upon the potential market for or value of "the copyrighted work," § 107(4), *i.e.*, the 19 Works.  Here, each of the Works was deleted from TVEyes' servers as a matter of course 32 days after it was broadcast and has not been accessible on TVEyes' service since.  (SUF ¶ 19).  Thus, there no possibility of additional future use of any sort by TVEyes— much less any "similar widespread use" of the kind cognizable under this factor. Fox does not argue otherwise.

Even so, Fox's claim that if TVEyes' use is deemed to be fair, it will sound the death knell for Fox and its newsgathering activities is unconvincing.  (Fox. Br at 40-

**HIGHLY CONFIDENTIAL**

41.)  The record does not support the dire predictions of Fox's imminent demise.  For 15 of the 18 years that Fox has been in business, TVEyes (and many other companies) have monitored its broadcasts.  (SUF ¶ 3).  By any measure, Fox's business has thrived during this time.  ████████████████████████████ ████████████████████████████████████  (Villar ¶¶ 5-6, 10-14, 16-19, 21-25; Second Rose Decl. ¶ 5, Ex. GGGG ███████████████████████ Second Anten Decl. ¶9, Ex. BBBB ██████████████████████████████████ Misenti Decl. ¶¶ 19, 24; Wallace Decl. ¶¶ 15, 18)).  For 2013 alone, Fox's total revenues are estimated to be upwards of $1.8 billion dollars.  (Second Rose Decl. ¶ 5, Ex. GGGG.)[30]

Moreover, the vast majority of Fox's sizeable income is attributable to the fees paid to Fox by cable companies and advertisers. (Carry Decl. ¶ 14).  As discussed above, there is no link whatsoever between TVEyes' service and these fees because, *inter alia*, TVEyes does not replace the market for live television.  *See supra* at Part II.D.1. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████  (Second Rose Decl.¶ 6)  In short, there is no evidence to support Fox's hyperbolic contention that the continued existence of TVEyes will have any impact on Fox's news business operations.

---

[30]  Fox refused to produce certain financial information during discovery.  (*See* SUF ¶ 95.)  To the extent such information could have any bearing on the Court's analysis, TVEyes respectfully seeks the opportunity to review the documents sought and to depose Fox about their contents.  *See also* Schapiro 56(d) Decl.

HIGHLY CONFIDENTIAL

### 4.   Consideration of Public Interests Greatly Favors TVEyes

Finally, Fox makes the unremarkable observation that there is a public interest in enforcing the copyright regime.  (Fox Br. at 42-44.)  But this argument applies to *every* fair-use dispute, and the plaintiff in every such case already has been granted a time-limited monopoly that furthers the policies and incentives of copyright law.  Thus, the public interests underpinning the Copyright Act *have already been served* by the grant to Fox of time-limited monopolies in the Works.  *See HathiTrust*, 2014 WL 2576342, at *5.  The only question before the Court in a fair-use case is whether *TVEyes' use* of the Works serve a countervailing public interest that should be weighed against Fox's right to exploit the Works exclusively.  *See Swatch*, 2014 WL 2219162, at *9 (balancing the public benefit of *defendant's* use against copyright owner's personal gain); *Bill Graham*, 448 F.3d at 613 (same); *Castle Rock*, 150 F.3d at 141 (copyright law "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster") (quoting *Campbell*, 510 U.S. at 577); *Google Books*, 954 F. Supp. 2d at 292 ("Google Books serves several important educational purposes," thus favoring fair use); *see also Sony*, 464 U.S. at 454 (public benefit of time-shifting favored fair use);

TVEyes does not dispute that Fox's news programming serves an important public interest.  But equally important is the ability for the public to discover and access what is said on Fox's broadcasts for any number of purposes—including to comment on and criticize Fox. The policies and incentives on which copyright law is based strongly favor a finding of fair use in this case for at least the following reasons:

*First*, TVEyes has created a repository of information that can be accessed for research on a previously impossible scale.  Using TVEyes, clients can efficiently sift through the daily deluge of television content from numerous, disparate sources

HIGHLY CONFIDENTIAL

to instantly discover information relevant to them.   TVEyes provides significant educational, research benefits through its comparative analyses of keyword frequencies, distribution, and trends.   Without TVEyes, or a service like it, there would be no other way for users to discover, gain access to, and efficiently review this information.  (SUF ¶ 46).

*Second*, TVEyes serves the public interest by facilitating access to news **made** by Fox.  Today, the manner in which news organizations like Fox report news is often news in its own right, separate and distinct from the underlying news being reported.   (SUF ¶¶ 120-122.)  *See*, *e.g.*, (Rose Decl ¶¶ 26-27, Exs., VV-WW; (*e.g.* HUFFPOST MEDIA, June 4, 2014: "Fox Makes Disgusting Comment About Bowe Bergdahl's Father"; RAW STORY, May 25, 2014: "Fox News Expert Suggests Homosexual Impulses Triggered Calif. Mass Shooting"; WASHINGTON POST, Oct. 7, 2013: "Fox & Friends Fails On Obama-Muslim Museum Connection: No Surprise Here")).  Further, many national media outlets have journalists dedicated to "meta-news"—that is, covering how the media covers the news.  *See*, *e.g.*, Erik Wemple, WASHINGTON POST, http://www.washingtonpost.com/blogs/erik-wemple/ ("A reported opinion blog on news media.").   Major television networks—including FNC—also have programs dedicated to media analysis.  *See*, *e.g.*, *#mediabuzz* (FNC broadcast), *available at* http://www.foxnews.com/on-air/media-buzz/index.html ("Our new media program analyzes the coverage of a wide range of topics …."); *Reliable Sources* (CNN broadcast), *available at* http://reliablesources.blogs.cnn.com/ ("Now more than ever, the press is a part of every story it covers").

Indeed, several of the statements made in the Works at issue here were themselves newsworthy, independent of the underlying story being covered—and these FNC broadcasts were then covered by other news stations.  (Rose Decl. ¶ 14, Ex. JJ (*e.g.*, MEDIAITE, Nov. 1, 2012: "Fox's *The Five* Hosts: Post-Hurricane Sandy Gas Lines Are 'Carter-Esque,' Bad For Obama"; WASHINGTON POST, Dec. 10, 2012:

**HIGHLY CONFIDENTIAL**

"Will George Zimmerman Regret Hannity Interview?").   TVEyes' service thus greatly facilitates the public's access to the news made *by* Fox on its broadcasts every day, functioning as the source for creating a ***new*** news story. (SUF ¶¶ 59, 97, 120-22; Second Rose Decl. ¶¶ 7-8, Exs. HHHH-KKKK.)   Just as the Second Circuit recognized that "Bloomberg was simply revealing the newsworthy information of what Swatch Group executives had said," *Swatch*, 2014 WL 2219162, at *8, TVEyes functions to "reveal the newsworthy information of what [FNC and FBN] had said," *id.*; *see also Feist*, 499 U.S. at 348 ("facts … [such as] news of the day … may not be copyrighted and are part of the public domain available to every person.") (quotations omitted).

*Third*, TVEyes furthers the public interest by facilitating criticism of Fox—a fundamental First Amendment value.   Without TVEyes (or services like it), the public could not efficiently review content broadcast on FNC, exactly as it was broadcast on FNC, for the purpose of commenting on or criticizing Fox.   Fox, ITN Source and Executive Interviews, prohibit licensees from using Fox video segments to criticize Fox and its program—it even requires licensees to ***waive*** any claim to fair use.  (SUF ¶¶ 117-118.)  Further, would-be critics and commentators cannot use content from the Fox Website to criticize Fox because, as noted above, that content: (1) is exclusively controlled by Fox; (2) is incomplete; (3) does not accurately reflect exactly what was broadcast; and (4) has limited search functionality that interferes with the ability to search for and find content.   (*Id.* ¶¶ 100-114.)   There is tremendous value in having a disinterested third party capture and index all content as it aired, make it searchable, provide analytic tools, and provide snippets for purposes consistent with fair use. For example, Media Matters—a TVEyes client—has reported that "Fox News Underreported Sexual Assault In The Military," as compared to MSNBC and CNN, using TVEyes to conduct the analysis.

HIGHLY CONFIDENTIAL

(Rose Decl. ¶ 15, Ex. JJ).  This undeniably benefits the public interest and the core principles underlying the First Amendment.

Denying TVEyes the ability to make excerpts of Fox broadcasts available to subscribers for research—especially for research that results in criticism of Fox—elevates Fox's rights to exclusive ownership and control over the public's right to continue to access information and effectively engage in political discourse.  There is a public benefit to—and a First Amendment interest in—giving the public the means to carry on this conversation on its own terms.  TVEyes is essential to this end and this Court should hold that its use is fair.

### III.  FOX HAS NOT ESTABLISHED THAT TVEYES IS LIABLE FOR WILLFUL COPYRIGHT INFRINGEMENT

Because TVEyes has (at least) raised a question of fact as to whether its capture and indexing of the Works is a fair use under 17 U.S.C. § 107, the Court need not, and should not, address Fox's arguments regarding TVEyes' purported "willful infringement" of the 19 Works.[31]  (Fox Br. at 25).  However, in the event the Court rules that TVEyes' use is not fair, Fox ***still*** cannot prevail on its motion as to willful infringement.

Fox presents the Court with an astounding false statement of law:  it claims that because "TVEyes has admitted to verbatim copying of each of the Registered Works," Fox must be awarded summary judgment "***whether or not TVEyes can meet its burden of establishing its fair use defense***."  Fox. Br. at 26 (emphasis added).  This misstatement is not only wrong, but it is irresponsible—no court has

---

[31]   In its brief, Fox states in its heading that "TVEyes willfully has infringed the Registered Works."  Fox Br. at 25.  Puzzlingly, however, this section makes no mention of willfulness.  Thus, Fox has waived any argument that the Court should find any infringement to be "willful."  However, even if willfulness was not waived, TVEyes' capture and index of the Works was not willful for the same reasons that it did not make bad-faith use of those Works.  *See supra* Part II.A.3.

**HIGHLY CONFIDENTIAL**

*ever* determined a use to be fair, but nonetheless infringing.  That is because the text of § 107 specifies that "the fair use of a copyrighted work … is not an infringement of copyright."  17 U.S.C. § 107.

None of the three cases cited by Fox stand for the proposition that "verbatim copying" is infringing as a matter of law "whether or not [the defendant] can meet its burden of establishing its fair use defense."  (Fox. Br. at 26.)  *Infinity*, for example, held that the use at issue was ***not*** fair, and then remanded the case back to the district court to determine whether the defendant's service was nonetheless not an infringement under a "statutory carrier" defense.  105 F.3d at 112.  *WPIX* never addressed fair use, so it cannot stand for the proposition that Fox must be awarded summary judgment "whether or not" TVEyes can meet its fair-use burden.  Finally, Fox cites *Am Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) for this false proposition, but fails to inform the Court that *Aereo* also noted that "the doctrine of 'fair use' can help to prevent inappropriate or inequitable applications of the [Transmit] Clause."  *Id.* at 2511 (citing *Sony*).  *Aereo* ***expressly rejects*** Fox's theory that a fair use must nonetheless be infringing when "verbatim copying" is at issue; to the contrary, it went out of its way to expressly preserve the fair-use defense.   And if this Court needed any more convincing, the Second Circuit repeatedly has confirmed that "verbatim copying" may nonetheless be fair and non-infringing.  *See supra* Part II.C (copying of works in entirety nonetheless found to be fair—and non-infringing—uses in *HathiTrust*, *Swatch*, *Bill Graham*, *Google Books*, *Vanderhye*, *Perfect 10*, and *Kelly*). [32]

---

[32]  Should the Court find that TVEyes' use of the Works was not permissible under the doctrine of fair use, TVEyes respectfully requests permission to requests permission to move to reinstate its equitable defenses and take discovery on the additional defenses that were dismissed ***without prejudice*** at the April 7, 2014 hearing, including but not limited to,  inequitable estoppel and unclean hands.  *See* Schapiro 56(d) Decl.

## IV.   FOX'S "HOT NEWS" CLAIM IS BOTH PREEMPTED AND MERITLESS

Fox's claim for "hot news" misappropriation—a tort that is rarely recognized, and only in circumstances that are essentially identical to those of *International News Service v. Associated Press* ("*INS*"), 248 U.S. 215 (1918)—should be rejected, both because it is preempted by the Copyright Act and, in any event, Fox has failed to introduce evidence sufficient to support such a claim.

### A.   Fox's "Hot News" Claim Is Preempted by the Copyright Act

Contrary to Fox's assertion, a "hot news" claim is not available whenever "news organizations" believe that a business has "cop[ied] and re-disseminate[d] their efforts."  (Fox Br. at 44.)  Before Fox's "hot news" claim can even be addressed on the merits, Fox must first establish that its claim is not preempted.[33]

A "hot news" misappropriation claim is preempted if: (1) it seeks to vindicate rights equivalent to one of the bundle of exclusive rights protected by the Copyright Act; and (2) the work in question is of the type protected by the Copyright Act. *Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.* ("*Fly*"), 650 F.3d 876, 892 (2d Cir. 2011).  Fox does not dispute—nor could it—that both prongs are satisfied: (1) the works at issue (the Fox broadcasts) are all works "of a *type* covered by" 17 U.S.C. § 102, *Nat'l Basketball Ass'n v. Motorola, Inc.* ("*NBA*"), 105 F.3d 841, 851 (2d Cir. 1997); and (2) Fox seeks to vindicate rights equivalent to acts of copying and distribution, *Fly*, 650 F.3d at 902. (*See* Compl. ¶¶ 66-67.)

---

[33]  Fox does not attempt to argue that its "hot news" claim is not preempted; rather, it merely cites to *INS* for the proposition that a "hot news" claim as one that "protects 'the substance of the information'" while copyright law protects 'the particular form or collections of words in which the writer has communicated it.'" (Fox Br. at 44 n.11 (quoting *INS*, 248 U.S. at 234).)  However, the Second Circuit has since held that a "hot news" claim exists only in the most narrow circumstances where the facts presented mirror those of *INS*.  *See infra.*

**HIGHLY CONFIDENTIAL**

Where both prongs of the preemption test are satisfied, courts then apply the "extra element test"—that is, whether "an 'extra element' is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action." *NBA*, 105 F.3d at 850 (2d Cir. 1997) (quotations and citation omitted).  If so, "the right does not lie within the general scope of copyright, and there is no preemption." *Id.*

The Second Circuit twice has recognized—in *NBA* and *Fly*—that a "hot news" misappropriation claim may survive preemption, but warned that the exemption from preemption is extremely narrow.  Indeed, both Fly and NBA  found the claim to be preempted.  *See*, *e.g.*, *Fly*, 650 F.3d at 896 (*NBA* "repeatedly emphasized the 'narrowness' of the 'hot news' tort"); *NBA*, 105 F.3d at 852 ("[O]nly a narrow 'hot news' misappropriation claim survives preemption.").   "Hot news" claims are reserved for factual circumstances essentially identical to those of *INS*.[34]  *See Fly*, 650 F.3d at 894, 899 n.32, 902, 905, 906 (describing the surviving tort as "*INS*-type" or "*INS*-like").  In *Fly*, for example, the Court repeatedly compared the facts before it to *INS* in finding plaintiff's "hot news" claim to be preempted.  *See id.* at 650 F.3d at 902-06.

Fox purports to list the "elements" of a "hot news" claim, citing *NBA*.  (Fox Br. at 44.)  However, *Fly* expressly held that these are ***not*** the "elements" of a "hot news" claim.   To the contrary, the Court found the various five-part tests articulated in *NBA* to be *dictum*:

---

[34]  In *INS*, two competing wire services—AP and INS—transmitted news stories by wire to member newspapers.  *INS*, 248 U.S. at 215.  INS (1) lifted time-sensitive, factual stories from AP bulletins and sent them to INS papers by wire, and (2) took time-sensitive, factual stories from east coast AP papers and wired them to  INS papers on the west coast, thereby "scooping" AP with its own content without attribution.   *Id.* at 231, 238.   In the words of *Fly*, "AP broke news, and INS repackaged that news as though it were 'breaking' news of its own."  650 F.3d at 902 n.36.

**HIGHLY CONFIDENTIAL**

> [R]ather than identifying a set of required and specific "extra
> elements" essential to a non-preempted *INS*-like "hot news"
> claim, the Court in *NBA* was opining about the hypothetical set
> of circumstances—not present in that case—that might give rise
> to such a claim.  Because the *NBA* Court concluded that no such
> claim could be established on the facts of that case because of
> the absence of free-riding, its conjecture was descriptive and a
> helpful window into its reasoning, but could not bind subsequent
> courts.

650 F.3d at 899 n.32.  Thus, while this Court may consider the "five elements"

discussed in *NBA* to be a "helpful window," the true test is whether Fox's claim

mirrors the facts of *INS* so closely as to escape preemption.  Because Fox's claim is

not "*INS*-like" at all, its "hot news" claim is preempted.

### 1.   Fox Has Not Identified Any Particular Piece of Exclusive, Time-Sensitive "Hot News" Misappropriated by TVEyes That It Generated at Significant Cost and Expense

As a threshold matter, Fox has not identified *any* specific piece of time-

sensitive "hot news" that TVEyes allegedly misappropriated.  Rather, Fox identified

entire *topics*, without identifying a specific time or date that a particular piece of

"hot news" was exclusively disseminated by Fox.  Because TVEyes has not been

placed on notice of the particular "hot news" that it allegedly misappropriated, Fox's

claim must be dismissed.

In discovery, TVEyes issued an interrogatory to Fox requesting that it

"[i]dentify each piece of 'hot news' that TVEyes allegedly misappropriated and, for

each piece of 'hot news' identified, describe the efforts Fox News undertook to

gather it." (Anten Decl. ¶ 33, Ex. OOO.) The entirety of Fox's substantive response

is as follows:

> …  Fox News identifies, as the "hot news" that TVEyes
> misappropriated, all of the breaking news aired on Fox News Channel
> or Fox Business Network between July 31, 2010 and July 30, 2013,
> including, but not limited to: Fox News' May 19–25, 2013 coverage of
> the Moore, Oklahoma tornado; Fox News' April 15–22, 2013 coverage
> of the Boston marathon bombing and subsequent manhunt; Fox News'
> April 4–13, 2013 coverage of North Korea tensions; Fox News'

February 11, 2013 to March 20, 2013 coverage of the papal resignation and election; Fox News' December 14–18, 2012 coverage of the Newtown, Connecticut school shooting; Fox News' November 15–30, 2012 coverage of the Israel-Hamas conflict; Fox News' October 25 to November 5, 2012 coverage of Hurricane Sandy; Fox News' August 26–31, 2012 coverage of Hurricane Isaac; Fox News' September 12–20, 2012 coverage of political unrest in the Mideast; Fox News' August 24–31, 2011 coverage of Hurricane Irene; and Fox News' July 4, 2011 to September 4, 2011 coverage of the Arab Spring uprisings in Libya. *Id.*

Fox's identification of the "hot news" at issue is so overbroad on its face as to warrant instant dismissal of this claim.

*First*, Fox identifies the subject of its "hot news" claim as "all of the breaking news" that aired on FNC or FBN, but Fox fails to describe what it considers to be "breaking news." In its brief, Fox likewise fails to identify any "hot news" that TVEyes allegedly misappropriated, and instead conclusorily refers to "breaking" or "time-sensitive" news. (Fox Br. at 45-46.) This is plainly insufficient—TVEyes is entitled to notice of what Fox asserts TVEyes misappropriated. *See Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012) (dismissing trade-secret misappropriation claim because plaintiff failed to identify the trade secret used and defendants "are entitled to notice of the misappropriations for which [plaintiff] seeks to hold them liable"). Fox concedes that not all of its programming consists of "hot news," or even "breaking news." (*See* Fox SUF ¶¶ 12 (FNC delivers breaking news "as well as political and business news and information"); 21 ("FNC airs … information programming"); 38 (FNC's prime-time programs present "analysis" of news that already occurred).) Accordingly, not all of the news reported by Fox during the multi-day news "events" identified by Fox is sufficiently "hot" to give rise to the quasi-property rights that are asserted by Fox in its motion.

*Second*, in its interrogatory response, Fox identifies entire weeks of its "coverage" of world events as its protectable "hot news." For example, without identifying any particular story or segment that was broadcast, Fox claims the entirety of its coverage of the Arab Spring uprisings for **63 days** is "hot." Likewise,

**<u>HIGHLY CONFIDENTIAL</u>**

without identifying any particular story or segment that was broadcast, Fox claims the entirety of its "coverage" of the papal resignation and election for ***43 days*** is "hot."  Fox even identifies the entirety of nine days of "coverage of political unrest in the Mideast" as protectable "hot news"—a frustratingly vague claim considering that, unfortunately, there is almost always political unrest in the Mideast.  At base, Fox asserts that ***all*** of its coverage is "hot news."  But Fox does not, and never has, owned the topics of Hurricane Sandy, the Newtown shootings, or Israel-Hamas conflict. The Court should reject Fox's argument that it can name a world event and own every fact reported on it.

*Third*, "hot news" addresses the particular protection of a plaintiff's "property rights in time-sensitive information."  *NBA*, 105 F.3d at 853.  Fox, however, cannot state a claim for "hot news" misappropriation if the same information is being reported by others, because "the fact that the information in question was widely available undermines any claim by [Fox] that [it] possessed property rights in that information."  *Silver v. Lavandeira*, 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26, 2009). A "hot news" claim is a short-term monopoly over the facts collected—if the same facts are being distributed by multiple other sources, then a news organization cannot claim to have "property rights" in those same facts to the exclusion of others. Fox, however, produced no evidence that any of the facts contained in its "coverage" of these major news events was first published exclusively by Fox, nor that any such "facts" were not already available from another source when TVEyes allegedly misappropriated them.

To the contrary, Fox concedes that other news organizations "broke" the same stories at the same time. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**HIGHLY CONFIDENTIAL**

██████  ████████████████████  ████████████████

████████████████████████████████        In addition, Fox states that it

acquires content from (1) AP and Reuters, and (2) a joint news pool with ABC and

CBS.  (Berg Decl. ¶¶ 20-21.)   This again further demonstrates that not all Fox

reporting is exclusive to Fox.[35]  Because Fox has not established, pursuant to its

burden of proof, that any of the factual information it may have gathered during its

reporting of any particular news event was not already or simultaneously

disseminated by other news organizations, it cannot claim such news as "hot." [36]

Fox makes no effort to detail any cost or expense incurred in connection with

its gathering and reporting of the asserted "hot news."  Rather, Fox merely presents

general pronouncements about its ***entire*** news organization—for example, "high-

tech equipment," its "operating news bureaus," its hiring and training of journalists,

---

[35]  Though not mentioned in Fox's brief or Statement of Undisputed Facts, Fox tries to slip a few new "examples" of never-identified "breaking news coverage" segments into its moving papers.  (*See* Wallace Decl. at Ex. 57.)   Because they were not disclosed to TVEyes in advance of Fox's motion, they cannot be considered on summary judgment.  However, as an illustration, Fox's own clips demonstrate how not all Fox news is "hot."  In one segment, for example, a Fox correspondent relates that the Vatican issued a public statement that Pope Benedict XVI would be stepping down; the remainder of the segment follows the correspondents opining on the health of the outgoing Pope and how the next Pope would be elected.  (*See* Wallace Decl. Ex. 57, "2-11-2013 Pope Benedict XVI Resignation.wmv.")   This is a quintessential example of news that may be "breaking" (*i.e.*, recent) but not "hot" (*i.e.*, underlying facts owned by Fox).  ***Fox*** did not invest to "break" this news—it merely repeated the Vatican's own statement that had been simultaneously stated to ***thousands*** of other news outlets worldwide.

[36]  Even if Fox could establish that it was the first news outfit to report a particular piece of news, that information would lose its time-sensitive value as soon as other news networks independently acquired and disseminated it.  *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 209 (S.D.N.Y. 2003) ("This doctrine creates a narrow quasi property right in news, which as facts 'may not be copyrighted,' only as against business competitors and only until its commercial value as 'hot news' has passed.") (citing *Fin. Info., Inc. v. Moody's Investors Serv. Inc.*, 808 F.2d 204, 207 (2d Cir. 1986)).  In the age of the 24-hour news cycle, the time-sensitive value of news is increasingly fleeting.  Fox bears the burden of proving that any of the facts it claims to have exclusively acquired and reported to the world first were not reported by other news sources before Fox's broadcast was captured, indexed, and rendered searchable on TVEyes.

**HIGHLY CONFIDENTIAL**

and its "rush to the scene" when (undisclosed) "breaking news events" occur. (Fox Br. at 45.)  None of these expenditures, however, demonstrate an investment in a particular piece of "hot news"—they merely describe costs that support Fox's entire news operation, of which "hot news" is just a small part. ████████████████ ██████████████████████████████████████, but makes no effort to detail its costs for gathering any particular piece of "hot news." [37]  And as noted above, providing the purported newsgathering costs to cover "events" that last for weeks or months is not sufficient.

Fox seems to simply assert that because TVEyes captures all FNC and FBN broadcasts, there must be "hot news" in there somewhere, so TVEyes must have misappropriated that "hot news," and the details will be sorted out later.  That premise, however, is merely a failed copyright claim—"hot news" is a very narrow and highly specialized tort, and there must be specific investments that were made for specific acts of news-gathering that could give rise to a quasi-property right.  It is not enough to simply point to TVEyes' activities and proclaim its news "misappropriated"—Fox must first establish that it has a protectable property interest in certain gathered facts in the first place.  It has not done so.

<p style="text-align:center">*       *       *</p>

Not all news is "hot news."  Because Fox: (1) fails to identify any particular piece of "hot news" that TVEyes misappropriated; (2) fails to establish that any such news was exclusive to Fox and not already or simultaneously being reported by its competitors; and (3) fails to establish the cost it incurred in gathering that news, Fox fails to satisfy its burden of proof in establishing an *INS*-like claim.

---

[37] Nor has Fox established that the alleged "hot news" was not already widely distributed when reported by Fox or made available for viewing on TVEyes. (*See* Fox Br. at 46.)

HIGHLY CONFIDENTIAL

### 2.  TVEyes Does Not "Free-Ride" on Fox's Efforts Because It Attributes All Fox Content to Fox

Fox cannot establish that TVEyes "free rides" on Fox's effort as this factor has been interpreted by this Circuit in both *INS* and *Fly*.  The Second Circuit has established precisely what is meant by "free-riding" in a "hot news" context:

> The *INS* Court defined the "hot news" tort in part as "taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and ... appropriating it and selling it ***as [the defendant's] own***...." *INS,* 248 U.S. at 239.  That definition fits the facts of *INS:*  The defendant was taking news gathered and in the process of dissemination by the Associated Press and selling that news ***as though the defendant itself had gathered it***. ...

*Fly*, 650 F.3d at 903 (emphases added).  This is what was so troubling in *INS*.  INS lifted factual stories from AP bulletins or east-coast AP papers, repackaged the facts, and sent its stories to INS newspapers as if it had gathered the facts on its own.  *See id.* at 902 n.36 ("in *INS*, AP broke news, and INS repackaged that news as though it were 'breaking' news of its own").   Thus, to establish "free-riding," a defendant must sell the material as if it had gathered it on its own.

Where a defendant provides attribution to the source of the "hot news," there is by definition no free-riding.   The Second Circuit found attribution to be dispositive in *Fly*, recognizing that "Fly, having obtained the news …, is hardly selling [it] 'as its own,'" because "[i]t is selling the information ***with specific attribution to***" the source.  650 F.3d at 903 (emphasis added); *see also id.* at 902 (no free-riding because the defendant was "attributing the information to its source").   Thus, news media—including Fox—routinely convey facts originally gathered from other news-gatherers, with proper attribution. (Second Rose Decl. ¶¶ 11-19 Exs. NNNN-VVVV) (attaching recent examples of Fox broadcasts attributing breaking news to other sources).

**HIGHLY CONFIDENTIAL**

In this case, there is no dispute that TVEyes specifically attributes all broadcast content, including FNC and FBN content to its original source. (SUF ¶ 126.)  TVEyes' Results List includes the name of the station from which every result is returned.  (SUF ¶ 30.)  And when a user watches a clip on TVEyes, it always includes the name of the station on the Transcript Page.  (SUF ¶ 32.) Finally, to the extent that the FNC and FBN logos are displayed on the TV screen when broadcast, those logos also appear, in the same manner, on TVEyes.  Fox even concedes that "its news ticker" is continuously on the screen.  (Fox Br. at 46.)

Indeed, attribution is essential to TVEyes' service—users want to know what words were used (and if so, when and how) on ***television***, not how they were used on TVEyes.  For TVEyes to pass these clips on as its own, as if it had "gathered" this information, "would be of little value to either [TVEyes] or its customers," *Fly*, 650 F.3d at 903, who are interested in the fact that their keyword was mentioned on a particular news channel, not on TVEyes.  The entire ***point*** of TVEyes is that it accurately and completely captures what others have said on television—attribution is essential to any value.  *See id.* ("It is Fly's accurate attribution of the Recommendation to the creator that gives this news its value."). [38]

Moreover, TVEyes expends its own resources to capture the content of over 1,400 television and radio broadcasts and, using its own skill and technology, indexes the content into text databases and delivers relevant search results and excerpts in response to user-selected keywords (SUF ¶¶ 3, 13-15; Second. Ives Decl. ¶ 21 (listing costs associated with creating and maintaining a comprehensive keyword searchable database of television and radio content).)  All of these unique

---

[38]  To this end, the cases cited by Fox are irrelevant. (*See* Fox Br. at 47 citing *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 613 (S.D.N.Y. 2010); *Pollstar v. Gigmania Ltd.*, 2000 WL 34016436, at *6 (E.D. Cal. Sep. 1, 2000).  In neither of these cases (which both involved a motion to dismiss) did the defendant specifically attribute the material at issue to the plaintiff.

**HIGHLY CONFIDENTIAL**

contributions—capturing, indexing, organizing, and delivering—occur solely at TVEyes' expense. *See NBA*, 105 F.3d 854 ("free riding" not present where the parties  bore their own costs in collecting and disseminating the factual information in question).

Finally, by delivering keyword results to customers, TVEyes reports the ***fact*** that a particular keyword was mentioned in a particular Fox broadcast.  This, by definition, is not the same underlying news reported by Fox; it is a new fact, and therefore is not free-riding. *See Fly*, 650 F.3d at 902 ("[Fly] is collecting, collating and disseminating factual information—the ***facts*** that Firms and others in the securities business have made recommendations") (emphasis in original).

Fox asserts that because TVEyes allows users to view snippets of Fox content, TVEyes "bears none of the substantial operating costs needed to cover the news on a day-to-day basis," and thus has lower costs.  (Fox Br. at 46.)  That misses the point.  TVEyes is not, and does not purport to be, a newsgathering operation at all—it is a media-monitoring service.  Thus, whether TVEyes' overall costs are higher or lower than Fox's is irrelevant; TVEyes expends its own operating costs that Fox does not bear in order to provide a text-searchable electronic database of every word spoken on television.  If Fox ceased to exist, TVEyes would not be forced to spend any resources engaging in its own newsgathering, because it does not exist to "report" the news in the first place—it simply provides a research tool that neutrally, but accurately, captures and indexes whatever has been broadcast on television.[39]

---

[39]  Fox also reiterates its failed "bad faith" argument (Fox Br. at 47), which TVEyes addresses in full above, *see supra* Part II.A.4.

**HIGHLY CONFIDENTIAL**

### 3.   TVEyes Is Not a Threat to the Very Existence of Fox

Fox claims that TVEyes "reduces [Fox's] incentives to gather and report the news." (Fox Br. at 49.) Not only does Fox misstate the standard, but Fox is wrong on the facts. The question under *INS* is not merely whether TVEyes' service "reduces" Fox's incentives to gather and report news. Rather, to avoid preemption, TVEyes' service must constitute a "threat to the **very existence** of the product or service provided by" Fox. *NBA*, 105 F.3d at 853; *see also id.* at 852 (threat must be so severe so as to render plaintiff's "publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return" (quoting *INS*, 248 U.S. at 241). Ultimately, the "hot news" doctrine remedies the threat to newsgathering posed by misappropriation that "would destroy the incentive to collect news in the first place." *Id.*

In any event, Fox has introduced no evidence, other than self-serving declarations merely stating as much, that TVEyes has any meaningful impact on Fox's financials, let alone that TVEyes is a "threat to the very existence" of Fox such that FNC and FBN will cease to engage in any newsgathering activities. Fox's and TVEyes' services have co-existed for nearly the entirety of their operations, and ███ ████████████████████████████████████     ████████████████████████ ████████████████████████████████████████████████████████████ so it is laughable for Fox to claim that TVEyes somehow threatens to put the entire Fox news organization out of business. (Fox SUF ¶¶ 17-18, 56-58; Carry Decl. ¶ 14; Misenti ¶¶ 7, 19, 20; Second Rose Decl. ¶ 5.)

Fox offers no basis to conclude that the existence of TVEyes (or other business-to-business media-monitoring services that provide snippets for the purpose of conducting internal research and analysis) will render Fox "profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return." *INS*, 248 U.S. at 241. "Hot news" misappropriation

HIGHLY CONFIDENTIAL

is a severe tort that provides a news operation with a monopoly over facts; is the law will recognize a claim only in cases where the incentive to gather facts will be outright destroyed, and not just depressed.  Fox's claim must fail.

### 4.   TVEyes and Fox Do Not "Directly" Compete

A "hot news" misappropriation claim will be preempted unless the parties are the most direct of direct competitors, in the way that INS and AP were directly competitive wire services chasing after identical stories.  It is not enough for the parties to merely have some areas of overlap in business; rather, "only products in the 'keenest' of competition satisfy the direct competition requirement for a non-preempted claim."  *Fly*, 650 F.3d at 913 (Raggi, J., concurring) (quoting *INS*, 248 U.S. at 221 (plaintiff and defendant newspaper companies were "in the keenest competition" in gathering and publishing news throughout the United States)). TVEyes and Fox do not "directly" compete.

*First*, Fox is not a media-monitoring service, and TVEyes does not (and does not purport to) engage in its own newsgathering efforts.  (SUF ¶¶ 93, 125).  There is no evidence that Fox is now, or plans to be, in the business of capturing, indexing and making searchable by keyword the content broadcast on over 1,400 television and radio stations, nor that TVEyes is in the business of providing original programming for consumption on television.  *See Fly*, 650 F.3d at 914-15 (Raggi, J., concurring) ("The Firms do not aggregate or distribute other Firms' Recommendations … [and] Fly does not produce any of its own recommendations or seek trading commissions").  Further, Fox's own declarants and documents identify MSNBC and CNN, but not TVEyes, as Fox's "primary competitors."  (*See* Wallace Decl. ¶ 45; *see also* Villar Decl. ¶ 13 (comparing FNC coverage of Boston Marathon bombing to CNN and MSNBC); Ex. 4 (comparing FNC ratings to CNN and MSNBC; SUF ¶ 93).)  While both TVEyes and Fox may, on a global level, trade in

**HIGHLY CONFIDENTIAL**

the very general subject of news, such "broad similarity between the companies' overall goals does not constitute the ***substantial similarity*** required for direct competition." *Fly*, 650 F.3d at 913 (Raggi, J., concurring) (emphasis added).

*Second*, as discussed *supra* at II.D.1, Fox has not introduced any evidence of an actual or potential cable subscriber no longer subscribing to or watching FNC or FBN because of the existence of TVEyes. *See NBA*, 105 F.3d at 853-54 ("With regard to NBA's primary products—producing basketball games with live attendance and licensing copyrighted broadcasts of those games—there is no evidence that anyone regards SportsTrax or the AOL site as a substitute for attending NBA games or watching them on television."). While Fox may claim that Fox and TVEyes "directly compete" in connection with Fox's ancillary business of licensing clips, the issue is not whether there is ***any*** competition, but whether there is the "keenest" of direct competition akin to two directly competing newswire services, where one party "scoops" the other. *INS*, 248 U.S. at 221.

*Third*, the parties' services are qualitatively different. TVEyes is a research tool to monitor television broadcasts, a service that is not offered by Fox. By contrast, the overwhelming majority of Fox's revenue is attributable to fees paid by cable and satellite companies and advertisers—hundreds of millions of dollars every year (Carry Decl. ¶ 14)—and these fees are unaffected by TVEyes post facto use of Fox broadcasts. Nor does TVEyes service compete with Fox's television programming or clip licensing and online businesses, *see supra* at II.D.2., which represents a tiny fraction of Fox's revenues. (Second Rose Decl. ¶ 6). *See Fly*, 650 F.3d at 913 (Raggi, J., concurring) (no direct competition where the service at issue was not plaintiff's "primary business[]").[40]

---

[40] Fox also claims that TVEyes' service competes with the Fox Website's search engine. (Fox Br. at 48.) For the reasons set for *supra* at II.D.2. this is not the case.

HIGHLY CONFIDENTIAL

Under *INS*, the "direct competition" requires that the parties be in the "keenest" of competition in their primary businesses.  Because Fox and TVEyes offer different services, they do not "directly" compete under for the purposes of a "hot news" claim.

<p style="text-align:center">*      *      *</p>

As noted above, the central inquiry of a non-preempted "hot news" claim is whether the facts presented mirror those of *INS*.  Here, because Fox refused to even identify the "hot news" at issue other than simply defining it as all Fox "breaking news" (whatever that is), Fox's claim does not get out of the starting gate.  But even if Fox did identify "hot news" that it ***exclusively*** had gathered, Fox and TVEyes are not direct competitors, TVEyes does not pass of Fox's news as if TVEyes had gathered it, and in any event TVEyes does not threaten the very existence of Fox's continuation in the news-gathering industry.  Because the presented facts are nowhere near those of *INS*, the Fox's "hot news" claim is preempted.

### B.    Fox's "Hot News" Claim Is Preempted by the Copyright Act

Even if Fox's "hot news" claim was not preempted by the Copyright Act, it should be rejected on the merits for the same reasons discussed above.  Any "extra elements" for exemption from preemption of a "hot news" claim are also the elements of the underlying "*INS*-like" tort.  *Fly* 650 F.3d at 898.  Because this case does not present "*INS*-like" facts, Fox's claim should be dismissed.

## V.    FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS BOTH PREEMPTED AND MERITLESS

Fox's common law misappropriation claim should be dismissed because it is preempted by the Copyright Act, or in the alternative, for lack of proof.

**HIGHLY CONFIDENTIAL**

### A.    Fox's "Direct Competition" Misappropriation Claim Is Preempted by the Copyright Act

Fox alleges that TVEyes is liable for non-hot news misappropriation/unfair competition under New York law because "TVEyes uses Fox News's work in competition with it" and is thus "intentionally misappropriating Fox News content and palming it off to consumers … intentionally misleading the public to believe that there is a connection between Fox News and TVEyes where there is none." (Compl. ¶¶ 73-74.)

This claim should be dismissed as a matter of law because binding Second Circuit precedent holds that state-law unfair competition/misappropriation claims premised on the copying of a plaintiff's copyrighted works are preempted by the Copyright Act.  *See NBA*, 105 F.3d at 852 (New York's broad misappropriation doctrine preempted by federal copyright law); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) ("Walker's cause of action for unfair competition is preempted by the federal copyright laws to the extent it seeks protection against copying of Walker's book."); *see also* 17 U.S.C. § 301(a) ("all legal or equitable rights that are equivalent to any of the exclusive rights" of the Copyright Act "are governed exclusively by" the Copyright Act).   Indeed, the Second Circuit has explicitly held that where the defendant's acts "concern material within the realm of copyright," "***only*** a narrow hot news claim survives preemption for actions concerning material within the realm of copyright."   *NBA*, 105 F.3d at 852 (emphasis added); *see also Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 208 (2d Cir. 1986) ("We are not persuaded by FII's argument that misappropriation is not 'equivalent' to the exclusive rights provided by the Copyright Act.").   Because Fox's materials are within the "realm" of copyright, its non-"hot news" misappropriation claim is preempted as a matter of law.

**HIGHLY CONFIDENTIAL**

In *Fly*, the Second Circuit confirmed that the broad doctrine of unfair competition described in *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950) is preempted by the Copyright Act.  650 F.3d at 896-97.  The Court explained:

> No matter how "unfair" Motorola's use of NBA facts and statistics may have been to the NBA—or Fly's use of the fact of the Firms' Recommendations may be to the Firms—then, such unfairness alone is immaterial to a determination whether a cause of action for misappropriation has been preempted by the Copyright Act.   The adoption of new technology that injures or destroys present business models is commonplace. ***Whether fair or not, that cannot, without more, be prevented by application of the misappropriation tort.*** Indeed, because the Copyright Act itself provides a remedy for wrongful copying, such unfairness may be seen as supporting a finding that the Act preempts the tort.

*Fly*, 650 F.3d at 896 (emphasis added, footnotes omitted); *id.* (stating that NBA deemed preempted the "broad theory of misappropriation" embodied in *Metropolitan Opera*).

Fox advances two theories as to why its common law misappropriation/unfair competition claim does not "concern material within the realm of copyright" and therefore survives preemption.  Both should be rejected.

*First*, Fox argues that its claim is based not on TVEyes' acts of copying, but on "TVEyes' use of its distribution system," which, Fox maintains, is not protected under copyright law.  (Fox. Br. at 55).   However, ***the Complaint makes no mention of TVEyes "use" of Fox's "distribution systems."***   Rather, the Complaint alleges that TVEyes misappropriated Fox's  "premium programming and content," and "uses" and "distributes" Fox's work to consumers.  (Compl.  ¶¶ 72-74.) These allegations are qualitatively equivalent to Fox's claim for copyright infringement.  *See, e.g.*, *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) ("unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted"); *Durham Indus., Inc. v.*

**HIGHLY CONFIDENTIAL**

*Tomy Corp.*, 630 F.2d 905, 919 (2d Cir. 1980) ("[t]o the extent that Tomy's unfair competition claim seeks protection against Durham's copying," it is preempted). Fox scrambles to save its claim by referring to rights to an unpleaded "distribution system,"[41] but the Court should reject Fox's attempt to "dress up its claim that [the defendant] had copied [plaintiff's work]" for the purpose of surviving preemption. *Eyal R.D. Corp. v. Jewelex New York Ltd.*, 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) (Hellerstein, J.); *see also id.* ("to avoid preemption, that which is claimed to be unfair competition must be something different from copying, or the fruits of copying, or the intent or bad faith that can be inferred from the act of copying").

*Second*, Fox argues that its non-"hot news" misappropriation/unfair competition claim is based upon consumer deception, and is thus necessarily "qualitatively different" from its copyright claim.   (Fox Br. at 55-56).   More specifically, Fox claims that TVEyes' unauthorized use of Fox's content causes consumer confusion—presumably as to whether TVEyes is authorized by Fox to do so.  (Compl. ¶ 74 (alleging consumer confusion arising out of a perceived "connection of association between Fox News and TVEyes where there is none.").)  This claim does not survive preemption because the alleged consumer deception arises directly out of the defendant's unauthorized copying.   *See Walker*, 784 F.2d at 52-53 (dismissing common-law unfair competition claim as arising out of defendant's alleged copying); *Eyal*, 784 F. Supp. 2d at 447 (dismissing common-law unfair competition claim alleging consumer deception as preempted); *Levine v. Landy*, 832 F. Supp 2d 176, 191 (N.D.N.Y. 2011) (plaintiff's claim "essentially a copyright infringement claim with the added allegation that after unlawfully copying,

---

[41] The closest reference in Count III to "distribution" is Fox's claim that "TVEyes's contemporaneous distribution of Fox News's content directly competes with Fox News cable telecasts." (Compl. ¶ 73.) This is equivalent of a copyright claim under 17 U.S.C. § 106(3) (providing right "to distribute copies … of the copyrighted work").

HIGHLY CONFIDENTIAL

distributing, and/or publishing the photographs, defendants stamped their own name or copyright on the works, rather than plaintiff's" and was thus preempted); *Nash v. CBS, Inc.*, 704 F. Supp. 823, 834 (N.D. Ill. 1989) ("palming off," or any other "evidence of misrepresentation only 'accentuates' a misappropriation claim and is not the 'essence' of such an action"); *c.f. Buttner v. R.D. Palmer Enterprises, Inc.,* 2013 WL 6196560, at *3 (N.D.N.Y. Nov. 27, 2013) ("Misrepresentation of authorship or failure to attribute authorship of a work does not save an unfair competition claim under New York common law from preemption by the Copyright Act."). In fact, a nearly identical claim of alleged "consumer deception" was made in the unfair competition claim asserted in *Metropolitan Opera*, 101 N.Y.S.2d at 486 ("the defendants … mislead the public into believing that the recordings are made with the co-operation of Metropolitan Opera and under its supervision"), which the Second Circuit later held to be preempted. *Fly*, 650 F.3d at 896-97.

### B. Fox Has Failed To Prove "Direct Competition" Misappropriation on the Merits

Even if Fox's misappropriation claim were not preempted, Fox has failed to establish its claim on the merits. The "essence" of a common law unfair competition claim under New York law "is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Eyal R.D.*, 784 F. Supp. 2d at 447 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995)). "To recover for unfair competition, a plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief, and must show that there was bad faith." *Id.* at 447 (quotations omitted).

Though not at all clear from the face of its Complaint, Fox now seems to assert two separate theories of misappropriation: that TVEyes has (1) "misappropriated the results of Fox News' labor, skill and expenditures in bad faith,

**HIGHLY CONFIDENTIAL**

and has used them to profit at Fox News' expense"; and (2) "deceived customers into thinking that Fox News has authorized its use of content from FNC and FBN." (Fox Br. at 51.)  Both of Fox's theories fail for lack of proof.

*First*, Fox's claim that TVEyes' has "utilized Fox News' distribution system for its own commercial benefit and in direct competition with Fox News' use" (Fox Br. at 52) is entirely unsupported—there is no evidence that TVEyes has "used" any "distribution system" belonging to Fox to conduct its business.  Nor has Fox proven that it even owns a "distribution system" that could be considered protectable property susceptible to misappropriation.  TVEyes captures and indexes content that is broadcast on television, but it does not utilize anything else owned by Fox to conduct its business, and the record contains no evidence to the contrary.  There is no evidence that TVEyes has somehow stolen Fox's proprietary (but not copyrightable) "system" for distributing its copyrighted works.

*Second*, Fox's claim that "TVEyes has deceived consumers by crafting the overall appearance of its website and service in a way that gives the misimpression to consumers that it has permission or a license from Fox … when it does not" is equally lacking in support.  There is nothing about the presentation of TVEyes service that suggests a business affiliation with Fox.  (*See* www.tveyes.com; Second Ives Decl. ¶ 22; SUF ¶ 127.)   Nor is there evidence in the record of consumer confusion: Fox has not introduced a consumer survey demonstrating that potential TVEyes' customers are likely to believe that TVEyes' service emanates from or is approved by Fox, and the self-serving declarations of Ms. Cronin and Ms. Ashton are themselves insufficient to establish confusion.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001) (affirming district court's exclusion of alleged instances of consumer confusion among plaintiffs employees on summary judgment on the grounds that they were inadmissible hearsay and  *de minimis*); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d

**HIGHLY CONFIDENTIAL**

Cir. 1985) ("The two letters which were admitted are insignificant when contrasted to the hundreds of thousands of magazines sold"); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 279 (S.D.N.Y. 2006) (holding "a number of people" inquiring about or assuming an affiliation between two parties "not particularly significant" in light of "the sales volume of both companies"). TVEyes has never claimed to have a business relationship with Fox, and nothing in the manner in which TVEyes' markets and promotes itself suggests that such a relationship exists.   (SUF ¶ 127.)   To the contrary, on the rare occasions that TVEyes is asked about its relationship with broadcasters, it provides an accurate explanation.  (Second Ives Decl. ¶¶12, 22.)

Finally, TVEyes has not acted in bad faith.  In determining whether there is bad faith for purposes of a misappropriation claim, the "only relevant intent is intent to confuse." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 329 (S.D.N.Y. 2012) (quotations omitted).  Fox has not introduced any evidence that TVEyes intended to confuse the public as to the existence of a "connection or association" between Fox and TVEyes.  The mere fact that TVEyes captures and indexes Fox content to create a searchable database itself does not support an inference of bad faith. *Cf. Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005 (2d Cir. 1997) ("bad faith should not be inferred simply from the fact of copying.")   Indeed, TVEyes ***attributes*** the source of any broadcast content by always identifying the channel from which all content originates.  (SUF ¶ 126.)

Nor is the fact that TVEyes did not remove Fox content from its service after receiving a cease and desist letter evidence of bad faith.  TVEyes had a reasonable belief that its service is not infringing under principles of copyright fair use, and accordingly, its decision not to comply with Fox's demand letter is not evidence of bad faith. *See*, *e.g.*, *Hi-Tech Pharm. Co. v. Hi-Tech Pharm., Inc.*, 2007 WL 1988737,

**HIGHLY CONFIDENTIAL**

at *11 (E.D.N.Y. July 5, 2007) (defendant's continued use after receiving demand letter consistent with good-faith belief that use was not infringing).

## **CONCLUSION**

For the foregoing reasons, TVEyes respectfully requests that the Court deny Fox's motion for summary judgment in its entirety.


Dated:        July 24, 2014

<div style="margin-left:40%">

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By    /s/  Andrew H. Schapiro
       Andrew H. Schapiro
       andrewschapiro@quinnemanuel.com
       Todd Anten
       toddanten@quinnemanuel.com
       Jessica A. Rose
       jessicarose@quinnemanuel.com

       51 Madison Avenue, 22nd Floor
       New York, NY 10010
       (212) 849-7000

       *Attorneys for Defendant TVEyes, Inc.*

</div>