**<u>HIGHLY CONFIDENTIAL</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOX NEWS NETWORK, LLC,

               Plaintiff,

    - against -

TVEYES, INC.,

              Defendant.

Case No.  13-CV-5315 (AKH)

**DEFENDANT TVEYES' REPLY MEMORANDUM OF LAW**
**<u>IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ................................................................. 1

ARGUMENT ................................................................. 2

I.    TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107 ............... 2

    A.    The Nature and Character of TVEyes' Service Is Consistent With the Principles Underlying Fair Use ................................................. 3

        1.    TVEyes' Use of the Works as Part of Its Research Tool Is Highly Transformative ................................. 4

        2.    TVEyes' Use Of The Works-In-Suit Serves Public Interests ................................. 13

        3.    TVEyes' For-Profit Status Does Not Weigh Against Fair Use ................................. 17

        4.    There Is No Evidence of Bad Faith ................................. 20

    B.    The Works-in-Suit Are Factual in Nature and Were Previously Published ................................................. 23

    C.    Copying the Entirety of the Works Was Necessary to Create a Comprehensive, Text-Searchable Index ................................. 24

    D.    TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit ................................................. 26

        1.    TVEyes Does Not Act as a Substitute for the Works-in-Suit ................................. 28

            a.    TVEyes Does Not Affect Fox's Revenues from Cable Company Licenses or Advertising Partners ................................. 28

            b.    TVEyes Does Not Affect the Secondary Market for Public Performances Licenses for the Works-in-Suit ...... 32

i

        c.      TVEyes Does Not Deprive Fox of Revenue From
Use of the Works-in-Suit Online ..................................... 36

        d.      Lost Licenses to Media-Monitoring Services Are
Not Legally Cognizable Bases of Market Harm ............. 40

        e.      Similar Widespread Use Would Not Harm Fox ............. 41

    2.      TVEyes Provides a Tremendous Benefit to the Public ............. 43

E.    Weighing the Fair Use Factors, Along with Other Relevant
Considerations, TVEyes' Use Is Fair.................................... 46

II.    FOX'S "HOT NEWS" MISAPPROPRIATION CLAIM IS PREEMPTED
AND MERITLESS .......................................................... 48

A.    Fox's "Hot News" Claim Is Preempted by the Copyright Act.............. 49

    1.      Fox *Still* Has Not Identified Any Particular Piece of
Exclusive, Time-Sensitive "Hot News" Misappropriated by
TVEyes ...................................................................... 50

    2.      TVEyes Does Not "Free Ride" on Fox's Efforts Because It
Attributes All Fox Content to Fox ............................... 56

    3.      TVEyes Is Not a Threat to the "Very Existence" of Fox's
Newsgathering Activities ............................................ 59

    4.      TVEyes and Fox Do Not "Directly" Compete............................. 61

B.    Fox Cannot Establish Its "Hot News" Claim on the Merits ................ 65

III.    FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS
PREEMPTED AND MERITLESS.................................................... 65

A.    Fox's "Direct Competition" Misappropriation Claim Is
Preempted by the Copyright Act .......................................... 65

B.    Fox Cannot Establish Its "Direct Competition" Claim on the
Merits......................................................................... 68

CONCLUSION........................................................................ 71

## TABLE OF AUTHORITIES

**Page**

**Cases**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
   447 F. Supp. 2d 266 (S.D.N.Y. 2006) .................................................................. 69

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) .................................................................. 4, 25

*Am. Geophysical Union v. Texaco, Inc.,*
   60 F.3d 913 (2d Cir. 1994) .................................................................. 17

*Arica Inst., Inc. v. Palmer,*
   970 F.2d 1067 (2d Cir. 1992) .................................................................. 24

*Assoc. Press v. Meltwater U.S. Holdings, Inc.,*
   931 F. Supp. 2d 537 (S.D.N.Y. 2013) .................................................... 5, 25, 26

*Authors Guild, Inc. v. Google Inc.,*
   954 F. Supp. 2d 282 (S.D.N.Y. 2013) ............................................................*passim*

*Authors Guild, Inc. v. HathiTrust,*
   2014 WL 2576342 (2d Cir. June 10, 2014) ....................................................*passim*

*BanxCorp v. Coscto Wholesale Corp,*
   723 F. Supp. 2d 596, 613-14 (S.D.N.Y. 2010) ........................................... 62

*Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.,*
   650 F.3d 876 (2d Cir. 2011).........................................................................*passim*

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................. 67

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006)........................................................................*passim*

*Blanch v. Koons, ,*
   467 F.3d 244 (2d Cir. 2006)................................................................... 20, 22

*Bouchat v. Baltimore Ravens L.P.,*
   737 F.3d 932 (4th Cir. 2013) .................................................................. 21

*Buttner v. R.D. Palmer Enters., Inc.,*
   2013 WL 6196560 (N.D.N.Y. Nov. 27, 2013) ....................................... 67

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) ...................................................................*passim*

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,*
   753 F.2d 14 (2d Cir. 1985) .................................................................. 69

*Cariou v. Prince,*
   714 F.3d 694 (2d Cir. 2013)................................................................... 3, 17

*Castle Rock Entm't v. Carol Publ'g Grp., Inc.,*
   150 F.3d 132 (2d Cir. 1998)............................................................. 22, 46

*Computer Assocs. Int'l v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992) ............................................................................ 66

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983) .......................................................................... 13

*Durham Indus., Inc. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980) ............................................................................ 66

*Eyal R.D. Corp. v. Jewelex New York Ltd.*,
    784 F. Supp. 2d 441 (S.D.N.Y. 2011) ......................................................... 66, 67

*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*,
    499 U.S. 340 ............................................................................................. 14, 23

*Field v. Google*,
    412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................. 44

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997) ............................................................................ 70

*Hall v. Bed Bath & Beyond*,
    705 F.3d 1357 (Fed. Cir 2013) ........................................................................ 68

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1984) ................................................................................... 21, 45

*Hi-Tech Pharm. Co. v. Hi-Tech Pharm., Inc.*,
    2007 WL 1988737 (E.D.N.Y. July 5, 2007) ..................................................... 70

*Infinity Broad Co. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ......................................................................... 9, 24

*International News Service v. Associated Press*,
    248 U.S. 215 (1918) ...............................................................................*passim*

*Kelly v. Arriba Soft Corp.*,
    335 F.3d 811 (9th Cir. 2003) ..................................................................*passim*

*L.A. News Serv. v. Reuters Tele. Int'l Ltd.*,
    149 F.3d 987 (9th Cir.) .................................................................................... 9

*L.A. News Serv. v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) ............................................................................ 9

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ............................................................. 23

*Levine v. Landy*,
    832 F. Supp. 2d 176 (N.D.N.Y. 2011) ............................................................. 67

*Linkco, Inc. v. Fujitsu, Ltd.*,
    230 F. Supp. 2d 492 (S.D.N.Y 2002) .............................................................. 68

*Maxtone-Graham v. Burtchaell*,
    803 F.2d 1253 (2d Cir. 1986) ..................................................................... 24, 35

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
    101 N.Y.S.2d 483, 486 (N.Y. Cnty. Sup. Ct. 1950) ............................................... 67

*Nash v. CBS, Inc.*,
    704 F. Supp. 823 (N.D. Ill. 1989) ........................................................................ 67

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997)........................................................................*passim*

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) ...................................................................................... 9

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001)................................................................................... 69

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004)............................................................................ 3, 21

*Pac. & S. Co. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) ............................................................................. 9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .....................................................................*passim*

*Ringgold v. Black Entm't Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997).................................................................................... 3

*Ritani, LLC v. Aghjayan*,
    880 F. Supp. 2d 425 (S.D.N.Y. 2012) .................................................................. 51

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
    894 F. Supp. 2d 288 (S.D.N.Y. 2012) .................................................................. 70

*Roy Export Co. v. Columbia Broad. Sys.*,
    672 F.2d 1095 (2d Cir. 1982)............................................................................... 68

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir 1988).................................................................................... 68

*Silver v. Lavandeira*,
    2009 WL 513031 (S.D.N.Y. Feb. 26, 2009) ................................................... 54, 56

*Sofa Entm't, Inc. v. Dodger Prods., Inc.*,
    782 F. Supp. 2d 898 (C.D. Cal. 2010)................................................................... 18

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    726 F. Supp. 2d 291 (S.D.N.Y. 2010) .................................................................. 68

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ................................................................... 27, 31, 37, 40, 46

*Standard & Poor's Corp. v. Commodity Exch., Inc.*,
    683 F.2d 704 (2d Cir. 1982)................................................................................. 62

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    2014 WL 2219162 (2d Cir May 30, 2014) .....................................................*passim*

*Tassin v. Sears, Roebuck & Co.,*
   946 F. Supp. 1241 (M.D. La. 1996) .......................................................... 53

*Twentieth Century Sporting Club, Inc. v. Transradio Press Service, Inc.,*
   300 N.Y.S. 159 (N.Y. Sup. 1937) ............................................................. 62

*Walker v. Time Life Films, Inc.,*
   784 F.2d 44 (2d Cir. 1986) ......................................................................... 67

*Warren Publ'g Co. v. Spurlock,*
   645 F. Supp. 2d 402 (E.D. Pa. 2009) ....................................................... 21

*Weissman v. Freeman,*
   868 F.2d 1313 (2d Cir. 1989) .................................................................... 24

## Statutes and Rules

17 U.S.C. § 106(3) ......................................................................................... 66

17 U.S.C. § 107 ......................................................................................*passim*

Fed. R. Civ. P. 26(e) ..................................................................................... 53

U.S. Const. art. I, § 8, cl. 8 ........................................................................... 14

## Other Authorities

31A C.J.S. Evidence § 200 (2012) ................................................................ 39

William F. Patry, Patry on Fair Use § 3:9 ................................................... 13

## PRELIMINARY STATEMENT

As part of its media-monitoring service—a remarkable tool that transforms otherwise fleeting television broadcasts into a comprehensive, text-searchable database for conducting research—TVEyes captured and indexed 19 Fox broadcasts (the "Works-in-Suit" or "Works").  Fox now concedes that TVEyes' use of the Works-in-Suit for the purpose of creating this database was a fair use.  Thus, the only remaining copyright question before the Court is whether TVEyes' use of the Works-in-Suit to provide subscribers with short video snippets in response to their search queries was also fair.   Because TVEyes' use of the Works-in-Suit for this purpose is highly transformative, and because Fox has not sustained any market harm, TVEyes' use of the Works is fair.

## FACTUAL BACKGROUND[1]

For a recitation of the relevant factual background, TVEyes respectfully directs the Court to the Factual Background sections in: (1) TVEyes' Memorandum of Law in Support of its Motion for Summary Judgment; and (2) TVEyes' Memorandum of Law in Opposition to Fox's Motion for Summary Judgment.[2]

---

[1]   The following terms are used herein:  "TVEyes Br." refers to TVEyes' opening brief filed in support of its motion for summary judgment, and "Fox Opp." refers to Fox's brief filed in opposition to TVEyes' motion.  "Fox Br." refers to Fox's opening brief filed in support of its own motion for summary judgment, and "TVEyes Opp." refers to TVEyes' brief filed in opposition to Fox's motion.  "SUF" refers to TVEyes' Statement of Undisputed Facts Pursuant to Local Rule 56.1.

[2]   TVEyes also respectfully directs the Court to its submissions previously filed in support of its motion and in opposition to Fox's motion, including its Statement of Undisputed Facts and its Counterstatement of Additional Facts, as well as the Third Declarations of David Ives (dated August 6, 2014) and David Seltzer (dated August 6, 2014).

**ARGUMENT**

I.      **TVEYES' USE OF THE WORKS-IN-SUIT IS FAIR UNDER § 107**

Fox now expressly concedes that TVEyes' use of Fox's broadcasts for the purpose of creating a comprehensive, text-searchable database is a fair use under *Authors Guild, Inc. v. HathiTrust* ("*HathiTrust*"), 2014 WL 2576342, at *12 (2d Cir. June 10, 2014).  (*See, e.g.*, Fox Opp. at 13-15 ("Fox News' complaint does not concern TVEyes' indexing"); *id.* at 32 (Fox's "complaint is not with a *HathiTrust*-type index").)  ***Fox now limits its grievance solely to TVEyes' purported "delivery" of short snippets from the 19 Works-in-Suit***. (*See* Fox Opp. at 13-14 (discussing *HathiTrust*);[3] *id.* at 15 (taking issue only with TVEyes' purported "redistribution" of the Works).)

The Court need not break new ground on this issue, as Judge Chin's decision in *Authors Guild, Inc. v. Google Inc.* ("*Google Books*"), 954 F. Supp. 2d 282 (S.D.N.Y. 2013) provides the answer.  There, Google copied over 20 million books and provided snippets of text in response to user's search queries.  On summary judgment, Judge Chin held that "[t]he use of book text to facilitate search through the display of snippets is transformative."  *Id.* at 291.   Google's use of book snippets is conceptually identical to TVEyes' use of video snippets—both provide their users with targeted access to portions of content so that they may conduct research, using the copyrighted materials "in a way they have not been used before."  *Id.*  Further, *Google Books* recognized that: (1) that while Google is a commercial enterprise, it does not engage in "direct commercialization" of the works; (2) Google Books serves "important educational purposes"; (3) Google's users would be unlikely to put in the

---

[3]    Fox misrepresents the holding of *HathiTrust* when it states that the use at issue was fair "only because … the search results provided by their index delivered no copyrighted content."   (Fox Opp. at 14.)   The Second Circuit never addressed whether providing content would have rendered the database non-transformative.

"time and energy" to input repeated searches to recreate an entire book; and (4) "Google Books provides significant public benefits" as "an invaluable research tool" for "students, teachers, librarians and others." *Id.* at 291-93. These same principles apply to TVEyes, and instruct that TVEyes' use of the Works is fair.

### A. The Nature and Character of TVEyes' Service Is Consistent With the Principles Underlying Fair Use

As Fox acknowledges, "there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in [the preamble of] § 107." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (quotation marks omitted).[4] There is little doubt that, as a tool designed for the purpose of facilitating clients' internal research and analysis, TVEyes fits squarely among the illustrative examples of research and scholarship.

Fox asserts, however, that TVEyes has no place among the preamble's examples because TVEyes' ***users***, not TVEyes itself, conducted the search queries that generated snippets of the Works. (Fox Opp. at 7.) The law, however, makes no such distinction; otherwise, ***none*** of the many electronic-database cases, which courts routinely find to be fair, would fall within the preamble's illustrations. In *Google Books*, for example, the service was fair because Google's tool "helps readers, scholars, [and] researchers" by, *inter alia*, "transform[ing] book text into data for the purposes of substantive research, … thereby opening up new fields of research." *Id.* at 291; *see also HathiTrust*, 2014 WL 2576342, at *1 (use by "research universities"

---

[4]   Fox suggests that a use that falls outside these categories cannot be fair, citing *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 78 (2d Cir. 1997). (*See* Fox Opp. at 6.) *Ringgold*, however, acknowledges these examples "have an 'illustrative and not limitative'" function," *id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)), based on the statute's use of the terms "including" and "such as," *id.* at 78 n.9. *See Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (illustrations in preamble "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses").

of copyrighted works in their entirety for electronic database was fair); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (displaying entire copyrighted work in search engine results was fair); *Kelly v. Arriba Soft Corp.*, 335 F.3d 811 (9th Cir. 2003) (same).  To suggest that this line of cases somehow falls **outside** of the core fair-use goals of research and scholarship is to eschew logic—if the purpose of a new technology is to facilitate research, there is no reason why the tool it should not be recognized as falling within the ambit of the preamble. Fortunately, no court has ever adopted such a cramped view of the law.

### 1.   TVEyes' Use of the Works as Part of Its Research Tool Is Highly Transformative

In its opposition, Fox assumes that because TVEyes does not physically alter the snippets of the Works it made accessible to users, it is nothing more than a "slavish substitute for Fox News' own use."  (Fox Opp. at 12.)  To arrive at this conclusion, however, Fox must ignore the binding precedent of this Circuit that a use "can be transformative in **function or purpose** without altering or actually adding to the original work."  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.* ("*Swatch*"), 2014 WL 2219162, at *8 (2d Cir May 30, 2014) (emphasis added); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 610 (2d Cir. 2006) (reproduction of copyrighted images in their entirety fulfills a "transformative purpose"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) ("use of a copyrighted work need not alter or augment the work to be transformative in nature").  Fox, however, makes no reference to whether TVEyes' use of snippets is different in "function or purpose" than Fox's original broadcast.

Fox and TVEyes have entirely different purposes. Fox's purpose is to convey reliable news upon which its viewers can rely.  (Misenti Decl. ¶ 12; Berg ¶¶ 3-4.) Fox did not create the Works for the purpose of enabling users to conduct research on their contents anymore than the authors in *Google Books* wrote their books for

the purpose of allowing them to be researched.  By contrast, TVEyes has no interest in the underlying accuracy contained in Fox's news broadcasts, whether they convey true or reliable information, or whether the snippets generated in response to queries contain the "most important" portion of the broadcast.  TVEyes' sole purpose is to accurately capture the words and images that are broadcast on television without regard for the meaning of those words and images.[5]  In *Swatch*, the Second Circuit held that Bloomberg's reproduction of a sound recording was transformative because "while Swatch Group purported to convey true answers to the analysts' questions …, Bloomberg made no representation one way or another as to whether the answers given by Swatch Group executives were true or reliable." 2014 WL 2219162, at *8.  The Court concluded that "Bloomberg's message—'This is what they said'—is a very different message from Swatch Group's—'This is what you should believe,'" and thus was transformative.  *Id.*  The same principle applies here.

Further, it is beyond reasonable dispute that TVEyes' purpose is limited to enabling its clients to conduct internal research and analysis about what has been broadcast on television, including whether a keyword has been mentioned, and if so, the context surrounding that mention.  (*See* Ives Decl. ¶ 7.)  This purpose is communicated by TVEyes to clients in multiple ways.  For example:

- **TVEYES' USER AGREEMENT**: TVEyes' user agreement forewarns all users that any "data" provided by TVEyes in connection with its service "may be utilized for ***Client's internal purposes only***."  (Ives Decl. ¶ 7 & Ex. A, § 3) (emphasis added).[6]  All clients must agree to this restriction.  *Id.*

---

[5]  This is in sharp contrast to the service at issue in *Assoc. Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013), which always delivered both the "title" and "lede" of each Associated Press article to its users.  *Id.* at 554.

[6]  Fox argues against this plain language by contending that the word "data" is not defined as meaning "video clips," so the agreement ***permits*** clients to use clips

*(footnote continued)*

- **DOWNLOAD PAGE**: Any time a user attempts to download a snippet via TVEyes, the user-facing website displays the message:

> Important Note: Material supplied by TVEyes, Inc. may be used for ***internal review, analysis or research only***. Any editing, reproduction, publication, rebroadcasting, public showing or public display is forbidden.

(Ives Decl. ¶ 8 & Ex. B; Fox Response to SUF ¶ 8) (emphasis added).

- **EMAIL COMMUNICATIONS**: TVEyes' email communications with customers routinely include warnings that clips may be used for internal research and analysis only. One typical message, for example, reads:

> TVEyes clips are for ***Internal Review, Analysis and Research only***. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden and may violate copyright laws.

(Ives Decl., Ex. C at TVEYES-042936, TVEYES-041566) (emphasis added). Another example provides:

> TVEyes clips are for ***internal review, analysis and research only***. Any placement on any public website may violate copyright laws.

(*Id.*, Ex. C at TVEYES-024246-50) (emphasis added).[7]

---

externally. (Fox Response to SUF ¶ 7.) Fox is wrong—the word "data" is used in its broadest sense to refer to ***all*** information provided by TVEyes; there is no other reasonable way to read the agreement. (Third Ives Decl. ¶ 5.) Moreover, reading the agreement as Fox requests is inconsistent with the reminders identified above that clips obtained via TVEyes must be used for internal research and analysis only. (*Id.*) Indeed, when clients ask about acquiring rights for public display, TVEyes refers them to the broadcaster. (Second Ives Decl. ¶ 12 & Ex. TTT.)

[7]   Fox does not dispute that similar language was routinely included in TVEyes' emails. While Mr. Ives attached to his declaration three sample emails from TVEyes employees (*see* Ives Decl. Ex. C (emails from Alan Willig, Larry Gallo, and Michael Schmitt), Fox's own exhibits filed in support of its motion for summary judgment include many additional examples. (*See* Simmons Decl., Ex. 116 at TVEYES-0376899 (similar warning from Chris Catropa); *id.* Ex. 107 at TVEYES-037155; *id.* Ex. 108 at TVEYES-001991, 994, 999; *id.* Ex. 110 at TVEYES-038909; Ex. 113 at TVEYES-039495, 496, 497, 499, 500.)

- **TELEPHONIC COMMUNICATIONS**: TVEyes' staff reminds clients in telephone communications of the restrictions that TVEyes is to be used for internal research and analysis only.  (Ives Decl. ¶ 8.)

These restrictions and policies confirm that TVEyes operates under the transformative purpose of facilitating clients' internal research needs—a classic fair-use purposes.  No matter what Fox claims TVEyes' marketing materials say, clients' use of TVEyes is cabined by these limitations.

Other aspects of TVEyes' business are consistent with its purpose as a research tool:  (1) TVEyes is only available to businesses and not to the general public (SUF ¶ 5); (2) content is available for search only up to 32 days after broadcast (*id.* ¶ 19); (3) snippets automatically begin 14 seconds before the word is spoken, and thus are not correlated with the "beginning" of any particular news story (*id.* ¶¶ 18, 32, 40); (4) snippets may be played up to a maximum of only 10 minutes, and fewer than ███ of clips have been played for that long (*id.* ¶ 70) and (5) TVEyes employs technological "circuit breakers" to prevent snippets from being widely disseminated.  (Second Seltzer Decl. ¶¶ 14-17; Second Ives Decl. ¶ 19.) These limitations are analogous to those of *Google Books*, where the court recognized that the implementation of certain features helped ensure that use of the tool would be consistent with its purpose.

The use of the Works by TVEyes and its clients demonstrates that TVEyes is used as a research tool—not as a replacement for watching live television, browsing curated clips posted by Fox online, or obtaining a public performance license from ITN Source.  TVEyes generated a total 560 snippets of the 19 Works in response to user's search queries.[8]  The average length of these snippets was just 53.4 seconds.

---

[8]   As discussed below*, see infra* Part I.D.1.c, 352 of these 560 snippets were of portions of the Works never posted online by Fox.  (Third Seltzer Decl. ¶ 3, Ex. XXXX.)

85.5% of the snippets were less than one minute long; 76% were less than 30 seconds long; and 51% were less than **10 seconds** long. (Fox Response to SUF ¶¶ 80-81.) No user came close to playing any snippet for 10 minutes maximum, nor did any user access any portions of the Works *in seriatim*. (*See* SUF ¶¶ 77, 80; Second Seltzer Decl. ¶¶ 5-7.) Only seven snippets were permanently saved to TVEyes' Media Center by users, and none of those files has been accessed since the day it was saved by the user. (Third Seltzer Decl.¶ 2.) In addition, there is no evidence that any snippets of the Works has ever been shared outside of a user's company or posted to any external website in violation of TVEyes' user agreement. These undisputed facts demonstrate that TVEyes is used by its clients for the purpose it was designed: as a tool for conducting internal research.

Fox repeatedly argues that TVEyes "cannot rely on the activities of its subscribers" in presenting its fair-use defense. (Fox Opp. at 6.) Fox misunderstands the law. Evidence pertaining to how clients use the TVEyes service demonstrates: (1) TVEyes' own transformative purpose under the first factor, *see Google Books*, 954 F. Supp. 2d at 291 (finding transformation under the first factor because Google Books "has become an important tool for libraries and librarians and cite-checkers," and describing how users can use the service "for purposes of substantive research, including data mining and text mining in new areas"); *Perfect 10*, 508 F.3d at 1165 (finding transformation because works were used as "an electronic reference tool"); *Kelly*, 336 F.3d at 819 (finding transformation because users had "improve[d] access to images on the internet"); and (2) the public benefit conferred by TVEyes' service under the first and the fourth factors, *see*, *e.g.*, *Bill Graham*, 448 F.3d at 613 (the fourth fair use factor "requires a balancing of the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is

denied."). To be sure, if a defendant's own use is ***not*** fair, its actions will not be excused by the fair-use activity of its users.[9] However, in this action, TVEyes asserts that its own use of the Works, as part of a comprehensive database and research tool, is transformative, and that its service provides a significant public benefit. The manner in which TVEyes' clients use the service is evidence of both.

*      *      *

With this understanding, Fox's allegations that TVEyes is merely a "slavish substitute" are unpersuasive.

***First***, Fox argues that "courts consistently hold that copying and distribution" of video clips is not transformative. (Fox Opp. at 12.) In ***none*** of the cases cited by Fox, however, did the defendant "clipping service" establish that the purpose of its service was to use the content to create from scratch a searchable database for conducting research and analysis—an undeniably transformative purpose. In *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999), for example, the defendant merely translated and sold entire copies of abstracts, without engaging in any transformative purpose. Likewise, in *Infinity*, the defendant did nothing more than "sell access to [entire] unaltered radio broadcasts," without any transformative purpose. 150 F.3d at 108.[10]

---

[9] For example, in *Infinity Broad Co. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), the Court determined that the defendant's own use was not transformative—"all Kirkwood does is sell access to unaltered radio broadcasts." *Id.* at 108. The defendant then argued that his "users transform the broadcasts," but because his own use was not transformative, the activities of his end-users were not relevant. (Fox Opp. at 6.) *See also L.A. News Serv. v. Reuters Tele. Int'l Ltd.*, 149 F.3d 987, 993 (9th Cir.) (finding defendant's use to not be transformative in the first instance, and cannot be saved by end-user behavior); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (similar).

[10] The same is true for the remaining out-of-circuit cases cited by Fox. (*See* Fox Opp. at 6)—each is a service that does nothing more than copy and sell plaintiffs' news programs. In *Pac. & S. Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984), for example, there was no fair use because the defendant "***only*** copies and sells" entire news broadcasts. *Id.* at 1496 (emphasis added). Unlike TVEyes, none of those

*(footnote continued)*

9

In stark contrast, TVEyes incorporated the Works into a comprehensive, text-searchable database which leverages them as "data for the purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research." *Google Books*, 954 F. Supp. 2d at 291.  This context cannot be ignored—it is why almost every court to have evaluated the use of a copyrighted work in connection with a search engine or database has found it to be transformative, even where the work is displayed in its entirety.  *See*, *e.g.*, *Perfect 10*, 508 F.3d at 1165; *Kelly*, 336 F.3d at 819.  If the display of the **entire** work in *Perfect 10* and *Kelly* was transformative, then certainly providing access to a short snippet for the purpose of conducting research and analysis is transformative.  *See Google Books*, 954 F. Supp. 2d at 291 ("The use of book text to facilitate search through the display of snippets is transformative.").  It is not surprising that virtually all of the "clipping service" cases cited by Fox are more than 15 years old—because modern, online research services such as TVEyes' are qualitatively different than the services at issue in those cases.  TVEyes is a search engine and research tool that "adds something new, with a further purpose or different character" to the Works.  *Campbell*, 510 U.S. at 579; *see also Google Books*, 954 F. Supp. 2d at 291 ("Google Books … adds value to the original and allows for the creation of new information, new aesthetics, new insights and understandings. Hence, the use is transformative.") (citation and quotation marks omitted).

**Second**, Fox argues that the snippets of the Works generated by TVEyes in response to its users' search queries are "substitutes" for the television programs and clips offered by Fox.  (*See* Fox Opp. at 13.)  However, as described in detail below, *see infra* Part I.D.1, there is no evidence of market substitution because

---

defendants were research tools that improved and transformed the original works and placed them in new contexts, providing new understandings.

TVEyes serves a different purpose than Fox's offerings.  *See HathiTrust*, 2014 WL 2576342, at *9 ("transformative uses … by definition, do not serve as substitutes for the original work").

Fox tries to distract the Court from this difference by theorizing that TVEyes' users can "download and edit unlimited … clips" and "share them … via social media." (Fox Opp. at 13.)  However, the undisputed facts show that actual use of the Works was very limited, and consistent with use of TVEyes as an internal research tool.  The vast majority of the snippets of the Works were accessed less than 1 minute long, and only seven files were saved by users to TVEyes' Media Center—none of which have been accessed since the day they were saved.  (SUF ¶¶ 80-81; Third Seltzer Decl. ¶ 2.)  Moreover, Fox ignores that all of the functionality provided by TVEyes—including downloading, editing, and sharing of clips—is used to enable the client's internal use only. (Ives Decl. ¶ 8 & Exs. B-C at TVEYES-042936.)

***Third***, Fox claims that *HathiTrust* stands for the proposition that when a electronic database "make[s] copyrighted content available," it is no longer transformative. (Fox Opp. at 14.)  This is simply wrong.  In *HathiTrust*, the Court held that the defendant's full-text searchable database was transformative, but also held that a completely different service offered by the defendant—the pure copying and dissemination of entire books "to facilitate access for print-disabled persons"— was not transformative (although it was still found to be a fair use).  2014 WL 2576342, at *11.  This service was not provided in connection with research, nor was it part of a search engine; rather, it simply copied and distributed entire books, with no altered purpose or context.  However, where a database makes copyrighted content available for the purpose of conducting research (or other fair-use ends), it is consistently found to be fair, as in *Google Books*, *Perfect 10*, and *Kelly*.

**Fourth**, Fox suggests that if TVEyes is truly a research tool akin to *HathiTrust*, there is no need to provide video snippets in connection with user search queries. (Fox Opp. at 15, 17.)  However, the Work-in-Suit are not books (as in *HathiTrust*), but **television** broadcasts, replete with what Fox itself describes as "artistic elements, such as pictorial graphics, music and sound effects, set dressing, and audiovisual content." (Fox Opp. at 20.)  TVEyes' users  research is greatly enhanced by being able to see and hear **how** their keywords are mentioned, to access the "subtle indications of meaning inferable from their hesitation, emphasis, tone of voice, and other such aspects of their delivery." *Swatch*, 2014 WL 2219162, at *8; *see also id.* (such information "may be just as valuable to [users] as the [raw text], since a speaker's demeanor, tone, and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show").  This is particularly important in this case because the Works-in-Suit are fact-intensive news broadcasts and "the need to convey information" with "precision" makes it "desirable and consonant with copyright law for a defendant to faithfully reproduce an original work." *Id.*

**Fifth**, Fox claims that TVEyes offers no evidence that its users accessed snippets for a different purpose than the original broadcasts. (Fox Opp. at 15.)  The evidence proves otherwise.  It is undisputed that user's accessed the Works for an average of 53.4 seconds, with 85.5% of the snippets played for less than 1 minute (with more than half for less than 10 seconds).  No user watched any snippet that was even close to the maximum time available.  (Fox Response to SUF ¶¶ 80-81.)  Nor is there any evidence that any snippets from the Works was publicly performed or used in any manner inconsistent with TVEyes' internal use contract and policy.  These facts demonstrate that the Works were accessed in a manner consistent with TVEyes' purpose—to facilitate its clients' targeted, internal research.

*Sixth*, contrary to Fox's challenge (Fox Opp. at 16), TVEyes' use of snippets is conceptually identical to that of *Google Books*—a small, tailored reference to a past event, *i.e.*, a snippet of past broadcast. 954 F. Supp. 2d at 291 ("[t]he display of snippets of text for search is similar to the display of … small images of concert posters for reference to past events"). Fox's focus on the physical size and quality of the snippets is misguided; there is no requirement that a transformative use be a degraded one—TVEyes' purpose is to "convey valuable factual information," which "would have been impaired" if users could not clearly see the snippets.[11] *Swatch*, 2014 WL 2219162, at *9. Further, Fox ignores that the snippets of the Works were short and tailored to client's research objectives—unlike, for example, the images in *Bill Graham*, which were reproduced and displayed in their entirety.

### 2.    TVEyes' Use Of The Works-In-Suit Serves Public Interests

The first factor favors fair use when the use serves public interests, whether or not the use is transformative. (*See* TVEyes Br. at 35-46; TVEyes Opp. at 31-32.) This is because "[t]he key issue in every case is whether the use is beneficial to society." William F. Patry, Patry on Fair Use § 3:9. *Swatch*, for example, recognized that, "regardless of how transformative the use is," the use at issue served public interests because the defendant's "faithful reproduction … served 'the interest of accuracy, not piracy.'" 2014 WL 2219162, at *9 (quoting *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)). Likewise, in *Google Books*, providing snippets of text as part of a searchable

---

[11]  Contrary to Fox's representation, TVEyes' CEO never admitted that a TVEyes "consumer, happy with … high quality video clips, would have no need for an authorized video clip" from Fox. (Fox Opp. at 16, 49.) Mr. Ives simply stated that a customer who receives a clip from TVEyes (subject to TVEyes' use restrictions) would not need to get that clip from Fox. Fox's counsel never asked Mr. Ives about a scenario where "authorization" from Fox was required—*e.g.*, where the use is not a fair one. Because TVEyes' use is fair, no authorization from Fox is needed.

electronic database served "several important educational purposes." 954 F. Supp. 2d at 292. TVEyes serves the same fundamental purposes: it "has transformed [TV broadcasts] into data for purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research." *Id.* at 291-92. None of Fox's arguments to the contrary are availing.

*First*, Fox argues that merely providing a public benefit does not make a use transformative. (Fox Opp. at 17-18.) Whether the use is transformative, however, is a separate, unrelated inquiry. But even if a use is *not* transformative, permitting use of the material may still be in the public interest, thus weighing the first factor in the defendant's favor. *See Swatch*, 2014 WL 2219162, at *9.

*Second*, Fox tries to distinguish *Swatch* by arguing that because TVEyes is not in the business of gathering or reporting news, it cannot further a public interest. (Fox Opp. at 18.) News gatherers, however, are not favored children of fair use—the preamble of § 107 lists not only "news reporting," but also "research," "criticism" and "comment" as illustrations. Thus, TVEyes' furtherance of research, scholarship and analysis of the Works is in the public interest. The efforts Fox purportedly undertook in creating the Works (*see* Fox Opp. at 18-19) are irrelevant, as copyright law does not protect authors' labors. *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 349 ("[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts'") (quoting U.S. Const. art. I, § 8, cl. 8).[12]

*Third*, Fox posits that TVEyes is somehow "more egregious" than other electronic databases because it "does not improve access to authorized copies" of Fox

---

[12]  Fox also argues that it has a public interest in enforcement of copyright law. As discussed in TVEyes' previous brief (TVEyes Opp. at 58-61), and further below, *see infra* Part I.D.2, this argument applies to *every* fair-use dispute—the public interests underpinning the Copyright Act have already been served by granting Fox time-limited monopolies in the Works. *See HathiTrust*, 2014 WL 2576342, at *5.

content. (Fox Opp. at 19.) That is not so. Fox does not dispute that TVEyes directs users to the location on the Fox Website for the program from which a given snippet originates.[13] (*See* Seltzer Decl. ¶¶ 23-24; Fox Response to SUF ¶ 35.) Moreover, when TVEyes is asked by clients about how to obtain the rights to publicly post or perform works, TVEyes refers those clients to the broadcaster. (Second Ives Decl. ¶ 12, Ex. TTT.) Moreover, logic dictates that many TVEyes users would never even become aware of snippets that interest them without the keyword functionality provided by TVEyes. Thus, TVEyes ***does*** improve access to and interest in Fox content.

Further, contrary to Fox's representation, TVEyes does not make "all of Fox News' content available." (Fox Opp. at 19.) TVEyes did not provide users with access to ***any*** of the Works in their entirety. Rather, users viewed short snippets of the Works that averaged 54 seconds long. In addition, these snippets were targeted to the user's specific query, beginning 14 seconds prior to the user's search terms. (SUF ¶¶ 17-18, 32, 82.) This is far ***less*** "egregious" than the other database cases where the defendants provided in search results the ***entirety*** of copyrighted works, but were nonetheless deemed fair. In *Perfect 10*, for example, the entirety of the copyrighted images could be seen by users in search results. 508 F.3d at 1165; *see also Kelly*, 336 F.3d at 819 (same); *Swatch*, 2014 WL 2219162, at *9 (sound recording offered in its entirety) *Bill Graham*, 448 F.3d at 613 (copyrighted work offered in its entirety). Any particular TVEyes' user's search, however, returns only a snippet, and nowhere close to the entire Work. Further, no user has ever tried to view an entire Work, or even viewed anything close to the maximum possible length of a clip. (Second Seltzer Decl. ¶¶ 5-7; SUF ¶¶ 77, 80.)

---

[13] This feature, called Media View, was added to TVEyes' service in May 2013, ***before*** 13 of the 19 Works-in-Suit even aired, and months before this lawsuit was filed. (Third Seltzer Decl. ¶ 5.)

**Fourth**, Fox claims that TVEyes does not offer a public benefit because it is possible to research what is said and shown on Fox by (1) searching on the Fox Website or (2) watching FNC or FBN on television or recording what is said on a DVR for later viewing.  (Fox Opp. at 19-20.)  This claim is not credible.  As to the Fox Website, notwithstanding its many technical deficiencies (*see* Seltzer Decl. ¶ 47), Fox makes only about **16%** of its broadcasts accessible online, and all of the content that is made available is curated and subject to Fox's "editorial discretion." (Misenti Decl. ¶¶ 12-13; *see also* SUF ¶ 99 (Fox can omit, remove, or alter content posted on its website at any time).)  For example, the large majority of the snippets of the Works-in-Suit accessed by TVEyes' users were not available on the Fox Website.  (Third Seltzer Decl. ¶¶ 3-4.)  Thus, the Fox Website does not allow a user to conduct business-oriented research for every word spoken on Fox, as TVEyes' service enables.[14]  Nor is Fox's suggestion that a human being could sit and watch every second of FNC and FBN programming (at the same time, along with over 1,400 other television and broadcast stations) and listen for any mention of a keyword as it is spoken (or record the content and watch it later), persuasive.  It is equivalent to claiming that Google Books does not offer a valuable public benefit because a reader could simply read the 20 million books that were scanned, or that an Internet search engine is not valuable because users can just type individual website URLs into browsers.  The entire point of TVEyes is to enable users to conduct research they could **not** otherwise perform, particularly because television

---

[14]  Even if all Fox content was available on its website, Fox concedes that the Fox Website does **not**: (1) include content from other channels; (2) offer email alerts whenever a particular keyword is mentioned, (3) or provide metrics about the frequency particular keywords on Fox or other channels.  (Fox Response to SUF ¶¶ 100, 102, 106-107.)  And, in any event, Fox concedes that its Website is expressly limited to personal use, while TVEyes' clients may use TVEyes only for business-related purposes.  (*See id.* ¶¶ 5, 113.)  Thus, TVEyes' clients are **prohibited** from using the Fox Website for their fair-use research purposes.

broadcasts, unlike books, are ephemeral, furthering the research and educational purposes copyright law was designed to protect. This not only demonstrates TVEyes' transformativeness, but also its significant public benefits.

### 3.   TVEyes' For-Profit Status Does Not Weigh Against Fair Use

Where a use is transformative, commerciality carries little weight. *See Campbell*, 510 U.S. at 579; *Cariou*, 714 F.3d at 708. Because TVEyes' service is highly transformative, *see supra* Part I.A.1, commerciality has minimal relevance here.[15] But even putting transformation aside, TVEyes' use of the Works is not "of a commercial nature." 17 U.S.C. § 107(1).

***First***, Fox directs the Court to TVEyes' overall revenues and fees, insisting that TVEyes' status as a subscription-based service necessarily means that TVEyes' use of the Works was commercial. (Fox Opp. at 7) This, of course, is not the law. Rather, the Second Circuit instructs that a use is commercial only where a defendant "capture[s] significant revenues ***as a direct consequence*** of copying the original work." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994). However, any commerciality is "discounted ... where the link between [the defendant]'s commercial gain and its copying is ... attenuated.'" *Swatch*, 2014 WL 2219162, at *7 (quotation marks omitted). In *Swatch*, for example, the Court assigned Bloomberg's commerciality "relatively little weight," even though it was "a subscription service available to paying users," because: (1) the use was a "small part" of Bloomberg's "multifaceted research service;" and (2) "it would strain credulity to suggest that providing access to [the use] more than trivially affected the value of that service." *Id*. The same is true here—the Works are a "small part"

---

[15]  Fox concedes that if the Court finds TVEyes' use to be transformative, then any commerciality would not weigh against fair use—its entire argument is premised on its (flawed) position that TVEyes' use merely supersedes Fox's. (Fox Opp. at 8-9.)

of TVEyes' "multifaceted research service"; and TVEyes' use of snippets from these 19 Works for 32 days could not have "more than trivially affected" TVEyes' value.

**Second**, TVEyes charges the same flat fee for any use of its service, whether or not the user **ever** views or downloads a Fox snippet.  (Ives Decl. ¶ 16.)  In place of evidence, Fox offers the Court unsupported pronouncements about the general features of TVEyes' overall service.[16]  Even fully crediting these speculative contentions, Fox offers no evidence of any "direct" link between TVEyes' revenues and users' ability to view the 19 Works, or any other Fox content.  TVEyes' "commerciality" is akin to that in *Google Books*, where Google "does not engage in the direct commercialization" because Google: (1) did not sell scans of books; (2) did not sell snippets displayed; and (3) does not run ads on pages containing snippets.  954 F. Supp. 2d at 291-92.  The same is true here—as its business, TVEyes does not: (1) sell the broadcasts it captures; (2) sell snippets; or (3) run ads on pages.  Further, Fox offers no evidence that TVEyes ever used the 19 Works in commercial advertising, or to otherwise promote the sale of its service—that's because TVEyes has never done so.  *See Bill Graham*, 448 F.3d at 612 (no "commercial gain" because defendant "has not used any of [plaintiff's] images in its commercial advertising or in any other way to promote the sale of the book."); *Sofa Entm't, Inc. v. Dodger Prods., Inc.*, 782 F. Supp. 2d 898, 906 (C.D. Cal. 2010) (commerciality has little significance where "there is no evidence before the Court that Defendant used the [video clip] in the marketing of" defendant's work).

**Third**, Fox claims that FNC and FBN are "important" to TVEyes, so TVEyes' use of the Works must somehow have directly contributed to TVEyes' revenue.  (Fox

---

[16]  For example, in support of its statement that TVEyes' revenues "clearly are directly attributable to its copying of Fox News' content" (Fox Opp. at 8), Fox cites to: (1) the fact that TVEyes captured the Works-in-Suit; (2) TVEyes' general status as a for-profit enterprise; and (3) its (false) contention that TVEyes distributes captured content in "real time."  (Fox Br. at 8-9.)

Opp. at 9.)   Fox, however, cannot dispute that: (1) in the ten-plus years between March 31, 2003 and January 2, 2014, more than ███ of TVEyes' users had never accessed *any* Fox content on TVEyes (Second Seltzer Decl. ¶ 6); (2) snippets from the Works received a combined total of only 560 plays, constituting about ████████████████████ of all video plays; and (3) 85.5% of the plays of clips from the Works were less than 1 minute long, and half were less than *10 seconds* long.  (SUF ¶¶ 79, 81)  "[I]t would strain credulity" for Fox to assert that the mere availability of snippets from these particular Works "more than trivially affected" TVEyes' value.

   *Fourth*, Fox posits that in cases where no commerciality was found, "profits came from sources wholly unrelated to the copying of the copyrighted works." (Fox Opp. at 9.)  Not so—such cases involve copying, but the courts found the copying to simply be trifling.  In *Bill Graham*, the sale of a book containing the copyrighted images was held to not be sufficiently commercial because a few images on one page was "incidental" to the overall value of the book.   *Id.*, 448 F.3d at 612.  And in *Swatch*, Bloomberg made available the entirety of a sound recording to its paying subscribers, but the Court found that the use of this one sound recording was "trivial."  2014 WL 2219162, at *7.  TVEyes is indistinguishable.

   *Fifth*, while Fox properly acknowledges that any economic gain by TVEyes from use of the 19 Works must also be balanced against the exclusion of broader public benefits, it nonetheless claims that no other case has credited public benefits over such "brazen, direct commercial use" as here.  (Fox Opp. at 9 n.6.)  This argument is puzzling.  TVEyes' "commerciality" is no greater than that of *Google Books*, where more than 20 million books were scanned and made available to the public forever.  954 F. Supp. 2d at 284.  And in *Swatch*, no commerciality was found where an entire copyrighted work was disseminated to subscription-only customers. 2014 WL 2219162, at *7.  TVEyes is *less* commercial than these services, as: (1) the

Works are factual; (2) snippets are available for only up to 32 days after broadcast; and (3) only snippets, not the entire Works, are delivered in response to search queries.  Thus, for the reasons discussed above, TVEyes' broader public benefits outweigh any conceivable, minimal commerciality the Court might find.  *See supra* Part I.A.2.

### 4.    There Is No Evidence of Bad Faith

Fox claims that TVEyes' incidental use of the 19 Works was done in bad faith.  Not only does a defendant's good or bad faith have no meaningful role in current fair-use jurisprudence, but even if this Court does consider the issue, Fox offers no relevant evidence demonstrating TVEyes' bad faith.

*First*, Fox suggests that whether a defendant acted in bad faith is central to the fair-use inquiry, relying primarily on decades-old cases.  (*See* Fox Opp. at 10.) More recent cases, however, have questioned whether good or bad faith has *any* meaningful relevance to the first fair-use factor.  *See, e.g.*, *Swatch*, 861 F. Supp. 2d 336, 340 (S.D.N.Y. 2012) (Hellerstein, J.) ("fair use does not depend on a finding of good faith");[17] *aff'd*, 2014 WL 2219162, at *7 (questioning "role good or bad faith plays in fair use analysis").  This is because *Campbell* questioned whether any weight should be placed "on the alleged infringer's state of mind."  510 U.S. at 585 n.18; *see also Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006).  Indeed, the case Fox cites for the proposition that good faith is "integral" to the first factor (Fox Opp.

---

[17]  Fox alleges that, in *Swatch*, this Court "credit[ed]" a plaintiff's allegations of unauthorized use."  (Fox Opp. at 10 (citing *Swatch*, 861 F. Supp. 2d at 340).)  The quoted language, however, comes from this Court's finding that any discovery into the defendant's "state of mind" or "good faith in acquiring" was "*irrelevant* to my analysis of Defendant's use."  *Swatch*, 861 F. Supp. 2d at 343 (emphasis added).

at 10) concluded that it "generally contributes little to fair use analysis." *NXIVM*, 364 F.3d at 479 n.2.[18]

***Second***, Fox claims that TVEyes' use of Fox broadcasts supposedly violates TVEyes' cable agreements through which it receives access to those broadcasts. (Fox Opp. at 10.)   TVEyes' agreements with cable companies, however, are irrelevant to whether TVEyes' use of ***Fox*** content is fair.   Fox does not dispute that: (1) TVEyes legitimately gained access to Fox's content through its cable subscriptions; and (2) TVEyes did not violate any agreement with Fox.   Further, no cable company has brought a claim asserting that TVEyes breached any agreement (and Fox does not have standing to bring such a claim).[19]   Thus, Fox's citations to cases where copyrighted content was illicitly "purloined" (Fox Opp. at 10) have no relevance here.[20]   Further, Fox's argument would mean that ***any*** use of Fox content for ***any*** fair-use purpose—be it parody, criticism, or research—is necessarily conducted in bad faith if the work is obtained via cable, because such use necessarily "violates" the underlying cable agreement.   No court, however, has ever found that by merely subscribing to cable, a subscriber forgoes a fair-use defense.

Even if Fox's argument is fully credited, unauthorized access does not demonstrate bad faith when the purpose is to facilitate fair-use goals such as

---

[18]   This is particularly true where, as here, the defendant's use is transformative. *See, e.g.*, *NXIVM*, 364 F.3d at 479 ("the first factor still favors defendants in light of the transformative nature of the secondary use"); *Bouchat v. Baltimore Ravens L.P.*, 737 F.3d 932, 942 (4th Cir. 2013) ("The transformative nature of the defendants' uses … provided them with every reason to believe that their use was fair."); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 422 (E.D. Pa. 2009).

[19]   When Fox raised this argument with the Court at the April 7, 2014 conference, the Court found the agreements to not be relevant.  (*See* 4/7/14 Hr'g Tr. at 8:15-9:6.)  Further, the documents Fox cites—internet printouts of blank form agreements—are inadmissible hearsay.  (*See* TVEyes' Response to Fox's SUF ¶¶ 124-25.)

[20]   In *Harper & Row*, for example, the defendant "knowingly exploited a purloined manuscript" to scoop the publisher.  471 U.S. at 563.   And in *NXIVM*, the defendant's "access to the manuscript was unauthorized."  364 F.3d at 478.   In contrast, Fox makes no claim that TVEyes' access to Fox content was illicit.

research and criticism.   *Swatch*, for example, found no bad faith where the defendant knowingly obtained an unauthorized copy of the work, because legitimate fair uses "would be crippled" if a secondary user "were limited to sources of information that authorize disclosure."   2014 WL 2219162, at *7.[21]   Here, the undisputed facts establish that: (1) journalists use TVEyes to analyze and criticize broadcast news, including Fox (*see* Fox Response to SUF ¶¶ 53, 60, 97, 122; Rose Decl. ¶¶ 15-27 & Exs. KK-UU); (2) Fox selectively curates which content it will and will not make available online pursuant to its own "discretion" (Misenti Decl. ¶ 12); and (3) Fox will not grant licenses to users who intend to criticize Fox (SUF ¶¶ 117; Rose Decl. Ex. O, ¶ 5.1.1; Anten Decl. Ex. KKK, ¶ 7.)   Journalists' watchdog activities, "whose protection lies at the core of the First Amendment, would be crippled if [TVEyes was] limited to sources of information that authorize disclosure." *Swatch*, 2014 WL 2219162, at *7.

**Third**, Fox claims that TVEyes acted in bad faith because it continued to offer Fox content on its service "after Fox News made repeated demands that TVEyes stop." (Fox Opp. at 10.)   The Supreme Court has already rejected this argument, stating that "being denied permission to use a work does not weigh against a finding of fair use." *Campbell*, 510 at 585 n.18; *see also Swatch*, 2014 WL 2219162, at *7 (similar); *Blanch*, 467 F.3d at 256 (similar).   That is because "[i]f the use is otherwise fair, then no permission need be sought or granted." *Blanch*, 467 F.3d at 256 (quoting *Campbell*, 510 U.S. at 585 n.18).[22]   Indeed, **every** disputed fair use involves use of a work without the plaintiff's permission.[23]

---

[21]   Fox tries to characterize *Swatch* as creating a special rule for "members of the news media for purposes of news reporting." (Fox Opp. at 10 n.7.)   Fox, however, offers no basis for differential treatment between news reporting, research, criticism, or any of the other illustrations of fair use listed in the preamble of § 107.

[22]   Fox tries to distinguish *Campbell* by creating an artificial distinction between a failure to seek permission and a demand to cease copying.   (Fox Opp. at 11 n.8.)   The Second Circuit already rejected this argument.   *Castle Rock Entm't v. Carol*

(*footnote continued*)

***Fourth***, Fox claims that TVEyes' use of the Works without a license violates TVEyes' "own stated practice of obtaining licenses from content owners."  However, that TVEyes entered into business relationships with a few ***other*** content providers is not evidence that it needed a license to use ***Fox*** content.  *Campbell*, 510 U.S. at 585 n.18 (agreements with others "may simply have been made in a good-faith effort to avoid … litigation"); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 325 (S.D.N.Y. 2008) (rejecting argument that defendant's obtaining "permission for all the other music in the movie" but not for plaintiff's evinces bad faith).[24]

## B.  The Works-in-Suit Are Factual in Nature and Were Previously Published

It is beyond dispute that the Works are highly factual television news programs, and thus are more amenable to fair use than non-factual works.  *See Swatch*, 2014 WL 2219162, at *13 ("the scope of fair use is greater with respect to factual than non-factual works.")  Fox argues that because the Works contain "expressive choices," their factual natures can be ignored.  (Fox Opp. at 20.)  That the Works are not pure compilations of facts, however, means only that they qualify for copyright protection in the first instance, *see Feist*, 499 U.S. at 348, not that they

---

*Publ'g Grp., Inc.*, 150 F.3d 132, 146 (2d Cir. 1998) ("defendants' continued distribution … after [plaintiff] notified defendants of its copyright infringement claim" is "of no relevance to the fair use equation").

[23]  TVEyes never made "repeated representations" (Fox Opp. at 11) that it would remove Fox content (*see* Second Ives Decl. ¶ 20), but even if it did, such representations would not be relevant, as TVEyes had no obligation to remove the content in the first place.

[24]  TVEyes' position that "[i]t is certainly not the practice of TVEyes to operate without any necessary agreement being in place" (Fox Opp. at 11) ***proves this point***—no agreement with Fox was "necessary" here because it is a fair use.  And Fox's assertion that "customers have been led to believe by TVEyes that video clips downloaded from the TVEyes service are licensed for use on internal and external websites" (*id.*) is supported by nothing other than a single, self-serving statement of a Fox employee's purported (false) belief or on hearsay from unidentified "clients." (*See* TVEyes' Response to Fox's SUF ¶¶ 255, 257-259.)  Further, Fox does not dispute that TVEyes never represented that it was licensed by Fox. (*See id.* ¶ 256.)

are less susceptible to fair use.  Indeed, it is hard to conceive of a televised work more factual in nature than a news program.  *See Swatch*, 2014 WL 2219162, at *13 (second factor favored fair use where "sole purpose" of work "was to convey … information"); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262-63 (2d Cir. 1986) (second factor favored fair use where book was "essentially factual in nature").[25]

Nor does Fox dispute that the Works were already accessible to the public when they were first captured and indexed, which further favors a finding of fair use.  (Fox Response to SUF ¶ 85); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (second factor favored fair use where work was previously published and accessible to the public).  Accordingly, because the Works are highly factual news reports that were published prior to TVEyes' use, this factor weighs in favor of fair use.  *See Google Books*, 954 F. Supp. 2d at 292 (that "vast majority of books" are non-fiction and published "favor[s] a finding of fair use").

## C.  Copying the Entirety of the Works Was Necessary to Create a Comprehensive, Text-Searchable Index

Fox effectively concedes that TVEyes' use of the Works in their entirety to create a comprehensive, text-searchable database is fair use.  (*See, e.g.,* Fox Opp. at 15, 32, 34 (stating Fox does not object to TVEyes' use of the Works for this purpose).)  *See HathiTrust*, 2014 WL 2576342, at *8 (copying and digitizing of ten million books to create text-searchable database is a fair use); *Google Books*, 954 F.

---

[25]  Fox's citations to *Infinity* and *Weissman v. Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989), are inapposite.  (Fox Opp. at 20-21.)  In *Infinity*, neither the district court nor the Second Circuit considered or addressed the factual nature or newsworthiness of the copyrighted works as part of the second-factor analysis.  *See* 150 F.3d at 109; 965 F. Supp. 553, 557 (S.D.N.Y. 1997).  In *Weissman*, the court held that "the scientific nature of [the Work] tilts this factor ***toward*** [fair use]," though it ultimately held the factor was neutral because "incentive interests" favored the plaintiff.  868 F.2d at 1325 (emphasis added).

Supp. 2d at 292 (copying and digitizing entirety of twenty million books to facilitate full-text search function "critical to the functioning of Google Books"); *Vanderhye*, 562 F.3d at 642 (copying of entire essays to create digitized database to detect plagiarism did not weigh against fair use); *Perfect 10*, 508 F. 3d at 1165 ("The fact that Google incorporates the entire Perfect 10 image into the search engine results does not diminish the transformative nature of Google's use."); *Kelly*, 336 F.3d at 821 ("It was necessary for Arriba to copy the entire image" because copying only part of the image would "reduc[e] the usefulness of the visual search engine").

Fox claims that TVEyes has taken "too much" by providing snippets of the Works to users in connection with their searches.  (Fox Opp. at 23.)  Yet Fox does not dispute that the snippets accessed by TVEyes' users were just small portions of the overall Works: the average play length of these snippets was just 53.4 seconds (SUF ¶ 80), and more 85% of the plays were shorter than 60 seconds, 76% were less than 30 seconds, and 51% were less than ***10 seconds***.  (*Id.* ¶ 81.)  Moreover, the length of these snippets was not excessive in light of the need to provide sufficient context about the keyword mention to serve the user's particular purpose.  *See Swatch*, 2014 WL 2219162, at *13 (recognizing need for providing sufficient context when facts are disseminated).

Nor is there any evidence that the snippets viewed on TVEyes contained the "heart" of the Work.  (Fox Opp. at 34 n.16.)  As an initial matter, Fox has waived this argument by refusing to identify the "heart" of the Works in discovery, or in its opposition brief.  (Second Anten Decl. ¶ 8, Ex. AAAA ("Identify the 'heart' of each of the Works-in-Suit" (Interrogatory 21)).)  Regardless, snippets  from the Works accessed by TVEyes' users were generated automatically in response to standing Watch Terms or search queries.  (SUF ¶ 18, 82.)  Unlike the service at issue in *Meltwater,* upon which Fox heavily relies, TVEyes' service is technologically unable recognize the "heart" or "lede" of a broadcast, nor does it distinguish between

"breaking" and "regular" news.[26]  (SUF ¶ 40; Second Ives Decl. ¶ 7.)  Snippets of video are generated in response to user-selected search terms and pursuant to a mathematical algorithm that has no relationship to the underlying substantive or structural elements of the broadcasts.  (SUF ¶¶ 18, 82.)

### D. TVEyes' Service Has No Negative Effect on Any Cognizable Market for the Works-in-Suit and Provides a Tremendous Public Benefit

The fourth factor considers whether TVEyes' use of the Works will "*excessively* damage the market for the original by providing the public with a substitute for that original work."  *HathiTrust*, 2014 WL 2576342, at *6 (emphasis added).  And, if any actual or potential harm is found to exist, it must be balanced against "the benefit the public will derive if the use is permitted."  *Bill Graham*, 448 F.3d at 613.  Crucially, this factor is concerned only with actual or potential harm flowing from use of "the copyrighted work," § 107(4), *i.e.*, the 19 Works-in-Suit; any alleged harm related to any other works is irrelevant.

---

[26] The Court should reject Fox's attempt to define the "heart" of the Work as whatever portion is most important to the secondary user.  (Fox Opp. at 23 n.16.)  If the "heart" of the Work were defined in this way, the third factor would *always* favor the plaintiff—by definition, whatever is used would be the "heart."  Further, Fox's citation to *Meltwater* for this proposition is highly misleading.  There, the court found that because "Meltwater always prints the story's *title and lede*, as well as material surrounding one targeted keyword…. Meltwater systematically provides its subscribers with what in most instances will be the essence of the AP article relevant to the reader."  931 F. Supp. 2d at 554-54 (emphasis added).  Thus, the court held that, for AP readers, the title and lede provide the "essence" of the entire article.  The court contrasted this with Google News Alerts, which, it observed, "do not systematically include an article's lede."  *Id.* at 555.  Similarly, TVEyes does not systematically deliver the "heart,"—*i.e.*, "lede" or "title"—of the broadcasts it captures.  Indeed, it has no way of recognizing these features.  Instead, the snippets delivered to users are generated by a mathematical algorithm whereby the search term always appears 14 seconds after the start of the snippet, regardless of where it appears in the underlying program.  Further, Fox has not even identified the "heart" of each of the Works (or if they even have a "heart").  (SUF ¶¶ 18, 82).

It is Fox who bears the burden of proving that TVEyes' use of the Works has or will result in market substitution. *HathiTrust*, 2014 WL 2576342, at *7 ("To defeat a claim of fair use, ***the copyright holder*** must point to market harm that results because the secondary use serves as a substitute for the original work.") (emphasis added); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) ("respondents failed to demonstrate that time-shifting would cause any likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works."). Fox has not met its burden.

As an initial matter, Fox argues that there is "a near presumption of market harm in the context of verbatim copying of the original in its entirety for commercial purposes." (Fox Opp. at 24.) That is not the law. As courts in this Circuit have recognized, market harm does not necessarily flow from verbatim copying of the entire original copyrighted work, particularly where, as here, the defendant's use is transformative and/or furthers the goals of copyright law. *Campbell*, 501 U.S. at 591 (when a work is transformative "market substitution is at least less certain, and market harm may not be so readily inferred"); *see, e.g.*, *See HathiTrust*, 2014 WL 2576342, at *9 (fourth factor favored defendant, despite verbatim copying for commercial purposes, because "transformative uses ... by definition, do not serve as substitutes for the original work"); *Bill Graham*, 448 F.3d at 614-15 (similar); *Google Books*, 954 F. Supp. 2d at 292-93 (similar). In this case, because TVEyes' use of the Works is transformative, there is no evidence of cognizable market harm to Fox, and none should be "presumed" merely because TVEyes captured the entire Works to include in its index.

27

1.    **TVEyes Does Not Act as a Substitute for the Works-in-Suit**

Fox has failed to introduce any evidence of actual or potential harm to the market for the 19 Works.   Rather, Fox's allegations of substitution are pure speculation and based on assumptions that are unreasonable and unsupported.

a.    **TVEyes Does Not Affect Fox's Revenues from Cable Company Licenses or Advertising Partners**

Fox claims it has sustained market harm because clients used TVEyes, instead of cable or satellite television, to "watch" Fox broadcasts live.  (Fox Opp. at 24-26.) ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████    ████████████████████████████
████████████████████████████████████████████    (*See*
Carry Decl. ¶¶ 4, 14; Second Rose Decl. ¶ 5 & Ex. GGGG.)   These markets were unaffected by TVEyes' use of the Works, which were captured and indexed by TVEyes only ***after*** they were licensed to and broadcast by cable companies.   In other words, TVEyes' *post facto* use of the Works had no bearing whatsoever on the fees commanded by Fox in connection with its airing of the Works.   Not one of Fox's nine fact witnesses makes any claim to the contrary.   And since the Works are no longer available on TVEyes' service, and have not been since 32 days after each was broadcast,[27] the inquiry should end here.  (SUF ¶¶ 19, 76.)   Fox's arguments to the contrary should be rejected.

---

[27]   None of the seven snippets from the Works saved to TVEyes' Media Center has ever been accessed since the day it was created.  (Third Seltzer Decl. ¶ 2.)

***First***, Fox speculates that perhaps TVEyes' service ***in general*** could reduce cable subscriptions in the future, which in turn, could eventually result in lost revenue to Fox. At the outset, Fox's theory is irrelevant because it has no relationship to the Works. And in any event, this attenuated argument fails for lack of proof. The record contains ***zero*** evidence that a single TVEyes client ever opted to forgo a subscription to cable or satellite television in favor of TVEyes' service, whether in connection with the Works or otherwise. The only "proof" Fox offers in support of this theory of market substitution is the self-serving and conclusory speculation of its senior executives—and even this evidence does not demonstrate that TVEyes' clients would forgo cable service in favor of TVEyes.

***Second***, contrary to Fox's repeated and erroneous assertions, TVEyes' service cannot be used to watch live television and therefore does not serve as substitute for cable or satellite subscriptions. (Second Seltzer Decl. ¶¶ 3-11; Second Ives Decl. ¶¶ 3-9.) TVEyes does not "retransmit" copyrighted programming live or over Internet.[28] (*Id.*) TVEyes only permits users to access video snippets in response to queries up to a maximum of 10 minutes—and even that has occurred less than ██████ of the time. (SUF ¶ 70.) Moreover, all snippets obtained from TVEyes are ***at least*** ██████████████████ (SUF ¶¶ 29, 70.) The closest a user can come to "watching" television on TVEyes is to run multiple queries and then cobble together a set of (at least) ██████████████ snippets to view in sequence—a process that would be extraordinarily cumbersome and tedious.[29] (Second Seltzer Decl. ¶¶ 3-11;

---

[28] Fox's citation to *WPIX* (Fox Opp. at 25), is inapposite because: (1) TVEyes does not "retransmit" television live over the internet; and (2) *WPIX* did not involve a fair-use defense.

[29] *See*, *e.g.*, *Google Books*, 954 F. Supp. 2d at 292-93 (although possible to do so, users are unlikely to spend energy to run multiple searches using Google Books to recreate entire book).

Second Ives Decl. ¶¶ 3-9.)  Moreover, **none** of the Works was ever accessed in this manner, nor does Fox even contend that they were.  (Second Seltzer Decl. ¶ 5.)

TVEyes' service enables clients to **monitor** television—not to watch it—and that is how it is used.  TVEyes' clients played snippets from the Works for an average of 53.4 seconds, with 85.5% of all snippets shorter than 1 minute.[30]  (SUF ¶¶ 80-81.)  Clients' use of TVEyes to access longer excerpts of Fox content has been exceedingly rare.  For example, between March 31, 2003 and December 31, 2013 there were only three instances of users **ever** accessing 30 minutes or more of any sequential content on FNC and **zero** instances on FBN.[31]  (Second Seltzer Decl. ¶ 5.)  To put these numbers in perspective, these uses represent approximately ██████ of all user plays of FNC content in the same period of time.  (*Id.*)  In fact, during these same 10-plus years, approximately ████ of TVEyes' users had never accessed **any** FNC content on TVEyes at all.  (*Id.* ¶ 6.)  The evidence is overwhelming that TVEyes is not now, nor has it ever been, a substitute for watching FNC, or live television in general.

**Third**, Fox's suggestion that TVEyes' clients—who are all business or government entities—would forgo purchasing subscriptions to cable television in favor of TVEyes' service, which does not offer even remotely comparable

---

[30]  This is consistent with user behavior for all Fox content—the average length of plays of snippets on TVEyes is ████ seconds for FNC and ██ seconds for FBN, and ████ of all such plays are shorter than 1 minute.  (SUF ¶ 71.)

functionality, is absurd.  (SUF ¶¶ 5, 11; Second Ives Decl. ¶ 9.)  No business that needs access to live television would pay TVEyes $500 a month for a service that does not even provide that functionality *instead* of paying a fraction of that price for a cable or satellite subscription.  And there is no reason to believe that TVEyes' clients—such as the White House, Members of Congress, ███████, television stations, media companies, and a variety of corporations—do not have ***both*** cable and TVEyes subscriptions, because they serve entirely different purposes.  Fox offers no evidence to the contrary.  *See Sony*, 464 U.S. at 453-54 (rejecting plaintiffs "prediction that live television or movie audiences will decrease" as "speculative") (quotations omitted).

***Fourth***, Fox speculates that TVEyes' service reduces television viewership ratings for FNC and FBN, which in turn, impacts the fees paid by cable providers and advertisers to Fox.  (Fox Opp. at 25.)  In addition to being irrelevant (again, having no connection to the market for or value of the Works, which were captured by TVEyes only after they were broadcast) and speculative, this argument, and the testimony given in support of it, is highly misleading.  As Fox and its testifying senior executives are no doubt aware, Nielsen ratings do not measure television viewership in the workplace, which is where TVEyes is used.  (Villar Decl. ¶ 7 (Nielsen ratings based on meters placed "in the home"); Second. Rose Decl. ¶ 10, Ex. MMMM (same); SUF ¶¶ 5,11 (TVEyes only sold to businesses for business-related purposes).)  Nor do Nielsen's ratings account for viewership on Fox's TVEverywhere service accessed via the Internet.  (Villar Decl. ¶ 29.)  It is thus essentially impossible for TVEyes' use of the Works to have depressed Fox's ratings.

31

b.    **TVEyes Does Not Affect the Secondary Market for Public Performances Licenses for the Works-in-Suit**

Fox has alleged that TVEyes directly competed with its exclusive licensee ITN Source because TVEyes provided its clients with access to excerpts of the Works.  (Compl. ¶ 40.)  This position, however, has no basis in fact or law.

*First*, the undisputed evidence demonstrates that TVEyes and ITN Source serve mutually exclusive markets.  ITN Source provides clips and the appropriate public performance licenses to third parties **when a license is legally required**, such as for use in a television show.  TVEyes, on the other hand, supplies clips to third parties for their internal use—*i.e.*, **when a public performance license is not necessary**.[32]



*Second*,  there is no evidence that a secondary market for public performance licenses for these particular Works even exists, much less that it was usurped by TVEyes.   As noted, Fox has earned **no revenue** directly from issuing public performance licenses for any of the Works to third parties for any purpose—either in the 32 day period after the Works were broadcast, or at any time since then.



(SUF. ¶ 116.)[33]  And while it is possible that third parties might be interested in licensing these Works (or portions thereof) in the future—*e.g.*, to be incorporated in a television show or advertisement—TVEyes' service cannot possibly substitute for that potential market because the Works are no longer accessible on TVEyes, and have not been since 32 days after each was broadcast. (*Id.* ¶ 76.)  Thus, TVEyes' service has had no effect on the market for licenses to publicly perform the Works (if one exists), nor will it have any effect in the future.

***Third***, while Fox does not deny that the Works were only available on TVEyes service for 32 days after they were broadcast, it nonetheless claims—without citing any evidence—that these 32 days are the time during which Fox's content is "most valuable."  (Fox Opp. at 28-29.) ███████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████  (Fox Response to SUF ¶ 119.)  Fox then implies that the users who accessed portions of the Works on the service would otherwise have needed a public performance license from ITN Source to access those snippets.  (*Id.*)  This argument is pure speculation.  There is no evidence that ***any*** snippets of the Works obtained by TVEyes' users were (1) publicly performed in violation of TVEyes' contract or (2) used in any manner that would require a license from Fox or ITN Source.

***Fourth***, Fox claims that TVEyes "promotes the fact that its subscribers can use its service beyond internal use" (Fox Opp. at 27), but none of the evidence it

---

[33]  In its response to TVEyes' SUF (¶ 116), Fox claims that it licensed the Works by allowing them to be telecast on its cable channels, but that is not a secondary market—it is Fox's primary market, with which TVEyes does not interfere (*see supra* Part I.D.1.a).  In addition, Fox claims that it licenses "video clips" to third-party websites, but does not dispute that it produced no evidence that video clips from ***the 19 Works*** were ever so licensed.  (*Id.*)  Finally, Fox does not dispute that ITN Source and Executive Interviews never issued a license for any clip from ***the 19 Works***.  (*Id.*)

cites supports this conclusion. (*See* TVEyes Response to Fox SUF, ¶¶ 189-190,196,198; Second Ives Decl. ¶¶ 17-19; Second Seltzer Decl. ¶ 14-16.)[34]  To the contrary, it is beyond reasonable dispute that TVEyes limits the use of video snippets obtained by clients through its service to internal use only.  This is: (1) reflected in TVEyes' contract with its subscribers; (2) stated on the download page of TVEyes' Website every time a client downloads a snippet to her computer; and (3) reiterated in verbal and written communications between TVEyes' employees and clients, including in the evidence cited by Fox.  *See supra* Part I.A.1 & nn.6-7.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████     (Fox Opp. at 27-28.)  This argument is legally irrelevant because it does not relate to the Works, and there is no evidence that any snippet from any of the Works was ever publicly performed.  In any event, to arrive at this staggering figure, Fox assumes—without any legal or factual basis—that every time a TVEyes client accessed a snippet of Fox content via TVEyes in the past 10 years, that client was legally required to obtain a public performance license from Fox for the same use.  Fox provides no support for this contention because none exists.  TVEyes provides clips for clients' internal use only—and not for uses that would require a license from Fox.  (*See* SUF ¶¶ 4, 7-9; Second Ives Decl. ¶ 10, 12 & Ex. TTT.)

---

[34]  For example, TVEyes' website ***does not*** state that clients may post clips to social media, as Fox misleadingly claims.  (*See* TVEyes Response to Fox SUF ¶ 189.)  TVEyes' website says that clients may "post clips"—***but Fox has added the phrase "to social media" to its description***.  (*Id.*)  Of course it is quite possible for users to "post" clips for internal purposes consistent with the  contractual terms and conditions of their TVEyes account.  Similarly, TVEyes' CEO David Ives testified during his deposition only that it is ***theoretically, technologically possible*** for users to post snippets obtained via TVEyes to the social media, but he ***never*** testified that this activity is permitted under TVEyes' user agreement. (*Id.* at ¶ 190.)



Indeed, it is absurd to think that the White House, for example, would have to pay Fox a hefty licensing fee every time it viewed a snippet of Fox-owned footage and circulated it for internal comment and/or criticism.  (*See* SUF ¶ 56 (emails showing White House use of TVEyes to comment on Fox news coverage).)   Fox cannot exclude TVEyes from a fair-use market under the guise of copyright law.  *Bill Graham*, 448 F.3d at 614-15 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work. [C]opyright owners may not preempt exploitation of transformative markets ….").

**Seventh**, it certainly is not "beyond the realm of possibility that [TVEyes' service] might stimulate further interest in [access to Fox-owned content for public performance]"  *Maxtone-Graham*, 803 F.2d at 1264.  When asked by clients about how to obtain the public performance rights to video excerpts, TVEyes refers these clients the appropriate broadcaster.  (Second Ives. Decl. ¶ 12, Ex. TTT (emails in

---

35 For the reasons set forth in TVEyes' Response to Fox's Rule 56.1 Statement of Facts, Ms. Ashton's testimony on this point, as well as the documents she introduces, should be excluded: (1) as inadmissible hearsay; and (2) because the documents were not produced during discovery.  (*See* TVEyes Response to Fox SUF ¶¶ 2-4, 36-37, 84.)

which TVEyes has referred clients to broadcasters—including Fox—to obtain licenses for clips.)  Further, all video content available on TVEyes is clearly sourced to the broadcaster, and in some instances, even points clients to the broadcaster's website.  (*See* Seltzer Decl. ¶¶ 16, 18, 23 & Figures 5, 7, 8.)  This evidence proves that clients can discover content using TVEyes they subsequently might want to license from Fox.

### c.  TVEyes Does Not Deprive Fox of Revenue From Use of the Works-in-Suit Online

Fox contends that TVEyes has replaced the market for clips of the Works made available on the Internet by Fox (Fox Opp. at 30), but the record contains no evidence of usurpation.  Fox's claim of market substitution rests entirely on the naked assumption that the clients who accessed snippets of the Works on TVEyes would otherwise have visited the Fox Website, or the sites of its content partners, to search for and view those same snippets. The record demonstrates that this assumption is not reasonable.

*First*, 352 of the 560 snippets from the Works that were viewed by TVEyes' clients *were never made available* online by Fox.  (Third Seltzer Decl. ¶ 3 & Ex. XXXX.)  This is not surprising, given that Fox does not post on its website most of what it broadcasts on television.  (Carry Decl. ¶¶ 10-11.)  By definition, market substitution is not possible for these snippets.

As for the clips from Works that Fox *did* post online, Fox speculates—without any factual basis whatsoever—that the users who accessed snippets on TVEyes otherwise would have visited the Fox Website, or the sites of its content partners, to manually conduct keyword searches to find and view the same

content. [36]   That assumption is unfounded and unreasonable.   TVEyes *automatically* monitors multiple keywords simultaneously on thousands of channels across a ***comprehensive and accurate*** database of content. (Seltzer Decl. ¶¶ 37-39.)  Logistically speaking, it would not be possible for TVEyes' clients to conduct these individual searches manually, nor can it be assumed that any client would attempt to do so.  Indeed, it is beyond implausible that TVEyes' clients—who are professionals using TVEyes at work—would spend countless hours conducting multiple keyword searches across potentially hundreds of websites, including the Fox Website, continuously searching for content. [37]  This is especially true for searches on the Fox Website because, as Fox concedes, just a small fraction of the content broadcast on FNC and FBN is available online—making a manual keyword search on the Fox Website a particularly fruitless exercise.   Other than the conclusory statements of Fox executives who simply declare—without any factual basis—that TVEyes' service diverts traffic from the Fox Website, there is no proof that this has ever occurred, in connection with the Works or otherwise.  *See Sony*, 464 U.S. at 453-54 (time shifting was fair use because the copyright owners' "prediction that live television or movie audiences will decrease" was "speculative").

---

[36]  Notably, ***none*** of the video clips posted by Fox on its Website from the following eight Works were ever accessed on TVEyes: *On the Record with Greta Van Susteren* (Oct. 31, 2012); *The Five* (Nov. 2, 2012); *The Fox Report with Shepard Smith*, (Nov. 2, 2012); *The O'Reilly Factor* (June 24, 2013); *Hannity* (June 26, 2013); *The Five* (July 2, 2013); *The Fox Report with Shepard Smith* (dated July 2, 2013); *The Fox Report with Shepard Smith* (July 3, 2013); and *Hannity* (July 3, 2013).  (Third Seltzer Decl. ¶ 4.)

[37]  An analogy to Google's popular "Alert" function is useful to illustrate this point. When an individual sets up an "Alert" using Google, the search engine automatically delivers hit results for the chosen keyword to that person via email and with a frequency selected by the user.  But just because a person sets  up and receives Google Alerts does not at all mean that without these alerts the user would conduct hundreds or thousands of manual searches on various websites for the same term.  In fact, it is very likely that the user would not ever have become aware that the term was mentioned at all.

***Second***, Fox's theory of market substitution is further undermined by the Terms of Service of its Website, which expressly restrict the use of the site's content to "personal use only" and "may not be used for commercial purposes" unless the user "receives prior written authorization from Fox News." (Fox Response to SUF ¶ 114; *see also* Rose Decl. ¶ 11, Ex. GG.) By contrast, TVEyes' services are offered solely to businesses for their commercial use. (SUF ¶ 5, 11.) While Fox does not dispute that its Terms of Service prohibit such use, it insinuates—without any evidentiary support—that visitors to the Fox Website may share, post and otherwise distribute Fox content for ***non-personal, commercial purposes***, and that this use is encouraged by Fox. (Fox Opp. at 31.) This argument is directly contradicted by Fox's Terms of Use, and is otherwise unsupported by evidence. TVEyes cannot usurp a market that Fox has expressly disclaimed.

***Third***, as discussed in TVEyes' opening brief (Br. at 47-51), TVEyes' clients cannot accomplish their media-monitoring objectives using the Fox Website because, *inter alia*, the Fox Website (1) does not aggregate, index and make keyword searchable content from broadcasters other than Fox, and is not a one-stop-shop for monitoring keywords (*see* Seltzer Decl. ¶ 47); (2) does not contain everything that has been broadcast on FNC, exactly as it was broadcast, because Fox posts just a small fraction online (*see* Carry Decl. ¶ 10; Misenti Decl. ¶ 12; Rose Decl. ¶¶ 18, 27 & Exs. NN & WW); (3) contains clips that are materially different from what was broadcast on FNC (*see* SUF ¶ 113; Rose Decl. ¶ 9 & Exs. DD-EE.); (4) offers limited search functionality, no analytics tools, and video clips returned in response to search queries that lack basic contextual information essential to those who monitor the media, such as the air-time and show title (*see* SUF ¶¶ 105-110); (5) only offers clips with a predetermined beginning and ending that are pre-edited by Fox to a length that corresponds to the start and end point around the particular discussion—not to the user's keyword (*see id.* ¶ 103; Misenti Decl. ¶¶ 7, 18); and (6)

the content on the site is completely controlled by Fox and subject to its "editorial discretion" (*see* Misenti Decl. ¶ 12; SUF ¶ 99; Rose Decl. ¶ 27 & Ex. WW; Anten Decl. ¶¶ 22-23 & Exs. DDD-EEE; Second Rose Decl. ¶ 7 & Ex. HHHH-KKKK.)

**Fourth**, Fox argues that these differences do not matter because they do not definitively prove that substitution has **not** occurred. (Fox Opp. at 29-30 ("TVEyes' burden is not met by arguing that its service offers features that Fox News' websites do not.").) However, it is **Fox** that bears the burden of demonstrating market substitution, not TVEyes. *HathiTrust*, 2014 WL 2576342, at \*7 ("To defeat a claim of fair use, **the copyright holder** must point to market harm that results because the secondary use serves as a substitute for the original work.") (emphasis added). In any event, the fact that TVEyes' media-monitoring objectives cannot be accomplished on the Fox Website demonstrates that Fox's theory of market harm is implausible—and certainly that market substitution cannot be **presumed**—because the Fox Website cannot be used by clients to systematically monitor the media.[38] *See* 31A C.J.S. Evidence § 200 (2012) ("The court will more promptly discharge a litigant from the burden of evidence where the proposition is a negative one, and the burden of evidence is sustained by proof which renders probable the existence of the negative fact, nothing in the nature of a demonstration being required.") (footnotes omitted). In short, the record demonstrates that TVEyes' service and Fox's Website cater to different consumers with different objectives, undermining

---

[38] Fox misleads the Court by falsely suggesting that the Fox Website has a feature comparable to TVEyes' Watch Term email alert function. (Fox Opp. at 31.) Users can sign up on the Fox Website to receive email alerts about generic top stories of the day or "breaking news"—as it is defined by Fox. Or users can subscribe to a number of daily or weekly "newsletters" such as "Fox News Latino Morning Headlines" or "Weekly Health Headlines." However, Fox concedes that its website does not enable users to track individual keywords, nor receive email alerts when those words are spoken on the air. (Fox Response to SUF ¶ 102.) Nor does the Fox Website allow users to search for video snippets by entering the date and time that the snippet was broadcast. *See* http://www.foxnews.com/alerts/subscribe.html.

any claim of market substitution.  (SUF ¶¶ 5, 15, 40, 41, 44-71, 77, 80-81, 93, 100-114.)

*Fifth*, Fox argues that TVEyes' clients have no reason to visit the Fox Website to view clips posted there.  (Fox Opp. at 30.)  This is absolutely untrue. TVEyes subscribers otherwise inclined to visit the Fox Website will do so to access the top news stories of the day, to watch live television, to view pre-edited videos on a particular topic or story, to consume online-only content, and to share links to videos or stories with their friends and family, among other things.  ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████  There is no evidence that TVEyes' service deprives Fox of the web traffic it would otherwise receive from TVEyes subscribers accessing the Fox Website for personal enjoyment.[39]

### d.   Lost Licenses to Media-Monitoring Services Are Not Legally Cognizable Bases of Market Harm

Fox argues that TVEyes' use of the Works affects the potential market for licenses Fox might issue to other media-monitoring services to use its content. (Fox

---

[39] Even if the Court were to fully credit Fox's unsupported, speculative theory—*i.e.*, that every time a user accessed a snippet on TVEyes that was also available on the Fox Website, she would have searched for that same clip on the Fox Website—the resulting harm would be miniscule.  At best, Fox **might** lose handful of views per clips—hardly enough to qualify has cognizable market harm.  *See Sony*, 464 U.S. at 456 ("respondents failed to demonstrate that time-shifting would cause any likelihood of **nonminimal** harm to the potential market for, or the value of, their copyrighted works.")(emphasis added); *HathiTrust*, 2014 WL 2576342, at *6 ("A fair use must not **excessively** damage the market for the original by providing the public with a substitute for that original work.") (emphasis added).

Opp. at 26-27.)  As a matter of law, however, Fox cannot claim harm from loss of a transformative or fair-use market.  As *HathiTrust* explains:

> It is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair).  Lost licensing revenue counts under Factor Four only when the use serves as a substitute for the original and the full-text use does not.

2014 WL 2576342, at *10; *see also Bill Graham*, 448 F.3d at 614-15 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work.  [C]opyright owners may not preempt exploitation of transformative markets") (citation and quotations omitted, alteration in original).  Fox's claim that "other copyright holders have indicated that [similar] services typically pay them to use their content" (Fox Opp. at 26) is irrelevant:  that other companies licensed content for fair-use purposes does not make TVEyes' use any less fair—that is akin to arguing that a parody of a song is not a fair use where other parodists are willing to pay license fees to the songwriter.[40]

### e.    Similar Widespread Use Would Not Harm Fox

Fox argues that if other media-monitoring companies were permitted to use the Works in the manner TVEyes has, Fox would be harmed.  (Fox Opp. at 32-33.) Fox offers no evidence, however, to support this theory.

Although the Court may consider whether "unrestricted and widespread conduct of the sort engaged in by [TVEyes] would result in a substantially adverse impact on the potential market for the original work," that inquiry focuses upon "the original work," *i.e.*, the 19 Works.  *Swatch*, 2014 WL 2219162, at *14 (quoting *Campbell*, 510 U.S. at 590).  In other words, the Court's analysis must be limited to

---

[40]  Nor is there any evidence that Fox has or will ever licensed its content to a media monitoring service.  (Third Ives Decl. ¶ 4.)

the effect of TVEyes' use upon the potential market for or value of "the copyrighted work," § 107(4), *i.e.*, the 19 Works.   Here, each of the Works was deleted from TVEyes' servers as a matter of course 32 days after it was broadcast and has not been accessible on TVEyes' service since.  (SUF ¶ 19.)  Thus, there no possibility of additional future use by TVEyes—much less any "similar widespread use" of the kind cognizable under this factor.

Nor does the record support a finding that use of the Works by TVEyes and other media-monitors has or will "threaten Fox News' incentive to make the investments necessary to create news and information programming." (Fox Opp. at 33.)  For most of the 18 years that Fox has been in business, TVEyes and numerous other monitoring companies have recorded and monitored Fox broadcasts without its permission.  (SUF ¶ 3 (TVEyes has been in business since 1999); Third Ives Decl.¶ 3.)  Indeed, the practice of media-monitoring has been "widespread" for many years.  (*Id.*)



For 2013 alone, Fox's total revenues are estimated to be upwards of $1.8 billion dollars.  (Second Rose Decl. ¶ 5, Ex. GGGG.)[41]

(Fox Response to SUF ¶ 94;

---

[41]  Fox refused to produce certain financial information during discovery.  (*See* SUF ¶ 95.)  To the extent such information could have any bearing on the Court's analysis, TVEyes respectfully seeks the opportunity to review the documents sought and to depose Fox about their contents.  *See also* Rule 56(d) Declaration of Andrew H. Schapiro.

Carry Decl. ¶ 14.)  As discussed above, there is no link whatsoever between TVEyes' media-monitoring service and these fees because, *inter alia*, TVEyes does not replace the market for live television.  *See supra* Part I.D.1.a. Nor does TVEyes' service (or any of the numerous services like it) pose any legitimate threat to the ███ proportion of the revenue Fox receives annually from all banner advertisements, pre-roll advertisements, video syndication and public performance licenses, ████████████████████████████████████████. Importantly, corresponding revenues attributable to the Works would account for a ████████████████████████████ in the grand scheme of Fox's thriving business.  (Second Rose Decl.¶ 6.)

### 2.   TVEyes Provides a Tremendous Benefit to the Public

As discussed *supra*, there is no evidence that TVEyes' use of the Works has caused, or will cause, any market harm to Fox, much less "excessive damage" that would render TVEyes' use unfair.  *HathiTrust*, 2014 WL 2576342, at *6. But even if the Court were to find some cognizable harm to Fox, it must be weighed against the tremendous public benefit conferred by TVEyes.  *Bill Graham*, 448 F.3d at 613.

**First**, as detailed in its opening brief, TVEyes' service furthers the goals of copyright law and provides a significant public benefit.  (*See* Br. at 51-54.)  TVEyes has created from scratch a powerful research tool that enables subscribers to sift through tens of thousands of hours of television content daily, from numerous, disparate sources to instantly discover information relevant to them.  (SUF ¶¶ 14, 44-46.)  Without TVEyes, or a service like it, there is no other way to discover, gain access to, and efficiently review the staggering amount of content broadcast on television and radio. (SUF ¶ 46.)  The utility of TVEyes' service is demonstrated by the clients who use it:  The White House, over 100 members of Congress, ███████ ████, local law enforcement entities, and journalists, to name just a few, who use

the service, *inter alia,* to: (1) track how issues are treated in the news; (2) confirm the accuracy of public statements and information reported; (3) compare and contrast coverage of disparate broadcast channels; and (4) comment on or criticize broadcast news.   (*See* SUF ¶¶ 11, 46-63, 120-122)   Courts have recognized the public benefit of similar services.   *See Perfect 10*, 508 F.3d at 1166 (acknowledging the "truism that search engines…provide great value to the public" and weighing this against commercial loss to the plaintiff); *Kelly*, 336 F.3d at 820 (search engine "promotes the goals of the Copyright Act and the fair use exception" by "enhancing information-gathering techniques."); *Google Books*, 954 F. Supp 2d. at 287-88 (Google Books is an "essential research tool" used to "analyze massive amounts of data" and "examine word frequencies"); *Field v. Google*, 412 F. Supp 2d 1106, 1118-19 (D. Nev. 2006) (search engine's "cached" function "allows users to locate and access information that is otherwise inaccessible" among other "socially important purposes").

*Second*, TVEyes also furthers the public interest by facilitating criticism of Fox and its broadcasts.   Fox concedes, as it must, that it drastically limits the content it makes available online based on its "editorial discretion" (Carry Decl. ¶¶10-11; Misenti Decl. ¶ 12), ██████████████████████████████████ ██████████████████████████████████████ (SUF ¶¶ 117-118; Fox Response to SUF ¶ 117.)   In other words, *most* of what is broadcast by Fox ███████ ██████████████████████████ *is not available* in searchable form to the public for the purposes of criticism.   Fox argues that even if the Court rules against TVEyes the public can use content recorded on individual DVRs to criticize Fox. (Fox Opp. at 34.)   Not only is this suggestion absurd on a logistical level, *see supra* Part I.D.1.c, it also misses the point:   TVEyes' service is useful because of its comprehensive *search* functionality, and a ruling that TVEyes' service is not fair

will deprive the public of the only tool it has to sift through massive amounts of broadcast content by keyword.

*Third*, TVEyes also serves the public interest by facilitating access to news made on Fox broadcasts.  (SUF ¶¶ 120-122.)  Fox does not dispute that comments of Fox's on-air personalities, experts and guests are themselves newsworthy on a regular basis (including during the broadcasts of the Works), or that these statements are separate and distinct news events from the underlying facts reported during the broadcasts.  (SUF ¶¶ 59-60; Second Rose Decl. ¶ 7-8; Rose Decl. ¶ 14 & Ex. JJ (*e.g.*, MEDIAITE, Nov. 1, 2012: "Fox's *The Five* Hosts: Post-Hurricane Sandy Gas Lines Are 'Carter-Esque,' Bad For Obama"; WASHINGTON POST, Dec. 10, 2012: "Will George Zimmerman Regret Hannity Interview?")  Rather, Fox responds to this argument by citing a string of cases standing for the proposition that copyrighted material will not be rendered unprotectable merely because it conveys news or involves matters of public interest.  (Fox Opp. at 34-35.)  TVEyes does not disagree.  However, when news is made during Fox broadcasts—as it often is— TVEyes' service greatly benefits the public by facilitating access to this legitimate "new" news.[42]  *See Swatch*, 2014 WL 2219162, at *8; *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1984) ("[c]ourts should be chary of deciding what is and what is not news.") (citations omitted).

*Fourth*, Fox argues that the public interest should weigh in its favor because there is a "compelling interest" in enforcing the copyright regime.  (Fox Opp. at 18,

---

[42]  To provide just one recent example, on July 10, 2014, Ben Shapiro, a guest on Fox's *The Kelly File*, made news by referring to the Obama White House as a "borderline Jew-Hating Administration."  (Second Rose Decl. Ex. JJJJ.)  This incident was reported by the press and bloggers, but a video clip of this was not made available on Fox's website, or the sites of its authorized partners.  (*Id.* ¶ 8 & Ex. KKKK.)  It was, however, available to subscribers on TVEyes.  (*Id.* ¶ 8 & Ex. JJJJ).  Other examples of how TVEyes service has facilitated access to news made on Fox broadcasts—as well as news made during the broadcasts of the Works—can be found in the record.  *See* Rose Decl. ¶¶ 15-30 & Exs.; Second Rose Decl. ¶¶ 7-8.)

34.)  But this argument applies to *every* fair-use dispute, and the plaintiff in every such case already has been granted a time-limited monopoly that furthers the policies and incentives of copyright law.   Thus, the public interests underpinning the Copyright Act *have already been served* by the grant to Fox of time-limited monopolies in the Works.   *See HathiTrust*, 2014 WL 2576342, at *5.   The only question before the Court in this fair-use case is whether *TVEyes' use* of the Works serve a countervailing public interest that should be weighed against Fox's right to exploit the Works exclusively. *See Swatch*, 2014 WL 2219162, at *9 (balancing the public benefit of *defendant's* use against copyright owner's personal gain); *Bill Graham*, 448 F.3d at 613 (same); *Castle Rock*, 150 F.3d at 141 (copyright law "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster"); *Google Books*, 954 F. Supp. 2d at 292 ("Google Books serves several important educational purposes," thus favoring fair use); *see also Sony*, 464 U.S. at 454 (public benefit of time-shifting favored fair use);  TVEyes does not dispute that Fox's news programming serves an important public interest.   But it is also important for the public to discover and access snippets of Fox's broadcasts for any number of purposes—including to research, comment on and criticize Fox.   The public benefit weighs heavily in TVEyes' favor.

### E.    Weighing the Fair Use Factors, Along with Other Relevant Considerations, TVEyes' Use Is Fair

Taken together, the relevant considerations strongly favor a finding of fair use.   TVEyes' use of the Works is transformative because they were used as raw material to create a text searchable database for subscribers' internal use.   By capturing broadcast content from across the country—and indeed, the world—exactly as it was broadcast, TVEyes builds from scratch a powerful research tool that would not otherwise exist, and whose function cannot be replicated by other

means.  The fact that TVEyes allowed its users to access snippets of the Works with their search results does not make TVEyes' use less transformative—to the contrary, it furthers TVEyes' legitimate research goals by providing narrowly tailored visual context that could not be provided by merely reading a transcript

Even if this Court were to conclude TVEyes' use of the Works was not transformative, it should still find the use to be fair, because there is no market harm to Fox.  There is no proof that the TVEyes users who accessed snippets of the Works would otherwise have sought them out on the Fox Website (to the extent they were ever posted there) or licensed them from ITN Source or Executive Interviews, and it is unreasonable to make any such assumption given the nature and purpose of TVEyes' service.  Finally, even if there were some evidence of harm to Fox's market for clips of the Works, it would be greatly outweighed by the tremendous utility and public benefit conferred by TVEyes, not the least of which, is to facilitate criticism of Fox.

*     *     *

As a last salvo, Fox raises a straw man by positing that TVEyes' "approach" to fair use would permit a company to copy ***entire*** books and then sell ***entire*** copies to clients who might hypothetically use the book to write a book review.  Of course, Fox's self-serving hypothetical does not remotely reflect the facts of this case, or TVEyes' position in this lawsuit, which is that TVEyes' highly transformative search engine, designed to facilitate internal research and analysis: (1) does not replace the market for any of the Works-in-Suit; and (2) confers a significant benefit on the public.  Although Fox may wish the law were otherwise, TVEyes' "approach" merely reflects modern fair-use jurisprudence.

## II.   FOX'S "HOT NEWS" MISAPPROPRIATION CLAIM IS PREEMPTED AND MERITLESS

Fox does not dispute that only factual scenarios that are essentially identical to those of *International News Service v. Associated Press* ("*INS*"), 248 U.S. 215 (1918), may even qualify for a claim of "hot news" misappropriation, as only an "*INS*-like" claim is not preempted by the Copyright Act.  *See Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.* ("*Fly*"), 650 F.3d 876, 905 (2d Cir. 2011) (only an "*INS*-like claim" survives preemption, noting that "the *INS* Court's concern was tightly focused on the practices of the parties to the suit before it") (citations omitted).

Here, however, Fox presents no facts even close to those of *INS*—thus, Fox's "hot news" claim is necessarily preempted by the Copyright Act.  (*See* TVEyes Br. at 56-64; TVEyes Opp. at 63-76.)   Indeed, Fox's opposition brief concedes that it has failed to even allege, let alone support, a valid "hot news" claim.  For example:

- Fox ***concedes*** that it has not identified any specific piece of "hot news" that was misappropriated, but rather identifies only generic world events.

- Fox ***concedes*** that it has not established that any specific piece of "hot news" was time-sensitive at the time of any alleged misappropriation.

- Fox ***concedes*** that TVEyes does not present Fox's news as though TVEyes gathered it, but rather provides full attribution to Fox, and thus does not "free ride."

- Fox ***concedes*** that it has presented no evidence that TVEyes' activities are a threat to the very existence of Fox's entire newsgathering operation.

- Fox ***concedes*** that TVEyes and Fox do not "directly" compete, akin to the competing news wire services of *INS*.

Each one of these deficiencies alone presents a sufficient ground to dismiss Fox's "hot news" claim as preempted.  And even if the Court does not find Fox's "hot news" claim to be preempted, Fox has not provided any evidence sufficient to establish the merits of its claim.

48

## A.   Fox's "Hot News" Claim Is Preempted by the Copyright Act

Before this Court may address the merits of Fox's "hot news" claim, it must first determine whether the claim is preempted by the Copyright Act.  The only two Second Circuit cases to have addressed "hot news" claims both found the claims to be preempted, without addressing the underlying merits.  *See Fly*, 650 F.3d at 902 (plaintiffs' "hot news" claim "fails because it is preempted by the Copyright Act"); *Nat'l Basketball Ass'n v. Motorola, Inc.* ("*NBA*"), 105 F.3d 841, 854 (2d Cir. 1997) (plaintiff's "hot news" claim "is preempted").

As noted in TVEyes' opening brief, a "hot news" claim is preempted if: (1) the claim seeks to vindicate rights equivalent to the exclusive rights protected by the Copyright Act; and (2) the work in question is of the type protected by the Copyright Act.  (TVEyes Br. at 56); *Fly* 650 F.3d at 892.   Fox does not dispute, and thus concedes, that both of these prongs are satisfied.  Thus, the Court must find Fox's claim to be preempted ***unless*** Fox establishes that TVEyes' acts "meet the exceptions" for preemption of a "hot news" claim.  *Fly*, 650 F.3d at 878.  While *NBA* identified various factors that might except a claim from preemption, *Fly* confirmed that *NBA* did not present "a set of required and specific 'extra elements' essential to a non-preempted *INS*-like claim"; rather, it presented a "hypothetical set of circumstances" that merely provided a "helpful window into [the Court's] reasoning."  *Id.* at 650 F.3d at 899 n.32.  Ultimately, the true test of preemption is whether the claim is "*INS*-like."  If it is not, the claim is preempted.  *See id.* at 902 (plaintiffs' "claim is not a so-called *INS*-type non-preempted claim").

Ignoring this binding law, Fox asserts that its claim is not preempted here because the Second Circuit has found that, in certain circumstances, a "hot news" claim is capable of surviving preemption.  (Fox Opp. at 49-50.)  This is a *non sequitur*.  TVEyes does not dispute that it is ***possible*** for a non-preempted "hot news" to exist under certain factual circumstances (*i.e.*, those identical to *INS*); the

question is whether ***Fox's*** "hot news" claim survives preemption.  For example, in *Fly* and *NBA*, the Court found that the "hot news" claims were preempted because the factual record did not support that the defendant was "free-riding."  *Fly*, 650 F.3d at 902; *NBA*, 105 F.3d at 854.

This distinction is not academic—the five "elements" identified by Fox (Opp. at 37 n.23) are ***not*** the exclusive elements of a "hot news" claim under New York law; rather, they are non-binding suggestions about what might save a "hot news" claim from ***preemption***.  *Fly* at 650 F.3d at 899 n.32.  As Judge Raggi explained:

> *NBA*'s test is sometimes mischaracterized as identifying the "elements" of a "hot news" tort under state law.  The federal courts, however, cannot create New York common law.  That task is reserved for New York courts.  Rather, the *NBA* test attempts to define a subset of New York "hot news" claims surviving preemption.

*Id.* at 911 n.3 (citation omitted).[43]

Fox makes no attempt to identify the "elements" of a "hot news" claim under New York law.  The Court, however, need not plummet down this rabbit hole—while the only claim that could even survive preemption is one that is *INS*-like, Fox nonetheless fails its own presented test.  (*See* TVEyes Br. at 64.)  Thus, even treating the five factors presented by Fox as the exclusive "elements" of a "hot news" claim, Fox's claim still must be dismissed.

### 1.  Fox *Still* Has Not Identified Any Particular Piece of Exclusive, Time-Sensitive "Hot News" Misappropriated by TVEyes

As noted in TVEyes' earlier briefs, Fox has not identified any particular piece of "hot news" that TVEyes allegedly misappropriated.  (TVEyes Br. at 57-60; TVEyes Opp. at 65-69.)  Rather, in response to an interrogatory from TVEyes

---

[43]  Further, the majority noted that if it was required to pass on the merits of the claim, it might certify the issue to the New York Court of Appeals.  *Fly*, 650 F.3d at 890.  To avoid any confusion, TVEyes preserves its right to challenge the "continued viability of the tort under New York law."  *Id.*

asking for such information, Fox identified "all of the breaking news aired on [FNC] or [FBN] between July 31, 2010 and July 30, 2013, including but not limited to" 11 world events.  (Anten Decl. ¶ 31, Ex. MMM (Interrogatory 6).)[44]  Fox did not identify any specific piece of information gathered, nor any specific date and time that its reporting of information aired; rather Fox listed generic events—*e.g.*, "the papal resignation and election," "political unrest in the Mideast," "the Arab Spring uprisings in Libya"—with timeframes lasting anywhere from a week to two months.

Fox's failure to identify any particular piece of "hot news" is not a mere technical deficiency; by bringing a "hot news" claim, Fox is asserting a property-based interest not in the expression of its broadcasts (which would be covered by copyright law), but in the ***underlying information itself***.  *See NBA*, 105 F.3d at 853 (a "hot news" claim "is about the protection of property rights in time-sensitive information").  Fox must therefore place TVEyes on notice of what "time-sensitive information" was allegedly misappropriated.  *See Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 451 (S.D.N.Y. 2012) (dismissing trade-secret misappropriation claim because plaintiff failed to identify the trade secret used and defendants "are entitled to notice of the misappropriations for which [plaintiff] seeks to hold them liable").  Just because Fox covers an event over the course of many days does not automatically transform every piece of reporting associated with that event into time-sensitive "hot news."  Rather, Fox must specify: (1) what the information it gathered was; (2) how that information was time-sensitive; and (3) the cost incurred in gathering that information.  In effect, Fox is asking for a presumption that ***all*** of its programming constitutes time-sensitive "hot news" without having to prove it.

---

[44]  In its opening and opposition briefs, TVEyes inadvertently referred the Court to Anten Decl. ¶ 33, Ex. OOO.  Ex. MMM, however, is the proper exhibit.

***First***, Fox does not dispute that it did not identify any specific piece of "hot news" misappropriated by TVEyes (Fox Opp. at 37); rather, it asserts that it does not need to because TVEyes captures the entirety of Fox's broadcasts. Fox, however, confuses a "hot news" claim with a copyright claim. A "hot news" claim is not premised on copying, but on the ***type*** of factual information Fox disseminated. It is Fox's burden as the plaintiff to establish that the ***particular*** information it reported was time-sensitive, exclusive, and gathered at a cost—Fox's failure to do so, and instead to simply name generic world events, fails to put TVEyes on notice and renders a "hot news" claim unavailable.[45]

***Second***, Fox sets forth a hodgepodge of facts about Fox's general business, including that: (1) it delivers "general breaking news, as well as political and business news and information"; (2) its ticker delivers news updates; and (3) viewers come to Fox to watch "key breaking news events." (Fox Opp. at 38.) Such statements, even if fully credited, still do not serve to identify the specific, time-sensitive information for which Fox now claims a property interest. Indeed, Fox concedes that its programming not only consists of "breaking news" (whatever that is), but also general political news, business news, financial news, and information, none of which it alleges is time-sensitive. (Fox Opp. at 38.) And Fox doesn't even try to identify any particular piece of time-sensitive information reported by FBN,

---

[45]  None of the cases cited by Fox stand for the proposition that a plaintiff need not identify the specific information that it claims is "hot news." (Fox Opp. at 37-38.) In *INS*, for example, AP submitted affidavits from Melville E. Stone and Fred W. Agnew, who each identified particular bulletins, issued by AP at a specific time on a specific date, that AP alleged were misappropriated by INS.  *See* https://archive.org/stream/associatedpressv00assouoft/associatedpressv00assouoft_djvu.txt (providing text of bill of complaint and supporting affidavits); *see also INS*, 240 F. 983, 991 (S.D.N.Y. 1915) (rejecting portions of affidavits that "contain general allegations rather than specific instances" of misappropriation). And in *Fly*, the plaintiffs included in their Complaint instances of particular recommendations, issued at a specific time on a specific date, that they alleged were misappropriated. *See* Complaint (Dkt. No. 1) at ¶ 26, No. 06-cv-4908 (S.D.N.Y June 26, 2006).

instead just asserting that it provides generic "breaking news." (*Id.* at 40.) Because Fox concedes that not every piece of information on FNC or FBN is "hot news," it must identify what is and what is not "hot news" here. And no matter how many times Fox describes its news as "breaking"—a word it uses 27 times in Section II.A alone—such a conclusory label does not serve to identify specific information.

***Third***, Fox argues that it "identified numerous specific representative examples of its news reporting between July 31, 2010 and July 30, 2013 and produced all of its coverage of those events." (Fox Opp. at 38.) Not so.[46] Fox's response to TVEyes' interrogatory simply names world events; Fox did not identify any specific, time-sensitive ***information*** in which it claims a property interest, nor did it supplement its response pursuant to Fed. R. Civ. P. 26(e).[47] In its opposition brief, Fox tries to cure this deficiency by—for the first time—identifying additional examples of "breaking coverage" of certain news events. (Fox Opp. at 39-40.) As an initial matter, the Court may not credit information disclosed for the first time in summary judgment briefing that had been requested in an interrogatory. *See*, *e.g.*, *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1252 (M.D. La. 1996) (excluding from consideration affidavits identifying information for the first time "in response to defendant's summary judgment motions" that had been requested in an interrogatory). But even if the Court considers these arguments, Fox ***still*** does not

---

[46] Fox's claim that it "produced all of its coverage of those events" is misleading; Fox  produced to TVEyes an enormous box full of DVDs consisting of the ***entirety*** of its broadcasts for ***two full years***, without identifying any particular segments as containing "hot news."

[47] Fox tries to add additional world events to its list for the first time in its opposition, including "election night coverage in 2012, the Boston Marathon bombing, the George Zimmerman verdict, the royal baby's birth, the Washington Navy Yard shooting, and the Senate vote during the government shut down in 2013." (Fox Opp. at 38.) None of these (other than the Boston Marathon) were identified in Fox's response to TVEyes' Interrogatory No. 6, and in any event, each suffers from the same deficiency as Fox's already-identified "instances"—it merely names world events, and not particular time-sensitive information.

identify specific, time-sensitive information it supposedly gathered at a cost.  For example, if each of the "breaking" events or updates listed by Fox had already been disseminated by others, such information would no longer be "time-sensitive" sufficient to exclude others from conveying the same information.  *See Silver v. Lavandeira*, 2009 WL 513031, at *6 (S.D.N.Y. Feb. 26, 2009) (dismissing "hot news" claim because "[t]he fact that the information in question was widely available undermines any claim by Plaintiff that she possessed property rights in that information").  If others already reported it—*e.g.*, Pope Benedict XVI's resignation, or the Boston Marathon bombing—then that information simply is no longer "time sensitive" because the "hot news" has become "cold."  Fox, however, provides no evidence that any of the information it now lists was, in fact, "hot" when gathered.  To the contrary, Fox's own evidence demonstrates that each of the new additional world events it now identifies (Fox Opp. at 38) were also covered by (at least) its primary competitors, CNN and MSNBC, on the same day.  (*See* Villar Decl. Ex. 4.)  Fox fails to prove that any of its coverage was, in fact, still "hot" when reported.[48]

**Fourth**, Fox claims that it has "established that its news reports were time sensitive when they were gathered and when they were misappropriated."  (Fox Opp. at 41.)  Even assuming that Fox sufficiently identified the "news reports" at issue (which it did not), it points to no *evidence* of time-sensitivity in those facts.  It merely parrots its same, generic language about its "breaking news" along with its attorneys' *ipse dixit*, without directing the Court to any evidence establishing that this particular information was time-sensitive.  While Fox suggests that its news is

---

[48]  Fox's screenshots further prove the point.  Its screenshot of the Boston Marathon bombing (Fox Opp. at 40), for example, presents a time of 3:07 PM, but the bombings took place 18 minutes earlier at 2:49 PM (and Fox's footage apparently was provided by a local CBS affiliate, WBZ-TV, not Fox's own cameras)—by that point, the fact of the explosions had already been widely disseminated.  Merely listing what happened at that tragic event and the following days does not establish that Fox is entitled to an exclusionary property interest in the same information.

not a "historic retrospective" (*id.* at 41), the same is true of all news—Fox must establish not only that it provides news, but that this news is sufficiently "hot" to exclude others from conveying the same facts.  While Fox tries to evade this point by suggesting that TVEyes allows its users to view Fox broadcasts in "real time," not only is this assertion undisputedly false (there is a ███████████ delay between the initial broadcast and when a snippet is even available for viewing on TVEyes (*see* Second Seltzer Decl. ¶ 3)), but it also has nothing to do with whether the information was "hot" when Fox supposedly disseminated it.[49]

*Fifth*, Fox concedes that it does not claim to own facts associated with a particular news event, but argues that it owns "its particular report of a breaking news event … which may include, among other things, interviews with particular sources or eyewitnesses that do not appear in other reports on the same breaking news events."  (Fox Opp. at 42.)  However, Fox does not allege that any of the "hot news" it (supposedly) identifies includes: (1) interviews with a particular source; or (2) eyewitnesses that do not appear in other reports.  Further, Fox does not explain how such interviews necessarily convey "time-sensitive" information, as opposed to a mere impression.   And, in any event, Fox's "particular report," *i.e.*, the embodiment of its broadcast, is protected by copyright law, not a "hot news" tort.

*Sixth*, Fox argues that it need not establish that any of its allegedly "hot" news was published exclusively by Fox because "virtually no newsworthy event happens in the world without more than one reporter covering it."  (Fox Opp. at 42.) *That is the point*—it is only in the narrowest of circumstances, where a news organization expended great effort to uncover *unique* facts, that a "hot news" claim

---

[49] This ███████████████████ while brief, is meaningful in today's 24-hour news cycle.  Fox has the burden of establishing, through evidence, that any information in which it claims a property interest was not overwhelmed by other reports of the same information.  Fox chose not to introduce any such evidence.

may survive.  In *INS*, for example, the Court explicitly noted that the value of the information at issue stemmed from its "novelty."  248 U.S. at 238.  If the same information is being disseminated by others, it can no longer be considered "time-sensitive."  *See id.*; *Silver*, 2009 WL 513031, at *6.  Fox did not introduce any evidence that the information it gathered was "novel"; thus, its claim is not an "*INS*-like" one and should be dismissed.[50]  And while Fox now claims that it "breaks" news stories before other organizations, the single example Fox provides is of a standard interview relating to a topic not even identified in its response to TVEyes' interrogatory.  While an interview may be newsworthy, it is not necessarily "hot."[51]

### 2.   TVEyes Does Not "Free Ride" on Fox's Efforts Because It Attributes All Fox Content to Fox

The binding law of this Circuit establishes that, for the purposes of a "hot news" claim, the element of "free riding" requires that the defendant sell the information at issue "***as though the defendant itself had gathered it***."  *Fly*, 650 F.3d at 903 (emphasis added).  Where a defendant attributes the information at issue as gathered by the plaintiff, there is no "free-riding"—and thus, no "hot news" claim—as a matter of law.  *See id.* at 903 ("Fly, having obtained the news …, is hardly selling [it] as its own," because "[i]t is selling the information with specific

---

[50]  Fox incorrectly suggests that TVEyes "makes no argument" that Fox generates or gathers information at a cost.  (Opp. at 37.)   To the contrary, as TVEyes explained, because Fox has not even identified the "hot news" that TVEyes misappropriated in the first place, Fox by definition has not identified its cost for gathering that same information.    While TVEyes does not dispute that Fox generally ███████████████████ on its ***overall*** newsgathering efforts, Fox has not introduced any evidence of the cost to gather any "time-sensitive" information at issue here; rather, Fox presumes that ***all*** of its reporting on the 11 world events identified is "hot," so all of those costs necessarily support its "hot news" claim.  Fox's unsupported presumptions, however, are not evidence.

[51]  Fox's sole example—Hannity's interview of George Zimmerman (Fox Opp. at 42 n.25)—is ironic, given that Fox concedes that zero of TVEyes' clients ever used the service to view any part of that interview.  (Fox Response to SUF ¶ 77.)

attribution to" the source); *id.* at 902 (no free-riding because the defendant was "attributing the information to its source"). This is consistent with *Fly*'s directive that "hot news" claims mirror *INS*, where "AP broke news, and INS repackaged that news as though it were 'breaking' news of its own." *Id.* at 902 n.36. This is sensible—news organizations routinely convey facts gathered by others, with proper attribution (*e.g.*, "CNN is reporting …"). (*See also* Second Rose Decl. ¶¶ 11-19, Exs. NNNN-VVVV) (examples of Fox attributing news to other sources).)

Fox admits that it "does not claim that TVEyes misrepresented Fox News' works as its own." (Fox Opp. at 57 n.30.)[52] This is alone defeats of Fox's "hot news" claim.[53] Fox argues, however, that: (1) attribution is not an element of "hot news" listed in *NBA*, and (2) if it is, Fox introduced evidence of "passing off." (Fox Opp. at 45.) Neither argument is well-founded.

**First**, as noted above, the *NBA* "test" was determined by *Fly* to be *dictum*. *Fly*, which post-dates *NBA*, held that a lack of attribution is required for a "hot news" claim to survive preemption because it was an essential fact in *INS*. Fox simply ignores *Fly*. Because *Fly* unequivocally holds that attribution to the source renders a "hot news" claim unavailable as a matter of law, Fox's claim must fail.

**Second**, Fox tries to reformulate *Fly*'s instruction as permitting a "hot news" claim whenever there is an allegation of "passing off." Whether TVEyes "free rides"

---

[52] *See also* Fox's Response to SUF ¶ 126 (undisputed that TVEyes attributes all broadcasts content to its source). Further, it is undisputed that: (1) TVEyes' Results List includes the name of the station for every result (*id.* ¶ 30); (2) when a user watches a clip on TVEyes, it always includes the name of the station on the Transcript Page (*id.* ¶ 32.); and (3) if the FNC and FBN logos are displayed on the screen in the initial broadcast, those logos also appear on TVEyes (Fox Br. at 46).

[53] As noted in TVEyes' opposition brief (at 71), attribution is essential to TVEyes' service—users want to know what words were used (and if so, when and how) on **television**, not how they were used on TVEyes. For TVEyes to pass these clips on as its own, as if it had "gathered" this information, "would be of little value to either [TVEyes] or its customers," *Fly*, 650 F.3d at 903, who are interested in the fact that their keyword was mentioned on a particular channel, not on TVEyes.

on Fox, however, has nothing to do with license or permission. As *Fly* warned, "the term free-riding refers explicitly to a requirement … as described by *INS*." 650 F.3d at 903. *Fly* determined that "free riding" in the "hot news" context requires "selling that news as though the defendant itself had gathered it." *Id.* This is because "hot news" is about efforts expended in **gathering** the news; permission or license to redistribute have nothing to do with gathering. Absent attribution, the original gatherer is deprived of any credit for the efforts it expended to gather that information in the first place. Because TVEyes provides Fox with full credit for its efforts, that is the end of the matter.[54]

In addition, the nature of TVEyes' service cannot be overlooked. Fox does not dispute that TVEyes expends its own resources to capture the content of over 1,400 television and radio broadcasts and, using its own skill and technology, indexes the content into text databases and delivers relevant search results and excerpts in response to user-selected keywords. (*See* SUF ¶¶ 3, 13-15; Second. Ives Decl. ¶ 21.) These unique contributions—capturing, indexing, organizing, and delivering—occur solely at TVEyes' expense. *See Fly*, 650 F.3d at 905 ("half of Fly's twenty-eight employees are involved in the collection of the Firms' Recommendations and production of the newsfeed on which the Recommendations are posted" and Fly thus expends its own "substantial organizational effort"). In this context, TVEyes is not merely "copy[ing] and redistribute[ing]" Fox's news reports (Fox Opp. at 43-44); rather, TVEyes provides a qualitatively different service not offered by Fox: a research tool that allows users to determine the fact that a Watch Term has been mentioned on television, and a short clip providing appropriate context of that

---

[54] Indeed, Fox's "license/permission" argument is the basis for its "direct competition" misappropriation claim. (*See* Fox Opp. at 53-55.) Fox can't have it both ways. In any event, for the reasons described below, *see infra* Part III, Fox's purported evidence of "passing off" is inadmissible and undisputedly wrong.

mention.  Because Fox does not offer such a service for 1,400 television and radio broadcasts—or even for its own content—TVEyes is not "free riding" on Fox.[55]

While Fox complains that TVEyes "makes no investment or newsgathering or reporting" (Fox Opp. at 43), such an argument misses the point.  TVEyes is not, and does not purport to be, a newsgathering operation at all—it is a media-monitoring service, which expends its own operating costs that Fox does not bear in order to provide a text-searchable electronic database of every word spoken on television.  If Fox ceased to exist, TVEyes would not be forced to gather any news, because it does not exist to "report" the news in the first place.  It is a research tool that neutrally, but accurately, captures and indexes whatever has been broadcast on television.

### 3.  TVEyes Is Not a Threat to the "Very Existence" of Fox's Newsgathering Activities

Fox now agrees (Fox Opp. at 50) that a non-preempted "hot news" claim must prove that TVEyes' service is a "threat to the very existence" of Fox's newsgathering activities.  *NBA*, 105 F.3d at 853; *id.* at 852 (threat must be so severe so as to render plaintiff's "publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return" (quoting *INS*, 248 U.S. at 241)).  Fox presents no credible evidence of such a threat.

***First***, Fox presents a convoluted theory that perhaps TVEyes "eliminates [viewers'] need to purchase a subscription from one of Fox News' affiliates," thus

---

[55]  Fox incorrectly asserts that, to not be a free-rider, TVEyes must have reporters who watch Fox and write original content repurposing the facts into TVEyes' own reports, as in *Fly*.  (Fox Opp. at 44.)  TVEyes' service, however effectively "reports" through its technology—by providing targeted information in response to specific user queries, beginning 14 seconds after the mention, TVEyes discloses the fact that a particular Watch Term was said on television.  That TVEyes dedicates much of its resources and skills to technology rather than human review is how TVEyes is able to provide its research tool in the first place; the information TVEyes provides, across 27,000 hours of daily broadcasts, cannot be achieved by human efforts.

eventually reducing Fox revenues based on affiliate and advertising fees. (Fox Opp. at 46.) This argument fails for the reasons discussed *supra* at Part I.D.1.a.

*Second*, Fox suggests that even if TVEyes does not threaten the very existence of its subscription-related revenues, it replaces Fox's revenues associated with authorized clips, website traffic, or clip licensing. (Fox Opp. at 46.) Fox does not argue, however, that these are essential elements to its incentive to gather news in the first place. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  ███████  ██████████████

██████████████████████  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

*Third*, Fox argues that its incentive to continue gathering news is "real" because the news industry in general is shrinking. (Fox Opp. at 47.) This, however,

---

[56] Meanwhile, Fox earned $1.8 billion in revenue in 2013. (Second Rose Decl. ¶ 5.)

[57] Fox also alleges that TVEyes interferes with its website viewership, where viewers might see video or banner advertisements. Fox, however, simply provides a single number for its yearly video or banner advertisements revenue, and does not identify whether these revenues are associated with clips of FNC or FBN content, or something else. For example, the Fox website also includes Fox News Radio clips, for which Fox does not present a "hot news" claim, but which do include video advertisements. In addition, the Fox Website hosts thousands and thousands of written news articles, which are not part of Fox's "hot news" claim, but each of which includes banner ads ████████████████████ (*See* Misenti Decl. Ex. 60). Because Fox has not identified the amount of revenue associated specifically with the Fox content at issue—FNC and FBN video clips—Fox cannot rely on its overall website revenue figures. And even if the Court gives full credit to *all* of Fox's syndicated, website, and clip-licensing revenue, such revenue would collectively account for ████████████ of Fox's total revenue in 2013. (Second Rose Decl. ¶ 6.) Thus, even assuming that *every* potential viewer of syndicated, website, or clip-licensed Fox content shifted to TVEyes—an implausible assumption—there would be no realistic effect on Fox's incentive to gather news.

has nothing to do with whether **TVEyes** is threatening Fox's incentive to gather news.  If anything, this demonstrates that the real threat to Fox's newsgathering practices is the underlying nature and structure of the overall news industry, and that any future dangers to Fox are unrelated to TVEyes' activities.[58]

**Fourth**, Fox continually tries to paint TVEyes as a substitute for Fox, equivalent with mass public distribution of Fox video clips.  (Fox Opp. at 46-47.) For the reasons described in detail above, *see supra* Part I.D.1, TVEyes is not a substitute for Fox.

### 4.    TVEyes and Fox Do Not "Directly" Compete

Finally, TVEyes does not "directly" compete with Fox in the "keenest" sense, akin to the directly competing wire services in *INS*.  *See Fly*, 650 F.3d at 913 (Raggi, J., concurring) ("only products in the 'keenest' of competition satisfy the direct competition requirement for a nonpreempted claim") (quoting *INS*, 248 U.S. at 221). Fox's attempt to modify the applicable standard from one of the "keenest" direct competition, to one of **any** conceivable competition, should be rejected.

Fox concedes that "TVEyes does not provide news reports or operate a cable news channel and Fox News is not itself a media clipping service for other content owners."  (Fox Opp. at 47.)  Fox's concession that the parties are not in the "keenest" of competition, akin to directly competing news wire services, is dispositive.  *See Fly*, 650 F.3d at 914-15 (Raggi, J., concurring) (no direct competition because "[t]he Firms do not aggregate or distribute other Firms' Recommendations … [and] Fly

---

[58]  Fox's suggestion that Fox's incentive to gather news would be destroyed if other media-monitoring services captured and indexed Fox content is further betrayed by the media-monitoring industry.  As discussed above, *see supra* Part I.D.1.e, there are—and have been for many years—dozens of media-monitoring services in this country that capture Fox's broadcasts and allow users to view snippets of Fox content, but Fox's viewership and revenues have only increased.  (*See* Third Ives Decl. ¶ 3.)

does not produce any of its own recommendations or seek trading commissions"). Notwithstanding this concession, Fox argues that TVEyes somehow uses Fox's content in direct competition with Fox's offerings.  Fox is wrong.

***First***, Fox argues "the parties themselves [do not need to] be direct competitors in all aspects of their businesses." (Fox Opp. at 47.)  In so arguing, Fox ignores the directive of *Fly*, which held that only facts that mirror *INS* can withstand preemption.  650 F.3d at 905 (*INS* was "tightly focused on the practices of the parties to the suit before it").

Further, while the parties do not need to directly compete in ***every*** aspect of their businesses (as no two businesses are literally identical), they do have to directly compete in one of the plaintiff's "primary markets."  In *NBA*, for example, the Court restricted its analysis to the plaintiff's "primary products" and determined that the defendant's services did not compete with those products. *NBA*, 105 F.3d at 853-54; *Fly*, 650 F.3d at 901 n.35; *see also id.* at 913-14 & n.4 (noting requirement of direct competition in a "primary market" or "primary business").  Thus, it is Fox's competitors for its "primary product"—which Fox identifies as competing cable news stations MSNBC and CNN—who are, in the "keenest" sense, directly competing with Fox.[59]  TVEyes, however, is not such a competitor.[60]  Fox's purported clip-related operations are, at best, an ancillary part

---

[59]  *See, e.g.*, Wallace Decl. ¶ 45 ("Fox News' primary cable news competitors [are] MSNBC and CNN"); Villar Decl. ¶ 13 (comparing FNC coverage of Boston Marathon bombing to CNN and MSNBC); *id.* Ex. 4 ███████████████

[60]  Fox's citations to cases for the proposition that ***any*** use of Fox's broadcasts establishes "direct" competition are ill-founded.  *BanxCorp v. Coscto Wholesale Corp*, 723 F. Supp. 2d 596, 613-14 (S.D.N.Y. 2010), for example, was based on allegations, not evidence.  And *Twentieth Century Sporting Club, Inc. v. Transradio Press Service, Inc.*, 300 N.Y.S. 159 (N.Y. Sup. 1937) and *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704 (2d Cir. 1982) both pre-date *NBA* and *Fly*, which held that, for a "hot news" claim to survive preemption, the defendant must compete with the plaintiff's "primary" products.

of its "primary product": content created for broadcasting on FNC and FBN.  Fox's clip-syndication and -licensing markets constitute about ███ of its annual revenue.  (*See* Second Rose Decl. ¶¶ 3-4 (Fox's syndication and licensing revenues for 2013 totaled ███; *id.* ¶ 5 (Fox's overall revenue for 2013 was $1.8 billion).)  And Fox's website offers, at most, only ██ of all Fox content (Misenti Decl. ¶ 13), so it cannot be thought of as a "direct competitor" to TVEyes.  Finally, Fox concedes that ███████████████████████████████████████ ███████ Fox's minor, afterthought video-clip operations simply are not a "primary product" of its business.

Further, where parties target different markets for different uses, the mere possible overlap in clients does not render the parties "direct" competitors.  In *Fly*, Judge Raggi found dispositive

> the crucial difference between the businesses:  while the Firms disseminate only their own Recommendations to select clients most likely to follow the advice and place trades with the Firms, Fly aggregates and disseminates sixty-five firms' Recommendations and other financial information to anyone willing to pay for it without regard to whether clients accept or trade on particular Recommendations.

650 F.3d at 914.  That is the precise situation here:  While Fox disseminates its content with the goal of getting more viewers to watch more Fox content on TV and improve its ratings, TVEyes "aggregates and disseminates" 1,400 television and radio broadcasts "without regard to whether [its] clients" watch Fox (or CNN or MSNBC or any other channel)—TVEyes' search system is content neutral.  To be sure, TVEyes does have direct competitors:  *other media-monitoring services*.  *See id.* (Fly "directly compete[s]" with other outlets "that also seek to provide all Recommendations to anyone interested").  However, "[TVEyes'] aggregate subscription product is sufficiently distinct from [Fox's] business model, which cannot be divorced from the … market it targets."  *Id.*  While some TVEyes' users may ultimately view or download a Fox snippet, "the overlap in potential clients

does not make the products or their targeted markets sufficiently similar" for the purposes of a "hot news" claim.  *Id.* at 915.  Ultimately, the "broad similarity" of both parties trading in factual information "does not constitute the substantial similarity required for direct competition."  *Id.* at 913.

***Second***, Fox argues that TVEyes can be used as a substitute for watching FNC or FBN on television or through Fox's TVEverywhere service.  (Fox Opp. at 47-48.)  As noted above, however, Fox has not provided a single piece of evidence (other than its own speculation) of such substitution.  *See supra* Part I.D.1.

***Third***, Fox suggests that TVEyes competes with Fox's desire to distribute video clips of its programming.  (Fox Opp. at 48.)  As discussed above, Fox's video-clip operation is not one of its "primary products."  But even if it was, Fox has introduced no admissible evidence that, but for TVEyes' service, a TVEyes client otherwise would have visited Fox's website or one of its other "authorized" sources for clips—it simply speculates as much.  To the extent that Fox suggests that TVEyes is nothing more than a service for downloading clips, Fox does not dispute that fewer than ███ of users' Watch Terms result in a user even playing the corresponding video clip, let alone downloading it.  (Seltzer Decl. ¶ 38.)  And while Fox claims that TVEyes "scoops" Fox by makes snippets available before Fox or its licensees do (Fox Opp. at 47), Fox forgets that ***Fox already publicly broadcast the information on television***.  Fox does not dispute that TVEyes captures only what has already aired (Fox Response to SUF ¶ 85); thus, TVEyes  does not "scoop" Fox's licensees—if anything, Fox "scooped" those licensees via its own broadcasts.

***Fourth***, Fox directs the Court to statistics of use of Fox content on TVEyes.  (Fox Opp. at 48.) However, for the sake of clarity, only ███ of all TVEyes users

64

have *ever* seen *any* Fox content—be it FNC or FBN—on TVEyes, from 2003 to 2014.  (Second Seltzer Decl. ¶ 6.)[61]

### B.    Fox Cannot Establish Its "Hot News" Claim on the Merits

Even if Fox's "hot news" claim was not preempted by the Copyright Act, it should be rejected on the merits for the same reasons discussed above.  While the "elements" identified in *NBA* were merely non-binding suggestions about what may save a "hot news" claim from preemption, at a minimum such "extra elements" are necessarily included the elements of the underlying tort.  The ultimate question is whether this case presents facts that are "*INS*-like."  *Fly* 650 F.3d at 898.  Because this case is not *INS*-like—it does not present a scenario akin to competing news wire services, where one takes the other's specifically-identified time-sensitive information and passes it off as its own—Fox's "hot news" claim fails on the merits.

### III.    FOX'S "DIRECT COMPETITION" MISAPPROPRIATION CLAIM IS PREEMPTED AND MERITLESS

### A.    Fox's "Direct Competition" Misappropriation Claim Is Preempted by the Copyright Act

Fox advances two theories as to why its common-law misappropriation/unfair competition claim survives preemption.  Both should be rejected.

***First***, Fox argues that its "direct competition" claim is not based on TVEyes' acts of copying, but rather on "TVEyes' use of [Fox's] distribution system," which, Fox maintains, is not protected under copyright law.  (Fox Opp. at 56.)  However, ***the Complaint makes no mention of TVEyes' "use" of Fox's "distribution***

---

[61]  Contrary to Fox's representation, TVEyes' CEO never admitted that a "consumer would have no need for an authorized video clip if they obtained a clip from TVEyes."  (Fox Opp. at 49.)  Mr. Ives simply stated that a customer who receives a clip from TVEyes (under TVEyes' restrictions) would not need to get that clip from Fox.  Fox's counsel never asked Mr. Ives about a scenario where "authorization" from Fox was required—*e.g.*, where the use is not a fair one.  Because TVEyes' service is fair, no authorization from Fox is necessary.

*system.*"   Rather, the Complaint alleges that TVEyes misappropriated Fox's "premium programming and content," and "uses" and "distributes" Fox's works to consumers.  (Compl. ¶¶ 72-74.)  These allegations are qualitatively equivalent to Fox's claim for copyright infringement.  *See*, *e.g.*, *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) ("unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted"); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 919 (2d Cir. 1980) ("[t]o the extent that Tomy's unfair competition claim seeks protection against Durham's copying," it is preempted).

In any event, Fox's attempt to save its claim by referring to rights to an unpleaded "distribution system"[62]—whatever that is—is merely an attempt "dress up its claim that [the defendant] had copied [plaintiff's work]" for the purpose of surviving preemption.  *Eyal R.D. Corp. v. Jewelex New York Ltd.*, 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) (Hellerstein, J.); *see also id.* ("to avoid preemption, that which is claimed to be unfair competition must be something different from copying, or the fruits of copying, or the intent or bad faith that can be inferred from the act of copying").  There is no evidence that TVEyes has made use of any property belonging to Fox other than its television broadcasts, which were captured and indexed by TVEyes through independent means only *after* they were distributed to the public.  (Fox Response to SUF ¶ 85 (not disputed that TVEyes' only captures "that has been publicly disseminated")).

---

[62] The closest reference in Count III to "distribution" is Fox's allegation that "TVEyes's contemporaneous distribution of Fox News's content directly competes with Fox News cable telecasts."  (Compl. ¶ 73.)  This is equivalent of a copyright claim under 17 U.S.C. § 106(3) (providing right "to distribute copies … of the copyrighted work").  Fox, however, does not allege that TVEyes' "distribution system" competes with Fox's "distribution system."

***Second***, Fox argues that its "direct competition" misappropriation/unfair competition claim is based upon consumer deception, and thus is necessarily "qualitatively different" from its copyright claim.   (Fox Opp. at 56-57.)   More specifically, Fox claims that TVEyes misleads consumers "into believing that Fox News gave permission or licensed TVEyes to use its content." (*Id.* at 56.)   This claim does not survive preemption because the alleged consumer deception arises directly out of the defendant's unauthorized copying.  *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52-53 (2d Cir. 1986) (dismissing common-law unfair-competition claim as arising out of defendant's alleged copying); *Eyal*, 784 F. Supp. 2d at 447; *Levine v. Landy*, 832 F. Supp 2d 176, 191 (N.D.N.Y. 2011) (plaintiff's claim is "essentially a copyright infringement claim with the added allegation that after unlawfully copying, distributing, and/or publishing the photographs, defendants stamped their own name or copyright on the works, rather than plaintiff's" and was thus preempted); *Nash v. CBS, Inc.*, 704 F. Supp. 823, 834 (N.D. Ill. 1989) ("palming off," or any other "evidence of misrepresentation only 'accentuates' a misappropriation claim and is not the 'essence' of such an action"); *c.f. Buttner v. R.D. Palmer Enters., Inc.,* 2013 WL 6196560, at *3 (N.D.N.Y. Nov. 27, 2013) ("Misrepresentation of authorship or failure to attribute authorship of a work does not save an unfair competition claim under New York common law from preemption by the Copyright Act.").   In fact, a nearly identical claim of alleged "consumer deception" was made in the unfair-competition claim asserted in *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 486 (N.Y. Cnty. Sup. Ct. 1950) ("the defendants … mislead the public into believing that the recordings are made with the co-operation of Metropolitan Opera and under its supervision")—a theory of unfair competition the Second Circuit since held as preempted.  *Fly*, 650 F.3d at 896-97.

67

B.    **Fox Cannot Establish Its "Direct Competition" Claim on the Merits**

Even if Fox's "direct competition" misappropriation claim was not preempted, Fox has failed to establish it.

***First***, Fox asserts that TVEyes' has "utilized Fox News' distribution system for its own commercial benefit and in direct competition with Fox News' use" (Fox Opp. at 52.)   As noted above, Fox made no such allegations in its Complaint, and should be barred from making them now.   *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Salahuddin v. Cuomo*, 861 F. 2d 40, 42-43 (2d Cir 1988) (purpose of complaint is to "give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").   Moreover, none of the cases cited by Fox support the proposition that a purported "distribution system" should be regarded as protectable property under New York's unfair competition law.   *See*, *e.g.*, *Hall v. Bed Bath & Beyond*, 705 F. 3d 1357 (Fed. Cir 2013) (bad faith counterfeiting of plaintiff's portable towel product design and trade dress); *Roy Export Co. v. Columbia Broad. Sys.*, 672 F.2d 1095 (2d Cir. 1982) (bad faith use of plaintiff's film to compete with another of plaintiff's films); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291 (S.D.N.Y. 2010) (bad faith use of plaintiff's business plan and associated work product); *Linkco, Inc. v. Fujitsu, Ltd.*, 230 F. Supp. 2d 492 (S.D.N.Y 2002) (bad faith theft of plaintiff's computer system architecture).   Moreover, the authority cited by Fox involve defendant's who *actually used* the alleged property belonging to the plaintiff.   Fox's Complaint makes no such allegations.

Even if a cause of action for "direct competition" misappropriation of Fox's purported "distribution system" did exist (and is not preempted by the Copyright Act and/or is not the same as a "hot news" misappropriation claim), Fox has not proved it.  Fox has not directed the Court to any evidence demonstrating that it

owns a proprietary "distribution system" that could qualify as protectable property susceptible to misappropriation.  And, to the extent any such "distribution system" exists and is protectable, there is certainly no evidence that TVEyes *used* that system.  TVEyes captures and indexes *content* that is broadcast on television, but it does not utilize anything else owned by Fox to conduct its business, and the record contains no evidence to the contrary.  In short, Fox's dubious claim that TVEyes has somehow stolen Fox's proprietary (but not copyrightable) "system" for distributing its copyrighted works is unsupported by the evidence.[63]

*Second*, Fox's claim that "TVEyes attempts to mislead consumers into believing that Fox News gave permission or licensed TVEyes to use its content" is also unsupported. (Fox Opp. at 56.)  There is nothing about the presentation of TVEyes' service that suggests a business affiliation with Fox.  (*See* http://www.tveyes.com; Second Ives Decl. ¶ 22; SUF ¶ 127.)  Nor is there any evidence in the record of consumer confusion: Fox has not introduced a consumer survey demonstrating that potential TVEyes' customers are likely to believe that TVEyes' service emanates from or is approved by Fox, and the self-serving declarations of Ms. Cronin and Ms. Ashton are themselves insufficient to establish confusion.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001) (affirming district court's exclusion of alleged instances of consumer confusion among plaintiffs employees on summary judgment on the grounds that they were inadmissible hearsay and *de minimis*); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) ("The two letters which were admitted are insignificant when contrasted to the hundreds of thousands of magazines sold"); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F.

---

[63] To the extent that Fox is claiming that TVEyes has used its protectable broadcast content, such a claim would be preempted by the Copyright Act for the reasons discussed above.  *See supra* Part III.A.

Supp. 2d 266, 279 (S.D.N.Y. 2006) (holding "a number of people" inquiring about or assuming an affiliation between two parties "not particularly significant" in light of "the sales volume of both companies").   TVEyes has never claimed to have a business relationship with Fox, and nothing in the manner in which TVEyes' markets and promotes itself suggests that such a relationship exists.  (SUF ¶ 127.) To the contrary, on the rare occasions that TVEyes is asked about its relationship with broadcasters, TVEyes provides an accurate explanation.  (Second Ives Decl. ¶¶ 12, 22, Ex. TTT.)

Moreover, TVEyes has not acted in bad faith.  In determining whether there is bad faith for purposes of a misappropriation claim, the "only relevant intent is intent to confuse." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 329 (S.D.N.Y. 2012) (quotations omitted).  Fox has not introduced a shred of evidence that TVEyes intends to confuse the public as to the existence of a "connection or association" between Fox and TVEyes.  The mere fact that TVEyes captures and indexes Fox content to create a searchable database itself does not support an inference of bad faith.  *Cf. Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1005 (2d Cir. 1997) ("bad faith should not be inferred simply from the fact of copying.")  Indeed, Fox concedes that TVEyes **attributes** the source of any broadcast content by always identifying the channel from which all content originates.  (*See* Fox's Response to SUF ¶ 126 .)  Nor is the fact that TVEyes did not remove Fox content from its service after receiving a cease-and-desist letter evidence of bad faith.   TVEyes had a reasonable belief that its service is not infringing under principles of copyright fair use, *see supra* Part I.A.4, and accordingly, its decision not to comply with Fox's demand letter is not evidence of bad faith. *See*, *e.g.*, *Hi-Tech Pharm. Co. v. Hi-Tech Pharm., Inc.*, 2007 WL 1988737, at *11 (E.D.N.Y. July 5, 2007) (defendant's continued use after receiving demand letter consistent with good-faith belief that use was not infringing).

70

## CONCLUSION

For the foregoing reasons, TVEyes respectfully requests that the Court grant its motion for summary judgment in its entirety.


Dated:          August 7, 2014

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By____/s/  Todd Anten_____

Todd Anten
toddanten@quinnemanuel.com
Jessica A. Rose
jessicarose@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Defendant TVEyes, Inc.*

71