USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/9/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

FOX NEWS NETWORK, LLC,                          :
                                                :     **ORDER AND OPINION**
                          Plaintiff,            :     **DENYING IN PART AND**
       -against-                                :     **GRANTING IN PART CROSS**
                                                :     **MOTIONS FOR SUMMARY**
TVEYES, INC.                                    :     **JUDGMENT**
                                                :
                          Defendant.            :     13 Civ. 5315 (AKH)
                                                :

-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

TVEyes, Inc. ("TVEyes") monitors and records all content broadcast by more than 1,400 television and radio stations twenty-four hours per day, seven days per week, and transforms the content into a searchable database for its subscribers. Subscribers, by use of search terms, can then determine when, where, and how those search terms have been used, and obtain transcripts and video clips of the portions of the television show that used the search term. TVEyes serves a world that is as much interested in what the television commentators say, as in the news they report.

Fox News Network, LLC ("Fox News") filed this lawsuit to enjoin TVEyes from copying and distributing clips of Fox News programs, and for damages, and bases its lawsuit on the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the New York law of unfair competition and misappropriation. TVEyes asserts the affirmative defense of fair use. 17 U.S.C. § 107. Both parties have moved for summary judgment.

For the reasons stated in this opinion, I find that TVEyes' use of Fox News' content is fair use, with exceptions noted in the discussion raising certain questions of fact.  Fox News' request for an injunction is denied.[1]

## I.      Factual Background

### A.      TVEyes

TVEyes is a media-monitoring service that enables its subscribers to track when keywords or phrases of interest are uttered on the television or radio.  To do this, TVEyes records the content of more than 1,400 television and radio stations, twenty-four hours a day, seven days a week.  Using closed captions and speech-to-text technology, TVEyes records the entire content of television and radio broadcasts and creates a searchable database of that content.  The database, with services running from it, is the cornerstone of the service TVEyes provides to its subscribers.

The database allows its subscribers, who include the United States Army, the White House, numerous members of the United States Congress, and local and state police departments, to track the news coverage of particular events.  For example, police departments use TVEyes to track television coverage of public safety messages across different stations and locations, and to adjust outreach efforts accordingly.  Without a service like TVEyes, the only way for the police department to know how every station is constantly reporting the situation would be to have an individual watch every station that broadcast news for twenty-four hours a day taking notes on each station's simultaneous coverage.

---

[1] The parties have asked for confidentiality with respect to considerable materials in the briefs.  To the extent that such information is found in this opinion, confidentiality is terminated.  The interest of the public in the full basis of the fair use defense outweighs any interest in confidentiality.  *See the Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004).

An Internet search of a recent amber alert for a missing child, for example, would not yield the same results as would a TVEyes search result, because using the internet search results would provide only the segments of content that the television networks made available to the Internet. TVEyes' search results, in contrast, will index, organize, and present what was said on each of the 1,400 stations about the amber alert reliably and authoritatively. Without TVEyes, the police department could not monitor the coverage of the event in order to ensure that the news coverage is factually correct and that the public is correctly informed.

Upon logging into its TVEyes account, the subscriber is taken to the Watch List Page. This page monitors all of the subscriber's desired keywords and terms, and organizes search results by day, tabulating the total number of times the keyword was mentioned by all 1,400 television and radio stations each day over a 32 day period. While on the Watch List Page, a user can also run a "Google News" search, comparing the mentions of the keyword or term on the internet with the mentions of the keyword or term on the TVEyes database. A subscriber can also create a custom time range to tabulate the number of times a term has been used in a certain time period, and the relative frequency of such use compared to other terms. Subscribers can set up email alerts for specific keywords or terms, and receive responses one to five minutes after the keyword or term is mentioned on any of the 1,400 television and radio stations TVEyes monitors. TVEyes' responses to subscribers provides a thumbnail image of the show, a snippet of transcript, and a short video clip beginning 14 seconds before the word was used.

When a subscriber on the Watch List Page clicks on the hyperlink showing the number of times the term was mentioned on a particular day, the subscriber is brought to the Results List Page. The Results List Page displays each mention of the keyword or term in reverse chronological order. Each individual result includes a portion of transcript highlighting

3

the keyword and a thumbnail image of the particular show that used the term. When the user clicks the thumbnail image of the show, the video clip begins to play automatically alongside the transcript on the Transcript Page, beginning 14 seconds before the keyword is mentioned.

The Transcript Page shows users the following information: the title of the program; the precise date and time of the clip; a transcript of the video; the name and location of the channel; market viewership of the clip according to the Nielsen Ratings data; the publicity value of the clip according to data from the television research company, SQAD; and a web address to the website for the channel that features the program or for the program itself if such a web address exists.

TVEyes also provides website pages that organize and present the relevant data graphically and pictorially. The Media Stats page organizes data associated with the watch term, providing a graphic showing the number of times the term has been mentioned over a given time period. The Marketshare page displays a "heatmap" graphic that shows the geographic locations where the term is most used, and the frequency of the mentions. The Broadcast Network page generates a pie chart depicting the breakdown of broadcast stations on which the watch term was used. TVEyes also features a Power Search tool that allows users to run ad-hoc keyword search queries; clicking the thumbnail image will bring the user to the clip's corresponding transcript page. Subscribers also can organize searches according to dates and times, by broadcast. The "Date and Time Search" feature enables subscribers to play a video clip starting at a specific time and date on a specific television station, rather than entering a search term.

Subscribers can save, archive, edit, and download to their personal computers an unlimited number of clips generated by their searches. The clips, however, are limited to ten minutes, and a majority of the clips are shorter than two minutes. TVEyes enables subscribers to

4

email the clip from its website to anyone, whether or not a TVEyes subscriber. If the user has downloaded the particular clip, the user can share the clip, or a link to it, on any and all social media platforms and by email. When a recipient clicks on the hyperlink, the viewer is directed to TVEyes' website, not to the content owner's website, and can watch the video content in high-definition. Unless saved or downloaded, the clip's availability is limited to the 32-day term that the clip will remain on the website from the time the clip first appeared on television. Thus TVEyes facilitates publicity activities by subscribers publicizing the content that TVEyes has captured from the broadcasts of television and radio stations, both copyrighted and non-copyrighted contents.

TVEyes is available only to businesses and not to the general public. As of October 2013, TVEyes had over 2,200 subscribers including the White House, 100 current members of Congress, the Department of Defense, the United States House Committee on the Budget, the Associated Press, MSNBC, Reuters, the United States Army and Marines, the American Red Cross, AARP, Bloomberg, Cantor Fitzgerald, Goldman Sachs, ABC Television Group, CBS Television Network, the Association of Trial Lawyers, and many others.[2]

All TVEyes subscribers are required to sign a contractual limitation in a User Agreement, limiting use of downloaded clips to internal purposes. Whenever a subscriber seeks to download clips, TVEyes' website gives notice that such material may be used only for internal review, analysis, or research. Any reproduction, publication, rebroadcasting, public showing or public display is forbidden. TVEyes' email communications with subscribers contain similar warnings. When TVEyes users ask how to obtain rights to publicly post or disseminate clips,

---

[2] One of the subscribers is Stroock & Stroock & Lavan, LLP, a law firm of which I was a partner before being appointed a U.S. District Judge in 1998.

TVEyes refers such inquiries to the broadcaster. TVEyes recently added a feature that will block a user from trying to play more than 25 minutes of sequential content from a single station.

TVEyes is a for-profit company with revenue of more than $8 million in 2013. Subscribers pay a monthly fee of $500, much more than the cost of watching cable television. TVEyes advertises in its marketing materials that its users can "watch live TV, 24/7;" "monitor Breaking News;" and "download unlimited clips" of television programming in high definition. It also highlights that subscribers can play unlimited clips from television broadcasts, "email unlimited clips to unlimited recipients" and "post an unlimited number of clips" to social media and enjoy "unlimited storage [of clips] on TVEyes servers," and therefore is better "than the traditional clipping services." TVEyes also advertises that subscribers can edit unlimited radio and television clips and download edited clips to their hard drive or to a compact disk. The TVEyes User Manual states that its Media Snapshot feature "allows you to watch live-streams of everything we are recording. This is great for Crisis Communications, monitoring Breaking News, as well as for Press Conferences." Fox News draws specific attention to such live-streaming of its programs by TVEyes in its claim of copyright infringement.

**B. Fox News**

Fox News is an international television news organization headquartered in New York. Fox News owns and operates two television news channels: Fox News Channel ("FNC") and Fox Business Network ("FBN"). FNC delivers breaking news in a twenty-four hour news cycle on all matters of interest, including political and business news, and has been the most watched news channel in the United States for the last eleven years. FBN is a financial news channel that provides real-time information and reports on financial and business news. FBN is

6

distributed to over 70 million cable subscribers across the United States. Both FNC and FBN air news and information twenty-four hours a day, seven days a week. Their primary competitors are the cable television channels, MSNBC and CNN.

FNC and FBN are in the business of reporting news worldwide, and incur significant expenditures to cover developing news stories of the day, every day. Their programs reflect creative endeavors, and considerable time, effort, and expense in delivering news and political commentary to the public. The news ticker passing horizontally at the bottom of the television screen provides real-time updates of breaking news while regular programming airs.

Fox News also has a growing online and digital presence on the Internet (as do its competitors, MSNBC and CNN). Fox News makes live streams of FNC and FBN programming available on the internet through its TVEverywhere service, to viewers having a cable or satellite subscription. Fox News also makes certain segments of its shows available to the general public on its websites, FoxNews.com and FoxBusiness.com. Fox News makes about 16% of its television broadcast content available online, and is concerned that a broader dissemination beyond that will result in a weakening of its viewer-base or create a substitute for viewing Fox News on television cable and satellite. Fox News provides clips of segments of its programs within an hour of airing, and with updates as needed. The video clips do not show the exact content or images that were aired on television — the news ticker on the bottom of the screen is absent in the online clips, for example. Furthermore, the online clips sometimes feature "corrected" versions of news stories, amending and correcting incorrect and outdated descriptions in the original television version.

Visitors to Fox News' websites are shown a pre-reel advertisement, before watching news clips, a feature that generates revenue for Fox News. Visitors to Fox News'

7

websites can also copy and paste URLs of specific clips to share on social media platforms. Fox News also allows website visitors to search the video clip content on its website, and provide keywords for that purpose. Fox News restricts the use of the video clips provided on the websites, requiring that they are to be used for "personal use only and [the content] may not be used for commercial purposes." Visitors to Fox News' websites are not permitted to download any of the video clips.

Fox News licenses third party websites, including Yahoo!, Hulu, and YouTube, to store and show video clips of segments of its program on their websites, thereby generating another stream of income by the license fees Fox News charges. Fox News licensees must covenant that they will not show the clips in a way that is derogatory or critical of Fox News. In the past three years, Fox News has made approximately $1 million in revenue from licensing content to these third party websites.

Fox News also distributes video clips through its exclusive clip-licensing agent, ITN Source, Ltd. ("ITN Source"). ITN Source distributes and licenses video clips of Fox News' content to companies and governmental organizations for use in a variety of ways, including to post on a website or social media platform or to create a digital archive. ITN Source maintains a library of over 80,000 Fox News video clips which its customers can search using keywords. Overall, Fox News has made approximately $2 million in licensing fees through ITN Source. ITN Source's partner, Executive Interviews, Ltd. ("Executive Interviews") also distributes Fox News' content by marketing copies of video clips to guests who have appeared on Fox News' channels. Executive Interviews' clients include multinational corporations, small boutique and regional companies, nonprofit organizations, and government entities.

8

The vast majority of Fox News' revenues is derived from fees paid to Fox News by cable companies that broadcast Fox News' content. Unlike broadcast television which is aired free of charge, FNC and FBN, as cable television stations, charge fees to cable providers like, for example, Time Warner Cable, and they, in turn, charge fees for use of cable to their subscribers. Time Warner Cable and other cable and satellite providers pay Fox News per-subscriber carriage fees — the more subscribers, the bigger the carriage fee. Fees and advertising revenues from commercial advertisers and sponsors vary directly with the Nielsen Ratings of the total number of viewers, and similar ratings of traffic on Fox News websites.

Fox News filed this lawsuit because of concern that TVEyes will divert viewers of its news and commentary programs and visits to its websites. Fox News sues TVEyes for violations of the Copyright Act, 17 U.S.C. § 101 *et seq.*, and under state law for misappropriation. Fox News also alleges that TVEyes' use of Fox News' video content to create video clips that TVEyes' subscribers can play, save, edit, archive, download, and share constitute copyright infringement. Specifically, Fox News alleges that TVEyes copied and infringed 19 hour-long programs aired on FNC and FBN between October 16, 2012 and July 3, 2013 aired on FNC and FBN.[3] Fox News owns copyright registrations for the nineteen hour-long shows. TVEyes asserts that its use of Fox News' content is a "fair use" protected by the Copyright Act. *See,* 17 U.S.C. § 107. The parties have cross-moved for summary judgment.

---

[3] The 19 programs at issue in this suit are two episodes of *On the Record with Greta Van Sustren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*; two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in Benghazi*.

## II.     Discussion

### A.     Standard of Review

A motion for summary judgment shall be granted where the pleadings and

supporting materials show that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must

"resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor

of the party opposing summary judgment." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.

2008).  The assertion of the fair use affirmative defense raises a mixed question of law and fact

that can be resolved at summary judgment if there are no genuine material facts in dispute. *Bill

Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

### B.     Copyright Infringement

The Copyright Act, 17 U.S.C. § 101 *et seq.*, grants authors "a limited monopoly

over (and thus the opportunity to profit from) the dissemination of their original works of

authorship." *Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87 (2d Cir. 2014).  The Copyright Act

also gives authors the exclusive right not only to reproduce these works but also to create

"derivative works."[4]  *Id.*  To show copyright infringement, an author must show ownership of a

valid copyright and unauthorized copying of the author's copyrighted work.  *Tufenkian

Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

---

[4] A derivative work is defined as one "based upon one or more preexisting works, such as a translation,
musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art
reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed,
or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications
which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101.

10

Fox News has shown, and TVEyes concedes, that Fox News owns valid copyrights in the nineteen television programs that form the subject of this lawsuit.[5] TVEyes admits also that it copies, verbatim, each of Fox News' registered works. These concessions constitute copyright infringement unless TVEyes shows that its use is fair use. *UMG Recordings, Inc. v. MP3.Com, Inc.,* 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000). Fox News does not argue that TVEyes' use of Fox News' broadcasts for the purpose of creating an analytical database is a fair use; Fox News takes issue with the features of TVEyes' database that provide TVEyes subscribers with video clips of Fox News' content.

### C. Fair Use

As the Supreme Court explained, from "the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts . . .' U.S. Const., Art. I, 8, cl. 8." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994). The Fair Use doctrine limits the author's monopoly over her work allowing the public to make use of the copyrighted work without the author's permission in certain situations. 17 U.S.C. § 107. The preamble to the fair use section in the Copyright Act provides in pertinent part that:

> the fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright . . .

When the copied work is being used for one of the purposes identified in the preamble, there is a strong presumption in favor of fair use for the defendant. *NXIVM Corp. v. Ross Institute*, 364

---

[5] Fox News owns copyrights only over the creative expression in its television programs. Factual reports are not copyrightable because facts cannot be original to an author. Compilations and descriptions of facts, however, are copyrightable because the presentation "can display originality." *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999).

F.3d 471, 477 (2d Cir. 2004). These examples of fair use are illustrative. *Campbell*, 510 U.S at

577-78.

A court considering whether or not a challenged and potentially infringing use of

a copyrighted work is fair use must consider the following nonexclusive statutory factors:

> (1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) The nature of the copyrighted work;
> (3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) The effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The four factors should not "be treated in isolation, one from another. All are

to be explored, and the results weighed together, in light of the purposes of copyright."

*Campbell*, 510 U.S. at 578. "The ultimate test of fair use is whether the copyright law's goal of

promoting the Progress of Science and useful Arts would be better served by allowing the use

than by preventing it." *Bill Graham Archives v. Dorling Kindersley Limited¸* 448 F.3d 605, 608

(2d Cir. 2006) (internal quotations and citations omitted). This evaluation is an "open-ended and

context-sensitive inquiry," *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) that calls for

"case-by-case analysis." *Campbell*, 510 U.S. at 577. A proponent of the fair use doctrine need

not establish that each factor weighs in its favor to prevail. *NXIVM Corp. v. Ross Inst.*, 364 F.3d

471, 476-77 (2d Cir. 2004). Because fair use is an affirmative defense, the proponent carries the

burden of proof on issues in dispute. *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913,

918 (2d Cir. 1994).

### i.   The First Factor

The first factor directs courts to consider "the purpose and character of the use,

including whether such use is of a commercial nature or is for nonprofit educational purposes."

17 U.S.C. § 107(1). The "central purpose of this investigation" requires evaluating whether the new work "merely supersedes the objects of the original creation" or "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 578-79 (internal citations and quotations omitted). Transformation "lies at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright" and therefore "the more transformative the new work, the less will be the significance of other facts, like commercialism, that may weigh against a finding of fair use." *Id.*

Transformation almost always occurs when the new work "does something more than repackage or republish the original copyrighted work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ("A transformative work is one that serves a new and different function from the original work and is not a substitute for it."). A use "can be transformative in function or purpose without altering or actually adding to the original work." *Swatch Group Mgmt. Servs. v. Bloomberg LP*, 2014 WL 2219162 (2d Cir. May 30, 2014). Appreciating that this first factor largely turns on whether or not TVEyes is deemed transformative, both parties claim to have a controlling line of precedent in their favor.

TVEyes relies on a line of cases holding that electronic libraries of books, created for the purpose of allowing users to pinpoint which books use certain keywords or terms, is transformative and therefore constitutes fair use. In *Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87 (2d Cir. 2014), the Second Circuit considered a copyright challenge to the Hathi Trust Digital Library ("HDL"), an electronic repository of scanned books. HDL contains over 10 million works. The general public can search HDL for any particular term. The search results will show

13

the page numbers on which the search term appears in each book in the HDL, and the number of times the term appears. The HDL does not display snippets of the text nor can the individual view the actual page on which the term appears.[6] The Second Circuit found that HDL was protected from copyright infringement because its "creation of a full-text searchable database is a quintessentially transformative use [and] the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn" and therefore qualified as fair use. *Id.* at 97.

In *Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013), Google defended its practice of scanning more than 20 million books without permission from the copyright holders as fair use. Google's digital library created an index of all the words in each scanned book. Users can search for a particular word or phrase to see in which of the 20 million books that word appears. Additionally, because the books in Google Books are digitized, a user can search a particular book to see how many times that word or phrase appears in that book. Google provides a "snippet view" of the page in which the search word appears, dividing the page into eight different snippets. The results for a particular keyword only show three snippets on each page, making it difficult for a user to read the entire page without generating multiple searches for each page, and repeating such multiple searches for each page in a book. Furthermore, a user motivated to run enough different searches to cumulatively view all eight snippets on every page, still could not read the entire book since one out of every ten pages of the digitized book is blocked out and will not be shown no matter what kind of serial searches are run by a user.

---

[6] Hathi Trust allows its member libraries to provide its patrons that have a certified print disability (meaning, among other things that they cannot physically hold a book) with access to the full contents of the book in the digital library.

The Authors Guild sued Google for copyright infringement. Google asserted a fair use defense, claiming that its creation of an online digital library was transformative. The district court agreed, ruling that Google Books' copying created a "highly transformative" database of the words in books:

> Google books digitizes books and transforms expressive text into a comprehensive word index that helps readers, scholars, researchers, and others find books. . . . The use of book text to facilitate search through the display of snippets is transformative. . . . Similarly, Google Books is also transformative in the sense that it has transformed the book text into data for purposes of substantive research, including data mining and text mining in new areas, thereby opening up new fields of research. Words in books are being used in a way they have not been used before. Google Books has created something new in the use of book text — the frequency of words and trends in their usage provide substantive information.

*Id.* at 291. The district court considered it important that the research database had become an important tool for librarians and cite-checkers, and thus served a different purpose and function than did the book itself. Google Books was thus not a replacement of the hard copies of books, but added value by creating new information. *Id.* The district court considered that it was unlikely that someone would expend the time and effort to "input countless searches to try and get enough snippets to comprise an entire book," and that a user probably would need a hard copy of the book to generate the search terms necessary to read the entire book. *See, also, Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (internet search engine's display of thumbnail versions of plaintiff's photographs constituted fair use because they were put "to a use fundamentally different than the use intended by Perfect 10"); *Kelly v. Arriba Soft Corporation*, 336 F.3d 811 (9th Cir. 2002) (same).

Fox News objects to TVEyes copying its content and disseminating it to TVEyes' subscribers. Fox News argues that excerpts, circulations, and summaries of copyrighted content are not transformative and not a fair use. *See Nihon Keizai Shimbun, Inc. v. Comline Business*

*Data, Inc.*, 166 F.3d 65 (2d Cir. 1999) (ruling that abstracts and rough translations of Japanese copyrighted content was not transformative).

In *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), defendant created a dial-up service that allowed its subscribers to call a telephone number to listen to live radio broadcasts. By telephoning the number, subscribers could listen to the radio broadcast through the phone. The Second Circuit held that defendant's telephone service was not fair use. Because the derivative broadcast merely repackaged or republished the original, there was a "total absence of transformativeness in [defendant's] act of retransmission" which prevented a fair use finding. *Id.* at 109.

In *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013), the defendants created a news monitoring service for news articles that appeared on the internet. The service featured a searchable database that allowed users to see the number of times, and where, keywords were used. The defendant used an automated computer program that crawled the Internet for news, and extracted and downloaded all content responsive to search terms, customized by users. The extracted content was then placed in a queue for indexing. Users could search the database for keywords or terms and find out how many times, when, and where they were used. The court ruled that this use was not transformative because it "uses its computer programs to automatically capture and republish designated segments of text from news articles, without adding any commentary or insight in its New Reports." *Id.* at 552. The district court acknowledged that the "purpose of search engines is to allow users to sift through the deluge of data available through the Internet and to direct them to the original source. That would appear to be a transformative purpose." *Id.* at 556.

However, the district court noted that Meltwater chose "not to offer evidence that Meltwater News customers actually use[d] its service to improve their access to the underlying news stories that are excerpted in its news feed," and without such proof, Meltwater failed to prove its fair use defense. *Id.* at 554. Meltwater failed to show that its service was actually used by subscribers for research or to transform the original news story into a factum or datum that told a broader story about the overall news reporting industry. *See, also, Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87, 97 (holding that a word search of books which "does not add into circulation any new, human-readable copies of any books," but just creates a word search, constitutes fair use); *Los Angeles News Service v. Reuters*, 149 F.3d 987 (9th Cir. 1998) (holding that copying plaintiff's video recording of the Rodney King riots and selling it to other news stations for the very same purpose was not fair use); *Los Angeles News Service v. Tullo*, 973 F.2d 791 (9th Cir. 1992) (holding that copying plaintiff's video recordings of news events and selling them to news outlets for same purpose was not fair use). In the cases cited by Fox News, save for *Meltwater*, defendants were copying the plaintiff's work and then selling it for the very same purpose as plaintiff. That is quintessential copyright infringement and thus these cases do not shed much light on the more nuanced issue before me today, and especially not on the question of transformation.

TVEyes distinguishes itself from those cases by the different character of its database. Print is fixed in form, and regularly available from publishing sources and archives. A service that provides clipping of news articles and columns provides essentially the same service as could be provided by the content provider itself. TVEyes, however, is not a clipping service for print. TVEyes' search results show the combination of visual images and text in a medium that raises the commentator to have the qualities of news itself. The focus of certain programs

and talk shows on President Obama's recent golf vacation, for example, was as much the news as

the beheading of an American reporter. The actual images and sounds depicted on television are

as important as the news information itself — the tone of voice, arch of an eyebrow, or upturn of

a lip can color the entire story, powerfully modifying the content. The service provided by

TVEyes, indexing and collecting visual and audio images, allows subscribers to categorize, not

only content in the response to key search words, but also "information [that] may be just as

valuable to [subscribers] as the [content], since a speaker's demeanor, tone, and cadence can

often elucidate his or her true beliefs far beyond what a stale transcript or summary can show."

*The Swatch Group Management Ltd. v. Bloomberg L.P.,* 2014 WL 2219162, at *8 (2d Cir.

2014). Unlike the indexing and excerpting of news articles, where the printed word conveys the

same meaning no matter the forum or medium in which it is viewed, the service provided by

TVEyes is transformative. By indexing and excerpting all content appearing in television, every

hour of the day and every day of the week, month, and year, TVEyes provides a service that no

content provider provides. Subscribers to TVEyes gain access, not only to the news that is

presented, but to the presentations themselves, as colored, processed, and criticized by

commentators, and as abridged, modified, and enlarged by news broadcasts.

There also is a second relevant distinction that makes the district judge's opinion

in *Meltwater* less helpful to deciding the disposition here. Meltwater aggregated content already

available to the individual user who was willing to perform enough searches and cull enough

results on the Internet. The service provided simply "crawled" the Internet, gathering extant

content. TVEyes, however, creates a database of otherwise unavailable content. TVEyes is the

only service that creates a database of *everything* that television channels broadcast, twenty-four

hours a day, seven days a week. The Internet does not and cannot house the entirety of this

18

content because Fox News, for example, does not provide all of its content online. Thus, without

TVEyes, this information cannot otherwise be gathered and searched. That, in and of itself,

makes TVEyes' purpose transformative and different in kind from Meltwater's, which simply

amalgamated extant content that a dedicated researcher could piece together with enough time,

effort, and Internet searches. These differences further reduce the persuasive value of the district

court opinion in *Meltwater*.

Fox News argues that the clips that TVEyes provides are of the very content that is

protected by its copyright. The clips, however, are integral to TVEyes' service of monitoring

and reporting on all the news and opinions presented by all television and radio stations.

Without these excerpted video clips, TVEyes' users could not receive the full spectrum of

information identified by an index, for the excerpt discloses, not only what was said, but also

how it was said, with subtext body language, tone of voice, and facial expression — all crucial

aspects of the presentation of, and commentary on, the news.

Fox News argues that a TVEyes' subscriber could watch sequential ten minute clips of

content end to end, and thus watch and hear all of Fox News' programs in their entirety just two

to five minutes after they air. Fox News makes an unrealistic point, for cost and trouble would

make such copying impractical and timely. In any event, the case before me must be decided on

its own merits. "The task is not to be simplified with bright-line rules, for the statute, like the

doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577.

I find that TVEyes' search engine together with its display of result clips is

transformative, and "serves a new and different function from the original work and is not a

substitute for it." *Hathi Trust*, 2014 WL 2576342, at *6. In making this finding, I am guided by

the Second Circuit's determination that databases that convert copyrighted works into a research

19

tool to further learning are transformative.  TVEyes' message, "'this is what they said' — is a very different message from [Fox News'] — 'this is what you should [know or] believe.'"  *Swatch*, 2014 WL 2219162, at *8.  TVEyes' evidence, that its subscribers use the service for research, criticism, and comment, is undisputed and shows fair use as explicitly identified in the preamble of the statute.  17 U.S.C. § 107.

The issue of fair use is affected by the issue of profits.  Clearly, TVEyes is a for-profit company, and enjoys revenue and income from the service it provides.  However, the consideration of profits is just one factor, among many others.  "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579; *Swatch*, 756 F.3d at 90-91.  If "commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country."  *Campbell*, 510, U.S. at 584.  Thus I find that the first factor weighs in favor of TVEyes' fair use defense.

### ii.    The Second Factor

The second statutory factor in the fair use analysis requires consideration of "the nature of the copyrighted work."  17 U.S.C. § 107(2).  This factor considers the "value of the materials used," and calls for "the recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 568.  The nature of Fox News' programming and its copyrightable content is not disputed.  The news itself is not subject to copyright protection, but the creative expression and artistic license necessarily exercised in

20

deciding how to portray, film, direct, stage, sequence, and communicate this information is subject to copyright protection.  Nevertheless, there is "greater leeway" for a determination of fair use when the work is factual or largely informational.  *Cariou v. Prince*, 714 F.3d 694, 709-10 (2d Cir. 2013).  In these cases, the scope for fair use is greater.  *Swatch*, 2014 WL 2219162, at *13.  Additionally, where the creative aspect of the work is transformed, as is the case here, the second factor has limited value.  *Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87 (2d Cir. 2014).  I find that the second factor, the nature of the copyrighted work, does not weigh for or against a finding of fair use.

### iii. The Third Factor

The third factor requires that I consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).  Here, there is no question that TVEyes copies all of Fox News' content — that is the essence of TVEyes' business model.  The third factor does not, however, counsel a simple, crude quantitative comparison.  It asks rather "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purpose asserted under the first factor." *Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87 (2d Cir. 2014).  Thus, where copying the entire work is necessary to accomplish the transformative function or purpose, as is the case, here, this factor, like the second factor, bows to the importance and priority of the first factor's finding of transformative use.  "[T]he crux of the inquiry is whether no more was taken than necessary.  For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use." *Id.*

Here TVEyes copies all of Fox News' television content (and other stations' contents) in its entirety, a service no one, including Fox News itself provides.  The value of TVEyes'

database depends on its all-inclusive nature, copying everything that television and radio stations

broadcast. One cannot say that TVEyes copies more than is necessary to its transformative

purpose for, if TVEyes were to copy less, the reliability of its all-inclusive service would be

compromised. I find that the third factor, the extent of the copying, weighs neither in favor or

against a fair use finding, since "the extent of permissible copying varies with the purpose and

character of the use," *Campbell*, 510 U.S. at 586-87, and TVEyes' service requires complete

copying twenty-four hours a day, seven days a week.

### iv.  The Fourth Factor

The fourth factor considers "the effect of the use upon the potential market for or

value of the copyrighted work." 17 U.S.C. § 107(4).

> It requires courts to consider not only the extent of market harm caused by the particular
> actions of the alleged infringer, but also whether unrestricted and widespread conduct of
> the sort engaged in by the defendant . . . would result in a substantially adverse impact on
> the potential market . . . The enquiry must take account not only of harm to the original
> but also harm to the market for derivative works.

*Campbell*, 510 U.S. at 590 (internal citations and quotations omitted).   Crucially, this factor "is

concerned with only one type of economic injury to a copyright holder: the harm that results

because the secondary use serves as a substitute for the original work." *Hathi Trust*, 2014 WL

2576342, at *9.  Thus any economic harm caused by transformative uses does not factor into this

analysis, "because such uses, by definition do not serve as substitutes for the original work." *Id.*

This factor also requires a "balancing of the benefit the public will derive if the use is permitted

and the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448

F.3d at 610 (internal quotations omitted).

### a.  Economic Injury

The Fair Use doctrine does not permit users to

excessively damage the market for the original by providing the public with a substitute
for the original work. Thus, a book review may fairly quote a copyrighted book for the
purposes of fair and reasonable criticism, but the review may not quote extensively from
the heart of a forthcoming memoir in a manner that usurps the right of first publication
and serves as a substitute for purchasing the memoir.

*Authors Guild, Inc. v. Hathi Trust*, 755 F.3d 87, 95-96 (2d Cir. 2014) (internal citations and

quotations omitted). "Market harm is a matter of degree, and the importance of this factor will

vary, not only with the amount of harm, but also with the relative strength of the showing on

other factors." *Campbell*, 510 U.S. at 590 n.21.

Fox News bases its suit on 19 individual, hour-long programs that it aired

between October 16, 2012 and July 3, 2013. Fox News argues that TVEyes' service decreases

the per-subscriber carriage fees that advertisers and cable and satellite providers are willing to

pay Fox News. Fox News alleges that people will watch copies of content on TVEyes, and not

FNC and FBN, thereby depressing Fox News' viewership ratings. Fox News' allegations

assume that TVEyes' users actually use TVEyes as a substitute for Fox News' channels. Fox

News' assumption is speculation, not fact. Indeed, the facts are contrary to Fox News'

speculation.

First, none of the shows on which Fox News' suit is based remain available to

TVEyes subscribers; TVEyes erases content every 32 days. Second, in the 32 days that these

programs were available to TVEyes' subscribers, only 560 clips were played, with an average

length of play of 53.4 seconds and the full range of play being 11.5 seconds to 362 seconds. Of

the 560 clips played, 85.5% of the clips that were played were played for less than one minute;

76% were played for less than 30 seconds; and 51% were played for less than 10 seconds. One

program was not excerpted at all. The long term TVEyes statistics are consistent with the

specific statistics of the 19 programs. From 2003 to 2014, only 5.6% of all TVEyes users have

ever seen any Fox News content on TVEyes. Between March 31, 2003 and December 31, 2013, in only three instances did a TVEyes subscriber access 30 minutes or more of any sequential content on FNC, and no TVEyes subscriber ever accessed any sequential content on FBN. Not one of the works in suit was ever accessed to watch clips sequentially. The record does not support Fox News' allegations. Fox News fails in its proof that TVEyes caused, or is likely to cause, any adverse effect to Fox News' revenues or income from advertisers or cable or satellite providers.

In a typical month, fewer than 1% of TVEyes' users play a video clip that resulted from a keyword search of its watch terms. TVEyes subscribers play video clips, on average, for 41 seconds, while the median play duration is 12 seconds. 95% of all video clips played on TVEyes are three minutes or shorter; 91% are two minutes or shorter; and 82% are a minute or shorter. Fewer than .08% of clips are ever played for the maximum clip time of ten minutes. Most clips respond to a search using keywords, fewer than 5.5% of all plays originate from a Date and Time Search. There is no basis for Fox News' alleged concern that TVEyes' subscribers are likely to watch ten minute clips sequentially in order to use TVEyes as a substitute for viewing Fox News' programming on television.

No reasonable juror could find that people are using TVEyes as a substitute for watching Fox News broadcasts on television. There is no history of any such use, and there is no realistic danger of any potential harm to the overall market of television watching from an "unrestricted and widespread conduct of the sort engaged in by defendant." *Campbell*, 510 U.S. at 590 (internal citations and quotations omitted). Fox News has not shown that TVEyes poses a risk to it of reduced returns on advertising rates or revenues because of alleged diversions of television viewers.

24

Fox News also argues that TVEyes impairs the derivative market for video clips of copyrighted content with syndication partners like YouTube, and with Fox News' exclusive licensing agent, ITN Source and Executive Interviews. Why, Fox News asks, should TVEyes subscribers purchase clips from Fox News' licensing agents if they can be procured as part of their TVEyes subscription? However, Fox News is unable to provide the identity of the customers Executive Interviews allegedly lost. Fox News' entire revenue from this derivative source, between July 1, 2012 and June 30, 2013, is $212,145.00 from syndication partners and $246,875.00 from the licensing of clips, a very small fraction of its overall revenue. In light of this very small possible impact, any, "cognizable market harm" that can occur is likely to be out-weighed by the public benefit arising from TVEyes' services. *See Campbell*, 510 U.S. at 590, n.21.

### b. **Public Benefit**

The fourth factor requires a balance between the "benefit the public will derive if the use is permitted, and the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448 F.3d at 610 (internal quotations omitted). TVEyes argues that its service provides an immense benefit to the public interest because it assembles from scratch a library of television broadcast content that otherwise would not exist and renders it easily and efficiently text-searchable. Without TVEyes, there is no other way to sift through more than 27,000 hours of programming broadcast on television daily, most of which is not available online or anywhere else, to track and discover information.

TVEyes subscribers use this service to comment on and criticize broadcast news channels. Government bodies use it to monitor the accuracy of facts reported by the media so they can make timely corrections when necessary. Political campaigns use it to monitor political

advertising and appearances of candidates in election years. Financial firms use it to track and archive public statements made by their employees for regulatory compliance. The White House uses TVEyes to evaluate news stories and give feedback to the press corps. The United States Army uses TVEyes to track media coverage of military operations in remote locations, to ensure national security and the safety of American troops. Journalists use TVEyes to research, report on, compare, and criticize broadcast news coverage. Elected officials use TVEyes to confirm the accuracy of information reported on the news and seek timely corrections of misinformation. Clearly, TVEyes provides substantial benefit to the public.

I therefore conclude that this factor does not weigh against a finding of fair use, especially when the de minimis nature of any possible competition is considered in comparison to the substantial public service TVEyes provides. Subject to possible exceptions from the downloading and sharing of clips via social media, as discussed below, I find that the small possible market harm to Fox News is substantially outweighed by the important public benefit provided by TVEyes.

#### iv. The Balance of the Factors

Ultimately, "the various non-exclusive statutory factors are to be weighed together, along with any other relevant considerations, in light of the purposes of the copyright laws." *Google Books*, 954 F. Supp. 2d at 293. TVEyes' service copies television broadcasts but for an entirely different purpose and function. TVEyes is not "trying to scoop" Fox News' broadcasts or to "supplant the copyright holder's commercially valuable right of first publication" *Swatch*, 2014 WL 2219162, at *7. TVEyes captures and indexes broadcasts that otherwise would be largely unavailable once they aired.

Users access the clips and snippets for an altogether different purpose — to evaluate and criticize broadcast journalism, to track and correct misinformation, to evaluate commercial advertising, to evaluate national security risks, and to track compliance with financial market regulations. As TVEyes points out, "monitoring television is simply not the same as watching it." As the Second Circuit explained in *Swatch Group Mgmt. Servs. Ltd. v. Bloomberg LP*,

> In the context of news reporting and analogous activities, moreover, the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration. Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism.

2014 WL 2219162, at *8. TVEyes' service provides social and public benefit and thus serves an important public interest.

I therefore find that TVEyes' copying of Fox News' broadcast content for indexing and clipping services to its subscribers constitutes fair use. However, I do not decide the issue of fair use for the full extent of TVEyes' service, TVEyes provides features that allow subscribers to save, archive, download, email, and share clips of Fox News' television programs. The parties have not presented sufficient evidence showing that these features either are integral to the transformative purpose of indexing and providing clips and snippets of transcript to subscribers, or threatening to Fox News' derivative businesses.

Similarly, neither party is entitled to summary judgment on the issue of whether the date and time search function, allowing its subscribers to search for television clips by date and time instead of by keyword or term, is integral to the transformative purpose of TVEyes and its defense of fair use. While the evidence shows that this feature does not pose any threat of market harm to Fox News, the record fails to show that it is crucial or integral to TVEyes'

27

transformative purpose. The factual record should be developed further before I can decide this issue.

### D.    Hot News Misappropriation Claim

Fox News also pleads a hot news misappropriation claim, alleging that TVEyes stole "hot news" from Fox News in violation of state tort law. In *International News Service v. Associated Press*, 248 U.S. 215 (1918), the case that created the concept of hot news misappropriation, plaintiff and defendant were in exactly the same business of gathering news worldwide and distributing it to its members, various news reporting outlets. The Associated Press ("AP") sued the International News Service ("INS") because the INS had engaged in a practice of "scooping" AP news stories. They did this by lifting AP news stories from AP bulletins and repackaging them as INS news stories and selling them to news outlets before the AP could. The Supreme Court ruled that this kind of "reaping what one has not sown" was tortious where the parties were "in the keenest of competition between themselves in the distribution of the news throughout the United States." *Id.* at 231.

To prevail on a hot news misappropriation claim, Fox News must show that: (1) it generates or collects information at some expense; (2) the value of information is highly time sensitive; (3) defendant's use of information constitutes free-riding on plaintiff's costly efforts to generate or collect it; (4) defendant's use of information is in direct competition with a product or service offered by plaintiff; and (5) the ability of other parties to free-ride on efforts of plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened. *The National Basketball Ass'n v. Motorola, Inc.* 105 F.3d 841, 852 (2d Cir. 1997).

Before addressing the merits of this claim, however, I must determine whether or not this state law claim is preempted by the federal Copyright Act. "All legal or equitable rights that are equivalent to any of the exclusive rights" of the Copyright Act "are governed exclusively by" the Copyright Act. 17 U.S.C. § 301(a). State law hot news misappropriation claims are preempted by the Copyright Act if the "claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by the Copyright Act; and the work in question is of the type of works protected by the Copyright Act." *Barclays Capital, Inc. v. TheFlyontheWall.com, Inc.*, 650 F.3d 876, 892 (2d Cir. 2011). Where both of these conditions are met, as is clearly the case here, the court then applies the "extra element test" to determine whether the claim should survive because of some extra element in the tort bringing it outside the realm of copyright.

This test asks whether "an extra element [is] required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action," such that the claim is qualitatively different from a copyright claim. *National Basketball Association*, 105 F.3d at 850. Here, Fox News argues that the "extra element" is the fact that TVEyes stole its "hot news" and thereby "free-rides" on Fox News' hard work and labor in the same way the INS free-rode on the AP's labor. In making this argument, Fox News ignores the actual definition of free-riding provided by the Supreme Court in *INS*. For the purposes of this tort and its preemption test, the term "free-riding" means "taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and ... appropriating it and selling it as the [defendant's] own ..." *Barclays Capital, Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 895, (2d Cir. 2011), quoting *International News Service v. Associated Press*, 248 U.S.

215, 239 (1918). The Supreme Court defined free-riding as passing off someone else's work as one's own. Here, TVEyes is not passing off Fox News' content as its own.

   In *Barclays Capital*, the Second Circuit ruled that the hot news misappropriation claim was preempted by the Copyright Act, and that the "extra element" test premised on "free-riding" was not shown. In that case, the plaintiff researched and analyzed the financial markets in order to generate daily reports that provided recommendations to clients about firms in which to invest, and stock in which to trade. The defendants obtained information about firm recommendations and posted them on its website before firms made them available to the general public and before exchanges for trading in those shares opened for the day. The Second Circuit held that the hot news misappropriation claim was preempted by the Copyright Act, and that defendants were not "free-riding," but were "collating and disseminating factual information – the *facts* that Firms and others in the securities business would have made recommendations with respect to the value of and the wisdom of purchasing or selling securities – and attributing the information to its source." *Barclays Capital, Inc.*, 650 F.3d at 902.

   Fox News' hot news misappropriation claim is preempted by the Copyright Act for the very same reasons. As in *Barclays*, "[i]t is not the identity of Fly and its reputation as a financial analyst that carries the authority and weight sufficient to affect the market. It is Fly's accurate attribution of the Recommendation to the creator that gives this news its value." *Id.* Similarly, TVEyes is not a valuable service because its subscribers credit it as a reliable news outlet, it is valuable because it reports what the news outlets and commentators are saying and therefore does not "scoop" or free-ride on the news services. Thus, the hot news misappropriation claim is preempted by the Copyright Act because if fails the extra element test.

### E. Misappropriation

Lastly, Fox News brings a state law misappropriation claim based on the equitable doctrine that recognizes that "a person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia Malone and Company, Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012). Such a claim must be "grounded in either deception or appropriation of the exclusive property of the plaintiff." *HL Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989). Here again, I must first determine if this claim is preempted by the Copyright Act. It is, and for straightforward reasons that echo the analysis above. Fox News goes to great length to argue that TVEyes acted in bad faith and that TVEyes' "bad faith" constitutes the extra element to take Fox News' claim outside the Copyright Act. Under this analysis, however, elements of a tort that address the mens rea or intent of the tortfeasor cannot constitute an "extra element" for purposes of evading preemption. An

> action will not be saved from preemption by elements such as awareness or intent, which alter the action's scope but not its nature . . . Following this 'extra element' test, we have held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by section 301.

*Computer Association Intern v. Altai, Inc.* 982 F.2d at 717 (2d Cir. 1992) (internal citations and quotations omitted).

Thus, the misappropriation claim also is preempted by the Copyright Act. "The broad misappropriation doctrine relied upon … is therefore equivalent to the exclusive rights in copyright law. . . Indeed because the copyright act itself provides a remedy for wrongful copying, such unfairness may be seen as supporting a finding that the Act preempts the tort." *Barclays Capital, Inc.*, 650 F.3d at 895. *See also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) ("Walker's cause of action for unfair competition is preempted by the federal copyright laws to the extent it seeks protection against copyright of Walker's book" dismissing

31

common law unfair competition claim as arising out of defendant's alleged copyright); *Levine v. Landy*, 832 F. Supp. 2d 176, 191 (N.D.N.Y. 2011) (plaintiff's claim is "essentially a copyright infringement claim with the added allegation that after unlawfully copying, distributing, and/or publishing the photographs, defendants stamped their own name or copyright on the works, rather than plaintiff's" and was thus preempted). This claim is also preempted by the Copyright Act and therefore must fail no matter what kind of evidence Fox News could or has produced to support it.

*Conclusion*

I hold that TVEyes' database and provision of television clips and snippets of transcript are transformative and thus constitute fair use, protecting it from claims of copyright infringement. The record must be further developed, however, before I can determine whether or not the features that allow searches by date and time, and that allow clips to be archived, downloaded, emailed, and shared via social media are integral services and protected by a fair use defense.

Counsel shall meet with me for a status conference to discuss the proceedings necessary to determine the remaining issues on October 3, 2014 at 10:00 a.m. Counsel shall meet prior to the conference, and submit their respective views in a joint letter submitted by October 1, 2014 at noon.

The Clerk shall mark the motion (Doc. No. 32) terminated.

SO ORDERED.

Dated:    September ⁊, 2014
          New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge