- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FOX NEWS NETWORK, LLC,

          Plaintiff,

    - against -

TVEYES, INC.,

          Defendant.

Case No.  13-CV-5315 (AKH)

---

**DECLARATION AND EXPERT REPORT OF STUART KARLE**

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     SUMMARY OF OPINIONS ..................................................................................1

II.    QUALIFICATIONS .............................................................................................4

III.   FACTUAL BACKGROUND ................................................................................6

      A.     The TVEyes Service ................................................................................6

      B.     Fox News' Derivative Businesses ..........................................................10

IV.    THE SAVING/ARCHIVING, EMAILING, DOWNLOADING AND
      DATE/TIME SEARCH FUNCTIONS ARE INTEGRAL TO TVEYES'
      TRANSFORMATIVE PURPOSES .....................................................................13

      A.     Saving/Archiving Clips On TVEyes .......................................................14

      B.     Emailing Clips Using TVEyes ................................................................15

      C.     Downloading Clips Using TVEyes..........................................................16

      D.     Date and Time Search Function ..............................................................19

      E.     Video Clips And "High Definition" ........................................................21

      F.     Case Study: Brian Williams.....................................................................23

V.     TVEYES DOES NOT THREATEN FOX NEWS' DERIVATIVE
      BUSINESSES .....................................................................................................29

      A.     TVEyes' Saving, Emailing, And Downloading Functions Do Not
            Reduce Traffic To Fox News' Website ....................................................29

      B.     TVEyes' Saving, Emailing And Downloading Functions Do Not
            Threaten Fox News' TVEverywhere And Fox News Go Services ..............34

      C.     TVEyes' Saving, Emailing And Downloading Functions Do Not
            Threaten Fox News' Clip Licensing Business................................................36

VI.    THE ABILITY TO POST CLIPS PUBLICLY IS NOT INTEGRAL TO
      TVEYES' TRANSFORMATIVE PURPOSE............................................................41

      A.     TVEyes Does Not Permit Users To Post Clips To The Internet.................42

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

B.  TVEyes Users Do Not Frequently Post Fox News Content To The Internet ................................................................................. 45

C.  The TVEyes Service Is Not Designed To Promote Public Posting Of Clips .......................................................................................... 50

VII.  ALTERNATIVES TO TVEYES DO NOT EXIST .................................................. 55

A.  Watching Television And Recording It On A DVR ................................ 55

B.  Media-Monitoring Services That Store Clip Data  On Clients' Servers ................................................................................................ 56

C.  Internet Archive's TV News Archive ............................................. 57

D.  Vanderbilt University's Television News Archive ...................................... 58

VI.  WIDESPREAD USE OF TVEYES OR OTHER MEDIA-MONITORING SERVICES DOES NOT THREATEN FOX NEWS' DIGITAL BUSINESSES OR THE FUTURE OF JOURNALISM .......................................... 59

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

I, Stuart Karle, declare as follows:

1.     I have been retained by the law firm of Quinn Emanuel Urquhart & Sullivan, LLP to provide expert analysis and opinion on behalf of TVEyes, Inc. in this case.

2.     I have been asked to comment on the opinions expressed by Professor Beth Knobel in her expert report dated December 15, 2014 ("Knobel Report") and, in particular to: (1) evaluate the importance of the saving, emailing, sharing, downloading, and Date and Time Search features to the transformative purpose of the TVEyes service, as described by this Court in its September 9, 2014 Opinion & Order ("Opinion"); and (2) assess whether the saving, emailing, sharing and downloading features threaten Fox News or its derivative businesses.

3.     The opinions I express in this report are based on my more than 30 years of experience in the business of digital journalism and news distribution, as described in greater detail below.

I.     **SUMMARY OF OPINIONS**

4.     TVEyes is a remarkable service that enables the monitoring and criticism of broadcast media like no other product I have seen.  By capturing and recording what is broadcast on television and radio at every minute of the day, practically everywhere in the country, TVEyes assembles a comprehensive, independent record of what was said on the air, enabling the professional users of the service to hold broadcasters accountable for their sins and credit them for their wins.

5.     The features that enable TVEyes' users to save (or archive), email, and download clips are natural and essential extensions of this powerful tool. These functions enable the critics, commentators, researchers and analysts who

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

use TVEyes to view, share, discuss, and preserve for future use clips of television content exactly as they aired, without having to depend on the broadcaster as a source.  TVEyes' Date and Time Search feature provides an alternative means of locating content for purposes that the Court has already found to be transformative.

6.     The ability to save, email, and download information exists in virtually all professional information-sharing products because these features are integral to how our businesses, and our people, work.  For example, it's easy to see how the utility of a word-processing program would be greatly diminished if it didn't allow users to save a document,  email it to others, or download it to a laptop or iPad.

7.     The same is true for TVEyes.  Viewing a clip is often only the beginning of the research process; to use the information gathered, clients must be able to: (1) save that clip, so that it may be re-visited at a later time (in particular, after TVEyes' 32-day window closes); (2) show the clip to the user's supervisor, co-workers, and other decision-makers, so that the value of the information gleaned may be discussed, rather than requiring every person involved to create their own account and run their own search to see the same clip; and (3) download the clip, so that the user may store the clip with other materials related to the story, and without having to connect to the Internet or login to TVEyes' website to view it.

8.     TVEyes' service—including its saving, emailing, and downloading features—does not present a "devastating" threat to Fox News, the television news industry, the future of journalism, or American democracy—contrary to Professor Knobel's assertions.  TVEyes simply does not compete with Fox News or any of its digital offerings; it is a premium-priced, professional research product with powerful search technology for organizations who must monitor

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

what is said on the media, such as journalists, elected officials, political campaigns, law enforcement and private businesses.  None of Fox News' derivative businesses meet the same need.

9.     Having evaluated all the evidence of supposed market harm presented by Fox News in its motion for summary judgment, and all the documents appended to the Knobel Report, I am convinced that TVEyes' saving, emailing and downloading features have no material impact on Fox News' derivative businesses.  These features do not reduce traffic to the Fox News website, depress the market for public display licenses, or cause consumers to forgo cable subscriptions.  To the contrary, in the roughly 15 years that TVEyes and similar media-monitoring services have been operating, by all accounts Fox News' business has thrived.

10.     The financial pressures facing the news industry today as a result of increased competition and changing technology have nothing to do with TVEyes, or media-monitoring services like it.  If anything, these services help to improve the quality of journalism because they are used to hold news outlets accountable for their reporting.

11.     For the reasons explained in this report, I conclude that: (1) TVEyes' saving/archiving, emailing, downloading, and Date and Time Search features are integral to TVEyes' transformative purpose of allowing users to comprehensively monitor and report on television broadcasts; and (2) TVEyes' saving/archiving, emailing, and downloading features are not threatening to Fox News' derivative businesses.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## II.   <u>QUALIFICATIONS</u>

12.   I am an expert in the business of digital journalism and news distribution.  In the course of my career, I have been a leader in a number of businesses as they responded to the digitization of text and images.

13.   After graduating from Columbia College (B.A. 1982), where I served as the Editor-in-Chief and Publisher of the *Columbia Daily Spectator* in 1981, I spent one year as a reporter for a new digital publication of Dow Jones Newswires focused on the markets for government and private debt.  While a reporter at the *Dow Jones Capital Markets Report*, I saw firsthand how digital distribution could transform the speed and customization of the publication of news.  In that era, of course, electronic distribution occurred over dedicated, and quite expensive, lines leased from AT&T, and the products were priced at a significant premium to printed publications.

14.   I attended the University of Chicago Law School (J.D. 1986), and then practiced law, with a significant focus on media-related issues, first at Gibson, Dunn & Crutcher LLP from 1986 to 1992, and later in-house at Dow Jones from 1992 until 2008.  As related to journalism and the news business, I dealt with issues of copyright, defamation, access to information, freedom of information, distribution, contempt and press regulation on every continent other than Antarctica.

15.   At Dow Jones I was General Counsel of *The Wall Street Journal* from 2005 until 2008.  My responsibilities over time included business and strategic issues involving gathering, editing, distributing and monetizing news and information in virtually all media—newspapers, magazines, radio, television (broadcast and cable), dedicated financial information terminals as well as, of course, since 1994, over the Internet.  I was deeply involved in the changes made by Dow Jones and its publications over the years as the Internet

4

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

had a greater and greater impact on business opportunities and choices for all media companies.

16.     After leaving Dow Jones in 2008, I provided legal and business advice to various electronic information companies, including websites (for example, *The Daily Beast*, *Talking Points Memo*, *PaidContent*) and more traditional media publishers, including the largest publisher of Russian scientific journals as it transitioned its business from print to electronic distribution.

17.     From 2011-2013, I was the Chief Operating Officer of Reuters News, the more than 160 year-old wire service owned by Thomson Reuters, with responsibility for budgets, human resources, legal, and journalist safety.  I also was a key participant as the company tried to execute on a digital strategy that would expand Reuters reputation with and revenue from consumers.

18.     I am now a partner in North Base Media, a boutique firm focused on investing in journalism-related enterprises in the developing world and in technologies that  support news companies.

19.     In 2009 I was asked to redesign the law curriculum taught to students at the Columbia School of Journalism, and have taught there since 2009.  I have also taught media law at New York University Law School (2008-2010), and have lectured on media legal and business issues at Yale Law School, Oxford University, and numerous conferences.

20.     Attached hereto as **Exhibit 1** is a true and correct copy of my curriculum vitae.

21.     The opinions I express in this report are based on my extensive experience in the business of digital news distribution, conversations with TVEyes' Chief Executive Officer David Ives and members of the TVEyes' engineering team, and my review of various written materials, including the

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

results of my own investigation and Internet searches, the Court's September 9, 2014 decision, the parties' briefing, declarations, deposition transcripts, exhibits, documents and other materials identified in **Exhibit 2**, attached hereto.

22.    I have not testified before as an expert witness at deposition or trial.  In consideration for my work in this matter, I am being compensated in the amount of $500 per hour.

## III.   FACTUAL BACKGROUND

23.    I have reviewed the Court's decision in this case dated September 9, 2014.    In that decision, Judge Hellerstein made certain factual determinations that I accept as true for the purposes of this report.  Background facts pertinent to my opinion are summarized below:

### A.    The TVEyes Service

24.    TVEyes is a media-monitoring service that enables its subscribers to discover and locate mentions of particular words or phrases of interest on almost every major television and radio station in the United States.[1]  To do this, TVEyes captures the broadcasts of more than 1,400 television and radio stations, twenty-four hours a day, seven days a week.[2]  After capturing the entire content of television broadcasts, TVEyes makes that content text-searchable using both closed captions and speech-to-text technology, and allows its users to view snippets of video content in response to their search queries.[3] TVEyes captures approximately 27,000 hours of television broadcast content

---

[1]    Opinion at 2; June 26, 2014 declaration of David Ives ¶ 2.
[2]    Opinion at 2; June 26, 2014 declaration of David Ives ¶¶ 2, 4.
[3]    Opinion at 2; June 25, 2014 declaration of David Seltzer ¶ 3.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

every day, exactly as it was broadcast.[4]  Without a service like TVEyes, the only way for a user to comprehensively learn how particular words or phrases have been mentioned on television would be for her to continuously watch every station on television every day, twenty-four hours a day, listening for a particular word—an impossible task.[5]  As the Court concluded: "Without TVEyes, there is no other way to sift through more than 27,000 hours of programming broadcast on television daily, most of which is not available online or anywhere else, to track and discover information."[6]

### TVEyes Users

25.    As noted in greater detail below, in addition to viewing clips, TVEyes users are also able to save/archive, share by email, and download to their personal computers clips that are generated by their searches.[7]  Those clips are limited to a maximum of ten minutes in length, though the vast majority are shorter than two minutes in length.[8]  Unless a clip is saved or downloaded, its availability is limited to 32 days after the content was first broadcast.[9]

26.    TVEyes is offered only for professional purposes—for example, to corporations, news organizations, and politicians—and is not available to the general public.[10]  As of October 2013, TVEyes had over 2,200 subscribers, including the White House, 100 members of Congress, various governmental

---

[4]   Opinion at 2-3, 25; June 25, 2014 declaration of David Seltzer ¶ 4.
[5]   Opinion at 2-3; June 26, 2014 declaration of David Ives ¶ 5.
[6]   Opinion at 25.
[7]   Opinion at 4-5.
[8]   Opinion at 4.
[9]   Opinion at 5.
[10]   Opinion at 5; June 26, 2014 declaration of David Ives ¶ 6.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

bodies, and journalists (such as MSNBC, the Associated Press, and Reuters).[11] Most TVEyes subscribers pay a fee of $500 per month for access to TVEyes' service, although select subscribers, such as non-profits or journalists, may receive reduced rates.[12]

## Restrictions on Use of TVEyes

27.     TVEyes has certain restrictions on how its clients may use clips from the service.  For example, "All TVEyes subscribers are required to sign a contractual limitation in a User Agreement, limiting use of downloaded clips to internal purposes."[13]   In addition, "[w]henever a subscriber seeks to download clips, TVEyes' website gives notice that such material may be used only for internal review, analysis or research.   Any reproduction, publication, rebroadcasting, public showing or public display is forbidden."[14]  TVEyes' email communications with subscribers contain similar warnings.[15]  When users ask how they may obtain rights to publicly post or disseminate clips, TVEyes refers the user to the broadcaster.[16]   TVEyes blocks users from trying to play or download more than 25 minutes of sequential content from a single station.[17] TVEyes has also developed and implemented "circuit breakers," which help to prevent TVEyes clips from being widely disseminated.[18]

---

[11]   Opinion at 2; June 26, 2014 declaration of David Ives ¶ 9.

[12]   June 26, 2014 declaration of David Ives ¶ 16.

[13]   Opinion at 5.

[14]   Opinion at 5. The notice specifically says:

> **Important Note:** Material supplied by TVEyes, Inc. may be used for internal review, analysis or research only. Any editing, reproduction, publication, rebroadcasting, public showing or public display is forbidden.

June 26, 2014 declaration of David Ives ¶ 8 & Exhibit B.

[15]   Opinion at 5; June 26, 2014 declaration of David Ives ¶ 9 & Exhibit C.

[16]   Opinion at 5-6; July 23, 2014 declaration of David Ives ¶ 12 & Exhibit TTT.

[17]   Opinion at 6; July 23, 2014 declaration of David Seltzer ¶ 7.

[18]   July 23, 2014 declaration of David Seltzer ¶¶ 15-16.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## The Works-in-Suit

28.     In this case, Fox has sued TVEyes for infringement of 19 individual hour-long programs broadcast on the Fox News Channel ("FNC") between October 16, 2012 and July 3, 2013 (the "Works-in-Suit").

29.     The average length of the clips played by TVEyes users that sourced from the 19 Works-in-Suit was 53.4 seconds.[19]  (The average FNC video viewed on TVEyes is played for 42.3 seconds, and the average Fox Business Networks ("FBN") video viewed on TVEyes is played for 44.0 seconds).[20] According to TVEyes' Chief Systems Architect, 85.5% of all the TVEyes clips viewed by users sourcing from the Works-in-Suit were less than one minute long.[21]

30.     Sixty-one (61) TVEyes users viewed a combined total of 560 clips from the Works-in-Suit:[22]

| TVEyes Clients | Number of Views |
|---|---|
| Journalists/Publications | 145 |
| Political campaigns (national and local) | 145 |
| National political party/Convention/Committee | 88 |
| The White House | 42 |
| Elected officials and staff (senators, congressmen and governors) | 41 |
| Political advocacy group/lobby/Super PAC | 28 |
| Policy institute/Think tank | 22 |
| Strategic communications/Public relations firms | 20 |
| U.S. Military/U.S. Department of Defense | 19 |
| Radio production | 7 |
| State police department | 3 |

---

[19]   June 25, 2014 declaration of David Seltzer ¶ 44.
[20]   June 25, 2014 declaration of David Seltzer ¶ 45.
[21]   June 25, 2014 declaration of David Seltzer ¶ 36.
[22]   TVEYES-044583.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

31.  Fifteen (15) TVEyes users downloaded a combined total of twenty-one (21) clips from the Works-in-Suit:[23]

| TVEyes Clients | Number of Downloads |
| --- | --- |
| Journalists/Publications | 11 |
| Elected officials (U.S. Congress) | 5 |
| Political campaigns | 3 |
| U.S. Department of Defense | 1 |
| Public relations firm | 1 |

32.  Four (4) TVEyes users emailed a combined total of six (6) clips from the Works-n-Suit:[24]

| TVEyes Clients | Number of Emails |
| --- | --- |
| National political party/Convention/Committee | 6 |

### B.  Fox News' Derivative Businesses

33.  Fox News has identified three derivative businesses that it claims are threatened by TVEyes' saving, emailing, and downloading features:  (1) Fox News' authorized digital platforms, such as the Fox News website; (2) Fox News' TVEverywhere service; and (3) Fox News' traditional clip-licensing business.

### The Fox News Website

34.  Fox News' website is located at www.foxnews.com.  The number of video clips of Fox News broadcasts made available to the public on the Fox News website is █████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

---

[23]  TVEYES-044581.
[24]  TVEYES-044582.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -



35.    Unlike TVEyes, the Fox News website is a consumer-oriented product, designed for personal use only.   The website's Terms of Service expressly prohibit use of the site for commercial purposes, and prohibits visitors from downloading video clips.[27]

**Fox News' TVEverywhere & Fox News Go Services**

36.    The Fox News TVEverywhere service website allows users who subscribe to cable television to watch Fox News' channels live on their computer screens via the Fox News website.   Fox News Go provides functionality very similar to the TVEverywhere service—it enables cable subscribers to watch Fox News channels live from their desktops, tablet computers or smart phones.

37.    Neither TVEverywhere nor Fox News Go are search engines like TVEyes.  Neither has keyword search or other media monitoring functionality. These services simply allow people to watch television from their desktops, laptops, tablet computers or phones as they would watch on their television sets at home.[28]

---

[25]  June 26, 2014 declaration of Jeff Misenti ¶ 13.
[26]  Opinion at 7.
[27]  Opinion at 8; June 26, 2014 declaration of Jessica A. Rose ¶ 12 & Ex. HH (Terms of Service).
[28]  See http://www.foxnewsgo.com/ & http://video.foxnews.com/v/1241186546001#sp=watch-live&v=1241186546001.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## Fox News' Licensing Business

38.     Both directly and through its licensees ITN Source and Executive Interviews, Fox licenses content previously aired on FNC and FBN to third parties for use in connection with the production of television shows, movies, advertisements, video games, film festivals, e-books and other projects.

39.     Clips licensed through Fox News are ███████████████████ ███████████████████████████████ Although I understand that Fox News claims there is a market for licensing video clips for internal use, the documents I have reviewed show ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████.[29]

40.     ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████



---

[29] June 26, 2014 declaration of Jessica A. Rose ¶¶ 2-3 & Ex. M (ITNSOURCE0000101); June 26, 2014 declaration of Todd Anten Ex. LLL (deposition of Andrew Williams 192:12-19).

[30] June 26, 2014 declaration of Todd Anten ¶ 29 & Ex. KKK (ITNSOURCE0000161, ¶ 7).

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

██████████████████████████████████████████████████

██████████████████████████████████████[31]

## IV.   THE SAVING/ARCHIVING, EMAILING, DOWNLOADING AND DATE/TIME SEARCH FUNCTIONS ARE INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSES

41.   I have been asked to provide my opinion on whether the TVEyes features that allow users to search by date and time, and that allow clips to be saved/archived, emailed, downloaded, and posted on social media are integral to TVEyes' transformative purposes.

42.   For the reasons further described below, I conclude that each of these features (other than the public posting of clips, which is discussed in Section VI) is integral to TVEyes' transformative purpose of enabling users to conduct internal research and analysis on a comprehensive database of television broadcasts—each feature is a natural extension of the service that the Court has already determined is a transformative use of television content.

43.   If TVEyes' service were limited to viewing clips, and nothing more, much of its utility would be lost.  To conduct research and analysis, users must be able to save the results of their searches (as any good researcher should when collecting information), share those results with colleagues in their organizations (who may need to view the clip but do not have direct access to the TVEyes service themselves or do not know how to use it), and download those clips (so that the user does not have to be connected to the internet, or can organize clips together with other materials not from TVEyes).

---

[31]  June 26, 2014 declaration of Jessica A. Rose ¶ 5 & Ex. O (ITNSOURCE0000011, ¶ 5.1.1); June 26, 2014 declaration of Todd Anten Ex. LLL (deposition of Andrew Williams 200:1-203:9).

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

A. **Saving/Archiving Clips On TVEyes**

44.     TVEyes offers users several ways to save clips (sometimes referred to as "archiving" clips, so I use the terms "saving" and "archiving" interchangeably, as TVEyes does).  First, clips generated by TVEyes as a result of a user's searches are saved on TVEyes' system for 32 days.  Second, a user may save a particular 90-second clip by clicking "save clip" from a Transcript Page.  Clips saved this way are available for only seven days after they are saved; if the user downloads a clip using this method, the clip is deleted from TVEyes' servers one hour after it is downloaded.  Third, a user may create a clip using the Clip Editor from a Transcript page, selecting a precise start and end time for the clip.  Clips that are edited in this manner may be either stored in TVEyes' Media Center permanently or stored for seven days, at the users discretion.

45.     Allowing users to save TVEyes clips is integral to TVEyes' purpose of enabling research and analysis of the content of television broadcasts. *First*, saved clips function as a library, allowing users instant access to clips they had already searched for and found, without having to re-run their searches and look for the relevant clip again.  *Second*, because TVEyes' search features are limited to content 32 days after the first broadcast, a user who wishes to see a clip more than 32 days after it was first broadcast can *only* do so by saving the clip.  This is critical when a user wants to track a particular keyword or phrase over time beyond 32 days—for example, to revisit the clip as part of fact-checking, to conduct longitudinal comparisons over more than 32 days, or to conduct long-term research on a particular story that may last longer than 32 days.  Saving/archiving such clips furthers, and is integral to, TVEyes' function as a research tool: without this functionality, users could not conduct and

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

reliably preserve research and analysis over periods of time longer than 32 days.

46.    As someone who frequently has worked with journalists covering stories that evolve over time and has responded to complaints from users about errors and bias, I believe the saving/archiving function is critical for effectively monitoring the media.  Journalists are expected (and often required) to preserve records of the underlying source material they use when conducting research and analysis—the saving/archiving feature is a natural part of that process.  Examples of journalists who have used TVEyes' saving/archiving function to facilitate their analysis are attached hereto as **Exhibit 3**.

### B.    **Emailing Clips Using TVEyes**

47.    TVEyes' "email" feature allows users to send messages to others via email with links to particular clips.  This can be done by clicking TVEyes' "Email View/Transcript Page" button at the top of the Transcript page, or by copying the URL at the top of a Transcript Page and pasting it into an email.

48.    Providing users with the ability to email clips is integral to TVEyes' purpose of enabling research and analysis of the content of television broadcasts.  In today's work environments, email is a central tool used communicate and collaborate with co-workers, supervisors, and bosses.  Sharing clips by email is often the most efficient way to communicate to co-workers and decision makers the precise results of a search.

49.    The emailing function is particularly critical when, as is often the case, the person who actually logs into the TVEyes service is not among the decision-makers who needs access to the clip.  An excellent example of this is how the White House uses the saving and emailing functions together to efficiently distribute clips for analysis:  a White House intern logs on to the

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

service and then distributes relevant clips to those on the White House staff who need to see them.  Attached hereto as **Exhibit 4** are emails from the White House demonstrating the utility of TVEyes' emailing function.

50.    If the emailing feature were not available, every decision maker would have to go to a computer, log on to the TVEyes system, look for the clip of interest and then view it.  This would not only be inefficient, it would be impracticable, because not everyone within an organization who may need to view a clip has a TVEyes user login, or knows how to use the  service.

51.    Emailing clips is a part of the transformative purpose that Judge Hellerstein has already articulated.  Just as the clips themselves "are integral to TVEyes' service of monitoring and reporting,"[32] in today's business world employees must be able to communicate the fruits of their efforts internally, with others in their organization.  The alternative—to expect each person in a workplace to have her own TVEyes account and repeat the same searches others have already conducted—would be inefficient, impracticable, and would greatly reduce the utility of the service.

### C.    **Downloading Clips Using TVEyes**

52.    A TVEyes client can use the "download" function to save searched-for clips onto her computer's hard drive.  This enables the user to access the clip at a later time, or from a different location, without having to log on to the TVEyes service, or to be connected to the Internet at all.  The ability to view clips offline can be particularly convenient in circumstances where a user is in transit and does not have robust Internet connectivity available (such as during travel).

---

[32]  Opinion at 19.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

53.    Downloading also allows users to easily transfer video clips from one device to another.   A clip that has been downloaded from TVEyes can be loaded onto laptop computers, iPads and other tablets, and smart phones in the course of their daily business, onto portable storage systems (such as a thumb drive), or a cloud service such as DropBox.

54.    Downloading is also necessary for any user who wants to keep a central file of materials related to a particular topic or story.   TVEyes' system only allows users to save video clips from TVEyes and nothing more—it cannot store video clips gathered from other sources, nor can it store other types of external files, such as Microsoft Word files and Excel spreadsheets, pdf documents, or anything else.   Journalists, for example, tend to collect and save all of their materials relating to a particular story in a single place, such as a particular computer folder.   And for video clips (which may require large amounts of memory), in my experience journalists may save clips from multiple sources in a single video repository location, such as a private, password-protected account on YouTube.

55.    The downloading function must also be used if a client wants to embed a clip into a Microsoft Word or PowerPoint document.

56.    Downloading also facilitates users' ability to compare clips at the same time.   In my experience it is quicker to switch back and forth between files downloaded on my computer rather than to switch between different URLs on the web.   While it is possible to open two windows in TVEyes and compare two clips in that way, having done so, in my opinion comparing files that have been downloaded is far more efficient and effective.   Further, it would require significant bandwidth for a user to simultaneously run two clips through TVEyes' service at the same time—bandwidth that not all users necessarily have.   In any event, in my experience, users generally do not open two windows

17

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

from the same website at the same time to conduct comparisons—it is a cumbersome process that would involve resizing various windows.

57.    Allowing users to download clips allows users to maintain such records on their own computers and not rely on TVEyes for storage and safekeeping.  This is particularly important because if a TVEyes client ends its subscription to TVEyes, it can no longer access clips that it had saved/archived on TVEyes.  Thus, if a TVEyes user needs to save source material from a story (as most journalists do), downloading the clip is the only way to ensure that the material is not inaccessible in the future should the business cease using TVEyes in the future.

58.    The ability to download clips is essentially no different from the ability to save/archive clips, as far as TVEyes' purpose is concerned—whether a clip is saved/archived or downloaded, it may be used only for internal research and analysis.  And whether the clip is stored directly on TVEyes' system (through saving/archiving) or on the user's own computer (through downloading), the result is the same: a long-term record of the underlying material beyond the 32-day window, which any user needs to secure when conducting responsible research and analysis.

59.    I was surprised by Professor Knobel's opinion that it is unnecessary to provide downloading capabilities for TVEyes' service to be effective.  (Knobel Report ¶ 233).  Even aside from the ability to maintain a longer archive to cover a story over time, I have never worked in an office that did not have occasional glitches in its high-speed lines.  Downloading allows one to work regardless of whether one has a decent Internet connection.  Moreover, if I were working with colleagues and wanted to share my analysis of a clip or several clips, I would always prefer to be able to rely on data stored on my computer rather than on data I am downloading from the Internet.  Anyone who has ever done or attended a product demonstration

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

that failed because of a faulty Internet connection will understand the foolishness of relying on an Internet connection for time-sensitive work if that can be avoided.

### D.    Date and Time Search Function

60.    The "Date and Time Search" feature allows users to begin watching a clip at a specific time (within the past 32 days) on a specific television station, rather than entering a search term.[33]  About 5.5% of all searches on TVEyes are conducted through a date/time search.[34]

61.    The Date and Time Search is a critical component of a media monitoring research tool.  This is because closed-caption text, which is the primary basis for TVEyes' keyword search function, can be incorrect or incomplete.  Quite often there are spelling errors in the text of the transcription (which is particularly common with proper names and foreign words), and other times the individual transcribing the broadcast misses a word or two.  Even the best system will never be perfect, which is why TVEyes' Date and Time Search feature is absolutely critical to any user trying to comprehensively monitor a topic or keyword.

62.    To give a timely example, ISIS (in the winter) is at least on some occasions transcribed as "ices," and vice versa.  Likewise, monitoring the media for references for Koch Industries and the Koch brothers, and not the carbonated beverage in the red can, can prove difficult.  As a result of transcription errors or omissions, clips containing keywords that are misspelled or omitted from the closed-caption text will not appear in a TVEyes user's account.  The Date and Time Search feature is simply an alternative way to locate a clip of interest.

---

[33]   June 25, 2014 declaration of David Seltzer ¶ 26.
[34]   June 25, 2014 declaration of David Seltzer ¶ 39.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

63.   Moreover, often what is most important to a researcher, journalist, or other analyst is not what was said on television, but ***when*** it was said.  For example, if a journalist wants to determine who "broke" a story first, keyword searching may not be particularly effective, as it would only bring back results beginning 14 seconds before the first mention, and not necessarily the start of the "story."  The Date and Time Search feature, however, allows that journalist to see when CNN "broke" a story, and then determine how much time passed before MSNBC "broke" the same story.  Examples of journalists using TVEyes for precisely this purpose are attached hereto as **Exhibit 5**.

64.   In addition, the Date and Time Search feature is particularly useful where a client is interested not in the text of a particular clip that was broadcast, but rather is interested in an ***image***—for example, a graphic, an expression, a reaction, or a picture.   These pieces of information are not transcribed in the text of closed captioning or speech-to-text recognition software, and therefore cannot be located by keyword search.  Attached hereto as **Exhibit 6** are examples of journalists reporting on the use of  images on Fox News Channel.

65.   Finally, the Date and Time Search feature is a handy backup feature when a user knows that a particular piece of information was conveyed on a certain channel around a certain time, but does not know the precise language used.  For example, perhaps a user is aware that a guest on a FNC morning show discussed health care, but does not know if the guest used the term "health care," "Obamacare," "Affordable Care Act," or "PPACA."  Instead of guessing at the precise words spoken, the Date and Time Search feature allows the user to quickly find the relevant clip.

66.   If any critic or commentator really wants to compare how a story is covered by competing media, it's essential to understand not just the content of each

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

newsroom's story, but also how that story was played by each broadcaster.  Context is needed to understand editorial choices fully.  In other words, the order in which stories appear on the news says a lot about how a producer is appealing to her audience.  For commentators who make observations about how various stations covered scandals or stories, it is useful to see what was at the top of the news on a certain day.  Did NBC run its coverage of the Brian Williams implosion earlier or later than Fox, ABC, or CBS?  Did local stations treat it the same?  One can find some of this by searching the keyword "Brian Williams," but that search won't show what another station ran instead at the same time.  Arguing otherwise is like saying that one can see the difference in story choices between *The New York Times* and *The Wall Street Journal* by reading individual stories, but without looking at front pages that show the editorial choices being made by each news organization in context.  Of course both matter—the individual story and the choices made about how/when to feature that story.

67.    The Date and Time Search feature is a part of the transformative purpose that Judge Hellerstein has already articulated.  This feature makes TVEyes' system a ***more robust*** research tool, allowing users to find the clips they want when a keyword search, for whatever reason, does not return the needed clip.    The Date and Time Search feature complements the comprehensive nature of TVEyes' service, allowing users to truly find ***any*** content that had been broadcast, and not only the content that is returned by a keyword text program that inevitably and necessarily is prone to errors.

### E.    Video Clips And "High Definition"

68.    Professor Knobel suggests a number of times in her report that a transcript of a clip is equally as effective as a video with sound for purposes of analyzing and critiquing television.  I strongly disagree, as would anyone who has

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

watched Bill O'Reilly of Fox News rather entertainingly look skeptically at a guest, Jon Stewart of *The Daily Show* throw up his arms in frustration or Chris Matthews of MSNBC screw up his face like he has just chewed on a fresh lemon. When television is most effective, it is because of the combination of words and images, and that cannot be captured or critiqued by reading a transcript. Whether it is police trying to figure out why an emergency broadcast was or wasn't effective, or the White House monitoring events, it would make little sense to ignore the power of visual images and focus only on transcripts. As Judge Hellerstein has observed, "[t]he actual images and sounds depicted on television are as important as the news information itself—the tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, powerfully modifying the content."[35]

69.   Professor Knobel also objects that TVEyes makes clips available in high definition ("HD"), rather than in lower resolution. Professor Knobel says that she does not believe that HD is necessary for TVEyes' purpose, and therefore she infers that HD quality exists only to encourage distribution of TVEyes clips in breach of the User Sgreement. (Knobel Report ¶ 71).

70.   The basis for Professor Knobel's belief that HD is superfluous to the product is that TV news has always included graphics on-screen, and therefore one does not need HD to be able to understand the text on a screen. This is unpersuasive for two reasons. ***First***, the extraordinary clarity of the HD picture has encouraged producers to cram more and more information on the screen, whether in crawls along the bottom or quite detailed graphics along the side. No sensible producer would have tried to deliver this much information with a

---

[35]   Opinion at 18; see also Opinion at 19 ("TVEyes' users could not receive the full spectrum of information identified by an index, for the excerpt discloses, not only what was said, but also how it was said, with sub text body language, tone of voice, and facial expression all crucial aspects of the presentation of, and commentary on, the news").

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

standard definition screen.  **Second**, accepting Professor Knobel's statement that more and more video is being viewed on small screens, when a TVEyes user is reading these graphics on a phone or tablet, a sharp picture is essential for being able to absorb all of the information that was broadcast.

### F.  <u>Case Study: Brian Williams</u>

71.    A recent news event illustrates the importance of TVEyes' saving, emailing, downloading, and Date and Time Search features, demonstrating how they make it possible for  journalists, researchers and analysts to cover and comment on stories effectively.

72.    In her report, Professor Knobel mentions that she downloaded complete episode of *NBC Nightly News with Brian Williams* (absent commercials) by circumventing various obstacles that TVEyes places in the way of users who would attempt the same.  (Knobel Report ¶ 64).  Presumably, Professor Knobel chose *NBC Nightly News with Brian Williams* because it was the most-watched news program on broadcast television when Professor Knobel conducted her research, with over 9 million nightly viewers.

73.    On January 30, 2015, *NBC Nightly News with Brian Williams* included a story about 21:36 minutes into the broadcast (as I determined by using TVEyes) about Mr. Williams' attendance at a hockey game at Madison Square Garden accompanied by a retired soldier.  The announcer at MSG described the soldier as being with Mr. Williams and his crew after Mr. Williams' helicopter had been "hit and crippled by enemy fire" during the Iraq War in 2003.

74.    In the days following the broadcast, news outlets erupted with claims that Mr. Williams exaggerated the personal danger he faced in Iraq.  Soldiers who had been present said that Mr. Williams was never on a helicopter that had been

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

hit by enemy fire, and that he had lied about this incident repeatedly and more elaborately over the years.  Mr. Williams' earlier broadcasts became a new story.

75.    Using TVEyes, I was able to view a clip of Mr. Williams' January 30 broadcast.  In doing so, not only did I attend to the text of the clip, but I listened to the tone of Mr. Williams' voice, observed Mr. Williams' demeanor, and viewed the photographic and video montages accompanying the story, all of which modified the text in important ways that could not be ascertained by a mere reading of the transcript.    Indeed, part of the outrage over Mr. Williams' story was how trustworthy he appeared.

76.    Using TVEyes, I conducted searches for the keyword phrase "Brian Williams."  My TVEyes Watchlist reflected that "hits" for the term "Brian Williams" grew from 258 on January 29, 2015 to 4,458 on February 5, 2015.

77.    Five days after the January 30 broadcast, Mr. Williams delivered a widely replayed (and criticized) apology.[36]  I note that Fox News participated in this reporting and criticism—according to TVEyes, FNC ran that apology clip numerous times in the five days following its first broadcast.

78.    On February 10, 2015, Mr. Williams was suspended for six months;[37] on February 11, there were 12,383 hits on TVEyes for the Watch Term "Brian Williams."

---

[36]  See *Brian Williams Admits He Wasn't on Copter Shot Down in Iraq*, New York Times (Feb. 4, 2015) at http://www.nytimes.com/2015/02/05/business/media/brian-williamsapologizes-for-saying-he-was-shot-down-over-iraq.html; *With an Apology, Brian Williams Digs Himself Deeper in Copter Tale*. New York Times (Feb. 5, 2015) at   http://www.nytimes.com/2015/02/06/business/brian-williamss-apology-over-iraq-account-is-challenged.html.

[37]  See *Brian Williams Suspended From NBC for 6 Months Without Pay*, New York Times (Feb. 10, 2015) at http://www.nytimes.com/2015/02/11/business/media/brian-williams-suspended-by-nbc-news-for-six-months.html.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

79.    TVEyes enables users interested in Mr. Williams to analyze the story that instigated the controversy, his apology, and his suspension.  For example, in addition to viewing the original story, TVEyes enables its users to: (1) determine at precisely what moment other news organizations "broke" Mr. Williams' story by using the Date and Time Search feature; (2) analyze the nature and tone of other channels' reports on Mr. Williams' demise, and compare the quantity and quality of that coverage; (3) research other of Mr. Williams' stories for inaccuracies; (4) download and save to their personal computers clips of Mr. Williams' story and his apology, so that they may revisit these clips in six months when Mr. Williams' suspension is scheduled to end and the underlying clips are no longer available on TVEyes' system (due to the 32-day limitation); and (5) share these clips with colleagues and decision-makers (that is, the user's supervisors or bosses) as part of their organization's internal research and analysis of the story.

80.    TVEyes' Date and Time Search feature also provides important insights into the story.  For example, on February 5, 2015, *The Huffington Post* reported: "According to a search done using TVEyes, MSNBC did not mention the [Williams apology] story until 10:49 a.m. Wednesday, with anchor Jose Diaz-Balart echoing Williams' words and rolling footage of his apology from the night before."[38] If another TVEyes user wants to confirm that MSNBC mentioned the story at exactly 10:49 a.m., the easiest way to do so is through a Date and Time Search.

81.    Mr. Williams' story had wide-ranging significance in the news industry.  For example, by the third week in February, there were claims (which I personally believe are inaccurate) that Fox News anchor Bill O'Reilly had exaggerated his experiences during his coverage of the Falklands war and the war

---

[38] See *News Anchors Have A Lot Of Questions About Brian Williams' Helicopter Story*, Huffington Post (Feb. 5, 2015) at http://www.huffingtonpost.com/2015/02/05/brian-williams-helicopter-apology-news-anchors-react_n_6622238.html.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

in El Salvador in the early 1980s when he was a correspondent for CBS.  Many stories drew comparisons between Mr. Williams and Mr. O'Reilly.  TVEyes' saving, emailing, and downloading features enables users to compare and contrast the actions of Mr. Williams with those of Mr. O'Reilly—for example, to examine how Mr. O'Reilly covered the controversy over Mr. Williams before Mr. O'Reilly himself came under attack, and then how he defended himself.[39]

82.   If Mr. Williams returns in six months, critics, commentators, and academics can use TVEyes to analyze footage from his stories and footage of his replacement, recounting the original story and its aftermath.  To do this, TVEyes' users will need to save, download, and email clips.  Any competent organization would much prefer to have access to the original clips—the actual sources of information—than rely on their memories of 6-month-old broadcasts.

83.   Other examples of the necessity of the saving, emailing and downloading features abound.  I would expect (and hope) that journalists, critics, and commentators are now assembling files of the current comments of potential Presidential candidates, eventually to be used as a research component for future stories.  Such statements may be made not just on national news programs, but on local stations that will cover the coffees and Lions Club appearances of visits to Iowa, New Hampshire, and other critical states.  Certainly I would expect that

---

[39] As one example, on February 25, 2015, *The Huffington Post* reported on MSNBC's coverage of Mr. O'Reilly, stating: "the O'Reilly fracas has mostly come up in passing on MSNBC, according to a search of monitoring service TVEyes.  In two of three instances, it was brought up by guests, not hosts. … By contrast, CNN has covered the O'Reilly controversy 20 times, from news briefs to lengthier segments with guests, TVEyes indicated. … [MSNBC] references the Williams story a dozen times in the six days after Stars and Stripes initially broke the story on Feb. 4, according to a TVEyes search." *MSNBC Largely Silent On Bill O'Reilly War Reporting Controversy*, Huffington Post (Feb. 25, 2015) at http://www. huffingtonpost.com/2015/02/25/msnbc-bill-oreilly-controversy_n_6752074.html.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

candidates' campaigns are saving and storing clips as part of their own internal research and analysis when the time comes for these campaigns to prepare advertisements about "flip-flopping."

84.     It gives me comfort to know that a reporter with access to TVEyes can assemble and save records of broadcast statements and coverage that are just as comprehensive as the ones the campaigns will assemble.  If a service such as TVEyes did not exist, it would be effectively impossible for journalists to scour all local television broadcasts for contradictory statements or positions—a serious disservice to accurate reporting by an independent press.

85.     There are countless examples of TVEyes clients who have use TVEyes' save/archive, download, email, and/or Date and Time Search features in furtherance of TVEyes' transformative purposes.  For example:

a.      *Media Matters* conducted an analysis of FNC's coverage of marriage equality court rulings in 13 states issued between September 2013 through May 2014.  *Media Matters* used TVEyes to review FNC's coverage of "marriage equality rulings" in 13 states for the "five-day windows after each decision" and compared coverage to that of CNN and MSNBC.  *Media Matters*' analysis was published on June 4, 2014. Because this analysis was conducted over the course of several months (and well outside the 32-day window that TVEyes provides search capabilities), *Media Matters* necessarily needed to save/archive the results in support of its analysis over the entirety of the 9 months included in its study.  This analysis would not be possible if the user was unable to save/archive relevant clips because it was a cumulative study conducted over the course of many months.

b.      On March 25, 2013, *Mediaite* reported that "[a]ccording to TVEyes, Fox News has mentioned Benghazi 1,886 times in the past 3 months, or an average of about 21 times a day.  That's compared to 721 mentions on MSNBC (along with 718 instances of "Schmengazi") , and only 687 for CNN."  Such a determination required the ability to archive/save clips from TVEyes based on earlier-conducted searches beyond the 32-day window.  This analysis would not have been possible if someone had not previously searched for, and saved/archived ███████████████████████████████████████████████████

c.      On February 22, 2013, *Media Matters* reported that between May 1 and June 6 of 2005, the story about a leaked memo between then-Prime Minister Tony Blair and his advisors about the Bush

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

administration "received approximately 20 mentions on CNN, Fox News, MSNBC, ABC, CBS, NBC and PBS **combined**, according to TVEyes.  By contrast, during the same five-week period, the same outlets found time to mention more than 260 times the tabloid controversy that erupted when a photograph showing Saddam Hussein in his underwear was leaked to the British press." Such a determination required that *Media Matters* had conducted its research, and saved/archived the results, almost ***eight years earlier***—far beyond the 32-day window that TVEyes' service searches.  This exemplifies the role of research in the news industry—those conducting analysis must save and store their research for long periods of time (and often, for many years) in connection with an unwritten future story, where those results will need to be revisited and reanalyzed.

d.   On July 2, 2014, *Mediaite* published an article about a graphic that had appeared on the screen during a FNC show.  Specifically, the article stated that "after some research using TVEyes, it turns out that this banner [graphic] about 'defending the homeland' is a real piece of Fox News graphics art.  It's been used exclusively by *Fox & Friends* for at least the past few days, as an introductory video (and lower-third chyron) …."  Because this story is about a graphic (and not spoken word) used on FNC, reporting on the graphic was not amenable to a keyword search.  This is an example of where use of the Date and Time Search flourishes—it allows users to search pieces of ***visual*** news that are difficult to find through keyword searches, where the user knows the channel and has a general idea of when the graphic may have appeared.

See **Exhibit 3** and **Exhibit 6** attached hereto for copies of these articles.

86.   In the above examples, responsible journalism practices would require that the user not only save/archive the results of her research, but that she also would have: (1) shared the results of her research with her editors, proofreaders, cite-checkers, or other internal employees as way of confirmation; and (2) downloaded the clips, so that she could have simple access to the relevant source material in the future, so that she could (for example) store her research on a DVD, along with her notes.  In my experience, journalists frequently are expected to save and retain copies of all materials they use in their reporting; TVEyes' provision of saving/archiving, downloading, sharing, and Date and Time Search functions all act in furtherance of the ultimate accurate reporting of news.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## V.    TVEYES DOES NOT THREATEN FOX NEWS' DERIVATIVE BUSINESSES

87.    Fox News claims that TVEyes' saving, emailing and downloading features cause harm to its derivative businesses in three ways:  (1) by diverting traffic to the Fox News website; (2) by reducing use of Fox News' TVEverywhere & Fox News Go services; and (3) by substituting for clip licenses.  I have considered these arguments carefully and it is my opinion that TVEyes poses no material threat to any of these businesses.

### A.    TVEyes' Saving, Emailing, And Downloading Functions Do Not Reduce Traffic To Fox News' Website

88.    Fox News claims that the ability to save, email, and download Fox News clips using TVEyes' service reduces traffic to the Fox News website and the sites of its syndicated partners.  As Professor Knobel describes it, "by encouraging clients to publicly post clips and hyperlinks to clips, the TVEyes Content-Delivery Features act as a substitute for and divert people away from Fox News' online platforms." (Knobel Report ¶ 95).

89.    At the outset, it's worth noting that Fox News



.[40]

Thus, the theory that Fox News is harmed by diverted website traffic ***does not apply at all*** to the vast majority of Fox News content captured by TVEyes because that same content is not even made available online by Fox News.

90.    Fox News' theory of market harm also assumes that TVEyes clients habitually misuse the service by ignoring the contractual restriction on external use (and the various notes and reminders from TVEyes staff that clips are for internal

---

[40]   Opinion  at 7; June 26, 2014 declaration of Jeff Misenti ¶ 13.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

use only) and post Fox News content online.  As discussed in Section VI, my research shows that TVEyes clients generally abide by TVEyes internal use restriction and only rarely post Fox News clips online.  Moreover, there is no evidence that any clips from the Works-in-Suit have been posted online by TVEyes clients

91.    Fox News' theory of market harm also does not apply to anyone who requires a Fox News clip for ***offline*** use—*i.e.,* without being connected to the Internet.  The Fox News website does not permit users to download content to be used offline.  Any researcher or journalist looking to save video (perhaps for purposes of a comparative analysis, or even just to maintain a record of source information) will have no assurance that the video he has seen today on the Fox News website will be available tomorrow, or perhaps in three months when he is ready to write his story or analysis.  As discussed in Section IV.C, the ability to download, view, and save video clips offline is integral to media monitoring.

92.    The Fox News website's Terms of Use also restricts use of the content on the Fox News Website to "personal" use, and expressly prohibit visitors to the Fox News website from accessing video content for commercial purposes, which is exactly what TVEyes clients need it for.[41]  Unlike the TVEyes service, Fox News' website is not intended to be a professional tool for efficiently searching or analyzing broadcast clips.

### 1.    Even Crediting Fox News' Diverted Traffic Theory, The Potential Harm To Fox News Is *De Minimis* At Best

93.    There is no evidence in Professor Knobel's report of any actual advertising revenue lost as a result of TVEyes clients' use of the saving, emailing or

---

[41]  Opinion at 8; June 26, 2014 declaration of Jessica A. Rose ¶ 12 & Ex. HH (Terms of Service).

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

downloading features.  But for the sake of argument, let's assume that every one of the clips from the Works-in-Suit downloaded or shared via email by TVEyes users (which is a combined total of 27 clips) did in fact cause traffic to be diverted from the Fox News website.  Even in that case, the amount of money "lost" by Fox is **_virtually nothing_** because of the way online advertising is priced and sold.

94.     In general, advertisements on websites like Foxnews.com come in two forms—banner advertising and pre-roll advertising.[42]   Banner ads appear on a webpage, while pre-roll advertisements are shown before video clips.  For both of these types of ads, an advertiser is charged a rate per every 1,000 website visitors who might have been exposed to its advertisement.  For banner ads, this rate is for "impressions," or each time an ad was served to website visitors.  For pre-roll ads, this rate is for "views" of the ad, which are generally counted whenever the ad is run, whether or not anyone is actually watching it.

95.     An adverting rate based on exposure to website visitors is calculated in increments of 1,000, which is known as the "CPM," or the cost per "mille."  For example, if 20,000 users click onto the Fox News website and a particular banner advertisement is displayed, Fox News will be paid 20 times the CPM rate for that ad (absent an alternative agreement).  If we assume the CPM associated with the ad is $10, the advertisement would have generated $200 for Fox News.  Whether there is an additional visitor, an additional 100 visitors, or an additional 500 visitors will make no difference to the money Fox News will collect for showing that banner advertisement.   Not until the impressions cross the next 1,000-visitor milestone will Fox News collect more money from an advertiser.

---

[42]   June 26, 2014 declaration of Jeff Misenti ¶ 19 ("Fox News makes money from its online distribution of content originally available on FNC and FBN" through "pre-roll advertisement[s]" and "banner advertising").

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

96.     Based on recent conversations with academics and industry participants, there is a wide range in the CPM rate for video advertising: between $10-40.  This rate assumes the website is selling ads itself, rather than relying on ad networks to fill empty advertising slots, in which case the CPM may be as low as $1.

97.     At his deposition, Fox News' Chief Technology Officer testified that ████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████[43]

98.     In this lawsuit, Fox selected 19 hour-long Works in Suit to represent its claimed losses.  TVEyes users downloaded 21 clips and emailed 6 clips from these Works-in-Suit.[44] For simplicity, let's assume that the average CPM for banner ads and pre-roll ads is $20 ███████████████████████████████████████ ██████████.  If every single one of the 27 downloads and emails represents a user diverted from the Fox News website (an assumption that Fox News has not proven), Fox News would most likely stand to lose **zero dollars** because it takes 1,000 lost impressions or views for Fox News to earn $20.  If these 27 impressions and views happen to push the number of impressions or views over the next 1,000-click threshold, Fox News would stand to lose $20, in part as a result of these 27 diverted users.

99.     If we want to guess at what Fox News' losses might be over the course of an entire year, we could assume that TVEyes' downloading and emailing features could theoretically divert 27 users from the Fox News website **every day**.  Over the course of a year, that's a total of 9,855 lost "views" or "impressions" (27 multiplied

---

[43]  See **Exhibit 7** attached hereto (excerpts from Nov. 20, 2014 deposition of Jeff Misenti 171:15-16, 171:22-24 (banner ads); 311:4 (pre-roll ads)).

[44]  TVEYES-044581 - 0445812.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

by 365 days of the year), which would amount to a total loss to Fox News of about $200 dollars for the year.

100.   Of course, it is not accurate to assume that **all** of the clips of Fox News content downloaded or emailed by TVEyes clients over the course of the year reduced traffic to the Fox website ███████████████████████████████



████████████████████████   Thus it would make sense to discount the supposed revenue exposure alleged by Fox News for the year to ██████████

██████

101.   Fox News will surely say that these calculations underestimate the potential diverted traffic because TVEyes users can share clips within their organizations.  To address that issue, let's assume that every single one of clips that was downloaded or emailed by TVEyes clients every day for 365 days a year **and** was also available on the Fox News website, was shared with 10 additional people, each of whom would otherwise have visited the Fox New website to view the clip (again, complete speculation).   Under these circumstances, Fox News' (purely theoretical) losses for the year would be, at most, ████.   But of course it's just as likely that this "lost traffic" would have had absolutely no impact on the advertising revenue of Fox News because they could have been the 200th to 470th viewers of a pre-roll or a banner advertisement, and so would not have triggered the next CPM threshold.

102.   In reality, it is unlikely that any TVEyes clients would go to the Fox News website instead of TVEyes to accomplish their media monitoring objectives: the Fox News website is not a comprehensive database of thousands of television channels, does not provide keyword tracking, and does not enable users to edit clips to their precise specifications, archive them for future use, or download them for use offline.   Moreover, Fox News restricts use of clips available on its website to

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

personal use—precisely the opposite of what TVEyes clients need it for.  The Fox News website is simply not a substitute for TVEyes.

**B.   TVEyes' Saving, Emailing, And Downloading Functions Do Not Threaten Fox News' TVEverywhere And Fox News Go Services**

103.    Professor Knobel opines that the saving, archiving, and downloading functions on TVEyes "drive users away from Fox News' TVEverywhere service." (Knobel Report ¶ 105).    Professor Knobel's argument is premised upon the erroneous assumption that TVEyes is used by clients to "watch TV," thus acting as a substitute for watching Fox News broadcasts via a traditional television set, or through Fox News' TVEverywhere service, (which simply allows cable subscribers to watch Fox News broadcasts live on their computers).  My understanding is that Judge Hellerstein already has rejected this argument in his Sept. 9 decision, where he found that "No reasonable juror could find that people are using TVEyes as a substitute for watching Fox News broadcasts on television."[45]

104.    Certainly the statistics regarding the saving, downloading, and emailing of the Works-in-Suit do not support the conclusion that these functions have made TVEyes a substitute for cable television, TVEverywhere or Fox News Go.  None of the clips that were downloaded, saved, or emails from the Works-in-Suit were "sequential" such that they could be cobbled together to "watch" a show.[46]

105.    I also understand that TVEyes' internal records show that in the more than 10 years between March 31, 2003 and January 1, 2014, there were only three instances of consumers accessing two or more consecutive 10-minute clips on FNC or FBN.[47]  Thus, historically speaking, TVEyes clients have not used the service in

---

[45]   Opinion at 24.
[46]   Opinion at 23-24 (rejecting similar arguments).
[47]   July 23, 2014 declaration of David Seltzer ¶ 5.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

the manner Professor Knobel speculates they do—as an alternative way to "watch" TV. [48]

106.   Moreover, in my opinion, no rational consumer would substitute TVEyes for their cable subscription or use it in lieu of Fox's TVEverywhere or Fox News Go services (which are offered for free with a cable subscription).  Why would TVEyes users pay $500 per month to obtain a rather clunky replacement for the cable service for which they pay (in my case using Time Warner Cable in Manhattan and with a tier of service called "Preferred TV") $87.99 per month?  I frankly don't see the economics of that choice.

107.   Cable is a simple delivery system:  I turn on my cable box and TV, adjust the station to what I want to watch, and there it is.  It is a feed of information delivered to me without my doing anything other than turning it on and tuning the channel.  If I want to be sure I don't miss something, my DVR is built into my service (that $10.08 monthly charge is part of my $87.99 monthly total for TV).  I press a button and the recorded show plays.

108.   The professional-grade search capability offered by TVEyes isn't a substitute for the consumer experience of watching Fox News Channel or any other television channel.  As Judge Hellerstein has already recognized, monitoring the news is simply different than watching it. [49]

---

[48]  Opinion at 24 ("There is no basis for Fox News' alleged concern that TVEyes' subscribers are likely to watch ten minute clips sequentially in order to use TVEyes as a substitute for viewing Fox News' programming on television.").

[49]  See Opinion at 27 ("As TVEyes points out, 'monitoring television is simply not the same as watching it.'").

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

## C.   TVEyes' Saving, Emailing And Downloading Functions Do Not Threaten Fox News' Clip Licensing Business

109.   Professor Knobel opines that Fox News has lost revenue because TVEyes users who saved, emailed, or downloaded clips from the Works-in-Suit would otherwise have paid Fox News or its licensing partners (ITN Source and Executive Interviews) ███████████████████  ██████  ████████████ ██████████. I have seen no evidence in Professor Knobel's report, or any of the other documents I reviewed, to support this claim.

110.   Clips from the Works-in-Suit were downloaded a total of 21 times by the following TVEyes clients:

| TVEyes Clients | Number of Downloads |
|---|---|
| Journalists/Publications | 11 |
| Elected officials (U.S. Congress) | 5 |
| Political campaigns | 3 |
| U.S. Department of Defense | 1 |
| Public relations consultant | 1 |

111.   In addition, clips from the Works-in-Suit were shared by email a total of 6 times by the following TVEyes clients:

| TVEyes Clients | Number of Emails |
|---|---|
| National political party/Convention | 6 |

112.   No clips from the Works-in-Suit were posted publicly on the Internet by TVEyes clients in violation of TVEyes' contract as far as I am aware.

### 1.   Clip Licensing For Internal Use

113.   Professor Knobel claims that there is an "established market for licensing the internal use of news clips" (Knobel Report ¶ 14), but none of the

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

documents I have reviewed for this case, and nothing in my own personal experience, supports this view.

114.   .[50]  Nor have I seen any email correspondence establishing that this has ever been done.  If a market does exist for licensing Fox News clips for internal use, and I very much doubt that it does, it is extremely small.

115.   I can state categorically that I am unaware of any journalist or news organization that licenses video for internal use within its newsroom or its own reporting.  None, ever, not for any price, ████████████████████████████ ████████████████████.  It's worth pointing out that 11 of the 21 downloads from the Works-in-Suit were requested by journalists/publications.

116.   What does happen is that if one news organization wants to *broadcast* footage from a competitor, and if that footage exceeds what can be used as a "fair use" (with every effort being made to bring the use within the protection of "fair use"), it will license that footage from the owner—frequently for no money or a nominal payment.  This sometimes happens when an inexperienced producer makes a mistake by using too much footage and a license is negotiated after the fact.

117.   I am on the adjunct faculty at the Columbia Journalism School.  While I do not conduct formal academic research myself, many of my colleagues who focus much of their professional attention on video journalism do.  These professors have very small research budgets and certainly could never afford to pay ████████████

---

[50] See June 26, 2014 declaration of Jessica A. Rose ¶¶ 2-3 & Ex. M (ITNSOURCE0000101)

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

███████████████████████████████████████. As far as I am aware, there is no clip licensing market for this type of research use.

118.   Furthermore, it strikes me as highly implausible that TVEyes clients who access clips for internal use to monitor the media—such as journalists, political campaigns and elected officials—█████████████████████████ ██████████████████████████████████████████ ███████



In fact, many of TVEyes clients are using Fox News clips for precisely this purpose.[52]

119.   ████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████. (Knobel Report ¶ 144, Ex. 41). First, I am not appearing in this case as a legal expert, but I can tell the court that I litigated (and lost) a fair use claim on behalf of Dow Jones Newswires in London Chancery Court in the late 1990s.   The challenged use in that case, a story reporting what a high-priced service had predicted about the coming year's cocoa

---

[51]  June 26, 2014 declaration of Todd Anten ¶29 & Ex. KKK (ITNSOURCE0000161, ¶7).
[52]  See **Exhibit 4** attached hereto (███████████████████████████ ███████s); June 26, 2014 declaration of Jessica A. Rose Ex. WW (examples of journalists using TVEyes to criticize Fox News).

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

crop in Cote d'Ivoire, was plainly a fair use in the United States.  In the UK, this short article amounted to a violation of the copyright of the publisher of the newsletter.  Second, I would note that ███████████████████████████████████ ████████████████████████████

120.   Professor Knobel claims (in ¶ 85) that the documents attached as Exhibit 26 to her report show that TVEyes' saving, archiving, and downloading features "substitute for obtaining a video clip through a clip license."  None of the documents in this Exhibit show that TVEyes clients intended to use the clip at issue for any purpose that would have required a license from Fox News.

121.   I also found the emails in Professor Knobel's Exhibits 23 & 24 to be less distressing than she did. ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████

122.   Professor Knobel's position that Fox News' licensing partners (ITN Source and Executive Interviews) and TVEyes are in competition, and thus TVEyes has "devalued" clips, is inaccurate. (Knobel Report ¶ 86).  TVEyes is a media-monitoring business that enables clients to search for and obtain for internal use video clips tailored to their precise keyword.  ITN Source and Executive Interviews, on the other hand, are not "old-fashioned clipping services" or any kind of media-monitoring service, for that matter.  Clipping services track what the media says about you or a specific topic.  ITN Source and Executive Interviews are licensing services, generally for content you already know about and/or need a license to use. These two business models are different, and for the most part, mutually exclusive.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

TVEyes provides powerful search functionality and clips to clients who want to monitor the media and who do not need a license to use clips for that purpose, while ITN Source and Executive Interviews caters to client who need a license to use already-identified footage for their intended purpose.

## 2.    Clip Licensing For External Use

123.    Professor Knobel claims that TVEyes' saving, emailing and downloading features harms Fox News' business for licensing clips for use on external websites and social media platforms. (Knobel Report ¶ 85). I do not believe this is true.

124.    As far as I am aware, none of the clips from the Works-in-Suit that were saved, downloaded or emailed by TVEyes clients were posted to the public facing Internet by TVEyes clients. (Neither Professor Knobel nor Fox News claims that they were).

125.    Nor have any clips from the Works-in-Suit ever been licensed by Fox News or its clip licensing partners for any purpose, including for display on a website. In other words, there doesn't seem to be a market for licensing clips from the Works-in-Suit for public display. But should such a market develop in the future, TVEyes' service is unlikely to interfere with it because copies of the Works-in-Suit were deleted from TVEyes servers 32 days after they were broadcast.

126.    Moreover, this theory of harm assumes that TVEyes users will routinely **_misuse_** the service to post Fox News clips on the public-facing Internet. As I have noted, my research demonstrates that TVEyes clients generally abide by the internal use restrictions and very few Fox News clips have been posted online in violation of TVEyes' policy. See _infra_ Section VI. In fact, TVEyes staff has repeatedly informed clients that they must obtain a license from the broadcaster

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

before they post a clip to a public website.  See **Exhibit 8** attached hereto ("In order to post to a public website, you will need permission from the station.").

127.  Professor Knobel's report suggests there is a great quantity of Fox News content emanating from TVEyes posted online.  This is simply not the case. In the whole of her 120-page report and 74 Exhibits, Professor Knobel identifies a total of just 14 Fox News clips posted to the public facing Internet that originated with TVEyes service.

128.  Professor Knobel cites these clips as examples of potential clip licenses lost to TVEyes.  This claim is dubious.  None of these public posts strikes me as important enough to inspire a payment of ███████████████ to Fox News. What seems more likely is that these organizations would simply not post the clip to the Internet at all, rather than pay such a steep licensing fee.  In any event, as I have noted, public posting of this sort is not permitted by TVEyes and these examples represent the occasional misuse of the service by clients.

## VI.  THE ABILITY TO POST CLIPS PUBLICLY IS NOT INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSE

129.  Fox News' primary theory of market harm, namely, that its derivative businesses are threatened when TVEyes users post clips from Fox News broadcasts on the Internet, is premised entirely on the assumption that TVEyes clients routinely *misuse* TVEyes service by posting Fox News clips online.  (Knobel Report ¶ 95).

130.  My research shows, however, that TVEyes clients overwhelmingly abide by TVEyes' internal use restriction and only rarely post Fox News clips online.  Indeed, after conducting my own independent searches, I was able to find just 44 Fox News clips from TVEyes posted on the whole of the Internet, including the clips identified by Professor Knobel in her report.  This miniscule number, which represents less than ███████████████ FNC or FBN clips created by

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

TVEyes clients, flatly refutes the claim that TVEyes' clients routinely abandon their contractual obligations by posting Fox News content on the Internet.

### A.   TVEyes Does Not Permit Users To Post Clips To The Internet

131.   TVEyes does not permit clients to post clips to the public-facing Internet without permission from the rights holder.[53]

132.   The User Agreement signed by TVEyes' clients when they subscribe to the service expressly restricts the use of clips obtained through TVEyes to internal purposes only.   Specifically, the third provision in this agreement states in full:

> OWNERSHIP AND COPYRIGHT.   Company and its third party providers shall retain ownership rights in and to the Licenses. Client may not copy, license, sell, resell, transfer, distribute or otherwise exploit any of the foregoing and will use it best efforts to stop any unauthorized use thereof.   The data provided is from proprietary sources and may be utilized for Client's internal purposes only.

133.   This provision is not buried in a long agreement; it is not written with confusing language; in my opinion, it is unambiguous and unequivocal.   I base this opinion on my considerable business experience with user agreements for professional information products.   One example would be Telerate, which was a dedicated news and information terminal focused on financial markets that was owned by Dow Jones from 1990-1998.   Telerate's subscription agreements included numerous limitations on redistribution of information to third parties.   Other examples of products I have dealt with that included similar restrictions are Dow Jones News Retrieval, a news database Dow Jones started marketing to professionals in the early 1980s, and which ultimately became Factiva, which is still

---

[53]  Opinion at 5 (TVEyes' User Agreement "limit[s] the use of downloaded clips to internal purposes").

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

offered by Dow Jones as a subsidiary of Newscorp, and Eikon, the flagship news and information terminal sold by Thomson Reuters.  Attached hereto as **Exhibit 9** is a copy of a TVEyes' contract with its users.

134.  It is also my experience that in general businesses make a point of reading contracts before they sign them, and that the professionals using costly information services like TVEyes also tend to know or learn quickly the scope of what they can (and cannot) do with that information.  It isn't just the prospect of liability for breaching an agreement that encourages compliance.  The bigger problem may be losing access to a useful information product.

135.  TVEyes clients are reminded of the internal use restriction in a number of ways after they sign their contract.  ***First***, TVEyes places a reminder about the internal use policy on the "download page," which appears just before a user downloads a clip.  It reads:

> **Important Note:**
> **Material supplied by TVEyes Inc. may be used for internal review, analysis or research only.  Any editing, reproduction, publication, rebroadcasting, public showing or public display is forbidden.**[54]

This "Important Note" is not buried on the page; it does not appear only once and then not again.  It appears for each download ordered and it is immediately visible and readable to the left of the transcript of the clip.  It is also consistent with the language of the TVEyes User Agreement.  Attached hereto as **Exhibit 10** is a printout of this note as it appears on the TVEyes website.

136.  ***Second***, I understand that several of TVEyes' client service staff include a footer on the bottom of their email correspondence to remind clients of the internal use policy.  Examples of these emails are attached hereto as **Exhibit 11**.

---

[54]  June 26, 2014 declaration of David Ives ¶ 8 & Exhibit B.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

TVEyes client service representatives communicate on a regular basis with TVEyes users to offer technical support, answer questions, run searches, and run reports among many other services.  In fact, this type of unlimited, hands on customer service is one of the selling points of the service.  Professor Knobel's statement that "outside of a few workers in the business affairs, technology or legal departments, no one at a client organization would have any reason to communicate directly with staff at TVEyes" is simply incorrect. (Knobel Report ¶ 130).

137.  ***Third***, TVEyes' CEO testified that TVEyes staff routinely remind clients about this restriction in telephone and in-person communications.[55]

138.  ***Finally***, when clients have inquired about the possibility of posting clips from TVEyes to the public-facing Internet in the past, TVEyes' staff has explained that the client must have permission from the content provider to use the clip in this way.  Examples of such emails are attached hereto as **Exhibit 8**.

139.  Professor Knobel attaches to her report seven (7) emails between one TVEyes sales person and several prospective TVEyes clients during 2010 and 2011.  In these emails, the TVEyes sales person erroneously states that clips from TVEyes' service may be posted to the Internet.  Based on these emails Professor Knobel concludes that TVEyes encourages all of its clients to post clips on social media. (Knobel Report ¶ 74).  I do not agree to with Professor Knobel's assessment.  The emails that Professor Knobel points to are from a single TVEyes sales person who misstated TVEyes' internal use policy to certain prospective clients of the service.  TVEyes' CEO David Ives was not aware of this until these emails were produced in this litigation.  Moreover, these emails are inconsistent with TVEyes' contracts, its website, and other correspondence and communications between TVEyes staff and clients.

---

[55]  July 23, 2014, declaration of David Ives ¶ 17.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

140.  In any event, these emails are irrelevant because, as discussed in Section VI, very few Fox News clips are posted to the Internet by TVEyes clients, including **no** clips from the Works-in-Suit.

### B.  TVEyes Users Do Not Frequently Post Fox News Content To The Internet

141.  Professor Knobel claims in her report that TVEyes users "frequently" post Fox News content to the Internet in violation of their contract with TVEyes. (Knobel Report ¶ 82).  This conclusion is demonstrably false.  As discussed in more detail below, my own searches revealed a total of just 44 Fox News clips originating from TVEyes on the whole of the Internet.  The fact is, TVEyes clients do not "frequently" post content from TVEyes to the Internet, but when they do, it is almost never Fox News content.

142.  Professor Knobel cites results of a search using Google, which allegedly revealed "tens of thousands of hyperlinks on social media platforms and other Internet websites that link to high definition video clips archived on TVEyes' servers, including over 60,000 hyperlinks across the Internet and over 25,000 on Facebook alone – all obtained from TVEyes."  (Knobel Report ¶ 11).

143.  At the outset, there are a number of obvious problems with Professor Knobel's research.  **First**, Professor Knobel does not describe anywhere in her report how these searches were conducted.  She does not disclose the search query she used, nor does she append the results of this search to her report.  Professor Knobel asks the Court to accept the results of her searches at face value, but she has not provided the basic information about her methodology that is necessary to reproduce and verify her results.  In my mind, this raises a serious red flag because it made it impossible for me to review her data, and not just her conclusions.

144.  **Second**, and quite significantly, Professor Knobel does not identify how many of the videos are Fox News clips—which, of course, are the **only** clips

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

that matter in assessing whether TVEyes' saving, emailing, and downloading features threaten Fox News' derivative businesses.  As discussed below, conducting my own Internet searches I was able to identify just 44 Fox News clips originating with TVEyes on the Internet—such a small number that it and of itself demonstrates that Fox News suffers virtually no harm even when TVEyes clients misuse the service.

145.   ***Third***, Professor Knobel does not indicate how many of the hyperlinks identified in her search were duplicates.  In my own research, described below, I came across many duplicate links, and I have every reason to expect that her searches yielded the same.

146.   I attempted to verify Professor Knobel's results by searching the Internet using the Google search engine.  Specifically, I ran the following search query in the Google search engine:

**"mediacenter.tveyes.com" OR "mms.tveyes.com" OR**

**"s3.amazonaws.com/TVEyesMediaCenter"**

These search terms were selected because they identify links to video content stored on TVEyes servers, without also capturing web pages that used the word "tveyes" alone, without an accompanying video clip.  (For example, my query was intended not to include a webpage containing a news story that mentioned TVEyes, but did not contain a clip from TVEyes).  The results of this search are attached hereto as **Exhibit 12**.

147.   In addition, I ran the query above in the Google search engine, using the "advanced" options (http://www.google.com/advanced_search), which allowed me to focus my searches to the Facebook.com and Twitter.com web pages.  The results of these two additional searches are attached hereto as **Exhibit 13** and **Exhibit 14**.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

148.   Reviewing all the results of these three searches, I found a total of just 44 clips of Fox News content originating from TVEyes on the Internet.[56]  While 44 is a small number in and of itself, it is tinier still when considered as a proportion of the approximately ███████ FNC and FBN clips generated by TVEyes users:  these 44 clips represent just ██████ of all FNC and FBN created by TVEyes users through the end of 2013.[57]  I should also note that most of these 44 video clips no longer played when accessed, likely because they were more than 32 days old.

149.   Importantly, none of the Fox News clips I located online were from the Works-in-Suit, which I understand are the only copyrighted works before the Court in this case.  In fact, clips from the Works-in-Suit were downloaded by TVEyes clients just 21 times:

| TVEyes Clients | Number of Downloads |
|---|---|
| Journalists/Publications | 11 |
| Elected officials (U.S. Congress) | 5 |
| Political campaigns | 3 |
| U.S. Department of Defense | 1 |
| Public relations consultant | 1 |

150.   There is no indication from the searches I conducted, the documents appended to the Knobel Report, or the evidence submitted by Fox News in connection with summary judgment briefing that any clips downloaded from the Works-in-Suit were posted publicly.

---

[56]  I located these 44 clips by conducting the Google searches described above, which attempted to replicate the results referenced by Professor Knobel in her report.  I must assume that I missed some clips though human error, and that additional searches may have located more clips—although they may simply have found the same clips.  I do believe, however, that even if additional searching found many multiples of the clips I found, the number of clips located would still represent just a tiny fraction of the Fox News clips created by clients using TVEyes.

[57]  TVEYES-036298 ("Activity Log").

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

151. In addition, although I tried a number of different queries, I was not able to reproduce anything approaching the number of hyperlinks to TVEyes Professor Knobel claims she obtained through her of the Google searches. And since Professor Knobel did not append her search results to her report, I could not verify her claims.

152. But even taking Professor Knobel's numbers at face value (and assuming there are no redundancies in the data and that all of the links were tested and do in fact lead to TVEyes' server) the 63,000 clips she has identified (again, my own searches found only 44 clips of Fox News content) represent just ███████████ ████████████ of the █████████ that were clips were created by TVEyes clients across all stations through the end of 2013.[58]   In other words, Professor Knobel's own data proves that just a tiny fraction of the clips saved by TVEyes clients have ever been posted to the Internet.

153. Significantly, Professor Knobel ignores the fact that some television stations ***allow*** clips of their broadcasts to be posted to the Internet. For example, C-SPAN allows anyone to post clips of its broadcasts to the Internet for non-commercial purposes.[59]   Not surprisingly given TVEyes' client base, some of the clips I came across in my searches were clips from C-SPAN, sometimes posted to the Internet by members of Congress.

154. In addition, a large proportion of the TVEyes clips that I found were from local television stations that had run stories about a local resident or business. Although I cannot be certain, it seems likely that many of these clips were posted with the permission (or at minimum with the knowledge) of these local stations.

---

[58]   See Activity Log.
[59]   See http://www.c-span.org/about/copyrightsAndLicensing/.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

From the station's perspective drawing more attention to a story and the station  is often a positive outcome.

155.    Professor Knobel also claims that the 63,000 links she found "represent just the tip of the iceberg" because her search could not "locate TVEyes hyperlinks on websites or social media platforms that have settings to prevent them from being included in Google's search results." (Knobel Report ¶ 77).  If my understanding of iceberg architecture is correct, 90% of an iceberg is under water, and I do agree with Professor Knobel that there is certainly much information available over the Internet that is not indexed by Google or other search engines.  However, the websites operating on this part of the Internet—the "dark web" as some call it—are highly unlikely to be paying licensing fees to Fox News, Executive Interviews or ITN Source for the right to publicly display video clips because these websites, by definition, are not highly trafficked.

156.    The fact that I was able to locate a relatively small number of clips on the Internet originating with TVEyes does not surprise me.  Over the years I have worked with several electronic information products, including Factiva (originally known as Dow Jones New Retrieval), Telerate, and Reuters.  Like TVEyes, all of these were subscription products that were priced well above what a casual consumer would be willing to pay for information; all had restrictions in their user agreements that limited republication and redistribution; all had occasional users who would breach provisions; but generally users observed the terms of their agreements, understood the scope of the rights for which they were paying and remained within those bounds.

157.    In my opinion, Fox News' concerns about public postings and social shares are greatly exaggerated.  My research supports the conclusion that TVEyes users generally abide by their contractual obligations and do not post Fox News content to the Internet.   Rather, TVEyes clients save, email and download Fox

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

News clips for internal use, in compliance with their contractual obligations.  The presence of Fox News clips on the Internet from TVEyes is at best *de minimis* and does not pose any threat to Fox News' derivative businesses.

### C.   The TVEyes Service Is Not Designed To Promote Public Posting Of Clips

158.   Professor Knobel opines that TVEyes is designed to encourage users to post clips to the public facing Internet and social media.  Specifically, Professor Knobel writes "TVEyes designed the technology of its system to encourage its customers to post, redistribute, and email content using the TVEyes Content-Delivery Features and does not even employ watermarking, digital rights management, or any other technological limitation that might assist in regulating the redistribution of news content."  (Knobel Report ¶ 10).  I do not agree with this conclusion about TVEyes because none of the elements of a website or system designed for social sharing are present on TVEyes.  In addition, the fact that TVEyes does not employ digital watermarking and other similar features does not suggest that TVEyes encourages social posting; instead, it is in keeping with TVEyes' primary mission of providing its users with the ability to search and retrieve television and radio content exactly as it was broadcast.

### 1.   Features Standard To A Website Designed For Public Sharing

159.   Websites that encourage users to post copyrighted content on social media or the Internet almost always contain two standardized tools designed to encourage content sharing:  (1) social share buttons and (2) a media player that can easily be embedded in another website.  These two features are present on every website that seeks to encourage users to post and redistribute video content on the Internet and have become part of consumer expectations.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

160.    Social share buttons enable a user to share content via social media with a single click of a button:



A user simply clicks on the buttons and the video clip is shared via social media. Attached hereto as **Exhibit 15** are screenshots from various websites that encourage social sharing with post to social media buttons.

161.    A feature essential for a website that promotes social sharing is a video player that embeds into another website.  This type of video player allows a user to incorporate video content from one website onto another website with the press of a button.  Typically, the share buttons are readily apparent on the video player, or become visible by scrolling over the player.  Websites that have embeddable video players include Bloomberg.com, Vimeo.com, WallStreetJournal.com, WashingtonPost.com, NewYorkTimes.com, and FoxNews.com.

162.    To my knowledge, social share buttons and the ability to embed a video player are the two tools most widely used to encourage sharing on social media websites and the across the Internet.  Over the years, I have been involved in the design of various websites that prioritized social engagement and sharing and these features were regarded as critical for this purpose.

163.    Neither of these universal social sharing tools is incorporated into the design or functionality of TVEyes:  it does not have social share buttons, nor does it have a video player that can be embedded by a user into a third party website.  The absence of these easy to use social sharing tools on TVEyes is of course consistent with it being a professional, premium-priced product with an explicit contractual limitation to internal use.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

164.    To post a link to a TVEyes clip to a social media service, a user would have to create a post using that service's separate tool, write the context for the post, and then paste the content into the post and share.  In addition to requiring the user to jump back and forth between TVEyes and another service, this process does not provide formatting and content options that the social share buttons include.  For example, when I press the Twitter share button on a website, the service creates a "shortened link" that ensures I will stay within the character limit of a Twitter post.  Unlike the LinkedIn or Facebook share buttons, a user would have to create her own headline describing the content, which frequently will make her post less effective.

165.    By contrast, TVEyes ***does*** have a button that allows a user to share a video clip by email because sharing clips by email ***is*** encouraged by TVEyes (though it is not the graphic image used on consumer websites).  As discussed in Section IV. B, email functionality is often essential when using clips for research and analysis.



**TVEyes Email Clip Button**

166.    Professor Knobel reports that she was able "to download an entire episode of *NBC Nightly News with Brian Williams* without commercials from TVEyes in five high definition video clips" that she could then" email to others or upload to social media."  (Knobel Report ¶ 10).  But as she describes, doing so required that she create five different clips of this 30 minute program and have each of them emailed to her, presumably reassemble them, and then post them to the Internet.  Moreover, if Professor Knobel were an actual TVEyes client, she would have to do all of this while knowingly violating her contract with TVEyes.

52

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

167.   I can see no reason why Professor Knobel (or anyone else) would want to undertake this considerable effort when she could have simply gone to the NBC News homepage; clicked once on the Nightly News button at the top right of the page; clicked a "Watch Full Episodes" button on the left of the next page; selected her episode and watched it.  Should she have wanted to share it with others, she could have clicked on one those share buttons that NBC locates to the right of the player on its website for Facebook, Twitter, Google+ or email.

### 2.   The Absence Of Watermarking And High Definition Does Not Encourage Public Posting

168.   It is Professor Knobel's opinion that the absence of watermarking on clips generated by TVEyes is designed to encourage republication of clips.  (Knobel Report ¶ 67).  I do not agree with this assessment.  There is a much simpler, functional reason that TVEyes does not include a watermark, a date/time code, or any other material that would modify the picture as it appeared when originally broadcast.  TVEyes' promise is to capture and make available to subscribers all the content that was broadcast, precisely as it was broadcast, with no additions to the screens or detractions from it.   To impose a watermark, especially a TVEyes watermark that might imply some authorship by TVEyes and obscure the content below the stamp, could be misleading and is at odds with the fundamental purpose of the service.

169.   Professor Knobel also takes issue with the fact that clips downloaded from TVEyes do not include a "date/time" code, even though a date/time code appears on the lower right of the screen when a clip is viewed on TVEyes' website.  Professor Knobel speculates that this is because TVEyes clips are not intended for internal use.  Professor Knobel is incorrect.  The date/time code that appears when TVEyes clips are viewed on the TVEyes website is displayed by the user's web browser—it is not part of the clip itself.   TVEyes would have to undertake

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

additional steps to append the date/time information onto each clip before it was downloaded by the user.  Given that TVEyes' primary function is to provide users with pristine clips of broadcasts, there is no business reason for TVEyes to do this.

170.   It is also not clear to me that including a date/time code would be an indicator that TVEyes would be making it more difficult for users to violate their agreement to stick to internal use.  One could argue that the absence of special TVEyes coding on the clip makes it incumbent upon a user to establish her own method for maintaining a coherent, usable archive of clips.  Requiring each user to create that external organization scheme makes it more difficult to share clips with others who would have no idea from the footage itself precisely when it was broadcast.

171.   I would also note that if a dishonest actor wanted to eliminate watermarks or date/time codes it would be a simple matter to do so.  One could easily take the clip and enlarge the image so that this data—the watermark and date/time code—appear outside of the border of the screen, and therefore would not appear when the clip is viewed on a website.

172.   Professor Knobel's suggestion that TVEyes must incorporate metadata into its clips to allow for monitoring and tracing usage is also problematic to me.  To quote Professor Knobel, "I often think of metadata as a digital "thumbprint" that uniquely identifies digital files and where they come from. Metadata is often used in Digital Rights Management systems that seek to discourage the unauthorized use of digital files."  (Knobel Report ¶ 70 ).  Given that there is no evidence of persistent misconduct of TVEyes subscribers there would seem to be no justification to increasing the ability to track subscriber conduct.  Many of TVEyes' subscribers compete with each other—news networks, academics, etc.—so improved tracking capabilities might well raise questions among subscribers, all of whom have signed, and almost all of whom honor, User Agreements limiting their use of TVEyes clips

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

to internal use.  How would one explain why TVEyes would deliver to its users coded downloads that would almost exclusively track usage **within the user's own office**?  Surely enough words and images have been spilled in recent years on all the means companies and governments use to track what everyone is doing on their computers and online.  It would be a poor idea in that environment to suggest that TVEyes should add to the tools through which any of the activities of journalists, academics, researchers and politicians can be tracked to address an insignificant number of (possible) contractual breaches.

173.  Thus, most of the product changes suggested by Fox News would undermine the transformative use of the TVEyes service by larding onto the original image broadcast by a network, add tracking mechanisms or making the product harder to use.  Given the paucity of evidence that TVEyes users breach their TVEyes User Agreement *en masse*, these steps all appear to be "solutions" in search of a problem.

## VII.   ALTERNATIVES TO TVEYES DO NOT EXIST

174.  Professor Knobel opines that media-monitoring services like TVEyes are not necessary because alternative services are available to those who need to monitor the media.  I do not agree with Professor Knobel's analysis.  The alternatives to TVEyes service identified by Professor Knobel are inadequate and would materially reduce the effectiveness of media monitoring and criticism.

### A.   Watching Television And Recording It On A DVR

175.  Professor Knobel claims that those who are so inclined can monitor the media by simply watching television or recording it on one's personal VCR or DVR.  Frankly, both suggestions are difficult to take seriously.  It is not possible for a person to simultaneously monitor over 1000 television channels 24 hours a day, 365 days a year for keywords, which is why TVEyes performs such a valuable service.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

176.    Similarly, DVRs do not provide search capabilities other than scrolling or choosing a specific time in advance of airing.  Comparing programming recorded on a DVR would require multiple DVRs or recordings within the same DVR, multiple screens and complexity that would make effective monitoring impossible. DVRs are also of no help in monitoring the unforeseen broadcast that one didn't think to record, like Brian Williams' story about his trip to Madison Square Garden with the pilot of his helicopter in Iraq.  Nor can they record broadcasts outside of the users geographic location.  TVEyes is designed to do all of these things.

**B.    Media-Monitoring Services That Store Clip Data On Clients' Servers**

177.    Professor Knobel points to media-monitoring services, like Volicon, which record and store television data on servers placed in each clients' offices (in contrast to TVEyes, which captures and stores television data on servers owned by TVEyes located across the country).

178.    As an initial matter, Volicon's core business is to monitor the quality of the signal transmitted by channels, and to simplify the workflow of networks as they capture footage and prepare it for distribution.  Such a service would be used by television broadcasters like Fox News who must monitor and circulate its own footage.  In fact, a customer service representative for Volicon told me that the media-monitoring services the company provides  are  very limited.

179.    The primary drawback of services like Volicon is that they do not give the client access to a ***comprehensive*** database of television content across over 1000 channels nationwide.  Rather, clients who use services like this are limited by whatever cable channels they can record in their local area, and also by the amount of data storage they can afford to maintain.  As a result, a service like Volicon cannot meet the needs of clients who want to search and analyze television content that includes local content from all over the country, such as national political

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

campaigns, national political parties, journalists, Congressman, and companies with a national presence.

180.   Another major drawback to services like Volicon is that they are extremely expensive.  Volicon's business model is to charge a fee to install its system on a client's premises.  As part of that installation Volicon can set up its system to monitor specific key words identified by the customer.  Should the customer want to change what words are being monitored, however, Volicon would have to reinstall the system, which would result in another charge to the client.

181.   I spoke to a representative at Volicon personally by phone and learned that because each Volicon installation is customized, the company has no standard rates.  However, I understand that to install a Volicon system with the ability to monitor just 100 channels (and again, only those available locally) would cost around $500,000.  This extremely expensive pricing places Volicon's services well out of reach for most businesses—especially the organizations that TVEyes caters to—such as journalists, elected officials, political campaigns, think tanks, and local police departments.

## C.   Internet Archive's TV News Archive

182.   Professor Knobel points to the TV News Archive as an alternative to TVEyes.  While it is certainly a worthy project, the TV News Archive is quite limited and doesn't have the virtue of TVEyes' comprehensive database of all broadcast content over a running 32-day period.  Rather, it archives programming available in San Francisco and Washington D.C. only, and thus would not be sufficient to meet the needs of clients who need to monitor content outside of those two geographic regions.  Moreover, on TV News Archive, there is a lengthy delay from the time content is first broadcast on television to the time a clip of that same content is available for viewing.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

183.    As to monitoring Fox News content specifically, Professor Knobel maintains that "anyone who wants to conduct any kind of research or analysis on Fox News' programs, just as they are telecast, can easily do so using the TV News Archive, and they can do so for as long as they need." This is not accurate. Fox News broadcast content is not available on the TV News Archive shortly after it is broadcast. For example, on the afternoon of March 2, 2015 I searched the TV News Archive for a clip from the *Fox & Friends* broadcast that aired on FNC earlier that morning, but it was not available on TV News Archive. Next, I searched for a clip from the March 1, 2015 *Fox & Friends* broadcast and that was not available either. Both clips were available on TVEyes.

### D.    <u>Vanderbilt University's Television News Archive</u>

184.    Finally, Professor Knobel claims that the Vanderbilt Television News Archive is an adequate substitute for TVEyes  This archive certainly has material going back far longer than TVEyes, but also is far less comprehensive. It archives evening news broadcasts from ABC, CBS, and NBC, and since 2004, has archived only one hour a day of programming from CNN and FNC. There is no indication that the archives includes FBN or any local programming.[60]

185.    This collection of materials is not intended for fast-paced monitoring in aid of analysis, commentary and criticism. Rather, it is a deep archive of several decades that is intended for historians who have the time to request loans and transmit recordings on DVDs back and forth to the archive. No content is made available until at least 72 hours after broadcast, and archives are made available through the shipment of DVDs, which must be returned to the archive. The archive says it generally takes a week to deliver a DVD in response to a request. TVEyes,

---

[60]    See http://tvnews.vanderbilt.edu/.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

in contrast, allows the user to learn of and view the relevant snippet within minutes after it was first broadcast.

## VI.   WIDESPREAD USE OF TVEYES OR OTHER MEDIA-MONITORING SERVICES DOES NOT THREATEN FOX NEWS' DIGITAL BUSINESSES OR THE FUTURE OF JOURNALISM

186.   Professor Knobel greatly overstates the effect—if any—that TVEyes' saving, emailing and downloading features will have on the future of Fox News and television news industry in general.

187.   TVEyes does not present a threat to the business of Fox News or to the future of journalism (whatever that turns out to be) because TVEyes has a very limited, professional audience that needs to monitor the news: Journalists, academics, political campaigns, elected officials, police department, the department of defense, public relations firms and companies.   It's not a consumer product designed for the masses and it never will be.

188.   Nor will TVEyes or similar media-monitoring services ever replace television or news websites.   They simply do not serve the same purpose as these news outlets.   One goes to TVEyes and gets the total of number of hits on one's Watch Terms; one turns on the television or visits news website to get headlines and teasers for stories.   Every professional who uses TVEyes will still use TV and news websites (as well as other information products designed for consumers). TVEyes does not offer the convenience of consuming news across all topics or the functionality for engaging with that content, including through social sharing.   In short, as good as TVEyes is a monitoring service for broadcast data, it is dreadful as a consumer product designed to keep a user informed about the world at large.

189.   Moreover, as discussed above, TVEyes' business simply doesn't cause any significant market harm to Fox News.   Even under the theoretical worst case scenarios presented by Professor Knobel, the harm to Fox News  from lost traffic to

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

its website or lost licenses for internal uses that require a license (whatever those are) would be *de minimis*. Of course I have seen no evidence that any **actual** harm has ever befallen Fox News as a result of TVEyes.

190.   Professor Knobel's concerns about Burelle's, eOutreach, Vocus, Moreover, and Meltwater are identical those she has about TVEyes. To the extent that each of these services are simply accessing TVEyes data and using it in connection with their own media-monitoring services, with the same restrictions imposed by TVEyes on its own customers, they simply expand the pool of professionals who can access a superior tool for monitoring broadcast content. Increasing the number of well-informed media critics, supporters and monitors does not threaten Fox News or any other broadcaster. They are all premium products; they are priced as premium products; they are not substitutes for the consumer products or experiences.

191.   Professor Knobel's concern that the practice of media monitoring will become "widespread" and bring down journalism (and in the process our democracy as we know it) is pure hyperbole. (Knobel Report ¶ 20). The media monitoring industry is not new. It has been "widespread" for years. TVEyes itself started 1999, and today there are dozens of similar services that capture and index television content without the permission of Fox News in much the same way and for the same purposes that TVEyes does.[61] There is no reason to think that these services, or the features they offer, have impeded the growth of Fox News in any way. To the contrary, Fox News continues to earn record profits, with annual revenue close to $2 billion. Traffic to the Fox News website continues to increase and its television ratings continue to surge. To the extent Fox News has suffered any financial harm at the hand of media monitors like TVEyes—and I don't believe

---

[61]  See August 7, 2014 declaration of David Ives ¶ 3.

- CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER -

for one second that it has—that harm is miniscule and pales in comparison to the networks' enormous profits.

192.    I share Professor Knobel's view that the news media plays a critical role in our society, and around the world, in providing the public with reporting and analysis that is independent from governments and corporate interests.  That role endures in part because even as the press holds others to account, it is itself held to account.  TVEyes enables the monitoring and criticism of broadcast media like no other product I have seen.  Errors can be exposed, and quality work defended, forcefully and accurately.

193.    I do agree with Professor Knobel that broadcasters like Fox News must innovate to find new sources of revenue and expand existing ones.  However, the suggestion that ridding the world of media-monitoring services like TVEyes would somehow benefit Fox News makes little sense.  Shuttering the most effective tool for monitoring television ultimately would hurt broadcasters far more than it would help them.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 6, 2015 in New York, New York.

_____

Stuart Karle