UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------- x
FOX NEWS NETWORK, LLC,                     :
                                           :  Case No.: 1:13-cv-05315-AKH
                Plaintiff,                 :
                                           :
  - against -                              :  ECF Case
                                           :
TVEYES INC.,                               :
                                           :
                Defendant.                 :
------------------------------------------- x

# BRIEF OF AMICI CURIAE
## BRIGHT HOUSE NETWORKS, CABLE NEWS NETWORK, INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC AND NEWS 12 NETWORKS LLC IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:    (212) 489-8230
Facsimile:    (212) 489-8340

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE .................................................................................................. 1

SUMMARY OF ARGUMENT ....................................................................................................... 3

ARGUMENT .................................................................................................................................. 4

I.     The Functions Permitted and Promoted by TVEyes
       Go Far Beyond the Pale of Fair Use ................................................................................... 4

II.    By Allowing Its Customers to Download, Save and Distribute Substantial, High-
      Resolution Clips of Video and Audio Content, TVEyes Competes Directly With – And
      Diverts Revenue From – Rights-Holders Such as *Amici* in a Valuable Market They Are
      Actively Exploiting ............................................................................................................. 9

DWT 26793557v7 0085000-002111

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
　931 F. Supp. 2d 537 (S.D.N.Y. 2013)..........................................................................3, 5, 6, 8

*Authors Guild, Inc. v. Google, Inc.*,
　954 F. Supp. 2d 282 (S.D.N.Y. 2013), *appeal docketed*, No. 13-4829 (2d Cir.
　Dec. 23, 2013).........................................................................................................................6, 7

*Authors Guild, Inc. v. HathiTrust*,
　755 F.3d 87 (2d Cir. 2014)...................................................................................................6, 8, 10

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
　448 F.3d 605 (2d Cir. 2006)......................................................................................................7

*Blanch v. Koons*,
　467 F.3d 244 (2d Cir. 2006)......................................................................................................6

*Harper & Row Publishers v. Nation Enters.*,
　471 U.S. 539 (1985).................................................................................................................10

*Infinity Broad. Corp. v. Kirkwood*,
　150 F.3d 104 (2d Cir. 1998)................................................................................................5, 8, 9

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Co., Inc.*,
　621 F.2d 57 (2d Cir. 1980).......................................................................................................10

*Kelly v. Arriba Soft Corp.*,
　336 F.3d 811 (9th Cir. 2003) ...................................................................................................7

*Los Angeles News Serv. v. Tullo*,
　973 F.2d 791 (9th Cir. 1992) .................................................................................................5, 8

*Nihon Keizai Shimbun v. Comline Bus. Data, Inc.*,
　166 F.3d 65 (2d Cir. 1999).....................................................................................................5, 8

*Pacific & Southern Co., Inc. v. Duncan*,
　744 F.2d 1490 (11th Cir.1984), *cert. denied*, 471 U.S. 1004 (1985)....................................5, 8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
　508 F.3d 1146 (9th Cir. 2007) ...............................................................................................3, 7

DWT 26793557v7 0085000-002111

iii

*Princeton Univ. Press v. Michigan Document Services, Inc.*,
    99 F.3d 1381 (6th Cir. 1996) ................................................................................................9

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2003) ............................................................................................5, 8

*Wainright Secs. Inc. v. Wall Street Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1997) ..............................................................................................5, 6

**Federal Statutes**

17 U.S.C. § 102 .................................................................................................................................5

**State Statutes**

W. Patry, *The Fair Use Privilege in Copyright Law* (1985) ...............................................................9

**INTERESTS OF AMICI CURIAE**

*Amici curiae* are media companies that create and distribute high-quality news and entertainment content.  *Amici* submit this brief in support of Plaintiff's renewed motion for summary judgment to emphasize that this case is not just about Fox News; it affects all creators and publishers of broadcast and digital content, including *amici*, who depend on licensing deals and advertising sales to support their continuing ability to provide high-quality news and entertainment content.[1]

**Bright House Networks** is the sixth largest owner and operator of cable systems in the United States.  Bright House Networks serves approximately 2.5 million customers who subscribe to one or more of its video, high-speed data, home security and automation and voice services.  Bright House Networks also owns and operates exclusive, award-winning, local news and sports channels in its Florida markets.

**Cable News Network, Inc. ("CNN")**, a division of Turner Broadcasting System, Inc., a Time Warner Company, is a highly trusted source for news and information.  Its reach extends to nine cable and satellite television networks; one private place-based network; two radio networks; wireless devices around the world; CNN Digital Network, the No. 1 network of news web sites in the United States; CNN Newssource, the world's most extensively syndicated news service; and strategic international partnerships within both television and the digital media.

**CBS Studios Inc.** is a Delaware corporation and a wholly-owned subsidiary of CBS Corporation.  CBS Studios Inc. produces original content for both traditional and digital platforms, including such hits as "NCIS," "The Good Wife," "Blue Bloods" and "Hawaii Five-O."

---

[1] A*mici* state that no counsel for a party authored this brief in whole or in part, and no person or entity other than *amici* and its counsel made a monetary contribution to the preparation or submission of this brief.

**NBCUniversal Media, LLC** (NBCUniversal) is one of the world's leading media and entertainment companies in the development, production, and marketing of news, entertainment and information to a global audience.  NBC News, a division of NBCUniversal, produces the "Today" show, "NBC Nightly News," "Dateline" and "Meet the Press."  Among other businesses, NBCUniversal owns and operates the NBC Television Network; the Spanish-language television network Telemundo; several news and entertainment networks including MSNBC, CNBC, USA and Bravo; a television stations group consisting of 27 owned-and-operated NBC and Telemundo television broadcast stations that produce substantial amounts of local news, sports and public affairs programming; and the Universal and Focus Features film and television studios.

**News 12 Networks LLC** is the country's first 24-hour local television news network, currently serving more than 3 million households in the New York tri-state area, providing in-depth local news coverage.  It is a cable exclusive service affiliated with Cablevision, Time Warner, Service Electric, and Comcast cable systems.  News 12 is made up of seven individual local news channels and five traffic and weather channels serving the areas of Long Island, New Jersey, Southwestern Connecticut, Westchester County, the Hudson Valley, Putnam County, Brooklyn, and the Bronx.  News 12 Networks has won numerous industry awards during its 29 year history.  News 12's website, News12.com, features live-streaming video from each News 12 channel and a video on-demand format for other News 12 content.

2

## SUMMARY OF ARGUMENT

It is no secret that the media industry has come under enormous financial pressure in the digital age. As people consume more and more news via mobile devices or on the internet, the market for streaming audio and video has become a key source of revenue for media companies – one that is actively exploited by *amici* as well as Fox News. Indeed, today's consumers are increasingly drawn to shorter, topical video clips on their computers and mobile devices rather than full-length news programming.

TVEyes unlawfully misappropriates that market for itself. It systematically records content from over a thousand television channels, and charges subscription fees to its customers in exchange for distributing to them massive amounts of content it has neither created nor licensed. It also allows – indeed, encourages – its users to download, archive, and redistribute lengthy, high-resolution segments of unlicensed broadcast content, with no restrictions on downstream use. To make matters worse, the clips redistributed by TVEyes customers do not even link back to the content creator's own website. Instead, video segments are archived on TVEyes's own site, diverting valuable advertising revenues rightfully belonging to the copyright holder on top of the lost licensing fees. Thus, the redistributed clips enabled by TVEyes do not even act as "an electronic reference tool" or "pointer directing a user to a source of information" – the core legal justification relied upon in *Perfect 10, Inc. v. Amazon.com, Inc.* and its progeny to ground the fair use defense. 508 F.3d 1146, 1165 (9th Cir. 2007).

*Amici* respectfully disagree with the Court's prior ruling in this case dated September 9, 2014, and do not believe that the indexing function by TVEyes qualifies as a fair use. This case is indistinguishable from *Associated Press v. Meltwater U.S. Holdings, Inc.* (hereafter "*Meltwater*"), 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013), and from the many cases addressing commercial clipping services, which have never qualified as fair use. But even accepting the

3

Court's prior ruling for purposes of this argument, it is clear that the additional functions at issue here – downloading, archiving, emailing, saving, and sharing high-resolution clips of substantial length – reach far beyond the pale of fair use. These functions are completely unnecessary to the indexing and "search" capabilities that this Court considered fair use, and usurp the media's ability to monetize its own content after investing the costs of production. No case has ever held that such extensive, systematic use of third-party content without license or compensation to its creator constitutes fair use.

For the reasons set forth herein, *amici* urge this Court to grant Fox News' renewed motion for summary judgment and to dismiss TVEyes' fair use defense.

## ARGUMENT

### I. The Functions Permitted and Promoted by TVEyes Go Far Beyond the Pale of Fair Use

In its previous ruling, this Court held that it was fair use for TVEyes to copy entire broadcasts by Fox News for its "indexing and clipping services to its subscribers." [Dkt. No. 86 at 27]. Currently before the Court is the issue of whether the features of the TVEyes service allowing subscribers to "save, archive, download, email and share" high-definition segments of Fox News content is "integral" to the indexing purpose that this Court previously found to be transformative and fair. For the reasons set forth below, *amici* urge this Court to find that such functions do not fall within the ambit of fair use.

As an initial matter, it is *amici*'s position that the copying and storage of the entirety of a network's copyrighted news broadcast content in order to provide a commercial, subscription-based monitoring business simply does not constitute a fair use. Instead, this is the classic role

of a clipping service, which federal courts have repeatedly found to fall outside the bounds of the fair use doctrine.[2]

Indeed, the service offered by TVEyes is functionally indistinguishable from the Meltwater service that the Honorable Denise L. Cote of this Court previously held was ***not*** a fair use. Both are for-profit, commercial services that copy the entirety of a news organization's corpus of published, copyrighted material and sell that copyrighted material to subscribers in exchange for hefty subscription fees, without paying any license to the content owners. Like Meltwater, TVEyes "copies [Fox News] content in order to make money directly from the undiluted use of the copyrighted material; this is the central feature of its business model and not an incidental consequence of the use to which it puts the copyrighted material." *Meltwater*, 931 F. Supp. at 552.

That the content at issue here consists of television broadcasts, rather than printed news articles, has no bearing on the fair use analysis.[3] The Court ruled that TVEyes had greater leeway to copy television news broadcasts because they include not only the news itself but, "the presentations themselves, as colored, processed and criticized by commentators, and as abridged, modified and enlarged by news broadcasts." [Dkt. No. 86 at 18]. But these creative elements of television broadcasts are <u>exactly</u> what is <u>most</u> protectable under established copyright law. As the Second Circuit emphasized in *Wainright Secs. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1997): "What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of

---

[2] *See, e.g.*, *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 342 F.3d 191, 199 (3d Cir. 2003) (clip previews of movies); *Nihon Keizai Shimbun v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (abstracts of news articles); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (radio monitoring service); *Los Angeles News Serv. v. Tullo,* 973 F.2d 791, 797, 799 (9th Cir. 1992) (video news clipping service.); *Pacific & Southern Co., Inc. v. Duncan,* 744 F.2d 1490, 1496 (11th Cir.1984), *cert. denied*, 471 U.S. 1004 (1985) (TV news clipping service).

[3] There is no question that the television broadcasts are "original works of authorship fixed in [a] tangible medium of expression" and subject to the protections of the Copyright Act, 17 U.S.C. § 102.

words, and the emphasis he gives to particular developments. … the essence or purpose of legitimate journalism is the reporting of objective facts or developments, not the appropriation of the form of expression used by the news source." 558 F.2d at 95. Indeed, courts have long ruled that "expressive or creative" works have more protection than highly factual works, which are more vulnerable to application of a fair use defense. *See, e.g.*, *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006); *Meltwater*, 931 F. Supp. 2d at 557. The Court's above-referenced analysis is an incorrect approach that undermines the value of television news. As a precedent, the decision encourages the mass appropriation of news that was created at great cost, and sometimes risk, while at the same time eviscerates copyright owners' greatest commodity: control over content.

But even assuming, solely for purposes of this filing, that the indexing and clipping functions of TVEyes are transformative and constitute fair use as this Court previously held, the additional functions currently before the Court go far beyond the bounds of fair use. Even where courts have found an indexing or "search" function to qualify as fair use, they have based that finding on the understanding that the "snippet" or "search result" served up to the end user is too truncated, isolated, or degraded to serve the same informational or entertainment purpose as the original.

For example, in *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) (hereinafter "*HathiTrust*"), the Second Circuit found the HathiTrust's digital index to be a fair use where the search results in response to a user's query displayed only the number of hits for a particular search term within a work and indicated the pages where it appeared, but "d[id] not display to the user any text from the underlying copyrighted work (either in "snippet" form or otherwise)." *Id.* at 91 (emphasis added). Similarly, in *Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013), *appeal docketed*, No. 13-4829 (2d Cir. Dec. 23, 2013)(hereinafter

6

"*Google Books*"), the Southern District found the Google Books service to be a fair use based on the fact that Google Books "limits the amount of text it displays in response to a search" to short snippets of a few sentences from full-length books, and, in addition, "black-list[s]" portions of each book in an attempt to prevent or discourage users from using Google Books as a vehicle to read the full text of the work.  954 F. Supp. 2d at 287, 292-93.  Previous cases are in accord. *See, e.g., Perfect 10, Inc.*, 508 F.3d at 1156, 1164 (finding fair use where "reduced, lower-resolution versions" of copyrighted full-sized images were used as a "pointer" to the original work); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (holding that thumbnails in search engine did not substitute for the original artistic work because "the thumbnails are of much lower-resolution than the originals; any enlargement results in a significant loss of clarity of the image, making them inappropriate as display material"); *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 609-11 (2d Cir. 2006) (holding that display of images of posters in 480-page cultural history of the Grateful Dead was transformative, explaining that "[w]hile the small size [of the images of the posters] is sufficient to permit readers to recognize the historical significance of the posters, it is inadequate to offer more than a glimpse of their expressive value").

Here, in stark contrast, the TVEyes service is not simply an "index" that directs the user to the original content or even prompts it to purchase or license that content through available channels.  Instead, it operates as a one-stop shop, serving up to subscribing users lengthy, high-resolution segments of copyrighted broadcasts that it hosts on its own servers, and then allowing those users to download, save, share, email, and publicly post that copyrighted content for whatever purpose they choose, without any license from the copyright owner.  Notably, the Declaration of Plaintiff's expert, Beth Knobel, reveals that such redistribution is voluminous –

7

she documented tens of thousands of hyperlinks on social media platforms and other Internet websites that link to high definition video clips archived on TVEyes' servers, often for commercial uses, including video clips of some of *amici's* copyrighted content.

Moreover, it is not necessary for TVEyes to allow its subscribers to download the lengthy, high-resolution clips, distribute them to third parties, or post them publicly on the Internet in order to achieve its purported indexing purpose.  As the Second Circuit reiterated in *HathiTrust*, "a transformative use adds something new to the copyrighted work and does not merely supersede the purposes of the original creation."  *HathiTrust*, 755 F.3d at 101.  The high-resolution segments, which can be as long as ten minutes in length, easily serve as substitutes for the original: they allow both the TVEyes subscriber and further downstream users to watch the segment over and over as they would have watched the original, for its news and/or entertainment purpose, and not simply to learn that a certain word or company name was uttered.  (Indeed, these additional functions cast significant doubt on TVEyes' claim that it predominantly acts as an indexing service.)

The case law provides no basis for finding that it is a fair use for a commercial entity to sell lengthy segments of unlicensed, copyrighted works to subscribers without any restriction on their downstream uses.  To the contrary, such actions fall squarely within the clipping-service model for which courts have repeatedly rejected a defense of fair use.  *See, e.g., Meltwater*, 931 F. Supp. 2d at 637; *Video Pipeline, Inc.,* 342 F.3d at 199; *Nihon,* 166 F.3d at 72; *Infinity Broad. Corp.*, 150 F.3d at 108; *Tullo,* 973 F.2d at 797, 799; *Pacific & Southern Co., Inc.,* 744 F.2d at 1496.  Although TVEyes attempts to cloak itself in the potential downstream uses of its subscribers – such as commentary, news reporting, criticism, national-security monitoring – in a bid to defend its own business model, the law is clear that a commercial redistributor of content

8

cannot stand in the shoes of its users for purposes of the transformative-use test.  As the Second Circuit has ruled: "[I]t is [the defendant's] own retransmission of the broadcasts, not the acts of his end-users, that is at issue" in the fair-use analysis – and where, as here, "all [the defendant] does is sell access to unaltered [television] broadcasts," there is no transformative use.  *Infinity Broad. Corp.*, 150 F.3d at 108.  *See also Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (courts have "properly rejected attempts by for-profit users to stand in the shoes of their customers") (citing W. Patry, *The Fair Use Privilege in Copyright Law*, 420 n.34 (1985)).

II.     **By Allowing Its Customers to Download, Save and Distribute Substantial, High-Resolution Clips of Video and Audio Content, TVEyes Competes Directly With – And Diverts Revenue From – Rights-Holders Such as *Amici* in a Valuable Market They Are Actively Exploiting**

Clips and short segments of published content provide a meaningful source of revenue for *amici* and other media organizations, both in the form of licensing fees and in revenue from advertising displayed on or near the original content segments.  Unlike segments available for viewing on a network's website or its YouTube page, however, segments downloaded from TVEyes do not provide analytics to the content owner about the number of views or shares – vital currency for digital publishers who carefully track uptake of content in order to set advertising rates.  Nor can the content owner display advertising or otherwise receive revenue from the public display of its copyrighted content when downloaded through TVEyes.

For example, on a daily basis, *amicus* CNN displays multiple segments from its broadcast programs on its website, as well as through its live-streaming service, CNNGo.  When people view videos or stories on its website, or share them with social networks through enabled sharing functions, CNN receives web traffic and resulting advertising revenue.  But when a TVEyes subscriber shares a segment of a CNN broadcast that it downloaded through TVEyes—which

9

can be exactly the same content already available through CNN's services—the resulting views are not linked or reported back to CNN, resulting in lost advertising dollars.

To be clear, *amici* do not argue that there is no social utility to markets for redistributed broadcast content. Such markets exist, and *amici* are active participants in them. But what TVEyes does is different: its business model consists of delivering other parties' copyrighted news and entertainment content to its paying corporate customers, while avoiding both the costs of creating that content and the costs of licensing it from those who do. In other words, it "profit[s] from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 562 (1985). But "[t]he fair use doctrine is not a license for corporate theft." *Iowa State Univ. Research Found., Inc. v. Am. Broad. Co., Inc.*, 621 F.2d 57, 61 (2d Cir. 1980). The clipping services in whose shoes TVEyes follows have always been required to compensate copyright owners when they delivered clips to their paying subscribers, whether on a per-clip basis or through a flat license fee. TVEyes is no different, and should be held to the same standard on which the television industry has always relied.

Nor is it relevant, and most certainly not determinative, that TVEyes produces a service that is useful for its subscribers. As the Second Circuit made adamantly clear in *HathiTrust*, "Added value or utility is not the test: a transformative work is one that serves a new and different function from the original work and is not a substitute for it." 755 F.3d at 96. TVEyes offers the very substitute prohibited by the law; it merely repackages other companies' news clips and enables its subscribers to further redistribute them, directly substituting for the original works.

In sum, the uses that TVEyes wants to grant to its downstream users – the ability to copy, save, and publicly display content – are at the center of the bundle of rights granted to copyright

10

owners in the Copyright Act, and they unquestionably command value in the marketplace. Allowing downstream users to download, archive, save, and publicly display copyrighted works without license under the guise of fair use effectively eviscerates this bundle of rights, and would cause significant market harm to *amici* and others similarly situated. *Amici* therefore urge this Court to grant Fox News' renewed motion for summary judgment.

Dated: New York, New York
       May 22, 2015

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:    s/ Elizabeth McNamara
Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
1633 Broadway
New York, NY 10019
Tel: 212-489-8230
Fax: 212-489-8340

Attorneys for *Amici Curiae*