**<u>HIGHLY CONFIDENTIAL</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOX NEWS NETWORK, LLC,

               Plaintiff,

     - against -

TVEYES, INC.,

               Defendant.

Case No.  13-CV-5315 (AKH)

**DEFENDANT TVEYES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE REMAINING ISSUES IDENTIFIED IN THE COURT'S SEPTEMBER 9, 2014 ORDER**

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................... 1

PROCEDURAL HISTORY ........................................................................... 2

FACTUAL BACKGROUND .......................................................................... 7

    A.    Overview Of TVEyes' Service. .................................................... 8

    B.    TVEyes' Users. ........................................................................... 9

    C.    TVEyes' Internal Use Restrictions. ......................................... 9

    D.    The Works-In-Suit. .................................................................. 11

    E.    TVEyes' Saving, Emailing, And Downloading Features. ...... 12

        1.    Saving TVEyes Clips. ................................................... 13

        2.    Emailing TVEyes Clips. ............................................... 14

        3.    Downloading TVEyes Clips. ......................................... 14

    F.    TVEyes' Date And Time Search Feature. .............................. 15

    G.    Fox News' Derivative Businesses. .......................................... 16

        1.    The Fox News Website. ................................................ 16

        2.    Fox News' TV Everywhere & Fox News Go Services. ................ 17

        3.    Fox News' Clip Licensing Business. ............................ 17

I.    LEGAL STANDARD ............................................................... 19

II.    THE SAVING, EMAILING, DOWNLOADING AND DATE AND TIME SEARCH FEATURES ARE INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSE ........................................................ 19

    A.    Saving Is Integral To TVEyes' Transformative Purpose. .................... 20

    B.    Emailing Is Integral To TVEyes' Transformative Purpose. ................. 23

    C.    Downloading Is Integral To TVEyes' Transformative Purpose ........... 24

    D.    The Date/Time Search Feature Is Integral To TVEyes' Transformative Purpose ........................................................... 27

    E.    The Saving, Emailing, Downloading, And Date And Time Search Features Provide A Tremendous Public Benefit ................................. 31

III.    FOX'S DERIVATIVE BUSINESSES ARE NOT THREATENED BY TVEYES' SAVING, EMAILING OR DOWNLOADING FEATURES ............ 33

    A.    Fox News' Fox News Go And TV Everywhere Businesses Are Not Threatened By TVEyes' Saving, Emailing, or Downloading Features. ................................................................. 35

    B.    Fox News' Website Businesses Are Not Threatened By TVEyes' Saving, Emailing, or Downloading Features. ......................... 37

    C.    Fox News' Clip Licensing Business Is Not Threatened By TVEyes' Saving, Emailing, or Downloading Features ............................ 41

IV.    THE ABILITY TO POST CLIPS PUBLICLY IS NOT INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSE ..................................... 44

CONCLUSION ................................................................................ 47

HIGHLY CONFIDENTIAL

## TABLE OF AUTHORITIES

**Page**

### Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................... 19

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) ............................................... 3, 5, 27, 33, 34

*Bell v. Metro. Transp. Auth.*,
   No. 12 Civ. 1235(AKH), 2013 WL 8112461 (S.D.N.Y. Nov. 1, 2013).................... 19

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)................................................................ 34

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp, Inc.*,
   150 F.3d 132 (2d Cir. 1998)................................................................ 34

*Fox News Network, LLC v. TVEyes, Inc.*,
   43 F. Supp. 3d 379 (S.D.N.Y. 2014) ...............................................*passim*

*Gallo v. Prudential Residential Servs., L.P.*,
   22 F.3d 1219 (2d Cir. 1994)................................................................ 19

*Harlen Assocs. v. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001)................................................................ 19

*N. Jersey Media Grp. Inc. v. Jeanine Pirro and Fox News Network, LLC*,
   No. 13-cv-7153 (ER)........................................................................ 46

*Roe v. City of Waterbury*,
   542 F.3d 31 (2d Cir. 2008)................................................................ 19

*Sony Corp. of Am. v. Universal City Studios*,
   464 U.S. 417 (1984) .................................................................... 33, 34

### Statutes

17 U.S.C. §107.................................................................... 2, 3, 4, 34

**HIGHLY CONFIDENTIAL**

## PRELIMINARY STATEMENT

This Court has already held that allowing subscribers to search for and view clips of Fox News programming on TVEyes is a fair use.  The Court should now hold that allowing subscribers to save, email and download these clips is fair because these functions are necessary to effectively research and monitor television broadcasts.  Without the ability to save clips, journalists and political campaigns could not compare and contrast statements made on television today with those made six months ago.  Without the ability to email, White House interns and Congressional staffers could not share clips with their supervisors.  Without the ability to download, business executives could not view clips off-line when an Internet connection is not available.  The ability to locate and view clips alone is not enough to effectively research and monitor television broadcasts; subscribers must be able to use and share the information they find.

This Court should also hold that TVEyes' Date and Time Search feature, which allows subscribers to search for a clip by the date, time and channel on which it aired, is a fair use as well.  Without it, clients would not be able to locate clips in circumstances when keyword search functionality is ineffective—for example, where closed-captioning data is absent, incorrect or incomplete, or where the subscriber is searching for an image and not a spoken word.  The Date and Time Search feature makes TVEyes' search engine more comprehensive, which in turn makes clients' media monitoring more accurate and complete: it enables subscribers to find **_anything_** that was broadcast on television.

Not only are these features central to TVEyes' purpose as a comprehensive searchable database of broadcast content, they directly contribute to the tremendous public benefit derived from TVEyes' service.  Each one of these features, for example, enable journalists to comment on and criticize broadcast news channels, financial firms to track and archive public statements, police

HIGHLY CONFIDENTIAL

departments to review past public safety statements to compare their efficacy to later ones, and the White House to give timely feedback to the press corps.  The public interest weighing in favor of fair use is strong.  On the other hand, there is no evidence that Fox News has suffered any cognizable market harm as a result of these features.  Just 21 clips from the Works-in-Suit were downloaded by TVEyes clients, 7 clips were permanently saved, and 6 clips were emailed through the service—almost entirely by journalists, elected officials, national political parties and political campaigns.  There is nothing in the record that even remotely suggests that any of these substituted for those on the Fox News Website or licensed by Fox News through its agents.

In sum, the supplemented record confirms that the saving, emailing, downloading and Date and Time Search features of the TVEyes service are necessary and natural extensions of the highly transformative research database that this Court has found to be a fair use.  Moreover, the record makes clear that that these features have no material effect on Fox News' derivative businesses.  The Court should therefore grant TVEyes' motion for summary judgment.

## PROCEDURAL HISTORY

On July 30, 2013, Fox News filed this action against TVEyes alleging, *inter alia*, that TVEyes' media-monitoring service infringed Fox News' federal copyrights in 19 individual hour-long programs (the "Works-in-Suit" or the "Works").[1]  The parties cross-moved for summary judgment, primarily addressing whether TVEyes'

---

[1]   The 19 Works-in-Suit are: two episodes of *On the Record with Greta Van Susteren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*; two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in Benghazi.  Id.* at 387 n.3.

**HIGHLY CONFIDENTIAL**

use of Fox News' copyrighted content for the purpose of creating a comprehensive searchable database of video clips was a fair use under 17 U.S.C. §107.

On September 9, 2014, this Court issued an Order and Opinion, *see Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379 (S.D.N.Y. 2014) (hereinafter "*Order*"), which in large part granted TVEyes' motion and denied Fox News' motion. After setting forth the relevant facts, the Court held that the creation of a comprehensive, searchable database (including content collected from FNC and FBN), and the provision of video clips to TVEyes' subscribers, are protected fair uses.[2]

As to the first fair use factor—"the purpose and character of the use," 17 U.S.C. §107(1)—the Court held:

- "The service provided by TVEyes, indexing and collecting visual and audio images, allows subscribers to categorize, not only content in the response to key search words, but also 'information [that] may be just as valuable to [subscribers] as the [content], since a speaker's demeanor, tone, and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show.'" *Order* at 392 (quoting *Swatch Grp. Mgmt. Ltd. v. Bloomberg L.P.,* 756 F.3d 73, 84 (2d Cir. 2014)).

- "TVEyes is transformative .... By indexing and excerpting all content appearing in television, every hour of the day and every day of the week, month, and year, TVEyes provides a service that no content provider provides." *Id.*

- "Subscribers to TVEyes gain access, not only to the news that is presented, but to the presentations themselves, as colored, processed, and criticized by commentators, and as abridged, modified, and enlarged by news broadcasts." *Id.* at 392-93.

- "TVEyes … creates a database of otherwise unavailable content. … [W]ithout TVEyes, this information cannot otherwise be gathered and searched. That, in and of itself, makes TVEyes' purpose transformative." *Id.* at 393.

- "The clips … are integral to TVEyes' service of monitoring and reporting on all the news and opinions presented by all television

---

[2]   In addition, the Court dismissed Fox News' "hot news" and state law misappropriation claims as preempted by the Copyright Act. *See Order* at 398-400.

**HIGHLY CONFIDENTIAL**

and radio stations.  Without these excerpted video clips, TVEyes' users could not receive the full spectrum of information identified by an index, for the excerpt discloses, not only what was said, but also how it was said, with subtext body language, tone of voice, and facial expression—all crucial aspects of the presentation of, and commentary on, the news." *Id.*

- "TVEyes' search engine together with its display of result clips is transformative, and 'serves a new and different function from the original work and is not a substitute for it.'" *Id.* (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)).

- "TVEyes' evidence, that its subscribers use the service for research, criticism, and comment, is undisputed and shows fair use as explicitly identified in the preamble of the statute.  17 U.S.C. §107." *Id.*

As to the fourth fair use factor—"the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. §107(4)—the Court held:

- "Fox News' allegations assume that TVEyes' users actually use TVEyes as a substitute for Fox News' channels.  Fox News' assumption is speculation, not fact." *Order* at 395.

- After analyzing undisputed metrics of how TVEyes' subscribers actually use TVEyes, "[t]here is no basis for Fox News' alleged concern that TVEyes' subscribers are likely to watch ten minute clips sequentially in order to use TVEyes as a substitute for viewing Fox News' programming on television." *Id* at 396.

- "No reasonable juror could find that people are using TVEyes as a substitute for watching Fox News broadcasts on television.  There is no history of any such use, and there is no realistic danger of any potential harm to the overall market of television watching from an 'unrestricted and widespread conduct of the sort engaged in by defendant." *Id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)).

- Fox's "entire revenue … between July 1, 2012 and June 30, 2013, is ▮▮▮▮▮▮▮▮▮ from syndication partners and ▮▮▮▮▮▮▮▮ from the licensing of clips, ▮▮▮▮▮▮▮▮▮▮▮▮ of its overall revenue.  In light of this very small possible impact, any, 'cognizable market harm' that can occur is likely to be outweighed by the public benefit arising from TVEyes' services." *Id.* (quoting *Campbell*, 510 U.S. at 590 at n.21).

- "Without TVEyes, there is no other way to sift through more than 27,000 hours of programming broadcast on television daily, most of which is not available online or anywhere else, to track and discover information." *Id.* at 396-97.

HIGHLY CONFIDENTIAL

- "Clearly, TVEyes provides substantial benefit to the public." *Id.* at 397.

- Thus, the fourth factor "does not weigh against a finding of fair use, especially when the de minimis nature of any possible competition is considered in comparison to the substantial public service TVEyes provides." *Id.*

The Court then balanced the four fair use factors[3] and weighed them together, "'along with any other relevant considerations, in light of the purposes of the copyright law.'" *Id.* (quoting *Authors Guild, Inc. v. Google Inc.,* 954 F. Supp. 2d 282, 293 (S.D.N.Y. 2013) (Chen, J.)). In doing so, the Court held:

- "TVEyes captures and indexes broadcasts that otherwise would be largely unavailable once they aired. Users access the clips and snippets for an altogether different purpose—to evaluate and criticize broadcast journalism, to track and correct misinformation, to evaluate commercial advertising, to evaluate national security risks, and to track compliance with financial market regulations." *Id.*

- "TVEyes' service provides social and public benefit and thus serves an important public interest." *Id.*

The Court concluded that TVEyes' (1) capturing of the entirety of FNC and FBN broadcast content, (2) indexing of that content into a research database, and (3) enabling of its subscribers to view clips of searched-for FNC and FBN content, are protected fair uses.[4] *Order* at 397.

While the Court held that TVEyes' capturing and indexing of FNC and FBN content, and providing video clips from search results to subscribers, were fair uses, the Court reserved its judgment on certain **other** features of TVEyes' service:

---

[3]   The Court held that the second and third factors weighed neither for nor against a finding of fair use. *Order* at 394.

[4]   Fox did not move for reconsideration on any of the factual or legal findings in the Court's September 9 Order and Opinion; thus, Fox cannot now challenge any of those finding in this current round of supplemental briefing. *See* SDNY L.R. 6.3 (notice of motion for reconsideration "shall be served within fourteen (14) days after entry of the Court's determination of the original motion").

HIGHLY CONFIDENTIAL

> TVEyes provides features that allow subscribers to **save**, **archive**, **download**, **email**, and **share** clips [via social media] of Fox News' television programs. The parties have not presented sufficient evidence showing that these features either are integral to the transformative purpose of indexing and providing clips and snippets of transcript to subscribers, or threatening to Fox News' derivative businesses.
>
> Similarly, neither party is entitled to summary judgment on the issue of whether the **date and time search function**, allowing its subscribers to search for television clips by date and time instead of by keyword or term, is integral to the transformative purpose of TVEyes and its defense of fair use. While the evidence shows that this feature does not pose any threat of market harm to Fox News, the record fails to show that it is crucial or integral to TVEyes' transformative purpose.

*Order* at 397-98 (emphases added). The Court concluded that "[t]he factual record should be developed further before I can decide this issue." *Id.* at 398.[5] As a result, two narrow issues now remain before the Court:

(1) Whether the ability to save, archive, download, email, or share clips—or use the Date and Time Search function to locate clips—is "crucial or integral" to TVEyes' transformative purpose of indexing and providing clips to its users; and

(2) Whether the ability to save, archive, download, email, or share clips is "threatening to Fox News' derivative business."

The Court permitted the parties to each take a Rule 30(b)(6) deposition "confined to the questions I ruled that I could not decide." (Dkt. 92 at 2:12-16). The Court also permitted the parties to submit expert reports "again confined to the questions that I could not resolve in my decision." (*Id.* at 3:12-14). The parties exchanged expert reports—Fox News submitted the report of Beth Knobel (Dkt. 100) and TVEyes submitted the expert report of Stuart Karle (Dkt. 106) ("Karle

---

[5] The Court later reiterated: "The record must be further developed … before I can determine whether or not the features that allow searches by date and time, and that allow clips to be archived, downloaded, emailed, and shared via social media are integral services and protected by a fair use defense." *Order* at 400.

**HIGHLY CONFIDENTIAL**

Report," attached as Exhibit YYYY to Mr. Karle's declaration).[6]  Both experts were then deposed.[7]

## FACTUAL BACKGROUND

In its earlier briefing, TVEyes presented to the Court a detailed description of TVEyes' service, including: (1) TVEyes' clients; (2) TVEyes' research-oriented features; (3) the ways in which customers use TVEyes; (4) the benefits TVEyes provides; (5) metrics regarding the Works-in-Suit; and (6) a walk-through of TVEyes' service, complete with screenshots.  (*See* Dkt. 51 at 3-19).  For the convenience of the Court, TVEyes provides a brief summary of its system before addressing the particular features about which the Court has requested supplemental information.[8]

---

[6]  Stuart Karle is an expert in the business of digital journalism and news distribution.  He has worked in the news industry for over 20 years, and has expertise in the economics of news distribution and how news organizations and other businesses make money from distributing information and news digitally.  He is also experienced in the practices employed by journalists in gathering and writing about news—he has supervised and counseled journalists on best practices for researching, gathering, editing, and reporting news, including as Vice President and General Counsel at *The Wall Street Journal* and as Chief Operating Officer at Reuters.  *See* Karle Decl. ¶¶3-9.

[7]  The parties also stipulated, and the Court so ordered, that they would forgo the submission of statements pursuant to SDNY L.R. 56.1.  [*See* Dkt. 101].

[8]  TVEyes' submissions accompanying this brief include: (1) the declaration of David Ives dated May 20, 2015 ("**4th Ives Decl.**"); (2) the declaration of David Seltzer dated May 20, 2015 ("**4th Seltzer Decl.**"); (3) the declaration of Jessica A. Rose dated May 21, 2015 ("**3d Rose Decl.**"); and (4) the declaration of Stuart Karle dated May 20, 2015 ("**Karle Decl.**").  In addition, TVEyes respectfully incorporates its earlier submissions to the extent they are helpful to the Court's resolution of the remaining questions.  These submissions include: (1) the declarations of David Ives dated June 26, 2014 ("1st Ives Decl."), July 23, 2014 ("2d Ives Decl."), and August 6, 2014 ("3d Ives Decl."); (2) the declarations of David Seltzer dated June 25, 2014 ("1st Seltzer Decl."), July 23, 2014 ("2d Seltzer Decl."), and August 6, 2014 ("3d Seltzer Decl."); (3) the declarations of Jessica A. Rose dated June 26, 2014 ("1st Rose Decl.") and July 24, 2014 ("2d Rose Decl."); and (4) the declarations of Todd Anten dated June 26, 2014 ("1st Anten Decl.") and July 24, 2014 ("2d Anten Decl.").

**HIGHLY CONFIDENTIAL**

A.    **Overview Of TVEyes' Service.**

TVEyes is a media-monitoring service that enables its subscribers to discover and locate mentions of particular words or phrases of interest uttered on almost every major television and radio broadcast in the United States. *Order* at 383; 1st Ives Decl. ¶2. TVEyes does this by: (1) capturing television and radio content from more than 1,400 channels, 24 hours a day, 7 days a week; (2) creating a massive database of that content through the use of closed captions and proprietary speech-to-text technology; and (3) allowing subscribers to view snippets of video content in response to their search queries. *Order* at 383; 1st Ives Decl. ¶¶2, 4; 1st Seltzer Decl. ¶3. TVEyes captures about 27,000 hours of television broadcast content every day, exactly as it was broadcast. *Order* at 393, 396-97; 1st Seltzer Decl. ¶4.

"TVEyes is the only service that creates a database of ***everything*** that television channels broadcast, twenty-four hours a day, seven days a week." *Order* at 393. In so doing, TVEyes offers a unique and important service by creating from scratch a searchable library of television broadcast content ***that would otherwise not exist***, and making it available to subscribers for the purpose of conducting internal research and analysis. *Id.* at 396. Without a service like TVEyes, the only way for a user to reliably learn how particular words or phrases were mentioned on television would be to continuously watch every single station on television every day, twenty-four hours a day—an impossible task. *Order* at 384; 1st Ives Decl. ¶5; Karle Report ¶¶84, 175-176. As this Court recognized: "Without TVEyes, there is no other way to sift through more than 27,000 hours of programming broadcast on television daily, most of which is not available online or anywhere else, to track and discover information." *Order* at 396-97.

HIGHLY CONFIDENTIAL

## B.   TVEyes' Users.

TVEyes is offered for professional purposes only—for example, to corporations, news organizations, and politicians—and is not available to the general public.  *Order* at 385; 1st Ives Decl. ¶6.  As of October 2013, TVEyes had over 2,200 subscribers, including the White House, 100 members of Congress, various governmental bodies, and journalists ████████████████████████ ██████████████.  *Order* at 385; 1st Ives Decl. ¶9.  Most TVEyes subscribers pay a fee of $500 per month for access to TVEyes' service, although select subscribers, such as non-profits or journalists, may receive reduced rates.  1st Ives Decl. ¶16.

Content captured by TVEyes is automatically saved and made searchable for up to 32 days from the date it was first broadcast.  *Order* at 384-85, 395; 1st Seltzer Decl. ¶¶5, 42.  All video files, other than those permanently saved or downloaded by users, are deleted from TVEyes servers 32 days after they are captured.  *Order* at 395; 1st Seltzer Decl. ¶5.

As noted in greater detail below, in addition to viewing clips, TVEyes users are also able to save, share by email, and download to their personal computers clips generated by their searches.  *See infra* Part E; *Order* at 385.  All such clips are limited to a maximum of 10 minutes in length; however, 95% of all video clips played on TVEyes are 3 minutes or shorter in length, 91% are 2 minutes or shorter, and 82% are one minute or shorter.  *Order* at 396; 1st Seltzer Decl. ¶35.  Further, less than 0.08% of clips are ever played the maximum time of 10 minutes.  *Order* at 385, 396; 1st Seltzer Decl. ¶35.

## C.   TVEyes' Internal Use Restrictions.

TVEyes places restrictions on how its clients may use video clips obtained from the service, and warns its subscribers of these restrictions in multiple ways.

HIGHLY CONFIDENTIAL

***First***, all TVEyes subscribers are required to accept a contractual limitation in a User Agreement, limiting any use of clips obtained through TVEyes to internal purposes only. *Order* at 385; 1st Ives Decl. ¶7 & Ex. A; Karle Report ¶¶90, 126, 130.

***Second***, when a user seeks to download a clip, TVEyes' website displays a notice that such material may be used only for internal review, analysis or research. This notice, which appears on TVEyes' Download Page, states:

> **Important Note: Material supplied by TVEyes, Inc. may be used for internal review, analysis or research only.   Any editing, reproduction, publication, rebroadcasting, public showing or public display is forbidden.**

1st Ives Decl. ¶8 & Ex. B; *Order* at 385.

***Third***, TVEyes customer service staff—who communicate on a regular basis with TVEyes users to offer technical support, answer questions, run searches, and run reports, among other services—routinely remind clients in email and telephonic communications that clips obtained through TVEyes may be used only for internal review, research and analysis. *Order* at 385; 1st Ives Decl. ¶8 & Ex. C; 2d Ives Decl. ¶17; 4th Ives Decl. ¶27;  Karle Report ¶136 & Ex. 11.

***Fourth***, TVEyes blocks users from trying to play or download more than 25 minutes of sequential content from a single station. *Order* at 385; 2d Seltzer Decl. ¶7.  TVEyes has also developed and implemented "circuit breakers," which help to prevent TVEyes clips from being widely disseminated.  2d Seltzer Decl. ¶¶15-16; 4th Seltzer Decl. ¶13; 2d Ives Decl. ¶19.[9] ███████████████████

---

[9] 

**HIGHLY CONFIDENTIAL**

███████████████████████████████████████████████████

███████████████████████████████████████████████ 4th

Seltzer Decl. ¶16.

*Fifth*, when TVEyes' clients request permission to post video clips to the Internet, TVEyes refers them to the broadcaster to obtain whatever rights might be necessary, or informs them that certain broadcasters (such as C-SPAN) allow video clips to be publicly posted under certain circumstances.  *Order* at 385; 2d Ives Decl. ¶12 & Ex. TTT; 4th Ives Decl. ¶28 & Exs. DDDDD & EEEEE.

### D.  The Works-In-Suit.

Fox News alleges that TVEyes infringed its rights under federal copyright law in 19 individual hour-long programs.  *Order* at 387.  These Works-in-Suit were initially broadcast on FNC between October 16, 2012 and July 3, 2013.  (Dkt. 60, ¶72).

Over the entirety of the 32 days that each Work-in-Suit was available for searching and viewing on TVEyes, there were a total of 560 plays of clips from the Works-in-Suit.  *Order* at 395; 1st Seltzer Decl. ¶43.  The average play-length for these 560 clips was 53.4 seconds.  *Order* at 395; 1st Seltzer Decl. ¶44.  Further, 85.5% of these clips played for less than one minute, 76% played for less than 30 seconds, and 51% played for less than 10 seconds.  *Order* at 395; 1st Seltzer Decl. ¶45.

A combined total of 61 users played these 560 clips. Descriptions of these users are set forth below:

_____

████████████████████████████████████████████████████

████████████████████████████████████████████

HIGHLY CONFIDENTIAL

| TVEyes Clients | Number of Views |
|---|---|
| Journalists/Publications | 145 |
| Political campaigns (national and local) | 145 |
| National political parties/Conventions/Committees | 88 |
| The White House | 42 |
| Elected officials and staff (*e.g.*, senators, congresspersons and governors) | 41 |
| Political advocacy groups/lobbies/Super PACs | 28 |
| Policy institutes/Think tanks | 22 |
| Strategic communications/Public relations firms | 20 |
| U.S. Military/U.S. Department of Defense | 19 |
| Radio productions | 7 |
| State police departments | 3 |
| **Total** | **560** |

4th Seltzer Decl. ¶5. Thus, the vast majority of TVEyes subscribers who played clips from the Works-in-Suit were journalists or political or governmental organizations.

**E.** **TVEyes' Saving, Emailing, And Downloading Features.**

In addition to viewing clips directly on TVEyes' website, subscribers are able to: (1) save clips; (2) share clips by email; and (3) download clips to their personal computers. *Order* at 385; 1st Seltzer Decl. ¶19. All of these features are subject to the Internal Use Restrictions discussed above. *See supra* Part C.

As described in greater detail below, *see infra* Part II.A-C, each of these features is integral to, and indeed is a natural extension of, TVEyes' functioning as a comprehensive research database of television content. To conduct research and analysis, users must be able to ***save*** the results of their searches to view at a later time (as any good researcher should when collecting information), ***share*** those results with colleagues in their organizations (who may need to view the clip but do not have direct access to the TVEyes service themselves or do not know how to use it), and ***download*** those clips (so that the user does not have to be connected to the

**HIGHLY CONFIDENTIAL**

Internet to view them, or can organize clips together with other materials not from TVEyes).

### 1.   *Saving TVEyes Clips.*

TVEyes allows its users to save clips they have located so that they can view them at a later date in a number of ways:

***First***, whenever a clip is identified and generated by TVEyes from a keyword or phrase (a "Watch Term") on a user's Watchlist, that clip is ***automatically saved*** by TVEyes for 32 days from the date of initial broadcast.  4th Seltzer Decl. ¶6; 1st Seltzer Decl. ¶7.  Saving clips for 32 days is so essential to the purpose of TVEyes that this functionality is entirely automated and does not require the user to take any additional steps beyond selecting a keyword to monitor.

***Second***, a user may save a 90-second clip by clicking the "save clip" button on a Transcript Page.  Clips saved using this method are available on TVEyes' servers for only seven days after they are saved.  If the user downloads a clip using this method, the clip is deleted from TVEyes' one hour after it is downloaded.  4th Seltzer Decl. ¶6.  This type of saving is useful when the user knows that the information needed is contained within the first 90 seconds of the clip.

***Third***, a user may create a clip with a precise start and end time using the Clip Editor.  Video clips that are edited in this manner may be saved ***permanently*** in the user's Media Center.  In other words, clips saved by this method will not be deleted from TVEyes' system after 32 days (unlike clips that are automatically maintained by TVEyes, which are deleted after 32 days as a matter of course).  4th Seltzer Decl. ¶6.

A total of seven clips from the Works-in-Suit were permanently saved by TVEyes subscribers to their Media Centers.  4th Seltzer Decl. ¶7.  The play length of these saved clips are: 44 seconds, 58 seconds, 61 seconds, 64 seconds, 74 seconds,

HIGHLY CONFIDENTIAL

86 seconds, and 398 seconds.   4th Seltzer Decl. ¶7.  That is, six of the seven clips permanently saved from the Works-in-Suit were less than 90 seconds long.

### 2.     *Emailing TVEyes Clips.*

TVEyes allows a subscriber to send an email to work colleagues containing a link to a clip on TVEyes.  This can be done by either: (1) clicking the "Email View/Transcript Page" button at the top of the Transcript Page; or (2) copying the URL at the top of a Transcript Page and pasting it into an email.  4th Seltzer Decl. ¶8.

A total of four TVEyes users emailed a combined total of six video clips from the Works-in-Suit using the "Email View/Transcript Page" button.  Descriptions of these users are below:

| TVEYES CLIENTS | NUMBER OF EMAILS |
|---|---|
| National political parties/Conventions/Committees | 6 |

4th Seltzer Decl. ¶9.

### 3.     *Downloading TVEyes Clips.*

TVEyes enables its subscribers to download clips onto the hard drive of a computer or other device (like a smart phone, or tablet computer like an iPad).  This downloading function allows the user to view clips off-line, without an Internet connection and/or without logging on to TVEyes' website.  4th Seltzer Decl. ¶10. For example, if the user does not have robust Internet connectivity, or if the user is no longer a client of TVEyes, the user can still view clips she previously downloaded.  4th Ives Decl. ¶15; Karle Report ¶52.  The downloading function is fundamentally just another way to save a clip for longer than 32 days, only instead of being saved on TVEyes' system, the clip is saved on the user's own computer or device.  4th Ives Decl. ¶20; Karle Report ¶58.

14

**HIGHLY CONFIDENTIAL**

A total of fifteen TVEyes users downloaded a combined total of 21 video clips from the Works-in-Suit.  Descriptions of these users are below:

| TVEYES CLIENTS | NUMBER OF DOWNLOADS |
|---|---|
| Journalists/Publications | 11 |
| Elected officials (*e.g.*, U.S. Congress) | 5 |
| Political campaigns | 3 |
| U.S. Department of Defense | 1 |
| Public relations firm | 1 |
| TOTAL | 21 |

4th Seltzer Decl. ¶11.  In other words, 20 of the 21 clips downloaded from the Works-in-Suit were downloaded by journalists or political or governmental organizations.

## F.   TVEyes' Date And Time Search Feature.

As an alternative to keyword searches, TVEyes also offers a feature called "Date and Time Search" that enables users to find and view clips that aired at a particular time (within the past 32 days) on a particular station.  *Order* at 386; 1st Seltzer Decl. ¶26; 4th Ives Decl. ¶21; Karle Report ¶60.  The Date and Time Search tool is necessary when a keyword search cannot return the desired result—for example, if (1) the closed caption text contains spelling errors, is incorrect, or is entirely absent; (2) the user is interested in a graphic or image and not a spoken word; (3) the user needs to compare the content that aired at a particular time across various stations; or (4) the user seeks in the market viewership or publicity data associated with a particular channel at a particular time.  4th Ives Decl. ¶21; Karle Report ¶¶61-67.

Most clips on TVEyes are returned in response to keyword searches—fewer than 5.5% of all plays originate from a Date and Time Search.  *Order* at 396; 1st

HIGHLY CONFIDENTIAL

Seltzer Decl. ¶39.   The Date and Time Search functions primarily as a supplementary tool for when keyword searching is inadequate.

**G.      Fox News' Derivative Businesses.**

Fox News has identified three derivative businesses that it claims are threatened by TVEyes' saving, emailing, and downloading features:  (1) Fox News' authorized digital platforms, such as the Fox News website; (2) Fox News' TV Everywhere and Fox News Go services; and (3) Fox News' traditional clip-licensing business.

**1.      *The Fox News Website.***

Fox News' website is located at http://www.foxnews.com (the "Fox News Website").

Unlike TVEyes, the Fox News Website is a consumer-oriented product, designed for personal use only.   Karle Report ¶35. The website's Terms of Service expressly prohibit use of the site for commercial purposes, and prohibits visitors from downloading video clips.  *Order* at 387; 1st Rose Decl. ¶12 & Ex. HH (Fox News Website Terms of Service).

**HIGHLY CONFIDENTIAL**

### 2. *Fox News' TV Everywhere & Fox News Go Services.*

Fox News' TV Everywhere service allows users who subscribe to cable television to watch Fox News' channels live on their computer screens via the Fox News Website.  Fox News Go provides functionality very similar to the TV Everywhere service—it enables cable subscribers to watch Fox News channels live from their desktops, tablet computers or smart phones.   Neither TV Everywhere nor Fox News Go are search engines like TVEyes.   Neither has keyword search or other media monitoring functionality.  These services simply allow people to watch television from their desktops, laptops, tablet computers or phones as they would watch on their television sets at home. *See* Karle Report ¶¶103-108.

### 3. *Fox News' Clip Licensing Business.*

Both directly and through its licensees, ITN Source and Executive Interviews, Fox News licenses content previously aired on FNC and FBN to third parties for use in connection with the production of television shows, movies, advertisements, video games, film festivals, e-books and other projects.  1st Rose Decl. ¶3 & Ex. M (all Fox News, ITN Source, and Executive Interviews clip licensing revenues); 1st Anten Decl. Ex. JJJ (ITN Source marketing materials).  Clips licensed through Fox News are expensive, costing anywhere ████████████████.  *See, e.g.,* Declaration of Elizabeth Ashton, dated June 26, 2014, ¶17.  Between July 1, 2012 and June 30, 2013, Fox earned ███████████ from this business, ***all*** of which was from ████████████████████ ███ ███.  Order at 396; Rose Decl. ¶¶ 2-3.  Fox News has introduced no evidence that ███████████ █████████████████████████████████ ███ ███ ███████████████ ██████ ███.  1st Rose Decl. ¶¶2-3 & Ex. M.  Nor has Fox News ever licensed ████████████████████.

**HIGHLY CONFIDENTIAL**

*Id.*; 1st Anten Dec. Ex. LLL (deposition of Andrew Williams 192:12-19); 3d Rose
Decl. ¶9 & Ex. MMMMM (deposition of Jeff Misenti at 269:15-20).



HIGHLY CONFIDENTIAL

## ARGUMENT

### I.   LEGAL STANDARD

"A motion for summary judgment shall be granted where the pleadings and supporting documents show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Order* at 388 (quoting Fed. R. Civ. P. 56(a)).   The Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).

That being said, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).   Thus, "the non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion," *Bell v. Metro. Transp. Auth.*, No. 12 Civ. 1235(AKH), 2013 WL 8112461, at *1 (S.D.N.Y. Nov. 1, 2013) (Hellerstein, J.) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).   Further, "the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case," *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).   Finally, even where admissible evidence is presented by the non-movant, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### II.   THE SAVING, EMAILING, DOWNLOADING AND DATE AND TIME SEARCH FEATURES ARE INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSE

This Court held that the ability to search for and view FNC and FBN clips on TVEyes is a fair use because these acts are transformative and they do not cause legally cognizable market harm to Fox News. *Order* at 392-93, 396-97.   The saving,

HIGHLY CONFIDENTIAL

emailing, and download functions of TVEyes also should be protected because, as discussed below, TVEyes' transformative database cannot be fully leveraged for research and media-monitoring. Likewise, the Date and Time Search function should be protected because it provides an alternative way to locate clips when keyword searching cannot do so: such as when closed captioning is not present, is incomplete, or is in error; or when the clip is sought for a graphic element that appears only in the visual component of a broadcast. The saving, emailing downloading and Date and Time Search features are not ancillary or superfluous to TVEyes' service; rather, they are critical components that make it possible for clients to research and monitor television broadcasts effectively.

### A.     Saving Is Integral To TVEyes' Transformative Purpose.

Allowing users to save clips is integral to monitoring, researching and analyzing television broadcasts. In fact, the ability to save clips is so essential to TVEyes that it was built directly into the service: clips generated from user's keyword searches are ***automatically*** saved by TVEyes for 32 days. For those who need to view clips ***beyond*** 32 days from the broadcast date, TVEyes enables clients to permanently save clips in two ways: either by saving clips to the clients' Media Center, which will store the clip on TVEyes' system, or downloading the clip, which will save it to the client's local hard drive. The ability to save clips is integral to TVEyes transformative purpose for many reasons.

***First***, TVEyes automatically saves clips generated by users keyword searches for 32 days from the initial broadcast date. 4th Seltzer Decl. ¶6. Because of this, users may visit and revisit the results of their searches at their leisure, as many times as they need. Journalists, for example, use TVEyes' save function to monitor the occurrence of certain words over the course of a week without ever having to conduct repeated searches for the same clips: All clips containing the keyword of

HIGHLY CONFIDENTIAL

interest are saved on TVEyes and are located in users' Watch Lists, to be accessed at their convenience.  *See*, *e.g.*, 3d Rose Decl. ¶14 & Ex. RRRRR (using TVEyes to conduct searches on FNC for "Benghazi OR Libya" over course of two weeks); *id.* ¶15, Ex.  SSSSS (using TVEyes to conduct searches and compare coverage of Freddie Gray's death over course of six days on CNN, MSNBC, and FNC).  The fact that TVEyes automatically saves clips for 32 days greatly enhances the utility and efficiency of the service.

*Second*, the ability to save clips *beyond* 32-days is absolutely critical if a user wants to track a particular keyword or phrase over a longer period of time. Access beyond 32 days is necessary for clients who conduct long-term research on a topic or issue that evolves over months or years.  4th Ives Decl. ¶6; Karle Report ¶45.  Three recent examples illustrate the importance of the ability to permanently save clips on TVEyes.

- On June 4, 2014, *Media Matters* published an article in which the author used TVEyes to analyze coverage by FNC, MSNBC and CNN of marriage equality court rulings issued in 13 states over the course of an eight-month period, from September 27, 2013 to May 23, 2014.  3d Rose Decl. ¶11 & Ex. OOOOO; Karle Report ¶85(a).

- On April 4, 2015, *Media Matters* published a report on its website titled "How National Media Outlets Cover Transgender News Stories," which compared and contrasted the coverage of various cable, broadcast and Spanish language news networks of several transgender stories in the first two months of 2015.  3d Rose Decl. ¶12 & Ex. PPPPP.

- On March 25, 2013, *Mediaite* reported that "[a]ccording to TVEyes, Fox News has mentioned Benghazi 1,886 times in the past 3 months, or an average of about 21 times a day. That's compared to 721 mentions on MSNBC (along with 718 instances of 'Schmengazi'), and only 687 for CNN."  3d Rose Decl. ¶16 & Ex. TTTTT.

This research would not have been possible on TVEyes without the ability to save clips for more than 32 days.  *See also*, *e.g.*, 3d Rose Decl. ¶13 & Ex. QQQQQ; Karle Report ¶85 & Exs. 3 & 6 (attaching additional examples of journalists conducting research on TVEyes spanning more than 32 days, and thus requiring the ability to

**HIGHLY CONFIDENTIAL**

save).  It is not only writers who need to save clips longer than 32 days—political campaigns (among other clients) use the permanent save feature to track and archive candidate appearances for debate and media training.  4th Ives Decl. ¶6 & Ex. ZZZZ.  Because TVEyes' automatically deletes all content 32 days after the first broadcast, a user who needs to view a clip more than 32 days after it was first broadcast can **only do so** by permanently saving the clip.

*Third*, the ability to save clips beyond 32 days is also essential for journalists after their stories are published.  As Mr. Karle explains in his report, "[j]ournalists are expected (and often required) to preserve records of the underlying source material they use when conducting research and analysis—the saving/archiving feature is a natural part of that process."  Karle Report ¶46.  Likewise, other clients who rely on research obtained from TVEyes must be able to save that research in the event it is challenged in the future.

*Fourth*, the permanent saving feature is critical for media monitoring in the context of modern political campaigns—where taking inconsistent positions on a political issue (*i.e.*, "flip-flopping") can ring the death knell for a candidate.  Karle Report ¶83.  The ability to save clips for more than 32 days allows clients involved in the political process (such as journalists, candidates, and political advocacy groups, among others) to track candidates' and elected officials' public statements on various issues over months and even years.

This Court has already recognized that viewing a clip on TVEyes is a fair use. *See Order* at 393 ("The clips … are integral to TVEyes' service of monitoring and reporting on all the news and opinions presented by all television and radio stations.").  If viewing a clip for research purposes at the time it is broadcast is transformative, then so too is the ability to view a clip at a later time, including more than 32 days after it aired, for the same or similar purposes.

**HIGHLY CONFIDENTIAL**

### B.   Emailing Is Integral To TVEyes' Transformative Purpose.

The ability to email clips is integral to researching and monitoring television broadcasts.  As the Court is no doubt aware, email is the primary tool used to communicate and collaborate with co-workers, supervisors, and decision-makers in modern work environments.  There simply is no better or more efficient way to share "the full spectrum of information" contained in a video clip, including "the tone of voice, arch of an eyebrow, or upturn of a lip" with work colleagues than by email.  *Order* at 393; *see also* 4th Ives Decl. ¶9; Karle Report ¶48.

The ability to email is particularly integral to the TVEyes service when, as is often the case, the employee who typically logs in to TVEyes' system is just one of a number of people who ultimately may need access to the clip.  For example, one would not expect the 100+ members of Congress who subscribe to the service to personally review their keyword "hits" on TVEyes' website; typically, this function is performed by Congressional staffers who receive TVEyes credentials and are trained to use TVEyes' platform.  4th Ives Decl. ¶10; *id.* ¶22 & Ex. AAAAA (at TVEYES-040193, 040212, 040666, & 041730) (examples of Congressional staff asking TVEyes questions about clips).  In general, clients tend to give access to the TVEyes service to a limited number of employees who receive login credentials, are trained on how to use the service, and are tasked with sharing clips within the organization as necessary.  4th Ives Decl. ¶12.

The need to email TVEyes clips is exemplified by the White House's use of its TVEyes account:  White House interns log on to TVEyes' service and distribute relevant FNC clips to members of the White House staff (such as then-Press Secretary Jay Carney) who need to see them.  *See* 3d Rose Decl. ¶6 & Ex. JJJJJ (examples of TVEyes clips emailed to White House staff).  The value of the TVEyes service would be greatly diminished—if not completely lost—if each busy member of the White House staff was required to personally log on to TVEyes' website and

**HIGHLY CONFIDENTIAL**

independently search for a relevant, time-sensitive clip that an intern has already located (and could simply circulate by email).  4th Ives Decl. ¶13.

The utility of emailing clips from TVEyes among colleagues should come as no surprise to Fox News.  if clips from TVEyes could not be emailed, every employee who needed access to a clip would have to: (1) go to a computer, (2) log on to the TVEyes system, (3) search for the clip themselves (even though someone else already found it), and (4) view it.  This would not only be inefficient, it would be impracticable because not everyone within an organization who may need to view a clip has TVEyes user login credentials or knows how to use the service.  4th Ives Decl. ¶¶ 12-13; Karle Report ¶¶49-51.[10]

## C.   Downloading Is Integral To TVEyes' Transformative Purpose.

TVEyes enables its subscribers to download clips onto the hard drives of their personal computers, tablets (such as an iPad), smart phones or other mobile devices so that the clip is permanently saved and can be accessed by the client off-line, without an Internet connection.  TVEyes, however, does ***not*** permit users to publicly post or otherwise disseminate clips that they download.  Aside from being reminded of this prohibition in the user agreement and through communications

---

[10]  TVEyes' emailing feature, like all of its other features, is for internal research and analysis only and clients are informed and reminded in multiple ways that clips are not to be publicly distributed.  *See supra* Factual Background, Part C.

**HIGHLY CONFIDENTIAL**

with TVEyes representatives, TVEyes notifies its users of this prohibition every time they download a clip:

> **Important Note:  Material supplied by TVEyes, Inc. may be used for internal review, analysis or research only.   Any editing, reproduction, publication, rebroadcasting, public showing or public display is forbidden.**

The ability to download clips from TVEyes' system is integral to TVEyes' transformative purpose for many reasons.

*First*, TVEyes' downloading feature enables users to access clips they already found on TVEyes without having to connect to the Internet.  This functionality is absolutely critical in situations when Internet connectivity is not available, or is not robust, such as during travel.  4th Ives Decl. ¶15; Karle Report ¶52.  The ability to download clips is also essential in circumstances where the client does not wish to rely on the Internet to accomplish her objective—for example, for an important presentation.  Karle Report ¶59.  In addition to accessing clips off-line, downloading allows users who are not familiar with the TVEyes platform to view clips outside of the TVEyes environment without having to login to the system.  This is particularly beneficial to executives, elected officials or others in important positions who are less likely to have personal experience with TVEyes' platform.

*Second*, downloading allows clients to transfer clips from one type of computing device to another.  A clip that has been downloaded from TVEyes can be loaded onto laptop computers, iPads and other tablets, and smart phones, portable storage systems (such as a thumb drive), or placed on a cloud service such as DropBox.  4th Ives Decl. ¶17; Karle Report ¶53.  Downloading thus gives clients many additional options for transporting, storing and organizing clips of interest to them.

**HIGHLY CONFIDENTIAL**

***Third***, the downloading feature allows a user to segregate important clips that she may need to access repeatedly.  It can be time-consuming to connect to TVEyes' service every time a client wants to view a particular clip, and it may be more efficient to access the clip from a desktop or iPad.  This flexibility is integral to TVEyes' function as a comprehensive, usable database—for TVEyes to offer utility to clients, they must be able to use the clips in a way that matches their needs.  4th Ives Decl. ¶16.

***Fourth***, downloading is necessary for any user who wishes to maintain an organized file of materials relating to a particular topic that includes files ***other*** than video clips.  The "saving" feature on TVEyes described above does not organize or group clips—all clips are simply saved to the subscriber's Media Center.  Karle Report ¶54; 4th Ives Decl. ¶18.  Nor can documents other than video clips (such as Microsoft Word, Excel or PowerPoint files) be stored on TVEyes.  4th Ives Decl. ¶18; Karle Report ¶¶54-55.  Downloading a clip, however, allows subscribers to organize and store relevant clips in a manner that best suits their needs.  Journalists, for example, tend to collect and save all of their materials relating to a particular story in a single place, such as a particular computer folder.  Karle Report ¶54.  Downloading enables clients to store TVEyes clips together with other materials, such as notes, pictures and documents related to the project they are working on.

***Fifth***, the downloading feature facilitates users' ability to compare multiple clips at the same time—for example, conducting a side-by-side review of two clips, open on a computer at the same time, for the purpose of comparing and contrasting details.  4th Ives Decl. ¶19; Karle Report ¶56 (discussing benefits of viewing downloaded clips this way).

***Sixth***, downloading gives clients another way to permanently save clips for longer than 32 days.  *See supra* Part II.A.  Both saving a clip to Media Center and downloading a clip to a computer enables clients to view it at a later date.  And

**HIGHLY CONFIDENTIAL**

whether the clip is stored directly on TVEyes' system (through the saving feature) or on the user's own computer (through downloading feature), the result is the same: a long-term record of the underlying material beyond the 32-day window. 4th Ives Decl. ¶20; Karle Report ¶58. Some users may find it preferable to save clips on TVEyes' system (so that they do not have to worry about forgetting where they stored a downloaded file) while others may prefer to download clips to their personal computer (so that they do not have to be connected to TVEyes' system to view it). Either way, the ability to view clips beyond 32 days from the date that they first aired, without being connected to the Internet and outside of TVEyes' environment, are necessary for leveraging TVEyes' transformative database of clips.

### D. The Date/Time Search Feature Is Integral To TVEyes' Transformative Purpose.

As to the Date and Time Search feature, the Court has already determined that "the evidence shows that this feature *does not pose any threat of market harm* to Fox News." *Order* at 398 (emphasis added). The absence of any market harm is dispositive as to this feature—in the Second Circuit, "[t]o defeat a claim of fair use, the copyright holder *must* point to market harm that results." *HathiTrust*, 755 F.3d at 96 (emphasis added). This is sensible; if there is no market harm, by definition the secondary use is not acting as a market substitute for the original. *Id.* The Court need proceed no further to recognize that the Date and Time Search feature is protected as a fair use, regardless of how integral it is to TVEyes transformative purpose.

In any event, the Date and Time Search feature is integral to researching and monitoring television broadcasts. 4th Ives Decl. ¶21. As noted, the Date and Time Search allows users to begin watching a clip at a specific time on a specific station, rather than entering a keyword search term. This feature is necessary

**HIGHLY CONFIDENTIAL**

because there are a variety of circumstances where a keyword search cannot locate the desired clip:

*First*, because the keyword search function is based largely on closed caption text, it is highly susceptible to error.  The closed caption text may be incorrect due to spelling errors (which is particularly common with proper names and foreign words), or it may be incomplete (*e.g.*, if the transcriber misses a word or two, or if the subject of the search is a commercial, which often are not transcribed in closed captions).  *See* 4th Ives Decl. ¶22; Karle Report ¶¶61-62.  Indeed, TVEyes routinely recommends that clients use the Date and Time Search feature for this precise reason:

- A TVEyes salesperson suggested to a client who could not locate an individual who appeared on a FBN show: "Did you try a date/time search? Maybe his name was spelled wrong in closed captioning."

- When a customer from Senator ▮▮▮▮▮▮ staff could not locate an interview with Senator ▮▮▮▮ that aired on FBN, a TVEyes salesperson discovered that his name was written as ▮▮▮▮▮▮▮ in the closed captioning.

- When a customer from Congressperson ▮▮▮▮▮▮▮ staff could not locate an interview with Rep. ▮▮▮▮ that aired on FNC, a TVEyes salesperson discovered that his name was written as ▮▮▮▮▮▮ in the closed captioning.

- When a customer from Congressperson ▮▮▮▮▮▮▮ staff could not locate an interview with Rep. ▮▮▮▮▮ that aired on FNC, a TVEyes salesperson discovered that "[t]he Congressman's name did get mentioned but did not make it into the closed captioning.  I can show you how I found it using time-date …."

- When a customer informed TVEyes that it was not receiving clips for its keyword ▮▮▮▮▮ in association with National Lasagna Day, a TVEyes salesperson discovered that "the captioning for the Fox News clip identified it as ▮▮▮▮▮"

- When a customer from Congressperson ▮▮▮▮▮▮ staff could not locate a clip including Rep. Altmire on FNC, a TVEyes salesperson responded: "Sounds like the close [sic] captioning did not have the full name, if you use Date/Time Search for the approximate time on FNC will be there."

- When a customer wrote that she could not find a clip from FBN for the name ▮▮▮▮▮▮▮▮▮ a TVEyes salesperson responded

**HIGHLY CONFIDENTIAL**

that such terms are "dependent upon closed caption notes. Go to date/time search, and pull up the clip. Then, look at the closed caption notes and see how they intro'd him." The customer was then able to locate the clip, noting that "the text omits his last name, although it was in the audio." The TVEyes salesperson also noted that in the future the customer may want to use the name of the company as a search term because "closed captioning is less accurate with names, and more accurate with nouns."

- A TVEyes salesperson found a clip for a client, noting that "closed captioning is not 100% accurate. There are occasional misspellings or other inaccuracies. This is the nature of the spontaneous way closed captioning text is transcribed."

- When a customer from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ could not find a desired clip from FBN, a TVEyes salesperson found that the closed captioning erroneously used the name ▇▇▇▇▇▇▇▇▇▇▇▇

4th Ives Decl. ¶22 & Ex. AAAAA (attaching emails described above). As these examples illustrate, even the best closed captioning or speech-to-text technology is not perfect; the Date and Time Search feature is crucial for any user trying to comprehensively monitor a topic or keyword because it ensures that clients can find the clips they need when text-based searches fail.[11] 4th Ives Decl. ¶23; Karle Report ¶61.

**Second**, often what is most important to a researcher, journalist, or other analyst is not **what** was said on television, but **when** it was said. For example, if a TVEyes user wants determine who "broke" a story first, a keyword search may not be particularly effective. A Date and Time Search, however, would allow the user to see exactly when CNN "broke" the story, and then see how long it took for MSNBC to "break" the same story. *See* 4th Ives Decl. ¶25; Karle Report ¶63 & Ex. 5 (attaching examples of journalists using TVEyes for this purpose). For example, ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[11] In his expert report, Mr. Karle gives the additional examples of ISIS being mis-transcribed as "ices" and references to Koch Industries or the Koch brothers as "Coke." Karle Report ¶62.

███████████████████████████████████████

██████████████. 3d Rose Decl. ¶5 & Ex. IIIII.[12]

**Third**, the Date and Time Search feature is superior to keyword searching when a TVEyes user is interested in locating a graphic, an expression, a reaction, or a picture on a particular broadcast, but does not know the precise words that were spoken at the time the visual content was displayed.  *See* 4th Ives Decl. ¶24; Karle Report ¶64 & Ex. 6 (attaching examples of journalists reporting on use of images on FNC); 4th Ives Decl. ¶24 & Ex. BBBBB (asking TVEyes for assistance in locating FNC clip where client was credited "in the graphic"); *see also Order* at 392 ("The actual images … depicted on television are as important as the news information itself—the tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, powerfully modifying the content.").  Where the story is not ***what*** was said, but ***how*** it was said, the Date and Time Search is a crucial tool.

**Fourth**, the Date and Time Search feature is superior to keyword searching when a user is interested in learning about market viewership or publicity values associated with a broadcast.  4th Ives Decl. ¶26.  Rather than guess at keywords mentioned during the broadcast of interest, clients can enter the date, time and channel of the broadcast and determine the national publicity values and/or Nielsen ratings associated with it. *See*, *e.g.*, 3d Rose Decl. ¶10 Ex. NNNNN (using TVEyes to estimate value of national publicity FNC gave to anti-Clinton book); *id.* (using TVEyes to estimate value of national publicity FNC gave to Republican National Committee attack ad); 4th Ives Decl. ¶26 & Ex. CCCCC (informing user that "[y]ou

---

[12]  Similarly, if a user wants to compare what CNN, MSNBC, and FNC each chose to run as their first story at 9:00am on a particular date, a Date and Time Search would be the most efficient way to learn that information.  *See* Karle Report ¶66 (explaining why "the order in which stories appear on the news says a lot about how a producer is appealing to her audience").

can also use Date/Time Search" to learn "publicity/ad value" and Nielsen and SQAD data for a program that ran at a particular time).

***Fifth***, the Date and Time Search feature is superior to a keyword search to quickly find a clip when a user knows that a particular piece of information was conveyed on a certain station around a certain time, but does not know the precise language that was used in the broadcast.  Karle Report ¶65.

The Date and Time Search feature makes TVEyes' system a ***more robust*** search engine and research tool, complementing and enhancing the already-comprehensive nature of TVEyes' service by allowing a user to truly find ***any*** content that had been broadcast, and not only the content returned by a keyword text program.  *See* Karle Report. ¶67.  In this way, it is indistinguishable from the portions of TVEyes' service that this Court has already recognized as protected by fair use.

### E.   The Saving, Emailing, Downloading, And Date And Time Search Features Provide A Tremendous Public Benefit.

This Court has already recognized that "[c]learly, TVEyes provides substantial benefit to the public."  *Order* at 397.  TVEyes enables users to sift through over 27,000 daily hours of programming content, "most of which is not available online or anywhere else, to track and discover information."  *Id.* at 397.  TVEyes' subscribers use the service for a wide range of purposes, from monitoring the accuracy of reported facts, to tracking and archiving public statements to evaluate regulatory compliance, to ensuring national security and the safety of American troops, to researching, reporting on, comparing and criticizing broadcast news coverage, all of which benefit the public.  *Id.*

The ability to save, email, download, and locate clips via the Date and Time Search feature on TVEyes all equally promotes these public interests.  These features enable clients to fully leverage TVEyes' transformative database: clients

**HIGHLY CONFIDENTIAL**

who locate clips on TVEyes' search engine must be able to ***use and share*** these clips to communicate "the full spectrum of information" contained therein, and they must be able to access this information off-line or at a date in the future. *Order* at 393. The public benefit of TVEyes' database would be greatly diminished if clients could not locate a clip because of a misspelling in the closed-captioning, or permanently save their research, or email their findings to colleagues, or access clips without being connected to the Internet. And it would be far more difficult for local police departments to "monitor the coverage of an event to ensure that news coverage is factually correct" without the ability to share relevant clips internally via email to evaluate factual errors. *Id.* at 384. Nor could journalists "comment on and criticize broadcast news channels" for their treatment of news stories over time without the ability to permanently save clips. *Id.* at 397. These features are natural and necessary extensions of TVEyes' service—they are essential tools for effective media monitoring in today's environment.

In his expert report, Mr. Karle illustrates the importance of the save, email, download, and Date and Time Search features through the example of the controversy over claims that journalist Brian Williams exaggerated his personal involvement in a news story. Karle Report ¶¶71-82. As Mr. Karle explains, in addition to viewing the original story, TVEyes enables its users to: (1) determine at precisely what moment other news organizations "broke" the story by using the Date and Time Search feature; (2) download and permanently save to their personal computers clips of Mr. Williams' story and his apology, so that they may revisit these clips in six months when Mr. Williams' suspension is scheduled to end and the underlying clips are no longer available on TVEyes' system; and (3) share these clips with colleagues and decision-makers via email as part of their organization's internal research and analysis of the story. Karle Report ¶79. Other examples illustrating the importance of these feature abound. For example, at this moment,

HIGHLY CONFIDENTIAL

journalists, critics, and commentators, political action committees, and the campaigns themselves, are likely assembling clips of the various Presidential and Vice Presidential candidates in anticipation of news stories, debate preparation, or campaign strategizing, which will last through 2016.  Karle Report ¶83; 4th Ives Decl. ¶6.

Further, there are no practical alternatives to these functions.  How else can a user describe to her supervisor the exact tone of voice or expression on a news anchor's face other than to email the clip and let the supervisor see it for herself?  How else can a journalist accurately and completely save every fact communicated in a TVEyes clip she relied on for a story, should the facts be questioned in the future?  These features effectively function as a form of "time-shifting," allowing a user to simply re-watch an already-viewed clip at a later time.  *See generally Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984).

Limiting TVEyes' service to simply searching by keyword and watching video clips, without the ability to save, email or download those clips, would be like using Microsoft Word without the ability to save a document permanently, email it to others, or download it to a laptop, jump drive or smart phone for use off-line.  While the basic functionality of the program would be preserved, its overall utility and value to the public would be diminished greatly.  The same is true for TVEyes.  The ability to save, email, download and locate clips via the Date/Time Search features are essential for the service to operate at its best and to provide the greatest benefit to the public.

## III.   FOX'S DERIVATIVE BUSINESSES ARE NOT THREATENED BY TVEYES' SAVING, EMAILING OR DOWNLOADING FEATURES

To determine if TVEyes' saving, emailing or downloading features threaten Fox's derivative business, the Court must consider whether use of the Works-in-Suit by TVEyes users will "excessively damage the market for the original by providing

**HIGHLY CONFIDENTIAL**

the public with a substitute for that original work." *HathiTrust*, 755 F.3d at 95. This inquiry "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *Id.* at 99 (citing *Campbell*, 510 U.S. at 591). Thus, "any economic 'harm' caused by transformative uses ***does not count*** because such uses, by definition, do not serve as substitutes for the original work." *Id.* (emphasis added, citation omitted); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006) ("Since [defendant's] use of [copyrighted] images falls within a transformative market, [plaintiff] does not suffer market harm due to the loss of license fees."); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) ("The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original.").

Crucially, only actual or potential harm flowing from use of "the copyrighted work," 17 U.S.C. §107(4)—here, the 19 Works-in-Suit—can be considered; ***any alleged harm to other works owned by Fox News is irrelevant***. And Fox News bears the burden of proving that the saving, emailing or downloading of clips from the Works-in-Suit by TVEyes users has or will result in market substitution. *HathiTrust*, 755 F.3d at 96 ("To defeat a claim of fair use, ***the copyright holder*** must point to market harm that results because the secondary use serves as a substitute for the original work.") (emphasis added); *see also Sony Corp. of Am.*, 464 U.S. at 456 ("respondents failed to demonstrate that time-shifting would cause any likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works."). Finally, if any actual or potential market harm from the saving, emailing or downloading of clips from the Works-in-Suit by TVEyes users is found to exist, it must be balanced against "the benefit the public will derive if the use is permitted." *Bill Graham*, 448 F.3d at 613; *see supra* Part II.E.

HIGHLY CONFIDENTIAL

As discussed below, the saving, emailing and downloading of clips from the Works-in-Suit by TVEyes' clients has not harmed Fox News' derivative businesses. Rather, the evidence demonstrates that clients used these features to aid their transformative media-monitoring objectives and not as a substitute for: (1) the Fox News Go or TV Everywhere services; (2) clips available on the Fox News Website; or (3) clips licensed by Fox.

### A.     Fox News' Fox News Go And TV Everywhere Businesses Are Not Threatened By TVEyes' Saving, Emailing, or Downloading Features.

The Fox News Go and TV Everywhere services enable consumers to watch live streams of Fox programming for free on their computer screens, tablets, phones or other devices connected to the Internet.  Fox claims that the saving, emailing and downloading of clips from the Works by TVEyes clients has caused market harm to Fox News because these clients will use consecutive 10–minute-long clips to "watch" entire Fox News programs instead of viewing those programs via the Fox News Go and/or TV Everywhere platforms.[13]  The evidence does not support Fox's position.

*First*, none of the Works-in-Suit were accessed by TVEyes users as consecutive 10 minute clips, nor is it possible that TVEyes users will do so in the future because the Works are no longer available on TVEyes.[14]  *See Order* at 396

---

[13]  As a threshold matter, the Court should recognize that Fox News Go and TV Everywhere services are not truly "derivative" businesses for the purposes of this supplemental briefing—they are simply ways to watch television broadcasts on a computer or mobile device instead of on a television screen.  Thus, for all of the reasons that the Court has already found that TVEyes does not threaten Fox News' revenues or income from advertisers or satellite providers, nor does it act as a substitute for watching Fox News broadcasts on television, TVEyes also does not threaten the Fox News Go and TV Everywhere services.  *See Order* at 395-96..

[14]  All video files, other than those specifically archived by users, are deleted from TVEyes services 32 days after they are captured.  1st Seltzer Decl. ¶5; *Order* at 395 ("[N]one of the shows on which Fox News' suit is based remain available to TVEyes' subscribers; TVEyes erases content every 32 days.").

**HIGHLY CONFIDENTIAL**

("Not one of the works in suit was ever accessed to watch clips sequentially."); 2d Seltzer Decl. ¶5; Karle Report ¶104.[15]  In fact, only a total of 28 clips were ever saved, emailed or downloaded by TVEyes clients in the 32 days the Works were available on TVEyes.  4th Seltzer Decl. ¶¶7, 9, 11.  There is no evidence that these clips substituted in any way for the Fox News Go or TV Everywhere services.

**Second**, the evidence proves that historically TVEyes has not been used for to "watch" television.  *See Order* at 395-96; 2d Seltzer Decl. ¶5 ("[I]n the more than ten years between March 31, 2003 through to January 1, 2014, I was able to confirm only three instances of TVEyes users accessing two or more consecutive ten minute clips on FNC and zero instances on FBN.  To put these numbers in perspective, these events represents approximately 0.000016% of all user plays of FNC content in the same period of time."); Karle Report ¶105.

**Third**, in July 2014, TVEyes implemented a feature that blocks users from playing or downloading 25 minutes or more of sequential content from a single station, mooting any claim by Fox that such behavior is likely to occur in the future.  *Order* at 385; 2d Seltzer Decl. ¶7.

**Fourth**, there is no logical reason why TVEyes' clients, who use the service in a professional capacity, would pay TVEyes' $500-a-month subscription fee to go through the hassle of attempting to circumvent the circuit breakers to locate and view consecutive 10-minute-long clips when they can view entire episodes of Fox News content instantly—for free—with the press of a button using the Fox News Go or TV Everywhere services.  *See* Karle Report ¶106; *see also id.* ¶¶166-167.  As this Court recognized, "there is no basis for Fox News' alleged concern that TVEyes' subscribers are likely to watch ten minute clips sequentially in order to use TVEyes

---

[15]  The Court also deemed this point "unrealistic" because "cost and trouble would make such copying impractical and timely."  *Order* at 393.

HIGHLY CONFIDENTIAL

as a substitute for viewing programming on television." *Order* at 396.  This finding applies with equal force to the Fox News Go and TV Everywhere services, which are nothing more than alternative ways to watch television.  Karle Report ¶106.

***Finally***, the Fox News Go and TV Everywhere services cannot be used to monitor the media.  These products are not search engines—they offer users the ability to watch FNC and FBN programming, and do not have keyword search or other media-monitoring functionality, such as the ability to edit, save, download or email video clips.  Karle Report at ¶¶37, 107-108.  Indeed, Fox News Go and TV Everywhere serve an entirely different purpose than TVEyes: they allow consumers to watch Fox programming on their computers, laptops or other mobile devices for free, just as they would access the same programming on their televisions at home. These services are not comprehensive databases of television content designed for media monitoring.

In short, there is no evidence that the saving, emailing and downloading features of TVEyes' services has or will threaten the TV Everywhere or Fox News Go services.

**B.**   **Fox News' Website Businesses Are Not Threatened By TVEyes' Saving, Emailing, or Downloading Features.**

Fox News █████████████████████████████████████████████████
████████████████████████████████████████████████.  *Order* at 386; 1st Misenti Decl. ¶13.  Fox contends that the TVEyes users who saved, emailed or downloaded clips from the Works-in-Suit would otherwise have visited the Fox News Website to search for and view these same clips, and that this alleged diversion of traffic has caused Fox to lose advertising revenue.  The evidence does not support Fox's claim.

***First***, as this court has recognized, TVEyes is used to monitor the media, a goal that ***cannot*** be accomplished using the limited and pre-edited set of clips on

the Fox News Website.  *Order* at 392 ("By indexing and excerpting all content appearing in television, every hour of the day and every day of the week, month and year, TVEyes provides a service that no content provider provides.").  The value of TVEyes' service is that it gives clients access to a ***comprehensive*** database of everything that has been broadcast on cable television and radio, ***exactly as it was broadcast***, and makes this database text searchable.  *Id.* at 393 ("TVEyes … creates a database of otherwise unavailable content.  TVEyes is the only service that creates a database of ***everything*** that television channels broadcast, twenty-four hours a day, seven days a week."); *id.* at 395 ("The value of TVEyes' database depends on its all-inclusive nature, copying ***everything*** that television and radio stations broadcast") (emphasis added).  By contrast, Fox makes just a small fraction of what it broadcasts available on the Fox News Website in the form of clips, *see* Karle Report ¶89.  There is no evidence that clients who use TVEyes to systematically monitor the media, and who located, viewed, saved, emailed or downloaded clips from the Works as part of that effort, would otherwise have attempted to accomplish their monitoring objectives by using Fox News' website.

*Second*, the clips that Fox News decides to make available on its website are materially different than the clips available on TVEyes because ████████████ ████████████████████████████████████████████████████████ ████████████████████████ ██ ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████); 1st Seltzer Decl. ¶¶46-49 (contrasting the clips available on the Fox News Website from those available on TVEyes); *Order* at 387 ("The video clips do not show the exact content or images that were aired on television—the news ticker on the bottom of the screen is absent in the online clips, for example.  The online clips

**HIGHLY CONFIDENTIAL**

sometimes feature 'corrected' versions of news stories, amending and correcting incorrect and outdated descriptions in the original television version."). It is therefore ***not possible*** to use the Fox News Website to reliably locate, view, save, download or email a comprehensive set of ***pristine, as-aired*** video clips containing a particular keyword, and there is no reason to think that TVEyes' clients would visit the Fox News Website to try to accomplish this objective. The Fox News Website does not reliably reflect what was actually broadcast. But TVEyes does.

 ***Third***, an important benefit of TVEyes' service is that it performs keyword searches ***automatically*** across hundreds of television and radio stations simultaneously so that the user doesn't have to conduct endless manual keyword searches all throughout the day. There is no reason to think that TVEyes' clients who saved, emailed, or downloaded clips from the Works-in-Suit as a result of TVEyes automated search function would otherwise have visited the Fox News Website to manually search for these clips. Moreover, this assumption is unreasonable because just a small fraction of Fox content is available on the Fox News Website (or the sites of its syndication partners) anyway, making ad hoc manual keyword searches on the Fox News Website particularly ineffective for conducting ***comprehensive*** media monitoring: the user has no way of knowing if the searched-for material ever appeared on FNC or FBN, or if it ***did*** appear but Fox decided to exercise its "discretion" and not make it available. Karle Report ¶89.

 ***Fourth***, there is no evidence that any of the 27 clips from the Works-In-Suit that were saved, downloaded or emailed by TVEyes clients in the 32 days they were available on TVEyes substituted for clips that were available on the Fox News Website, or any of its partner sites. Moreover, Fox News has directed the Court to no evidence that any TVEyes clips from the Works-in-Suit has ever been posted to the Internet (which, in any event, would violate TVEyes' user agreement). As discussed below, because none of these was posted to the public-facing internet, any

(purely hypothetical) "lost traffic" to the Fox News Website from the saving, emailing or downloading of these clips would be *de minimis*.

**Fifth,** the Fox News Website and the TVEyes service are designed for different purposes and cater to different audiences.  The Fox News Website is a consumer-oriented site designed for entertainment that restricts the use of Fox content to "personal" use, and which prohibits visitors from accessing video content for commercial purposes.  *Order* at 387.  Fox News' website also **prohibits users from downloading clips.**  *Id.* ("Visitors to Fox News' websites are not permitted to download any of the video clips.")  By contrast, TVEyes is designed for and offered to a professional audience that needs access to this content for commercial purposes and needs to download clips for their internal use.  *See* Karle Report ¶¶ 91-92.

**Sixth**, because the Fox News Website is designed for entertainment, not research (1st Rose Decl. ¶12 & Ex. HH (Fox News Website is for "personal enjoyment and entertainment" and "solely for [] personal, non-commercial use")), the video segments available on the Fox News Website lack basic contextual information about the footage, such as the air-time and show title.  1st Seltzer Decl. ¶¶46-47.  Such information is essential to TVEyes' users, who can access snippets to research the context in which their keyword was mentioned.

**Seventh**, even if Fox News could prove that some of the TVEyes users who saved, emailed or downloaded the 27 clips from the Works-in-Suit would have otherwise visited the Fox News Website to search for these clips (and again, Fox presents no evidence in support of this assumption), the revenue lost to Fox as a result of this (purely speculative) reduction in traffic ████████████████ ████████████ █ ████████.  *See* Karle Report ¶¶93-102.  As Mr. Karle explains in his report, Fox News earns ████████████████ per every 1,000 website visitors who might have been exposed to its advertisements.  Even if every single one of the 27 clips from the Works-in-Suit represented a lost impression on Fox's website (again,

**HIGHLY CONFIDENTIAL**

pure speculation), ██████████████████████████████

████████████████████████████████ ██ █████████

██████████████████████ per every 1,000 impressions lost.  The statistics

showing how TVEyes clients accessed the Works-in-Suit prove that even under the

highly-speculative, worst-case scenario presented by Fox News, market harm would

have been *de minimis*:  In the 32 days that the Works were available on TVEyes, a

total of 61 TVEyes users viewed 560 clips from the Works, 15 TVEyes users

downloaded 21 clips from the Works, and 4 TVEyes users emailed 6 clips from the

Works.  Fox cannot plausibly claim that it has suffered legally cognizable market

harm from TVEyes' clients viewing, saving, emailing or downloading clips from the

Works given these numbers.  *See* Karle Report ¶¶93-102.

### C.   Fox News' Clip Licensing Business Is Not Threatened By TVEyes' Saving, Emailing, or Downloading Features

Both directly and through its agents, ITN Source and Executive Interviews,

Fox News licenses clips from its broadcasts for use in television shows, movies,

advertisements, museum displays and other similar projects that require the client

to obtain a public performance license.  1st Rose Decl. ¶¶2-3 & Ex. M.  Fox News

now contends, without a shred of evidence, that the 19 TVEyes users who saved,

emailed, or downloaded clips from the Works-in-Suit would otherwise have paid Fox

News or its agents ████████████████████ per clip for the right to use those

clips for internal purposes.  The record does not support Fox's claim.

*First*, █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.  1st Rose Decl. ¶¶2-3 &

Ex. M.  By contrast, TVEyes expressly ***prohibits*** clients from using clips obtained

through TVEyes for these purposes.  *Order* at 385; 1st Ives Decl. ¶¶7-8 & Exs. A-B.

**HIGHLY CONFIDENTIAL**

Thus, TVEyes and Fox News' clip licensing business serve entirely different markets that do not overlap: Fox News and its licensing agents provide clips (and the appropriate licenses) to clients use ***when a license is legally required***, such as for use in a film, television show or advertisement, while TVEyes supplies clips to clients for use ***when a license is not necessary***, such as for a client's internal use or to criticize Fox.  Fox News has directed the Court to ***no*** evidence that any TVEyes users saved, emailed or downloaded clips from the Works when they would have otherwise obtained the required public performance license from Fox.  Further, there is no proof that any of the Works that were saved, emailed or downloaded by TVEyes clients were not used solely for internal research and analysis purposes, or otherwise violated TVEyes' User Agreement.

 ***Second***, although Fox claims that it also licenses clips for ***purely internal*** use, the evidence proves otherwise.  ████████████████████████████ ████████████████████████████████████████ ██████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ 1st Rose Decl. ¶¶2-3, Ex. M.  Thus, putting aside whether use of a clip on a corporate intranet requires a license at all (and it does not), ██████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████ .

 ***Third***, Fox News claims that TVEyes clients who saved, emailed and downloaded clips from the Works would otherwise have obtained a license from Fox News.  This is implausible—████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████

**HIGHLY CONFIDENTIAL**



3d Rose Decl. ¶7 & Ex. KKKKK (at §2.4).  TVEyes clients who saved, emailed, and downloaded clips from the Works-in-Suit—mostly journalists, members of Congress, national political parties and political campaigns—are unlikely to agree to such restrictions on their free speech.  *See* Karle Report ¶118.  Indeed, many clients use TVEyes precisely so that ██ ██ ██████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.  *See* 3d Rose Decl. ¶6 & Ex. JJJJJ; Karle Report ¶49 & Ex. 4.  Journalists and the press—including *Media Matters*, the *Huffington Post*, and *Mediaite*, among others—use TVEyes' saving and downloading features to scrutinize and critique Fox News' news coverage and programming.  *See*, *e.g.*, 1st Rose Decl. ¶27 & Ex. WW (examples of journalists using TVEyes to criticize Fox News).  For clients who use TVEyes for these purposes, licensing clips from Fox is simply not an option.

**HIGHLY CONFIDENTIAL**

***Fourth***, ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████. 3d Rose Decl. ¶2 Ex. FFFFF; *id.* ¶7 & Ex. KKKKK (at §5.1.2.1).  This additional restriction makes it even less plausible that TVEyes clients who saved, emailed, or downloaded clips from the Works would have obtained a license from Fox to access these clips—███████████████████████
███████████████████████████████████████████████
███████████████.  This evidence makes plain that Fox's clip licensing business is not intended to meet the needs of clients like the White House, members of Congress and journalists who need timely access to video clips to accomplish their media monitoring and research objectives.

***Fifth***, many TVEyes clients, such as journalists, local police departments, members of Congress, and the White House, likely either are unable or unwilling to pay ██████████████████████████ ***per clip*** to Fox News just to use clips for internal research.  *See* Karle Report ¶115.  Not only is there no reason for these entities to obtain licenses from Fox News for this kind of use, but most organizations that monitor the media could not possibly afford to do so.  ████
███████████████████████████████████████████████
████ ███████████████████████████████████████████
████.  1st Rose Decl. ¶¶2-3 & Ex. M.

## IV.   THE ABILITY TO POST CLIPS PUBLICLY IS NOT INTEGRAL TO TVEYES' TRANSFORMATIVE PURPOSE

Finally, the Court has asked the parties to provide briefing as to whether the ability to share clips publicly is integral to the TVEyes service.  The ability for TVEyes users to share clips obtained from TVEyes publicly, such as on social media, is ***not*** integral to TVEyes' service.

**HIGHLY CONFIDENTIAL**

*First*, TVEyes **expressly prohibits** clients from publicly posting video clips obtained from the service without the permission of the broadcaster.   This restriction is repeatedly communicated by TVEyes to its clients in a number of ways including: (1) in the User Agreement signed by all TVEyes subscribers; (2) on the Download Page of TVEyes' service; and (3) in TVEyes' communications (including by email and telephone) with clients.   4th Ives Decl. ¶27; Karle Report ¶¶131-137. And when a client inquires about the possibility of posting video clips to the Internet, TVEyes' staff explains that the client must obtain the permission of the broadcaster to do so.   4th Ives Decl. ¶28; 2d Ives Decl. ¶12 & Ex. TTT; Karle Report ¶138.   Indeed, the Court has already considered and accepted these restrictions, recognizing:

> All TVEyes subscribers are required to sign a contractual limitation in a User Agreement, limiting use of downloaded clips to internal purposes.   Whenever a subscriber seeks to download clips, TVEyes' website gives notice that such material may be used only for internal review, analysis, or research.   Any reproduction, publication, rebroadcasting, public showing or public display is forbidden.   TVEyes' email communications with subscribers contain similar warnings.   When TVEyes users ask how to obtain rights to publicly post or disseminate clips, TVEyes refers such inquiries to the broadcaster.

*Order* at 385.

*Second*, TVEyes has no features designed to facilitate the public sharing of video clips.   TVEyes does not have (1) social share buttons or (2) a media player designed to be embedded in another website, which are the most widely used social sharing devices on the Internet today, and are the hallmarks of websites designed to promote public dissemination of content on the Internet.   4th Seltzer Decl. ¶14; Karle Report ¶¶159-165.   Nor does TVEyes offer any other feature that directly posts clips from TVEyes onto the Internet—the only way for a clip to be publicly posted would be for a user to violate TVEyes' restrictions by personally posting the

HIGHLY CONFIDENTIAL

clip.  Moreover, clips from TVEyes do not function well if posted on YouTube, the world's largest video sharing website.  Specifically, due to the way TVEyes clips are configured, the audio component is often out of synch with the video component when TVEyes clips are posted on YouTube.  TVEyes has been aware of this technical problem for many years, but decided against correcting it because clips from TVEyes are not meant to be publicly posted on YouTube.  4th Seltzer Decl. ¶15.

*Third*, aspects of TVEyes' technological infrastructure are designed to prohibit the widespread distribution of content from the service.  For example, TVEyes has developed and implemented various "circuit breakers" which disable video clips that garner a lot of traffic.  4th Seltzer Decl. ¶13; Karle Report ¶27.  ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮▮ ▮▮ ▮▮▮ ▮▮ ▮▮ ▮▮▮▮▮

▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮  4th Seltzer Decl. ¶16.

*Finally*, even if the Court were to find that TVEyes was somehow responsible for its users' posting of TVEyes clips on social media (and again, it should not), the Court should then note that just weeks ago Fox argued before a court in this District that posting copyrighted content on social media is a transformative fair use *as a matter of law*.  *See N. Jersey Media Grp. Inc. v. Jeanine Pirro and Fox News Network, LLC*, No. 13-cv-7153(ER), Dkt. 82 at 6

HIGHLY CONFIDENTIAL

(S.D.N.Y. Mar. 19, 2015) (Ramos, J.) (Fox arguing that "[e]xpression on social media, and on Facebook in particular, is … inherently intertwined with 'comment' and 'criticism'" because "[e]very post is an invitation for others to comment and criticize; every message and image invites reciprocal expression").  The Court may freely accept this party admission to find that the ability for TVEyes' users to post downloaded clips onto social media (notwithstanding that doing so violates TVEyes' policy) is nonetheless protected as fair use.

## CONCLUSION

For the foregoing reasons, TVEyes respectfully requests that the Court grant its motion for summary judgment in its entirety.


Dated:        May 21, 2015

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By     /s/  Todd Anten
        Todd Anten
        toddanten@quinnemanuel.com
        Jessica A. Rose
        jessicarose@quinnemanuel.com

        51 Madison Avenue, 22nd Floor
        New York, NY 10010
        (212) 849-7000

        *Attorneys for Defendant TVEyes, Inc.*