**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOX NEWS NETWORK, LLC,

Plaintiff,

- against -

TVEYES INC.,

Defendant.

Case No. 1:13-cv-05315-AKH

ECF Case

**REDACTED**

**DECLARATION OF BETH KNOBEL, PH.D. IN SUPPORT OF PLAINTIFF FOX NEWS NETWORK, LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT**

I, Beth Knobel, Ph.D., declare as follows:

1. I am a tenured Assistant Professor of Communication and Media Studies at Fordham University with a Doctorate of Philosophy from Harvard University. I am a nationally recognized expert in the practice of journalism, including authoring several books and articles that are used in journalism classes around the country, as well as frequently lecturing at various universities and journalist associations. In addition to my academic work, I have extensive experience in the news industry as a result of my lengthy career as a television producer, reporter, and bureau chief on behalf of CBS News and various other television agencies and print publications.

2. On December 15, 2014, I submitted an expert report and declaration in this case setting forth my opinion that, among other things: "The TVEyes Content-Delivery Features clearly threaten Fox News' derivative businesses and cause market harm to Fox News and other networks; The TVEyes Content-Delivery Features are not integral to the TVEyes Indexing/Viewing Features; and TVEyes' data and time feature is not integral to the TVEyes Indexing/Viewing Features." Declaration of Beth Knobel, Ph.D., dated December 15, 2014, (Dkt. No. 100) ("Knobel Decl.") ¶ 3.[1] After I submitted my report, Mr. Stuart Karle submitted an expert report and declaration responding to my conclusions. Declaration of Stuart Karle, dated March 6, 2015, (Dkt. No. 106) ("Karle Decl."). In addition, Mr. Karle and I sat for depositions concerning our opinions in this case on April 23, 2015 and April 10, 2015, respectively.

3. I submit this declaration in support of Fox News's renewed motion for summary judgment to clarify certain issues that were raised in Mr. Karle and my reports and our

[1] Capitalized terms not defined here are defined in my prior declaration.

depositions, as well as to address information that was not available to me at the time I wrote my report. It is based on my personal knowledge, my knowledge as an expert, and my knowledge based on my review of the documents produced in this case. In addition, I have reviewed Mr. Karle's report, and I attended his deposition. I disagree with his conclusions.

## I. THERE IS A CAPACIOUS MARKET FOR ONLINE AND DIGITAL TELEVISION CONTENT

4. In my report, I discussed the significant shift from traditional television viewership to viewers watching short video clips of television content online and through social media. Knobel Decl. ¶¶ 33–36. The result of this shift is that the market for video clips has greatly expanded and become increasingly extensive and diverse. In particular, television producers license content to all kinds of clients for all manner of uses, including internal use, social media posts, and web-based advertising, among many others.

5. In the last few weeks, additional evidence supporting my conclusion that the television market is undergoing a significant shift has surfaced. For example, Comcast's number of Internet subscribers surpassed its number of cable subscribers for the first time.[2] In fact, "[a]bout 19% of American households now live without cable television."[3] There are numerous articles discussing the significant shift from traditional television viewership to online and digital distribution of content. Examples of these articles include the following, which are attached hereto as **Exhibit 135**:

---

[2] Emily Steel, *Internet Customers Surpass Cable Subscribers at Comcast*, NEW YORK TIMES, May 4, 2015, at B3, *available at* http://www nytimes.com/2015/05/05/business/media/comcasts-earnings-rise-10-driven-by-high-speed-internet html (attached hereto as **Exhibit 133**).

[3] Suzanne McGee, *Cutting the cord: a look at the pros and cons of quitting cable*, THE GUARDIAN, Mar. 29, 2015, http://www.theguardian.com/technology/us-money-blog/2015/mar/29/cutting-the-cord-a-look-at-the-pros-and-cons-of-quitting-cable (attached hereto as **Exhibit 134**).

- On March 29, 2015, the *Guardian* reported that, "With an abundance of streaming services to choose from, many are choosing to leave cable behind entirely."

- The week before, the *New York Times* cataloged the numerous options available to "viewers who want to ditch their traditional TV subscriptions but not forsake their television-watching habits." These are the so-called "cord cutters."

- Similarly, the *Los Angeles Times* has reported: "Now, of course, TV is controllable, portable and permanent." Moreover, "[a]ny viewer with a DVR can build her own lineup while anyone with a digital device can create his own television catalog. After it airs, a show no longer fades into the ether or migrates into reruns; it accrues, it accumulates."

6. The shift to online distribution of content also is clear in the print news industry, where 75% of all newspapers (and virtually all major newspapers) have instituted paywalls requiring readers to pay for access to some or all of the digital content.[4] For example, despite the fact that it would certainly be more convenient for the public to have access to all of the *New York Times's* content for free, the *New York Times* limits nonsubscribers to 10 free articles per month.[5] The existence of a market in which consumers pay content-producers for digital access to that content is evidenced by the growing number of digital-only subscribers to the *New York Times*, which had increased to approximately 957,000 by the first quarter of 2015, a 20% increase over the same quarter in 2014.[6] Similarly, the *Wall Street Journal* requires a subscription for any access whatsoever to online content, and Gannett Company Inc., the

---

4 Natalie Jomini Stroud, *From free to fee: How U.S. dailies decide to use paywalls*, AMERICAN PRESS INSTITUTE, Sept. 18, 2014, https://www.americanpressinstitute.org/publications/research-review/paywall-decisions/; Peter Marsh, *The state of paid content: For free, for a fee, or somewhere in between*, INMA, http://www.inma.org/blogs/ahead-of-the-curve/post.cfm/the-state-of-paid-content-for-free-for-a-fee-or-somewhere-in-between (attached hereto as **Exhibit 136**).

5 THE NEW YORK TIMES, http://www.nytimes.com/subscriptions/Multiproduct/lp8LJXL.html (attached hereto as **Exhibit 137**).

6 Ravi Somaiya, Times Co. Reports a Loss, Tempered by Digital Growth, New York Times, Apr. 30, 2015, at B4, *available at* http://www.nytimes.com/2015/05/01/business/media/new-york-times-company-q1-earnings html (attached hereto as **Exhibit 138**).

nation's largest newspaper publisher, has instituted paywalls for all 80 of its papers, with the sole exception of USA Today.[7]

7. Moreover, as discussed in my report, consumers increasingly get their news content from social media platforms. Knobel Decl. ¶ 35. As a result, news organizations provide authorized clips of their content on their websites that are easily posted to social media platforms with links back to the content producer's website. *Id.* ¶¶ 46–50 (discussing Declaration of Jeff Misenti, dated June 26, 2014, (Dkt. No. 49)). By linking back to the content producer's website, these social media posts can lead to additional advertising impressions for the content owner (as opposed to links to TVEyes-created video clips, which do not). On Facebook, for example, users and content producers frequently post links to authorized copies of the content producers' content that leads to increased traffic to the content producer's website.

8. This dynamic was highlighted in one stunning example from earlier this month, during which a coding glitch at Facebook "changed the algorithm for its 'news feed'—the stream of posts users see," resulting in these links disappearing from Facebook's platform.[8] The glitch caused traffic to several popular websites to "fall off a cliff." This incident shows the growing importance of social media to the delivery of news reports. Indeed, this graphic shows that Facebook has begun to outstrip Google in the number of visitors who click on a link on its platform to visit another website:

---

[7] Jeff Bercovici, *Gannett Building Paywalls Around All Its Papers Except USA Today*, FORBES, Feb. 22, 2012, http://www forbes.com/sites/jeffbercovici/2012/02/22/gannett-building-paywalls-around-all-its-papers-except-usa-today/ (attached hereto as **Exhibit 139**).

[8] Lukas I. Alpert, *Publishers Warily Embed With Facebook*, WALL STREET JOURNAL, May 11, 2015, http://www.wsj.com/articles/publishers-warily-embed-with-facebook-1431387002 (attached hereto as **Exhibit 140**).



Similarly, Facebook announced last week an experiment called "instant articles" that will make articles from nine media companies, including the *New York Times*, available directly on the Facebook service.[9] As expressed by one columnist, "If you want to read the news, Facebook is saying, come to Facebook, not to NBC News or The Atlantic or The Times—and when you come, don't leave."[10] Of course, to the extent that Facebook's experiment is allowed to go forward, it will be with the authorization and approval of the media companies, who will in turn receive important remuneration for the use of their content.

9. As a result of this change in viewership behavior, television producers are increasingly working to expand their already plentiful online and digital offerings. For example, on April 12, 2015, HBO released a new stand-alone streaming service that gives purchasers access to "every episode of every season of the best of HBO's award-winning original

---

[9] Claire Cain Miller, *Why Facebook's News Experiment Matters to Readers*, NEW YORK TIMES, May, 14, 2015, at B3, *available at* http://www nytimes.com/2015/05/15/upshot/how-facebooks-experiment-changes-the-news-and-how-it-doesnt.html (attached hereto as **Exhibit 141**).

[10] *Id.*

programming, plus exclusive Hollywood blockbusters" without a cable or satellite subscription.[11] Similarly, a few months ago, Sling TV (a subsidiary of Dish Network) launched a new over-the-top service that streams live television channels over the Internet.[12] The service allows non-Dish subscribers to watch a package of television channels that include CNN, ESPN, AMC, TBS, Lifetime, and Bloomberg Television. It delivers the same content that airs on standard television, including any commercial breaks or national advertisements, but as a licensed product, the television channels receive a portion of Sling TV's profits.

10. As discussed in my report, by making their content available through online and digital distribution, television producers are able to further monetize their content in multiple ways. ***First***, many services require payment of a subscription fee either for the service itself, as is the case for HBO Now and Sling TV, or as part of a broader traditional cable or satellite subscription package, such as Fox News' TVEverywhere and CNN's CNNgo offerings. *See* Knobel Decl. ¶¶ 52, 54. In the latter case, television producers are paid higher affiliate fees by cable and satellite companies if they can guarantee a bigger online and digital audience for their content. ***Second***, these services often include banner and/or pre-roll advertising, from which the television producers also receive money. ***Third***, because these services generally are provided on the television producer's own website or mobile application, the services serve as an enticement bringing new viewership to the content producers' digital properties, on which they will see other advertisements as well as promotional material for other programs.

11. In my report, I also discussed another growing component of television producers' digital and online offerings: the sale and license of video clips for internal and intra-

---

[11] HBO Now Homepage, https://order hbonow.com/ (attached hereto as **Exhibit 142**).

[12] David Katzmaier, *Sling TV:Everything you need to know*, CNET, Jan. 20, 2015, http://www.cnet.com/news/sling-tv-everything-you-need-to-know/ (attached hereto as **Exhibit 143**).

company purposes. Knobel Decl. ¶¶ 139–46. This was also the subject of extensive testimony during Mr. Karle's deposition, during which it was made clear that internal use is a well-known and established market for digital content. In fact, Mr. Karle testified during his deposition regarding such licensing when he worked as a lawyer at the *Wall Street Journal*. Specifically, he discussed the document attached hereto as **Exhibit 144**, which was the *Wall Street Journal's* licensing and republishing policy in February 2008. As Mr. Karle's testimony and the document confirm, the *Wall Street Journal* licensed its content for all manner of internal uses, including:

- Purchasing single copies of articles for personal use;
- Including content in PowerPoint presentations; and
- Downloading content for internal corporate use.

Consistent with my report, Mr. Karle testified that the *Wall Street Journal's* purpose in licensing this content was to "extract revenue."[13]

12. As discussed in my report, numerous other media organizations monetize their content this way. Knobel Decl. ¶¶ 43, 139–52. Mr. Karle disputes my conclusion, Karle Decl. 113–22, but there is ample evidence supporting my opinion. For instance, NBC Universal offers an archive of video clips of "Universal Newsreels as well as MSNBC, CNBC, and NBC's local stations."[14] One of the use categories that NBC offers for these video clips is "Corporate/Government," which includes both "internal" and "external media."[15] The description of the internal Corporate/Government license is:

---

13 Excerpts from Mr. Karle's deposition are attached to the Declaration of Joshua L. Simmons, Esq., dated May 21, 2015.

14 NBC Universal Archives Homepage, http://www nbcuniversalarchives.com/ (attached hereto as **Exhibit 145**).

15 Rights Definitions, NBC Universal Archives, http://www nbcuniversalarchives.com/nbcuni/showUsageAgreement.do (attached hereto as **Exhibit 146**).

> The use and/or exhibition of Content limited to one project designed to train or develop employees or to present the corporate message, vision, or policies. This license may not be used for any promotion, advertisement, or public service announcement, and the project/production may not be sold for consideration.

It is intended for certain types of media channels, such as "a single individual project/production that will have limited distribution, such as a single trade show, a one-day internal corporate event or similar one-time events." It "does not include any website or Internet."

13. Similarly, as discussed in my report, Fox News has entered into numerous agreements that license its content for use internally on company intranets. Knobel Decl. ¶¶ 141–46. A collection of such licenses is attached hereto as **Exhibit 147**.

14. In addition to content producers directly licensing their works, the Copyright Clearance Center was designed to act as an intermediary between those that want to license a work and the copyright holder. CCC licenses rights for a wide-variety of materials including "books, journals, newspapers, magazines, movies, television shows, images, blogs and ebooks."[16] As depicted in the following image from a summary of CCC's Annual Copyright License, CCC routinely licenses content for all manner of "internal use":

| COVERAGE PROVIDED BY THE ANNUAL COPYRIGHT LICENSE |
|---|
| Download, save to corporate-owned hard drive or network drive and/or copy-and paste Web-based or other digital content. |
| Print out Web-based or other digital content onto paper or overhead slides. |
| Share digital content with co-workers via e-mail, intranet posting, CD-ROM, PDF, printed copy, fax, etc. |
| Share a single electronic copy of an article with a client, customer, or prospect upon request.* |
| Photocopy from a newspaper, magazine, book, journal, research report or other published document (including e-books and blogs). |
| Share photocopied content with co-workers via paper copies or fax. |
| Preserve digital content as part of the storage of a team's work product. |
| Store electronic copies of articles. |
| Share digital content via collaboration applications such as Lotus Notes and Microsoft SharePoint®. |
| Submit properly marked electronic copies of articles to government agencies for regulatory filings. |
| Submit properly marked photocopies of articles to government agencies for regulatory filings. |
| Scan printed works into digital form when an electronic version of the work is not readily available. |
| Use published content (including e-books and blogs) in a slide presentation or CD-ROM delivered to an internal audience. |

---

[16] About Us, COPYRIGHT CLEARANCE CENTER, http://www.copyright.com/content/cc3/en/toolbar/aboutUs html (attached hereto as **Exhibit 148**).

In particular, CCC will grant permission to post "digital content on your corporate website" or "intranet."  In addition to the Annual Copyright License, CCC offers a motion picture license that allows use for "sales meetings, employee training and development programs, company functions and more."  All uses, however, are subject to the general restriction that the license "does not include any right to create a library or collection intended to substantially replace the need for a particular Work."  In other words, CCC intentionally ensures that a market will exist for the works it licenses and that any use will not supersede them in the market.  Materials describing CCC's licensing options are attached hereto as **Exhibit 149**.

15.     Getty Images offers a similar license for "Corporate: Limited or Internal" use.  It is designed for "[u]se in any medium targeting an internal . . . audience."  It explicitly carves out "internet or email use."  Its intended uses include internal presentations, employee training videos, non-televised pilots, and shareholder meetings.[17]

16.     Finally, contrary to Mr. Karle's opinion that broadcasters only care about monetizing the external distribution of their content, Karle Decl. ¶¶ 115–16, it is common industry practice to include in the terms of use of a media company's website a prohibition against the reproduction and redistribution of its content for any purpose.  For example, NBC's Terms of Use state that users may not "copy, download, stream capture, reproduce, duplicate, archive, distribute, upload, publish, . . . broadcast, perform, display, sell, transmit or retransmit the Content unless expressly permitted by [the content owner] in writing."  CNN and the *New York Times* include similar restrictions.  The NBC, CNN, and New York Times terms of use referenced in this paragraph are attached hereto as **Exhibit 151**.

---

[17]  Rights Ready Footage, GETTY IMAGES.COM, http://imagery.gettyimages.com/pdf/footage/RR_footage_pricingPDF_lores.usa.pdf (attached hereto as **Exhibit 150**).

## II. THERE IS SIGNIFICANT EVIDENCE OF EXTERNAL USE OF TVEYES-CREATED VIDEO CLIPS

17. In my report, I indicated that, in November 2014, "I found tens of thousands of hyperlinks on social media platforms and other Internet websites that link to high definition video clips archived on TVEyes' services, including 60,000 hyperlinks across the Internet and over 25,000 on Facebook alone—all obtained from TVEyes." Knobel Decl. ¶ 11. In his report, Mr. Karle indicated that he attempted to replicate my results. During my deposition, I was asked to explain "exactly how you conducted this search?" *See* Deposition of Beth Knobel, Ph.D., Apr. 10, 2015 ("Knobel Dep.") at 98:11–12.[18] I provided a fulsome explanation of my process. *Id.* at 92:15–102:13. I also answered numerous follow up questions, and repeatedly offered to re-run the search live during the deposition. *Id.* at 111:21–22 ("I could do that search at any moment including right now."), 128:21–24 ("And we certainly [could] do that search right now, if you'd like an exact number . . . ."), 132:8–10 ("[T]hat number would be easy for use to determine sitting here right now . . . ."), 134:6–8 ("[W]e could do such a search right now and come up with a number which I would be happy to do . . . ."). Counsel for TVEyes, however, refused to allow me to do so. *Id.* at 129:2–4 ("[T]his is my deposition and we will do what I want to do, not what you want to do."), 147:19–24 ("Actually, I'm going to . . . I'm going to stop this testimony right now . . . I couldn't be less interested.").

18 Excerpts from my deposition are attached hereto as **Exhibit 152**.

18.     After my deposition, I caused the document attached hereto as **Exhibit 153** to be created, which was used as Exhibit 44 during the deposition of Mr. Karle.  It reflects the results of a search conducted on April 16, 2015 using the methodology that I referenced in my report and discussed during my deposition of entering the following query into the Google Internet search engine:

"mms.tveyes.com/*" OR "mediacenter.tveyes.com/*" OR
"s3.amazonaws.com/TVEyesMediaCenter/*" -site:tveyes.com

The query was constructed by including each of the root URLs I am aware of that result in video clips hosted by TVEyes' servers: mms.tveyes.com, mediacenter.tveyes.com, and s3.amazonaws.com/TVEyesMediaCenter.  Each root URL was followed by a wild card character (indicated by the * symbol), which ensures that all URLs that contain the root URL will be included (*e.g.*, a search for mediacenter.tveyes.com/* would return among its results websites on which the following URL was posted:

http://mediacenter.tveyes.com/downloadgateway.aspx?UserID=275209&MDID=2909241&MD Seed=7195&Type=Media).  The root URLs with the wide card characters were enclosed in quotation marks so that only those URLs would be included, and they were separated by the Boolean operator OR to indicate that webpages containing any of the URLs (as opposed to all of the URLs) should be returned.  In addition, I included the search term -site:tveyes.com, which excludes any webpages at the tveyes.com domain name.  In other words, my search includes any webpage that contains a link to a TVEyes-created video clip, except TVEyes' own webpages.

19.   **The search resulted in 142,000 results**, which indicates over 140,000 instances in which links to TVEyes-created video clips were posted on the Internet on that date:



When a user clicks on any of these links to TVEyes-created video clips, she is taken not to the content producer's website, but to TVEyes' servers.  As a result and as discussed in my report, TVEyes diverts the user from Fox News' websites and other online and digital properties, where they would see pre-roll and banner advertising, and instead the user is directed to TVEyes' service.  Knobel Decl. ¶¶ 83–109.  This clearly harms Fox News' derivative businesses.

20.   As with any search of an Internet search engine, my results have certain limitations in capturing the full scope of Internet-posting by TVEyes' subscribers.  For example, as my search only was conducted on April 16, 2015, it cannot reflect all links to TVEyes-created video clips posted on the Internet over a period of time.  The way that Google provides search results is that a user's query is compared to the information in Google's database at the date and time the search is run.  As a result, the number of results reported by Google only reflects the comparison of the search query to the database at that time, making it underinclusive as it would not include webpages that existed prior to or after that time.  For instance, it does not include links that were posted on the Internet and then removed before the search was conducted, or links posted after the search was conducted.  Similarly, the search only reflects public facing websites that allow Google to include their content in its search results.  As discussed in my report, some websites (including TVEyes itself), use a technical feature to omit themselves from

Google's search results.  Knobel Decl. ¶¶ 218–19.  Moreover, Google's search engine does not include links forwarded in e-mails or content downloaded as high definition video files using the TVEyes Content-Delivery Features.

21.     Another reason that Google's search results are underinclusive is that TVEyes' subscribers often times use URL shorteners so that they can post links to video clips on social media platforms that limit the number of available characters for a post.  For instance, on Twitter, users are limited to 140 characters per Tweet.  As a result, they often use URL shorteners, such as bitly, to convert long URLs into shorter ones (e.g., the URL for the TVEyes-created video clip of the Fox News Channel available at http://mediacenter.tveyes.com/downloadgateway.aspx?UserID=275209&MDID=2909241&MDSeed=7195&Type=Media was converted to the shortened URL of http://bit.ly/1GhBiSc).  When the shortened URL is clicked, the user is directed to the original website, but Google does not register the original URL in its search results.  As an example, on May 17, 2015, I caused a search on Twitter's search engine to be conducted for the phrase:

"mms.tveyes.com/*" OR "mediacenter.tveyes.com/*" OR "s3.amazonaws.com/TVEyesMediaCenter/*"

The search returned over **3,500 Tweets containing links to TVEyes-created video clips in the last year alone** (not including posts that had been taken down prior to my search), which are attached hereto as **Exhibit 154**.[19]  In numerous instances, the Tweets used URL shorteners, which Twitter's results (but not Google's search results) are able in some instances to resolve to the original URL before returning as a result in its search engine.  For example, the following

---

[19]     Due to the high volume of Tweets returned by my search, it was not possible to PDF the results.  Thus, I have saved an offline copy of the website, which is attached in the aforementioned exhibit.  For the convenience of the Court, I also have copied the Tweets into a Word document and created a PDF file, which is attached as **Exhibit 155**.  It is 990 pages long.

Tweet includes a bitly link that resolves to a TVEyes-created video clip of FNC content available at http://s3.amazonaws.com/TVEyesMediaCenter/UserContent/326797/4146820.8091/FNC_11-08-2014_08.36.30.mp4:[20]

22. In addition, while Google provides the number of results found in its database at the top of its search results page, Google does not return all of those results in the results list. Google does this by design. The Google search engine is intended as a consumer-facing product, and Google works hard to provide the most relevant search results for a given query. As a result, Google decided not to return every result in its database in response to user queries, thereby speeding up the search process. Indeed, Mr. Karle noted during his deposition that "Google is a consumer-focused product, and the number of consumers who want to click through 160,000 links or 8,000 links is very slight." Deposition of Stuart Karle, Apr. 23, 2015 ("Karle Dep.") at 279:3-6.[21] Nevertheless, as one commentator explained in the document attached hereto as **Exhibit 158**, "what the search results found number really means is how many mentions of that keyword they have in their database."

---

[20] I must note that this very clip is also available on Fox News' own website, illustrating yet another time a TVEyes client substituted in an unauthorized clip for the authorized one, harming Fox News. *See Beef jerky quickly becoming top selling snack*, Fox News, Nov. 8, 2014, http://video.foxnews.com/v/3881943342001/beef-jerky-quickly-becoming-top-selling-snack/ (attached hereto as **Exhibit 156**).

[21] Excerpts from Mr. Karle's deposition are attached hereto as **Exhibit 157**.

23.     Thus, although Google calculated that there were over 140,000 results for my April 16, 2015 query that looked for all the public facing links to video clips stored on the three TVEyes servers discussed above, Google only displayed about 600 of them when it delivered the the results of my search.  I have reviewed each of those 600 webpages, all of which are attached hereto as **Exhibit 159** and all of which contain video clips created using the TVEyes Content-Delivery Features.[22]  During my review, I discovered that in some instances the video clips created using the TVEyes Content-Delivery Features were being embedded on webpages.  As a result, it was not possible from the face of the webpage to identify that the video clip came from TVEyes.  Nevertheless, when I reviewed the HTML source code for the website,[23] it was clear that the video clip being displayed originated at TVEyes' servers.  For example, one organization posted the following clip from Fox News Channel in which Fox News' anchor discusses a letter the group had written to the Department of Justice (the webpage contains no discussion of the clip, but rather uses it as a promotional tool):



**Video Clip Posted on Cause of Action Website**

---

[22]     To the extent that I have identified additional webpages posting links to TVEyes-created video clips, I have included them in this exhibit as well.

[23]     It is simple to reveal the code for a webpage using an Internet browser.  I did so using the Develop menu of the Safari browser.

The webpage itself does not indicate that the clip came from TVEyes, but the source code for the webpage shows that the embedded video clip originates from TVEyes' servers:

```
<video class="wp-video-shortcode" id="video-8136-1" width="640" height="360"
preload="metadata" controls="controls"><source type="video/mp4"
src="http://s3.amazonaws.com/TVEyesMediaCenter/UserContent/325420/4688758.7978/FNC_03-27-
2015_05.16.26.mp4?_=1" /><a
href="http://s3.amazonaws.com/TVEyesMediaCenter/UserContent/325420/4688758.7978/FNC_03-27-
2015_05.16.26.mp4">http://s3.amazonaws.com/TVEyesMediaCenter/UserContent/325420/4688758.797
8/FNC_03-27-2015_05.16.26.mp4</a></video></div>
```

**HTML Source Code for Website at**
**http://causeofaction.org/watch-cause-of-actions-letter-to-doj-on-fox-news/**

Where necessary to show linking to TVEyes' servers, I have included the relevant source code with the webpage in the exhibit discussed in this paragraph.

24. Other examples from Exhibit 159 include webpages posting video clips with content from copyright holders such as Fox News, CNN, MSNBC, ESPN, BBC World, and local stations, to underline my assertions that the TVEyes Content-Delivery Feature are used to post links to video clips on the public-facing internet and that, as a result, those features threaten the entire television industry:

- On April 9, 2014, M3D, a 3D printer company, posted a video clip to a Fox Business Network on its Twitter page:



- On January 18, 2013, ETL Associates, Inc., a sports management company, posted a video clip from the Fox Business Network on its Facebook page:



- Lucid Innovation, a product design company, posted a video clip from Fox News Channel to promote Lucid's BoxKart toy design being included in Fox News' Top Toy Trends for 2014:



- On March 31, 2013, Congressman Elijah Cummings posting a link to a video clip from WBAL-BAL (NBC) on Facebook:



- On April 2, 2013, the Illinois Department of Commerce & Economic Opportunity posted a link in a Facebook message of a video clip containing coverage of the Department on CLTV:



- On February 1, 2012, the National Air Traffic Controllers Association, a labor union, posted a link to a TVEyes-created video clip of Fox News Channel coverage of one of its members:



- On May 29, 2011, the Harvard School of Engineering and Applied Sciences posted a video clip of an interview with one of its faculty members on CNN on its Facebook page:



- Reject and Protect, a coalition that objects to the Keystone XL pipeline, included numerous links to TVEyes-created video clips on its press page, including video clips containing content from Fox Business Network, MSNBC, Fox News Channel, and various NBC, CBS, and Fox affiliates:

FOX Business: http://mms.tveyes.com/transcript.asp?StationID=2025&DateTime=4/23/2014%202:25:57%20PM&playclip=true

MSNBC – All in With Chris Hayes: http://mms.tveyes.com/transcript.asp?StationID=205&DateTime=4/23/2014%203:05:27%20AM&playclip=true

FOX News – Special Report with Brett Baier: http://mms.tveyes.com/transcript.asp?StationID=130&DateTime=4/22/2014%206:14:36%20PM&playclip=true

WRC (NBC): http://mms.tveyes.com/transcript.asp?StationID=280&DateTime=4/22/2014%205:23:35%20PM

WUSA (CBS): http://mms.tveyes.com/transcript.asp?StationID=270&DateTime=4/22/2014%205:41:30%20AM

WTTG (FOX): http://mms.tveyes.com/transcript.asp?StationID=300&DateTime=4/22/2014%209:08:55%20AM

NewsChannel 8: http://mms.tveyes.com/transcript.asp?StationID=7005&DateTime=4/22/2014%204:22:01%20PM

- On November 2, 2014, Ashland University posted a link to a video clip from ESPN in its news center, touting one of its athletes:

On the Sunday night (Nov. 2) edition of ESPN SportsCenter's nightly Top 10 Plays segment, Eagles senior wide receiver Dan Piko's one-handed catch

11/02/14

On the Sunday night (Nov. 2) edition of ESPN SportsCenter's nightly Top 10 Plays segment, Eagles senior wide receiver Dan Piko's one-handed catch from redshirt freshman quarterback Travis Tarnowski was ranked third. The catch came during the 37-14 win Saturday (Nov. 1) night at Grand Valley State.

Piko finished the night with a career-high-tying nine catches for the second time in the last four contests. Tarnowski ended the victory with career-highs in completions (27) and attempts (49), and five yards short of his career high in passing yards (369).

View the catch at --
http://mms.tveyes.com/transcript.asp?StationID=175&DateTime=11%2F3%2F201...

- On October 2, 2011, the BYU Students for Mitt Romney Facebook page posted a link to a TVEyes-created video clip of Mitt Romney being interviewed by Mike Huckabee on the Fox News Channel:

BYU Students for Mitt Romney
October 2, 2011

The former foes sit down for a chat.

Mitt Romney stops by HUCKABEE on Fox News Channel

Rush transcript and flash video.

MMS.TVEYES.COM

Like · Comment · Share

25. In light of my review of the webpages returned by Google from my query, I have no reason to believe that the other 142,000 results in Google's database would not contain similar links to TVEyes-created video clips.

26. In his report, Mr. Karle attempted to replicate the results of my search queries. Mr. Karle's methodology, however, suffered from three critical flaws, making it underinclusive. ***First***, Mr. Karle did not properly preserve his search query so it cuts off in the middle of its search terms:

"mediacenter.tveyes.com" OR OR OR "mms.tveyes.com" OR OR OR "s3.a

**The Preserved Version of Mr. Karle's Search Query**

As a result, we cannot confirm what terms he used to conduct his search or whether he improperly narrowed the search query. ***Second***, Mr. Karle did not include a wild card character in his search, which likely resulted in undercounting. ***Third***, Mr. Karle's search query includes two extra Boolean OR connectors between his search terms. Based on his deposition testimony, I suspect that this was caused by Mr. Karle's incorrect use of Google's Advanced Search feature. According to his testimony, Mr. Karle entered his search terms into the Advanced Search in the row labeled "any of these words" and separated them with the word "OR." By doing so, when the search was conducted, Google automatically added additional Boolean OR connectors between the search terms. For example, by entering the phrase "this OR that" into the same row, Google's search query would be the following:

As Mr. Karle did not properly preserve his search results, I cannot tell whether his search included additional errors or was otherwise improperly narrowed to by underinclusive. Even so, Mr. Karle still identified thousands of instances in which links to TVEyes-created video clips were posted on the Internet. Karle Decl. Ex. 12. In other words, Mr. Karle's own evidence

overwhelming and convincingly contradicts his assertion that TVEyes clients do not post video clips generated by TVEyes externally.

## III. TVEYES' SUBSCRIBERS ARE PRIMARILY FOR-PROFIT COMPANIES AND PUBLIC RELATIONS PROFESSIONALS

27. In my expert report, I discussed the substantial harm caused by the TVEyes Content-Delivery Features to Fox News' online and digital markets. Knobel Decl. ¶¶ 83–109, 139–46. In an attempt to rebut my analysis, Mr. Karle relied on three documents that TVEyes produced on March 6, 2015 (the day before Mr. Karle's report was served). Karle Decl. ¶¶ 30–32, 110–11. As these documents were produced three months after my report was served, I did not previously have the opportunity to address them. The documents purport to reflect the types and numbers of TVEyes clients that viewed, downloaded, and "shared . . . through TVEyes' share e-mail feature" video clips from the Registered Works.

28. As a preliminary matter, TVEyes' categorization of its clients as reflected in the documents is unreliable, as neither the documents nor Mr. Karle's report indicate the methodology by which the subscribers were categorized. Indeed, it is impossible to tell to which TVEyes subscribers these documents are meant to refer or how those clients used the TVEyes service.

29.

[24] While I categorize for-profit corporations, journalism organizations, media organizations, and sports organizations separately in the attached spreadsheet, I have combined them for purposes of this statistic.



31. To visually assist the court, I have created appropriate highlighting in the Customer Contact List reflecting each of these categories: PR firms are highlighted in green, PR contacts that are clear on the face of the list are highlighted in yellow, and PR contacts that I located through independent research are highlighted in blue. The document is attached hereto as **Exhibit 162**, and one page from it reflects the following:

---

[25] The documents used to identify public relations professions not otherwise listed in the Customer Contact List are attached hereto as **Exhibit 161**.



32. My categorization of TVEyes' subscribers, of course, is underinclusive as some subscribers do not list an individual as its contact, making it impossible to research; listed a contact that did not have publicly available information about his or her occupation; or listed a contact in the finance or accounts payable department, who likely merely is responsible for bill payment.

33. Nevertheless, anecdotal evidence provides further support for my conclusion. For example, Mr. Karle attached to his report a set of e-mails that show communications within the White House. Karle Decl. Ex. 4. From my review of those communications, it is clear that the TVEyes service is being used by press officers at the White House and other government organizations. For example, in one e-mail, an intern forwards a video clip created using TVEyes to [REDACTED] -Broadcast Media Director; [REDACTED] Deputy Press Secretary; and [REDACTED] a White House press assistant. *Id.* at FOXNEWS0002768. The video clip is then forwarded to at least 125 individuals, as well as two additional distribution lists (one of which appears to be the White House press mailing list). *Id.* In another e-mail, one White House intern forwards a video clip to

another White House intern, whose title is "Media Affairs Intern" within the "WHO Communications Department." *Id.* at FOXNEWS0002770. That intern then forwards the video clip to another large distribution group.

34. In another anecdotal example, the Office of the Secretary of Defense and Joint Staff released a set of documents to the *New York Times* as part of a FOIA request and published them on its website, which is attached hereto as **Exhibit 163**. One of those documents contains an e-mail titled "Monday TV Clips" that was forwarded from an individual whose name has been redacted to 19 individuals who appear to be public affairs professionals, including Dorrance Smith, then Assistant Secretary of Defense for Public Affairs; Allison Barber, then Deputy Assistant Secretary of Defense for Internal Communications and Public Liaison; Bryan Whitman, then Deputy Assistant Secretary of Defense for Media Relations; and Eric Ruff, then-Press Secretary and Deputy Assistant Secretary of Defense for Public Affairs. Among other things, the e-mail contains a link to a TVEyes-created video clip of Fox News Channel content. The e-mail is attached hereto as **Exhibit 164**.

35. Finally, I reviewed the TVEyes subscribers that the Court specifically highlighted in its September 9, 2014 opinion. Op. 5. A number of them, however, have been listed on TVEyes' Inactive Customer List, including the White House (as discussed above, the evidence reflects use by its public affairs group), [REDACTED]

[REDACTED]

[REDACTED] Declaration of David Ives, dated June 26, 2014, (Dkt. No. 53) Ex. E, at 1–4, 17, 21, 26.

36. As to the remainder, each was used by the organization's PR, communications, or public affairs group just as with the Department of Defense. For example, numerous accounts

supposedly used by members of Congress actually were purchased by the members' communications directors and press secretaries, as opposed to the White House Chief of Staff or the President's policy advisors. Simmons Decl. Ex. 119, at 18–22. [REDACTED] Finally, the PR groups at ABC Television Group and the Marines used the TVEyes Content-Delivery Features to publicly post video clips on Facebook and their websites:

```
<MFR_Outside_Wire_RSS>
    <SiteTitle>tveyes.com</SiteTitle>
    <StoryDate>2014-11-11T00:00:00</StoryDate>
    <Headline>Marine Corps Band New Orleans- WVUE-NO (FOX)</Headline>
    <StoryURL>http://mms.tveyes.com/Transcript.asp?StationID=1425&DateTime=11/11/2014%205:10:44%20PM&Term=+"New%20Orleans"%
        20+Marines+"New%20Orleans"%20+Marine%20-forecast&PlayClip=TRUE</StoryURL>
</MFR_Outside_Wire_RSS>
```

**Exhibit 167**.[26]

37. In other words, regardless of what organizations TVEyes claims to provide services or how it attempts to categorize them, it is clear that the TVEyes Content-Delivery Features have been designed, marketed, and promoted to public relations and communications professions for the external posting of high definition video clips. *See* Knobel Decl. ¶¶ 60–82.

[26] The image on the right is a reproduction of XML data, which was publicly posted on the Marines' website. Such data is often used by websites to automatically generate content. For example, the XML data here appears to have been used at one time to generate the news stories that would appear on the Marines' website.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of May, 2015.

Beth Knobel

Beth Knobel, Ph.D.