```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
FOX NEWS NETWORK, LLC,                                       :
                                                             :   **OPINION AND ORDER**
                                  Plaintiff,                 :   **REGULATING ISSUES OF FAIR**
        -against-                                            :   **USE AND GRANTING CROSS-**
                                                             :   **MOTIONS FOR SUMMARY**
TVEYES, INC.                                                 :   **JUDGMENT**
                                                             :
                                  Defendant.                 :   13 Civ. 5315 (AKH)
                                                             :
------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

   TVEyes, Inc. ("TVEyes") is a media-monitoring service that records all content on more than 1,400 television and radio stations and transforms the content into a searchable database. Subscribers are able to track when, where, and how words of interest are used in the media, and can obtain transcripts and video clips of the portions of the television programs that use those words. Fox News Network, LLC ("Fox News") filed this lawsuit under the Copyright Act, 17 U.S.C. § 101 *et seq.*, claiming infringement of its copyrighted content seeking damages and an injunction barring TVEyes from copying and distributing clips of Fox News programs.[1] TVEyes asserts the affirmative defense of fair use. In 2014, the parties cross-moved for summary judgment. In an Opinion and Order dated September 9, 2014, I upheld TVEyes' affirmative defense of. *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379 (S.D.N.Y. 2014). However, I reserved judgment with respect to four features of the service, finding the factual record inadequately developed to grant summary judgment to either party at that time. Specifically, TVEyes allows users to archive videos, download videos, share videos by e-mail,

---

[1] Fox News also sought to recover under New York tort law for "hot news" misappropriation. I held that claim preempted by the Copyright Act, and dismissed the claim in my previous Order. *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379 (S.D.N.Y. 2014).

and search for content by date and time, rather than by keyword. The parties pursued additional discovery with respect to these features, limiting experts to one per side, followed by renewed briefing on the open issues, focusing on the following questions:

> 1) Whether each function in question is integral to TVEyes' transformative purpose, and
>
> 2) Whether each function in question threatens Fox News' derivative business.

This Order now resolves the renewed cross-motions for summary judgment. For the following reasons, I find that TVEyes' archiving function is fair use; that its e-mailing function, if subjected to various protections, can be fair use; but that the downloading and date-time search functions are not fair use.

## THE PARTIES

### i. *TVEyes*

As I explained in my previous opinion, *TVEyes,* 43 F. Supp. 3d at 379, familiarity with which is assumed, TVEyes creates a searchable database of virtually all television and radio content by using closed-caption technology and recording broadcasts through standard cable services such as Comcast and Cablevision. TVEyes allows users to track the usage of words or phrases of interest, and to view the transcripts and video clips of the portions of the television broadcast that use the search term. The purpose is to give subscribers "access, not only to the news that is presented, but to the presentations themselves," for both are news: the subject that is reported, as well as the manner in which it is reported. *Id.* at 393. TVEyes is a for-profit business with over 22,000 subscribers. It markets itself to businesses and government agencies, and counts among its subscribers the White House, Department of Defense, over 100 members of Congress, and various news and non-profit organizations. It is not open to the general public.

TVEyes subscribers may set "watch lists" for terms and receive real time alerts when the terms are used. Subscribers may also search past broadcasts, for which video is saved for 32 days. When a matching segment is located, the user can view the matching transcript and video clip up to ten minutes long, although the vast majority of clips are shorter than two minutes. The video clip is also accompanied by important analytic data such as the segment's Nielsen viewership rating, the frequency with which the term has been mentioned over a specified time period, and the geographic markets and channels where the term is used. These searching, indexing, and display features make up TVEyes' core function.

TVEyes also provides a suite of functions that complement its core service. The first of these functions is "archiving." TVEyes users are able to "archive" video clips that appear in response to their search queries to a personal digital library on TVEyes' server. Archiving a video keeps the video available indefinitely to that subscriber.[2] A second complementary function is "e-mailing." Subscribers can share links to the video clips with others by e-mail, allowing the recipients of the link to view the video clip on TVEyes' server through their web browsers.[3] TVEyes does not utilize an authentication process to limit viewing to authorized users. A third complementary function is "downloading." Subscribers are able to download copies of identified digital video clips to their computers for offline use and permanent storage. TVEyes places no technological restriction on its subscribers' use or distribution of downloaded video clips, nor does it utilize any method of identifying the clip as sourced from TVEyes. And a fourth complementary function is "date-time search," by which users can retrieve video clips of

---

[2] Videos are otherwise purged from TVEyes' servers after 32 days.

[3] The links to videos can also be posted to social media services, such as Facebook or Twitter. TVEyes concedes that such posting is not fair use and is not integral to its service, and it claims to have implemented a series of measures that prevent the videos from being accessed through social media. The efficacy of those measures is disputed, however. TVEyes will have to demonstrate that its measures will be reasonably effective.

3

chosen networks according to the date and time slots of the broadcasts. The issue in the instant motions is whether each of these four functions constitutes fair use. TVEyes has the burden to prove its affirmative defense, as I later discuss.

### ii. *Fox News*

Again, as I discussed in my previous decision, 43 F. Supp. 3d at 379, Fox News is an international television news organization that owns and operates Fox News Channel ("FNC") and its financial news counterpart, Fox Business Network ("FBN"). FNC is in the business of reporting news worldwide on a twenty-four hour news cycle, and has been the most watched cable news network for the past 11 years. Its primary competitors are cable television channels MSNBC and CNN.

Viewers generally watch Fox News on television through their cable TV subscriptions, but Fox has a growing online presence as well. For example, live online streams of FNC and FBN are available to viewers with cable or satellite subscriptions through Fox's TVAnywhere platform for authenticated streaming. In addition, Fox makes a limited number of video clips available on its websites, FoxNews.com and FoxBusiness.com, although the amount of content is sharply limited by Fox's contracts with the cable companies. Currently, only about 16% of broadcast content is available on Fox's website. Fox receives advertising revenue when viewers watch videos on its websites, including revenue from banner advertisements on the page itself, and from "pre-reel" advertisements that play before a video clip begins. Fox also has agreements with syndication partners, including Yahoo!, Hulu, and YouTube, "to store and show video clips of segments of its program[s] on their websites, thereby generating another stream of income." *TVEyes*, 43 F.Supp.3d at 387. And Fox licenses its video clips to clients, including companies, journalists, and politicians, through its agents, ITN Source and Executive Interviews.

However, licensees must "covenant that they will not show the clips in a way that is derogatory or critical of Fox News." *Id.* Together, Fox News' online distribution and licensing services make up its "derivative business."

Fox invests significant resources in creating content and covering news stories. It alleges that, by making Fox News' content available to TVEyes subscribers, TVEyes is diverting potential licensees, website visitors, and therefore revenue, from Fox.

## LEGAL STANDARD

### *i. Summary Judgment*

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding the motion, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The court should also "eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d. 113, 122 (2d. Cir. 2004). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving] party's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### *ii. Copyright Infringement*

The Copyright Act grants authors "a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014). A *prima facie* case of infringement requires an author to show only (1) ownership of a valid copyright, and (2) unauthorized copying of the copyrighted

work. *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

### *iii. Fair Use*

Fair use is an affirmative defense to copyright infringement. *Am. Geophysical Un. v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994). It allows for a user to use copyrighted materials without permission of the author when "necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful arts.' *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8). The Copyright Act itself provides illustrative examples of fair use, including such "purposes [] as criticism, comment, news reporting, teaching, . . . scholarship, or research." 17 U.S.C. § 107. The statutory list is not exhaustive. Fair use requires a fact-intensive and context-specific evaluation, *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006), whether "the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (internal quotations omitted). *See also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1110 (1990).

The Copyright Act, 17 U.S.C. § 1707, provides four guiding factors for evaluating a fair use defense. First, the Court must examine the purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes. The "central purpose of this investigation" requires evaluating whether the new work "merely supersedes the objects of the original creation," or "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 578-

6

79. Second, the Court should look at the nature of the copyrighted work. The fair use defense is stronger when the nature of the copyrighted work is factual rather than fictional. *See Harper & Row Publishers, Inc. v. Nation Enters.* 471 U.S. 539, 563 (1985). Third, the Court should weigh the amount and substantiality of the portion used in relation to the copyrighted work as a whole. This step requires the Court to ask "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014). Finally, the Court must examine the effect of the use upon the potential market for or value of the copyrighted work. The key inquiry at this stage is whether economic injury results from the secondary use serving as a substitute for the primary work. *Id.* at 99. Courts may consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in substantially adverse impact on the potential market . . . [including] the market for derivative works." *Campbell*, 510 U.S. at 590 (internal quotations omitted). Courts must balance "the benefit the public will derive if the use is permitted [against] the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448 F.3d at 610.

## PROCEDURAL BACKGROUND

Fox News brought this action for infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, alleging that TVEyes copied and infringed 19 hour-long programs that aired on Fox News Channel and Fox Business Network between October 16, 2012 and July 3, 2013 (the "Works-in-Suit"). The 19 Works-in-Suit are: two episodes of *On the Record with Greta Van Susteren*; three episodes of *Special Report with Bret Baier*; three episodes of *The Five*; four episodes of *The O'Reilly Factor*; two episodes of *The Fox Report with Shepard Smith*; four episodes of *Hannity*; and one episode of *Special Report Investigates: Death & Deceit in*

7

*Benghazi.* In 2014, the parties cross-moved for summary judgment. I denied Fox's motion and granted TVEyes' motion in part, finding that TVEyes' core function – recording content, putting it into a searchable database and, upon a keyword query, allowing users to view short clips of the content up to 32 days from the date of airing – constitutes fair use. *Fox News Network, LLC v. TVEyes, Inc.,* 43 F.Supp.3d 379 (S.D.N.Y. 2014)

In reaching that conclusion, I looked first at the purpose and character of TVEyes' use and found it transformative because it serves a different purpose than the original. While Fox aims to report the news, TVEyes aims to monitor what the media reports as news, the latter having qualities of news in its own right. For example, the 2012 attack on the U.S. Embassy in Benghazi was important news, but so was Fox News' intense focus on the story. TVEyes was unique in providing such a reliable "database of *everything* that television channels broadcast, twenty-four hours a day, seven days a week." *Id.* at 392.[4] I found that the character of the service was unlike the news clipping service in *Associated Press v. Meltwater U.S. Holdings*, 931 F.Supp.2d 537 (S.D.N.Y. 2013), which simply "crawled" the internet for news and indexed it. Instead, "TVEyes' search results show the combination of visual images and text in a medium that raises the commentator to have the qualities of news itself." *Fox News Network, LLC v.*

---

[4] Fox notes that since the previous set of briefs, a public, non-profit entity called the Internet Archive TV News Archive has emerged to perform the same function as TVEyes. The TV News Archive is expressly permitted by Congress to "reproduce[e] and distribut[e] by lending of a limited number of copies and excerpts . . . of an audiovisual news program." 17 U.S.C. §§ 108(a) 108(f)(3). Fox argues that the allowance for TV News Archive necessarily indicates that Congress did not intend to allow a commercial library like TVEyes to provide the very same service, under the *expressio unius* canon of construction. However, TVEyes rightly points out that the allowance for TV News Archive is not dispositive. The authorizing statute, 17 U.S.C. § 108(f)(4), expressly provides that "[n]othing in this section . . . in any way affects the right of fair use as provided in section 107." And even if it did intend to preempt co-extensive services, TVEyes goes far beyond what the TV News Archive offers. For example, the record shows that TV News Archive records content only in San Francisco, Washington DC, and Philadelphia; it has a 24-hour delay; it does not allow automatic monitoring; it lacks Nielsen viewership and publicity information; and the search function fails to capture some matching results. *See* 2d Karle Decl. ¶ 48-50. For a service whose value rests in universal monitoring, these shortcomings are important. I decline to change my prior fair use ruling because of arguments based on TV News Archive.

*TVEyes, Inc.*, 43 F.Supp.3d 379, 392 (S.D.N.Y. 2014). I found that a better analogy was Google's library digitization project in *Authors Guild, Inc. v. Google, Inc.*, 954 F.Supp.2d 282 (S.D.N.Y. 2013), which allowed users to search a particular book to see how many times a word or phrase appears, and provided a "snippet" view of the page. In order to provide its transformative service, I found that TVEyes must be allowed to show clips of the matching video segments because "[t]he actual images and sounds depicted on television are as important as the news information itself—the tone of voice, arch of an eyebrow, or upturn of a lip can color the entire story, powerfully modifying the content." *TVEyes*, 43 F.Supp.3d at 392.

I next looked at the nature of the copyrighted work and explained that, although "news itself is not subject to copyright protection, [] the creative expression and artistic license necessarily exercised in deciding how to portray, film, direct, stage, sequence, and communicate this information [can be protected]." *Id.* Still, I found that the factual nature of the content weighs in TVEyes' favor.

Third, I looked at the amount and substantiality of the portion used. I explained that while it was true that TVEyes copied all of Fox News' content, no one else did that, including Fox News itself, and that providing a reliable, 24/7, all-inclusive service was transformative. "The value of TVEyes' database depends on its all-inclusive nature." *Id.* If TVEyes did not provide a comprehensive database, its transformative value would be compromised. Indeed, reproducing only *some* of Fox's content might more likely be considered unjustified infringement.

Finally, I weighed the effect on the potential market for the copyrighted work against the benefit to the public from a service like TVEyes. I found that the notion that people will watch FNC's content on TVEyes rather than FNC, thereby depressing FNC's viewership

ratings and, in turn, its carriage fee, was pure speculation. There was no evidence of market substitution, and I found support for the proposition that such copying would be unlikely from *Authors Guild, Inc. v. Google, Inc.*, 954 F.Supp.2d 282 (S.D.N.Y. 2013). In that case, the Court considered that it was unlikely that users would go through the trouble of "input[ting] countless searches [into Google] to try and get enough snippets to comprise an entire book." Similarly, I thought it unlikely that TVEyes users would go through the trouble of running countless searches to reconstruct a full TV broadcast. Meanwhile, the service provides a substantial benefit to the public. No other service allows subscribers to comment on and criticize broadcast news channels, governments to monitor the accuracy of media reports and make timely corrections, political campaigns to monitor political advertising and candidate appearances, financial firms to archive public statements by employees for regulatory compliance, the Army to track media coverage of military operations in remote locations, and journalists to research, report on, and compare news coverage. *TVEyes*, 43 F.Supp.3d at 392.

    On balance, I found that the factors supported a finding of fair use for TVEyes' core business. However, I found that the four complementary features at issue in the motions now before me – archiving, e-mailing, downloading, and date-time search – raised concerns and were not adequately explained. Therefore, I reserved judgment with respect to these features, and requested supplemental discovery and briefing. After such discovery, including depositions of one expert witness each, the parties filed renewed cross-motions for summary judgment on May 21, 2015. I heard argument on July 28, 2015, and now issue this decision.

## DISCUSSION

    At the outset, I note that Fox News' submission devotes substantial effort to re-litigating my previous finding of fair use. That was not the purpose of the supplemental

discovery and motion practice. None of the arguments persuades me to change the rulings I made in my Opinion of September 9, 2014.

I now turn to the four complementary features at issue in the instant cross-motions.

### i. *Archiving*

Once a user locates a video clip through a TVEyes search, he can press a button to "archive" the clip, which causes the clip to be listed in the subscriber's "Media Center." The Media Center is the interface through which a user plays content on the TVEyes website. Archived clips are not stored on a subscriber's own computer; they are stored on TVEyes' servers. The act of archiving achieves two benefits for a user. First, it allows users to revisit clips they have already found at later dates. Without the archiving function, a subscriber would have to conduct a search from scratch every single time he wanted to view a particular clip. Second, an archived clip will remain available to a user indefinitely. Ordinarily, content remains searchable and viewable on TVEyes' servers for 32 days, after which content will no longer appear in search results and will no longer be viewable. However, when a user archives a clip within the 32-day window, it will remain saved on TVEyes' server. Only the user who archives a particular clip is able to access it after 32 days; the clip will not appear in search results by other users.

TVEyes argues that the ability to archive video clips is integral to its service, and I agree. Requiring users to go through repeated searches every time they want to view previously identified clips would place needless obstacles in the path of prospective researchers, critics, and commentators, and would sharply curtail the value of TVEyes' service. And without the ability to revisit content older than 32 days, longer-term, longitudinal studies of the media's treatment of

particular subjects would be impossible. Such subjects as the media's changing treatment of a particular story over time, and disparities between two networks' treatment of a given topic, are themselves newsworthy. *See, e.g.*, 3d Rose Decl. ¶ 16 & Ex. TTTTT ("According to TVEyes, Fox News has mentioned Benghazi 1,886 times in the past 3 months, or an average of about 21 times a day. That's compared to 721 mentions on MSNBC (along with 718 instances of 'Schmengazi') and only 687 for CNN"). The ability to detect these patterns and trends is an essential feature of the transformative service that TVEyes provides. TVEyes is transformative because it "convert[s] copyrighted works into a research tool to further learning," allowing its subscribers to "research, critici[ze], and comment." *TVEyes* 43 F. Supp. 3d at 394. Content does not suddenly become unfit for fair uses on the 33rd day after its creation.

Justice Holmes, in his dissenting opinion in *Abrams v. United States*, 250 U.S. 616, 630 (1919), explained that "the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ." The quote came in the context of a First Amendment challenge to the convictions of five men for circulating literature intended to undermine the WWI war effort, but it has application here, too. Justice Holmes was expressing the Constitution's support for a free and open "marketplace of ideas." *Consolidated Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537-38 (1980). Democracy works best when public discourse is vibrant and debate thriving. But debate cannot thrive when the message itself (in this case, the broadcast) disappears after airing into an abyss. TVEyes' service allows researchers to study Fox News' coverage of an issue and compare it to other news stations; it allows targets of Fox News commentators to learn what is said about them on the network and respond; it allows other media networks to monitor Fox's coverage in order to criticize it. TVEyes helps promote the free exchange of ideas, and its archiving feature aids that purpose.

Archiving video clips to remain stored beyond 32 days and to facilitate successive reference is integral to TVEyes' service and its transformational purpose of media monitoring. And Fox has not identified any actual or potential market harm arising from archiving.[5] I hold that the archiving function is fair use, complementing TVEyes' searching and indexing functions.

### ii. *E-mailing and Sharing*

TVEyes' permits its subscribers to share identified video clips with others by sending them a URL link to the video on the TVEyes' server. The recipient, by clicking the link, can play the video clip through his web browser, alongside the transcript of the clip. Unless downloaded – a feature that will be discussed shortly – the video clip remains on TVEyes' server only; it does not reside on the user's computer. The link is public, meaning the recipient does not need to possess TVEyes login credentials in order to access the video. Technically, the video can be shared through any medium that allows transmission of text (e.g. e-mail, social media, instant messaging), but TVEyes concedes that social media sharing is not integral to its service. It expressly allows subscribers to share links via e-mail, however, and maintains that the e-mailing feature is fair use on the ground that "email is the primary tool used to communicate and collaborate with co-workers, supervisors, and decision-makers." TVEyes Mem. Law 23 (citing 4th Ives Decl. ¶¶ 10, 20 & Ex. AAAAA). For example, Congressional staffers share video clips among themselves; Congressmen share with members of Committees and caucuses; lawyers share with clients, etc. To prohibit e-mailing of videos would prevent relevant information from reaching the critical party.

---

[5] Fox argues that TVEyes threatens harm in derivative markets generally – chiefly licensing – but it has not isolated any harm resulting from archiving in particular.

13

I agree that to prohibit e-mail sharing would prevent TVEyes users from realizing much of the benefit of its transformative service. For example, members of Congress rely on TVEyes to be made aware of what the media has to say about the issues of the day and about them. But their interns and staffers, not they, sit at computers querying keywords of interest through the TVEyes portal, and then e-mail the results up the chain of command. Without e-mail, the Congressman would be limited to either sharing a computer with his staffer or else having the staffer describe the contents of the clip to the Congressman without showing him the clip. In practice, the former is unrealistic and the latter fails to deliver "the full spectrum of information . . . [including] what was said, [and] how it was said with subtext body language, tone of voice, and facial expression—all crucial aspects of the presentation of, and commentary on, the news." *Fox News Network, LLC v. TVEyes, Inc.*, 43 F.Supp.3d 379 (2014).

There are many players in the marketplace of ideas, each with supporting staffs of employees, interns, and independent consultants. And once information is located, parties must be able to transmit that information as part of comment, criticism, and debate. E-mailing of URL links allows information to reach the individuals who need to know what is being said in order to engage in news reporting, commentary, criticism, teaching, scholarship, research, and other fair uses permitted by the Copyright Act. *See* 17 U.S.C. § 107.

However, there is also substantial potential for abuse. In its current incarnation, TVEyes' e-mailing feature cannot discriminate between sharing with a boss and sharing with a friend, nor between sharing for inclusion in a study and sharing a clip for inclusion in a client sales pitch. Fair use cannot be found unless TVEyes develops necessary protections. What limits

should be placed on subscribers who share links through social media?[6] What can prevent subscribers from sharing for purposes not protected by § 107? If TVEyes cannot prevent indiscriminate sharing, it risks becoming a substitute for Fox's own website, thereby depriving Fox of advertising revenue. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (Courts may consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in substantially adverse impact on the potential market . . . [including] the market for derivative works.").

TVEyes has the burden to show fair use. *Am. Geophysical Un. v. Texaco, Inc.*, 600 F.3d 913, 918 (2d Cir. 1994). It must develop protocols to reasonably assure that, when subscribers share video clips, they do so consistent with § 107. Until the development of reasonable and adequate protections and a satisfactory showing thereof, TVEyes' e-mailing function cannot be considered fair use.

### iii. *Downloading*

When a subscriber identifies a clip, he can click a button on the page that downloads the clip to his computer as a local media file. The clip can then be viewed offline, without requiring access to TVEyes' server, and can be stored permanently in the subscriber's own computer memory. Downloaded clips contain no identifiers, such as watermarks, and can be shared with and accessed by anyone. There is also no "digital rights management" software that limits access rights, as with some other forms of multimedia.

---

[6] TVEyes claims to block users from viewing videos that are accessed through social media sites such as Facebook and Twitter, but Fox argues that the blocks are ineffective. Fox is correct. TVEyes has not shown how it limits the publication of shared information beyond subscribers. Indeed, TVEyes' own representatives and marketing materials have emphasized subscribers' ability to share information through social media.. *See* Knobel Decl. Ex. 21 at TVEYES-037904 ("You can then use the clips in your Public Awareness campaigns! . . . Post clips on Facebook, YouTube, and Twitter on an unlimited basis!").

I believe that TVEyes' downloading function goes well beyond TVEyes' transformative services of searching and indexing. *See New York Times Co., Inc. v. Tasini*, 533 U.S. 483, 498 (2001) (online news database violated authors' distribution rights by selling electronic copies of their articles for download); *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 651 (S.D.N.Y. 2013) ("[A]n electronic file transfer is plainly within the sort of transaction that [the Copyright Act] was intended to reach.") (quoting *London-Sire Records, Inc. v. Doe*, 542 F. Supp. 2d 153, 173-74 (D. Mass. 2008); *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 913 (N.D. Ca. 2000) ("Plaintiff persuasively argues that downloading MP3 files does not transform the copyrighted music."); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (concluding that repackaging copyrighted recordings in MP3 format suitable for downloading "adds no 'new aesthetics, new insights and understandings' to the original"). TVEyes is transformative because it allows users to search and monitor television news. Allowing them also to download unlimited clips to keep forever and distribute freely may be an attractive feature but it is not essential. Downloading also is not sufficiently related to the functions that make TVEyes valuable to the public, and poses undue danger to content-owners' copyrights.

TVEyes claims that downloading is "absolutely critical" because it allows for offline use, but very few remaining locations in the United States lack internet connectivity by modem, broadband, or wireless access. *See* Knobel Decl. ¶ 235. TVEyes claims that downloading local files allows users to transfer video clips easily between devices like laptops, tablets, and cell phones, but each of those devices can already access video clips online, almost as easily. *Id.* And TVEyes claims that downloading allows researchers to improve efficiency by organizing related clips into folders, which TVEyes' online Media Center does not allow. *See*

16

Karle Report ¶ 54. But a limitation in TVEyes' user interface is best remedied by improving the user interface; it does not justify creating a path for infringing the copyrights of others.

The downloading function, although convenient, is not integral to TVEyes' transformative purpose. Convenience alone is not ground for finding fair use. *See Am. Geophysical Un. v. Texaco, Inc.*, 60 F.3d 913, 923 (2d Cir. 1994) (rejecting fair use where employees photocopied scientific journals for "personal convenience"); *United States v. ASCAP*, 599 F. Supp. 2d 415, 429 (S.D.N.Y. 2009) ("copyright . . . is not designed to afford consumer . . . convenience") (quoting *MP3.Com,* 92 F. Supp. 2d at 352). I decline to find fair use with respect to the downloading function.

### iv. *Date-Time Search*

In addition to searching by keyword, TVEyes subscribers can search by date and time. The user enters the desired channel and the desired start and end date/time (up to a 10-minute window), and TVEyes produces the corresponding transcript and video clip. Date-Time searches constitute about 5.5% of all TVEyes searches.

TVEyes contends that the Date-Time search function is a necessary complement to its keyword search because, often, a keyword search fails to locate the desired video segment. The keyword search function is based largely on closed caption text, TVEyes argues, which makes it highly susceptible to error, particularly with respect to proper nouns and foreign words. For example, when "a customer from Senator Ted Cruz's staff could not locate an interview with Senator Cruz that aired on FBN, a TVEyes support agent discovered that his name was written as 'Ted Crews' in the closed captioning." 4th Ives Decl. ¶ 22. The problem could be particularly acute for foreign names having variant English transliterations. But Date-Time search does not remedy this problem. True, if the closed-caption transcription misspells a proper noun, the user

will be unable to find the matching segment through a keyword search. But neither will the user be able to locate the matching segment through Date-Time search unless he already knows the exact date and time slot the desired program aired. "Date-Time search" is therefore something of a misnomer. The feature is not as much a "search" tool as a content delivery tool for users who already know what they seek. In such cases, TVEyes is not so transformational, since users should be able to procure the desired clip from Fox News or its licensing agents, albeit for a fee. Put simply, if a user wants to watch the first half of last Thursday's *O'Reilly Factor*, the Court sees no reason why he should not be asked to buy the DVD/

Unlike TVEyes' core business, its "Date-Time search" function duplicates Fox's existing functionality. Fox's contention that TVEyes' Date-Time search is likely to cannibalize Fox News website traffic and sales by its licensing agents is persuasive. TVEyes "bears the burden of showing an absence of 'usurpation' harm" to Fox News. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 111 (2d Cir. 1998). I cannot say that it has carried its burden.

The "Date-Time search" function is not integral to TVEyes' core service and poses unique risks to Fox News' derivative businesses that TVEyes' core business does not. "Date-time search" is not fair use.

## CONCLUSION

For the foregoing reasons, TVEyes' archiving function qualifies as fair use, and its downloading and "Date-Time search" functions do not qualify as fair use. Its e-mailing feature can qualify as fair use, but only if TVEyes develops and implements adequate protective measures. The parties shall meet and jointly propose by September 11, 2015, a schedule for TVEyes to propose such protective measures, for Fox to respond, and, should the parties fail to reach agreement regarding the sufficiency of TVEyes' measures, for a joint submission for the

Court to resolve any disputed issues. If the parties fail to agree to a schedule by September 11, 2015, they shall appear for a status conference on Friday, September 18, 2015 in Courtroom 14D to discuss their respective difficulties. The parties also shall suggest an appropriate decree, and advise the Court whether any issue of damages remains.

The motions for leave to file amici curiae briefs (Doc. Nos. 116, 121, 128) are granted. The briefs were read and considered. The Clerk shall mark those motions, terminated.

The Clerk shall also mark the supplemental motions for summary judgment (Doc. Nos. 110, 111), terminated.

SO ORDERED.

Dated:    August 25, 2015
          New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge